UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

v.

Michael Binday, *et al.*,

               *Defendants.*

Case No. 12-CR-152 (CM)

ECF Case

**MICHAEL BINDAY'S OPPOSITION TO THE GOVERNMENT'S MOTIONS**
***IN LIMINE* AND MOTIONS RELATED TO FEDERAL RULE OF EVIDENCE 404(B)**

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York  10017
Tel.: (212) 856-9600

*Attorneys for Defendant Michael Binday*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 3

    I.   The Government's Motion to Preclude Evidence and Argument that the
       Insurers Acted Negligently Should be Denied ................................................. 3

          A.   The Defendants Do Not Intend to Introduce Evidence
               of "Victim" Negligence as a Defense .......................................... 4

          B.   Evidence of Insurer Underwriting and STOLI
               Practices are Admissible to Negate Materiality ........................... 8

    II.    The Court Should Deny the Government's Motion to Limit Evidence of
        the Insurers' Failure to Rescind STOLI Life Insurance Policies ........................ 10

    III.   Because the Government's Motion to Preclude Evidence and Argument
        that the Insurers Suffered No Actual Economic Harm Seeks to
        Constructively Amend the Indictment, the Indictment Should be
        Dismissed ......................................................................................................... 13

          A.   The Government's New Found Reliance on an
               Uncharged "Right to Control" Theory of Mail and
               Wire Fraud Warrants Dismissal of the Current
               Indictment ................................................................................... 15

                  1.   The Indictment Does Not Allege a "Right to Control"
                      Theory of Mail and Wire Fraud ....................................... 15

                  2.   The New "Right to Control" Theory Contradicts This
                      Court's December 2012 Order ........................................... 21

                  3.   The Government's Intent to Present an Uncharged
                      "Right to Control" Theory of Fraud at Trial
                      Constitutes an Improper  Constructive Amendment of
                      the Indictment Requiring Dismissal ................................. 23

          B.   The Evidence of Actual Economic Harm to the
               Insurers is Critically Relevant to Several Defenses—
               There Was No Scheme to Defraud; Any
               Misrepresentations Were Immaterial; and, There is
               No Proof of Criminal Intent ........................................................ 26

i

IV.     The Court Should Reject the Government's Attempt to Preclude Evidence of the Complicity of Insurance Company Employees ........................................... 29

V.      The Government's Motion to Preclude Evidence of the Insurers' Participation in the Life Settlement Market Should Be Denied ........................... 30

VI.     Evidence of the Life Settlement Market is Admissible to Prove that Misrepresentations About Insurable Interest Were Not Material to the Insurers ................................................................................................................. 33

VII.    No Defendant Intends to Rely on an Advice-of-Counsel Defense ...................... 34

VIII.   The Government's Motion to Introduce Mr. Binday's Proffer Statements Should Be Denied as Premature and the Court Should Order the Government to Immediately Redact Its In-Depth Summary of Mr. Binday's Statements in its Motion Papers ............................................................ 34

IX.     The Court Should Deny the Government's Efforts to Preclude the Admission of Largely Unidentified Statements Attributable to Mr. Binday ........ 36

X.      Evidence and Argument About the Defendants' Legitimate Insurance Business Should Not Be Precluded........................................................................ 37

XI.     The Court Should Prohibit the Government From Relying on Facts Relating to Mr. Binday Regarding a Previously Dismissed Obstruction Charge ................................................................................................................... 38

XII.    The Court Should Prohibit the Government from Introducing Statements Mr. Binday Made to the New York State Insurance Department......................... 41

XIII.   Evidence of Purported Efforts to Influence a Witness Is Irrelevant to Conduct Charged Against Mr. Binday and Risks Spillover Prejudice ................. 44

XIV.    Evidence of Mark Resnick's Alleged Underpayment of Taxes Should be Excluded .............................................................................................................. 44

CONCLUSION.................................................................................................................. 47

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

<u>Brogan v. United States</u>, 522 U.S. 398 (1998).............................................................. 7

<u>Epstein v. Kalvin-Miller Int'l, Inc.</u>, 121 F. Supp. 2d 742 (S.D.N.Y. 2000) ................................. 42

<u>James v. Gilmore</u>, No. 03-CV-0868, 2009 WL 435286 (W.D.N.Y. Feb. 20, 2009) ................... 36

<u>Madeira v. Affordable Hous. Found., Inc.</u>, 469 F.3d 219 (2d Cir. 2006)............................... 41, 44

<u>Palmieri v. Defaria</u>, 88 F.3d 136 (2d Cir. 1996)............................................................. 36

<u>Regent Office Supply Co.</u>, 421 F.2d 1174 (2d Cir. 1970) ...................................................... 30, 31

<u>S.E.C. v. DiBella</u>, No. 3:04CV1342(EBB), 2007 WL 2904211 (D. Conn. Oct. 3, 2007) ............................................................................................................................. 6

<u>States v. Autuori</u>, 212 F.3d 105 (2d Cir. 2000).............................................................. 44

<u>Stirone v. United States</u>, 361 U.S. 212 (1960).............................................................. 27

<u>United States v. Afjehei</u>, 869 F.2d 670 (2d Cir. 1989) .................................................... 47

<u>United States v. Annabi</u>, No. S1 10 Cr. 7 (CM), 2012 WL 489111 (S.D.N.Y. Feb. 14, 2012) ...................................................................................................................... 38

<u>United States v. Attanasio</u>, 870 F.2d 809 (2d Cir. 1989)........................................................... 11

<u>United States v. Babajian</u>, No. CR 07-00755 DDP, 2009 WL 412333 (C.D. Cal. Feb. 17, 2009) ......................................................................................................... 9

<u>United States v. Binday</u>, 908 F. Supp. 2d 485 (S.D.N.Y. 2012)......................................... *passim*

<u>United States v. Blumhagen</u>, No. 03-CR-56S, 2005 WL 3059395 (W.D.N.Y. Nov. 15, 2005) ...................................................................................................................... 27

<u>United States v. Bowe</u>, 360 F.2d 1 (2d Cir. 1966)........................................................ 44

<u>United States v. Brand</u>, 467 F.3d 179 (2d Cir. 2006) .................................................... 47

<u>United States v. Bruno</u>, 661 F.3d 733 (2d Cir. 2011) .................................................... 25

<u>United States v. Cheng</u>, 131 F.3d 132, 1997 WL 738588 (2d Cir. 1997) ................................... 10

<u>United States v. Cushing</u>, No. S3 00 CR. 1098(WHP), 2002 WL 1339101 (S.D.N.Y. June 18, 2002)........................................................................................... 45

United States v. D'Amato, 39 F.3d 1249 (2d Cir. 1994) ........................................................... 5, 6

United States v. Deutsch, 451 F.2d 98 (2d Cir. 1971) ................................................................ 48

United States v. Finazzo, No. 10-CR-457 (RRM), 2011 WL 3794076 (E.D.N.Y. Aug. 24, 2011) ......................................................................................................... 26, 30

United States v. Garcia, 291 F.3d 127 (2d Cir. 2002) ............................................................... 47

United States v. Gonzalez, 110 F.3d 936 (2d Cir. 1997) ........................................................... 43

United States v. Gordon, 987 F.2d 902 (2d Cir. 1993) .............................................................. 47

United States v. Hatfield, 685 F. Supp. 2d 320 (E.D.N.Y. 2010) .............................................. 45

United States v. Hathaway, 798 F.2d 902 (6th Cir. 1986) ......................................................... 25

United States v. Henry, 29 F.3d 112 (3d Cir. 1994) .................................................................. 24

United States v. Johnson, 139 F.3d 1359 (11th Cir. 1998) ........................................................ 7

United States v. Kaiser, 609 F.3d 556 (2d Cir. 2010) ............................................................... 43

United States v. LaFlam, 369 F.3d 153 (2d Cir. 2004) .............................................................. 47

United States v. Lesniewski, No. 11 Cr. 1091, 2013 WL 3776235 (S.D.N.Y. July 12, 2013) .................................................................................................... 8, 12, 48

United States v. Levis, 488 F. App'x 481 (2d Cir. 2012) ..................................................... 28, 35

United States v. McDonough, 56 F.3d 381 (2d Cir. 1995) .................................................... 17, 26

United States v. Mollica, 849 F.2d 723 (2d Cir. 1988) .............................................................. 25

United States v. Neder, 197 F.3d 1122 (11th Cir. 1999) ........................................................... 7

United States v. Nixon, 418 U.S. 683 (1974) ............................................................................ 6

United States v. Novak, 443 F.3d 150 (2d Cir. 2006) ............................................................... 29

United States v. O'Connor, 580 F.2d 38 (2d Cir. 1978) ............................................................ 42

United States v. Ozsusamlar, 428 F. Supp. 2d 161 (S.D.N.Y. 2006) ........................................ 38

United States v. Powell, 509 F. App'x 958 (11th Cir. 2013) ...................................................... 8

United States v. Rigas, 490 F.3d 208 (2d Cir. 2007) ................................................................ 43

United States v. Roshko, 969 F.2d 1 (2d Cir. 1992) .................................................................. 26

United States v. Russo, 74 F.3d 1383 (2d Cir. 1996) ...................................................... 5

United States v. Rybicki, 287 F.3d 257 (2d Cir. 2002) ................................................ 29

United States v. Saadey, 393 F.3d 669 (6th Cir. 2005) ................................................ 46

United States v. Scott, 677 F.3d 72 (2d Cir. 2012)....................................................... 48

United States v. Shellef, 507 F.3d 82 (2d Cir. 2007)............................................. *passim*

United States v. Starr, 816 F.2d 94 (2d Cir. 1987) ............................................... 29, 44

United States v. Stavroulakis, 952 F.2d 686 (2d Cir. 1992) ........................................ 19

United States v. Thomas, 377 F.3d 232 (2d Cir. 2004) ................................................. 8

United States v. Torres, No. 06 Cr. 808, 2008 WL 2977884 (S.D.N.Y. Aug. 4,
    2008) ........................................................................................................................ 36

United States v. Weatherspoon, 581 F.2d 595 (7th Cir. 1978).................................... 7

United States v. Weiss, 752 F.2d 777 (2d Cir. 1985) .................................................. 25

United States v. Zemlyansky, No. 12 Cr. 171 (JPO), 2013 WL 2151228 (S.D.N.Y.
    May 20, 2013)......................................................................................................... 19

United States v. Zingaro, 858 F.2d 94 (2d Cir. 1988) ................................................ 27

Vought, No. 3:05CR268 (JBA), 2006 WL 1662882 (D. Conn. June 15, 2006)........... 6

Weiss v. La Suisse, Societe D'Assurances Sur La Vie, 293 F. Supp. 2d 397
    (S.D.N.Y. 2003)....................................................................................................... 39

Wisdom v. Undercover Police Officer # C0127, 879 F. Supp. 2d 339 (E.D.N.Y.
    2012) ....................................................................................................................... 42

## INTRODUCTION

On February 15, 2012, after a two and one-half year investigation, a grand jury sitting in this District charged Defendants Michael Binday, James Kevin Kergil, and Mark Resnick with mail and wire fraud, and conspiracy to commit mail and wire fraud.[1]  Until August 20, 2013, the government's theory of its prosecution—as set forth in the indictment—was specifically and solely predicated on the fact that misrepresentations made by the Defendants in life insurance applications caused no fewer than ten insurance companies *not to receive specific economic benefits* they otherwise expected.[2]  To that end, the indictment boldly pronounces that the numerous insurance company "victims" "*were financially harmed in issuing such policies*," that their "*cash flow . . . decreased*," and that they "*received less income than they expected*." Indictment ¶¶ 4, 10(b), (d), Feb. 15, 2012, ECF No. 1 (emphasis added).  The indictment then goes on to detail four specific ways in which these Insurers suffered *actual* financial and economic harm.  Id. ¶¶ 10(a)-(d).  In December 2012, this Court held that the indictment survived the Defendants' motion to dismiss because the indictment specifically alleged that the

---

[1] This brief is submitted by Mr. Binday on behalf of all Defendants.  We are submitting an omnibus response to the government's fourteen individual evidentiary motions, which it also submitted in a single brief, in an effort to respond to the government's motions in a manner most convenient for the Court.

[2] The insurance company "victims" in this case (the "Insurers") are:  American General Life Insurance Company ("American General"); Aviva Life & Annuity Company of New York ("Aviva"); AXA Equitable Life Insurance Company ("AXA"); John Hancock Life Insurance Company ("John Hancock"); Lincoln Benefit Life Company ("Lincoln Benefit"); Lincoln National Corporation and The Lincoln National Life Insurance Company (collectively "Lincoln National"); MetLife Investors USA Insurance Company ("MetLife"); Massachusetts Mutual Life Insurance Company ("Mass Mutual"); PHL Variable Insurance Company and Phoenix Life Insurance Company (collectively "Phoenix"); Pruco Life Insurance Company ("Prudential"); Security Mutual Life Insurance Company of New York ("Security Mutual"); and Sun Life Assurance Company of Canada ("Sun Life"); and The Union Central Life Insurance Company ("Union Central").

Insurers suffered actual economic harm.  United States v. Binday, 908 F. Supp. 2d 485, 491 (S.D.N.Y. 2012).

Disguised as a motion *in limine*, the government suddenly and remarkably reverses course and attempts to argue on the eve of trial that this case is not about economic harm after all.  Without any explanation, it informs this Court that despite the allegations in the indictment, it does not intend to prove that the "victim" Insurers suffered *any* economic harm; instead, it intends to prove an uncharged theory of mail and wire fraud and seeks a ruling prohibiting the Defendants from presenting their defense that the Insurers did not suffer economic harm as a result of their involvement with stranger originated life insurance ("STOLI") policies.  See Gov't Mem. in Supp. of Motions *in Limine* Part III, Aug. 20, 2013, ECF No. 230 [hereinafter "Gov't Mot."].  These tactics are improper, unlawful and jeopardize the Defendants' fundamental right to present a defense to the charges filed against them.  The Court should not permit the government to run away from the specific theory of fraud charged in its own indictment.

Within the last few weeks, the parties received evidence in response to Rule 17 subpoenas issued by the Defendants demonstrating unambiguously that the Insurers' issuance of STOLI policies did not cause them *any* economic harm, unequivocally rebutting the government's theory of mail and wire fraud.  Based on this exculpatory evidence, which disproves the scheme to defraud alleged in the indictment, the government should have dismissed the indictment.  But rather than dismiss, the government at this late stage, without seeking input from a grand jury, unilaterally attempts to change its theory of prosecution on the fly in its motion papers, explicitly converting a mail and wire fraud case brought under United States v. Shellef into a "right to control" case.  This is improper.

If the government insists on relying on a new and uncharged "right to control" theory of fraud in a case where the indictment fails to set forth a single "right to control" allegation, the Court should dismiss the indictment now.  Alternatively, if the Court declines to dismiss the indictment, it should—as it suggested in its order denying Defendants' original motion to dismiss—order the government to prove the charges upon which it indicted, namely that the Insurers were defrauded because they did not receive economic benefits that they otherwise expected.  If the government knows now that it cannot prove those charges relating to economic harm, it should voluntarily seek a dismissal of this indictment.

For these reasons and those set forth in more detail below, the Court should deny the government's sweeping motions *in limine* and motions related to F.R.E. 404(b) evidence.

## ARGUMENT

### I.     The Government's Motion to Preclude Evidence and Argument That the Insurers Acted Negligently Should be Denied

The government contends that the Defendants should be precluded from introducing any evidence that the Insurers "acted negligently or carelessly" in the face of Defendants' alleged fraud by failing to properly screen for STOLI policies.  Gov't Mot. at 8.  The government's motion must be denied for two reasons.  *First*, the Defendants do not intend to introduce evidence of the Insurers' *negligence* as a defense, but instead intend to present evidence concerning the Insurers' *institutional awareness and encouragement* of the Defendants' activities to demonstrate not only that the Insurers were not defrauded, but that there was no scheme to defraud anyone here.  *Second*, what the government characterizes as impermissible evidence of "victim negligence" may be introduced to negate the government's evidence that the alleged misrepresentations were material.  If the Insurers carefully verified the medical information, but chose not to verify the financial information (bearing in mind that they received higher premiums

on multi-million dollar policies issued to individuals with a stated higher net worth), that choice indicates that the financial information did not matter to the Insurers and therefore the alleged misrepresentations were immaterial.   The Court should deny the government's motion and admit evidence of the Insurer's underwriting and STOLI screening practices.

A.      **The Defendants Do Not Intend to Introduce Evidence of "Victim" Negligence as a Defense**

The government's motion rests on the uncontroversial proposition that "negligence or lack of diligence or reasonableness on the part of a target of a fraudulent scheme is no defense" to mail or wire fraud.  Id. at 9.  That argument, however, misses the mark entirely.  The Defendants do not intend to elicit evidence or argue that the Insurers were merely negligent or careless with respect to the Defendants' alleged misrepresentations.  Instead the evidence will show that the Insurers were well aware of, encouraged, or at a minimum, consciously avoided, the Defendants' efforts, along with the efforts of hundreds of other similarly-situated life insurance agents, to procure life insurance policies for sale to investors.  Because this evidence is relevant to show there was no scheme to defraud and that the Insurers were not misled, it should not be precluded from this trial.

The Defendants will offer evidence such as the decision by American General, effective September 1, 2006, to loosen its financial underwriting procedures by rolling back its earlier requirement that applicants for life insurance age 70 and older applying for a policy of $1 million or more provide tax returns.  Ex. 1.  This choice was not negligent; it was an intentional adjustment to a corporate policy and demonstrates that the stated net worth of the applicant was immaterial.  The evidence will show that this decision to forgo requiring the tax returns of applicants was made despite a contemporaneous analysis, identifying a massive influx of STOLI policies.  If American General had not abandoned its tax return requirement, it would have

4

undoubtedly had a simple method to test the validity of the financial representations at issue in this case.  Moreover, the evidence in this case makes clear that American General only did away with this tax return requirement after it determined that it was rooting out *too much* STOLI and impacting profitability.  Compare Ex. 2 (select portion of a July 6, 2006 email from Suzanne Barrall to Beverly Meyer, *et al.*, American General employees, stating:  "Our pending and newly received IOLI have continued to drop.  Total pending/cond issued cases have dropped from 659 on 5/19 [2006] to 372."), and Ex. 3 at 3 (American General "Profit Center Review Highlights," dated July 25, 2006, discussing certain universal life ("UL") product changes made effective May 18, 2006 "in an attempt to curb participation in IOLI transactions," and stating:  "UL production dropped $2 million in June due to refusing this business."), with Ex. 1 (Rolling back tax return requirement effective September 1, 2006).

Corporate awareness and policy-making such as this goes well beyond "purported negligence or lack of diligence by individual underwriters and employees" and is directly relevant to the Insurers' awareness concerning the Defendants' charged conduct.  Gov't Mot. at 13.  Such evidence is relevant because if the Insurers were not deceived, they were not victims of a scheme to defraud.  See United States v. Russo, 74 F.3d 1383, 1392-93 (2d Cir. 1996) (affirming mail fraud jury instruction which stated "if you find that the government has failed to prove beyond a reasonable doubt that [the victim] was deceived . . . you may not convict on the conspiracy charge based on the alleged scheme to defraud"); United States v. D'Amato, 39 F.3d 1249, 1259-60 (2d Cir. 1994) (insufficient evidence of intent to defraud where corporate employees were aware of and authorized the defendant's misrepresentations); see also S.E.C. v. DiBella, No. 3:04CV1342(EBB), 2007 WL 2904211, at *4 (D. Conn. Oct. 3, 2007) (citing

D'Amato for the proposition that "the Second Circuit reasoned that there could not be fraud where the supposed victim of the fraud acquiesced in the conduct and was not deceived").

In a case analogous to ours, United States v. Vought, the district court found, in the context of granting Defendant's motion to serve a Rule 17(c) subpoena, that evidence concerning the purported victim's awareness of the fraud was relevant and admissible.  Vought, No. 3:05CR268 (JBA), 2006 WL 1662882, at *16-17 (D. Conn. June 15, 2006) (citing United States v. Nixon, 418 U.S. 683, 699-700 (1974)).  In Vought, the defendant stock brokers sought to purchase subscriptions to an initial public offering ("IPO") at a price only offered to bank depositors, and identified, recruited and funded depositors who would purchase IPO shares and sell them to the defendants, despite signing and submitting to the bank a certification stating they would not sell to third parties.[3]  The depositors would then transfer the shares to the defendants, who ultimately sold the shares to investors.  Vought, 2006 WL 1662882, at *2.  The district court held that "information concerning the Bank's awareness that some of its stock purchasers were being financed by non-depositors would be relevant to the issue of whether the Bank was deceived. . . .  And . . . if the Bank was not deceived, the Government's fraud theory fails."  Id. at *17.  All mail and wire fraud charges brought against the Vought defendants were ultimately dismissed by the government or resulted in a verdict of not guilty.  Docket, United States v. Vought, No. 05-CR-268 (D. Conn.).

In spite of this well-established authority, the government attempts—without success—to assert that the victim's actual knowledge of the deceit is not a defense to mail and wire fraud.

---

[3] The Vought depositors submitted to the bank the following signed statements:  "I am purchasing solely for my own account, and there is no agreement or understanding regarding the sale or transfer of the shares or the right to subscribe for the shares."  Vought, 2006 WL 1662882, at *2.  Nevertheless, however, the depositors transferred their shares to the defendants, who sold them on to investors at a profit.  Id.

Gov't Mot. at 10-12.  It attempts to do so by mischaracterizing the fundamental underpinnings of

the charges here.  For instance, the government cites United States v. Neder, 197 F.3d 1122 (11th

Cir. 1999), but the cited language actually comes from Neder's parenthetical summary of United

States v. Johnson, 139 F.3d 1359 (11th Cir. 1998), which holds that under a completely different

statute, 18 U.S.C. § 1001, "[a]ctual knowledge by the government is not a defense to the

'materiality' requirement of *false statement prosecutions*."  Id. at 1364 (emphasis added); see

also Gov't Mot. at 10 n.10 (citing Justice Ginsberg's concurring opinion in Brogan v. United

States, 522 U.S. 398 (1998), concerning a false statement charge under Section 1001).  But as the

government should know, the elements of mail and wire fraud and false statements are different,

as are their proof requirements.  See United States v. Weatherspoon, 581 F.2d 595, 600 (7th Cir.

1978) ("[T]he mail fraud statute proscribes different conduct and requires proof of different

elements than the false statements statute.").  As such, the false statement cases it cites offer no

support for the government's argument.[4]

The government cites several cases which reflect the widely-accepted view that victim

negligence is not a defense to fraud, which arise from the principle that the choice of a gullible or

careless victim does not vitiate a defendant's intent to commit fraud.  See, e.g., United States v.

Thomas, 377 F.3d 232, 243 (2d Cir. 2004) ("We refuse to accept the notion that the legality of a

defendant's conduct would depend on his fortuitous choice of a gullible victim."); United States

v. Lesniewski, No. 11 Cr. 1091, 2013 WL 3776235, at *2 (S.D.N.Y. July 12, 2013) ("[T]he

Court cannot conceive of any reasonable ground under which . . . negligence or carelessness

---

[4] The government's brief also quotes extensively from another Eleventh Circuit case, United States v. Powell, an unpublished decision from February 2013 which has yet to be cited by another court, let alone a court in this Circuit.  Gov't Mot. at 11-12 (citing Powell, 509 F. App'x 958 (11th Cir. 2013)).  The Powell court's assertion that "[w]hether the lenders in this case knew . . . that the loan applications were fraudulent is of no consequence," id. at 967, does not comport with the mail and wire fraud standards in this Circuit.  See supra at 4-5.

would be relevant."). But, as <u>D'Amato</u> and <u>Russo</u> demonstrate, evidence of victim conduct which goes beyond mere negligence, demonstrating the victim's knowledge or acquiescence concerning the alleged fraud, refutes allegations of mail and wire fraud.

**B.      Evidence of Insurer Underwriting and STOLI Practices are Admissible to Negate Materiality**

As this Court has recognized in another case, "while negligence of the [victim] is no defense to fraud, [] the government also has to prove materiality, and [] the defense can, if it wishes . . . raise questions about materiality and introduce evidence . . . to [negate] whatever evidence the government decides to put in about materiality." Trial Tr., <u>United States v. Cherico</u>, No. 08-CR-786 (CM) (S.D.N.Y. Oct. 17, 2011), at 4:18-23. In addition to corporate policies like the American General documents discussed above, the Defendants also intend to introduce policy file-specific evidence demonstrating the Insurers' severe financial underwriting deficiencies and knowledge with respect to the life insurance policies at issue in order to disprove the government's contention that the alleged misrepresentations were material. This evidence will show how the Insurers' employees furthered the Insurers' complicity in accepting STOLI business and therefore will disprove materiality.

The government incorrectly contends that in <u>Cherico</u> this Court ruled that evidence of "negligence on the part of the targeted bank in implementing its policies . . . would only be allowed if . . . [the evidence] demonstrated 'particular lending practices [were being followed] as a matter of bank policy.'" Gov't Mot. at 12-13 (<u>quoting</u> <u>Cherico</u> Tr. at 5:24-25). However, the defense evidence being offered in <u>Cherico</u> was not specific evidence of a particular bank's underwriting policies with respect to the mortgage files at issue in the case; instead, the Court rejected defense attempts to imply that "there is a problem with the government's materiality evidence because of the subprime mortgage crisis that ensued some years later." <u>Id.</u> at 5:9-19.

8

The Court quite properly found that such generalized, post-hoc evidence was not relevant to an assessment of the materiality of specific information furnished to a particular bank several years earlier.  In contrast, the Defendants' approach here will be to introduce, among other things, policy file-specific and contemporaneous evidence (which the Court did not rule out in Cherico), "not to prove negligence but to [negate] the government's evidence of materiality."  Id. at 7:9-10 (citing United States v. Babajian, No. CR 07-00755 DDP, 2009 WL 412333, at *5 (C.D. Cal. Feb. 17, 2009)).

The government's contention that in Cherico this Court previously sustained "objections to cross-examination concerning purported due diligence failures," Gov't Mot. at 13, is also unsupported.  This Court did not bar cross-examination on specific due diligence failures with respect to the particular mortgage files at issue, but sustained objections to general questions concerning hypothetical underwriting practices that were arguably objectionable on a number of grounds.[5]  The Court's rejection of expert testimony as to "speculative things" that the "bank could have learned" is similarly inapplicable to the specific proof that the Defendants will offer as to what the Insurers *actually did learn*, but chose to ignore, about the policies at issue.  See Cherico Tr. (Oct. 26, 2011) at 1174:16-21.  Moreover, this evidence is relevant even under the objective materiality standard proposed by the government.  Gov't Mot. at 9-11.  As discussed in greater detail in Part II, infra, an objective materiality test does not preclude consideration of the Insurers' actual practices.

---

[5] See, e.g., Cherico Tr. (Oct. 19, 2011) at 560:8-16 (sustaining unspecified objection to question:  "Would it be fair to say you rarely [asked the borrower, look at all this information on the documents, was this accurate], correct?"); id. (Oct. 20, 2011) at 607:3-7 (sustaining unspecified objection to question:  "And at the same time, if [the closing department is] not concerned, as was the case here, they don't have to revoke [the mortgage closing], right, it's up to them?"); id. at 607:24-608:2 (sustaining unspecified objection to question:  "And if [the closing department does not] refer it to underwriting because they are comfortable with it, then it stays, correct?").

Finally, any concern that evidence regarding Insurers' STOLI and underwriting practices, either as a matter of established corporate policy, or with respect to each of the specific policy files at issue in this case, could lead to jury confusion over whether victim negligence is a defense can easily be mitigated by an appropriate instruction.  See United States v. Cheng, 131 F.3d 132, 1997 WL 738588, at *1 (2d Cir. 1997) (affirming district court "Rule 403 balancing in favor of admissibility which was properly reflected in its limiting instructions to the jury"); United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (citing with approval the imposition of "appropriate limiting instructions to the jury" rather than "exclusion of relevant evidence" under Fed. R. Evid. 403).  The government's motion to exclude evidence and argument concerning the Insurers' awareness of the charged conduct, as demonstrated through the Insurers' corporate policies and underwriting practices, should be denied.

## II.     The Court Should Deny the Government's Motion to Limit Evidence of the Insurers' Failure to Rescind STOLI Life Insurance Policies

The government argues that the Insurers' failure to contest or rescind life insurance policies they determined were STOLI is not relevant to the issues in this case.  Gov't Mot. at 14-17.  The government is wrong.  The Insurers' decision not to contest or rescind a life insurance policy is relevant to demonstrating the Insurers' tacit approval of STOLI policies.  If the Insurers knew that they were underwriting STOLI policies and continued to accept the high premium payments associated with those policies, that evidence would plainly show that that misrepresentations set forth in the insurance applications were meaningless to the Insurers.  That evidence also would show that even when the Insurers were on notice that a policy was STOLI, all that really mattered to them was the receipt of the premiums.  Put in the context of this Court's jury charge in the Cherico case, this evidence would constitute further proof that the misrepresentations were not "capable of influencing the [Insurers]." Cherico Tr. (Oct. 31, 2011)

at 1498:10-14.  Remarkably, here the government seeks to preclude this evidence even though it directly contradicts what the government informs the Court it intends to prove at trial:  that the Insurers would not have issued the policies had the applications been answered truthfully.

The government suggests that the Court should utilize an "objective" approach to materiality in this case, and therefore, not concern itself with the Insurers' actual response (or lack thereof) to the false statements contained in the life insurance applications.  But applying an "objective" approach does not and should not render evidence of the actual practices of an Insurer irrelevant.[6]  While the government is correct that juries are often instructed that a fact is material if it would "be of concern to a reasonable and prudent person who was relying on the statements," that general proposition cannot divorce itself from relevant facts demonstrating whether the misstatements were capable of influencing the person or entity relying on them.[7]  To the contrary, the relevance of the actual practices of these Insurers—some of the world's biggest and most profitable insurance companies—certainly will inform a juror's assessment of how insurance companies generally view this information in making its decision.  In fact, this Court's charge in Cherico contemplates exactly that approach:

---

[6] Moreover, whether an "objective" approach is applicable in this case is not a foregone conclusion in light of New York Insurance Law § 3105, which defines materiality in the context of misrepresentations made to an insurance company by a would-be purchaser of insurance policies, in part, as follows: "In determining the question of materiality, evidence of the practice of the insurer which made such contract with respect to the acceptance or rejection of similar risks shall be admissible."  N.Y. Ins. Law § 3105(b)(1), (c).

[7] Indeed, none of the cases cited by the government foreclose the use of factual evidence to prove objective materiality.  See, e.g., United States v. Lesniewski, No. 11 Cr. 1091, 2013 WL 3776235, at *3 (S.D.N.Y. July 12, 2013) (precluding certain factual evidence offered for the purpose of materiality but on the ground that it was not sufficiently probative of immateriality, not on the ground that it could have been subjective); cf. United States v. Boyd, 2 F. App'x 86, 90–91 (2d Cir. 2001) (summary order) (relying on the admission of "evidence of the victims' background and education"—i.e., subjective evidence—to affirm a jury finding "that the victims were objectively reasonable").

> The false representations and pretenses must be material.  We use the word material to distinguish between the kinds of statements that matter and those that are of no real importance.  A material fact is one that you would expect to be of concern to a reasonable and prudent person who was relying on the statements made to him and the accuracy of the information being provided to him in making a decision.  Before you can find that an untruthful statement or omission to be material, you must conclude that the statement or omission *was one that was capable of influencing the bank's decision and was intended by the defendant to influence the bank's decision...*It had to be capable of influencing *the bank*, and intended by the defendant to *influence the bank*, whether it influenced the bank or not.

Cherico Tr. (Oct. 31, 2011) at 1497:25-1498:14 (emphasis added).

Here, Defendants will present evidence that the misstatements could not have influenced *the recipient of the misstatements* (the Insurers) because those companies desperately wanted STOLI business regardless of misstatements concerning an applicant's finances and intent to sell a policy.  This Court's instruction in Cherico makes clear that a jury's consideration of materiality can focus on whether the misstatement could have influenced the company's decision.  And, in this case, further evidence of whether the Insurers' knowledge of the actual misrepresentations would have influenced their decisions to issue the policy is reflected in the Insurers' continued receipt of premium payments, even after the government began investigating and ultimately indicted these Defendants.  This evidence further demonstrates that even when it became crystal clear to the Insurers that the policies at issue in this case were STOLI, the Insurers chose not to distance themselves from these same policies that the government now claims victimized them.  To the contrary, nothing changed; the Insurers continued to keep this business on their books.  This continued embrace of STOLI even when the Insurers knew these policies were being challenged by the government is further evidence of the fact that the misrepresentations were not material to them.

Recognizing the power of this evidence, the government protests that the jury would be confused by its admission.  Far from confusing, this conduct is straightforward and makes clear that the Insurers both wanted and needed this business *even when they were put on notice by the government that these policies may have been obtained on the basis of false representations.* This is powerful evidence that the financial misrepresentations simply did not matter to the Insurers, directly rebuts the government's allegations of fraud and the Court should not exclude it.  Finally, the Court already found that this information is *relevant* to the issues in this case when it specifically authorized Mr. Binday to serve a Rule 17(c) subpoena requesting documents, *inter alia*, demonstrating whether any of the relevant life insurance policies have been rescinded, contested, litigated, or sought to be declared void by the Insurers.  See United States v. Binday, 12 Cr. 152, 2013 WL 4494659, at *3 (S.D.N.Y. Aug. 15, 2013) (applying the standard under Nixon and concluding that such documents are relevant, admissible, and specific).

**III.  Because the Government's Motion to Preclude Evidence and Argument that the Insurers Suffered No Actual Economic Harm Seeks to Constructively Amend the Indictment, the Indictment Should be Dismissed**

In a stunning turn of events on the eve of trial, the government moves to preclude the Defendants from showing that the insurance company "victims" suffered economic harm, Gov't Mot. at 17-19, notwithstanding the fact that the indictment explicitly alleges that the Insurers were defrauded by the Defendants because they were deprived of *specific economic benefits*. The indictment unambiguously charges the Defendants with mail and wire fraud under the theory approved in United States v. Shellef, 507 F.3d 82 (2d Cir. 2007), which explicitly requires that the government show that the insurance company "victims" did not receive a benefit they reasonably anticipated.  See id. at 109; Indictment ¶¶ 9-10, ECF No.1.  The

indictment alleges in no uncertain terms that the benefits not received by the Insurers were economic in nature, directly alleging that the Insurers "were financially harmed," that they actually "received less income than [they] expected," that they actually had to make "earlier payouts" of death benefits, and that they actually suffered "decreased cash flow."  Indictment ¶¶ 4, 10(d), Feb. 15, 2012, ECF No. 1.

Moreover, last year, in response to the Defendants' motion to dismiss the indictment, the government argued to this Court that its theory of fraud as set forth in the indictment should survive the motion because the indictment "alleges that the defendants' misrepresentations 'caused a discrepancy between the benefits reasonably anticipated by the [Insurers] and the actual benefits received, and then spells out four different ways in which the lies that the defendants told, caused to be told, and schemed to tell mattered to the [Insurers'] *bottom line.*" Gov't Mem. in Resp. to Defs.' Pretrial Mots. 8, Nov. 6, 2012, ECF No. 43 [hereinafter "Gov't Opp'n"] (emphasis added) (<u>citing</u> Indictment ¶¶ 9-10, ECF No.1).  Relying on the government's argument and the detailed allegations of economic harm in the indictment, this Court denied Defendants' motion to dismiss, finding that the indictment contained sufficient allegations that the misrepresentations at issue "*actually cause[d]* the insurance companies economic harm." <u>Binday</u>, 908 F. Supp. 2d at 490 (emphasis added).  The Court allowed the government to proceed precisely because it was relying on the economic harm allegations it now apparently disclaims.

Out of nowhere, and in the incongruous context of a motion *in limine*, the government now seeks to preclude the Defendants from showing factually that the Insurers suffered no actual economic harm in a case that, according to the indictment, is supposedly about actual economic harm suffered by the victimized Insurers.  Faced with a growing volume of evidence that directly disproves the notion that the Insurers suffered *any* economic harm, the government believes it

can, without superseding the indictment, simply shift gears, change its entire theory of prosecution, pursue a totally different uncharged theory of mail and wire fraud (an uncharged "right to control" theory), and preclude the Defendants from mounting the defense they have been preparing from the outset of this case.

Put simply, the government has now expressly taken the position that it intends to prosecute this case as a "right to control" mail and wire fraud case.  See Gov't Mot. at 19 ("The government must of course prove that defendants contemplated harm—if only to the [Insurers'] *right to control their assets* through discretionary economic decisions") (emphasis added).  This theory of mail and wire fraud was not alleged in the indictment and the Defendants will not have the opportunity before trial to move to dismiss the government's newly-revealed charge, a step Defendants otherwise would have taken because the theory is plainly insufficient as applied to these facts.  As explained below, the government's new strategy will impermissibly thwart the grand jury by constructively amending the indictment and is totally improper as a matter of law. Accordingly, in light of the government's tacit concession that it intends pursue a constructive amendment at trial, the Court should dismiss the indictment now.  Alternatively, the Court should deny the government's motion *in limine* in full, prohibit the government from proceeding on an uncharged "right to control" theory and require the government to proceed—if it can—on the original mail and wire fraud theory as outlined in the indictment and approved by the Court.

**A.    The Government's New Found Reliance on an Uncharged "Right to Control" Theory of Mail and Wire Fraud Warrants Dismissal of the Current Indictment**

**1.    The Indictment Does Not Allege a "Right to Control" Theory of Mail and Wire Fraud**

The indictment alleges that the Defendants engaged in "a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses,

representations" by making misrepresentations regarding "essential elements" of the life

insurance applications, thereby causing the Insurers to be deprived of benefits they reasonably

expected.  Indictment ¶¶ 9, 10, 36; see Shellef, 507 F.3d at 108-09 (holding that a proper mail

and wire fraud charge requires allegations that the misrepresentations relate to "essential

elements" of an offense and must result in victim not receiving a benefit they anticipated).  By

contrast, a "right to control" theory of mail and wire fraud is properly alleged when the

indictment charges that "the purpose of the scheme was to defraud [the victim] of . . . *their right

to control* their money, property, and other things of value."  United States v. McDonough, 56

F.3d 381, 390 (2d Cir. 1995) (emphasis added).  As the Second Circuit explained in United

States v. Wallach, the "right to control" theory of mail and wire fraud protects "intangible

property rights," and is "predicated on a showing that some person or entity has been deprived of

potentially valuable economic information.  Thus, the withholding or inaccurate reporting of

information that could impact on economic decisions can provide the basis for a [right to control]

mail fraud prosecution."  Id., 935 F.2d 445, 463 (2d Cir. 1991) (citations omitted).

There is a clear distinction between allegations of a "scheme [] to defraud the [victims] of

[] money, property, and other things of value," as set forth in the indictment, "and [a scheme to

defraud the victims of] their right to control their money, property, and other things of value."

See McDonough, 56 F.3d at 390 (holding that because the "Defendant was charged with

depriving citizens of money *and* the right to control money . . . he could have been convicted

under either of these theories") (emphasis added).  If the government intended to prosecute the

Defendants pursuant to a "right to control" theory, it surely knew how to do so, as demonstrated

in several mail and wire fraud indictments brought by the United States Attorney's Office and

other branches of the Department of Justice in this District, long before the February 2012

indictment was filed in this case:

- Indictment alleging "a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses . . . *and further to deprive the municipal issuers of the property right to control their assets* by causing them to make economic decisions based on misleading and false information." Indictment, United States v. Ghavami, No. 10-CR-1217-JFK-HB (S.D.N.Y. Sept. 15, 2011), ¶ 24 (emphasis added).

- Indictment alleging "a scheme and artifice to defraud municipal issuers and to obtain money and property from municipal issuers by means of false and fraudulent pretenses, representations, and promises . . . *and to deprive the municipal issuers of the property right to control their assets* by causing them to make economic decisions based on false and misleading information."  Indictment, United States v. Carollo, No. 10-CR-654 (S.D.N.Y. May 31, 2011), ¶ 19 (emphasis added).

- Indictment alleging:  "The foregoing scheme was intended to, and did, defraud numerous Prospective Borrowers and deprive them of (i) money and property; *and (ii) the right to control their assets* in that the co-conspirators knowingly deprived the Prospective Borrowers of truthful information necessary to make discretionary economic decisions."  Indictment, United States v. Kalish, No. 05-CR-656 (RPP) (S.D.N.Y. Feb. 14, 2007), ¶ 7 (emphasis added).

- Indictment alleging that the "scheme was intended to, and did, defraud the MKD Developers and deprive the MKD Developers of money and property, *and the right to control their assets* by knowingly depriving the MKD Developers of truthful information necessary to make discretionary economic decisions."  Indictment, United States v. Carlo, No. 04-CR-805-RPP (S.D.N.Y. Nov. 15, 2005), ¶ 4 (emphasis added).

These indictments make clear that mail and wire fraud cases proceeding on a "right to

control" theory must specifically set forth "right to control" allegations in the operative

indictment.  By contrast, the indictment in this case contains no such "right to control" language.

This blatant omission makes clear that the government intended to proceed only on a theory that

the object of the alleged scheme was to deprive the Insurers of money or tangible property by

causing the specific economic harms alleged.  The indictment in United States v. Zemlyansky—

like the indictment in this case—did not contain a single right to control allegation.  Compare

Indictment, Zemlyansky, No. 12-CR-171 (S.D.N.Y. Feb. 29, 2012) ¶ 28, with Indictment ¶ 36

(alleging "a scheme and artifice to defraud, and for obtaining money and property by means of

false and fraudulent pretenses, representations, and promises").  As the district court recognized

in Zemlyansky, "[t]he Indictment . . . does not rely on a deprivation of the insurers' 'right to

control' their property.  Rather, it rests simply on the alleged deprivation of their monetary

interest in nonpayment of claims."  United States v. Zemlyansky, No. 12 Cr. 171 (JPO), 2013

WL 2151228, at *6 (S.D.N.Y. May 20, 2013).

      The charging instrument "need do little more than to track the language of the statute

charged and state the time and place (in approximate terms) of the alleged crime."  United States

v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation omitted).  Nevertheless, in

the "speaking" indictment returned in this case the government far exceeded this standard and

opted to charge, in great detail, its theory of mail and wire fraud based on the alleged financial

harm to the Insurers caused by the Defendants' charged conduct.  Moreover, omitting any

reference to a "right to control" theory of harm, the indictment set forth certain key language,

drawn directly from Shellef, alleging that because of these misrepresentations, the Insurers

suffered "a discrepancy between the benefits reasonably anticipated . . . and the actual benefits

received," because of misrepresentations "concern[ing] essential elements of the bargains."

Indictment ¶¶ 9, 18; compare Shellef, 507 F.3d at 109 (dismissing an insufficient indictment that

failed to allege "a discrepancy between benefits reasonably anticipated and actual benefits

received") (internal quotation marks omitted).

      Furthermore, the indictment sets forth four ways the Insurers were economically harmed:

- The inflation of an applicant's net worth resulted in insureds who would die sooner, "resulting in *less income from premium payments* to the [Insurers] and an *earlier payout of [] the death benefit* to the beneficiaries."  In addition, this "caused [the

Insurers] to approve—and later *pay out—larger death benefits* than they otherwise
would have approved."

- Minimum-funded policies caused the Insurers to receive "*less income* than expected
  from universal life policies."

- The failure of policies to lapse "undermined actuarial assumptions and financial
  planning that the [Insurers] used to *price their policies*."

- The use of grace periods and late payments meant that "the *cash flow available from
  [premium] payments decreased*."

Indictment ¶¶ 10(a)-(d) (emphasis added).

Of course, the Defendants can only guess as to what has prompted the government's

sudden reversal, but it may have something to do with the mounting volume of documentary

evidence, never sought by the government during the course of its three-year investigation, that

demonstrates it cannot prove the alleged economic harms detailed in the indictment.  For

example, a document the Defendants have previously cited, a December 14, 2006 Lincoln

National memorandum, states explicitly that Lincoln National made pricing adjustments to the

universal life insurance products "so that if we do get IOLI business in these products, *it will not

adversely impact profitability*."  Ex. 4 at LINCOLN090418-19 (emphasis added).  An American

General email dated November 1, 2006, with the subject "IOLI/SOLI cases," produced to the

Defendants in early August 2013, echoes this sentiment.  See Ex. 5 (stating that though "we're

seeing more 'IOLI-like' cases . . . the product pricing is such that we're no longer worried about

IOLI cases.").  Moreover, additional documents recently produced by Lincoln National make the

lack of economic harm associated with STOLI even clearer.  See, e.g., Ex. 6 at

LINCOLN090509 (another Lincoln National memorandum, dated October 10, 2007, stating that

"the . . . risks of [STOLI] are . . . not economic").

19

There is also evidence debunking the government's theory that STOLI business increased mortality and therefore resulted in the Insurers paying additional death benefits they would not have otherwise paid.  See, e.g., Ex. 7 at 3 ("[A]ctual mortality experience on policies with face amounts of $1 million or greater and issued to insured's [sic] ages 70 and older (the STOLI demographic) is . . . 12% *better* (lower) than assumed in pricing.  This suggests that STOLI activity has not had an adverse impact on our mortality experience."); Ex. 8 (American General document discussing 2006 earnings projections, including "better than budgeted mortality in [universal life]," and indicating projected payments of death benefits to decrease by 4%).[8]

Furthermore, multiple Insurers' underwriting guidelines undermine the government's contention that the Insurers relied on the prospect that some percentage of policies would lapse. For example, Mass Mutual's underwriting guidelines state that: "[p]rudent financial underwriting will *increase persistency* and reduce the effect of anti-selection," i.e., increase the likelihood that the applicant will continue paying his or her premiums and not lapse.  Ex. 9 at 1 (emphasis added); Ex. 10 at 13 (American General underwriting document stating "[l]ow lapse rates are critical to competitiveness and profitability").  As Lincoln National explained in Exhibit 4, that Insurer "priced so that if we got zero lapses and minimum funded policies (classic IOLI), we would achieve profitability consistent with the products['] overall pricing returns."  Ex. 4 at LINCOLN090418.  Thus, faced with substantial contradictions to the indictment's clear

_____

[8] Indeed, the government is well aware of Exhibits 4 and 7. ███████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████  Four days after this meeting, on August 20, 2013, the government filed its motions *in limine* abandoning the theories of economic harm elaborated in the indictment and asserting a "right to control" theory of fraud.

allegations of economic harm to the Insurers, the government now finds itself forced to pursue a new uncharged theory of the case.

> ### 2. The New "Right to Control" Theory Contradicts This Court's December 2012 Order

The government's response to the Defendants' motion to dismiss the indictment did not deviate from the theory of fraud pleaded in the indictment—in fact the government's brief stressed that theory. The government touted the indictment's use of the key <u>Shellef</u> language, and the supporting allegations of specific economic harm, in order successfully to distinguish its allegations from the defective indictment in <u>Shellef</u>, which had merely alleged that the victim was "induced . . . to sell [a product] that it would not have sold had it known" about the defendant's alleged misrepresentations. <u>Shellef</u>, 507 F.3d at 107-08; Gov't Opp'n at 6, ECF No. 43 ("[T]he indictment here contains precisely the allegations that the <u>Shellef</u> court held were lacking in that case.").

Moreover, the unambiguous allegations of actual economic harm supporting the government's theory of fraud were also reiterated in the government's opposition papers. <u>Id.</u> at 4-6. As the government explained, the indictment "spells out four different ways in which the lies that the defendants told . . . *mattered to the Providers' bottom line*." <u>Id.</u> at 8 (emphasis added).

The Court expressly adopted the government's position, holding that "[g]iven the '<u>Shellef</u>' language in the present indictment, there is no danger that a jury might improperly convict the defendants at bar based on a misrepresentation[] that had no relevance to the object of the contracts in question." <u>Binday</u>, 908 F. Supp. 2d at 491. As the <u>Shellef</u> court explained, the danger of improper conviction arises when the jury fails to appreciate that "schemes that do no more than cause their victims to enter into transactions they would otherwise avoid . . . do not

21

violate the mail or wire fraud statutes." <u>Shellef</u>, 507 F.3d at 108.  The indictment survived the

Defendant's motion to dismiss precisely because—as the Court held in denying the motion—it

specifically alleges "that the defendants made material misrepresentations as part of a scheme to

defraud the Providers (describing at length why the lies mattered to the Providers' economic

decision making), and explains how  those misrepresentations *actually cause the Providers*

*economic harm*." <u>Binday</u>, 908 F. Supp. 2d at 490 (emphasis added).

     Abandoning its earlier arguments and the <u>Shellef</u> language entirely (the case is never

even cited in its brief), the government now unabashedly claims that "whether actual harm to the

[Insurers] resulted . . . is irrelevant," and that the Defendants "*contemplated* harm—if only to the

[Insurers'] *right to control* their assets through discretionary economic decisions."  Gov't Mot. at

19 (emphasis in original and added).  However, cursory citation to authority concerning the

"right to control" theory of fraud in a motion *in limine* is not a valid substitute for a well-pleaded

indictment.  <u>See</u> <u>Shellef</u>, 507 F.3d at 107-08 (dismissing indictment despite the government's

assertion, in an opposition brief, that the defendant deprived the alleged victim's "right to define

the terms of the sale of its property").  The government's new approach is completely at odds

with its previous submissions and the Court's basis for denying Defendants' motion to dismiss

the indictment.

     Moreover, based on the "extremely detailed" indictment, this Court also denied the

Defendants' motion for a bill of particulars, stating that "Defendants have more than enough

information about the charges against them to enable them to prepare their defense, avoid unfair

surprise at trial, and preclude a second prosecution for the same offense." <u>Binday</u>, 908 F. Supp.

2d at 497.  But that conclusion is seriously undermined if the government is permitted, at the

eleventh hour, to radically shift its theory of fraud.  And, when the Defendants pointed to

evidence that the Insurers were not economically harmed in support of their motion to dismiss

the indictment, the government asserted that the effort was premature and stated that the

Defendants "will have the opportunity to present [their] evidence and arguments therefrom at

trial." Gov't Opp'n at 9, ECF No. 43. Cynically, now with trial upon us, the government has

reversed course and seeks to deny the Defendants that opportunity by moving to preclude

evidence and argument on the very same economic harms it once stridently pressed.

### 3. The Government's Intent to Present an Uncharged "Right to Control" Theory of Fraud at Trial Constitutes an Improper Constructive Amendment of the Indictment Requiring Dismissal

The government's concession that it intends to abandon the theory it charged, and

proceed only on a "right to control" theory, will result in an improper constructive amendment of

the indictment warranting dismissal.[9] Dismissal of the indictment is an appropriate remedy when

the government seeks to bring an uncharged theory of prosecution well after the indictment has

issued. See United States v. Henry, 29 F.3d 112, 114, 116 (3d Cir. 1994) (affirming dismissal of

---

[9] There are fundamental issues regarding the viability of the government's newly embraced "right to control" theory in light of the Supreme Court's decision in Skilling v. United States, 130 S. Ct. 2896 (2010), which limited the government's ability to pursue fraud charges based on the deprivation of "intangible rights." It is an open question—and one that the Defendants have not had an appropriate opportunity to address in the absence of a proper indictment and the chance to move to dismiss—whether the government's newly articulated theory alleges a violation of the mail and wire fraud statutes as a matter of law. See Shellef, 507 F.3d at 107-08 (dismissing indictment that alleged the defendant induced the victim to sell "additional amounts [of product] that it would not have sold," and rejecting the government assertion that the misrepresentations deprived the victim of "the right to define the terms for the sale of its property"). Moreover, the government's bare assertions that the purported STOLI risks could affect "the pricing of the companies' insurance products" and that it may have an impact on the preferential tax treatment afforded life insurance (Gov't Mot. at 4), without more, are deficient. See United States v. Kurtz, No. 04-CR-0155A, 2008 WL 1820903, at *3-4 (W.D.N.Y. Apr. 21, 2008) (dismissing the indictment purporting to allege "right to control" wire fraud where the government (i) did not define the alleged rights deprived in the indictment, (ii) introduced a so-called "intellectual property interest" for the first time in opposition to a motion to dismiss the indictment, and (iii) was barred by Shellef from bootstrapping into the indictment a purported "right to control to whom [the victim] sold its product").

an indictment where the government raised "right to control" allegations for the first time on

appeal); <u>Kurtz</u>, 2008 WL 1820903, at *6 (dismissing the indictment despite the government's

claim, on opposition to a motion to dismiss the indictment, that the charged scheme to defraud

deprived the victim's "intellectual property rights"); <u>United States v. Bruno</u>, 661 F.3d 733, 740

(2d Cir. 2011) (despite the government's contention that an indictment "[could] be read as also

charging" a specific theory of honest services fraud not expressly set forth in the indictment, the

court dismissed the indictment, stating:  "It would be preferable and fairer, of course, for the

government to proceed on explicit rather than implicit charges.").

       Allowing the government simply to proceed at trial with argument and evidence

concerning a "right to control" theory of fraud will constitute an improper constructive

amendment of the current indictment.   A constructive amendment "occurs when 'the terms of

the indictment are in effect altered by the presentation of evidence and jury instructions which so

modify essential elements of the offense charged that there is a substantial likelihood that the

defendant may have been convicted of an offense other than that charged in the indictment.'"

<u>United States v. Mollica</u>, 849 F.2d 723, 729 (2d Cir. 1988) (<u>quoting</u> <u>United States v. Hathaway</u>,

798 F.2d 902 (6th Cir. 1986)).

       Concerns over constructive amendment are heightened in the context of allegations of

fraud.  Because of the "broad range of conduct covered by the federal fraud statutes, it is critical

that courts 'vigilantly enforce the Fifth Amendment requirement that a person be tried only on

the charges contained in the indictment returned by the grand jury.'"  <u>Mollica</u>, 849 F.2d at 729

(<u>quoting</u> <u>United States v. Weiss</u>, 752 F.2d 777, 791 (2d Cir. 1985) (Newman, J., dissenting in

part)).  The prohibition on constructive amendments prevents a situation in which "the evidence

present[s] the trial jury with two possible theories as to [an element of the crime] but one of those

theories had never been passed on by the grand jury." <u>United States v. Roshko</u>, 969 F.2d 1, 5 (2d

Cir. 1992).  If the government wanted to shift from a theory charged under <u>Shellef</u> to the "right

to control" theory it now embraces, it should have gone before the grand jury to supersede the

indictment.  Indeed, this is exactly what the government did in <u>United States v. Finazzo</u>.  <u>Id.</u>, No.

10-CR-457 (RRM), 2011 WL 3794076, at *1, *5 (E.D.N.Y. Aug. 24, 2011) (noting that "the

Government filed a superseding indictment that allege[d] the fraudulent scheme in different

terms," that the defendant "deprived [the victim] of the opportunity to seek lower prices").

It is apparent from the face of the indictment, which omits any reference to a "right to

control" theory of mail and wire fraud, that the grand jury did not indict on that theory.  The

government's deadline for superseding the indictment has long since expired and it cannot

achieve the same ends through a motion *in limine*.[10]  As discussed above, a "right to control"

theory is a distinct theory of mail and wire fraud which potentially provides an entirely separate

basis for conviction.  <u>See</u> <u>McDonough</u>, 56 F.3d at 390 (where the "indictment charged that the

purpose of the scheme was to defraud the [victims] of 1) money, property, and other things of

value . . . *and*, 2) their right to control their money, property, and other things of value…[the

defendant] could have been convicted under either of these theories") (emphasis in original).

The admission of evidence permitting conviction "on a charge the grand jury never made…[is]

fatal error," constituting a constructive amendment and requiring, ultimately, reversal.  <u>United

States v. Zingaro</u>, 858 F.2d 94, 103 (2d Cir. 1988) (<u>quoting</u> <u>Stirone v. United States</u>, 361 U.S.

212, 219 (1960)).

---

[10] During a status conference held on June 13, 2012, the Court ordered that "[i]f the
government wishes to file a superseding indictment it must do so before [September 3, 2012]."
Minute Entry, Status Conf., June 13, 2012 (no docket number assigned).

Based on the government's concession that it intends to proceed upon an uncharged theory of fraud, the Court may dismiss the indictment now. United States v. Blumhagen, No. 03-CR-56S, 2005 WL 3059395, at *5 (W.D.N.Y. Nov. 15, 2005) (dismissing indictment where "acceptance of the government's position would, in essence, amount to an improper expansion or amendment of the indictment" and risk an "impermissible constructive amendment"). Alternatively, the Court can deny the motion *in limine* in full, and require the government to proceed—if it can—on the original theory of fraud as outlined in the indictment.

### B. The Evidence of Actual Economic Harm to the Insurers is Critically Relevant to Several Defenses—There Was No Scheme to Defraud; Any Misrepresentations Were Immaterial; and, There is No Proof of Criminal Intent

Putting aside the government's attempt to prove at trial an entirely different theory of fraud from the one alleged in the indictment, evidence and argument concerning the actual economic harm the Insurers did, *or did not*, suffer as a result of the issuance of the relevant life insurance policies is relevant to proving the essential elements of mail and wire fraud, under any theory. The government's arguments to the contrary, which simply presume a presentation of this case on the basis of a "right to control" theory rendering evidence of economic harm irrelevant, are meritless.[11]  *First*, as the government concedes, it must prove, at a minimum, that

---

[11] Evidence of actual economic harm is equally relevant under the "right to control" theory of mail and wire fraud.  Because the "'right to control theory' of money or property fraud is predicated on a showing that some person or entity has been deprived of potentially valuable economic information," the absence of actual economic harm would be relevant to show that the alleged misrepresentations in fact had no economic value. United States v. Post, No. 08-CR-243 KMK, 2013 WL 2934229, at *17 (S.D.N.Y. June 3, 2013).  As explained in United States v. Mittelstaedt:

> [L]ack of information that might have an impact on the decision regarding where [] money is spent, without more, is not a tangible harm and therefore does not constitute a deprivation of section 1341 "property."   To be material, the information withheld either must be of some independent value or must bear on the ultimate

"the defendants *contemplated* harm." Gov't Mot. at 18. Thus, while the jury must assess the weight of the evidence as to this point, the Defendants should not be precluded from introducing evidence which casts doubt on the government's claims. Such evidence—including the extremely large premium payments that the Insurers reaped from the relevant life insurance policies—is also circumstantial evidence of the Insurers' institutional knowledge and encouragement of the Defendants' activities, going directly to whether there was a fraud in the first place, let alone whether the Defendants intended to defraud. *Second*, evidence as to the actual economic harms to the Insurers, or the absence thereof, is also relevant to the materiality of the alleged misrepresentations.

The exclusion of evidence offered by the defense to raise doubts as to an essential element of mail and wire fraud is improper and warrants vacating a conviction. United States v. Levis, 488 F. App'x 481 (2d Cir. 2012) (vacating wire fraud conviction based on the preclusion from trial of evidence of the materiality of the alleged misrepresentations), cert. denied, 133 S. Ct. 2020 (2013). This critical evidence should not be precluded from presentation at trial. See United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987) ("Absent any evidence of an intent to harm the victims . . . we concluded that the evidence was insufficient to demonstrate a fraudulent intent as required by the mail fraud statute."); United States v. Rybicki, 287 F.3d 257, 262 (2d Cir. 2002) ("[P]roof of actual harm befalling the victim as a result of the scheme . . . may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm.").

Among the evidence that the Starr court considered in determining that the government failed to prove fraudulent intent was testimony from customers that they "received exactly what they paid for" and that no customer had been cheated. Starr, 816 F.2d at 98 (noting that the

value of the transaction.
Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994).

proof of fraudulent intent did "not identify what harm, if any, the [Defendants] intended to inflict on their customers" and was, in fact, "quite to the contrary").  Similarly, in United States v. Novak, 443 F.3d 150 (2d Cir. 2006), the alleged scheme involved undisclosed kick-back payments to the defendant made by union employees who were knowingly paid wages for "no-show" hours by contractors.  The trial included evidence that in light of agreements between the union and the contractors, the wages paid and no-show hours were consistent with the contractor's expectations and thus the contractors suffered no harm.  According to the Second Circuit, the evidence presented was "insufficient to show the requisite intent to harm" because the "contractors received all they bargained for."  Id. at 153-54, 159.

As the Starr court explained, the government "cannot escape the burden of showing that some actual harm or injury was *contemplated* by the schemer," thus evidence of an actual or contemplated "loss or injury to the victim of the fraud" is probative of fraudulent intent.  Id. at 101.  Here, if the government's motion *in limine* is granted, it will be free to pursue precisely the tactic that was rejected in United States v. Regent Office Supply Co.:  "Instead of offering proof of some tangible injury to the [victims], the government argues in the negative that 'it is not essential [to] prove that purchasers were in fact defrauded.'"  Id., 421 F.2d 1174, 1181 (2d Cir. 1970) (concluding that "the absence of any proof of actual injury to any customer" amounts to an impermissible claim that the misrepresentations "are per se fraudulent"); see Finazzo, 2011 WL 3794076, at *6 (to prove mail and wire fraud as originally charged, the government "was required . . . to demonstrate harm by proving that [the victim] paid more to South Bay than the 'prevailing' market price").

Indeed, as discussed in Part I, the Defendants intend to demonstrate institutional awareness and encouragement on the part of the Insurers with respect to STOLI business,

28

negating the government's claim that they were defrauded by the Defendants' activities.  As such, evidence pertaining to "how the Subject Insurers actually fared, economically, in the wake of [D]efendants' false representations," Gov't Mot. at 18, is relevant to the benefits they knowingly derived from the Defendants' alleged conduct and circumstantial evidence of institutional awareness.  See discussion supra Part I.

Evidence of actual economic harm also is relevant to the materiality of the alleged misrepresentations.  That is because where, as here, the purported victims of the scheme received substantial benefits from the bargain they have struck—in this case millions of dollars in premium payments—it is the government's burden to show that "they were cheated out of the *additional* pecuniary benefits which the false representation led them reasonably to expect." Regent Office Supply Co., 421 F.2d at 1182 (emphasis added).  Evidence such as actual mortality assessments of STOLI policies, Ex. 7 at 3, or the Insurers' statements that STOLI policies "*will not adversely impact profitability*," Ex. 4 at LINCOLN090418-19 (emphasis added), directly address whether the "false representations of fact [were] material to the bargain."  Regent Office Supply, 421 F.2d at 1182.  Cognizant of these standards, the government brought an indictment that did, in fact, allege actual economic harm.  Despite its apparent desire to abandon that indictment, such evidence is relevant.  The government's motion *in limine* should be denied.

## IV.  The Court Should Reject the Government's Attempt to Preclude Evidence of the Complicity of Insurance Company Employees

The government argues that the Defendants should be precluded from offering evidence that individual "rogue" insurance company employees were complicit in efforts to secure STOLI policies.  Gov't Mot. at 19-21.  To the extent the Defendants offer evidence of the conduct of insurance company employees, it will not be for the purpose the government suggests.  Rather,

Defendants will rely on the conduct of insurance company employees to demonstrate the complicity *of the insurance companies* in seeking out—rather than rooting out—STOLI business.  For example, as noted above, in 2006, in an effort to recruit more STOLI business, American General withdrew its financial underwriting requirement that life insurance applicants provide tax returns to verify their income and net worth.  Indeed, to the extent American General underwriters were subsequently less vigilant in their financial underwriting after the company made a corporate decision to loosen its underwriting standards, that evidence can and should be considered by the jury in assessing whether the Insurers were defrauded.  Put differently, the Defendants are entitled to show that the conduct of insurance company employees in, *inter alia*, ignoring STOLI red flags and actively courting the Defendants' business, was consistent with and actually furthered the Insurers' efforts to ensure that more STOLI business—and the higher premiums that accompanied it—came to the Insurers.  This evidence would go directly to whether the financial misrepresentations at issue were material as well as to the Defendants' intent to defraud the Insurers.  See supra Part I.A (citing cases addressing relevance of evidence demonstrating that victim's knowledge of the alleged fraud).  Accordingly, the Court should deny this motion.[12]

## V.   The Government's Motion to Preclude Evidence of the Insurers' Participation in the Life Settlement Market Should Be Denied

The government seeks to preclude Defendants from introducing evidence establishing that the insurance company "victims" in this case were participants in the multi-billion dollar life settlement market, a massive exchange in which life insurance policies are routinely bought by

---

[12] It is important to note, however, that the government does not contest that the conduct of insurance company employees can be considered to prove that the Defendants were led to believe that the Insurers wanted STOLI business and did not have the intent to defraud.  Gov't Mot. at 21.

investment firms, hedge funds and the very insurance companies at issue in this case. Evidence of insurer participation in the life settlement market is directly relevant to establishing the Insurers' understanding that life insurance policies could be—and very often were—sold after purchase. Moreover, despite the inextricable presence of the life settlement market in this case, the government inexplicably seeks to shield from the jury the fact that the Insurers themselves were high-level traders in the multi-billion dollar life settlement industry. But the Insurers' role in this industry—and intimate knowledge of its practices—directly undercuts the government's claim that the Insurers were denied anticipated benefits when the insureds sold their policies to third parties.

The crux of the government's theory of criminal liability in this case is that the false financial representations in life insurance applications—including representations about the insured's intent to sell the policy—harmed the Insurers economically, by causing, in the words of the indictment, "a discrepancy between the benefits *reasonably* anticipated by the [Insurers] and the actual benefits received." Binday, 908 F. Supp. at 489 (quoting Indictment ¶ 9) (emphasis added). These alleged harms include:

- Less premium income because "a policy held or funded by a *third-party investor* typically would be funded at or near the minimum amount necessary to sustain the policy."

- Less lapse-related profit because *third party investors* confounded the lapse rates projected in the Insurers' actuarial models.

- Decreased cash-flow because *third party investors* "typically took advantage of grace periods and other features that permitted late payments of premiums with greater frequency than insured persons."

Indictment ¶¶ 10(b)-(d) (emphasis added).

Notably, however, these supposed "harms" are all standard features of the life settlement industry and all explicitly reference "third party investors." This massive industry, which had a

face value of $35 billion at the end of 2011, <u>see</u> Tracer, <u>AIG Impairments Top $600 Million as</u>

<u>Elderly Outlast Lifespan Bet</u>, Bloomberg, Mar. 11, 2013 (<u>available at</u> http://www.bloomberg.

com/news/2013-03-12/aig-impairments-top-600-million-as-elderly-outlast-lifespan-bet.html),

owes much of its magnitude to STOLI policies.  Several of the "victim" Insurers at issue in this

case are active participants in the life settlement market.  For example, the face value of the life

settlement policies of AIG—the parent company of "victim" American General—was estimated

at over $17 billion at the end of 2012.  <u>See</u> Tracer, <u>supra</u>.  As key players in this industry, the

Insurers were fully aware of the likelihood that a high-value universal life insurance policy

would be sold to a third party investor, who would then pay only minimum premiums during

grace periods and would rarely let the policy lapse.  For the government to claim now, in light of

the prevalence of policy sales to third party investors *that the Insurers themselves encouraged*

*and engaged in*, that the Insurers both anticipated the policies would not be sold and relied on

that expectation is pure sophistry.  Their own granular experience and stoking of that massive

market undercuts that expectation.  The right hand wrote life insurance policies while the left

hand scoured the market seeking investment opportunities, knowing full well that these policies

would likely sold to entities interested not in the life of the insured, but rather in his death.

Against this backdrop, the Insurers could not "reasonably" have anticipated that the policies

would remain in the hands of the original applicant, would lapse, or that the policy holders would

pay premiums above the minimum and ahead of grace periods.  In short, the Insurers cannot be

permitted to play victim before the jury and conceal their role as crucial market players in the

STOLI investment plan.  They cannot publicly shun the life settlement industry in testimony and

avoid cross-examination on the ways in which they embraced, understood and fueled it.  Thus,

the Court should deny the government's efforts to conceal these highly relevant facts.

**VI.    Evidence of the Life Settlement Market is Admissible to Prove that Misrepresentations About Insurable Interest Were Not Material to the Insurers**

The existence of a multi-billon dollar secondary life settlement market—which the government acknowledges is perfectly legal—and the Insurers' participation in that market, are relevant to the issue of materiality.  Given the size and scope of the life settlement industry, as well as the fact that Insurers cannot restrict insureds from selling their own life insurance policies (a fact the government concedes), the insurance companies should have had an expectation that each and every life insurance policy they underwrote for this age group with a multi-million dollar face amount was a prime candidate to be purchased in the life settlement market.  Simply put, the government cannot cloak the Insurers as victims of misrepresentations regarding a potential sale of a policy, when an insured always maintained a right to sell that policy in a highly active and lucrative secondary market.  The jury should consider the existence of the life settlement market to consider whether misrepresentations about the sale of the life insurance polices at issue in this case were material to the Insurers.  See Levis, 488 F. App'x at 483-84 (reversing wire fraud conviction where district court excluded evidence that "could have raised doubts as to materiality").

Moreover, the existence and legality of the secondary market, in which the Insurers were major players, is relevant to rebut any suggestion that betting on death or owning a life insurance policy absent an insurable interest was illegal or immoral during the time period covered by the indictment.  As the government concedes, a life insurance policy is property that can be assigned to any third party, even one that does not have an insurable interest in the insured.  To the extent government witnesses will testify that the sale of life insurance policies to investors was improper, distasteful or immoral, it is critical that the defense be permitted to counter this

prejudicial perspective with evidence that the life settlement industry is a legitimate, thriving

industry, in which even the alleged Insurer victims are active participants.

**VII.    No Defendant Intends to Rely on an Advice-of-Counsel Defense**

The government moves to require Defendants to disclose whether they intend to invoke

an advice-of-counsel defense.  This motion is moot because the Defendants do not intend to

assert an advice-of-counsel defense at trial.

**VIII.   The Government's Motion to Introduce Mr. Binday's Proffer Statements Should Be
Denied as Premature and the Court Should Order the Government to Immediately
Redact Its In-Depth Summary of Mr. Binday's Statements in its Motion Papers**

The government's motion for the conditional admission of statements Mr. Binday made

in his proffer should be denied as premature.  A motion *in limine* is intended to "aid the trial

process by enabling the Court to rule in advance of trial on the relevance of certain forecasted

evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption

of, the trial."  Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996).  Mr. Binday fully

understands his obligations under the proffer agreement and fully understands the consequences

that would flow from him or his counsel opening the door to their admission.  It is plain from the

face of the proffer agreement that the offer of evidence contrary to the statements made in the

proffer allows the government to use his proffered statements.  There is no reason for the Court

to rule now that indeterminate evidence that Mr. Binday might hypothetically offer would make

statements in the proffer admissible.  See, e.g., United States v. Torres, No. 06 Cr. 808, 2008 WL

2977884, at *1 (S.D.N.Y. Aug. 4, 2008) (concluding "that it would be premature to rule on the

admissibility of Defendant's proffer statements because Defendant has not yet made any specific

assertions that allegedly contradict his proffer statements").  This is particularly true now that

Mr. Binday has informed the government that he will not contest the misrepresentations at issue

in this case because the statements that the government would seek to rely upon should Mr.

Binday "open the door" are *consistent* with not contesting those misrepresentations.  Because the

government is asking the Court to resolve a dispute that is not ripe for decision and likely never

will be, the Court should deny this aspect of the government's motion.  See, e.g., James v.

Gilmore, No. 03-CV-0868, 2009 WL 435286, at *2 (W.D.N.Y. Feb. 20, 2009) (denying as

unripe defendants' motion *in limine* to exclude character evidence where plaintiff had made no

indication it intended to offer such evidence).

      Additionally and importantly, Mr. Binday objects to the government's inclusion of the

substance of his proffer statements in the government's motion *in limine*.  Mr. Binday proffered

under the terms of an agreement that contemplated the disclosure of the substance of his

statements only under certain limited and defined circumstances.  By disclosing the in-depth

substance of Mr. Binday's statements in its motion *in limine*—i.e., not one of the prescribed

circumstances—the government has broadcast Mr. Binday's statements to the world prior to any

triggering of the conditions in the proffer agreement that permitted the government to make such

disclosure.  This was improper and the Court should not tolerate the government's efforts to

circumvent and sidestep its own agreements in an effort to put Mr. Binday's statements before

this Court prematurely.[13]  The government's brief is available on this Court's ECF system and is

easily accessible to the public notwithstanding that Mr. Binday proffered with an expectation that

the government would not release these statements unless or until he took a position inconsistent

---

[13] We understand that the United States Attorney's Office in this District is beginning to
use motions *in limine* as a vehicle to prematurely place proffer statements before courts prior to
trial and prior to a defendant's opening of any door.  We believe the Court should put a stop to
this policy, which could potentially taint the defendant before a jury pool and deprive her of a
fair trial. The government should rely on the clear remedy outlined in the proffer agreement:  its
ability to rebut any assertions made by the defendant with statements from the defendant's
proffer agreement should the defendant take a position inconsistent with statements made in the
proffer.

with them.  Accordingly, we request that the Court order the government to redact pages 25 and

26 of its memorandum of law.[14]

## IX.      The Court Should Deny the Government's Efforts to Preclude the Admission of Largely Unidentified Statements Attributable to Mr. Binday

The government broadly moves to prohibit Mr. Binday from relying on largely

unidentified out-of-court "self-serving" statements to prove a lack of intent to defraud because,

the government contends, those statements are hearsay.  But the government identifies only one

such statement it seeks to exclude, a January 21, 2011 email in which Mr. Binday discussed the

government's difficulty in proving that the Insurers suffered any harm as a result of issuing

STOLI policies.[15]  Mr. Binday does not intend to rely on that out-of-court statement at trial to

prove his lack of intent to defraud.

Apart from this one statement contained in the January 21, 2011 email, the government

has failed to identify any additional purported "self-serving" statements it seeks to exclude at

trial, notwithstanding its identification of over a thousand potential trial exhibits.  The

government is not entitled to a sweeping preclusion of unidentified statements.  See Nat'l Union

Fire Ins. Co., 937 F. Supp. at 287 (reserving judgment on a motion *in limine* for trial because

"the current motion is too sweeping in scope to be decided *in limine*"); United States v.

Ozsusamlar, 428 F. Supp. 2d 161, 165 (S.D.N.Y. 2006) ("[C]ourts considering a motion *in

limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual

context.").  To the extent that the government believes that certain prior statements made by the

---

[14] Prior to the submission of this brief, counsel for Mr. Binday contacted the government and requested that they redact the summary of his statements. The government refused.

[15] It is worth noting that this email makes clear that the government likely had communicated to Mr. Binday's then-attorneys its intent to prove economic harm in this case.  As noted above, the government, on the eve of trial, is now abandoning that theory because, as Mr. Binday's comments foreshadowed, the evidence does not support its position.

Defendants are inadmissible hearsay, it should identify them now. The government relies on this Court's decision in United States v. Annabi, No. S1 10 Cr. 7 (CM), 2012 WL 489111 (S.D.N.Y. Feb. 14, 2012), in an attempt to justify its exclusion of one identified and an unlimited unidentified number of purported "self-serving" statements. Unlike this case, in Annabi the government's *in limine* request was narrowly targeted because it sought to exclude twenty-two specific emails. Id. at *1-2; see also Weiss v. La Suisse, Societe D'Assurances Sur La Vie, 293 F. Supp. 2d 397, 407 (S.D.N.Y. 2003) ("A motion in limine may properly be denied where it is too sweeping in scope."). At this point, absent the government's identification of specific statements, it is premature for the government to ask the Court to preclude an entire class of unknown statements with unknown probative value. While Mr. Binday agrees that he will not rely on his statements in the January 21, 2011 email to prove lack of intent to defraud, the Court should deny this motion in all other respects.

## X.   Evidence and Argument About the Defendants' Legitimate Insurance Business Should Not Be Precluded

Continuing its speculation as to potential defenses at trial, the government argues that evidence of the Defendants' "legitimate" insurance business should be excluded. The government advances this position despite the fact that (a) it plans to call several individuals from Mr. Binday's insurance business to testify at trial; (b) it seeks to introduce the Defendants' tax returns; and (c) several of the insureds listed as potential trial witnesses met the Defendants in the context of purchasing other forms of insurance, such as term life insurance and long-term care insurance. In other words, the issue of the Defendants' life-long "legitimate" insurance business is inextricably linked with evidence the government proposes to present at trial. The government should not be permitted to strip the Defendants' conduct of context and, in so doing, mislead and inflame the jury. This motion should be denied, and the issue can be revisited at

trial in the context of objections to specific documents or lines of questioning.  Cf. Baxter

Diagnostics, Inc. v. Novatek Med., Inc., No. 94 Civ. 5220(AJP), 1998 WL 665138, at *3

(S.D.N.Y. Sept. 25, 1998) (denying motions *in limine* that "lack[ed] the necessary specificity

with respect to the evidence to be excluded" and were "too sweeping in scope to be decided *in*

*limine*").

**XI.     The Court Should Prohibit the Government From Relying on Facts Relating to**
**        Mr. Binday Regarding a Previously Dismissed Obstruction Charge**

        The government's attempt to present evidence against Mr. Binday regarding the now-

dismissed Count V is nothing more than a surreptitious recharging of a dismissed count of the

indictment.  As the government concedes, Count V of the indictment, charging Mr. Binday with

obstruction of justice, was dismissed with the government's consent during pretrial motion

practice because the government conceded that it lacked evidence demonstrating that Mr. Binday

intended to obstruct an official proceeding.  See Gov't Opp'n at 1, ECF No. 43 (agreeing to

dismiss Count V against Binday based on the "application of Supreme Court's decision in United

States v. Aguilar, 515 U.S. 593 (1995)"); Binday, 908 F. Supp. 2d at 487 (dismissing Count V

because that charge "fails as a matter of law").  Notwithstanding its agreement to dismiss Count

V, the government still seeks to admit evidence that Mr. Binday allegedly sought to arrange for

others to lie about the fact that misrepresentations were made on insurance applications when

speaking with insurance company investigators.

        Although the government wrongly argues that the allegedly obstructive conduct is

admissible as direct evidence of both the conspiracy and the substantive counts, proof of

obstruction is not necessary to prove any of the crimes with which Mr. Binday is charged.  With

respect to the conspiracy count (Count I), the Supreme Court has held that actions taken to cover

up a conspiracy are not themselves part of the conspiracy:  "Acts of covering up, even though

done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." Grunewald v. United States, 353 U.S. 391, 402 (1957) (citing Krulewitch v. United States, 336 U.S. 440, 442-43 (1949); and Lutwak v. United States, 344 U.S. 604, 617-18 (1953)). As "every conspiracy is by its very nature secret . . . [and] every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces," it follows that acts to conceal a conspiracy cannot be implied to be part of the conspiracy itself. Grunewald, 353 U.S. at 402.

Nor should the government be permitted to use this evidence as direct evidence of the substantive offenses of mail and wire fraud. Inclusion of these facts at trial will only lead to juror confusion and prejudice to Mr. Binday in a case where his co-defendants—but not Mr. Binday—are charged with conspiracy to obstruct justice. See Indictment Count IV (charging Messrs. Kergil and Resnick with conspiracy to destroy records and obstruct justice).

The government argues that the only probative value of this evidence is to show that "these lies were a perpetuation of the lies that Binday and others had caused to be made to the Subject Insurers in the first instance." Gov't Mot. at 29. But the government's efforts to rely on this evidence for this purpose is particularly unnecessary in this case because Mr. Binday is not contesting the misrepresentations at issue. On August 28, 2013, Mr. Binday informed the government that he will not contest the fact that the applications contained misrepresentations as set forth in Paragraph 17 of the indictment. Mr. Binday's decision to not contest the misrepresentations renders the alleged obstructive evidence impermissibly cumulative and unnecessary. Indeed, evidence is properly excluded under Federal Rule of Evidence 403 as cumulative if it is relevant to issues already conceded. See Madeira v. Affordable Hous. Found.,

Inc., 469 F.3d 219, 251 (2d Cir. 2006) (affirming the exclusion of evidence of lack of insurance "as cumulative and wasteful of the court's and the jury's time because the parties entered into a stipulation to that fact"); Wisdom v. Undercover Police Officer # C0127, 879 F. Supp. 2d 339 (E.D.N.Y. 2012) (allowing that parties could stipulate to a third-party's conviction to render evidence of that conviction "cumulative and subject to exclusion under Rule 403"); Epstein v. Kalvin-Miller Int'l, Inc., 121 F. Supp. 2d 742, 745 (S.D.N.Y. 2000) ("Given that the parties have stipulated that due to his heart condition and diabetes, plaintiff was disabled [and] . . . any further evidence of defendant's medical condition to prove the disability element of plaintiff's prima facie case would be a 'needless presentation of cumulative evidence.'").  Because this evidence is unnecessarily cumulative, the Court should prohibit the government from using it at trial.

Moreover, Mr. Binday's decision not to contest the misrepresentations at issue in this case also should prohibit the government from relying on this evidence pursuant to Rule 404(b) as probative of Mr. Binday's "intent" and "knowledge."  Because Mr. Binday is not contesting the misrepresentations, the evidence the government seeks to admit is not relevant to the remaining disputed issues in the case, namely the materiality of the misrepresentations in the life insurance applications and whether the Defendants intended to harm the Insurers by depriving them of a benefit they reasonably expected.  See, e.g., United States v. O'Connor, 580 F.2d 38, 43 (2d Cir. 1978) (holding inadmissible under Rule 404(b) evidence of other bad acts that "was not relevant to a significant issue that was truly in dispute").

Finally, the government cites a series of cases for the proposition that this alleged obstructive conduct is "inextricably intertwined" with the charged crimes and, therefore necessary to complete the story.  Gov't Mot. at 30.  The government's cases are totally misplaced because in those cases the challenged evidence was necessary to provide context for

40

the underlying crimes—without the challenged evidence the charged crimes made no sense.  See

United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997) (holding that the challenged

evidence of a thwarted burglary "gave coherence to the basic sequence of events that occurred on

the night [of the arrests]" at issue in a case concerning possession of a firearm); United States v.

Kaiser, 609 F.3d 556, 571 (2d Cir. 2010) (affirming the admission of evidence of fraudulent

dealings prior to the charged securities fraud conspiracy because "[i]t would have been

impossible to intelligibly present a case . . . without starting at the beginning"); United States v.

Rigas, 490 F.3d 208 2d Cir. 2007) (affirming admission of evidence of pre-conspiracy period

acts of the same type and nature as the charged criminal activity and whose effects carried over

into the conspiracy period).  By contrast, in this case, however, the evidence of the alleged

obstruction is unnecessary and cumulative because it is not needed to provide necessary context

for the underlying alleged criminal conduct.

## XII.   The Court Should Prohibit the Government from Introducing Statements Mr. Binday Made to the New York State Insurance Department

The government's request to admit evidence that Mr. Binday made misrepresentations (1)

in a letter from his lawyer to the New York State Insurance Department (the "Insurance

Department"); and (2) during testimony to the Insurance Department, is impermissibly

cumulative.  The misrepresentations the government seeks to introduce are the same series of

misrepresentations set forth in the indictment.  Compare Gov't Mot. at 31-32 (identifying

misrepresentations regarding net worth, premium payment and insurable interest), with

Indictment ¶¶ 17(a)-(c) (same).  As noted above, courts should exclude evidence under Rule 403

as cumulative if it is relevant to issues that will not be contested at trial.  See, e.g., Madeira, 469

F.3d at 251.  Mr. Binday is not contesting the misrepresentations at issue and he has informed the

government of his intent in that regard.  Therefore, the Court should prohibit the government

from relying on it.

Moreover, Mr. Binday is not charged with defrauding or making false statements to a

state regulatory agency and no part of this case requires proof of such conduct.  Despite the

government's laser-like focus on the lies and misrepresentations in this case, as pointed out

above, this case is not a *false statements* case.  It is a *fraud* case, which requires proving critical

elements beyond the making of a false statement, including the fact that the statement was

material and involved the wrongful taking of money or property.  See Starr, 816 F.2d at 98

("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud

prosecution"); see also United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000) (discussing

the elements of mail and wire fraud).  The government's insistence on proving that Mr. Binday

made false statements to a state agency could easily confuse the jury into thinking that Mr.

Binday is charged with making false statements even though he is not.  See United States v.

Bowe, 360 F.2d 1, 15 (2d Cir. 1966) ("A trial judge has discretion to exclude evidence which is

only slightly probative if its introduction would confuse and mislead the jury by focusing its

attention on collateral issues and if it would unnecessarily delay the trial.").

Further, whether Mr. Binday lied on these other statements makes it no more likely that

the statements at issue in this case constituted fraud.  The only realistic purpose of admitting this

evidence would be to imply that Mr. Binday had a propensity to commit the charged crimes, the

exact inference that Rule 404(b) seeks to preclude.  See United States v. Cushing, No. S3 00 CR.

1098(WHP), 2002 WL 1339101, at *3 (S.D.N.Y. June 18, 2002) (denying a government motion

to admit evidence of false statements made to NASD in a prosecution for securities fraud for

making false statements to the SEC); United States v. Hatfield, 685 F. Supp. 2d 320, 323-24

(E.D.N.Y. 2010) (relying on <u>Cushing</u> to deny the government's motion to admit evidence of the defendants' uncharged false statements, which stood "a good chance of confusing the jury as to the actual crimes charged").  Because Mr. Binday does not plan to challenge the misrepresentations at trial, this confusion can be easily avoided.

## XIII.  Evidence of Purported Efforts to Influence a Witness Is Irrelevant to Conduct Charged Against Mr. Binday and Risks Spillover Prejudice

The government argues that it should be permitted to introduce evidence allegedly demonstrating that Mr. Binday—almost two years after the initiation of the government's investigation and well after Mr. Binday submitted his last insurance policy to the Insurers—instructed a government cooperating witness (Paul Krupit) to get new counsel and not cooperate with the government.  The government claims that this evidence shows consciousness of Mr. Binday's guilt.  But even if that were true, this evidence is highly prejudicial because it suggests not that Mr. Binday was guilty of the crimes charged, but that he tampered with or obstructed the government's investigation, notwithstanding the fact that this Court already dismissed the obstruction charge.  Moreover, this evidence is not probative of the only two disputed issues in this case:  (1) whether this information was material to the Insurers; and (2) whether the Insurers were defrauded because they did not receive a benefit they otherwise expected.  Because this evidence is not probative of either of those elements, and because the jury will likely be confused into wrongly thinking that Mr. Binday attempted to obstruct the government's investigation (when that charge already has been dismissed), the Court should prohibit the admission of this irrelevant and highly prejudicial evidence.

## XIV.  Evidence of Mark Resnick's Alleged Underpayment of Taxes Should be Excluded

Finally, without specifying what amounts or which tax years, the government seeks permission to present evidence that Mark Resnick allegedly failed to pay taxes on certain income

derived from the conduct charged in the indictment.  The government justifies this patently

prejudicial accusation by claiming—without explanation in the context of this case, because

there is none—"concealment of ill-gotten gains is an integral part of assuring the success of that

illegal activity."  Gov't Mot. at 34 (quoting United States v. Saadey, 393 F.3d 669, 678 (6th Cir.

2005)).  This transparent effort to circumvent Rule 404(b)'s prohibition on propensity evidence

should be rejected.

      The government fails to cite the applicable standard.  The Sixth Circuit's decision in

Saadey involved the issue of joinder under Fed. R. Crim. P. 8, which requires a similarity or

transactional connection between the joined counts.  See Saadey, 393 F.3d at 678.  Fed. R. Evid.

404(b) requires, on the other hand, a clear connection between the prior act evidence and a

disputed issue at trial.  In particular, where, as here, prior act evidence is offered to prove a

defendant's intent or knowledge, it must be similar to the charged offense.  United States v.

LaFlam, 369 F.3d 153, 156 n.1 (2d Cir. 2004) (per curiam); see United States v. Brand, 467 F.3d

179, (2d Cir. 2006) (government must show "similarity or some connection" of prior act

evidence to charged crime, in order to establish that the prior act is relevant to a disputed

element, such as intent).  Thus, "it is an abuse of discretion for the trial court to admit other-act

evidence 'if the other act or acts are not sufficiently similar to the conduct at issue.'"  United

States v. Gordon, 987 F.2d 902, 909 (2d Cir. 1993) (quoting United States v. Afjehei, 869 F.2d

670, 674 (2d Cir. 1989)); see United States v. Garcia, 291 F.3d 127, 137, 139, 145 (2d Cir. 2002)

(finding reversible error in district court's admission of a prior drug conviction as relevant to

knowledge and intent with regard to charged drug offense).  To that end, "[t]he probative value

of the proffered evidence depends largely on whether or not there is a close parallel between the

crime charged and the acts shown."  Gordon, 987 F.2d at 908 (internal citation omitted).

Here, there is no such "close parallel" between Mr. Resnick's alleged under-reporting of income and the charged offense, much less, a connection between the tax matter and a disputed issue at trial. The other act involves alleged tax fraud, the indictment charges insurance fraud. More importantly, the disputed issue at trial will not be that Mr. Resnick was unaware of the falsity of the representations on the insurance applications, but whether these false statements were material to the Insurers. In that light, there is simply no parallel between under-reporting of taxable income and the charged offense. See, e.g., United States v. Scott, 677 F.3d 72, 81 (2d Cir. 2012) (remanding where recognition evidence admitted to establish undisputed issue of identity, because "evidence admitted under 404(b) must be relevant to an issue in dispute").

The cases cited by the government do not dictate a contrary result. Saadey, as noted earlier, addressed improper joinder and not the more stringent dictates of Rule 404(b). United States v. Deutsch, 451 F.2d 98 (2d Cir. 1971), has nothing to do with unreported taxable income. Rather, it involved a failure by an investment advisor to disclose a conflict of interest. In the one case cited by the government involving the admission of tax filings under Rule 404(b), Lesniewski, the failure to report income was "inextricably intertwined" with the charges at trial that the defendant had fraudulently obtained disability payments while claiming he had not worked. Lesniewski, 2013 WL 3776235, at *7. Here, any claim that Mr. Resnick's alleged failure to report income was "integral" to the success of the alleged illegal activity is without merit. Had the I.R.S. audited Mr. Resnick and discovered unreported income, that process would not have led inexorably to an investigation of how he earned undisclosed income. (Indeed, given the failure of the government to articulate the amounts and dates of the alleged evasion, it is not even clear if the fraud investigation was already underway and known to Mr. Resnick when the alleged under-reporting occurred.) Nor was there ever a requirement related to Mr. Resnick's

charged conduct that he produce tax returns, disclose or conceal income, or correlate his activities with information provided in his personal and business tax returns. Simply put, the charged conduct and the allegation of undisclosed taxable income are wholly unrelated. In the absence of any connection with the charged conduct, the alleged tax evasion is not indicative of "consciousness of guilt," but simply evidence of bad character and propensity to commit crime—the precise evidentiary function Rule 404(b) outlaws.

Finally, the admission of this evidence does not separately satisfy the requirements of Rule 403. Evidence may also be unfairly prejudicial when, even though relevant to a fact in issue, it also tends so strongly to show the defendant's propensity to commit crimes. See, e.g., Old Chief v. United States, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged…'Unfair prejudice'…means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."). Here, the prejudice of the proposed 404(b) evidence substantially outweighs any probative value. The Defendants are not disputing the existence of false statements on life insurance policies submitted to Insurers in this case. The central, contested issues at trial will be whether these statements impacted the heart of the life insurance transaction, and whether the statements were material. Whether Mr. Resnick failed to report income is a complete sideshow to the contested issues, and evidence on this point will only serve to inflame the jury against him, and confuse the issues, by requiring him to defend against wholly separate allegations.

**CONCLUSION**

46

For the reasons set forth herein, the Defendants respectfully request that the Court dismiss the indictment.  Alternatively, we request that the Court deny the Government's Motions *in Limine* and Motions Related to Federal Rule of Evidence 404(b) in full, prohibit the government from proceeding on an uncharged "right to control" theory, and require the government to proceed—if it can—on the original mail and wire fraud theory as outlined in the indictment and approved by the Court.


Dated:  September 3, 2013                     Respectfully Submitted,
        New York, N.Y.


                                              _____s/ Elkan Abramowitz_____
                                              Elkan Abramowitz
                                              Benjamin S. Fischer
                                              Jasmine Juteau
                                              Peter Janowski
                                              MORVILLO ABRAMOWITZ
                                              GRAND IASON & ANELLO P.C.
                                              565 Fifth Avenue
                                              New York, New York 10017
                                              (212) 856-9600

                                              *Attorneys for Defendant Michael Binday*