D9OJBIN1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          12 Cr. 152 CM

5    MICHAEL BINDAY,
     a/ka/ Sealed Defendant 1,
6    JAMES KEVIN KERGIL,
     a/k/a Sealed Defendant 2,
7    and MARK RESNICK,
     a/k/a Sealed Defendant 3,

8
                    Defendants.
9
     ------------------------------x
10

11

12                                        September 24, 2013
                                          10:50 a.m.
13

14

15   Before:

16                     HON. COLLEEN McMAHON,

17                                          District Judge
                                              and a jury
18

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

D9OJBIN1                         Trial

APPEARANCES

PREET BHARARA,
        United States Attorney for the
        Southern District of New York
SARAH McCALLUM,
ZACHARY FEINGOLD,
EUN YOUNG CHOI,
        Assistant United States Attorneys


MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.
        Attorneys for defendant Binday
BY:   ELKAN ABRAMOWITZ, Esq.
      BENJAMIN SEAN FISCHER, Esq.
      JASMINE MARIE JUTEAU, Esq.
                Of counsel


GALLET DREYER & BERKEY, LLP,
        Attorneys for defendant Kergil
BY:   ROGER LEE STAVIS, Esq.
      ADAM MICHAEL FELSENSTEIN, Esq.
                Of counsel


LAW OFFICES OF JANE ANNE MURRAY
        Attorneys for defendant Resnick
BY:   JANEANNE MURRAY, Esq.
                Of counsel

1          (Trial resumes)

2          (In open court; jury not present)

3          THE COURT:  I apologize for having suppressed the fact

4    I was in the middle of a root canal.

5          MS. MURRAY:  Your Honor, can I put something on the

6    record?

7          THE COURT:  Yes.

8          MS. MURRAY:  I was the only attorney in the courtroom

9    this morning with somebody from Connect, the Computer Connect

10   service and a juror walked in and looked at me and said, "Am I

11   too early?"  And I said to her, "10:30."

12         THE COURT:  Good answer!

13         MR. FELSENSTEIN:  We have an application this morning.

14         THE COURT:  Yes.

15         MR. FELSENSTEIN:  Pursuant to Rule 403, we would like

16   to preclude testimony from Thomas Pernice.  Pernice is the son

17   of the insured Mary Pernice.  We have had testimony from three

18   insureds already.  We are going to have a fourth today from

19   Steven Espinal.

20         THE COURT:  What is it he is going to testify to that

21   his mother hasn't already testified to?

22         MR. FELSENSTEIN:  His mother hasn't testified, your

23   Honor.  They're only testifying to the fact there are lies on

24   the application, which we have conceded in our opening and

25   cross-examined witnesses on as well.

D9OJBIN1                        Trial

1           THE COURT:  I am not going to preclude the government

2    from putting on its case.

3           MR. FELSENSTEIN:  Thank your Honor.

4           MS. McCALLUM:  Your Honor, we have just one matter.

5           We would like, at the request and suggestion of the

6    Court Reporters, offer into evidence what has been marked as

7    Government Exhibit 6000.

8           THE COURT:  Yes.

9           MS. McCALLUM:  Which is the list of all the exhibits

10   we entered into evidence.

11          THE COURT:  I knew the Court Reporters would come up

12   with a solution!  I just knew it!  It is in evidence.

13          MR. ABRAMOWITZ:  No objection.

14          THE COURT:  It is in evidence.

15          (Government Exhibit 6000 received in evidence)

16          MR. FEINGOLD:  Would you like us to get the witness,

17   your Honor?

18          THE COURT:  Let's get the witness.

19          (Recess)

20          THE COURT:  Can we get the jurors, please.

21          THE CLERK:  Yes.

22          (Jury present)

23          THE COURT:  Good morning, everybody.  I am really,

24   really sorry.  I apologize.  I had obviously suppressed the

25   fact I was in the middle of a root canal when we started the

1    trial and that I had to finish it this morning.  I forgot that

2    yesterday.

3            When I got back down to my office, there was, of

4    course, a message from the endodontist reminding me I had this

5    appointment.  That is why I am late.  It is my fault.  I really

6    apologize.  Sir, you're still under oath.  I believe we're on

7    cross.

8    CROSS-EXAMINATION

9    BY MR. FISCHER:

10   Q.  Good morning, Mr. Marcec.  My name is Ben Fischer, and I

11   represent Michael Binday.

12           Mr. Marcec, you testified yesterday about

13   illustrations that you worked on while you were at R. Binday

14   Plans & Concepts, correct?

15   A.  Yes.

16   Q.  You worked on preparing and reviewing illustrations.  Isn't

17   that right?

18   A.  Yes.

19   Q.  Illustrations contained certain estimates about certain

20   things related to a life insurance contract, correct?

21   A.  Yes.

22           MR. FISCHER:  Can I have the government show

23   Government Exhibit 536, please.

24   BY MR. FISCHER:

25   Q.  I would like to specifically direct your attention to the

D9OJBIN1                         Marcec - cross

1    page with the Bates number 293517.  Mr. Marcec, just let me

2    know when you've gotten there.  You might also be able to look

3    on your screen, too.

4    A.  Yes, I have it.

5    Q.  Do you see that?

6    A.  Yes.

7    Q.  Mr. Feingold was asking you some questions yesterday about

8    this chart in the middle of the page.  Do you recall some of

9    those questions?

10   A.  Yes.

11   Q.  He was asking you about premium outlays, right?

12   A.  Yes.

13   Q.  And the fact that -- he asked you whether part of the first

14   year premium outlay would be paid as a commission to the

15   insurance broker.  Do you remember that?

16   A.  Yes.

17   Q.  And then he said the second -- he discussed with you the

18   fact the second year premium, oftentimes the funders would be

19   looking for a low second year premium.  Do you recall that?

20   A.  Yes.

21   Q.  I want to direct your attention to the premium outlays on

22   that chart between lines 3 and 20.  Do you see those?

23   A.  Yes.

24   Q.  Is it fair to say that between lines 3 and 20, every

25   premium outlay is $156,734,00.  Do you see that?

1    A.  Yes.

2    Q.  And that that number is bigger than the first year premium

3    outlay of $149,300.00, correct?

4    A.  Yes.

5    Q.  It is also bigger than the second year premium outlay of

6    $72,015.00, correct?

7    A.  Yes.

8    Q.  And is it fair to say that the premium outlay referenced in

9    line items 3 through 20 of that chart is money that if the

10   insurance policy stays in effect, is going to the life

11   insurance company, correct?

12   A.  Yes.

13   Q.  Now, you talked yesterday about how you had a role with

14   respect to funders and investors, right?

15   A.  Yes.

16   Q.  You had a role at R. Binday Plans & Concepts with respect

17   to funders and investors, correct?

18   A.  Yes.

19   Q.  Funders, funders were people who loaned money to make

20   premium payments, correct?

21   A.  Yes.

22   Q.  That was usually a two-year arrangement, correct?

23   A.  Correct.

24   Q.  And at the end of those two years, the money that the

25   funder loaned would be repaid, correct?

1    A.  Yes.

2    Q.  If the policy was sold?

3    A.  Yes.

4    Q.  That's the funder.

5          Investor would be someone who would buy the policy,

6    correct?

7    A.  Yes.

8    Q.  The amount they paid for the policy would typically

9    reimburse the funder, correct?

10   A.  Repeat that.

11   Q.  The amount an investor paid for a policy, a portion of that

12   amount would reimburse the funder, the entity that loaned the

13   money, correct?

14   A.  I am sorry.  Say that again.

15   Q.  Sure.  The funder would be repaid through the sale of the

16   life insurance policy, correct?

17   A.  Yes.

18   Q.  And oftentimes, many times, not just the funder would get a

19   payment if there was a sale of a life insurance policy, the

20   insured, the person getting life insurance, would also get a

21   payment as well, correct?

22   A.  Yes.

23   Q.  And typically that payment could be -- withdrawn.

24          That payment could be upwards of a hundred thousand

25   dollars, correct?

1   A.  Yes.

2   Q.  Now, the concept of the investors, the people who were

3   buying the life insurance policy, is that sometimes referred to

4   as a life settlement?

5   A.  Yes.

6   Q.  It's true, is it not, that life insurance policies have

7   cash value sometimes?  They're worth something?

8   A.  Yes.

9   Q.  And they may be worth more -- withdrawn.

10          They have cash value.  They're an asset, right?

11  A.  Yes.

12  Q.  Many times people -- withdrawn.  People are free to buy or

13  sell assets, right?

14  A.  Yes.

15  Q.  Do you have an understanding that people are free to buy

16  and sell life insurance policies -- which are assets, correct?

17  A.  Yes.

18  Q.  It's true, is it not, that there is a multi-billion dollar

19  life insurance --

20          MR. FEINGOLD:  Objection.

21          THE COURT:  I don't know what he is going to say.

22          MR. FEINGOLD:  Apologies.

23          THE COURT:  You do.  I don't.  Ask the question.

24          MR. FISCHER:  I'll start again.

25  BY MR. FISCHER:

1   Q.   It is true, is it not, Mr. Marcec, that there is a

2   multi-billion dollar life settlement market in the United

3   States, correct?

4               MR. FEINGOLD:  Objection, your Honor.

5               THE COURT:  Overruled.

6   A.   Yes.

7   BY MR. FISCHER:

8   Q.   It's true, is it not, that some of the largest insurance

9   companies in the world are active players in that life

10  settlement market.  Isn't that correct?

11              MR. FEINGOLD:  Objection, your Honor.

12              THE COURT:  Overruled.

13  A.   Yes.

14  BY MR. FISCHER:

15  Q.   American General is a very active player in that market.

16  Isn't that right?

17  A.   Yes.

18  Q.   They buy and sell life insurance policies, don't they?

19  A.   Yes.

20  Q.   To the tune of billions of dollars, right?

21  A.   Yes.

22  Q.   Other life insurance companies do as well, correct?

23  A.   I believe so.

24  Q.   You testified yesterday on direct examination about

25  something called life expectancy reports.  Do you remember that

1   testimony generally?

2   A.  Yes.

3   Q.  Those were reports that sometimes you would get in

4   connection with providing a package to funders or investors,

5   right?

6   A.  Yes.

7   Q.  Do you have any knowledge of whether life insurance

8   companies also used life expectancy reports in determining, in

9   analyzing life insurance contracts?

10  A.  Yes.

11  Q.  They do, right?

12          It is a standard thing in the industry, correct?

13  A.  Yes.

14  Q.  You were also asked some questions generally yesterday

15  about life expectancy.  Do you remember those?

16  A.  Yes.

17  Q.  And the companies would prepare life expectancy reports

18  generally.  Do you remember that generally?

19  A.  Yes.

20  Q.  And that the life expectancy reports would come up with a

21  number.  Mr. Feingold showed you how many months that life

22  expectancy report thought someone was going to live.  Do you

23  remember that generally?

24  A.  Yes.

25  Q.  Mr. Marcec, nobody can determine how long someone is going

1    to live, correct?

2    A.  Correct.

3    Q.  Nobody knows the exact day somebody is going to die,

4    correct?

5    A.  Correct.

6    Q.  Premiums that are received by life insurance companies, and

7    in this case -- withdrawn.  The premiums that are received by

8    life insurance companies on the cases that you worked on would

9    be well over a hundred thousand dollars, correct?

10   A.  Yes.

11   Q.  Over $150,000, correct?

12   A.  Yes.

13   Q.  Sometimes over $200,000, correct?

14   A.  Yes.

15   Q.  And those were payments received by the insurance

16   companies, correct?

17   A.  Yes.

18   Q.  Now, isn't it true that the insurance companies, when they

19   receive those payments, they invest those payments?

20   A.  Yes.

21           MR. FEINGOLD:  Objection, your Honor.

22           THE COURT:  The objection is sustained.

23   BY MR. FISCHER:

24   Q.  Do you have any knowledge of whether insurance companies

25   that receive --

1          THE COURT:  There is no other way to ask the question.

2     The objection is sustained to the line.

3          MR. FISCHER:  May I have a moment, your Honor?

4          THE COURT:  Yes.

5          (Off-the-record discussion)

6     BY MR. FISCHER:

7     Q.  Mr. Marcec, just going back to some questions I asked you a

8     few moments ago about a life insurance cash value.  Do you

9     recall those?

10    A.  Yes.

11    Q.  Life insurance has cash value, correct?

12    A.  Yes.

13    Q.  And that means if you go to a life insurance company, at

14    some point they may give you some amount of cash in exchange

15    for you terminating that policy, correct?

16    A.  Yes.

17    Q.  They'll pay you, and they determine, the life insurance

18    company determines how much cash it is they'll give you?

19    A.  Yes.

20    Q.  Correct, and that is sometimes called a cash surrender,

21    right?

22    A.  Yes.

23    Q.  Isn't it true that the life settlement market often offers

24    people who have insurance more money for their life insurance

25    policy than what the life insurance company is offering on a

D9OJBIN1                    Marcec - cross

 1   surrender basis?

 2            MR. FEINGOLD:  Objection, your Honor; foundation.

 3            THE COURT:  The objection is sustained.

 4            MR. FISCHER:  Your Honor, he handled these

 5   transactions.  He worked, he brokered these transactions.

 6            THE COURT:  For the life insurance company?  I don't

 7   think so.  That is fine.  You will have people from the

 8   insurance industry testifying.

 9            MR. FISCHER:  I have nothing further.

10            THE COURT:  Anybody else?

11            MR. STAVIS:  No, your Honor.

12            THE COURT:  Ms. Murray?

13            MS. MURRAY:  Your Honor, just a couple of questions.

14            THE COURT:  Sure.  Okay.

15   CROSS-EXAMINATION

16   BY MS. MURRAY:

17   Q.  Good morning, Mr. Marcec.

18            You're not an actuary, are you?

19   A.  No.

20   Q.  The charts that you showed us yesterday of potential

21   returns from investments in life insurance policies, these

22   weren't prepared by actuaries, right?

23   A.  I am sorry.  Which charts?

24   Q.  The charts, the graphs that were put up on the overhead

25   yesterday which would be sent out to hedge funds in connection

1    with selling the life insurance policies and showing the

2    returns?

3    A.   Illustrations?

4    Q.   Yes.

5    A.   Yes, they were not prepared by actuaries.

6    Q.   They were not prepared using actuarial models, correct?

7    A.   They were prepared using the software from the insurance

8    carriers.

9    Q.   Do you know what went into that software --

10   A.   No.

11   Q.   -- mr. Marcec?

12           And these were essentially marketing materials to the

13   hedge funds, would that be fair to say, provided to the hedge

14   funds?

15   A.   Yes.

16           MS. MURRAY:  No further questions.

17           MR. FEINGOLD:  No redirect, your Honor.

18           THE COURT:  Thank you, sir.  Sorry to bring you back

19   today.

20           (Witness excused)

21           THE COURT:  Call your next witness.

22           MR. FEINGOLD:  The government calls James Avery.

23    JAMES AVERY,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

D9OJBIN1                              Marcec - cross

1    DIRECT EXAMINATION

2    BY MR. FEINGOLD:

3    Q.  Good morning, Mr. Avery.

4    A.  Good morning.

5    Q.  How old are you?

6    A.  61.

7    Q.  Where do you live?

8    A.  In Langhorne, Pennsylvania.

9    Q.  Did you go to college?

10   A.  I did.

11   Q.  Where did you go to college?

12   A.  La Salle University in Philadelphia.

13   Q.  Did you graduate?

14   A.  I did.

15   Q.  What did you get your degree in?

16   A.  BA in mathematics.

17   Q.  When did you graduate?

18   A.  1973.

19   Q.  What did you do after graduating college?

20   A.  I joined the Penn Mutual Life Insurance Company of

21   Philadelphia as an actuarial intern.

22   Q.  What is Penn Mutual?

23   A.  Penn Mutual is a mutual life insurance company.

24   Q.  What is an actuary?

25   A.  An actuary is someone who is trained and specializes in the

D9OJBIN1                          Avery - direct

1    measurement of risk.  Usually you find them in insurance

2    companies or in pension plans, the organizations where they can

3    measure risk and finance and the probability of death or

4    probability of health impairments, and they determine premiums

5    and they determine reserves adequate to pay future claims.

6    Q.  Is that really the pricing?

7    A.  That is one of the functions they do is pricing, yes.

8    Q.  Pricing of insurance policies?

9    A.  Pricing of all types of insurance, yes.

10   Q.  How long were you at Penn Mutual?

11   A.  I spent 15 years with Penn Mutual.

12   Q.  Where did you go after Penn Mutual?

13   A.  I joined the Prudential Insurance Company of America.

14   Q.  When was that?

15   A.  In October of 1988.

16   Q.  What were your different roles at Prudential?

17   A.  I joined them serving in the capacity as a corporate

18   actuary on the finance side.  I eventually wound up in

19   individual life insurance.  At one point I wound up running a

20   distribution, independent distribution company that deals with

21   agents and brokers who are not employed directly by Prudential.

22        I was chief actuary and chief financial officer for

23   the individual life business.  I eventually became president

24   and then in my last -- for 14 years I was president.  The last

25   6 or 7 years I was CEO of both individual life and our agency

D9OJBIN1                          Avery - direct

```
 1    distribution organization.  They were the agents who were
 2    employed by Prudential and carried Prudential business cards.
 3    Q.  In around the time of, let's say, 2005 to 2008, what was
 4    your position?
 5    A.  I think in 2005 I was probably president of the individual
 6    life insurance business.
 7    Q.  Would that include universal life policies issued to
 8    individuals?
 9    A.  All life insurance products issued in the United States.
10    Q.  When did you become CEO of that business?
11    A.  Probably about 6 or 7 years ago.
12    Q.  Are you still at Prudential?
13    A.  I retired April 1 of this year.
14    Q.  Mr. Avery, are you familiar with the term STOLI?
15    A.  I am.
16    Q.  What is STOLI?
17    A.  STOLI is an acronym which references many different ways of
18    referring to it, but primarily stranger initiated or stranger
19    owned life insurance, meaning that the owner or the person who
20    initiated the sale is a stranger to the insured and has no
21    insurable interest in the well-being of that insured.
22    Q.  What is an insurable interest?
23    A.  Insurable interest is codified by law.  It means that the
24    owner and beneficiary of the policy has an interest in the life
25    of the insured that goes beyond the insurance, meaning they're
```

1  endeared by either relationship, marriage or familiar

2  relationship or business relationship and that the person's

3  well-being is more important to them than the insurance

4  proceeds and that their relationship is not dependent strictly

5  on being rewarded at death.

6          So if you have an insurable interest, meaning you have

7  an interest beyond the insurance in that life.  By law in most

8  states, to buy insurance you have to have an insurable

9  interest.

10 Q.  Is an insurable interest something that Prudential looked

11 at in deciding whether to issue universal life insurance

12 policies?

13 A.  We look at it to issue any life insurance policy.

14 Q.  What are some of the characteristics that you associated

15 with STOLI policies?

16 A.  They're a number of characteristics.  It was a market that

17 began probably in 2004-2005.  It involved some of the

18 characteristics change.

19         First off, I would say the industry, as they began to

20 understand it, at least my role, never wanted to issue a STOLI

21 policy.  As it evolved --

22         MR. ABRAMOWITZ:  I object.  Is he speaking for the

23 entire industry or only his company?

24         THE WITNESS:  I will change my answer.

25         THE COURT:  You don't have to.  You may sit down.

1    A.   In my capacity not only at Prudential, but I also served on

2    the life insurance, American Council of Life Insurance

3    Committee.  I had a role that was broader than just Prudential

4    in terms of legislative matters.

5            Anyway, going back, if you can repeat the question,

6    please?

7    Q.   Sure.  What are some of the characteristics that you

8    associated with STOLI policies?  I think just if you move the

9    microphone a little closer to you, that would be great.

10   A.   A number of characteristics.  I would say first, typically

11   they were large policies, typically issued to senior citizens.

12           "Senior" is defined as probably age 65 or above.

13   Typically what we would find if we could do proper evaluation

14   and get the facts, we would find that the individual insureds a

15   lot of times didn't need the insurance, didn't want the

16   insurance.  In a number of cases they couldn't afford the

17   insurance and someone arranged the financing, albeit a number

18   of times it was disguised to us.  They arranged financing to

19   pay the premiums because the person being insured couldn't

20   afford it.  Even if they could afford it, they didn't want to

21   buy the insurance.

22           A lot of times we saw they were given money to allow

23   the stranger to buy the insurance.  We saw advertisements in

24   Florida such as free cruises, free dinners, all things to

25   induce senior citizens to allow someone who had no insurable

1   interest in that person to buy an insurance policy, generally a

2   large insurance policy on that life.

3          THE COURT:  I need to tell you, see this nice man?  He

4   can only type so fast.  You talk like I talk; real fast.

5          THE WITNESS:  I will try to slow it down.

6          THE COURT:  Slow it down a little bit.

7          THE WITNESS:  Thank you.

8   BY MR. FEINGOLD:

9   Q.  What type of payment patterns, if any, did you associate

10  with STOLI?

11  A.  Well, as I said, the first thing is that when we could

12  discover STOLI, we found that there was someone behind the

13  scenes other than the insured who was purporting to purchase

14  the policy, paying the premiums.  They would typically be paid

15  with that loan for about two years, which there is a reason

16  behind the fact that generally insurance companies are limited

17  in contesting a claim after the first two years, except in a

18  lot of states for fraud.

19          So what we would find is there would be a loan in

20  place for two or three years to cover those initial premiums,

21  and then generally the policy then would be sold, if not

22  sooner, it would be sold and then the new investor-owner would

23  pay premiums from that point forward.

24  Q.  We have been talking about STOLI.  I think you testified

25  that there are other terms as well.  Are you familiar with the

1  term STOLI?

2  A.  Yes, that is the stranger originally life insurance, but

3  its is the same transaction or same marketing, market approach.

4  Q.  The same question for IOLI, I O L I?

5  A.  Again used for the same thing, the person initiated it, a

6  point of referencing there is an investor-owned life insurance,

7  but the same sort of marketing scheme where eventually the true

8  owner or beneficiary of the proceeds will not be the insured,

9  but will be someone who is unrelated to the insured, a

10 stranger.

11 Q.  Just so we are on the same page, I used the term STOLI

12 today.

13 A.  Okay.

14 Q.  When is the first time you became aware of STOLI?

15 A.  I think it was in the 2004-2005 time-frame.  I was

16 approached by individuals who wanted to market this and thought

17 it would be good for Prudential to use their products to sell

18 through this marketing, a form of marketing to generate more

19 life insurance sales.

20 Q.  What, if anything, did you do after learning that

21 Prudential was approached with this opportunity?

22 A.  I tried to gather as much information so I could understand

23 it.  Being an actuary, I understood pricing, I also understood

24 risk and quickly understood this was not the type of

25 transactions that I would allow at Prudential in my capacity.

1        I also understood it was stranger; and, therefore,

2    there was no insurable interest; and, therefore, not only would

3    we not wish to participate for many reasons, it also was an

4    illegal transaction.  So we turned the producers away and told

5    them we would not entertain -- even though it resulted in a lot

6    more sales, which ordinarily is the thing I'm in business to

7    do, it is not the type of sales I would want to attract.

8    Q.  I will just remind you to try to slow down as best you can.

9    A.  Sorry.

10   Q.  You mentioned a couple of terms there.  We'll go back to

11   your determination about not wanting STOLI in a minute.  Let's

12   go over some of the terms you used and may come up today.

13        Can you just explain at its core what is life

14   insurance?

15   A.  Life insurance is a contract between an insured or owner of

16   the policy and an insurance company that says for a stated

17   level of premiums, that the insurance company will pay a death

18   benefit that is usually stated as well in the contract at

19   death.  There may be other benefits in that life insurance

20   policy, but the prime reason for buying it is the death

21   benefit.

22   Q.  What is a universal life policy?

23   A.  There are a number of different forms of life insurance.

24        Universal life has some features that are different

25   than others.  The one primary features are that the premiums

1    are flexible, that as long as you pay, you can pay more in if

2    you want and sort of create a larger value within the policy or

3    you can pay a lesser amount, but you have to pay enough to keep

4    it in force.

5            If you violate that, and the contract will state how

6    much you have to pay, but the difference in most traditional

7    life insurance that some of you might be familiar with, the

8    premium is level and required the same every year.

9            This one allows you in some years to pay more and that

10   will enable you to pay less, or vice versa.  It gave

11   flexibility to the consumer to alter the amounts as long as

12   they aggregate on a cumulative basis, paid the total amount.

13   That is the primary difference of universal life.

14   Q.  You mentioned the term, "risk."

15           Would you just describe what you mean by risk in the

16   context of the life insurance business?

17   A.  Well, it is the same whether we are talking life insurance

18   or fire insurance or car insurance.  It is the job of the

19   actuary to take into account the expected claims, the expected

20   benefits that would be paid, and from that to determine a

21   premium.

22           The risk, the prime risk in a life insurance contract

23   is death, and you have deaths from -- some are from just age

24   itself, but there are deaths from early onset, accidental

25   deaths and what have you.

D9OJBIN1                          Avery - direct

1           The risks we are measuring primarily is the risk of

2    death, but we are measuring, in order to determine the premium,

3    which is part of the risk process, you're looking at what are

4    the interest rates, the investment returns on the premiums

5    because eventually they'll get paid out as benefit.  We are

6    evaluating the lapse, how many people will have a claim while

7    they still own the policy.  Not everyone that buys a life

8    insurance contract owns the life insurance contract when they

9    die.

10          They may buy -- an example might be they would buy it,

11   say, for the period of time they have young children in the

12   home and they want to make sure they provide for their family,

13   but they might buy a 20-year policy or they may buy a lifetime

14   policy, but after 20 years they deem they no longer need it and

15   lapse it or surrender it.

16          So it gave them peace of mind during that piece of

17   time that, God forbid, had they passed away, their family would

18   be cared for, but after that risk goes away, the risk of

19   funding and taking care of the family, they may no longer own

20   the life insurance contract.

21   Q.  What does the term "lapse" mean?

22   A.  "Lapse" generally refers to when a policyholder no longer

23   pays premiums; and, therefore, the contract terminates, the

24   life insurance contract, the arrangement between them and the

25   insurance company terminates.  At that point the death benefit

 1    goes away, there are no more premiums required, and depending

 2    on how high they fund it or didn't fund the contract, there

 3    might be a surrender value paid out to the insured.  "Cash

 4    value" it is referred to, but that depends on the type of

 5    contract and how well it was funded.

 6          At that point the arrangement is over and the

 7    insurance has served its purpose and has provided peace of mind

 8    to that family during that period of time.

 9    Q.  Mr. Avery, what is an underwriter?

10    A.  Underwriter is someone who is trained in many aspects of

11    life insurance to evaluate the risk.  They evaluate the health

12    of the individual.  As part of life insurance or part of any

13    insurance that anyone would buy, you're put into a class, a

14    risk class.

15          A common example would be auto insurance.  If you're a

16    young male driver, you are put into a risk class.  The

17    underwriter is evaluating the age and health and financial

18    status of the individual to see what classification to put them

19    in or decide whether they're insurable.

20          Sadly, if someone has a serious health condition that

21    is likely to result in imminent death, they would be deemed

22    uninsurable, and they could not purchase, and the underwriter

23    would determine that.  We have many classifications an

24    underwriter will put insured in which determines the premium

25    they have to pay should they completely purchase.

```
 1   Q.  You just mentioned underwriters look at many different
 2   things including financial status.
 3        What role, if any, did financial underwriting play at
 4   Prudential in evaluating whether to issue universal life
 5   policies?
 6   A.  Again, my answer will apply to all life insurance including
 7   universal life.  It plays two roles.
 8        The first thing is we want to make sure if someone is
 9   buying life insurance, they can afford to buy it.  They're not
10   being sold something that -- I'll back up a little.  I
11   apologize for this.  Agents who sell life insurance get paid
12   for selling, and we want to make sure they're not --
13        MR. ABRAMOWITZ:  I believe he is not answering the
14   question.
15        THE COURT:  I think that's correct.  Can we go back to
16   the question, please.
17        MR. FEINGOLD:  Sure, your Honor?
18        THE COURT:  Just, yes, reput the question.  If the
19   answers could be less in the way of long speeches and more
20   targeted to the question that is asked, I would appreciate it.
21        MR. FEINGOLD:  Sure.
22   BY MR. FEINGOLD:
23   Q.  Mr. Avery, what role, if any, did financial underwriting
24   play in evaluating the issuance of life insurance policies?
25   A.  Two roles.  We want to be sure the insured can afford the
```

1   purchase that they were being sold; and, secondarily, we wanted

2   to make sure that the death benefit they were buying was in

3   line with the risk that they had, that they weren't being

4   overinsured.

5   Q.  Why is it important that -- the first part of your answer,

6   why is it important to make sure that there is an insurable

7   interest there?  Why is it important to Prudential?

8   A.  Well, first off, as I stated earlier, if there is no

9   insurable interest, it is illegal to sell the life insurance

10  policy.  It is illegal.

11          Second, when we price a policy, we're pricing a policy

12  on the historical experience generally of what we believe are

13  classic insurance.  People who have risk, they're buying it to

14  cover their personal risk.  We are not pricing it on the basis

15  of what might be the behavior of an investor who hopes that the

16  insured dies quicker than later.  Most people buy insurance

17  would hope that they never die.

18          So we would expect a different experience.  We don't

19  want to be selling to a group of individuals where:  One, where

20  the transaction is illegal; and, two, where we haven't priced

21  for what might be the behavior of a different class of

22  individuals.

23  Q.  You also mentioned you want to make sure you weren't

24  overinsuring an applicant.  What do you mean by that?

25  A.  The simplest example would be if you had a hundred thousand

1    dollar home, and you tried to buy a million dollar fire

2    insurance policy, we would be very concerned that you're

3    overinsuring your home.

4          The same with a life.  If you're overinsuring the risk

5    that you have -- for example, we look at income, we look at

6    assets and determine what might be the risk you're covering and

7    are you buying insurance commensurate with that risk.  If

8    you're buying 4, 5, 20 times more than that, we're concerned

9    about just from public safety.  You're now worth a lot more

10   dead than alive.  That is not good public policy and not

11   something we would participate in.

12         Now we are concerned about what is the purpose of the

13   insurance.  It doesn't look like the insurance we would expect

14   an individual to be buying, so we would not issue excess

15   amounts.

16   Q.  Would the concern about overinsurance relate at all to

17   Prudential's business?

18   A.  The concern for overinsurance has always been in place

19   since I've known life insurance.

20   Q.  During your time at Prudential, focusing on mid-to-late

21   2000nds, in what amounts were universal life policies

22   available?

23   A.  Prudential, they were available I believe from the low

24   amount of 75,000 death benefit up to 30 million death benefit.

25   Q.  Who gets paid out the death benefit at the time of the

1    insured's death?

2    A.   The beneficiary, as chosen by the owner of the contract.

3    Q.   Are there any tax benefits that are associated with

4    universal life policies?

5    A.   There are tax benefits associated with all life insurance,

6    in that in the United States, the death benefit is received

7    tax-free by the beneficiary.  There are no taxes on the receipt

8    of that death benefit.

9    Q.   Are there any tax benefits associated with the amounts over

10   the premiums that are invested with the policies?

11   A.   If the policy is of the type that builds up value.  I spoke

12   earlier if you pay excess premiums, you'll build up a cash

13   value.  Those amounts accumulate tax-deferred.

14        What I mean by tax-deferred, if you eventually

15   received them as a death benefit, they're not taxed.  If you

16   receive the cash value as part of a death benefit, it is

17   received tax-free.

18        If, instead, you lapse the policy, stop paying

19   premiums, and you receive a cash value, then the excess of the

20   cash value over the premiums you've paid is taxable.

21   Q.   Mr. Avery, what is premium financing?

22   A.   Premium financing is a term used in the industry where the

23   owner-purchaser of the policy is taking a loan through somebody

24   or some organization to finance the premiums rather than paying

25   for it out of their own assets or income.

D9OJBIN1                          Avery - direct

1    Q.  Was premium financing for life insurance policies permitted

2    at Prudential?

3    A.  I'd say on a limited basis, yes.

4    Q.  On what basis was that?

5    A.  On the basis that we understood why the premium financing

6    was an appropriate transaction for the insured.  We wanted to

7    make sure that the insured understood the premium financing.

8            An example would be today with low interest rates,

9    they might be able to get a premium loan at a very low interest

10   rate, but the terms of the loan might be if rates go up, the

11   cost would go up, the interest rate would go up.  We want to

12   make sure they still afford it.

13           We want to understand who is borrowing.  Is it really

14   for the owner of the policy or is it masking an investor

15   stranger originated transaction?  But we have always looked at

16   premium financing before STOLI even existed to make sure that

17   it was appropriate for the purchaser.

18   Q.  How, if at all, would an applicant's finances come into

19   play with Prudential determining whether to issue a policy that

20   was being premium financed?

21   A.  We'd want to, as I said, we would want to understand the

22   basis.  An example would be you might have a business owner who

23   is very wealthy, and that justifies the amount of insurance

24   being purchased and that they believe they can borrow money at

25   a cheaper rate than using their own assets, which may be

1    earning a higher rate within the business.  We view that as a

2    valid form of premium financing.  They're choosing what assets

3    because their ability to take a loan is one of their assets, is

4    more efficient for them.  We would see that as appropriate.

5              If we see someone taking a loan who really can't

6    afford the loan, we would see that as inappropriate.

7    Q.  You mentioned the term producer earlier.  What is a

8    producer?

9    A.  There are many terms used I think in the industry; agent,

10   broker, producer.  People refer to themselves as producer in

11   the context I am using is a life insurance salesperson who is

12   not directly, not an employee of Prudential, is independent and

13   works for themselves or works for another firm, but does

14   contract through some media with Prudential to offer Prudential

15   policies as well as offer the policies of other companies.

16   Q.  Is that similar to an agent?

17   A.  Yes.

18   Q.  Do producers and agents receive commission from Prudential

19   for writing policies at Prudential?

20   A.  They do.

21   Q.  Generally how are commissions for universal life policies

22   calculated at Prudential in the mid-to-late 2000nds?

23   A.  Generally depending on the policy, universal life, there is

24   a percentage of first year premium that is paid to the

25   agent-producer, and then there is a lower percentage that is

1    paid in what is called renewal years, years two and later, much

2    lower percentage, but the high percentage is in the first year.

3    Q.   How high of a percentage could be paid on first year

4    commissions?

5    A.   It depends on the level of their contract and the amount of

6    production that they would be giving production.  It could go

7    from a low of 55 percent to a high of probably close to a

8    hundred percent.

9    Q.   That is a hundred percent of what?

10   A.   Of first year premium.

11   Q.   Now, were you familiar with how the pricing and the premium

12   amounts for universal life policies were determined at

13   Prudential in the mid-to-late 2000nds?

14   A.   I am.

15   Q.   Could you just give us the general overview of how the

16   pricing was done.

17   A.   Well, again it would be based on age, gender, health, and

18   then our experience with those classifications of age, gender

19   and health.

20        Our experience in terms of mortality and lapse and our

21   outlook on disparate returns, and they would be calculated by

22   the actuary to determine what premiums we needed to charge

23   annually that would give us enough money to pay those death

24   claims that would occur in the future.

25   Q.   Let's talk first about mortality experience.  What is that?

D9OJBIN1                       Avery - direct

1   A.  Mortality experience is the probability of death.  So the

2   claim is triggered at death, so we would take an age and gender

3   and determine probability by year, and those probabilities go

4   up each year they get older as well as it goes up each year

5   they get further away from underwriting.

6            We only get one shot to evaluate the health and

7   financial well-being of that individual, and that is an issue.

8   The cost goes up each year.

9   Q.  You say just the experience part of that.  What do you mean

10  by "experience"?

11  A.  Experience?  Prudential is large enough to price on its own

12  experience.  We have business in force that we can look at,

13  say, a female age 35, what their mortality experience is by

14  duration, age 36, 37 all the way up till age 120, and we use

15  that as a starting basis of our estimate of what mortality we

16  will get in the future on that same class.

17  Q.  Similar to looking at the history of how these these

18  policies have perform?

19  A.  It is more recent history we look at, yes.

20  Q.  And lapse experience, can you just briefly explain that.

21  A.  Right, that is another factor in pricing because, as I

22  said, not all policies will be held till death.

23            Again we look back at our more recent experience and

24  understand the behavior of individuals of holding policies, and

25  policies lapse for many reasons.  One, the need is no longer

1    there, the risk is no longer there.  You see policies lapse

2    sometimes during divorce.  You see policies lapse because they

3    no longer can afford the insurance because there are job,

4    employment issues.  We look at our own experience and put that

5    into pricing, adjust it as appropriate based on an outlook of

6    what we think will be occurring.

7    Q.  Pricing policies, did Prudential expect that the premiums

8    for each universal life policy would be paid up until the time

9    of the insured's death?

10   A.  No.

11   Q.  Why is that?

12   A.  Because if, if every policy purchased had a death benefit,

13   the premiums would be so large that for the most part people

14   couldn't afford them.  If you're paying as much premium as

15   you're going to get in death benefit, why would you buy it?  It

16   is similar to auto insurance.  You don't pay what a claim will

17   cost.  You hope you never have a claim.

18          Those who don't have a claim pay for those who do.

19   That is really the principle of insurance.  It is a pulling

20   together of a group of people who pay premiums in.  And those

21   who have claims take the premiums back out, and those who don't

22   are fortunate enough to not have incurred a claim and had the

23   peace of mind if they did, they would be covered financially.

24   Q.  Let's turn back to STOLI.

25          What was Prudential's position on whether it wanted to

1    issue policies that were taken out to be sold to investors?  I

2    am talking about the, say, any time in the 2000s?

3    A.  Right from the start when we identified what this new

4    marketing scheme was, we decided that we did not want to issue

5    any policies that were being initiated or sold to strangers.

6    Q.  What role, if any, did you have in establishing the

7    company's position on STOLI?

8    A.  I did establish the policy.

9    Q.  Why did you and Prudential take this position?

10             MR. ABRAMOWITZ:  I object to the question.

11             THE COURT:  Overruled.

12   A.  We took the position for I think the reasons I state

13   earlier.  One is if there is no insurable interest, it is an

14   illegal transaction.  Prudential would not participate in an

15   illegal transaction.

16             Two, as I stated earlier, this class of policyholders,

17   once I understood what was behind this marketing scheme, was

18   not in line with how we price our generic business, that this

19   group of policyholders would not behave the same, and we

20   started to see a number of instances of misrepresentation and

21   fraud associated with those transactions.

22             So it was just not a business we wanted to be in.  We

23   were also concerned that we were seeing is this marketing to

24   senior citizens.  Senior citizens didn't really understand what

25   they were getting into and it would be bad for them.

1          Eventually, in fact, I spoke at many conferences on

2     this --

3          MR. ABRAMOWITZ:  Your Honor, I object.

4          THE COURT:  Are you moving to strike?

5          MR. ABRAMOWITZ:  I am moving to strike.

6          THE COURT:  Motion denied.

7     BY MR. FEINGOLD:

8     Q.  Mr. Avery, you said you started to notice different

9     performance or different experience.  How does that impact

10    Prudential's bottom line?

11    A.  We didn't see different experience because we tried as best

12    we could not to sell any.  We understood from talking to the

13    people that were marketing this that the experience would be

14    very different because we understood how they would need the

15    policies to behave and what the behavior of the investor would

16    be, which would be very different than someone who is buying

17    insurance for their own family or business.

18    Q.  With respect to I think you talked about lapse experience

19    earlier, what was your understanding as to how the lapse

20    experience with STOLI would be different from the pool on which

21    Prudential was pricing its insurance?

22    A.  These policies, this class of policies would be owned by

23    investors who benefited from death and didn't benefit from

24    anything else, and so we believe that they would continue to

25    pay premiums and that they would try to select insureds where

1    they believe based on their evaluation that the premiums were

2    inadequate for the death benefit eventually to be received.

3    They were betting against the house and their behavior would be

4    so different than a normal insured who is hoping to live, not

5    hoping to die.

6    Q.  You mentioned a concern about participating in transactions

7    without insurable interest.  How would participating in those

8    sorts of transactions impact Prudential's bottom line, if at

9    all?

10   A.  Well, I believe if we had sold a large number of these

11   policies, we would incur losses on those policies.  I also back

12   then postulated that we would wind up seeing a number of

13   lawsuits regarding these cases which had proven to be true.  So

14   we just decided it was bad business.

15           We also thought that we would have insureds or

16   beneficiaries feeling that they somehow were duped, and it

17   would be bad for our reputation to be involved in these

18   transactions for any perspective.

19           If in the end we had to deny claims, the last thing I

20   or Prudential wanted to do was deny claims.  We spent a lot of

21   money marketing that we're there when you need us.  The last

22   thing we want to do is have someone read a headline that says

23   we denied a claim.  They may not read the story.  It would be

24   bad for our reputation.

25           (Continued on next page)

Q.  What concerns, if any, did you have that Prudential's bad

reputation or potential bad reputation would impact the bottom

line?

A.  Absolutely always concerned about reputation.

Q.  Why?

A.  Because we're an organization that needs to sell a lot of

insurance to cover costs and to spread the risk.  Remember I

talked about pooling of risk.  You need a large number of

people in order to do the insurance.  So we're in the market to

sell insurance.  Bad publicity does not help you generate new

sales.

Q.  Now, when Prudential collects premiums on a policy, does

that mean that Prudential makes money on that policy, profits

on the policy?

A.  We don't think of it as ever making money on any one

policy.  You couldn't determine it that way.  You have the

individual who pays one premium and dies six months later.  You

lose a lot of money on that policy, but we don't consider that

a loss.  We consider that -- that's the benefit of insurance

because there's another 900 people who paid a premium who

didn't die.  And, again, the premium that's paid by everyone

pays for those unfortunate enough to pass away.

         So we don't measure it at a single policy level.  It's

not a funding means; it's insurance.  So just like when one

person gets in a car accident, we wouldn't say we lost money on

1    that policy.  It's we look at the class of policyholders.  Did

2    it behave in the average, in the aggregate, how we expected the

3    aggregate to behave because there are untimely unexpected

4    deaths sometimes that occur right after the insurance is

5    purchased.  And they're unfortunate legitimate deaths,

6    accidental.  That's what insurance is there for.

7    Q.  Mr. Avery, was Prudential's position on not wanting to

8    issue STOLI policies communicated to others within Prudential?

9    A.  Yes, it was.

10   Q.  To whom?

11   A.  To our agents and to our -- you have intermediaries,

12   brokers, producers, through the general agencies we engaged,

13   and we communicated in various industry forums about it.

14   Q.  You communicated to underwriters at Prudential?

15   A.  Yes, it was.

16   Q.  Was it communicated to marketing people at Prudential?

17   A.  Yes, it was.

18           MR. FEINGOLD:  May I approach, your Honor?

19           THE COURT:  You may.

20   Q.  Mr. Avery, when you answer, could you speak a little louder

21   and closer to the mike so we can make sure we all hear you.

22   A.  Okay.

23   Q.  Thank you.  Great.

24           You have in front of what's been marked as Government

25   Exhibit 2943.  Do you recognize this type of document?

D9OLBIN2                        Avery - direct

1    A.  I do.

2    Q.  What is it?

3    A.  It's what we refer to as life underwriting guide.  These

4    are memorandums that are put together for our underwriters and

5    we do it on various subjects.  This particular one is around

6    different forms of marketing life insurance.  And we look at

7    different ways that life insurance is sold and decide whether

8    they're the type and nature of the transaction that we wish to

9    participate in with our products or we wish not to participate

10   in because of the nature and type of sale.

11   Q.  Was providing underwriting guidance to Prudential employees

12   like this a regularly conducted activity at the company?

13   A.  It's an ongoing activity.  This particular one is meant for

14   our underwriters, not all the employees, but the underwriters

15   doing the risk assessment.

16   Q.  Was it a regular practice at Prudential to update and make

17   a record of this guidance?

18   A.  Absolutely, on all subjects, not just this.

19   Q.  Who would compile documents like the one that's marked

20   Government Exhibit 2943?

21   A.  There is a corporate underwriting group in Newark, New

22   Jersey who was responsible for maintaining these.  And then it

23   would be distributed to our underwriters who work in different

24   organizations in Prudential in other areas, other states.

25          MR. FEINGOLD:  Your Honor, government offers 2943.

1          MR. ABRAMOWITZ:  No objection.

2          MR. STAVIS:  No objection.

3          THE COURT:  Admitted.

4          (Government's Exhibit 2943 received in evidence)

5          MR. FEINGOLD:  Can we publish 2943.

6   Q.  Mr. Avery, have you reviewed 2943 prior to today?

7   A.  I have.

8   Q.  Are you familiar with the substance in this exhibit?

9   A.  I am.

10  Q.  Can you just read the revised date on the top left?

11  A.  April of 2007.

12  Q.  And then can you read in the middle where it says

13  general -- do you see that paragraph?  Can you read the

14  sentence that starts "more recently."

15         MR. FEINGOLD:  And can we blow that up, please.  Thank

16  you.

17  A.  More recently there has been a proliferation of sales

18  concepts in which the intent from the outset is to settle the

19  life insurance policy.  The insured agrees to loan their

20  insurable interest to an investor, group of investors, and/or a

21  settlement company in exchange for cash.  These contracts are

22  commonly referred to as investor-owned life insurance, IOLI, or

23  stranger-owned life insurance, STOLI, since the investors

24  typically borrow the premium payments using only an intrinsic

25  value of the life insurance contract as collateral.  They are

1    also referred to as nonrecourse premium financed contracts.

2    Q.  What is nonrecourse premium financing?

3    A.  This means generally when someone takes a loan, they have

4    to pledge collateral, maybe their home or their income.  In

5    these particular transactions, the only collateral pledged to

6    the lender is the value of the life insurance contract, so

7    there's no recourse beyond the value of the life insurance

8    contract.

9    Q.  Would Prudential issue large life insurance policies that

10   had no collateral for the financing?

11   A.  To the best of my knowledge, no.

12   Q.  If you can turn to the second page, please, it's Prudential

13   2867 on the bottom right.  And do you see the section, Section

14   B?

15   A.  Yes.

16           MR. FEINGOLD:  Can we blow that up, please.

17   Q.  Can you please read that section.

18   A.  IOLI, STOLI, and nonrecourse premium financed contracts:

19   These contracts attempt to utilize life insurance policies as

20   investment vehicles.  They are usually sold with the intent of

21   immediately settling the contract upon the expiration of the

22   contestability period.

23           These sales involve features such as:  free insurance

24   for the insured for a limited period of time since most

25   premiums are financed; an up-front payment to applicants to

entice their participation; a loan to purchase the policy with

an option for the policyowner to decide to pay off the loan and

keep the policy, or to sell the policy to a life settlement

company; funding of the policy through a trust created for

investors' purpose employing nonrecourse financing that uses

only the policy as collateral, even if the cash value later

becomes inadequate to support the debt; life insurance and/or

annuity policies on pools of insureds that fit specific age

and/or health characteristics.

Investors have no insurable interest in the life of

the insured.  They are simply speculating on the premature

death of the insured in order to receive an investment return.

Q.  Are the characteristics listed in this section consistent

with what your understanding of STOLI was?

A.  Yes, they are.

Q.  If you could turn to the next page, it's stamped Prudential

2868.  Do you see the bottom part No. 4?

A.  Yes.

Q.  Could you please read that section "red flags in

underwriting," can you read the first paragraph and the first

sentence in the second paragraph.

A.  Prudential believes that these types of programs are

inconsistent with the basic principles of life insurance and

are not in the interest of policyowners or the insurance

industry.  The company does not support the sale of life

1  insurance so that the policyowner can sell it to a third party

2  who is speculating on the premature death of the insured.

3         The company will not issue insurance if it is

4  determined that the policy is likely being applied for as part

5  of one of the above arrangements.

6  Q.  Can we then turn to the next page, please, Prudential 2869.

7  And at the very bottom in bold, can you please read the bolded

8  section, the first bullet, going on to 2870.

9  A.  As part of our ongoing efforts to detect and prevent these

10  types of sales, a new policyowner statement form, COMB113794,

11  was developed.  This new form is required at the point of sale

12  on all term essential/term elite and UL/SUL policies where the

13  proposed insured is age 70 or older and the face amount is

14  1 million or above.  If there are any yes responses on this

15  form, the case must be referred to the tech team.  Exhibit 12

16  provides a sample copy of the form.

17  Q.  Before we look at Exhibit 12, could you just tell us,

18  UL/SUL policies, what are those?

19  A.  UL is universal life, which we discussed before, the

20  flexible premium form of life insurance.  SUL is a universal

21  life policy that it covers two lives and the death benefit is

22  paid at the second death, referred to as survivorship universal

23  life, used in estate planning generally.

24  Q.  All right.  If we could turn to Exhibit 12, which is at

25  Prudential 2871.  Is this the form that was referenced in the

1    document we were looking at?

2    A.  It is.

3    Q.  And if you could just look top left, what's the date at

4    least of this version of the form?

5    A.  April 2007.

6            MR. FEINGOLD:  If we could zoom in on the questions

7    starting with the bold "Prudential will not knowingly" and

8    going down to the bottom, please.

9    Q.  Mr. Avery, can you please read starting with "Prudential

10   will not knowingly participate" and then read the first

11   question.

12   A.  Prudential will not knowingly participate in a life

13   insurance sale where the sale of the policy in a secondary

14   market or the participation of investors in the policy death

15   benefits is being considered.  Accordingly, the policyowner is

16   asked to answer the following questions.

17           Question 1.  Have you or the proposed insured been

18   offered free insurance or any inducement, such as cash payment,

19   gifts, loan proceeds in excess of the amount necessary to fund

20   the policy, or anything else of value as an encouragement to

21   apply for this life insurance policy?  Yes or no.

22   Q.  What was the purpose of asking this question as part of the

23   application process?

24   A.  We were understanding the various traits of a STOLI sale

25   and we were trying to, through asking these questions, both

1    uncover those STOLI sales and make sure we didn't do them; and

2    also make sure we established a record from both the insured

3    and the producer or agent that the sale was not STOLI.

4    Q.  Can you please read the second question.

5    A.  Have you or the proposed insured been solicited to sell or

6    transfer, or had any discussions about selling any of the

7    following to a life settlement company or group of investors in

8    the next five years:  The proposed life insurance policy; any

9    other life insurance policy on the life of the proposed

10   insured; or, a trust, limited liability company, or other

11   entity that has been or will be established to own the policy?

12   Yes or no.

13   Q.  Why was this question being asked?

14   A.  Well, again, it's another question to make sure that

15   there's not the anticipation of a sale to a stranger as part of

16   the original sale.  And we began to add things like trusts

17   because we found that trusts could be used sometimes to

18   disguise the true eventual owner of the contract.

19   Q.  Please read question 3.

20   A.  Have you or the proposed insured entered into or been

21   offered a financing arrangement where a lender or other third

22   party, other than your employer or family member, will receive

23   any portion of the death benefit of the policy applied for in

24   excess of repayment of the principal and interest?  Yes or no.

25   Q.  Why was this question being asked?

1   A.  Well, as I said, there are legitimate premium financing.

2   But if the individual or firm that's providing the loan is

3   going to get more back than would normally be paid back in a

4   loan, then we believe that's disguised stranger-owned life

5   insurance, that there's a stranger, somebody that has no

6   insurable interest receiving part of the death benefits above

7   what they would normally do in a modified loan transaction.

8   Q.  Question 4.

9   A.  Are you or the proposed insured considering the sale or

10  transfer of the policy being applied for to a life settlement

11  company or other third party investors within the next five

12  years?

13  Q.  Why was this question being asked?

14  A.  This question was trying to get at intent of the purchase

15  because we found that in some cases, it would be claimed that

16  at the point of the original sale, there was no sale to a

17  stranger, and that if the sale occurred five days later, then

18  it did not violate insurable interest.  And we believe if the

19  intent was there at the time of the original purchase of the

20  life insurance contract that it did violate it and so we wanted

21  to know whether there was any contemplation of sale in the next

22  five years because, if so, then we would deem it STOLI and not

23  issue the contract.

24  Q.  Finally, No. 5, please read that question.

25  A.  Will any entity other than a life insurance company, life

1   reinsurance company or medical service provider engaged by

2   either of these companies be medically evaluating the proposed

3   insured to determine life expectancy?  Yes or no.

4   Q.  Why was this question being asked?

5   A.  Well, one of the traits of investor investing in a life

6   insurance policy would be they want to know how long the

7   insured is going to live because they want to know whether it's

8   a good investment or not, whether the premiums will have a good

9   return when they get the death benefit.  So if a stranger,

10  someone other than the insurance company is evaluating the life

11  expectancy of the insured, that suggests to us that someone

12  else is going to own this policy and it's STOLI and we would

13  not issue the policy.

14  Q.  Were the answers that would be provided to these questions

15  in applications, were those answers important to the company?

16          MR. ABRAMOWITZ:  I object.

17          THE WITNESS:  Yes.

18          THE COURT:  Overruled.

19  A.  Yes.  This was put in because they were extremely important

20  for us to help us try to identify STOLI.

21  Q.  Did you consider them to be important to the company's

22  financial health?

23          MR. ABRAMOWITZ:  Same objection.

24          THE COURT:  Overruled.

25  A.  We did.

1    Q.  What would have happened had any applicant answered yes to

2    the questions that are asked in this form?

3    A.  We would have a further conversation and if we deemed that

4    the yes answer gave us evidence that it is STOLI, we would not

5    issue the contract.

6              MR. FEINGOLD:  May I approach, your Honor?

7              THE COURT:  Yes.

8    Q.  Mr. Avery, you have in front of you Government Exhibit 112

9    and Government Exhibit 118.

10             Let's talk about 112.  Are you familiar with this form

11   of document?

12   A.  Yes, I am.

13             MR. FEINGOLD:  I should note 112 has been admitted.

14   Ms. Hayakawa, would you please you pull up the first page of

15   112.

16   Q.  What is Government Exhibit 112, Mr. Avery?

17   A.  It is an application to apply for the issuance of a life

18   insurance policy.

19   Q.  Just to be clear, are you familiar with this particular

20   application of Florra Adler?

21   A.  No, I'm not.

22   Q.  You're just familiar with the form of the document?

23   A.  The form of the document only.

24   Q.  If we could turn to page 2, which is stamped 126210, and if

25   we could look at the top section, coverage information.

 1    A.   Yes.

 2    Q.   Plan of insurance.  What is UL plus?

 3    A.   It's a form of universal life policy.  It just had the word

 4    "plus" in there because it had some distinguishing benefits

 5    that the other UL would not have.  Just a different form.

 6    Q.   And No. 2, initial amount of insurance, how much insurance

 7    is being applied for here?

 8    A.   $4 million.

 9    Q.   And that's the death benefit that would be paid out at

10    death?

11    A.   That is the death benefit.

12    Q.   If you could go nine pages in, the control number on the

13    bottom right is 126216.  And if we could look at the top part

14    under how are the purpose and amount of the policy determined

15    and then the purpose.  If we could zoom in on that, please.

16         Mr. Avery, do you see where it says purpose and then

17    personal, what's checked off?

18    A.   At the top it says how did you determine the amount of the

19    policy?  And it says estate analysis.  And then purpose is

20    death and personal for personal death benefit and for estate

21    conservation.

22    Q.   Why were these questions asked in Prudential's application?

23    A.   Questions like this are always asked to understand the

24    purpose, why is someone buying insurance and understand why

25    they might be buying the amount they're buying.

D9OLBIN2                        Avery - direct

1   Q.   Why was that important to Prudential?

2   A.   Again, we have a few things we want to make sure:   one,

3   there's an insurable interest; and, two, that the amounts being

4   applied for are covering an actual risk that exists so that the

5   person is not overinsuring and, again, worth more dead than

6   alive.

7              MR. FEINGOLD:   Next section:   What is the source of

8   initial and future premiums?   If we could zoom in on that,

9   please.   The entire section, please.   Thank you.

10  Q.   Mr. Avery, where it says what is the source of initial and

11  future premiums, what's checked off in response to that

12  question?

13  A.   Under initial premium, it says current income or savings.

14  And under future premium, it says current income or savings

15  account.

16  Q.   Why did Prudential ask about the source of initial and

17  future premiums?

18  A.   There are many reasons why we want to understand where the

19  premiums are coming from.   One, we want to make sure the

20  insured understands where it's coming from and that they can

21  afford it.   And, two, we want to understand is there anyone

22  else behind the scenes funding this policy.

23              But these questions have been around for a long, long

24  time.   The prime reason was do they have the means to buy this

25  policy, not just the initial premium, but future premiums.

1          MR. FEINGOLD:  Could we go down to the next section,

2    supplementary information, bottom half of the page.  Zoom in on

3    that, please.  Thank you.

4    Q.  Mr. Avery, do you see question 5, premium will be paid by,

5    what's checked off?

6    A.   Insured.

7    Q.  And 7A, complete if face amount is $1 million or greater.

8    Net worth?

9    A.  Net worth listed here is at four and a half million

10   dollars.

11   Q.  And 7B, complete if face amount is $5 million or greater.

12   I think you testified that this reflected a $4 million

13   application.

14          Had the application been for $5 million or more, would

15   the applicant have had to fill in greater details about assets

16   and net worth?

17   A.   Yeah.  At 5 million and above we want to understand the

18   assets, the breakdown of the assets, what's the source because

19   the policy is going to be a lot more expensive.  We want to

20   understand are those assets liquid and do they create the risk

21   that's being covered for the insurance.  So we want to know

22   more information as the policy gets larger.

23   Q.  Generally speaking, regardless of the face amount, why is

24   this application asking for information about income and net

25   worth?

D9OLBIN2                            Avery - direct

A.   Again, the starting point is is the insurance affordable to

the applicant and, two, is the amount of insurance they're

buying commensurate with the financial risk that they must have

if they have premature death.

Q.   If you could turn to page 12622.  It's about 19 pages in.

A.   Twenty?

Q.   I'm sorry 12622, it's a signature page.  It's the same

document, Government Exhibit 112.  There are control numbers on

the bottom right.

A.   Yeah, I have them.  I have six digits on all of them, I

believe.

Q.   I'm looking at 126222.

A.   222.

Q.   I may have misspoke.  I apologize.

A.   Okay.

        MR. FEINGOLD:  If we could just zoom in on the

signatures at the bottom.

Q.   Now, you see the bottom signature line, it says signature

of writing representative.

        What's a writing representative?

A.   That would be the agent or producer that we referenced

earlier.  That's the person who's selling the contract to the

insured.

Q.   Why did Prudential require that the producer or agent sign

these applications?

1    A.  They are the one that's bringing the insured to Prudential.

2    We also want to make sure they're accountable for the answers

3    to these questions to the best of their ability, and they're

4    also representing various aspects of this application.  And

5    it's also who will be paid should the sale be completed.

6    Q.  Can you please turn to Government Exhibit 118, which has

7    been admitted, and if we could please publish the second page

8    of 118.

9            Mr. Avery, do you recognize this part of the

10   application package?

11   A.  I do.

12   Q.  Is this the same or similar form that we saw in Government

13   Exhibit 2943?

14   A.  It is.

15   Q.  And if we could -- is there a line for signature and

16   producer on this page as well?

17   A.  There is.

18   Q.  And why did Prudential require the producer sign this form

19   as well?

20   A.  To make sure that they were working with the insured to

21   give us truthful answers to these questions, that they were

22   attesting to these questions as well.  They're basically saying

23   they have no knowledge of any plans to sell this policy that's

24   being applied for to a life settlement or viatical company.

25   Q.  Was this form used by Prudential to screen out STOLI

1  business?

2  A.  It was.

3        MR. FEINGOLD:  May I have one moment, your Honor.

4  Q.  Mr. Avery, are you familiar with the term life settlements?

5  A.  I am.

6  Q.  What is a life settlement?

7  A.  A life settlement is where an individual who's owned the

8  life insurance policy for some period of time and decides they

9  no longer need it, they can go to what's referenced as a life

10  settlement company and potentially sell their interest in that

11  contract for a sum of money and the life settlement company

12  will take over ownership of that policy.

13  Q.  Did Prudential's policies permit the sale of a life

14  insurance policy after it was issued?

15  A.  They did.

16  Q.  Why did Prudential's policies permit that?

17  A.  It was required by state law.

18  Q.  Now, does Prudential factor in the life settlement business

19  in pricing its policies?

20  A.  The life settlement business was a small business.  So I'd

21  say as the experience evolves, it got factored in, but it's

22  only as it evolved.  And typically the life settlement business

23  was dealing with very old policies which tended to be very

24  small face amounts from years ago, and so it would have a

25  modest impact as long as it was those very old policies of low

1    face amounts.

2    Q.  How would you distinguish the life settlement market with

3    STOLI, if at all?

4    A.  STOLI is sort of a subset of the life settlement business.

5    Life settlement business, again, can deal with policies that

6    were very old.  But the STOLI business also required a

7    settlement, but it was anticipated, the settlement was

8    anticipated coincident with the purchase of the policy and

9    that's the part that we object to.

10   Q.  Whereas with a legitimate life settlement transaction, what

11   was the anticipation at the issuance of the policy?

12   A.  Again, we -- the anticipation was whatever was developing

13   in our experience, studies around mortality and lapse and

14   premium payment patterns.

15   Q.  And in the mid-2000s, was STOLI part of your experience on

16   which you were pricing products?

17   A.  No.  We never wanted it to be part of our experience.

18            MR. FEINGOLD:  One moment, your Honor.

19            No further questions.

20            MR. ABRAMOWITZ:  Your Honor, may we take a five-minute

21   break, please?

22            THE COURT:  Okay.  I guess we're taking a five-minute

23   break.  Don't discuss the case.  Keep an open mind.

24            (Recess)

25            THE COURT:  Sir, you're still under oath.

1            Mr. Abramowitz.

2            MR. ABRAMOWITZ:   Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MR. ABRAMOWITZ:

5    Q.   Good afternoon, Mr. Avery.   My name is Elkan Abramowitz.   I

6    represent Michael Binday.

7    A.   Good afternoon.

8    Q.   I believe you testified on your direct towards the end that

9    the insurance policies issued by Prudential and, for that

10   matter, other insurance companies contain the right to sell the

11   policy.   Is that correct?

12   A.   Right to sell or assign, yes.

13   Q.   Sell or assign.   What does assign mean?

14   A.   It means that you can give the policy to someone else,

15   generally in exchange for something else.

16   Q.   And that was part of the bargain that Prudential would

17   enter into with the insured; is that correct?

18   A.   That is part of the contract, yes.

19   Q.   Part of the contract.   And that means that the day after,

20   the day after they sign the contract, they could sell that

21   contract; is that correct?

22   A.   That is correct.

23   Q.   Now, as you sit here today, Mr. Avery, are you aware as to

24   whether STOLI policies are legal or illegal?

25   A.   I don't know your definition of STOLI policies.

D9OLBIN2                        Avery - cross

1    Q.  Your definition of STOLI policies.

2    A.  My definition of STOLI policy, they're illegal.

3    Q.  They're illegal?

4    A.  Yes, sir.

5    Q.  Have you been able to persuade any state legislature,

6    court, Supreme Court of the United States, or the United States

7    Congress of that fact?

8    A.  Yes, we have, as an industry.

9    Q.  As an industry.  Tell me where it is written that STOLI

10   policies, as you define them here, is illegal?

11   A.  The National Council of Life Insurance Legislators and the

12   NAIC, two regulatory bodies have passed model regulation to

13   make STOLI illegal.  And those laws or versions of them have

14   been adopted by possibly 26 or more states at this time.  It

15   might be more since I've retired.

16   Q.  Are they -- have they been adopted in New York?

17   A.  I don't know, sir, what's in New York today.

18   Q.  Have they been adopted in Florida?

19   A.  I'm not sure the state-by-state listing, sir.

20   Q.  If you had your way, I take it, Mr. Avery, they should be

21   banned, is that correct, not permitted?

22   A.  The lack of insurable interest alone would make them not

23   permitted today.  We believe that regulations are just

24   codifying existing law in regulation.

25   Q.  The lack of insurable interest disappears the minute the

D9OLBIN2                          Avery - cross

1   policy is sold; is that correct?

2   A.   The requirement disappears, yes.

3   Q.   The requirement.

4   A.   The requirement disappears, yes.

5   Q.   Gone.  So, again, if sold the next day, the insurable

6   interest is gone; is that correct?

7   A.   As long as there was no intent from the beginning.

8   Q.   But people can change their minds; is that correct?

9   A.   We would find it very strange that someone would buy a

10  $5 million policy and change their mind the next day.

11  Q.   You might find it strange, but is it legal, Mr. Avery?

12  A.   It is legal, yes, sir.

13  Q.   Thank you very much.

14           Now, you went through a whole long list of things to

15  watch out for, telling your underwriters be careful of all

16  these, all of these red flags of STOLI; remember that?

17  A.   Yes, sir.

18  Q.   Person over 70, right, that's one of the red flags, the

19  insured is somebody to be over 70; is that correct?

20  A.   Not in and of itself, no.

21  Q.   That's one.  Is that one of the red flags?

22  A.   Over 70 and a million dollar policy.  They had to be

23  combined.

24  Q.   Okay.  A million, over a million?

25  A.   Million or over.

1  Q.  And so that's a red flag right away because you testified,

2  did you not, that some people in their mid-thirties and forties

3  get life insurance to protect their family situation if their

4  children are still living, etc.; is that correct?

5  A.  That is correct.

6  Q.  Now, generally speaking, would people over 70, would that

7  be still a factor that you would suspect people at that age

8  taking out insurance would consider important?

9  A.  Some transactions, although they would be in the minority.

10  Most would be estate planning or business protection.

11  Q.  And how about -- well, estate planning to get the death

12  benefit; is that right?

13  A.  That is correct, or estate liquidation, distribution.

14  Q.  It would be to get the death benefit, not to necessarily

15  protect the children?

16  A.  That's correct.  Well, the estate liquidation is sometimes

17  to protect the children in a liquidation of the estate.

18  Different form of protection.

19  Q.  Now, Mr. Avery, you said that you didn't want your

20  underwriters to get these policies, right, you didn't want

21  them, if they saw these red flags, your instruction was do not

22  write these policies; is that correct?

23  A.  Do not issue them, that is correct.

24  Q.  Did you ever implement any type of procedure that would

25  insure that the financial information that was furnished on

1   these transactions was correct?

2   A.  Yes, we did.

3   Q.  And did you, for example, ask that a copy of the tax return

4   be attached to the policy?

5   A.  I think in some instances --

6   Q.  The application, excuse me.

7   A.  In some instances we may have.  But tax returns are quite

8   private information for wealthy people, and so that's not

9   always the best way to do it.

10  Q.  Quite private?

11  A.  Quite private.

12  Q.  But their net worth statement, not so private?

13  A.  They have to provide the information or we wouldn't issue

14  them.

15  Q.  Right.

16  A.  If they decide to keep it private, they could, but we

17  probably would not issue without the information.

18  Q.  Right.  So the net worth statement is submitted, but you

19  think that if you asked people to attach the tax return that

20  they might resist doing that?

21  A.  It wasn't what I thought.  It was the pushback we might get

22  from the producer or broker dealing with that client and

23  sometimes.

24  Q.  The pushback, the pushback?

25  A.  Pushback.

1   Q.  Did it ever occur to you that the pushback would be because
2   if you submitted the tax return, you wouldn't know precisely
3   how much that person was worth or how much money that person
4   had --
5   A.  If they pushed back --
6   Q.  -- in income?
7   A.  If they pushed back, we would try to use other means to
8   discover whether they truly were of the financial means they
9   indicated.
10  Q.  I'm asking you as a matter of policy in your capacities
11  over the years in Prudential, did your company ever in
12  connection with STOLI red flag-type policies ever request that
13  a tax return be attached to the application, ever?
14  A.  I cannot answer what our underwriters might have asked for
15  in a specific case, but it was not our policy to request it.
16  Q.  It was never your policy; is that correct?
17  A.  As best I know.
18  Q.  Was it ever your policy to request that the applicant
19  attach bank statements to the applications?
20  A.  I again don't know.  Our underwriters would ask for
21  whatever information they thought they could get.  I don't know
22  what they specifically asked for.
23  Q.  Mr. Avery, policy.  Was it ever the policy of your company
24  to require copies of bank statements attached to applications,
25  especially in those cases where you were looking for red flag

1    STOLI?

2    A.  I don't believe it was our policy.

3    Q.  Was it ever the policy of Prudential to ask for a credit

4    check of the applicants, a credit check?

5    A.  At some times in our history, we did get credit checks, but

6    we employed individuals who sought to discover publicly

7    available information on insureds.  And depending on the face

8    amount being purchased, we would do our own investigation as

9    best we could with public records to get information on the

10   financial status of the insured, yes.

11   Q.  Now, over a million dollar policy, person over 70, life

12   insurance trust as a beneficiary, was there ever a policy to

13   require a credit check from publicly available information, yes

14   or no, Mr. Avery?

15   A.  We had a policy of investigating through publicly available

16   information all data available to us to check the financial

17   well-being of certain applicants, yes.

18   Q.  STOLI applicants?

19   A.  All -- we don't know they're STOLI, sir.

20   Q.  Was there anything in the exhibits that you testified about

21   today that exhibited that policy that you're talking about

22   where they're supposed to check public records?

23   A.  No.  These exhibits did not include what our investigators

24   did as part of their normal day-to-day job.

25   Q.  Was there ever a policy at Prudential to request that the

1    home that's listed on the application be appraised by a third

2    party?

3    A.  No, we did not have a policy of appraising a home.  But as

4    part of our public records search, we would look at the value

5    of homes if we could discover the homes.

6    Q.  You were shown --

7         MR. ABRAMOWITZ:  One moment, your Honor.

8    Q.  Now, where is this policy that we could look to to see that

9    your underwriters knew to check the public records or get an

10   appraisal for any homes that may have been listed?

11   A.  It was not our underwriters.  It was our special

12   investigation units who did it on behalf of the underwriters.

13   Q.  With respect to testimony about lapsed rates, Mr. Avery,

14   could you tell the Court and jury what is term insurance?

15   A.  Term insurance is a form of life insurance that typically

16   has a limited stated period upon which the death benefit will

17   be paid or the policy will be in force.  It could be ten years,

18   15 years, 20 years or 30 years.  They're the normal terms.

19        At the end of that period, depending on the contract,

20   it either ends and there's no more insurance, or you're given a

21   right to convert it to a permanent insurance.

22   Q.  And I take it that the requirement to pay premiums lapses

23   by virtue of the term of the insurance contract itself; is that

24   correct?

25   A.  At the end of the stated period, whether it's ten, 20 or 30

1  years, the coverages ends.  It's not considered a lapse at that

2  point.  The policyowner didn't take any action -- the contract

3  expired -- and they may have a right to convert depending on

4  the form of contract.

5  Q.  But the universal life policies we've been talking about

6  today have no term; is that correct?

7  A.  They go till death.

8  Q.  Till death.

9  A.  That's correct.

10 Q.  And the benefit that the insured is contracting for is a

11 payment by the insurance company upon his or her death; is that

12 correct?

13 A.  Yes, that's correct.

14 Q.  No matter when it happens?

15 A.  That is correct.

16 Q.  And the --

17 A.  As long as the premiums are paid.

18 Q.  And the obligation of the insured is to pay the premiums?

19 A.  That is correct.

20           (Continued on next page)

21

22

23

24

25

Q.  So when you talk about lapse rates, the expectation under
the insurance contract is that it will not lapse, is that
correct, under the contract?

A.  No.  First off, the contract does not speak to
expectations.  The pricing covers expectations.  In fact, in
the contract pricing, there is the expectation of lapse based
on historical experience.

Q.  When you say "based on historical experience," you can look
at all the policies that Prudential has written even if they've
written STOLI without your knowledge.  Is that right?

A.  We do look at all the policies, yes.

Q.  Right.  So if STOLI policies somehow got through these very
severe -- withdrawn.

        If the STOLI policies somehow slipped through the
cracks, they would be counted in this experience that you
talked about and perhaps the pricing could be changed based
upon that experience.  Is that correct?

A.  If they had slipped through, they would be counted.  They
may be small, and also STOLI only began really relatively
recently compared to all the data.

Q.  STOLI is not small by definition.  Is that correct?

        We are talking about multi-million dollar policies,
several hundred thousands a year in premiums.  That is not
small by your definition.  Is that correct?

A.  No, not at all small.

D9OJBIN3                           Avery - cross

1    Q.  The life settlement industry I believe you testified was

2    small.  What is your definition of "small"?

3    A.  Relative to the amount of insurance that we sell each and

4    every year or, more importantly, relevant to the amount of

5    insurance we have in force.

6    Q.  But it still is a multi-million dollar industry.  Is that

7    correct?

8    A.  Not at Prudential.

9    Q.  Not at Prudential?  How about the world?

10   A.  I am not privy to the data.

11   Q.  In all your committees and all your work with trying to get

12   legislation passed, have you learned that STOLI, the life

13   settlement industry is a multi-billion dollar industry?

14   A.  Yes, we have seen that report by the life settlement

15   industry itself.

16           MR. ABRAMOWITZ:  May I have a minute, your Honor?

17           (Off-the-record discussion)

18   BY MR. ABRAMOWITZ:

19   Q.  Mr. Avery, just for informational purposes, when Prudential

20   gets its premiums in on any policy, does it invest those

21   premiums?

22   A.  What is left after expenses absolutely gets invested, yes.

23   Q.  I take it that is on an ongoing basis?

24           All the premiums after accounting for expenses is

25   invested and money is made on that.  Is that correct?

D9OJBIN3                          Avery - cross

1    A.   After expenses and benefits paid out, and that is included

2    in the product pricing.

3              MR. ABRAMOWITZ:  May I, your Honor?

4              THE COURT:  You may.

5              (Pause)

6    BY MR. ABRAMOWITZ:

7    Q.   Mr. Avery, I show you what has been marked Defendant's

8    Exhibit 155 for identification and ask you have you ever seen

9    that document before?

10   A.   I have.

11   Q.   You have reviewed it?

12   A.   I have.

13   Q.   You know Mr. Nils Gyllenhammer?

14   A.   I do.

15   Q.   Who is Mr. Gyllenhammer?

16   A.   He worked in our -- Nils Gyllenhammer worked in our product

17   pricing area in individual life insurance company.

18             MR. ABRAMOWITZ:  I offer the exhibit into evidence.

19             MR. FEINGOLD:  Objection, your Honor.

20             THE COURT:  My copy?  Where is my copy?

21             MR. ABRAMOWITZ:  It is a corporate admission.

22             THE COURT:  Objection sustained.

23   BY MR. ABRAMOWITZ:

24   Q.   Now, you said you reviewed the document.  Let me ask you

25   specifically --

D9OJBIN3                          Avery - cross

1              THE COURT:  Don't try to get its contents in, please.

2              MR. ABRAMOWITZ:  No.  I will ask him.  Not the

3      contents.  I'll put it away.

4      BY MR. ABRAMOWITZ:

5      Q.  Do you know, Mr. Avery, whether Prudential varies its cost

6      of insurance based upon the insured's assets?

7      A.  Not directly, no.

8      Q.  Do you know whether Prudential varies its cost of insurance

9      depending upon whether the insured had an intent to sell the

10     policy?

11     A.  No, because we wouldn't issue it, so it would not be in our

12     experience.

13     Q.  If it slipped through, did Prudential vary the cost of

14     insurance depending upon whether the insured had an intent to

15     sell the policy?

16     A.  No.

17     Q.  Did Prudential vary its cost of insurance depending upon

18     whether the premium would be paid with the purchaser's own

19     funds or with borrowed or other funds?

20     A.  No.

21     Q.  Did Prudential vary its cost of insurance depending upon an

22     insured's purpose for purchasing the insurance?

23     A.  No.

24     Q.  Did Prudential vary its cost of insurance depending on

25     whether the purchaser had any other pending applications for

1    effective policies for life insurance at the time of the

2    purchase?

3    A.  No.

4         MR. ABRAMOWITZ:  I have no further questions.

5    CROSS-EXAMINATION

6    BY MR. STAVIS:

7    Q.  Mr. Avery, good afternoon.

8    A.  Good afternoon.

9    Q.  Did you receive a subpoena to testify here today?

10   A.  I did.

11   Q.  Did you have an opportunity to meet with prosecutors prior

12   to your testimony here today?

13   A.  I did.

14   Q.  Did you do that a number of times?

15   A.  Twice.

16   Q.  Did you do that on August 7th of this year, 2013?

17   A.  It was in August.  I don't know the exact date.

18   Q.  Did you meet on September 13th?

19   A.  We met in September.  I don't know the exact date.

20   Q.  Did you meet on September 22nd?

21   A.  I don't recall.  I thought we met twice.

22   Q.  Now, you testified on direct examination --

23   A.  -- in fact, I know we only met twice, once in Princeton and

24   once in New York.

25   Q.  -- you testified on direct examination the STOLI policies

D9OJBIN3                          Avery - cross

1    resulted in more sales, and that's something you would

2    ordinarily want, but you didn't want it with the STOLI

3    policies.  That was your testimony, correct?

4    A.  That is correct.

5    Q.  So there were more sales for Prudential, the company, that

6    you were, as CEO of life insurance, as a result of the STOLI?

7    A.  No.  I said there would have been had we not prevented

8    STOLI.  We tried our best we could to prevent.

9    Q.  You tried your best?

10           Your efforts to prevent STOLI came after you

11   recognized what STOLI was, correct?

12   A.  But possibly before transactions were coming to us.

13   Q.  You weren't a hundred percent effective --

14   A.  Clearly.

15   Q.  -- in combating STOLI.  That is a fair statement; isn't it

16   correct?

17   A.  What we found is --

18           THE COURT:  Yes or no, sir?

19           THE WITNESS:  We were not a hundred percent

20   successful.

21           MR. STAVIS:  Thank you.

22   BY MR. STAVIS:

23   Q.  The STOLI policies paid premiums, as you testified,

24   correct?

25   A.  Correct.

1   Q.  You testified on direct that you would get investment

2   returns on the premiums because you hold them, correct?

3   A.  That's correct.

4   Q.  You testified just a few minutes ago when Mr. Abramowitz

5   was asking you questions concerning investing returns, correct,

6   after benefits and expenses and all the other things?

7   A.  That is correct.

8   Q.  Would it be fair to say that the investment return on what

9   came in from those premiums would be more than, say, someone

10  would get if they bought a CD at their local savings bank?

11  A.  Yes.

12  Q.  Now, I want to just get a sense.

13          You rose to the level of the CEO, chief executive

14  officer, of the life insurance branch of Prudential?

15  A.  The United States life insurance branch.

16  Q.  The United States?

17  A.  Yes.

18  Q.  Was there a CEO of everything that was somehow above you?

19  A.  There was an executive into which various domestic

20  businesses report to, yes.

21  Q.  And not all those businesses were life insurance?

22  A.  None of them domestic.  I am referring to domestic, U.S.

23  business.  We have life insurance companies, businesses in

24  other countries.

25  Q.  Yes.

D9OJBIN3                          Avery - cross

1   A.  All the domestic businesses report to one individual, and

2   there was an individual life insurance that I ran.  There was a

3   group insurance business.  That was the only other life

4   insurance domestic business, and that was group insurance for

5   employers.

6   Q.  Yours was individual life insurance?

7   A.  That's correct.

8   Q.  Policies sold to individual insureds?

9   A.  Yep.

10  Q.  People who wanted a policy?

11          As to that, you were, for want of a better word, the

12  top person?

13  A.  That is correct, when it came to individual domestic life

14  insurance, yes.

15  Q.  How many employees total -- not talking agents yet, I'll

16  break it out -- how many employees total did you have to

17  oversee when you were the CEO of individual life insurance?

18  A.  It varied over time, as you might expect, but I would say

19  in the ballpark of 3,000, not counting our distribution system

20  which was another 3,000.

21  Q.  You've testified that there are -- you called them by

22  various names.  Producers, that was one name you used, correct?

23  You have to answer --

24  A.  Yes, producers, yes.

25  Q.  -- so the court reporter picks it up.

1   A.  Yes, yes.

2   Q.  Agents?

3   A.  Yes.

4   Q.  And brokers?

5   A.  Yes.

6   Q.  Now, you were referring in your direct examination -- by

7   the way, are those different terms for the same thing?

8   A.  I think they're terms of art.  In our case, we refer to

9   agents as those producers who were directly employed by

10  Prudential, carried Prudential business cards.  We tended to

11  refer to brokers and producers as those who were independent of

12  us but brought us business.

13  Q.  So let's take the agents.  Those are the ones with the

14  Prudential business cards.  How many of those were under your

15  direct authority when you were the CEO of life insurance, of

16  individual life insurance?

17  A.  All of them.

18  Q.  A number I am asking for, roughly?

19  A.  Agents, probably 1400, 1500 at the time.

20  Q.  Those are the Prudential employees?

21  A.  That's correct.

22  Q.  Now let's shift over to the non-Prudential employees who

23  you would refer to as the producers or the brokers.

24  A.  Yes.

25  Q.  And these producers or brokers are affiliated with

1   Prudential, in that they sell Prudential products, correct?

2   A.  Yes.

3   Q.  "Products" being life insurance of some sort or another?

4   A.  Yes.

5   Q.  But they're not directly employed --

6   A.  That's correct.

7   Q.  -- by Prudential?

8   A.  That's correct.

9   Q.  If you could approximate for the jury how many of those

10  would you have within your purview as the CEO of the individual

11  life insurance for Prudential?

12  A.  In order to sell Prudential, they have to be appointed.

13  Q.  Yes.

14  A.  I would say that varies over time, but it could be as many

15  as 30 to 50,000 because they may be appointed, but that doesn't

16  mean they place business in any given year with us.  The number

17  sounds larger than it truly is.

18  Q.  Are you able to break out how many of those 30 to 50,000

19  brokers or producers were actually writing Prudential policies?

20  A.  I am not at this point.

21  Q.  But the total of appointees who were appointed and able to

22  do business by selling Prudential products was that large

23  number, somewhere between 30 and 50,000?

24  A.  That is correct.

25  Q.  That approximate 30 or 50,000 you testified on direct

D9OJBIN3                          Avery - cross

1   examination received commissions?

2   A.   If they sold a policy for Prudential, yes.

3   Q.   Yes, if they sold a policy and they would be paid -- I

4   believe you testified on direct examination -- that they'd be

5   paid a certain number in the first year of a life insurance

6   policy, correct?

7   A.   Correct.

8   Q.   And a lesser number in the second year or the other out

9   years from the policy where the premiums are paid?

10  A.   That is correct.

11  Q.   Are the agents of Prudential, the ones directly employed by

12  Prudential, do they receive commissions?

13  A.   Yes, they do.

14  Q.   I'll ask the question more broadly now.

15           Do they receive any bonuses of any sort?

16  A.   Contracts have changed from time to time.  There sometimes

17  are production bonuses or quality bonuses or expense

18  allowances.

19  Q.   Have you completed your answer?

20  A.   I have.  Thank you.

21  Q.   If you write a certain amount of business, you might be

22  receiving more compensation?  I am talking now about the

23  agents, the employees of Prudential?

24  A.   Yes, that is correct.

25  Q.   And there would be certain goals set by the sales

D9OJBIN3                          Avery - cross

1    departments of Prudential for those agents, correct?

2    A.   There are certain targets set, yes.

3    Q.   Targets?

4    A.   Yes.

5    Q.   Would there be any awards for your larger producers?  Once

6    again, I am talking just about inside Prudential, the

7    card-carrying Prudential agents?

8    A.   Yes, they would be into the top so many would be entitled

9    to go to a conference, a reward conference where there would be

10   further education and reward given, yes.

11   Q.   Do you give awards at Prudential functions where they're

12   recognized for the amount of insurance they sell?  Again I am

13   talking just about the agents, I'll call them the card-carrying

14   Prudential agents?

15   A.   Also when you say "agents," you mean our employee agents?

16   Q.   Yes?

17   A.   As in most sales agents, there is recognition and reward

18   based on performance, yes.

19   Q.   And some of those conferences are in locales that are

20   resorts?

21   A.   Generally they're in resorts, yes.

22   Q.   In other words, they're in places that people would want to

23   be in?

24   A.   To encourage them, yes.

25   Q.   Now let's take the brokers-producers.

D9OJBIN3                        Avery - cross

1    A.  Yes.

2    Q.  These are the non-Prudential employees?

3    A.  Yes.

4    Q.  Now, you've testified that they receive commissions,

5    correct?

6    A.  Correct.

7    Q.  Do they receive awards of any kind from the company for the

8    number of policies that -- we are talking about life

9    insurance -- the number of life insurance policies that they

10   would write?

11   A.  No, there is not.

12   Q.  Just straight commissions?

13   A.  Generally higher commissions than what the agents get.

14   Q.  Are those, are those brokers or producers recognized in any

15   way by the company where you were the CEO of life insurance for

16   their number of policies that they wrote, for their production?

17   A.  No.

18   Q.  Just straight commission?

19   A.  Straight commission.

20   Q.  Now, you testified on direct examination that one of the,

21   one of the things about STOLI policies was that it might, the

22   company Prudential might incur losses and lawsuits.  Do you

23   recall that testimony on direct examination?

24   A.  That is correct, yes, I said that.

25   Q.  You said also on direct examination that lawsuits on these

1    cases have proven to be true?  You're prediction about lawsuits

2    has proven to be true?  There are many lawsuits that Prudential

3    is involved in, correct?

4    A.   There is a handful that Prudential is involved in.  I was

5    also predicting them for the industry at the time.

6    Q.   Well, let's just take Prudential.

7    A.   Yes.

8    Q.   There are lawsuits against Prudential by investors who

9    bought policies, correct?

10             MR. FEINGOLD:  Objection, your Honor.

11             THE COURT:  The objection is sustained.  Are we going

12   to get done with this witness before lunch?

13             MR. STAVIS:  I am, your Honor.  I will be done in just

14   a minute or two.

15             THE COURT:  Okay.

16             MR. STAVIS:  Maybe three.  No more than that.

17   BY MR. STAVIS:

18   Q.   Now, you were asked questions about life settlement, and

19   you indicated that Prudential, as required, your testimony was

20   that you can sell a life policy the next day, correct?

21   A.   Yes, I did indicate that.

22   Q.   It is a fact that a life settlement company would offer

23   more to an insured for a policy than would your company that

24   you were the CEO of life insurance, Prudential?

25             MR. FEINGOLD:  Objection.

1           THE COURT:  Sustained.

2           (Off-the-record discussion)

3    BY MR. STAVIS:

4    Q.  How do you determine what the cash surrender value would be

5    for a policy?

6           MR. FEINGOLD:  Objection, your Honor.

7           THE COURT:  The objection is sustained.  It is

8    irrelevant.  Move on.

9    BY MR. STAVIS:

10   Q.  You previously testified the life settlement industry is a

11   billion dollar industry?

12   A.  I did not give a number.  I just agreed with the gentleman

13   when he purported a number.  I know it is large, but I can't

14   attest to what that number is.  I am sorry.

15   Q.  The large number of people wanting to sell their policies

16   to independent companies as opposed to surrendering them back

17   to Prudential, the company of which you were the CEO in charge

18   of individual life insurance, correct?

19          MR. FEINGOLD:  Objection.

20          THE COURT:  I will let him answer the question.

21          THE WITNESS:  Would you restate the question, please.

22          THE COURT:  No, because it is very cumbersome.  It is

23   very cumbersome.  Get rid of the part about CEO, the whole

24   subordinate clause, and the sentence will be understandable.

25   BY MR. STAVIS:

D9OJBIN3                          Avery - cross

1    Q.  Of the many people who sold their insurance policies to

2    life settlement companies were people who didn't surrender them

3    to your company even though they had a cash surrender value?

4    A.  The many -- I am confused by the question.

5             THE COURT:  The question is, if somebody sold the

6    policy to a life settlement company, that means he didn't

7    tender the policy back, surrender it to Prudential, correct?

8             THE WITNESS:  It might not have been a Prudential

9    policy, that's correct.

10            THE COURT:  These are Prudential policies.

11            MR. STAVIS:  Only Prudential policies?

12            THE COURT:  In other words, if they sold to the life

13   settlement company, that necessarily meant they weren't giving

14   it back to you for the cash?

15            THE WITNESS:  I didn't agree to the many.  Those

16   policies that are Prudential policies sold to a life settlement

17   company are obviously not surrendered to Prudential, yes.

18            MR. STAVIS:  No further questions.

19            THE COURT:  How much do you have?

20            MS. MURRAY:  15 minutes.

21            THE COURT:  We are going to take a lunch break.  We

22   will see you folks back at 5 after 2:00.  Don't discuss the

23   case.  Keep an open mind.

24            (Jury excused)

25            MR. STAVIS:  Your Honor?

D9OJBIN3                          Avery - cross

1                THE COURT:  Yes.

2                MR. STAVIS:  I would object to that portion of your

3      Honor's ruling --

4                THE CLERK:  Stay seated.

5                MR. STAVIS:  -- I would object to that portion of your

6      Honor's ruling which did not allow me to elicit the lawsuits

7      that were the subject of the direct examination.

8                THE COURT:  You have an exception to every single one

9      of my rulings that goes against you.  That is the way this game

10     is played.  So you have your exception.

11               I don't sit here and say overruled, you have your

12     exception; sustained, you have your exception.  You have your

13     exception.  I understand what you are trying to get at.  I

14     concluded it is irrelevant.  You have your exception.

15               MR. STAVIS:  Thank your Honor.

16               (Luncheon recess)

17               (Continued on next page)

18

19

20

21

22

23

24

25

D9OJBIN3                          Avery - cross

1                AFTERNOON SESSION

2                2:10 pm

3                (Trial resumes)

4                (In open court; jury not present)

5                THE COURT:  Okay.  See if they all got back, that's

6        the question.  The lines are so long.  Let's get the witness

7        back.

8                THE CLERK:  We are down a juror.

9                (Jury present)

10               THE CLERK:  Remain seated.

11               THE COURT:  You're still under oath.  Ms. Murray.

12       CROSS-EXAMINATION

13       BY MS. MURRAY:

14       Q.  Good afternoon, Mr. Avery.

15       A.  Good afternoon.

16       Q.  Prudential today is the second largest life insurer in the

17       world, correct?

18               THE COURT:  You're big, right?

19               THE WITNESS:  It depends on how you measure it, but

20       I'll say yes.

21       BY MS. MURRAY:

22       Q.  I'm quoting from your own web site, sir.  You wouldn't

23       dispute that characterization?

24       A.  No, I would not.

25       Q.  Back when you were president of the life insurance U.S.

1  Division, was it also the second largest life insurer in the

2  world?

3  A.  Yes.

4  Q.  Today Prudential has approximately 1.044 trillion dollars

5  in assets under management.  Would it be a similar figure back

6  in the period of 2006 to 2009?

7  A.  It would be in that range, yes.

8  Q.  And today Prudential has 3.4 trillion in gross life

9  insurance worldwide.  Again would that be close to the figure

10  back in --

11          MR. FEINGOLD:  Objection, your Honor.  I apologize for

12  not waiting for Ms. Murray to finish.

13          THE COURT:  That is okay.  We can find out how big Pru

14  is.  We can --

15          THE WITNESS:  Yes.

16  BY MS. MURRAY:

17  Q.  Today Prudential has 48,000 employees.  Would that also be

18  fairly equivalent to the number of employees that Prudential

19  had back in 2006 to 2009?

20  A.  It has changed over time from various mergers, acquisitions

21  and dispositions, but it is in that range.

22  Q.  Do you know how many actuaries were in the company back in

23  2006 to 2009?

24  A.  No, I cannot quote the number.

25  Q.  The actuary is the individual who analyzes financial risk,

D9OJBIN3                         Avery - cross

1  correct?

2  A.  The actuaries have many functions within an insurance

3  company.

4  Q.  One of their functions is to analyze the consequences and

5  likelihood of financial risk?

6  A.  Yes, some part of it.  Others do as well, not just

7  actuaries.

8  Q.  Would it be fair that the actuaries develop models to

9  analyze risk?

10  A.  Yes.

11  Q.  And they use mathematics, economics, statistics, financial

12  theory, among other things, to develop those models?

13  A.  Yes.

14  Q.  The actuary profession is a very small profession

15  worldwide.  Is that fair to say?

16  A.  That's correct.

17  Q.  About 50,000 people in total?

18  A.  I don't know the number, but it is small.

19  Q.  You can't actually get to be an accredited actuary at a

20  university.  Is that right?

21  A.  No.  You have to pass exams passed by the Society of

22  actuaries.

23  Q.  And those are very difficult exams, would that be fair to

24  say?

25  A.  Yes, that is fair.

 1   Q.   Would it be fair to say -- and I don't mean to pander to

 2   you, Mr. Avery -- but actuaries are among the smart people in

 3   the room, would that be fair to say?

 4   A.   Some people would say that.

 5             THE COURT:   Probably actuaries.

 6             THE WITNESS:   I will take the Fifth on that.

 7   BY MS. MURRAY:

 8   Q.   Back in 2005, Prudential certainly knew about the life

 9   settlement industry at that point, right?

10   A.   Yes.   Prudential --

11   Q.   I am sorry.

12   A.   -- Prudential was one of the first to allow people who were

13   close to death actually to get their death benefit, which is a

14   part of viatical settlements.

15   Q.   And at the time in 2005, Prudential knew that it was a huge

16   growth industry worth billions of dollars a year, correct, the

17   life settlement industry?

18   A.   I don't believe it was that big back then, so I would not

19   agree with that.

20   Q.   But it was a growth industry at that time, would you agree?

21   A.   It was more a growth industry at the onset of the AIDS

22   epidemic and a declining industry when various medical protocol

23   came into place to help AIDS patients, who actually suffered a

24   downward trend after that.

25             THE COURT:   If you would just get a little closer to

1   or lift up that microphone, I would appreciate it.

2            THE WITNESS:  All right.

3   BY MS. MURRAY:

4   Q.  Prudential was aware in 2005 there was a new market for the

5   life settlement industry which was senior policies.  Is that

6   right?

7   A.  We became aware when the life settlement industry went into

8   a decline because of the improvement of AIDS patients'

9   outlooks, we became aware through various marketing efforts, as

10  I testified earlier, that the settlement industry itself was

11  growing, and these new STOLI-type marketing techniques would

12  fuel growth in that business, and that is when we became aware

13  of STOLI, yes.

14  Q.  You became aware of STOLI in 2005 as well?

15  A.  2004, 2005, somewhere in that time-frame, yes.

16  Q.  And the potential of STOLI to result in growth in the life

17  settlement industry, correct?

18  A.  That is correct.

19  Q.  Now, you did touch briefly on this on cross, but there are

20  two, the two most common forms of life insurance, would you

21  agree, could be divided into temporary versus permanent.  Would

22  you agree with that?

23  A.  That is a fair separation, yes.

24  Q.  The temporary one, forms of life insurance would include

25  term life insurance, the one most of us would be familiar with,

1    correct?

2    A.   That is the temporary one, yes.

3    Q.   And that is where one takes on an insurance policy for a

4    set period of time, 10, 20 or 30 years, correct?

5    A.   That's correct.

6    Q.   And the purpose in taking on this type of insurance is to

7    provide for a death benefit in the unlikely eventuality of an

8    early death, would that be fair to say typically?

9    A.   Typically, yes.

10   Q.   So that if a working parent, for example, passed away

11   unexpectedly in their 30's, 40's or 50's and still had young

12   children, it would be term life insurance to provide for

13   education and pay off --

14   A.   Yes.

15   Q.   It is called temporary because the assumption is that the

16   person will outlive the policy, right?

17   A.   No.  The assumption is that some people will die during

18   that period of time and some won't, and some do.

19              (Continued on next page)

20

21

22

23

24

25

1    BY MS. MURRAY:

2    Q.  The purpose in buying the term -- the purpose of a consumer

3    in buying it is to buy piece of mind and ultimately, hopefully,

4    outlive the policy.  Would that be fair to say?

5    A.  I think it would be fair to say most insureds would like to

6    outlive their policy, yes.

7    Q.  The other form of insurance is permanent insurance,

8    correct?

9    A.  Yes, that is a classification, yes.

10   Q.  And whole life and universal life policies are examples of

11   permanent insurance?

12   A.  That is correct.

13   Q.  And this is insurance that is not intended to end at a

14   particular point but is actually intended to go to death,

15   correct?

16   A.  If you pay the premiums till death, yes, or keep them

17   funded, yes.

18   Q.  And as Prudential markets it, it's designed to last as long

19   as you live, correct?

20   A.  As long as you live and as long as you desire it to last.

21   Q.  But you don't market it as a benefit designed to last until

22   you lapse, you don't market it that way, do you?

23   A.  No.

24   Q.  Now, you stated on direct that one of the factors that

25   actuaries take into account in pricing is -- in pricing

1    universal life policies, these permanent life insurance

2    policies, are the lapse rates?

3    A.  Yes, I did.

4    Q.  This means looking at the prior experiences of lapses and

5    then factoring that into these future assumptions, correct?

6    A.  Yes, I did.

7    Q.  And STOLI -- sorry.  Withdrawn.

8            Isn't it a fact, Mr. Avery, that relying on lapse

9    rates to price products is actually deemed not good actuarial

10   practice?

11   A.  No, it's deemed appropriate.  I disagree.

12   Q.  Isn't it a fact that actuaries generally believe that

13   relying on lapse rates is inappropriate, is inadvisable because

14   lapse rates are so unpredictable?

15   A.  No, I'm sorry.  I don't agree with you.

16   Q.  Okay.  And, in fact, lapse rates are subject to economic

17   forces and for that reason are hard to predict?

18   A.  I think under the rule of statistics in mathematics, when

19   you have a large group of people, the data becomes more

20   predictable and it's predictable over various economic cycles

21   and employment cycles.  We're not new to those cycles.

22   Q.  Isn't the most predictable thing death?

23   A.  The most predictable thing?

24   Q.  From an actuarial standpoint.

25   A.  I'd say, again, law of large numbers, it becomes more

1    predictable because of the size of the population you get in

2    the study.  But I don't know that it's more predictable.  There

3    are many things that you predict or assume.

4    Q.  Now, you said on direct that STOLI changes the assumptions

5    that actuaries and underwriters are making about lapse rates,

6    correct?

7    A.  No, I don't think I said that.

8    Q.  Would it be fair to say that STOLI changes the assumptions

9    that actuaries would use regarding lapse rates in pricing

10   universal life policies?

11   A.  We don't price for STOLI because we didn't want it.  So we

12   didn't price for it; that's why I objected to the question.  If

13   we were desired to sell STOLI, then you would, just like any

14   business that would behave differently, you would price it

15   based on the behavior of that class of policies.  But since we

16   did not intend to write STOLI, the actuaries did not price

17   STOLI or lapse rates differently for STOLI.

18   Q.  But you were pricing the policies based on prior lapse

19   rates in part, correct?

20   A.  That is correct.

21   Q.  And STOLI would undermine the assumptions you might have

22   made about prior lapse rates, correct?

23   A.  If STOLI had crept into the data, it would be in the data.

24   Again, STOLI is a rather new phenomenon, so it would be

25   somewhat limited in our experience until time went on and if

1  more policies got through the screens that we had in place,

2  yes.

3  Q.  So in 2005, when you knew that STOLI was appearing and

4  there was a growing life settlement industry, it will be fair

5  to say that past experience about lapse rates did not

6  necessarily predict future experience about lapse rates,

7  correct?

8  A.  I'm not sure I understand the question.

9  Q.  In 2005, when you were aware that STOLI was potentially

10 creeping in, Prudential knew that prior experience about lapse

11 rates was not necessarily predictive of future lapse rates; is

12 that right?

13 A.  No.  In 2005, we became aware of STOLI because producers

14 who wanted to do it brought it to us as an opportunity.  We

15 declined the opportunity.

16       So at that time we would not be assuming that we would

17 be getting STOLI.  We started to get it when it was disguised

18 and we couldn't identify it as easily as we had hoped.

19 Q.  And in 2005, you were aware of the potential that you could

20 be getting STOLI, right?

21 A.  Quite frankly, back in 2005, we thought this would go away

22 because it was not legal.

23 Q.  Now, the policies at issue here were sold to individuals

24 older than 70 years of age?

25 A.  No, I'd say we sold policies anywhere from generally age 60

1    on up, not always over age 70.

2    Q.  And these universal life policies were being marketed to

3    senior citizens, correct?

4    A.  Universal life is marketed to senior citizens, yes.

5    Q.  Now, while many people buy life insurance hoping to outlive

6    the policy or not to die soon, many in this group are buying it

7    with the purpose of preparing for death rather than insuring

8    against it; would that be fair to say?

9    A.  I'd say at the older ages, it's more estate planning.  So

10   it's preparing for potential death, yes.

11   Q.  We saw on direct the policy of Florra Adler -- and I won't

12   ask to show it again -- where the purpose of the policy, the

13   purpose of the policyholder in getting the policy was listed as

14   preparing for death and estate conservation?

15   A.  Estate conservation, yes.

16   Q.  Now, you also said on direct it's important to you that

17   senior citizens are not being sold something they can't afford,

18   right?

19   A.  That is correct.

20   Q.  And the --

21   A.  All policyholders, not just senior citizens.

22   Q.  Right.  And the pricing of the universal life policies, the

23   pricing of premiums gets higher as the person is older,

24   correct?

25   A.  That is correct.

1  Q.  And so for people in their seventies buying these policies,

2  the premiums can be anything from a hundred thousand dollars up

3  to several hundred thousand dollars a year, correct?

4  A.  Depends on their age and face amount, but they can be

5  large, yes.

6  Q.  And you have built lapses, the expectation of some lapses

7  into the pricing for those policies, right?

8  A.  Correct.

9  Q.  In other words, you're selling these permanent life

10  insurance policies to people in their seventies and late

11  seventies for very huge premiums and Prudential is hoping that

12  several of them will lapse, correct?

13  A.  No, we're not hoping.  We're basing it on experience of

14  what they actually do.  It's not a hope.

15  Q.  Prudential is anticipating that several of these will

16  lapse, correct?

17  A.  Anticipating it based on experience, yes.

18  Q.  And when that happens, Prudential actually pockets all the

19  premiums that have been paid to date, correct?

20  A.  No.

21  Q.  No.

22  A.  The reason being, if you look at the premium versus the

23  death benefit, as I said before, maybe the example I'd give, if

24  you had ten people who wanted -- each of them say when I die, I

25  want $100.  The insurance company anticipates that only one

```
1    will die while they own the policy.  They would charge each of
2    the ten people $10 and the insurance company would have $100.
3    And when that one person dies, the hundred dollars is
4    available.
5             So the other people who paid the $10 in, it's not
6    profit.  That's where the money comes from to pay the claim,
7    just like in auto insurance and fire insurance.  Our premiums
8    are never equal to the benefit.  They're less based on
9    experience.  So lapses is one of the experience factors, and
10   policies do lapse at the older ages.
11   Q.  But Prudential will sell these policies to people when
12   they're 75 years old, 78 years old, correct?
13   A.  If they have the need for it, yes.
14   Q.  And if that person lapses several years later with respect
15   to that individual policy, those premiums are not returned to
16   that individual when they decided to lapse, correct?
17   A.  The premiums are not returned, but they may have a cash
18   value depending on the contract.
19   Q.  But the minimum premium on many of these policies could be
20   several hundred thousand, correct?
21             MR. FEINGOLD:  Objection, asked and answered.
22             THE COURT:  The objection is sustained.
23   Q.  The minimum payment will not go towards any cash value,
24   would that be fair to say, Mr. Avery?
25   A.  I'll try to answer the question.
```

1          THE COURT:  I think you mean it doesn't increase the

2     cash value of the policy?

3     Q.  If one is simply paying the minimum premium to maintain the

4     death benefit, that is not increasing the cash value of the

5     policy?

6          THE COURT:  Does that cause the cash value of the

7     policy to increase?

8          THE WITNESS:  It can cause the cash value of the

9     policy to temporarily increase.  But with time, if they

10    continue to pay the premium, it will go up and back down and

11    essentially go to zero.  But in early years, it might increase

12    the cash value.  That's why I said, yes, it did.

13    Q.  Are you familiar with the National Association of Insurance

14    Commissioners?

15    A.  I am.

16    Q.  And what is it?

17    A.  It's insurance is regulated at the state level, so it is

18    actually regulated by each of the 50 states.  It's not

19    federally regulated the way the banks can be.  And each state

20    has an insurance commissioner who is in charge of regulation of

21    insurance in that state, either elected or appointed.  And they

22    come together as a group under the auspices of National

23    Association of Insurance Commissioners and they promulgate,

24    where they can, common legislation and regulation.

25    Q.  And so they promulgate these model regulations; would that

1    be fair to say?

2    A.   That is correct.

3    Q.   And different states will adopt many of these model

4    regulations, right?

5    A.   Yes, that's correct.

6    Q.   And are you familiar with the life insurance illustration

7    model regulation?

8    A.   Somewhat, yes.

9    Q.   And this is -- an illustration is a depiction of

10   nonguaranteed elements of a life insurance policy over a period

11   of years; would that be a correct description of what an

12   illustration is?

13   A.   That's one form.  There are illustrations for policies

14   other than that.  But, yes, they illustrate the policy, how it

15   might perform under a set of assumptions.

16   Q.   And in the universal life context, the illustration could

17   depict the growth of the cash value of the policy over a period

18   of years?

19   A.   Depending on the premium, as you've stated earlier, that's

20   assumed to the funded into the policy, it will depict all

21   aspects of the policy, cash value and death benefit.

22   Q.   Would you agree with the statement that the purpose of the

23   model regulation for life insurance policy illustrations is

24   that it will protect the consumer and foster consumer

25   education?

D9OLBIN4                          Avery - cross

 1              MR. FEINGOLD:  Object to form and relevance, your

 2     Honor.

 3              THE COURT:  The objection to relevance is sustained.

 4     It's sustained.

 5              MS. MURRAY:  Your Honor, I can have a side bar.

 6              THE COURT:  Objection is sustained.  Move on, please.

 7     Q.  And are you aware, Mr. Avery, that the model regulation on

 8     life insurance illustration prohibits the use of illustrations

 9     that are lapse supported?

10              MR. FEINGOLD:  Objection, relevance.

11              THE COURT:  Same objection.  Same ruling.

12     Q.  Would it be fair to say, Mr. Avery, that Prudential does

13     not announce to its customers, its potential insureds, that it

14     has factored lapse rates into the pricing of its products?

15              MR. FEINGOLD:  Objection, relevance, your Honor.

16              THE COURT:  Objection is sustained.

17     Q.  Now, Mr. Avery, on direct you said that mortality rates are

18     impacted by net worth; is that correct?

19     A.  No.  I think the answer I gave was indirectly they can be.

20     Q.  In other words, does Prudential take the position that

21     people with a higher net worth have a lower mortality?

22     A.  We don't take that position.  Our mortality studies would

23     indicate what mortality we get based on size of face amount,

24     and if you think about face amount as related to net worth,

25     that's the indirect aspect of it.

 1   Q.  Now, the people who are getting the universal life policies

 2   in their seventies are also on Medicare, correct?

 3            MR. FEINGOLD:  Objection.

 4            THE COURT:  The objection is sustained.

 5   Q.  The individuals getting these universal life insurance

 6   policies in their seventies, Mr. Avery, undergo very rigorous

 7   medical underwriting; is that right?

 8   A.  Yes.  There are different standards for underwriting based

 9   on face amount and age, so it differs by all ages.

10   Q.  And in connection with that medical underwriting, not only

11   is a detailed medical history of the individual taken, but also

12   information about the cause of death of siblings and parents,

13   correct?

14   A.  We get that in most ages, not just age 70 and above.

15   Q.  I'm just going to focus my questions on universal life

16   policies at issue in this case.

17   A.  Okay.

18   Q.  In addition, Prudential is able to request additional

19   medical tests of the individuals proposing to be insured,

20   correct?

21   A.  Certain tests we are permitted, yes.

22   Q.  And isn't it a fact, Mr. Avery, that there are no insurance

23   studies indicating that the healthiest of the rich have a

24   better mortality than the healthiest of people of modest means?

25            MR. FEINGOLD:  Objection, your Honor.

1        THE COURT:  Overruled.

2   A.  I can only say I'm aware that there are studies of

3   mortality by face amount.  I don't know --

4   Q.  You're aware of studies of mortality by face amount?

5   A.  Death benefit issued, yes.

6   Q.  And these mortality studies of face amount indicate that

7   people with high face amounts on the policies will live longer;

8   is that right?

9   A.  Those studies indicate whatever the data suggests.  At

10  times, it has suggested better mortality on the higher face

11  amounts, but it does change over times as medical science has

12  evolved.

13  Q.  And these policies do not analyze -- these studies have not

14  analyzed the net worth of the individuals involved in those

15  studies, correct?

16  A.  The studies I'm familiar with have not.

17        MS. MURRAY:  I have no further questions for this

18  witness.

19        THE COURT:  Thank you.

20        MR. FEINGOLD:  Very brief redirect, your Honor?

21        THE COURT:  Sure.

22  REDIRECT EXAMINATION

23  BY MR. FEINGOLD:

24  Q.  Mr. Avery, Ms. Murray just asked you a lot of questions

25  about mortality studies of high face amount life insurance

1   policies.  Are you referring to four or $5 million life

2   insurance policies?

3   A.  The studies I've seen generally look at a million dollars

4   and above as the classification, the ones I'm familiar with

5   again.

6   Q.  And for this range of policies, what's the expectation as

7   to the true net worth of those insureds?

8   A.  It's always assumed, since we wouldn't sell large policies

9   to people that didn't have some net worth equivalent to that,

10  that they would be large.

11  Q.  So $4 million for 4 million policy or thereabouts?

12  A.  Yeah.  So that's my comment of indirect.

13  Q.  Now, Mr. Abramowitz asked you some questions about the

14  bargain that Prudential is entering into when it issued a life

15  insurance policy; do you recall those questions?

16  A.  Yes.

17  Q.  Now, was part of the bargain that Prudential was entering

18  into insuring the risk that you knew about?

19  A.  Yes.  Yes.

20  Q.  Was part of the bargain insuring the risk that you had

21  truthful information about?

22  A.  Absolutely.

23  Q.  Was part of the bargain issuing a policy --

24          MR. STAVIS:  Objection as to form, your Honor.

25          THE COURT:  I haven't heard the rest of the question.

1  Q.  What part of the bargain, if any, did issuing a policy

2  based on truthful information have?

3  A.  The entire bargain.

4  Q.  Now, you heard a lot of questions about Prudential

5  employees, agents, producers, brokers.

6          Did Prudential expect its employees to abide by

7  Prudential's policy and position of not issuing STOLI policies?

8  A.  Absolutely.

9  Q.  Did Prudential expect its agents, producers, and brokers to

10  abide by Prudential's policy of not issuing STOLI policies?

11  A.  Yes.  We terminated any agent or broker that we thought was

12  doing those transactions.

13  Q.  Did you rely on brokers, producers, and agents to provide

14  Prudential with truthful and accurate information about their

15  clients and the applicants for life insurance policies?

16  A.  Absolutely.

17  Q.  Did Prudential have concerns about the bottom line being

18  impacted by issuing policies that are intended to be sold

19  immediately upon issuance?

20          MR. STAVIS:  Objection as to form, your Honor.

21          THE COURT:  Objection is sustained.  Stop asking

22  argumentative and leading questions.

23  Q.  Mr. Avery, what would happen if every universal life policy

24  that Prudential issued had the premiums paid until the insured

25  died?

1          MR. STAVIS:  Objection as to form, your Honor.

2          THE COURT:  Overruled.

3          MR. STAVIS:  Hypothetical being proposed to the

4     witness.

5          THE COURT:  That's just fine.

6     Q.  Do you remember the question?

7     A.  Yes.  Given that we take into account lapsation and

8     surrender of life insurance policies, if every policy we issued

9     never lapsed, never surrendered, the insurance company would

10    lose millions and millions of dollars and it would have to, as

11    soon as it started to experience that, since we base pricing on

12    experience, we would have to significantly raise prices going

13    forward.

14    Q.  What would happen to Prudential's business if it had to

15    significantly raise prices for its customers?

16         MR. ABRAMOWITZ:  Objection, your Honor.

17         THE COURT:  I'm sorry?

18         MR. ABRAMOWITZ:  Objection.

19         THE COURT:  Ground?

20         MR. ABRAMOWITZ:  It's hypothetical.

21         THE COURT:  Answer the question.

22         THE WITNESS:  Thank you.  Could you ask the question

23    again.

24    Q.  Certainly.  What would happen to Prudential's business if

25    Prudential had to significantly raise its prices for its

1   insurance customers?

2   A.   Two part answer:  One, it depends whether the competition

3   is similarly raising prices.  Secondarily, without that,

4   business would decline because insurance would become less

5   affordable for citizens who want to insure their risk and

6   that's one of our concerns.

7              MR. FEINGOLD:  One moment, your Honor.

8              No further questions.

9              MR. ABRAMOWITZ:  May I have a minute, your Honor?

10             THE COURT:  Sure.

11             MR. ABRAMOWITZ:  No further questions.

12             MR. STAVIS:  No further questions, your Honor.

13             THE COURT:  You're through, sir.

14             THE WITNESS:  Thank you.

15             (Witness excused)

16             MS. CHOI:  Your Honor, the government calls Steven

17  Espinal to the stand.

18   STEVEN ESPINAL,

19        called as a witness by the Government,

20        having been duly sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MS. CHOI:

23  Q.   Good afternoon, Mr. Espinal.

24  A.   Good afternoon.

25  Q.   How old are you?

1   A.  Forty-five.

2   Q.  Where do you live?

3   A.  Cliffside Park, New Jersey.

4   Q.  Do you live with anyone?

5   A.  Yes.

6   Q.  Who do you live with?

7   A.  My girlfriend, her niece, and her brother.

8   Q.  Do you work?

9   A.  Yes.

10  Q.  Where do you work?

11  A.  In Fort Lee, New Jersey.

12  Q.  And what do you do for a living?

13  A.  I work as a doorman.

14  Q.  And where specifically do you work as a doorman?

15  A.  In Fort Lee, New Jersey, a building called The Plaza.

16  Q.  How long have you worked there?

17  A.  Approximately 21 years.

18  Q.  Mr. Espinal, are you testifying here today pursuant to an

19  agreement with the government?

20  A.  Yes, I am.

21          MS. CHOI:  Your Honor, may I approach?

22          THE COURT:  Yes.

23  Q.  Mr. Espinal, could you please take a look at the document I

24  just placed before you which has been marked Government

25  Exhibit 4006.  Do you recognize that document?

D9OLBIN4                        Espinal - direct

1   A.  Yes, I do.

2   Q.  Is it a copy of your agreement with the government?

3   A.  Yes, it is.

4   Q.  Do you have an understanding of what that agreement

5   requires you to do?

6   A.  Yes, I do.

7   Q.  And what's that understanding?

8   A.  To tell the truth on this court.

9   Q.  And do you have an understanding what the government has to

10  do in return under that agreement?

11  A.  Yes.

12  Q.  And what's that?

13  A.  Provided that I tell the truth, it's a nonprosecution

14  agreement.

15  Q.  And do you have an understanding what would happen to you

16  if you were to lie under that agreement?

17  A.  This agreement would become null and void.

18  Q.  And could you be separately prosecuted if you were to not

19  tell the truth?

20  A.  Yes.

21  Q.  Okay.  If you could put that document aside.

22          Mr. Espinal, what is your mother's name?

23  A.  Martha Espinal.

24  Q.  How old is she?

25  A.  Eighty-five years old.

1    Q.  And what language does she usually speak?

2    A.  Spanish.

3    Q.  How well does Mrs. Espinal speak English?

4    A.  Not well.

5    Q.  Where does she live?

6    A.  In Cliffside Park, New Jersey.

7    Q.  Could you describe the building that she lives in, the type

8    of building she lives in?

9    A.  She lives in senior citizen housing.

10   Q.  How much does she pay in rent per month?

11   A.  Approximately $220.

12   Q.  Does she receive any assistance to pay for that rent?

13   A.  Yes.

14   Q.  What kind of assistance?

15   A.  Social security income.

16   Q.  And do you know if her rent is subsidized at all?

17   A.  Yes, it is.

18   Q.  And why does she receive that subsidy?

19   A.  It's based on her age and her financial income.

20   Q.  How long has she lived in that senior citizen housing

21   complex?

22   A.  Approximately ten years plus.

23   Q.  And how far away do you live from your mother?

24   A.  A few blocks.

25   Q.  Do you have an understanding of your mother's finances?

1    A.  Yes, I do.

2    Q.  Does your mother have any sources of income?

3    A.  No.

4    Q.  Other than social security income?

5    A.  Other than social security income, no, ma'am.

6    Q.  How much does she make in social security income per month,

7    do you know?

8    A.  Approximately 720 a month.

9    Q.  At any time between 2007 to the present, had your mother

10   had any significant assets?

11   A.  No.

12   Q.  And at any time between 2007 to the present, has your

13   mother owned any property?

14   A.  No, she has not.

15   Q.  And at any time between 2007 to the present, has your

16   mother had any investments?

17   A.  No.

18   Q.  Does your mother own a bank account?

19   A.  Yes.

20   Q.  Do you have access to that bank account?

21   A.  Yes, I do.

22   Q.  And between 2007 to the present, how much did your mother

23   have in that bank account on average per month?

24   A.  Approximately $700.

25   Q.  Do you know an individual named Michael Binday?

1    A.  Yes, I do.

2    Q.  Have you spoken with him previously?

3    A.  Previously, yes.

4    Q.  And how many times have you met him in person?

5    A.  Once.

6    Q.  Do you see Mr. Binday in the courtroom today?

7    A.  Yes, I do.

8    Q.  Could you point out Mr. Binday?

9    A.  The gentleman with the glasses, I believe the bluish tie.

10           MR. ABRAMOWITZ:  Identification conceded, your Honor.

11           THE COURT:  Indicating Mr. Binday.

12   Q.  Do you know an individual named Janice Greenbaum?

13   A.  Yes.

14   Q.  And how did you first meet Janice Greenbaum?

15   A.  Through purchasing an insurance policy for myself and my

16   mother.

17   Q.  And what kind of insurance policy was that?

18   A.  Life insurance policy.

19   Q.  And what was the face value, if you recall, of those life

20   insurance policies for yourself and your mother?

21   A.  Approximately a hundred thousand.

22   Q.  And are those real life insurance policies?

23   A.  Yes.

24   Q.  Now, at some point after you got those life insurance

25   policies, did you have another conversation with Janice

1    Greenbaum about another type of life insurance?

2    A.  Yes.

3    Q.  Could you describe that conversation?

4    A.  It was a conversation in reference to an insurance policy

5    called alternate -- alternate insurance policy.

6    Q.  And what was your understanding of what alternate life

7    insurance policy would be?

8    A.  A policy that is placed on your parents or -- a life policy

9    placed on your parents that you do not pay for and the policy

10   then gets sold and then you're paid a premium or between two

11   and 8 percent of what the policy was to be sold at.

12   Q.  Did you have an understanding of how much you could receive

13   under such a plan?

14   A.  I was, yes, I did.

15   Q.  And what was that understanding?

16   A.  I was told it could be anywhere from two, four, six or

17   8 percent of what the policy sells for.

18   Q.  And how large were those life insurance policies for, do

19   you know?

20   A.  Approximately 3 million.

21   Q.  And after you had -- after Janice Greenbaum explained this

22   to you, what did you say in response to her?

23   A.  How can I proceed with applying for the policy.

24   Q.  And what did she say to you?

25   A.  It's an application that you would have to fill out to be

1    qualified for it.

2    Q.  And did you talk to anyone else after this conversation

3    about the alternative life insurance policy?

4    A.  Yes.

5    Q.  Who did you speak with?

6    A.  Gentleman by the name of Michael Binday from Advocate

7    Brokerage.

8    Q.  And what did he say to you?

9    A.  He would send me the application packet in order to apply

10   for the policy.

11   Q.  And did he describe the process, the process about

12   alternative life insurance policies to you?

13   A.  Yes.

14   Q.  And was that process similar to what Ms. Greenbaum had

15   explained to you?

16   A.  Yes, it was.

17   Q.  Did you have an understanding about how premiums were going

18   to be paid for under this alternative life insurance program?

19   A.  No, I did not.

20   Q.  Did you think that your mother was going to have to pay for

21   them?

22   A.  She -- no.  I was told that I -- I or my mother would not

23   have to pay for them.

24   Q.  And did you have an understanding of when you would receive

25   money under this alternative life insurance program?

1  A.  I was told once the policy is sold, I would receive either

2  two to 8 percent of what the policy was sold at.

3  Q.  Did you talk to your mother about this program?

4  A.  Yes, I did.

5  Q.  And what did she say, what did you two discuss?

6  A.  I explained to my mother what the policy was about and she

7  also agreed and thought it would be a good idea.

8  Q.  And why did you and your mother want to go through with

9  participating in this program?

10  A.  Myself and my mom also thought it would be a good way to

11  provide for the family.

12  Q.  Was there something specific that you wanted to use that

13  money for --

14  A.  Yes.

15  Q.  -- if a policy were to be sold.  And what was that?

16  A.  First reason was to provide for a burial plot for my mother

17  when she did pass in the future and also to go on vacation and

18  buy a few things for my mother that she needed.

19  Q.  So did you and your mother decide to go forward with trying

20  to get these policies?

21  A.  Yes.

22  Q.  And so could you describe generally how the process worked?

23  A.  I received in the mail at my place of where I work a UPS

24  envelope with an application inside.  That application had

25  little stickie notes, Post-it notes on areas where my mother

1   needed to sign, and then that would be mailed back in a prepaid

2   UPS envelope next day.

3   Q.  And prior to receiving these packages, would you have any

4   communications with Advocate Brokerage?

5   A.  Yes.

6   Q.  And who would you talk to?

7   A.  Person by the name of Janet Bilbao.

8   Q.  Did you also talk to Mr. Binday?

9   A.  Yes.

10  Q.  And would they let you know that a package was coming in

11  the mail?

12  A.  Yes.

13          MR. ABRAMOWITZ:  Object to form.

14          THE COURT:  I'm sorry?

15          MR. ABRAMOWITZ:  Would they let you know which one.

16          THE COURT:  Want to rephrase it?

17  Q.  Would Ms. Bilbao let you know that a package was coming in

18  the mail?

19  A.  Yes.

20  Q.  And would sometimes Mr. Binday let you know that a package

21  was coming in the mail?

22  A.  If I recall correctly, yes.

23  Q.  And would you typically have to fill out the entire life

24  insurance application or just parts of the application?

25  A.  Parts of the application.

1   Q.  And aside from the application forms themselves, did you or

2   your mother have to do anything else in order to apply for

3   these alternative life insurance policies?

4   A.  Yes.

5   Q.  What was that, sir?

6   A.  It was requirement of a physical by a doctor that came to

7   the house and gave my mother a physical.

8              MS. CHOI:  Your Honor, may I approach?

9              THE COURT:  Yes.

10  Q.  Mr. Espinal, I've given you what's been marked as

11  Government Exhibit 703 for identification purposes.  Could you

12  tell me what this document is?

13  A.  It's a document marked Advocate Brokerage from Mr. Binday's

14  office.

15  Q.  And who is it sent to?

16  A.  Myself.

17  Q.  And what's the date on it?

18  A.  September 14, 2007.

19  Q.  And do you see the initials in the bottom left-hand corner

20  of that document?

21  A.  Yes.

22  Q.  And whose initials are those?

23  A.  They're my initials.

24  Q.  And when did you initial this document?

25  A.  When I met with you.

D9OLBIN4                          Espinal - direct

1    Q.   And where did this document originally come from?

2    A.   From Advocate Brokerage.

3    Q.   And did you have it in your possession at some time after

4    that?

5    A.   Yes.

6            MS. CHOI:  The government offers Government

7    Exhibit 703 into evidence.

8            MR. ABRAMOWITZ:  No objection.

9            MS. CHOI:  Ms. Hayakawa, could you please publish

10   GX703 -- I'm so sorry, your Honor.

11           THE COURT:  Admitted.

12           (Government's Exhibit 703 received in evidence)

13           MS. CHOI:  Could you please publish Government

14   Exhibit 703 for the jury.

15   Q.   Mr. Espinal, could you read the re line of that document

16   for the jury.

17   A.   Excuse me?

18   Q.   Could you read the line that's just on the screen right

19   now, the re line for the jury.

20   A.   Martha Espinal, AIG New Jersey, 3MM application forms for

21   signature.

22           MS. CHOI:  Ms. Hayakawa, could you zoom out and then

23   zoom in on the text of the letter, please.

24   Q.   Mr. Espinal, could you read out loud the first paragraph of

25   the cover letter including the bold language.

1   A.  Per our phone conversation, enclosed please find an AIG New

2   Jersey application, HIV and HIPPA forms, financial

3   questionnaire, and premium financing form.  New Jersey does not

4   have or require a definition or replacement form.  Please have

5   Martha sign in all sections highlighted in yellow.  Do not date

6   forms.

7   Q.  Could you read out loud that second paragraph as well.

8   A.  Included is the signature page for the trust.  Please have

9   Martha sign as the settlor.  Do not date form.

10  Q.  And could you read out loud that third paragraph.

11  A.  Finally, please have Martha sign the illustration as the

12  applicant.  Do not date form.

13  Q.  And could you read that last line, the last two lines of

14  the letter, please.

15  A.  If you have any questions, please call me at (914)723-7100

16  extension 130.  Please return completed forms to me in the

17  enclosed self-addressed overnight envelope.  Thank you.

18  Q.  What did you do once you received this cover letter and the

19  application beneath it?

20  A.  I followed the instructions.  My mother signed in the

21  indicated areas and they were mailed in the UPS provided

22  envelope the next day.

23  Q.  Now, the rest of the document that's attached to this cover

24  letter, is this a copy of the original application you received

25  from the office or is it the original?

1   A.  It's the rest of the letter are copies.

2   Q.  And did the original version of the application that you

3   received from Advocate Brokerage contain the highlighting as

4   referenced in the letter?

5   A.  Excuse me?

6   Q.  Did the original version of the application that you

7   received from Advocate Brokerage contain highlighting as it's

8   referenced in the letter?

9   A.  Yes, I believe so.

10  Q.  All right.  Why don't we take a look at this application.

11          MS. CHOI:  Ms. Hayakawa, could you pull up page 2 on

12  to the screen.

13  Q.  Now, Mr. Espinal, do you recognize the handwriting in the

14  section of the document that says personal information at the

15  top of the page?

16  A.  The only writing I recognize is the address of my mother.

17  Q.  Okay.  And whose handwriting is that?

18  A.  My mother's -- my handwriting, 550 Gorge Road, Apartment

19  3F.

20  Q.  And Cliffside Park, New Jersey?

21  A.  Yes.  And Cliffside Park, New Jersey, Apartment 3F.

22  Q.  For the other parts of that section, do you recognize the

23  handwriting as it appears there?

24  A.  No, I do not.

25  Q.  Were those sections filled in when you got these forms?

1    A.  Yes.

2    Q.  Drawing your attention to the line -- Ms. Hayakawa, if you

3    could blow up the personal information section.  Thank you --

4    turning your attention to the line that says personal earned

5    income, do you see what's written after that?

6    A.  Yes, the words "we do."

7    Q.  And household income after that?

8    A.  The words "we do."

9    Q.  And net worth and words next it that?

10   A.  The words "we do."

11   Q.  Were those words written there when you got this

12   application?

13   A.  Yes, they were.

14   Q.  Could you turn to page 6 of the application?

15           MS. CHOI:  And, Ms. Hayakawa, could you do the same,

16   please.

17   Q.  Now, at the bottom of that page, Mr. Espinal, do you

18   recognize the signature there?

19   A.  Yes.

20   Q.  Whose signature is it?

21   A.  My mother, Martha Espinal.

22   Q.  And do you see what's written next to "signed at city,

23   state"?

24   A.  The words "no."

25   Q.  And "on (date)"?

D9OLBIN4                          Espinal - direct

1   A.  The word "no."

2   Q.  Were those also there when you received the application?

3   A.  Yes.

4          MS. CHOI:  Ms. Hayakawa, could you turn to page 10 of

5   the document.

6   Q.  Mr. Espinal, could you do the same, please.

7          Mr. Espinal, could you read the language as it

8   appears, the handwriting on the top right-hand corner of that

9   page.

10  A.  We complete.  Please sign page 2.

11  Q.  And was that on the application when you received it?

12  A.  Yes, it was.

13         MS. CHOI:  Ms. Hayakawa, could you please turn to the

14  next page, page 11.

15  Q.  Do you recognize, Mr. Espinal, the signature as it appears

16  on the bottom of this page?

17  A.  Yes, I do.

18  Q.  Whose is it?

19  A.  My mother, Martha Espinal.

20  Q.  Did you or your mother fill out any of the information on

21  pages 10 or 11 of this financial questionnaire?

22  A.  No, we did not.

23  Q.  What did you do with the application after your mother

24  signed it?

25  A.  It was sent back to Mr. Binday's office in the UPS

1    envelope.

2    Q.  Was this the only application that your mother signed?

3    A.  No.

4    Q.  Do you know how many different applications your mother

5    signed for?

6    A.  I don't recall exact, the exact amount.

7    Q.  Did you have an understanding as to why your mother was

8    applying for multiple applications?

9    A.  Yes.

10   Q.  What was that understanding?

11   A.  The more applications --

12          MR. ABRAMOWITZ:  Object and ask from whom he got the

13   understanding from.

14          THE COURT:  I'm sorry?

15          MR. ABRAMOWITZ:  If it's hearsay, I'd like to know

16   about it.  If it's nonhearsay, I'd like to know about that.

17          THE COURT:  From whom did you get the applications?

18          THE WITNESS:  From Mr. Binday's office.

19   Q.  And from who, Mr. Espinal, did you get this understanding

20   of why there were multiple applications that your mother was

21   filling out?

22          THE COURT:  Did somebody tell you that you had to fill

23   out multiple applications?

24          THE WITNESS:  From Mr. Binday's office, yes, ma'am.

25          THE COURT:  Who told you that?

1          THE WITNESS:  Either Janet Bilbao or Mr. Binday.

2          THE COURT:  Either Janet Bilbao or Mr. Binday.  Thank

3    you.

4          It's much easier if you just ask a straightforward

5    plain English question.

6          MS. CHOI:  I'll try, your Honor.

7    Q.  Did you know why your mother was applying for so many life

8    insurance policies?

9    A.  Yes.

10   Q.  And what was your understanding as to why, why did you

11   think so?

12   A.  Basically the more policies that were sold, the more money

13   that would be made.

14         MS. CHOI:  May I approach, your Honor?

15         THE COURT:  Yes.

16   Q.  I'm showing you what's been marked as Government

17   Exhibit 719 and 738.

18         Mr. Espinal, what are these documents?

19   A.  These are the UPS express envelopes that I received in the

20   mail.

21   Q.  And do you recognize the initials that appear in the bottom

22   left-hand corner of both of these documents?

23   A.  Yes, I do.

24         MS. CHOI:  The government offers Exhibits 719 and 738

25   into evidence.

1          MR. ABRAMOWITZ:  No objection.

2          THE COURT:  Admitted.

3          (Government's Exhibits 719, 738 received in evidence)

4          MS. CHOI:  Ms. Hayakawa, could you pull those up on

5     the screen for the jurors, please.

6     Q.  Mr. Espinal, do you mind just showing the jurors what they

7     are.

8     A.  (Indicating).

9     Q.  Thank you.  Mr. Espinal, do you know whether Mr. Binday or

10    his office ever reached out to your mother directly?

11    A.  No, it was always through me.

12    Q.  Did Mr. Binday ever discuss with you whether you should

13    speak directly with insurance companies?

14    A.  Yes.

15    Q.  And what did he tell you?

16    A.  If anyone contacts you from an insurance company, direct

17    them to call his office.

18    Q.  What if anything did you tell your mother after you had

19    that conversation with Mr. Binday?

20    A.  If anybody calls the house, give them my phone number and I

21    would direct them to call Mr. Binday's office.

22          MS. CHOI:  May I approach again, your Honor?

23          THE COURT:  Yes.

24    Q.  Handing you what's been marked as Government Exhibit 723,

25    do you recognize this document, Mr. Espinal?

1   A.  Yes, I do.

2   Q.  And what is it?

3   A.  A fax cover sheet from Advocate Brokerage.

4   Q.  And who is it to?

5   A.  Myself.

6   Q.  Do you see your initials in the bottom left hand of this

7   document?

8   A.  Yes, I do.

9           MS. CHOI:  The government offers Government

10  Exhibit 723.

11          MR. ABRAMOWITZ:  No objection.

12          THE COURT:  Admitted.

13          (Government's Exhibit 723 received in evidence)

14          MS. CHOI:  Ms. Hayakawa could, you please pull that up

15  on the screen.

16  Q.  Mr. Espinal, could you read the re line as it appears on

17  that document.

18  A.  Excuse me, the gray line?

19  Q.  The R-E line right there.

20  A.  Oh, excuse me.  RE Martha Espinal Prudential policy

21  V123792.  Require signatures pages three.

22          MS. CHOI:  Could you pull out, Ms. Hayakawa.

23  Q.  Do you see, Mr. Espinal, that says pages?

24  A.  Yes.

25  Q.  And how many pages does it say?

1    A.  Three.

2    Q.  And are the pages that follow part of that fax?

3    A.  Yes.

4    Q.  Could you read out loud the text of the message on the fax

5    cover sheet, please.

6    A.  Message per our call this morning.  Please have Martha sign

7    the attached PRU receipts.  Application, signature page, good

8    health statement.  Please fax back to me.

9    Q.  What did you do when you received this fax?

10   A.  I brought the fax to my mom.  She signed in the indicated

11   areas, and it was faxed back to Mr. Binday's office.

12        MS. CHOI:  Ms. Hayakawa, could you please put up

13   page 2 of the document.

14   Q.  Mr. Espinal, do you recognize the signature on this page?

15   A.  Yes, I do.

16   Q.  And whose signature is that?

17   A.  My mother, Martha Espinal.

18        MS. CHOI:  Could you back out of that, please,

19   Ms. Hayakawa.

20   Q.  Could you also read, Mr. Espinal, the signed at line.

21   A.  Excuse me?

22   Q.  Could you read the line that says signed at out loud.

23   A.  Cliffside Park, 12/14/07.

24        MS. CHOI:  Ms. Hayakawa, could you go to page 3 of the

25   document.

1   Q.  Mr. Espinal, do you recognize the signature on that page?

2   A.  Yes.

3   Q.  Whose signature is that?

4   A.  My mother, Martha Espinal.

5           MS. CHOI:  May I approach, your Honor?

6           THE COURT:  You may.

7   Q.  Mr. Espinal, I'm handing you what's been marked as

8   Government Exhibit 805, which is already in evidence.

9           MS. CHOI:  Ms. Hayakawa, could you please publish that

10  document for the jury.

11  Q.  Mr. Espinal, what does this document appear to be?

12  A.  An application for life insurance.

13  Q.  And could you read the name that appears on line 1?

14  A.  Martha Espinal.

15  Q.  Do you recognize the handwriting on this page?

16  A.  No.

17          MS. CHOI:  Ms. Hayakawa, could you pull up page 8 of

18  that document.

19  Q.  Mr. Espinal, if you could follow along.  The numbers are on

20  the bottom center of the page.

21          Mr. Espinal, do you recognize the top signature on

22  this page?

23  A.  Yes.

24  Q.  And whose is it?

25  A.  My mother, Martha Espinal.

1   Q.  Could you turn to page 10 of the document, please.

2            MS. CHOI:  Now, Ms. Hayakawa, could you blow up the

3   part that says supplemental information, that section at the

4   bottom of the page for the jury.

5   Q.  Mr. Espinal, do you see that on your screen in front of

6   you?

7   A.  Yes.

8   Q.  Now, do you recognize the handwriting here?

9   A.  No.

10  Q.  And at No. 7A, do you see where it says net worth?

11  A.  7A.

12  Q.  Complete if face amount is 1 million or greater, and then

13  it says net worth.  Do you see that there?

14  A.  Yes.

15  Q.  And what number is written next to it?

16  A.  4,935,600.

17  Q.  Do you know who wrote that number?

18  A.  No.

19  Q.  Is that number an accurate reflection of your mother's

20  finances?

21  A.  No, it is not.

22  Q.  Did you ever provide anyone with that number?

23  A.  No, I did not.

24           MS. CHOI:  May I approach?

25           THE COURT:  You may.

1   Q.   Handing you what's been marked as Government Exhibit

2   Government Exhibit 807, which has also been admitted into

3   evidence.

4            MS. CHOI:  Ms. Hayakawa, could you also pull that on

5   to the screen.  Ms. Hayakawa, 807.

6   Q.   Mr. Espinal, do you recognize this document?

7   A.   I believe it's part of the application packet.

8   Q.   Do you recognize any of the handwriting on this page?

9   A.   No.

10   Q.   Who is the name of the proposed insured at the top?

11   A.   Prudential.

12   Q.   Underneath that, does it have a name that says name of

13   proposed insured and a line, do you see that?

14   A.   Martha Espinal.

15   Q.   Yes.  And then could you turn to page 2 of the document.

16            Do you recognize the signature at the top of the page

17   here?

18   A.   Martha Espinal.

19   Q.   Now, Mr. Espinal, could you keep this page out for a

20   second, the second page of Government Exhibit 807, and also do

21   you see what's been marked as 723 which we've already gone over

22   in front of you?

23   A.   Yes.

24   Q.   And would you turn the second page of 723.

25            MS. CHOI:  And, Ms. Hayakawa, if you could pull up 723

1   and 807, the second pages of both of those documents.

2   Q.  Now, ignoring what appears to be the text and the

3   signatures underneath your mother's signature on the left-hand

4   side, do those two documents look to be the same to you?

5   A.  Yes.

6   Q.  And they have the same date and the same signed at

7   location?

8   A.  Cliffside Park, New Jersey, 12/14/2007, yes, they do.

9   Q.  Thank you.

10          MS. CHOI:  May I approach, your Honor?

11          THE COURT:  Yes.

12  Q.  Showing what's been previously admitted and marked

13  Government Exhibit 782 and, Mr. Espinal, there are page numbers

14  in the bottom center of that document so you can follow along.

15  Could you turn to page 19 of that document.

16          MS. CHOI:  And could you pull that up as well,

17  Ms. Hayakawa.

18  Q.  Now, Mr. Espinal, the writing is quite small on this

19  document, so it might be easier to follow along on your

20  monitor, but on the top left-hand corner of the document, do

21  you see a name and an icon there?

22  A.  An icon, it says Lincoln Financial Group.

23  Q.  And then in bold line in caps underneath it --

24  Ms. Hayakawa, if you could just zoom in on all the text, thank

25  you -- what does that say?

1   A.  Amendment to application for insurance.

2   Q.  And could you read the line that starts "the undersigned

3   hereby."

4   A.  The undersigned hereby --

5   Q.  It might be easier on the screen though.

6   A.  The undersigned hereby commends his or her application for

7   insurance dated 5/30/2007 on the life of Martha Espinal.

8   Q.  Could you read out loud what's stated after the words

9   question 52?

10  A.  My annual earned income, 200,000.

11  Q.  And after question 54?

12  A.  My total assets are 4,935,600.

13  Q.  Were those numbers accurate about Mrs. Espinal?

14  A.  No.

15  Q.  And what about question 56?

16  A.  My net worth is 4,900,000.

17  Q.  Was that number accurate?

18  A.  No.

19          MS. CHOI:  Ms. Hayakawa, could you zoom out, please.

20  Q.  Do you recognize the top signature on that page, sir?

21  A.  The same page?

22  Q.  Yep.

23  A.  Yes.

24  Q.  And whose signature is that?

25  A.  Martha Espinal.

1          MS. CHOI:  Ms. Hayakawa, could you turn to page 23 of

2     that document and could you please zoom in on the section that

3     says six, billing instructions, on the bottom of the page.

4     Q.  Mr. Espinal, do you see that on your monitor or in front of

5     you?  Could you read out loud what it says for planned premium

6     there.

7     A.  Planned, excuse me, planned premium, 235,560.

8     Q.  And do you see there's a check box underneath that?

9     A.  Yes.

10    Q.  What does that check box indicate?

11    A.  Annually.

12    Q.  Could your mother have afforded to pay $235,560 annually on

13    a premium on a life insurance policy?

14    A.  No.

15    Q.  Now, putting that document aside, Mr. Espinal, do you know

16    who Frank Pellicone is?

17    A.  No, I do not.

18          MS. CHOI:  May I approach, your Honor?

19          THE COURT:  Yes.

20    Q.  I'm going to show you what's been marked for identification

21    purposes as Government Exhibit 742.  Could you read what --

22    could you read or do you know what that document is?

23    A.  Yes.

24    Q.  And what is it?

25    A.  Part of the application that was mailed to me.

1   Q.  Do you see -- and who mailed it to you?

2   A.  Advocate Brokerage.

3   Q.  Do you see your initials in the bottom left-hand corner of

4   that document?

5   A.  Yes.

6            MS. CHOI:  The government offers Government

7   Exhibit 742 into evidence.

8            MR. ABRAMOWITZ:  Can I just have a quick voir dire.

9            THE COURT:  Yes.

10  VOIR DIRE EXAMINATION

11  BY MR. ABRAMOWITZ:

12  Q.  When, what is the best estimate you have as to when you

13  received this document?

14  A.  In 2007, approximately, with the other applications.

15  Q.  With the application?

16  A.  If I recall correctly, yes, sir.

17           MR. ABRAMOWITZ:  Okay.  I have no objection.

18           MS. CHOI:  Could we please publish GX742 to the jury.

19           THE COURT:  Remind me to admit it at the end of the

20  day.

21           MS. CHOI:  I'm sorry, your Honor.

22           THE COURT:  Admitted.

23           (Government's Exhibit 742 received in evidence)

24  BY MS. CHOI:

25  Q.  Could you read out loud what's at the top of the document?

1   A.  Net worth and income worksheet Martha Espinal.

2   Q.  And do you see the section that's labeled assets there?

3   A.  Yes.  Home, estimated market value, 340,000.

4   Q.  Mr. Espinal, could you just sort of look at these numbers

5   and let us know if any of these numbers are an accurate

6   reflection of your mother's finances in 2007 or 2008?

7   A.  No, they're not.

8   Q.  Do you recall doing anything when you received this

9   document?

10  A.  Yes.

11  Q.  What did you do?

12  A.  I called Janet Bilbao and Michael Binday or asked to speak

13  to Mr. Binday in reference to this.

14  Q.  And why did you ask to speak to Mr. Binday in reference to

15  this document?

16  A.  I was concerned as to this may affect where my mother

17  lives.

18  Q.  Why did you have that concern?

19  A.  Because she gets her apartment based on her income and what

20  she has and this kind of was bringing a concern to me because

21  it shows that she has an awful lot and I was thinking that it

22  may cause her to lose her apartment.

23  Q.  And what did Mr. Binday tell you at that time?

24  A.  That it would not cause any problems where she lives.

25  Q.  And did he give you an explanation as to why he was using

1    those numbers?

2    A.  If I recall correctly, it was just to make the policies

3    more attractive to sell better.

4    Q.  Okay.  Now, putting that document aside and switching gears

5    a little bit, do you know how many policies were actually

6    issued for your mother by insurance companies?

7    A.  No, I do not.

8    Q.  Do you know if any policies were sold that were issued

9    under your mother's name?

10   A.  One that was sold.

11   Q.  And how did you come to know that one of the policies had

12   been sold?

13   A.  I received a call from Advocate Brokerage telling me that

14   Mr. Binday needed to meet with me quickly in order to seal the

15   deal, I guess, with one of the policies that was sold.

16   Q.  And did you in fact meet with Mr. Binday after that?

17   A.  Yes, I did.

18   Q.  And could you describe that meeting?

19   A.  He arrived at my apartment where I live in Cliffside Park.

20   He rang the doorbell, came into the apartment to tell me one of

21   the policies was sold, but, unfortunately, they didn't sell for

22   what he had hoped it would sell for.  So the amount that I was

23   to receive was significantly less than what he had originally

24   told me.

25   Q.  And what was your reaction to what Mr. Binday was telling

1    you?

2    A.  I wasn't happy about it.

3    Q.  And did you say anything to him?

4    A.  I was upset about the policy not selling for what he had

5    originally told me and I kind of told him I should just throw

6    you out of the apartment and just forget about the whole thing.

7    Q.  Did he say anything to you, did Mr. Binday say anything to

8    you in response?

9    A.  Yes.  He didn't realize I was going to be so hostile

10   towards him and that he would probably have to take legal

11   action against me if I was causing the disruption in the

12   proceedings to go ahead with the policy.

13   Q.  And what happened after that?

14   A.  I basically just wanted it to go away and said fine, let's

15   just complete the sale and, you know, continue and finish it.

16   Q.  And did you speak with him the next day?

17   A.  I don't recall if I spoke to him the next day.

18   Q.  Did you speak with anyone from Advocate Brokerage after

19   that conversation?

20   A.  Yes.

21   Q.  And what was that conversation about, that subsequent

22   conversation?

23   A.  I believe I spoke with Janet Bilbao and it was in reference

24   to having the -- getting my routing, my routing and checking

25   account number to have the amount to be paid to me directly

1     wired to the account.

2     Q.  And do you know how much you received as a result of your

3     mother's policy being sold?

4     A.  Yes.

5     Q.  How much?

6     A.  $10,000.

7             MS. CHOI:  May I approach, your Honor?  Thank you.

8     Q.  I'm showing you what's been marked as Government

9     Exhibit 701 for identification purposes.

10            Do you recognize this document, Mr. Espinal?

11    A.  Yes, I do.

12    Q.  What is it?

13    A.  I received this from my bank where I have my checking

14    account, a statement from my bank.

15    Q.  And did you have this document in your possession?

16    A.  Yes.

17            MS. CHOI:  The government offers Government

18    Exhibit 701 into evidence.

19            MR. ABRAMOWITZ:  No objection.

20            THE COURT:  Admitted.

21            (Government's Exhibit 701 received in evidence)

22            MS. CHOI:  Ms. Hayakawa, would you publish that,

23    please, 701.  Ms. Hayakawa, could you zoom in on the entry for

24    January 26 of 2010.

25    Q.  Mr. Espinal, do you see a wire there?

1   A.  Yes.

2   Q.  And what's the amount?

3   A.  $10,000.

4   Q.  And what did you use that $10,000 for?

5           MR. ABRAMOWITZ:  Objection, your Honor.

6   Q.  Did you use that $10,000 towards anything --

7           MR. ABRAMOWITZ:  Don't lead.  Objection.

8           THE COURT:  I haven't ruled yet.  You really have to

9   let me rule before you go on.  Okay?

10          MS. CHOI:  Yes, your Honor.

11          THE COURT:  Make jokes about it, but just internalize

12  it, please.

13          What's the ground for your objection?

14          MR. ABRAMOWITZ:  What he did with the money is totally

15  irrelevant.

16          THE COURT:  The objection is sustained.

17          MS. CHOI:  We have no further questions.

18  CROSS-EXAMINATION

19  BY MR. ABRAMOWITZ:

20  Q.  Good afternoon, Mr. Espinal.  My name is Elkan Abramowitz.

21  I represent Michael Binday.

22  A.  Good afternoon, sir.

23  Q.  Good afternoon.

24          MR. ABRAMOWITZ:  Could you put that last exhibit up

25  for a moment.  That's 701.

1    Q.  And I'm referring to the date on the exhibit which

2    indicates that there was a transfer on January 25 --

3    January 26, 2010; is that correct?

4    A.  Yes, sir.

5    Q.  When in relation to that date did you have this meeting

6    with Mr. Binday?

7    A.  A few days prior to that date, sir.

8    Q.  And he came to your apartment, you said?

9    A.  Yes.

10   Q.  And when you said that you were angry, did you threaten him

11   in any way?

12   A.  No.

13   Q.  Did you raise your voice to him in any way?

14   A.  No.

15   Q.  So how did you express your anger?

16   A.  I basically told him what would happen if I just asked

17   you -- if I threw you out of the apartment, is my exact words

18   to him.

19   Q.  And did you -- what tone of voice did you use when you said

20   that?

21            MS. CHOI:  Objection, your Honor.

22            THE COURT:  Overruled.

23   A.  Same tone of voice I'm speaking to you now, sir.

24   Q.  You just said?

25   A.  What would happen if I just threw you out of the apartment

1   and do away with this.  Just like that, sir.

2   Q.  And his response was if you -- what was his response?

3   A.  He didn't see -- he didn't realize he would be in a hostile

4   environment where I would be hostile toward him, his exact

5   words.

6   Q.  Were you hostile towards him?

7   A.  I don't believe I was, no, sir.

8   Q.  But he said that; is that correct?

9   A.  Yes.

10  Q.  And he said I didn't realize that you would be hostile to

11  me?

12  A.  The word "hostile" is the word I exactly remember.

13  Q.  And then you said something about legal action?

14  A.  Excuse me?

15  Q.  Then you said something about Mr. Binday said something

16  about legal action; is that correct?

17  A.  Yes.

18  Q.  Are you sure as you sit here today, Mr. Espinal, under

19  oath, that he did not say legal action for assault?

20  A.  Am I --

21          MS. CHOI:  Objection.

22          THE COURT:  The objection is sustained.

23          THE WITNESS:  Could you repeat that, sir?

24          THE COURT:  He can't.  That's not a proper question,

25  sir.  Don't answer it.

1   Q.  Do you remember the exact words he used when you say he

2   threatened you with legal action?

3   A.  He said -- I don't recall the exact words, but he said he

4   would have to take legal action if I was not compliant with his

5   instructions.

6   Q.  Mr. Espinal, in connection with all of these policies, did

7   your mother have to go, undergo additional medical tests?

8   A.  Additional medical tests, sir?

9   Q.  Yes.

10  A.  Doctors came to her apartment and evaluated her.

11  Q.  How often did that occur?

12  A.  I don't recall the exact amount of times, but it was more

13  than twice.

14  Q.  More than twice.  And these are doctors that you understood

15  were coming from the insurance company; is that correct?

16  A.  I was told -- I was told by Mr. Binday's office that a

17  doctor would be coming to my mother's apartment to evaluate

18  her.

19  Q.  Do you know whether, do you remember whether the insurance

20  companies, one of the insurance companies asked that an EKG

21  test be made?

22  A.  I believe so, yes, sir.

23  Q.  And was such a test, did you take your mother for such a

24  test?

25  A.  Yes.

1   Q.  Is it your understanding that the results of that test were

2   sent to the insurance company?

3   A.  To the best of my recollection, yes.

4   Q.  Do you -- how many times do you recall that an EKG was

5   requested?

6   A.  At least twice, if I recall correctly.

7   Q.  And on both occasions to your knowledge those -- the

8   results of those tests were sent to the insurance company; is

9   that correct?

10          MS. CHOI:  Objection, your Honor.  Foundation.

11          (Record read)

12          THE COURT:  Objection is sustained.

13          MR. ABRAMOWITZ:  I'm asking his knowledge what they

14  sent.

15          THE COURT:  Asking for hearsay.

16          Do you know what happened to those, sir, the test

17  results?  Do you have any idea what happened to them?

18          THE WITNESS:  No, ma'am.

19          THE COURT:  You don't.

20          Next question.

21          (Continued on next page)

22

23

24

25

1            MR. ABRAMOWITZ:  What is the exhibit number?  Could

2      you please put up Exhibit 742.

3      BY MR. ABRAMOWITZ:

4      Q.  Mr. Espinal, with respect to the information that is

5      written down on Exhibit 742, did any representative from an

6      insurance company ask you for documentation for any of the

7      information contained on that exhibit?

8      A.  No, sir.

9            MR. ABRAMOWITZ:  I have no further questions.

10            MR. STAVIS:  No questions.

11            MS. MURRAY:  No questions.

12            THE COURT:  Anything?

13            MS. CHOI:  No questions on redirect, your Honor.

14            THE COURT:  Thank you, sir.

15            (Witness excused)

16            THE COURT:  Okay.  Don't discuss the case.  Keep an

17      open mind.

18            (Jury excused)

19            MS. McCALLUM:  Would you like the witness on the stand

20      when we return?

21            THE COURT:  Very much.

22            (Off-the-record discussion)

23            THE COURT:  Okay.

24            THE CLERK:  The jury.

25            (Jury present)

1          THE COURT:  Call your next witness, please.

2          MS. McCALLUM:  The government calls Thomas Pernice.

3    THOMAS PERNICE,

4         called as a witness by the Government,

5         having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MS. McCALLUM:

8    Q.  Where do you live, Mr. Pernice?

9    A.  I live at 809 Central Avenue, Peekskill, New York.

10   Q.  What is your mother's name?

11   A.  Mary Pernice.

12   Q.  Where does she live?

13   A.  59 Peach Court in Goldens Bridge, New York.

14   Q.  How old is your mother?

15   A.  Currently 91.

16   Q.  I would like to draw your attention back to around 2007,

17   2008.  Were you involved in any discussions at that time about

18   life insurance for your mother?

19   A.  Yeah, my mother was involved, took out some long term

20   health care with an agent, a representative who introduced her

21   to another gentleman that was offering some life insurance.  At

22   that point she signed some papers, and it was referred to me to

23   ask me to sign some other papers.

24   Q.  Did there come a time when you met any agent who was

25   involved in this?

1   A.  Yes.

2   Q.  Who did you meet?

3   A.  I don't remember their names, and their faces are somewhat

4   hazy.

5   Q.  First of all, how many people were there?

6   A.  Two.

7   Q.  Were they men or women?

8   A.  Two men.

9   Q.  How many times did you meet these two men?

10  A.  Just once.

11  Q.  Where did you meet them?

12  A.  At my place.

13  Q.  That is in Peekskill?

14  A.  Yes.

15  Q.  Do you see either of those men in this courtroom here

16  today?

17  A.  I believe it is that gentleman over there with the balding

18  hair, but I am not sure.

19  Q.  Could you just tell us which location in the courtroom that

20  person is sitting in?

21  A.  The third person next -- the second row.

22          THE COURT:  The third person in from the aisle?

23          THE WITNESS:  Yes, in front of the computer.

24          MS. McCALLUM:  May the record reflect the witness has

25  identified the defendant Michael Binday.

1              MR. ABRAMOWITZ:  No objection.

2              THE COURT:  Okay.

3    BY MS. McCALLUM:

4    Q.  Do you recognize in the courtroom the other person who is

5    who you met?

6    A.  I am really not sure, to be honest with you.  I really

7    wouldn't want to say.

8    Q.  Would you tell us about this meeting with these two

9    gentlemen.

10   A.  Yeah.  Basically it was an opportunity to make a hundred

11   thousand dollars.  My mother was convinced that this would be

12   good for me if she took this policy out.  It was described to

13   me by the gentlemen it would be some kind of syndicate was to

14   pay the premiums on the life insurance policy for my mother in

15   return for me signing I guess my rights to the policy over to

16   that syndicate and would get a hundred thousand dollars.

17   Q.  Did you end up signing any paperwork?

18   A.  No, I didn't feel right about it.

19   Q.  As far as you're aware, did your mother go forward with an

20   application through these gentlemen?

21   A.  I think maybe she did.  Initially she signed some papers,

22   yeah.  I think it was hinging on me signing the final paper to

23   make it happen, from what I gathered.  After I met with them, I

24   never saw them again or talked to them again so I don't know

25   anything after that.

1   Q.  How long did this meeting last with these two men?

2   A.  Less than an hour.

3   Q.  What was the purpose of the meeting, from your

4   understanding?

5   A.  To get me to sign the paper.

6           MS. McCALLUM:  No further questions.

7           MR. ABRAMOWITZ:  We have no questions.

8           THE COURT:  Sir, that was quick.  You're done.

9           (Witness excused)

10          MS. McCALLUM:  Your Honor, at this time the government

11  would like to introduce some exhibits into evidence and have

12  them read to the jury.

13          THE COURT:  You want to read exhibits to the jury?

14          MS. McCALLUM:  Yes, your Honor, they're e-mails.

15  They're short.

16          THE COURT:  Okay.  Come on back, Agent, you're still

17  under oath.

18          MS. McCALLUM:  May I pass them out?

19          THE COURT:  Go ahead.

20          MS. McCALLUM:  May I pass out the copies to the jury,

21  your Honor?

22          THE COURT:  Yes.

23          (Pause)

24          MS. McCALLUM:  The exhibits we are offering are

25  Government Exhibits 1830, 1838, 1839, 1842, 1843, 1844, and

D9OJBIN5

1    1845, 1848 and 1849.

2               MR. ABRAMOWITZ:  No objection.

3               THE COURT:  Okay.  Admitted.

4               (Government Exhibits 1830, 1838, 1839, 1842, 1843,

5    1844, 1845, 1848 and 1849 received in evidence)

6    BY MS. McCALLUM:

7    Q.  Let's begin with 1830.  If we can have that on the screen,

8    please, if it is available.  This is an e-mail from Kevin

9    Kergil, November 4th, 2006 at 10:58 pm to Michael Binday, RE:

10   Status.  I am sorry.  Let's read the bottom e-mail first from

11   Mike Binday to Kevin Kergil November 4th, 2006, 12:32 pm,

12   subject status?

13   A.  Hi, Kevin.  Mary Pernice priced out very well.  She should

14   be a slam-dunk.  Dorothy France, any status on her updated

15   medical?  Michael.

16   Q.  And then the e-mail above that?  From Kevin Kergil to

17   Michael Binday, RE:  Status?

18   A.  Way to go, Shakiel.  I have France updates.

19   Q.  Let's go to Government Exhibit 1838.

20               It is an e-mail from Kevin Kergil, dated Wednesday,

21   March 7, 2007 at 1:43 pm to Michael Binday, subject Pernice

22   possibility.

23   A.  Hello Michael.  I spoke with Tom Pernice (son) this

24   morning.  There is a possibility a face-to-face meeting might

25   close this, as I think building a relationship with him is a

D9OJBIN5

1     crucial first step.  I have a great relationship with the mom,

2     as I straightened out a problem policy she had years ago.

3               However, he also needs a better understanding of the

4     trust which I am not quite astute enough at this juncture.  He

5     is available Fridays and Mondays.  I would like to schedule a

6     meeting this Friday.  I can come in today/tomorrow if you need

7     help with obvious pending problems, et cetera.  I will call you

8     later.  Thanks, Kevin.

9     Q.  Let's go to Government Exhibit 1839, and we'll start at the

10    second page, an e-mail from Michael Binday to Kevin, Tuesday,

11    March 6, 2007.  Subject:  Pernice inspection.

12    A.  Hi, Kevin.  We need to push this along.  How are you

13    progressing?  If you send over the info we need, we will

14    forward forward to Long Island.  Michael Binday.

15    Q.  The e-mail above that from Kevin Kergil to Michael Binday,

16    March 7, 2007, at 12:50 am, subject RE Pernice inspection.

17    A.  Michael, we spoke earlier and as I said her son appears to

18    want an attorney.  He knows analyze the trust document.

19    Whether that that will be enough to suffice and hopefully

20    approve or not I do not know.  I do not see this as good news.

21    This is pointed at your friend in Long Island.  There is no

22    point in rushing after 8 months to go nowhere.  Having said

23    that, I am pretty well disgusted at the moment.  Thanks, Kevin.

24    Q.  Back to that first page of Government Exhibit 1839, the

25    e-mail above from Michael Binday to Kevin Kergil, March 6,

D9OJBIN5

1    2007, at 7:08 pm, subject RE:  Pernice inspection.

2    A.  We want the case to move forward, but that is not the

3    point.  It is critical to get the IR done so that you can sell

4    Frank.  We can you can call Frank.  We have another 31 clients

5    to worry about ASAP.  We have another issue.  U.S. Life started

6    calling people tonight to do inspection reports.  They're not

7    supposed to order dot dot dot we are.  We already told U.S.

8    Life to cancel requests, but that did not reach IR company.

9           Some clients answered questions.  My staff is calling

10   to cancel all tomorrow.  Hopefully this does not cause a

11   problem.  Which is why we need your Pernice IR moving now.

12   Q.  Above that from Kevin Kergil to Michael Binday, March 7,

13   2007, RE:  Pernice inspection.

14   A.  Client name -- Mary Pernice.  Date of birth, 01-09-1922.

15   Social Security No. 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.

16   Q.  You can jump down to assets there.

17   A.  Assets:  Stocks, $1 million.  Home real estate, $1.5

18   million.  Personal property, $1.5 million.  Income, $200,000

19   includes income from trust, annuity, stock dividends and social

20   security.

21   Q.  Let's go to Government Exhibit 1842 now.

22          Starting with the bottom e-mail from Kevin to Michael

23   Binday, March 16th, 2007, at 9:36 am.  Subject Thomas Pernice

24   phone number.

25   A.  Hello, Michael.  Thomas Pernice phone No. 914-788-6704.

627

D9OJBIN5

1   Obviously, the first step is determining what the objection is,

2   if there is one.  Secondly, if there is an attorney involved.

3   I sort of doubt that since he never asked for any paperwork,

4   although he initially asked over the telephone prior to our

5   meeting.

6          He could definitely use the money as he was

7   complaining about $400 monthly heat and electric.  I could be

8   so lucky.  I am a landlord in Peekskill.  I wouldn't call the

9   tenants financially savvy.  My feeling is the lure of another

10  offer or two with mention of two year man that offers two free

11  years of multi-million dollar life insurance and a cash

12  settlement might be the trick.  Maybe we can give him something

13  in writing.  Did Bruce ever respond to your e-mail on the

14  Schedule A, the trust.

15  Q.  And then the e-mail above that from Kevin Kergil to Michael

16  Binday, March 16, 2007, at 6:22 pm, subject:  Forward Thomas

17  Pernice phone number.

18  A.  Hi, Michael.  Did you get around to calling him?  Fridays

19  and Mondays are best.

20  Q.  And above that, from Michael Binday to Michael Binday,

21  Monday, March 26, 2007, at 2:15 am, subject forward Thomas

22  Pernice phone number.

23  A.  Call him again.

24  Q.  Let's go to Government Exhibit 1843 now.  Start with the

25  bottom e-mail.  From Grace Prosloski, e-mail address ending in

D9OJBIN5

1    ipal dot com.  Subject:  Pernice, Mary.

2    A.  High, Rose!  Do we have a bankers policy on her?  Grace

3    Prosloski.

4    Q.  And above that, the e-mail from Rose Flanagan to Michael

5    Binday, Friday, March 23, 2007, at 1:18 pm.  Subject forward

6    Pernice, Mary.

7    A.  Michael, Tracey had the file and the bankers application

8    was saved in large cases.  I did not see the original

9    application in the actual file.  Did it ever go into Bankers

10   Life?  There is no indication anywhere that it did.  How do you

11   want me to respond to Grace?  Please let me know.  Rose

12   Flanagan.

13   Q.  And above that from Michael Binday to Rose Flanagan, March

14   23rd, 2007, at 2:32 pm, subject RE:  Pernice, Mary.

15   A.  We do not have a policy.  Her son got involved.  We do not

16   know whether this case is moving forward or not.

17   Q.  Government Exhibit 1844 is the next one.  We'll start with

18   the bottom e-mail, Michael Binday to Kevin Kergil, November

19   20th, 2007, at 4:32 pm, subject:  Pernice.

20   A.  Hi, Kevin.  Options are as follows:  Starlit AC will write

21   with her as her own beneficiary.  We have another program that

22   will let her use any other family member.  The 2 year program

23   wants her son involved.  Thank you.  Michael Binday.

24   Q.  Above that, from Kevin Kergil to Michael Binday, November

25   21, 2007, at 1:29 am.  Subject:  RE Pernice.

629

D9OJBIN5

1    A.   Thanks Michael.  The AC will definitely work.  I can ask

2    her about a family member and see.  As far as kids, she only

3    has the one son.  Thanks, Kevin.

4    Q.   Go to Government Exhibit 1845, an e-mail from Kevin Kergil

5    to Michael Binday, January 10th, 2008, at 3:28 pm.  CC, Tracey

6    Robinson, subject Pernice applications.

7    A.   Hello Michael/Tracey.  I have completed applications for

8    U.S. Life, AXA, and Prudential.  The medical exams were

9    completed end of December.  A reminder on her birthday which

10   was yesterday, January 9, also we cannot have her son Tom

11   Pernice involved.  Tracey, can I bring these in tomorrow,

12   Friday?  Thanks, Kevin.

13   Q.   Go to Government Exhibit 1848, an e-mail from Kevin Kergil

14   to Michael Binday, March 18, 2008, at 3:08 pm, subject Pernice

15   update.

16   A.   Hello, Michael.  I have appointment with Mary March 27.

17   She seems receptive to having niece as beneficiary.  Can you

18   confirm the offers we have.  Of course two year is welcome.

19   Thanks, Kevin.

20   Q.   And Government Exhibit 1849 from Kevin Kergil to Michael

21   Binday, March 26, 2008, at 4:15 pm, subject Pernice update.

22   A.   Hello Michael.  We are okay to move ahead.  However, Mary

23   would like minimum involvement with niece on transaction.  She

24   did not care for the up-front if it involved a bridge loan with

25   bank accounts and wire transfers, et cetera.  We have an offer

D9OJBIN5

with policy funded in one payment that might work such as

Phoenix.  She is comfortable with the two year as cash is not

needed, but mainly a simple transaction with niece is desired.

HMMM, simple transactions are hard to come by, dot dot dot,

thanks, Kevin.

       MS. McCALLUM:  That concludes the reading, and the

government now calls Michael burns.

 MICHAEL BURNS,

    called as a witness by the Government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. McCALLUM:

Q.  Good afternoon, Mr. Burns.

A.  Good afternoon.

Q.  Where do you work?

A.  I work for Lincoln Financial in Greensboro, North Carolina.

Q.  Does Lincoln Financial go by any other name?

A.  Our company name also Lincoln National Corporation is the

technical life insurance entity.

Q.  What is your position at Lincoln?

A.  I'm the senior vice president of life product management.

Q.  What kind of business does Lincoln do generally?

A.  A Financial Services business, insurance really.  We sell

life insurance, annuities, group life and health insurance and

retirement plans, so 401 (k) retirement plan-type business.

1    Q.  How long have you worked in the life insurance business?

2    A.  I entered the business over 25 years ago.

3    Q.  What companies have you worked at over the years in life

4    insurance?

5    A.  Mass Mutual, Connecticut mutual, AIG life, Jefferson Pilot,

6    which then merged and became part of Lincoln Financial.

7    Q.  What kind of work were you doing when you first started in

8    the life insurance business?

9    A.  I entered the life insurance business as an actuarial

10   student or an actuarial trainee.

11   Q.  What is actuarial work?

12   A.  So actuaries are involved with the technical aspects of

13   pricing and managing the risk and the fundamental economics of

14   insurance, so applying risk and statistics, the numbers behind

15   the business to determine the financial soundness of the

16   products in the business that we sell.

17   Q.  I think you said you started at Mass Mutual.  Is that

18   right?

19   A.  Yes, that's correct.

20   Q.  When you moved on to the next firm you went to, where was

21   that?

22   A.  That was Connecticut Mutual.  That was in Hartford,

23   Connecticut.

24   Q.  Were you doing actuarial work there as well?

25   A.  Yes, I was part of the actuarial, student actuarial trainee

1    program at Connecticut Mutual as well.

2    Q.  I think you mentioned AIG as well?

3    A.  AIG Life, yes, the domestic life insurance carrier for

4    American International Group at the time.

5    Q.  Did you do actuarial work at AIG as well?

6    A.  Yes, I did.

7    Q.  Jefferson Pilot, did you do actuarial work there?

8    A.  Yes, I did.

9    Q.  Have you ever worked as an underwriter?

10   A.  No.

11   Q.  What year did you join Jefferson Pilot?

12   A.  In 2002.

13   Q.  What was your position when you joined?

14   A.  I was the vice president of product management.

15   Q.  Did there come a time when Jefferson Pilot became Lincoln

16   Financial?

17   A.  Yes, the two companies merged.  I think the announcement

18   was towards the end of 2005.  The official merger of the two

19   companies occurred in 2006.

20   Q.  What was the name of the resulting company?

21   A.  Lincoln Financial Group.

22   Q.  Immediately after the merger, what was your position with

23   the resulting company?

24   A.  I was senior vice president of life product management.

25   Q.  At the time of the merger, what were your job

1   responsibilities?

2   A.  Maintaining the overall product, life insurance products,

3   the overall competitive balance, the profitability balance, so

4   really managing sort of the overall financial and competitive

5   viability of our life insurance products that were currently

6   being marketed and sold at the time.

7   Q.  In that role, were you supervising actuaries?

8   A.  Yes.

9   Q.  Were you supervising underwriters?

10  A.  No, not at that time.

11  Q.  Did there come a time when you began to supervise

12  underwriters?

13  A.  Yes, a few years ago, I think it was about two years ago

14  there was an organizational change where underwriting was also

15  brought under my leadership.

16  Q.  Drawing your attention back to the period between around

17  2006 and 2009, how many different life insurance products was

18  Lincoln offering for sale?

19  A.  We had a portfolio of life products that at any point in

20  time, I'd say between 15 to 20 different variations of

21  products.

22  Q.  How many of those were what is called universal life?

23  A.  Some form of universal life, probably somewhere, you know,

24  6, 7, 8, in that range.

25  Q.  What is universal life?

1  A.  It is a form of life insurance.  It's intended to be

2  permanent, so the intent is for the life insurance protection

3  to, for policyholders to have it for a reasonably long period

4  of time, potentially up to their full lifetime, but it is also

5  characterized by having premium flexibility.

6         So it has a lot of customizable flexibility to it, so

7  policyholders can select the type, the amount and timing of

8  their premiums and whether or not -- how they want to structure

9  the product to meet their financial needs.

10 Q.  Is there a minimum premium to keep it in force?

11 A.  Yes, yes.

12 Q.  Why would an insured choose to fund more than a minimum

13 premium?

14 A.  Sometimes they'll want to fund it to meet their objectives.

15         So, for example, a lot of policyholders might want to

16 have it funded over the next, over, say, a five-year period or

17 7 or 10-year period so that they can have it funded and not

18 have to worry about meeting the obligation of paying future

19 premiums and having the policy maintained on that basis.

20 Q.  From 2006 to around early 2009, what was the target market

21 for universal life insurance at Lincoln?

22 A.  It was encompassing, and so it encompassed traditional,

23 core insurance needs, business planning, but also significant

24 portion of it was meeting estate planning and wealth

25 transfer-type needs.

1    Q.   What does estate planning mean to you?

2    A.   Estate planning is really planning for meeting the

3    obligations of potential estate taxes.  So many individuals, if

4    they've accumulated wealth, they will be expected to pay some

5    form of an estate tax.  Sometimes it is referred to as the

6    death tax.

7         If the cause of the need to pay for that tax is, for

8    example, having built out an estate that might be a business or

9    it might be property, rather than liquidating that asset or

10   selling off that asset and not being able to transfer it

11   intact, they'll choose to purchase life insurance to provide

12   the immediate need for cash in order to meet their tax

13   obligations.

14   Q.   Now, what was the age range, if there was one, for the

15   target market for universal life products from 2006 to 2009?

16   A.   Life insurance in general, in particular on the estate

17   planning side of it, the typical age range would be 60, 60 and

18   over, and it naturally fits into when people begin to really

19   think about their estate planning and their estate taxes.

20        For other forms of universal life, it could reach down

21   into younger ages if there is a goal to meet.  Buy/sell

22   agreements is an example for a business case.

23   Q.   Are you familiar with the term life settlement?

24   A.   Yes.

25   Q.   What is that?

1    A.   It's the sale of a policy that is owned by a policyholder

2    and in force to a third party for some form of compensation to

3    the individual who is selling the policy.

4    Q.   Once Lincoln issues a universal life policy to a client or

5    a customer, does Lincoln allow the sale of that policy?

6    A.   Yes.  We can't prevent that.

7    Q.   Why can't you prevent it?

8    A.   There's regulatory, NASC requirements and guidance that we

9    need to comply with in order to allow policyholders, by state

10   regulations, to be able to sell their policies if they follow

11   the regulatory framework.

12   Q.   Now I just want to touch for a moment on the pricing of

13   universal life policies at Jefferson Pilot and Lincoln.  For as

14   long as you have been at those companies, what considerations

15   have gone into the pricing of these products?

16   A.   There is a wide range of considerations that go into

17   pricing a life insurance product.  The mortality and the

18   expected mortality is obviously an important piece of it.

19        The expenses associated with issuing and maintaining

20   the policy, the investment income that we can earn on the

21   premiums and on the reserves for the policy as well as impacts

22   such as the expected premiums that we'll receive and whether or

23   not and how long a policyholder is going to continue to pay

24   premiums on their policy and actually keep it in force.  So

25   those are the main ones anyway.

1   Q.  Just on that last one, are you familiar with the term,

2   "lapse"?

3   A.  Yes.

4   Q.  What does that mean?

5   A.  Lapse means that the policy doesn't have sufficient value

6   and sufficient premiums haven't been paid and it just

7   terminates and is no longer effective and in force.

8   Q.  Let's just briefly talk through each of those

9   considerations you just mentioned.  You said mortality?

10  A.  Ah-huh.

11  Q.  Tell us how mortality factors into the pricing of universal

12  life insurance?

13  A.  Yeah, with any form of life insurance, but universal, we

14  need to make an assessment as to what we think the insured's

15  expected mortality is going to be.  If somebody has a longer

16  expectation to live or is less likely to die, then the premium

17  will be lower than a similar insured that has a higher

18  expectation of dying early.

19  Q.  Are premiums set individually, person-by-person, or are

20  they set by a categorizations?

21  A.  They're set by broad categorizations.

22  Q.  When Jefferson Pilot and Lincoln has priced policies, how

23  do you evaluate what the mortality expectations should be?

24  What do you look to?

25  A.  We look at a whole host of factors.  We'll look at our

1    historic experience.  So the foundation of making an assessment

2    in terms of what our expected mortality is going to be is again

3    based on our historic experience, which fits into the types of

4    markets that we sell, how our products are positioned, the

5    demographics that we'll sell to, the parameters with which we

6    underwrite, how strictly we underwrite from a medical

7    standpoint, what our requirements would be in all of those

8    regards.

9            Based on the the aggregation of those judgments as

10   well as reinsurance costs and what reinsurance represents is

11   insurers who insure us for a portion of the risk, their view

12   and their assessments, all of those things factor into what our

13   expectation for the mortality on a policy would be.

14   Q.  You mentioned expenses going into the pricing?

15   A.  Ah-huh.

16   Q.  What are the expenses associated with universal life, for

17   example?

18   A.  Yeah, there is really several expenses that go into pricing

19   an insurance product.  The main ones are what are called

20   acquisition costs.  So costs that we incur to get the business

21   placed with us, and the two biggest acquisition costs are

22   commissions, so commissions that are paid to the producer, and

23   then the other cost of acquiring the business is just the cost

24   of underwriting the policy.

25           So as somebody applies for a life insurance policy, we

1    pay for the various costs of underwriting that policy, and so

2    that also can be a significant expense.  So those are the

3    acquisition expenses.

4         Then the other expenses that factor into the pricing

5    of a product are just general maintenance expenses, overhead,

6    keeping the lights on, and then paying for other bills

7    associated with just keeping a business going.

8    Q.  You mentioned the term "producer" in connection with

9    commissions.  What is a producer?

10   A.  A producer is an insurance agent or an insurance broker.

11   Q.  For universal life, what was the typical commission that

12   would be earned by a producer?

13   A.  Yes, so at the producer level, it would vary based on the

14   nature and the relationship of the producer.  I think it is not

15   uncommon for a producer, an individual producer, to earn up to

16   50 percent to 90 percent, and that's typical.  That would be

17   the producer themselves, just the individual agent.

18   Q.  You mentioned that how insureds would be expected to pay

19   premiums would factor into the pricing of a product.  Can you

20   explain that.

21   A.  Yes.  When we price a product, we think about or have to

22   factor in the flow of the premiums that will come into the

23   policy.  That is important because it is a source of, to the

24   extent that individuals decide to pay premiums at a higher

25   level, for example, than the minimum, that provides a source of

1    investment income that then makes its way into the underlying

2    pricing of some of the other factors such as the mortality

3    charges or cost of insurance charges that we would put into the

4    product.

5    Q.  Just returning to lapse for a moment.

6          If, all other things being equal, a product were

7    priced to assume no lapses, would that result in a more

8    expensive or less expensive product than one that was priced to

9    take account of expected lapses?

10   A.  All else being equal, that would raise the price of a

11   product.

12   Q.  Why would that be?

13   A.  Because in instances where there is a lapse, we'll have

14   collected premiums and not have to pay out a death benefit.  To

15   the extent that that occurs, that is an opportunity to provide

16   a lower cost to all the other insureds that will not lapse

17   their policy.

18   Q.  Are you familiar with the term STOLI?

19   A.  Yes.

20   Q.  What is STOLI?

21   A.  I think it stands for stranger originated life insurance.

22         I know it has had other acronyms associated with it,

23   but in general that's what it stands for.  It really represents

24   a transaction where a prospective policyholder is purchasing a

25   life insurance policy not with the intent of owning the policy

1    or meeting an insurance statement, instead taking that life

2    insurance policy, applying for it with the intent at the time

3    of purchase to sell it on the secondary market and to make

4    money by selling the life insurance policy on that basis.

5    Q.  When did you first become aware of STOLI?

6    A.  I think I began to hear about it as sort of an emerging

7    industry issue back in 2004.

8    Q.  Where were you working at that time?

9    A.  That was Jefferson Pilot.

10   Q.  Did Jefferson Pilot have any company policy or stance with

11   respect to STOLI in 2004?

12   A.  Not at that time.  I don't know that there was really

13   awareness of it.  At the time of emerging awareness, no policy

14   was set.

15   Q.  When was that?  When was the policy set?

16   A.  I think it was in the 2005 time-frame.

17   Q.  What was the policy that was adopted by Jefferson Pilot?

18   A.  That we did not want to be an insurer that issued business

19   that was issued as part of the STOLI transaction.

20   Q.  Why did the company adopt that policy?

21   A.  Really the position was based on the impact that it would

22   have on the profitability of the business.  So STOLI business

23   would impair profitability of our business, and our products

24   weren't priced for STOLI.

25              We also had concerns what impact STOLI would have on

1    life insurance as it was related to the social benefits that

2    insurance provides.  So there was concern that STOLI took what

3    is a financial instrument that is intended to protect families

4    and individuals and turned it into an investor commodity and

5    felt that that could potentially put some of the social and tax

6    benefits that life insurance has at risk.

7            Then the third piece of it was that the reinsurers

8    indicated that they did not want STOLI business.  From their

9    standpoint, it was largely because of the financial impact and

10   that if the reinsurers didn't want it, that to create

11   challenges of either reinsurers honoring claims covering or

12   potentially impacting future reinsurance pricing with higher

13   reinsurance rates.

14   Q.  The first thing you mentioned, there was profitability

15   concern.  What were the profitability concerns related to

16   STOLI?

17   A.  The profitability concerns were that it would be structured

18   in a way that it would reduce any STOLI transaction that would

19   have an expected profitability that was significantly below

20   what our products were priced at.

21   Q.  Why would that be?

22   A.  Because we would expect STOLI transaction, the death

23   benefit would -- the policy would never lapse, so always the

24   death benefit would be paid because the policy would never be

25   expected to lapse, and it would be funded on a minimum basis,

1   so there would be no investment income to offset some of that

2   or reduce investment.

3   Q.   Now, once Jefferson Pilot had adopted its anti-STOLI

4   policy, to whom did it communicate that policy?

5   A.   It was communicated to our distributors, to our agents and

6   agencies.

7   Q.   Did that include producers?

8   A.   Yes.

9   Q.   By what means was it communicated?

10  A.   It was in memo form.  It was probably a combination of an

11  electronic communication and potentially still a paper, hard

12  copy.  I can't remember at the time.

13  Q.   After Jefferson Pilot became Lincoln, what was the

14  resulting company's policy with respect to STOLI?

15  A.   The same, opposed to STOLI.

16  Q.   Had you been involved in company efforts to try to support

17  the anti-STOLI policy?

18  A.   Yes, yes.

19  Q.   In what ways have you been involved?

20  A.   In my role, it was to do everything reasonably and

21  practically possible to minimize the effect or the impact of

22  STOLI business being issued.

23          And so in my role as being responsible for managing

24  the products, it was largely, largely associated with making

25  sure that we did again what we could from a pricing standpoint

1   to try to make the products as unattractive for STOLI, while

2   also trying to make sure that they still were viable for the

3   legitimate estate planning sales that we wanted.

4           THE COURT:  I need you to tell me what is a good

5   breakpoint.

6           MS. McCALLUM:  Whenever your Honor would like.

7           THE COURT:  I have a sentencing to do.

8           MS. McCALLUM:  Okay.  We can break now if you like,

9   your Honor.

10          THE COURT:  Okay.  So let's break for the day, again

11  with my apologies about this morning.  I do not have a dental

12  appointment tomorrow morning, so we will start on time.

13          Please get here between 9:30 and a quarter of 10:00.

14  As soon as we are all assembled, we will be here.  Don't

15  discuss the case tonight.  Don't communicate about the case

16  with anybody.  Keep an open mind, and I will see you tomorrow.

17          (Jury excused)

18          MR. ABRAMOWITZ:  Your Honor?

19          THE COURT:  Yes.

20          MR. ABRAMOWITZ:  Your Honor, I noticed some of the

21  jurors were carrying exhibits.

22          THE COURT:  You can trust Mr. O'Neill to make sure

23  that they don't leave the room.

24          MR. ABRAMOWITZ:  Okay.  I saw that --

25          THE COURT:  We'll bring them back.

1          MR. FEINGOLD:  One final thing.  We mentioned this

2     before.  The government offers, I believe without objection,

3     Government Exhibits 2940 and 2942.

4          THE COURT:  Any problem with that?

5          MR. ABRAMOWITZ:  One minute.

6          THE COURT:  Jim, some of the jurors took their

7     exhibits.  Do we have them?

8          THE CLERK:  I have them.

9          THE COURT:  2940 and?

10         MR. FEINGOLD:  2940 and 2942.

11         THE COURT:  Any objection?

12         MR. ABRAMOWITZ:  Give us a minute, your Honor.

13         (Pause)

14         MR. FISCHER:  No objection, your Honor.

15         THE COURT:  Admitted.

16         (Government Exhibits 2940 and 2942 received in

17     evidence)

18         MR. FEINGOLD:  Nothing further from the government.

19     Thank you.

20         MR. ABRAMOWITZ:  Somebody is knocking on the jury

21     door.

22         (Pause)

23         THE CLERK:  Okay.

24         (Court adjourned until Wednesday, September 25, 2013,

25     at 9:30 o'clock am)

INDEX OF EXAMINATION

Examination of:                                    Page

ALEKSANDAR MARCEC

Cross By Mr. Fischer . . . . . . . . . . . . 482

Cross By Ms. Murray  . . . . . . . . . . . . 491

JAMES AVERY

Direct By Mr. Feingold . . . . . . . . . . . 493

Cross By Mr. Abramowitz  . . . . . . . . . . 535

Cross By Mr. Stavis  . . . . . . . . . . . . 548

Cross By Ms. Murray  . . . . . . . . . . . . 561

Redirect By Mr. Feingold . . . . . . . . . . 578

STEVEN ESPINAL

Direct By Ms. Choi . . . . . . . . . . . . . 582

Cross By Mr. Abramowitz  . . . . . . . . . . 614

THOMAS PERNICE

Direct By Ms. McCallum . . . . . . . . . . . 620

MICHAEL BURNS

Direct By Ms. McCallum . . . . . . . . . . . 630

```
1                    GOVERNMENT EXHIBITS

2    Exhibit No.                              Received

3    6000    . . . . . . . . . . . . . . .481

4    2943    . . . . . . . . . . . . . . .519

5    703   . . . . . . . . . . . . . . . .593

6    719, 738  . . . . . . . . . . . . . . . 600

7    723   . . . . . . . . . . . . . . . .601

8    742   . . . . . . . . . . . . . . . .609

9    701   . . . . . . . . . . . . . . . .613

10   1830, 1838, 1839, 1842, 1843, 1844, . . . . . 624

11            1845, 1848 and 1849

12   2940 and 2942   . . . . . . . . . . .645

13

14

15

16

17

18

19

20

21

22

23

24

25
```