D9PLBIN1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          12 Cr. 152 CM

5   MICHAEL BINDAY,
    a/ka/ Sealed Defendant 1,
6   JAMES KEVIN KERGIL,
    a/k/a Sealed Defendant 2,
7   and MARK RESNICK,
    a/k/a Sealed Defendant 3,

8
              Defendants.
9
    ------------------------------x

10

11

12                                        September 25, 2013
                                          9:54 a.m.
13

14

15  Before:

16                  HON. COLLEEN McMAHON,

17                                        District Judge
                                            and a jury
18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9PLBIN1                         Trial

                                 APPEARANCES

PREET BHARARA,
        United States Attorney for the
        Southern District of New York
SARAH McCALLUM,
ZACHARY FEINGOLD,
EUN YOUNG CHOI,
        Assistant United States Attorneys


MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.
        Attorneys for defendant Binday
BY:   ELKAN ABRAMOWITZ, Esq.
      BENJAMIN SEAN FISCHER, Esq.
      JASMINE MARIE JUTEAU, Esq.
                Of counsel


GALLET DREYER & BERKEY, LLP,
        Attorneys for defendant Kergil
BY:   ROGER LEE STAVIS, Esq.
      ADAM MICHAEL FELSENSTEIN, Esq.
                Of counsel


LAW OFFICES OF JANE ANNE MURRAY
        Attorneys for defendant Resnick
BY:   JANEANNE MURRAY, Esq.
                Of counsel

1              (Trial resumed; jury not present)

2              THE DEPUTY CLERK:  Case on trial continued.  The

3       government is present, defendants are present, jurors not

4       present.

5              THE COURT:  Good morning.  Sorry for anybody's

6       commuting difficulties.

7              All right.  So government has an application or two.

8              MS. McCALLUM:  Yes, your Honor.

9              The first issue is that we understand the defense

10      intends to cross the witness who's on the stand right now based

11      on a contemplated entry into the life settlement business by

12      Lincoln Financial that never happened.  And we would ask that

13      that line of cross not be permitted pursuant to --

14             THE COURT:  Denied.

15             MS. McCALLUM:  -- your Honor's order.

16             THE COURT:  Next.

17             MS. McCALLUM:  Your Honor, just to this is based on

18      the Court's pretrial ruling with respect to the life settlement

19      markets and your Honor ruled --

20             THE COURT:  I made no ruling at all about contemplated

21      entries.

22             MS. McCALLUM:  Well.

23             THE COURT:  The words contemplated entry never came up

24      in the in limine motions.

25             MS. McCALLUM:  But a fortiori because your Honor ruled

1    that the entry into the market itself would not --

2              THE COURT:  Page of ruling?

3              MS. McCALLUM:  This is page 13.

4              THE COURT:  Page 13.

5              MR. ABRAMOWITZ:  This would go to his credibility,

6    your Honor.

7              THE COURT:  Hang on.  Just hang on.

8              MR. ABRAMOWITZ:  I'm hanging.

9              MS. McCALLUM:  The top of the page.

10             THE COURT:  I said defendant should not expect that

11   they will be allowed to argue that the existence of an

12   aftermarket and the insurance participation therein constitutes

13   proof that the insurers knew that the particular policies would

14   in fact be sold.

15             That says nothing about what questions can be asked.

16   It says what arguments cannot be made and if such arguments are

17   made, I will interrupt them myself and I will say I have made a

18   ruling that such an argument is improper.

19             MS. McCALLUM:  I understand, your Honor, but in order

20   to make that argument -- the only purpose for eliciting this

21   evidence concerning Lincoln's purported contemplation of entry

22   into this market would be to make this argument.  So that's why

23   we're asking that the line of cross be precluded.

24             THE COURT:  What's the relevance, Mr. Abramowitz?

25             MR. ABRAMOWITZ:  That he's lying on the stand, your

D9PLBIN1                    Trial

1    Honor.  Goes to his credibility that they hated this business,

2    that they didn't want this business, it screwed them up

3    forever.

4              THE COURT:  For that limited purpose, it's

5    permissible.

6              MR. ABRAMOWITZ:  Thank you.

7              MS. McCALLUM:  Your Honor, may I just touch on that

8    once more?

9              THE COURT:  No.  We may move on.

10             MS. McCALLUM:  All right.

11             THE COURT:  We may move on.

12             MS. McCALLUM:  I will on that, because I understand

13   there is a memorandum that Mr. Abramowitz would like to use

14   with this witness in this regard, the witness has no

15   involvement in this memorandum.  He didn't write it.  And we

16   would ask that he not be able to use that memorandum to cross

17   this witness.

18             THE COURT:  You know, here's the deal.  He can be

19   shown a memorandum.  He can be asked if he's seen it before.

20   The answer to the question is no, that really will be an end to

21   it.  He can be asked if he participated in any discussions

22   about Lincoln Financial entering into the aftermarket.  If the

23   answer to the question is no, we're at the end of the

24   questioning, okay.

25             You can't preempt everything, Ms. McCallum.  You

D9PLBIN1                     Trial

1   can't.  I know that's the government's modus operandi.  I know

2   that's why I get hit with these motions which are essentially

3   don't let them put in a defense, don't let them cross-examine

4   the witnesses.  You can't do that.

5           MS. McCALLUM:  Your Honor, all we ask is that there

6   not be an improper cross of the witness, for example, by

7   reading from this memorandum --

8           THE COURT:  You can't read in a document that's not in

9   evidence.  Can't do it.  Not allowed.  If you object at the

10  appropriate moment, I promise you a ruling which, since

11  Ms. Choi is not on the floor, I'll get to make.  I hope I

12  didn't hurt her feelings yesterday.

13          MS. McCALLUM:  She understands she needs to wait, your

14  Honor.

15          THE COURT:  Take a deep breath.  They used to tell me

16  take a deep breath.

17          MS. McCALLUM:  The other matter, your Honor, is we

18  expect -- the government expects to rest either tomorrow or

19  Monday and we have been indicating that to the defense for many

20  days now.  We still don't have a witness list.  We understand

21  that the defense case is expected to be approximately a week.

22  We have no idea who the witnesses are.  We would ask that the

23  defense be directed to provide us with a witness list.

24          MR. ABRAMOWITZ:  Your Honor, we have about -- and I

25  told this to Ms. McCallum and I told her it was unnecessary to

D9PLBIN1                      Trial

1     raise this on the record that we have about 20 subpoenas

2     outstanding.  We will have a better idea as to how many of

3     those are going to be responded to by the end of the day today

4     and, if necessary, tomorrow morning.

5            THE COURT:  By 9 a.m. tomorrow morning, you should

6     have a tentative witness list to the government.

7            MS. McCALLUM:  Your Honor, just one more matter.  As

8     your Honor noted, Ms. Choi is not present at counsel table this

9     morning.  She will be here a little bit late with the Court's

10    permission.

11           THE COURT:  She is always welcome.

12           MR. STAVIS:  Your Honor.

13           THE COURT:  She actually asks a mean question.  Okay.

14           Yes, Mr. Stavis.

15           MR. STAVIS:  Yes.  I would like to notify the Court,

16    place on the record, there is a witness coming today by the

17    name of Frank Pellicone, P-E-L-L-I-C-O-N-E.  I made a specific

18    Brady request yesterday of the government concerning

19    Mr. Pellicone based on documents that I have from a grand jury

20    presentation in or about August of 2011 in People of the State

21    of New York v. Frank Pellicone.  And I made --

22           THE COURT:  You got the grand jury material?  Somebody

23    released the grand jury material to you?

24           MR. STAVIS:  It's a supporting deposition.  The

25    government released it to me several months ago, your Honor.  I

```
 1    actually --
 2              THE COURT:  Someone has committed a crime here?
 3              MR. STAVIS:  It's a supporting deposition of a
 4    custodian of records from Bank of America.  Anyway, I made
 5    inquiry.
 6              THE COURT:  Not much of a crime.
 7              MR. STAVIS:  At first the government said it must be
 8    the wrong Frank Pellicone.  I gave them more information.  They
 9    indicated by email that it is the right Frank Pellicone and
10    they have no information.  Obviously, if he was convicted or if
11    the underlying facts behind that would reflect on his
12    credibility, then the government would be under an obligation
13    under Brady --
14              THE COURT:  To produce any --
15              MR. STAVIS:  -- and Bagley and Kyles v. Whitley.
16              THE COURT:  To produce any information in its custody
17    and control.
18              MR. STAVIS:  Yes, your Honor.
19              THE COURT:  Not to go out and scour the world for
20    information.
21              MR. STAVIS:  That's correct, your Honor.
22              THE COURT:  Any information in its custody and
23    control.
24              MR. FEINGOLD:  May I, your Honor?
25              THE COURT:  You may.
```

D9PLBIN1                          Trial

1              MR. FEINGOLD:  Mr. Stavis is correct in that he raised

2       the issue yesterday.  As far as being the right Pellicone, we

3       confirmed that the Frank Pellicone who will be testifying did

4       in fact reside in Plano, Texas.  We didn't make any

5       confirmation beyond that.

6              The government believes it's fulfilled its Brady and

7       Giglio obligations and is not in custody or aware of any

8       information in connection with what Mr. Stavis is talking

9       about.  I haven't actually seen the document Mr. Stavis is

10      referring to although I understand it was produced.

11              (Pause)

12              MR. FEINGOLD:  May I confer with counsel?

13              THE COURT:  You may.

14              MR. FEINGOLD:  Your Honor, I think it's actually

15      important that this be made part of -- at least your Honor sees

16      this.  Your Honor, may I hand this document up?

17              THE COURT:  You certainly may.  Can we mark this Court

18      Exhibit 1?  This is not just --

19              MR. FEINGOLD:  It appears --

20              THE COURT:  I'm going to look at it, so I think it

21      should be marked something.

22              MR. FEINGOLD:  It appears to be a standard --

23              THE DEPUTY CLERK:  Court Exhibit 1.

24              MR. FEINGOLD:  It appears to be a standard

25      certification of records that banks return to the government in

1    response to a grand jury subpoena.

2             THE COURT:  Right.

3             MR. FEINGOLD:  And it appears that this custodian

4    didn't realize this was a federal grand jury subpoena and

5    presumed since we were -- since we were asking for records

6    related to Frank Pellicone that it was a grand jury matter

7    involving Frank Pellicone.  Had Mr. Stavis brought this to our

8    attention with respect to this document, I'm sure we could have

9    clarified this earlier and saved everybody a lot of time,

10   including our investigators going out and trying to determine

11   if there was anything to Mr. Stavis's allegations.

12            THE COURT:  What you're saying is the government

13   subpoenaed the grand jury -- I can't believe I'm having this

14   conversation -- the grand jury subpoenaed records relating to

15   Mr. Pellicone and that Ms. Wood of the Bank of America

16   responded to that subpoena by creating this document purporting

17   to create a proceeding in the grand jury New York County, as

18   far as you know, that's what this relates to?

19            MR. FEINGOLD:  That's what it appears to be.  We

20   typically get the certification of records from banks in

21   response to grand jury subpoenas, granted, not necessarily with

22   the styling of the People v. Frank Pellicone.

23            THE COURT:  Right.  Well, look, what can I say?  The

24   government represents that it has no Brady information about

25   Mr. Pellicone.  I will accept that representation, Mr. Stavis.

D9PLBIN1                          Trial

1    They have nothing to turn over to you.

2              MR. STAVIS:  I didn't ask the Court for relief, but I

3    wanted the government's position with response to my request on

4    the record.  It is now on the record, your Honor.

5              THE COURT:  Okay.  All right.  Are we ready to go?

6              MS. McCALLUM:  We'll get the witness, your Honor.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9PLBIN1                          Trial

 1             (Jury present)

 2             THE COURT:  Good morning, everybody.

 3             JUROR:  Good morning.

 4             THE COURT:  I hope those of you who are coming in from

 5    the north were not too terribly inconvenienced by what I

 6    understand was real bad train service this morning.

 7             All right.  We will resume.  Ms. McCallum is on the

 8    floor and, sir, you are still under oath.

 9             THE WITNESS:  Okay.

10             MS. McCALLUM:  Thank you, your Honor.

11     MICHAEL BURNS, resumed.

12    DIRECT EXAMINATION (cont'd)

13    BY MS. McCALLUM:

14    Q.  Good morning, Mr. Burns.

15    A.  Good morning.

16    Q.  Yesterday we spoke about the assumptions that Lincoln makes

17    in pricing its universal life products.

18             How if at all do assumptions about financial health

19    affect pricing?

20    A.  The financial, financial aspects of underwriting would fit

21    primarily into the core marketing of our products.  And so when

22    we think about how our life insurance products are positioned

23    in the marketplace, where they're focused, there's a certain

24    demographic and general focus of the markets that our products

25    are intended to be sold to.

1              And so when we think about our historic markets that

2    we've positioned the product to, for example, if it's a high

3    net worth market, we would base our mortality off of our

4    expectations of higher net worth mortality.

5    Q.  And in your experience, is there a correlation between

6    financial health and mortality?

7    A.  There's -- yes.  To the extent that our products, again,

8    are marketed to higher net worth individuals, it's perhaps an

9    unfortunate aspect but a reality in terms of what we see which

10   is that higher net worth individuals historically experience

11   better overall mortality experience than the general population

12   due to factors such as better access to healthcare.

13   Q.  Now, when we left off yesterday we started talking about

14   the ways in which you had been involved in efforts by Lincoln

15   to support the anti-STOLI policy.

16              Were you involved in any committees or working groups

17   in that regard?

18   A.  Yes.  Yes, there were some work groups.

19   Q.  And did those groups write any reports?

20   A.  I'm not sure about the work groups themselves writing any

21   reports.

22   Q.  Did you write any reports?

23   A.  Yes, I did.  I wrote some reports as it related to our

24   anti-STOLI efforts.

25              MS. McCALLUM:  May I approach, your Honor?

1        THE COURT:  You may.

2   Q.  I've just handed you what have been marked as Government

3   Exhibit 2970, 2971, and 2972.  Could you just open those up one

4   at a time.

5        Let's start with 2970.  Could you just identify that

6   document for me?

7   A.  Yes.  I have it.  It says subject IOLI and it's a memo from

8   myself and Bob Scheppegrell to Mark Konen.

9   Q.  What's the date of it?

10  A.  January 3, 2007.

11       MS. McCALLUM:  The government offers Government

12  Exhibit 2970.

13       MR. ABRAMOWITZ:  No objection.

14       THE COURT:  Admitted.

15       (Government's Exhibit 2970 received in evidence)

16  Q.  And can you look at Government Exhibit 2971 now, please.

17  A.  Yes.

18  Q.  What is that?

19  A.  This is a memorandum to the LFG audit committee.  It's from

20  Randy Freitag, Jeff Coutts, myself, dated October 10, 2007, and

21  the subject is IOLI/STOLI update and life settlements overview.

22  Q.  What is the LFG audit committee?

23  A.  LFG stands for Lincoln Financial Group, and the audit

24  committee is a sub-committee of our board of directors.

25       MS. McCALLUM:  The government offers Government

1   Exhibit 2971.

2              MR. ABRAMOWITZ:  No objection.

3              THE COURT:  Admitted.

4              (Government's Exhibit 2971 received in evidence)

5   Q.  And can you look now at Government Exhibit 2972.

6   A.  Okay.

7   Q.  Do you recognize that document?

8   A.  Yes.

9   Q.  What is it?

10  A.  It is a memorandum again to the LFG audit committee.  It's

11  from me.  The date is October 24, 2008, and the subject is

12  STOLI (IOLI) update.

13             MS. McCALLUM:  The government offers Government

14  Exhibit 2972.

15             MR. ABRAMOWITZ:  No objection.

16             THE COURT:  Admitted.

17             (Government's Exhibit 2972 received in evidence)

18             MS. McCALLUM:  Can we have the first page of

19  Government Exhibit 2970 on the screen, please.

20  Q.  And, Mr. Burns, if you've got that in front of you, it may

21  be easier to read from the page rather than the screen.

22  A.  So from the actual paper?

23  Q.  Sure.  Government Exhibit 2970.

24  A.  Okay.

25  Q.  Could you just read the first two paragraphs under

1   "background" out loud.

2   A.   Sure.  Over the past several years, the life insurance

3   industry has seen an increase in marketing programs with the

4   primary sales initiative to benefit investors, IOLI.  Both the

5   old Lincoln and old Jefferson Pilot took early and active

6   positions opposing the use of our products in these types of

7   sales applications.

8              Sales in these programs typically involve policies

9   with face amounts of $2 million or more on lives age 70 and

10  older and involve minimal funding.  These programs will work

11  any time there are investors with a different expectation on

12  mortality than the overall product pricing charges.  Typically,

13  these sales involve some form of premium financing, primarily

14  nonrecourse, to facilitate the arbitrage.

15  Q.   The reference here to minimal funding, what does that mean?

16  A.   That means paying the least amount into the contract as

17  necessary in order to keep it still in force.

18  Q.   And can you read now the third paragraph starting with

19  "consistent."

20  A.   Consistent with our opposition to these sales, Lincoln

21  Financial Group has issued communications to our advisers that

22  we do not want IOLI business.  Both Lincoln and JP issued

23  written communications to producers on March 18, 2005,

24  indicating we do not want this type of business.  JP reinforced

25  this message with a second communication to our producers on

1  December 5, 2005, and Lincoln did the same on February 13,

2  2006.  Our primary concerns with IOLI business are the

3  following.

4  Q.  Can you list read those bullet points, please.

5  A.  The reduced profitability of this business, the potential

6  impact on reinsurance pricing, coverage limits, and claims

7  coverage from our reinsurers who do not want this business; and

8  the long-term risk that the tax favored benefits of life

9  insurance could be jeopardized.

10 Q.  And, finally, could you read the last paragraph on that

11 page?

12 A.  Lincoln's life products are priced assuming a certain level

13 of policy persistency.  IOLI business is not expected to lapse

14 resulting in a death claim on every policy.  The elimination of

15 lapses reduces our profitability, and then in parentheses, IRR

16 of roughly eight to 9 percent, assuming current reinsurance

17 pricing.

18 Q.  What does IRR of roughly eight to 9 percent mean?

19 A.  IRR is a measure of profitability.  It represents the

20 return that the company gets for the capital invested to

21 support the business.

22 Q.  And does Lincoln have any target profitability margins?

23 A.  Yeah.  For life insurance, the general assumption and

24 target would be in the 12 to 15 percent range.

25 Q.  So if there was a product that had only eight to 9 percent

1   IRR, what would happen to that product?

2   A.   The corporate mandate would be to make changes to that

3   product to bring it back up to the profitability levels of 12

4   to 15 percent.

5   Q.   Can we go to page 2 of this exhibit, please, 2970 and can

6   you just read from the second paragraph, IOLI.

7   A.   IOLI is a departure from the fundamental purpose of life

8   insurance to benefit society and protect families.  Because of

9   these societal benefits, life insurance receives tax favored

10  benefits.  Insurance sold to benefit investors is a departure

11  from this principle and could ultimately result in a loss of

12  tax favored benefits on all life insurance to the detriment of

13  our industry and those we insure.

14  Q.   And what was the concern particularly with the tax benefit

15  problem?

16  A.   The concern again is broad that life insurance would be

17  perceived as a commodity that becomes a tradeable investment by

18  third party investors and again commoditized in a way that

19  takes it away from the more fundamental purpose of insurance

20  being a protection type vehicle for families.

21  Q.   And if insurance of this kind lost its tax benefits, how

22  would that affect Lincoln?

23  A.   It would make life insurance less attractive as an

24  alternative for the general population to serve their needs.

25  Q.   And what would that mean for Lincoln?

D9PLBIN1                     Burns - direct

1    A.  That would more than likely make it so that it is much more

2    difficult to sell, and we would more than likely sell a lot

3    less life insurance as a result.

4    Q.  Can you go to page 3, now, and I'll have you read under

5    current process, the paragraph down there that bleeds over to

6    the second page.

7    A.  The company has several methods to identify potential IOLI

8    business.  There are questions on the life insurance

9    application that identify features of IOLI.  These questions

10   are included in attachment A.  Underwriting and compliance

11   maintain a list of advisers known to produce this type of

12   business.  Our underwriters reference this list when other IOLI

13   flags are triggered.  Our systems are programmed to flag cases

14   with certain characteristics such as insureds over age 70, high

15   face amounts, limited or no insurance in force, collateral

16   assignment, trust ownership, and nonrecourse premium financing.

17   None of these factors alone indicate a case is clearly IOLI but

18   taken together can lead an underwriter to decide if it is

19   business we do not want.

20   Q.  The attachment A, could you turn to attachment A of that

21   memorandum.  It's the Bates stamp ending in 472, page 7 of the

22   memo.

23   A.  Okay, I have it.

24   Q.  What is listed on this page?

25   A.  It has IOLI questions or questions that are intended to get

D9PLBIN1                          Burns – direct

1    at IOLI on the life application, and it represents three

2    applications because this was written at a time when Jefferson

3    Pilot and Lincoln were going through the merger.  And so it

4    includes Jefferson Pilot financial application questions, it

5    has questions on the Lincoln Financial or the Lincoln Financial

6    Group applications, and then it has questions that will appear

7    or would appear, did appear on the new application when the new

8    product portfolio was established.

9    Q.  So were the Jefferson Pilot and the Lincoln questions at

10   the top ones that were already in place as of the time of the

11   writing of this memo?

12   A.  Yes, they would have been.

13   Q.  Can we just highlight the questions under Jefferson Pilot,

14   please, at the top.  Could you just read those out.

15   A.  Have you been involved in any discussion about the possible

16   sale or assignment of this policy to a life settlement,

17   viatical, or other secondary market provider?

18          Have you in the past two years sold a policy to a life

19   settlement, viatical, or other secondary market provider?

20          MS. McCALLUM:  Ms. Hayakawa, can we just pull up

21   Government Exhibit 771, which is already in evidence, at

22   page 9.

23   Q.  And draw your attention down to the questions 62 and 63 or,

24   sorry, 63 and 64.  Could you just read those, if you can,

25   Mr. Burns.

D9PLBIN1                         Burns - direct

A.  Have you been involved in any discussion about the possible

sale or assignment of this certificate to a life settlement

viatical or other secondary market provider?

         Have you in the past two years sold a policy or

certificate to a life settlement, viatical or other secondary

market provider?

Q.  Now, can we turn back to Government Exhibit 2970, page 4,

please, and I'll just have you read the paragraph, the first

full paragraph on that page, "if an underwriter."

A.  If an underwriter suspects a case is IOLI, he or she can

use a policy amendment to have the policyowner certify the case

is not IOLI.  This attachment -- this amendment, often

internally referred to as the Stange amendment, is included as

attachment B.

Q.  And were there in fact, just to be clear, at this time when

you were writing this memorandum, did you have any involvement

in underwriting?

A.  No, no, I did not.

Q.  Who is Bob Scheppegrell?

A.  Bob Scheppegrell was a business partner of mine who -- peer

of mine at the time -- who was in charge of the underwriting

and the new business issuance departments.

Q.  And were these certifications part of your function or part

of underwriting?

A.  They would have been part of underwriting in terms of -- a

1   part of underwriting.

2   Q.  Can we turn now to page 5 of that Exhibit 2970, and I want

3   to draw your attention to the paragraph immediately under

4   product changes, if you could read that out loud.

5   A.  I'm sorry.  Okay.  As part of the unified product

6   portfolio, UPP, product management has taken steps to address

7   the potential use of products for IOLI.  In the pricing refresh

8   for L300 Plus and Advantage Solutions, we adjusted pricing for

9   ages 70 plus specifically to combat the IOLI issue.  For this

10  block of ages we priced so that if we got zero lapses and

11  minimum funded policies (classic IOLI) we would achieve

12  profitability consistent with the product's overall pricing

13  returns.  This has the effect of reducing the competitiveness

14  of the product and makes it so that if we do get IOLI business

15  in these products, it will not adversely impact profitability.

16  As the DB2 product is being eliminated from the UPP, there were

17  no adjustments to that product.

18  Q.  What is the L300 Plus?

19  A.  That referenced a product that was an old Jefferson Pilot

20  product, more fully known as Legend 300 plus.

21  Q.  And what was Advantage Solutions?

22  A.  Advantage Solutions was a old Jefferson Pilot product.

23  Q.  And could you explain this pricing refresh?

24  A.  Yeah.  This was at a time when, again, we had the two

25  companies were going through the merger and so Jefferson Pilot

1    had a series of products or its portfolio of products, as did

2    Lincoln.  Targeting the April 1 time frame was a corporate and

3    company-wide initiative to bring together a common or unified

4    product portfolio that represented the integrated products of

5    the two companies into one broad portfolio.

6           So as part of that effort, we needed to establish a

7    new set of assumptions based on what the experience, expected

8    experience of the combined company would be as it relates to

9    all the actual experience and develop, price, and implement a

10   complete new series of products.

11   Q.  And what happened to the L300 Plus in particular during

12   that pricing refresh?

13   A.  Yeah, so the L300 Plus was a foundation for the new unified

14   product portfolio and that there was a new product as part of

15   that that was called Life Guarantee Plus.

16   Q.  When was that new product made available?

17   A.  It was launched in April of 2007.

18   Q.  And until what point was the old L300 Plus available?

19   A.  It was made available for 60 days after the introduction or

20   the launch of the new product or of the unified product

21   portfolio.  And the only other aspect that I would add to that

22   is that if a state hadn't yet approved the new product, then we

23   would wait until there was the state approval of the new

24   product for the time, the 60-day window, to begin ticking.

25   Q.  So that's 60 days running from what date would this

1   product, the L300, be available?

2   A.   Depending upon the state of approval, at the earliest it

3   would be April.  If there was a state, for example, that

4   approved it May 1, then the clock would begin running 60 days

5   from May 1.

6   Q.   And what was 60 days from April 1, 2007?

7   A.   So that would basically be the month of April and May that

8   it was still made available and no longer available on policies

9   that were submitted requesting that policy say after June 1.

10  Q.   On policies submitted?

11  A.   Right, beyond the submission of that policy.

12  Q.   And so if somebody had applied for the policy before the

13  May 31 -- the end of May 2007, would the L300 Plus still have

14  been available?

15  A.   If that would have qualified under the transition laws.

16  Q.   And that's a product that wouldn't have been repriced yet?

17  A.   The Legend 300, correct.

18  Q.   And what about Advantage Solutions, what was the reprice

19  timeline there?

20  A.   That was this very same timeline, and that was a product

21  that when it was introduced was renamed Life Elements Universal

22  Life.

23  Q.   And Life Elements was introduced when?

24  A.   Would have been in April.

25  Q.   Of 2007?

1  A.  Of 2007.

2  Q.  And the Advantage Solutions product would have been

3  available until when?

4  A.  Same transition period, 60 days.  So April, May, up until

5  the end of May of 2007.

6          MS. McCALLUM:  May I approach, your Honor?

7          THE COURT:  Yes.

8  Q.  Just to be clear, the pricing refresh, in what ways was the

9  pricing changed for the L300 Plus and the Advantage Solutions?

10 A.  It was both of those products were priced where the intent

11 with the repricing was to make them more expensive, increase

12 the charges, particularly the older ages, so that if they were

13 sold in instances where it was older ages and the funding was

14 lower that we wouldn't be impacted from a profitability

15 standpoint versus our normal profit standards.

16 Q.  And this memo says this has the effect of reducing

17 competitiveness of the product.  What did you mean by that?

18         MR. ABRAMOWITZ:  Asked and answered, your Honor.

19         THE COURT:  Overruled.

20 A.  It would have made it less competitive in the marketplace.

21         (Continued on next page)

22

23

24

25

D9PJBIN2                         Burns - direct

1    Q.  I have handed up Government Exhibits 210 -- these are all

2    in evidence -- 210, 606, 782, 977 and 1940.  Mr. Burns, I am

3    going to ask you to look at Government Exhibit 210 first and

4    can we have the first page of that on the screen, please.

5               What is this document, Mr. Burns?

6    A.  This is a life insurance policy.

7    Q.  Issued by what company?

8    A.  Jefferson Pilot.

9    Q.  You have flags in your document there.  The first flag, No.

10   1, at Bates stamped 38748 at the bottom -- and, Ms. Hayakawa,

11   can we just blow up the box "insured" at the bottom of the

12   text.

13              Who is the insured on this policy?

14   A.  It says Robert B. Katz.

15   Q.  What is the face amount?

16   A.  $4 million.

17   Q.  What is the policy date?

18   A.  May 11 of 2007.

19   Q.  Let's turn to the second flag, Mr. Burns.  This is Bates

20   stamped 38764.  What is the plan of insurance that was applied

21   for to result in this policy?

22   A.  It says JPF Advantage Solutions.

23   Q.  Is that the old product we were talking about a moment ago?

24   A.  Yes, it would be.  It is.

25   Q.  Can you turn to the third flag which is Bates stamped

1    38782, and can we just highlight the date at the bottom of the

2    page.

3    A.  It says the 30th of May, 2007.

4    Q.  I am going to ask you to turn now to Government Exhibit

5    606.  Can we have the first page of that on the screen, please.

6           Mr. Burns, do you recognize 606?

7    A.  Yes, this is a Jefferson Pilot life insurance policy.

8    Q.  Can we turn to the first flag in that policy 37369.

9           MS. McCALLUM:  Ms. Hayakawa, if you can just blow up

10   again the same portion there from insureds down.

11   BY MS. McCALLUM:

12   Q.  Who is this policy for?

13   A.  It says the insured is James T. Farrell.

14   Q.  And what is the specified amount?

15   A.  $4 million.

16   Q.  What is the policy date?

17   A.  September 9th, 2007.

18   Q.  And let's go to the second flag, 37389.

19           What is the plan of insurance being applied for that

20   resulted in this policy?

21   A.  This is JPF Legend XG.

22   Q.  What was that?

23   A.  That was a form of universal life insurance policy that was

24   issued by Jefferson Pilot at the time.

25   Q.  Is that one of the two subject to the refresh?

1   A.  This was a product that was subject to the refresh, but was

2   not referenced in the memo.

3   Q.  Was the timeline of that refresh similar to the timeline

4   for the Advantage Solutions and the L-300 Plus?

5   A.  Yes, it was.

6   Q.  Let's turn to the third flag at Bates stamped 37401.  What

7   is the date on this application?

8   A.  The 30th of May, 2007.

9   Q.  If an applicant had put in an application as of that date,

10  could it still take advantage, he or she still take advantage

11  of the earlier pricing?

12  A.  Yes, they would have had access to the old products and old

13  pricing.

14  Q.  Let's turn now to Government Exhibit 782.  What is this

15  document, Mr. Burns?

16  A.  This is a life insurance policy issued by Jefferson Pilot.

17  Q.  Can we turn to the first flag, Bates stamped 39658.  Would

18  you highlight the same box we have been highlighting.  Who is

19  the insured for this policy?

20  A.  Martha Espinal.

21  Q.  What is the specified amount?

22  A.  $2 million.

23  Q.  What is the certificate date?

24  A.  November 11th, 2007.

25  Q.  Can we turn to the second flag now Bates stamped 39674.

1   What is the plan of insurance that is being applied for that

2   resulted in this policy?

3   A.  It says JPF Advantage Solutions.

4   Q.  Is that one of the old products?

5   A.  Yes, it is.

6   Q.  Let's go to the third flag -- sorry -- Bates stamped 39686.

7   (Pause)  Do you see a date on that page?

8   A.  Yes.

9   Q.  What is it?

10  A.  The 30th of May, 2007.

11  Q.  Just to be clear, if the application was submitted while

12  the old product was still available, would the old product

13  still be available even if the issue date of the policy

14  post-dated the end of May, 2007?

15  A.  Yes, it was when the application was submitted.

16  Q.  Let's go now to Government Exhibit 977.  Do you recognize

17  that document?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's a life insurance policy issued by Jefferson Pilot.

21  Q.  If we can go to the first flag in that document Bates

22  stamped 38OO7.  If we can highlight the box we have been

23  highlighting.  Who is the insured for this policy?

24  A.  Silas Griffin, Jr.

25  Q.  What was the issue date for the policy?

1    A.   January 10th, 2008.

2    Q.   What is the specified amount?

3    A.   $4 million.

4    Q.   Let's go to the second flag in this document at 38031.

5              What is the plan of insurance that was applied for

6    that result in this policy?

7    A.   JPF legend plus.

8    Q.   Is that one of the old products or a new product?

9    A.   That is one of the old products.

10   Q.   Let's go to the third flag Bates stamped 38053.  What is

11   the date that appears in the bottom of this page?

12   A.   The 30th day of May, 2007.

13   Q.   Finally, can you look at Government Exhibit 1940, please.

14   What is this?

15   A.   This is a policy issued by Lincoln National.

16   Q.   Let's go to the first flag which ends in 587, Bates stamp

17   587.  Can you just blow up the top portion of this page.  Who

18   is the insured for this policy?

19   A.   Maria E. Ramos.

20   Q.   Would you go to the second flag now, please, ending in

21   Bates stamp 599.  What is the plan of insurance that was

22   applied for to result in this policy?

23   A.   JPF Advantage Solutions.

24   Q.   Is that one of the old products?

25   A.   Yes, it is.

D9PJBIN2                          Burns - direct

1    Q.  Can you turn to the third flag, please, Bates stamped 605.

2    What is the date appearing on this page?

3    A.  The 30th of May, 2007.

4    Q.  Mr. Burns, if any of those policies we just looked at had

5    been undisclosed STOLI policies, how would they be expected to

6    perform relative to your assumptions underlying the old

7    products?

8           MR. ABRAMOWITZ:  Objection to the question, your

9    Honor.  He can ask how they did perform as opposed to how they

10   were expected.

11          MS. McCALLUM:  Your Honor, the expectations are

12   critically relevant.

13          THE COURT:  The objection is overruled.

14   BY MS. McCALLUM:

15   Q.  You may answer.

16   A.  Can you repeat the question.

17   Q.  Sure.  If those policies that we just looked at were

18   undisclosed STOLI policies, how would they be expected to

19   perform relative to the assumptions underlying the pricing for

20   those old products?

21   A.  The expectation would be that they would be less profitable

22   than the standard, non STOLI issues.

23   Q.  Why would there be that expectation?

24   A.  Because of the expectation of -- primarily the funding

25   level would ultimately be different than what was priced and

1   expected for the policies as well as the lapse or the

2   persistency.

3   Q.   Lapse and persistency, do they mean -- are they talking

4   about the same thing?

5   A.   Very similar.  Lapse is a policy leaving the books and

6   persistency is how long it stays on.  They're two different

7   ways of looking at the same thing.

8   Q.   If any of the policies we just looked at had been disclosed

9   as STOLI, would they have been issued under the company's

10  policies?

11  A.   They should not have been been issued under the company

12  policy.

13  Q.   I want to just return to Government Exhibit 2970 if we

14  could, please, the memorandum.  Actually, just to be clear,

15  after the product refresh that occurred, did that mean that

16  Lincoln was now inviting STOLI on the books?

17  A.   No, no, not at all.

18  Q.   Did Lincoln want STOLI after that pricing refresh?

19  A.   No, not at all.

20  Q.   Why not?

21  A.   For the same reasons.  We still had products that, if STOLI

22  was used as part of the transaction, that it would impair the

23  profitability relative to the base pricing, and we still firmly

24  believed that the bigger, you know, that the societal issues,

25  the tax benefits and the risks that would impose there was a

1    continued risk, so sort of a market risk, if you will, for the

2    business in general, as well as continued expectations of our

3    reinsurers we would have controls in place that we would not

4    see this business from a reinsurance pricing standpoint.

5    Q.  What would be the effect on reinsurance prices if the

6    controls were not in place?

7    A.  If the controls were not in place, we would expect that the

8    reinsurers would potentially challenge claims and claims

9    coverage which would mean we would have to pay the claim and

10   not get reimbursed from the reinsurers.

11        If the reinsurers felt that as a result of that that

12   we were seeing higher or elevated levels of mortality and if

13   the persistency was different than what the reinsurers would

14   have priced into their pricing, they would have increase our

15   reinsurance costs on in you business.

16   Q.  Just to remind us what reinsurers are.

17   A.  So what reinsurers do is they insure insurance companies.

18   So when we sell large policies, let's suppose we are selling a

19   $10 million policy, rather than incurring a full $10 million

20   death benefit, what we do is reinsure a portion of that.

21        So, for example, we would spread that risk to various

22   other parties of, say, the $8 million.  We would enter into a

23   contract with a reinsurer, and we would pay the reinsurer a

24   premium, and then if and when a death claim comes in, in

25   exchange for the premiums that we paid, we would then receive,

1    say, $8 million of benefit from the reinsurers, with which we

2    could then pay the portion of the death benefit.  It is really

3    insurance for insurers.

4    Q.  In that circumstance I think would Lincoln hold any of the

5    risk or spread it all to the reinsurers?

6    A.  Policies that had, larger policies, we would reinsure the

7    risk, a portion of it.

8    Q.  A portion of it?

9    A.  Correct.

10   Q.  What portion of it?

11   A.  It depended.  Old Jefferson Pilot I believe would retain

12   the first two million and then any amounts above two million,

13   most of it would be reinsured.

14            Lincoln I think normal reinsured the larger percentage

15   of it with -- just on -- it gets technical, but on a

16   first-dollar basis.  They would reinsure 90 percent of all

17   death benefits, for example.

18   Q.  If we can go back now to Government Exhibit 2970, Page 5,

19   and I want to draw your attention to the second paragraph

20   under, "product changes," if you could just read that.

21   A.  "Additional steps include cutbacks in the ARTS (automatic

22   reduction to standard-table shave) program.  While we have

23   monitored ARTS business on a quarterly basis relative to our

24   pricing assumptions, such programs add to the perception of a

25   policy as a potential IOLI target.  The current JP program is

1    Table 4 to standard, available up to age 75.

2              The Lincoln program is Table 3 with credits to

3    standard, available up to age 70.  The ARTS program is

4    currently out to bid as part of the new reinsurance pool.  It

5    is expected that the reinsurance costs for ARTS will increase,

6    making it necessary to scale back the program to fit within

7    pricing allowances.

8    Q.  What is the table shave program?  What does table shave

9    mean?

10   A.  "Table shave" really means taking somebody who wants their

11   policy underwritten, is identified as a risk that is

12   substandard.  So generally people with some form of health

13   issue, but not a significant health issue, and so it is deemed

14   that it is administratively simpler to essentially categorize

15   all of those insureds or potential insureds to fit within that

16   category and automatically just issue them a standard price to

17   policy.

18   Q.  Would that be more or less expensive than the policy they

19   would otherwise be entitled to without the table shave?

20   A.  It would make it less expensive.

21   Q.  When you write here that there is a perception of a policy

22   as a potential IOLI target, how did table shave factor into

23   that IOLI problem?

24   A.  Yeah, so the perception would be that the insurance company

25   was issuing a policy where the cost of insurance or the

1   insurance charges were less expensive than they should qualify

2   for based on their true assessment of mortality.

3            So that would create an opportunity to get favorable

4   life insurance pricing that would make it more salable on a

5   secondary market to the life settlement companies, and that

6   could facilitate and make more attractive the economics of the

7   IOLI-STOLI transaction.

8   Q.  When you say "IOLI," is that synonymous with STOLI?

9   A.  Yes, yes.

10  Q.  What did Lincoln end up having to do with with respect to

11  the table shave program?

12  A.  We cut back, we scaled back on it.  We reduced the maximum

13  issue age that it was available to.  We reduced the total death

14  benefit that it was available for, I believe, and we also

15  reduced the width, if you will, or the severity of medical

16  impairments, if you will, the table range we would make it

17  available to.

18  Q.  How did that impact prices for people who are in the age

19  range of over 70 applying for these products?

20  A.  It didn't tremendously impact prices because the change in

21  that, that basis really was reducing the availability of it.

22           For people that otherwise would have qualified for the

23  standard, they were basically no longer eligible, and so for

24  them the price would have gone up; but for others, it would

25  essentially stay the same.

D9PJBIN2                         Burns - direct

1    Q.  Turn now to Government Exhibit 2971, that second

2    memorandum, dated October 10th of 2007.  Is this about 10

3    months after the first memo?

4    A.  Yes.  This is in October of 2007.

5    Q.  I just want to draw your attention to the first page again.

6    Could you just read the first paragraph.

7    A.  "This memo was created at the request of the audit

8    committee as a status update concerning actions we are taking

9    to manage what is commonly called investor owned life

10   insurance, IOLI, and stranger owned life insurance, SOLI,

11   hereafter simply IOLI, and to provide an overall assessment of

12   the potential impact of the life insurance settlement market on

13   our in force life insurance business.

14   Q.  The life insurance settlement market, is that just IOLI or

15   does that include other things as well?

16   A.  No.  The life insurance settlement market would include

17   other things as well, traditional life settlements.

18   Q.  What is a traditional life settlement?

19   A.  A traditional life settlement is somebody who sells their

20   policy after they had purchased their policy, and it is one

21   that normally occurs after, you know, they make an

22   established -- their needs change or perhaps their health

23   changes and they make the determination that they no longer

24   need a policy for what its original intended purpose was when

25   they purchased it.

D9PJBIN2                           Burns - direct

1    Q.  When you said it normally occurs, life settlement, does

2    that mean there is an expectation it will occur in all the

3    cases that are issued?

4    A.  No, no, not at all.  In fact, the expectation would be just

5    the opposite of that.

6    Q.  What was the expectation?

7    A.  That there wouldn't be a significant number of life

8    settlements in part because the insurance was being purchased

9    for insurance purposes, legitimate estate planning, protection

10   needs, and in instances where policyholders were potentially

11   going to think of wanting flexibility with their products, they

12   would then instead purchase a product that has a cash surrender

13   value that would largely perform similar, similar things that a

14   life settlement would do.

15   Q.  Just drawing your attention to under "executive summary,"

16   there are three bullets there.  Are those substantially the

17   same three bullets that we saw in the first memorandum?

18   A.  Yes, they are.

19   Q.  What are those again?

20   A.  The reduced profitability of this business, potential

21   impact on the pricing, coverage limits and claims coverage for

22   our reinsurers who do not want this business; and the long term

23   risk that tax-favored benefits of life insurance could be

24   jeopardized.

25   Q.  I should have asked we highlight the sentence right before

1    that as well.  Can we just see that now.  What is that first

2    sentence preceding the bullet points?

3    A.  "Our primary concerns with IOLI business are the

4    following."

5    Q.  Could you read the paragraph that begins immediately under

6    that, under the bullet points.

7    A.  We have undertaken a multifaceted approach (strong

8    messaging, continued process changes, agent terminations and

9    price increases on affected products) to reduce IOLI sales at

10   Lincoln as much as possible, and view this as an ongoing

11   challenge.  We believe that our recent actions have had the

12   effect of reducing the amount of IOLI business issued by

13   Lincoln and continue to believe that the in force block, in

14   total, has reasonable overall returns even with the IOLI

15   characteristic business issued in the path.

16   Q.  What is the in force block referring to?

17   A.  That references the business that is on the books.  It has

18   been issued in the past and the contracts are still active

19   contracts.

20   Q.  Are you referencing IOLI business or something more

21   general?

22   A.  No.  That is the entirety of our overall life insurance

23   business.

24   Q.  Turn to Page 2, and could you just read under IOLI/SOLI

25   overview.

D9PJBIN2                              Burns – direct

1    A.  The first paragraph?

2    Q.  Yes, please.

3    A.  Over the past several years, the life insurance industry

4    has seen an increase in IOLI type programs; where the intent of

5    the life insurance sale is to profit from the sale of the

6    policy after issue.  Lincoln opposes such sales and we continue

7    to take necessary actions to ensure that life sales are

8    consistent with our strategic intent and our profit and risk

9    standards.

10           Our challenge is to minimize IOLI sales without

11   adversely impacting our historically profitable legitimate

12   estate planning and wealth transfer sales.  Our efforts to

13   manage this balance have included product and underwriting

14   changes, additional screening measures, and agent terminations.

15   Q.  Can you read the next paragraph, please.

16   A.  From a product and underwriting standpoint, the

17   successfully transitioned to our new unified product portfolio

18   life products that have rate rate increases at older ages,

19   reflecting that changing market conditions.

20           Further, we've eliminated the availability of the

21   automatic table concession underwriting program to

22   policyholders above age 70.  These changes make the economics

23   of an IOLI transaction less attractive for investors, and

24   position our products such that, should an IOLI sale occur, the

25   impact on return would be minimal.

D9PJBIN2                        Burns - direct

1    Q.   The automatic table concession underwriting program, what

2    is that?

3    A.   That was what was referred to as the ARTS paragraph.

4    Q.   The table shave?

5    A.   Yes, the table shave.

6    Q.   Let's go to page 3 of that memo, at the bottom, and can you

7    just read the last paragraph of the memo.

8    A.   Based on recent trends in sales, we believe these

9    collective actions have been and will continue to be effective

10   at minimizing IOLI business while not adversely impacting

11   traditional uses of life insurance.  Further, we believe the

12   most significant risks of IOLI are social, legal, and

13   tax-related; not economic.

14   Q.   What did you mean by that last sentence, the risks of IOLI

15   are social, legal, and tax-related; not economic?

16   A.   It relates to the fact that we thought that our screening

17   practices were effective, largely screening out unwanted and

18   STOLI business.

19        And so with that, you know, as it relates to the key

20   elements of concern, to the extent that we were not seeing IOLI

21   or STOLI business, the reinsurance pricing shouldn't have been

22   an issue and there shouldn't have been a significant number of

23   policies that would have the adverse economics that IOLI would

24   have.  So that would really leave the broad enterprise-based

25   implications of, and social aspects that IOLI can put at risk,

 1   yes, as the primary risk of concern at the time.

 2   Q.  Was this referring to the economic impact of any particular

 3   STOLI policy that had slipped through?

 4   A.  No.  This is high level.

 5   Q.  Let's go to that third memo, Government Exhibit 2972.

 6   What's the date of this memo?

 7   A.  October 24th, 2008.

 8   Q.  Can we just highlight the top box there.  This is again a

 9   memo to LFG audit committee.  Who is Mark Konen?

10   A.  He is my supervisor.

11   Q.  A who is Fred Crawford?

12   A.  At the time he was the chief financial officer.

13   Q.  And what about Randy Freitag?

14   A.  Randy at the time was the chief risk officer, I believe, at

15   that time.

16   Q.  Let's highlight our primary concerns and the bullets below

17   that.  Are these the same concerns that were listed in the

18   other two memos regarding STOLI?

19   A.  Essentially, yes.

20   Q.  This is as of October 2008, did you continue to have these

21   concerns?

22   A.  Yes.

23   Q.  Could you just read the last paragraph out loud of this

24   page.

25   A.  We have undertaken a multifaceted approach (strong

1   messaging, continual process changes, agent terminations and

2   product pricing changes) to reduce STOLI sales at Lincoln as

3   much as possible, and view this as an ongoing challenge.  We

4   believe that our actions have been effective in limiting as

5   much as is reasonably possible the amount of STOLI business

6   issued by Lincoln while still enabling Lincoln to effectively

7   compete in legitimate wealth transfer and estate planning

8   markets.

9           Further, we continue to see no evidence to suggest

10  that the aggregate mortality experience of potentially affected

11  business has been adversely impacted by STOLI.

12  Q.  What is the potentially affected business you're referring

13  to here?

14  A.  The older age, all the business issued to older ages.

15  Q.  What did you mean when you wrote we currently see no

16  evidence to suggest that the aggregate mortality experience of

17  that potentially affected business has been adversely affected

18  by STOLI?

19  A.  That just means that at that point in time the total

20  business, all of it that had been issued, that the actual

21  claims were coming in at a rate in line with our expectations

22  overall.

23  Q.  Is that talking about STOLI business?

24  A.  That is talking about everything.

25  Q.  As of October 2008, what was your understanding of how long

1    the earliest STOLI policies were on the books, had been on the

2    books by that point?

3    A.  You know, it had been a couple -- we started hearing about

4    it as an industry issue back in 2004, so we expected 3, 4

5    years, I guess, 4, 5 years.

6    Q.  As of this point would you have had a complete picture of

7    what the aggregate mortality experience would be on the in

8    force business in general?

9    A.  No, just the first early years of the policies, so not, not

10   a prolonged period.

11   Q.  As you sit here today, do you have a complete picture of

12   the impact of STOLI on the aggregate mortality experience?

13   A.  No.

14   Q.  Can we turn to Page 4 of this memo.  I'll just have you

15   read the last paragraph, please, out loud.

16   A.  While we must acknowledge that some STOLI business is

17   likely being issued despite our best efforts, we see no

18   evidence of STOLI causing adverse mortality experience.  As

19   discussed in past memos to the audit committee, our analysis

20   suggests that the greatest risks of STOLI transactions are

21   social, legal, and tax-related, and not traditional economic

22   risks.  We we see no evidence to suggest that this has changed.

23         Further, we see recent developments in third party

24   life expectancy evaluations as creating an additional market

25   dynamic that will help in reducing the financial attractiveness

1    of the STOLI transaction, and serve to reduce STOLI activity in

2    general.

3    Q.   What did you mean by the third party life expectancy

4    evaluations as creating an additional market dynamic?

5    A.   At that time the third parties were modifying their

6    mortality expectations and they were essentially taking what

7    would in the past have been viewed as a shorter duration life

8    expectancy and evaluating them and now placing larger life

9    expectancies on them, quite frankly, puting them more in line

10   with the life expectancy calculations of insurance companies.

11   Q.   Who are these third parties you're talking about?

12   A.   Either the settlement companies or I think they outsource

13   the evaluations, so they were life expectancy, life

14   assessment-type firms.

15   Q.   This memo discusses impact on mortality expectations.  Is

16   there extensive discussion in this memo about impact on lapse

17   assumptions?

18   A.   I don't recall.  I think it was primarily on mortality, the

19   focus.

20   Q.   We see here in this paragraph again our analysis suggests

21   the greatest risks of STOLI transactions are social, legal, and

22   tax-related and not traditional economic risks.  What did you

23   mean again by that?

24   A.   That we thought that our screening processes were largely

25   effective, and so the percentage of STOLI, to the extent it was

1   slipping through, was relatively small.

2   Q.   Those screening measures and other measures that were

3   undertaken to combat STOLI, what, if any, costs were associated

4   with those to the company?

5   A.   In some respects, they're probably best viewed as soft

6   costs.  There were obviously resources, human capital that had

7   to be put behind establishing what the process would be.  To

8   the extent there were additional measures, it increased the

9   time to underwrite, so it would make our underwriters less

10  efficient, less effective, for example.  So those types of

11  costs could impact it.

12          MS. McCALLUM:  May I have a moment, your Honor?

13          THE COURT:  Yes.

14          (Off-the-record discussion)

15          MS. McCALLUM:  No further questions.

16          THE COURT:  Thank you.

17          MR. ABRAMOWITZ:  May we take five-minute break?

18          THE COURT:  We are not going to have another break

19  until 1:00 o'clock.  You get one break to a morning.  If you

20  want to take it now, we'll take it now.  Don't discuss the case

21  and keep an open mind.

22          (Jury excused)

23          THE COURT:  Let's move.

24          (Recess)

25          THE COURT:  Case on trial continued.  The parties are

1     present.  Jurors are not present.

2               MS. MURRAY:  I would like to make an offer of proof

3     about a document I would like to use in examining this witness,

4     and I would ask the witness not be in the room.

5               THE COURT:  Sir, could you walk through that door,

6     please.

7               (The witness left the courtroom)

8               THE COURT:  How long is your cross, Mr. Abramowitz?

9               MR. ABRAMOWITZ:  I would say 25 minutes, 20 minutes.

10              THE COURT:  Mr. Stavis?

11              MR. STAVIS:  I don't have cross, your Honor.

12              THE COURT:  All right.  Give me the document.

13              (Pause)

14              MS. MURRAY:  Your Honor, it is a chart.  It is an

15    exception from Lincoln's 10-K for 2007, indicating sales in the

16    UL policies in 2007, 2006, 2005.  There is a graph on Page 7 of

17    that document.  My purpose in introducing it is not to show the

18    profits and lack of economic harm.  My purpose is to show

19    incentives to the sales staff.

20              THE COURT:  Overruled.  Not coming in.  Too much of a

21    reach, Ms. Murray.  Nice try!

22              (Jury present)

23              THE COURT:  Okay.  Jim, could you bring the witness

24    back in, please.

25              (The witness returned to the courtroom)

1    CROSS EXAMINATION

2    BY MR. ABRAMOWITZ:

3         THE COURT:  Sir, you're still under oath.

4    Q.  Good morning, Mr. Burns.  My name is Elkan Abramowitz.  I

5    represent Michael Binday.

6    A.  Good morning.

7    Q.  Good morning.

8         Yesterday you were asked about the way you

9    communicated the anti-STOLI policies about which you testified.

10   Do you remember being asked those questions?

11   A.  Yes.

12   Q.  To whom did you communicate your anti-STOLI policies?

13   A.  To our producers, our agents and distributors.

14   Q.  I didn't hear the last.

15   A.  Distributors, the people that distribute our policies.

16   Q.  Are independent brokerage firms considered producers under

17   your definition?

18   A.  Independent brokerage firms would be distributors and their

19   brokers and agents would be the agent, the producers.

20   Q.  Do you have any indication that any of the written policies

21   about which you testified were sent to any of the defendants in

22   this case?

23   A.  I don't know.

24   Q.  Were you asked to look for any such evidence that those

25   communications were distributed to the defendants in this case?

1          MS. McCALLUM:  Objection.

2          THE COURT:  Ground?

3          MS. McCALLUM:  Hearsay and relevance.

4          MR. ABRAMOWITZ:  Hearsay?  He is here.

5          MS. McCALLUM:  The question is about what he has been

6   asked to do.

7          THE COURT:  Overruled.

8   BY MR. ABRAMOWITZ:

9   Q.  You may answer the question.

10  A.  Would you repeat it for me.

11         MR. ABRAMOWITZ:  May the Reporter please read the

12  question.

13         THE COURT:  Please.

14         (Record read)

15  A.  Not that I recall.

16  BY MR. ABRAMOWITZ:

17  Q.  Now, you also testified yesterday about the different types

18  of insurance that your companies -- whether you or Jefferson or

19  Lincoln -- were offering to the public.  Do you remember being

20  asked generally those questions?

21  A.  Yes.

22  Q.  Did you distinguish between policies that were intended to

23  be sold to people over 70 from policies that were intended to

24  be sold for people younger than that?

25  A.  I think I mentioned it in the broad sense, that universal

1    life products can meet the needs of a younger age market if it

2    involves some, for example, business planning or the

3    opportunity or the desire to build cash as well as having

4    products that just by their very nature would be focused in

5    terms of their marketing efforts towards the older age.

6    Q.   In your experience, Mr. Burns, insurance that is targeted

7    for the younger groups deal with family needs and what could

8    happen to a home or children if they were to die while the

9    insurance policy was pending?

10   A.   In part, yeah.  I mean that's an application.

11   Q.   People over 70 or even near 80 have a different intent or

12   expectation from their insurance.  Isn't that true?

13   A.   It depends on the individual circumstances of every case

14   that is being sold.

15   Q.   Now, you're talking about individuals.

16            I believe on your direct testimony you were talking

17   about your broad experience.  I am asking about your broad

18   experience with respect to why people over 70 would want to

19   have life insurance.

20   A.   It is a key segment that we focus on was obviously, as

21   mentioned, the estate planning, wealth transfer, so it is a

22   different form of protection, but that was a key area, but

23   there were also instances where policies were sold to older

24   people; for example, as a replacement of an existing in force

25   policy.

1    Q.  When you say "estate planning," you mean that they want to

2    keep that policy until the death benefit is paid.  Is that

3    correct?

4    A.  At the onset of establishing the estate, yeah, the

5    assumption would be that they're purchasing it for a purpose,

6    and that purpose, assuming their needs don't change,

7    circumstances don't change, yeah, there would be an expectation

8    that they would want that policy and keep it.

9    Q.  Not necessarily have that policy lapse.  Is that correct?

10   A.  Again I would expect that when people are buying a policy,

11   they're buying it for a need and not expecting to terminate the

12   policy.

13   Q.  In the insurance contract itself that you enter into with

14   the insureds over 70, is there any language in there that

15   suggests that we expect that you're going to have this policy

16   lapse, yes or no?

17   A.  No, not directly.

18   Q.  Indirectly it has got language that we expect you to stop

19   paying the premiums on this insurance?

20   A.  Yes, some forms of insurance have cash surrender values

21   that -- and there is language in there, for example, that talks

22   about the ability to reinstate your policy after it lapses.  So

23   there is a mention and a discussion and an acknowledgement that

24   policies can lapse, for example, and after you lapse, you have

25   a right to reinstate your policy.

1  Q.  But the intent is that it remain permanent.  Is that

2  correct?

3  A.  Again presumably at the time that they're purchasing the

4  coverage, they're purchasing it with the intent, for a need

5  that would be a permanent need.

6  Q.  I don't want to get into euphemisms.  The need is they want

7  the death benefit paid to the estate.  That is the need we're

8  talking about?

9  A.  If it is an estate planning sale, sure.

10  Q.  If it is generally, in your broad experience, a sale for

11  insurance for people in that age group, over 70?

12  A.  Yeah, again for a sale that is intended to pay estate taxes

13  and part of it is estate planning, sure, the expectation would

14  be when they're purchasing it, they're going to buy that policy

15  to fill what its intended purpose is.

16  Q.  The insurance company expects that as well in this category

17  of insurance.  Is that correct?

18  A.  We expect that when people are purchasing insurance, that

19  there is an estate planning need and there is legitimate need

20  for the purchase of the insurance on that basis.

21  Q.  Now, I think you were asked some of these questions on your

22  direct examination, but can we show Exhibit 2971, please.  Can

23  we turn to Page 3, the bottom.  You were asked this about three

24  or four times on -- it would be the bottom paragraph where it

25  says based on recent trends, if you believe that the most

D9PJBIN2                          Burns – cross

1    significant risks of IOLI were social, legal and tax-related,

2    not economic.  Is that right?

3    A.  Correct.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. ABRAMOWITZ:

2    Q.  Now, social means that people, the insurance companies

3    didn't want its product to be a commodity; is that correct?

4    A.  Essentially, yes.  We don't want it to be a Wall Street

5    commodity, for example.

6    Q.  And legally I understand.

7          Tax related.  In all the years that since your memo

8    was written, has there been any change in the tax status of

9    insurance companies with respect to life insurance policies?

10   A.  No.

11   Q.  No.  Now can we go to the next page, a portion that the

12   government didn't highlight, page 4, where it says economic

13   impact.

14         MR. ABRAMOWITZ:  Could I ask the government, that last

15   paragraph, economic impact, to highlight that.  Thank you.

16   Q.  Now, you wrote this yourself; is that correct?

17   A.  Yes.

18   Q.  And you said in this memo, did you not, that it's difficult

19   to estimate, but we regard the overall economic impact of IOLI

20   and life settlements as minor; is that right?

21   A.  That's what it says, yes.

22   Q.  And minor meaning not terribly significant?

23   A.  Correct.

24   Q.  And when you say assuming that IOLI makes up ten to

25   15 percent of sales, the overall ROE -- what is ROE?

1  A.  That stands for return on equity.

2  Q.  -- on new business would be affected by less than

3  1 percent.  Was that accurate when you wrote that?

4  A.  Yeah, believe it to be.

5  Q.  And you still believe it to be?

6  A.  Yeah.

7  Q.  Yeah, okay.  Now, now let's look at 2970 for a moment.

8          MR. ABRAMOWITZ:  Can I turn to page 3, please, of

9  2970, and can we highlight the bottom paragraph, current

10  process.

11  Q.  Now, in this memo, Mr. Burns, you wrote that underwriting

12  and compliance maintain a list of advisers known to produce

13  this type of business, referring to IOLI.  Were you aware of

14  such a list at the time that you wrote this memo?

15  A.  Yeah, I was aware that it was maintained.

16  Q.  And were you aware, Mr. Burns, that Mr. Binday was on that

17  list?

18  A.  No.

19  Q.  No.

20          MR. ABRAMOWITZ:  May I, your Honor?  I'm sorry.

21          THE COURT:  You may.

22  Q.  Mr. Burns, I show you what's been marked as Defendant's

23  Exhibit 164 for identification.

24          THE COURT:  You wouldn't mind giving me a copy of

25  that, Mr. Abramowitz, would you?

1          MR. ABRAMOWITZ:  You just say admitted or not

2     admitted.

3          THE COURT:  Usually.

4     Q.  I show you what's been marked as Defendant's Exhibit 164

5     for identification, and ask you whether as of November 21,

6     2007, you were aware that Michael Binday --

7          MS. McCALLUM:  Objection, your Honor.

8          MR. ABRAMOWITZ:  I didn't finish the question.

9          MS. McCALLUM:  Mr. Abramowitz is reading from a

10    document not in evidence.

11         MR. ABRAMOWITZ:  I'm not reading from a document.

12         THE COURT:  Excuse me.  Sir, give me this.  Give me

13    this document.

14         MR. ABRAMOWITZ:  I think you have it.

15         THE COURT:  Give me the document you've been given.

16    Could the witness give me the document.

17         The objection is sustained to the form of the

18    question.

19    Q.  As of November 2007, Mr. Burns, had anybody --

20         THE COURT:  Were you aware whether, whether, whether.

21    The word is whether, not that.  It is whether.

22    Q.  Were you aware whether Mr. Binday was on a watch list that

23    your compliance department had prepared?

24         THE COURT:  Yes or no, sir.

25    A.  No.

D9PLBIN3                          Burns – cross

1  Q.  No.  And I believe that we saw a fair number of exhibits

2  that Ms. McCallum put up this morning.  Were you aware that

3  after 2007, at least ten STOLI policies were submitted by

4  Mr. Binday?

5              MS. McCALLUM:  Objection.

6              THE COURT:  The objection is sustained.

7  Q.  Were you aware that any policies were submitted to Lincoln

8  National by Mr. Binday?

9              MS. McCALLUM:  Objection.

10             THE COURT:  The objection is sustained.

11             Here's the problem, ladies and gentlemen.  As you

12 know, the attorneys' questions are not evidence, right, okay.

13 And you can't think of them as evidence and that's why I have

14 to be really careful about the wording of the questions, all

15 right.

16             Whether.  The word is whether.  I can say it

17 repeatedly, but I've always found you to be a quick study,

18 Mr. Abramowitz.

19             MR. ABRAMOWITZ:  I thought I did say whether.  I

20 apologize if I didn't.

21             THE COURT:  You said "that."

22             MR. ABRAMOWITZ:  All right.  I apologize.

23 Q.  Were you aware whether ten policies from Mr. Binday's

24 company were submitted to Lincoln Financial after November of

25 2007?

1    A.  No.

2    Q.  No.  You were shown two on direct examination, so let's

3    look at those, please.  Exhibit 1103, please.

4             Do you see that exhibit?  You were asked questions

5    about it on direct examination by Ms. McCallum.

6    A.  Yes.

7    Q.  Okay.  What is the date of the application?

8             THE COURT:  Do you have the document?

9             THE WITNESS:  I was going to say --

10            THE COURT:  You should get the document.

11   Q.  Isn't it on the front page?

12   A.  I'm sorry, which exhibit?

13            THE COURT:  It's 1103.  It's Government Exhibit 1103.

14            MR. ABRAMOWITZ:  The date is on Bates 47075.  I'm

15   sorry.  I apologize.

16            MS. McCALLUM:  The witness does not have that exhibit.

17            THE COURT:  Then we should give him a copy, should we

18   not?

19            MR. ABRAMOWITZ:  I think if he can see it on the

20   screen.

21            THE COURT:  You can look at the screen right next to

22   you or we'll give you a copy.

23            MS. McCALLUM:  Shall I hand it up?

24            MR. ABRAMOWITZ:  Yeah, sure.

25   Q.  You can turn to page 47075 and look at the date at the top.

1    Can you read it?

2    A.  The issue date.

3    Q.  Yes.

4    A.  Yeah, September 22, 2008.

5    Q.  Now, can I look at -- that's after '07; is that correct?

6    A.  Yes, it is.

7    Q.  Now, could we look at Exhibit 977, and refer to page Bates

8    38007.  Just look at the date at the top.  Can you read the

9    date?

10   A.  And that's the issue date?  January 10, 2008, I believe it

11   says.

12   Q.  Yes.  Now, these are two policies that were furnished by

13   Lincoln; is that correct?

14   A.  Yes.

15   Q.  Now, after two thousand --

16   A.  Or Jefferson Pilot.  I'm not sure.

17   Q.  Or Jefferson Pilot.  But after the STOLI policies that you

18   announced had been disseminated; is that correct?

19   A.  Correct.

20   Q.  Now, were you aware whether after 2007 Mr. Binday was given

21   stock options in the company?

22           MS. McCALLUM:  Objection.

23           THE COURT:  The objection is sustained.  You see, it

24   assumes a fact not in evidence.  Now there's a way to describe

25   it.  It assumes a fact not in evidence.  There is no evidence

D9PLBIN3                          Burns - cross

1    of any such thing.

2              MR. ABRAMOWITZ:  Trying to elicit it.

3              THE COURT:  No, no.  Were you aware that.

4              MR. ABRAMOWITZ:  I said whether.

5              THE COURT:  I'm sorry.  I'm sorry.

6              MR. ABRAMOWITZ:  I apologize.  I believe I said

7    whether.

8              THE COURT:  Ladies and gentlemen, there is no such

9    evidence, neither is there any evidence in the record of the

10   other things that were the subject of the earlier "that"

11   questions.

12             MR. ABRAMOWITZ:  I thought I said whether, your Honor,

13   but I'll say it again.

14   Q.  Were you aware whether stock options in your company had

15   been offered to Mr. Binday after 2007?

16             MS. McCALLUM:  Objection to foundation and to the form

17   of the question.

18             THE COURT:  No.  Overruled.

19   Q.  You may answer.

20             THE COURT:  Do you know whether Mr. Binday was ever

21   offered any stock options in your company after 2007?

22             THE WITNESS:  No.

23             THE COURT:  You do not know.  Fine.  Next question.

24   Q.  Do you know whether after 2007 R. Binday Plans & Concepts

25   was deemed a premier partner in Lincoln National?

D9PLBIN3                          Burns – cross

1   A.   No.

2   Q.   Do you know what a premier partner means?

3   A.   Yes.

4   Q.   Can you tell the Court and jury what a premier partner is?

5              MS. McCALLUM:   Objection.

6              THE COURT:   Overruled.

7              MS. McCALLUM:   The witness just said he didn't know.

8              THE COURT:   He said he knew what a premier partner

9   was.

10              MS. McCALLUM:   He didn't know about how it had

11   relevance to this case.

12              THE COURT:   Excuse me.   He's been asked to tell the

13   jury what a premier partner is, Ms. McCallum.   That could

14   possibly maybe some day have relevance to the case.   I don't

15   know.   I'll allow the question.

16   A.   Yeah.   A premier partner was a program that was part of the

17   Jefferson Pilot companies, and the theory behind it would be to

18   provide somewhat like more concierge like service for producers

19   that sell policies or more policies with Jefferson Pilot.   So

20   probably the best way to think about it is it was a broad based

21   program, much like a frequent flyer program that an airline

22   might have, and the idea and the theory behind it was to want

23   to reward the top producers of legitimate business.

24   Q.   Was it only Jefferson Pilot or was it Lincoln National as

25   well that had this program?

709

D9PLBIN3                    Burns - cross

1   A.  It started as part of Jefferson Pilot.  It has carried over

2   into certain parts of Lincoln Financial, particularly one of

3   our distribution arms, Lincoln Financial Network in particular.

4   Q.  So that as of December 2008, would it be Lincoln National

5   or Jefferson Pilot or both?

6   A.  It would be Lincoln National.

7   Q.  Now, can we go back to Exhibit 2970 and top of page 4,

8   continuing with this watch list -- the bottom of page 3 first,

9   I'm sorry, it says our systems are programmed to flag cases

10  with certain characteristics such as insureds over age 70, high

11  face amounts, limited or no insurance in force, collateral

12  assignment, trust ownership, and nonrecourse premium financing.

13          Do you see that?

14  A.  Yeah, I saw that paragraph, yeah.

15  Q.  And then you were asked to read the next, the next

16  paragraph which says that if an underwriter suspects that a

17  case is IOLI, he or she can use a policy amendment.

18          Do you see that?

19  A.  Yes.

20  Q.  Was there any instruction given to the underwriters to root

21  out these flagged IOLI suspicious applications by requiring

22  that the applicants confirm their net worth by producing a copy

23  of their tax return?

24  A.  Underwriting didn't report to me at the time, so I really

25  just don't know.

1    Q.  You don't know.  And when you have a whole section here for

2    process enhancements, is there anything in that proposed

3    process enhancements that calls for a requirement that an

4    applicant produce a copy of his or her tax return?

5    A.  Again, that's an underwriting issue.  I just wouldn't know.

6    Q.  But you knew what to write in here; is that correct?

7    A.  I believe I wrote that with Bob Scheppegrell, who was in

8    charge of underwriting at the time.

9    Q.  And did he suggest to you in any way that a process

10   enhancement, as you refer to it, should include requiring a

11   copy of the applicant's tax return?

12           MS. McCALLUM:  Objection.

13           THE COURT:  Objection sustained.

14   Q.  In any event, you wrote this in collaboration with the head

15   of underwriting; is that correct?

16   A.  Yes.

17   Q.  And would you agree with me -- and you can take your time

18   and read the entire section on process enhancements -- that

19   there is no suggestion in there that you require an applicant

20   to submit a copy of his or her tax return along with the

21   application?  You can read.

22   A.  Yeah, if it's not in there, then it's not in there.  But,

23   again, I just don't know what was done from an operational

24   standpoint.

25   Q.  You worked with the head of underwriting on this memo; is

```
 1    that correct?  That's what you testified to.

 2    A.  Yes.

 3    Q.  Same question with respect to a simple credit check on an

 4    applicant applying for this policy.

 5         Was there any suggestion that in this proposed process

 6    enhancement by the head of underwriting when you were

 7    collaborating with him that you require that the applicants

 8    provide a credit check or that the underwriter, him or herself,

 9    get a credit check?

10         MS. McCALLUM:  Objection.  Calls for hearsay.

11         THE COURT:  First of all, I don't even understand the

12    question.  Convoluted that I cannot understand it.

13         MR. ABRAMOWITZ:  If I don't understand the question,

14    it's bad.

15    Q.  Mr. Burns, with respect to process enhancements, when you

16    were collaborating with the head of underwriting on this

17    memorandum, was there any suggestion that the underwriters in

18    order to root out this type of policy have a routine credit

19    check on the applicants?

20         MS. McCALLUM:  Objection, calls for hearsay.

21         THE COURT:  To the extent that it calls for what the

22    other guy said, that's true.  Did you make such a suggestion.

23    Q.  Did you?

24    A.  No.  I mean I simply didn't know.

25    Q.  And it didn't occur to you?
```

D9PLBIN3                          Burns - cross

1    A.   Again, that was outside my realm of what my area of domain

2    was at the time that the memorandum was written.

3    Q.   Did you consider in a proposed process enhancement that an

4    applicant also -- that the underwriter also check the internet

5    for the value of the house that's listed on the application?

6              MS. McCALLUM:   Objection, foundation.

7              THE COURT:   Foundation.

8              MS. McCALLUM:   And hearsay and form.

9              MR. ABRAMOWITZ:   This is credibility, your Honor.

10             THE COURT:   It's not hearsay.   To the extent it's

11   talking about what he did -- I don't understand the foundation

12   objection.   Overruled.

13             MR. ABRAMOWITZ:   May we have the question reread,

14   please.

15             THE COURT:   He participated in this process.   That's

16   the foundation.

17             (Record read)

18   A.   I don't recall.

19   Q.   You don't recall or you didn't?

20   A.   I don't recall.

21   Q.   Well, would you look at the memo, the section that says

22   proposed process enhancements, read through it and see if it

23   refreshes your recollection as to whether you made such a

24   suggestion.

25             THE COURT:   You say you don't recall, sir.   Is there

1   anything in that document that jogs your memory and that causes

2   you to recall?

3              THE WITNESS:  No.

4              THE COURT:  No.  Next question.

5   Q.  Did you propose in these proposed process enhancements that

6   copies of brokerage statements be submitted along with the

7   application for insurance of people over 70?

8   A.  Again, not that I know of.

9   Q.  Not that you know of.  But you would agree it's not in your

10  memo?

11  A.  If it's not there, it's not there.

12  Q.  Another process enhancement I want to ask you about is

13  whether bank statements, is there any -- did you consider as a

14  process enhancement that an applicant submit a bank statement

15  along with his or her application for insurance?

16  A.  Me personally?  No, I don't recall that.

17  Q.  You don't recall that.  And if it's not in here, that won't

18  refresh your recollection of whether you put it in here; is

19  that right?

20             THE COURT:  If it's not in here, it won't refresh your

21  recollection as to whether you put it in there?  If it's not in

22  there, he didn't put it in there.  Come on, Mr. Abramowitz.

23             MR. ABRAMOWITZ:  He just said he didn't recall and I'm

24  asking him whether the answer is did he recall or is the answer

25  no.  And I'm entitled to question his credibility.

1           THE COURT:  Mr. Abramowitz, your question was did they

2      consider doing this, did they consider doing that, and his

3      answer is I don't recall.  Okay.

4           MR. ABRAMOWITZ:  In the memo.  I'm asking him in the

5      memo.

6      Q.  Did you put in any process enhancement to the effect that

7      applicants should put in a copy of their bank account or their

8      bank statements?

9      A.  I would have to read the whole memo to answer that, but,

10     and so I don't recall whether it's in the memo or that we even

11     had that discussion as a consideration.

12     Q.  How often did you visit with the government in preparation

13     for your testimony?

14     A.  I think three or four times.

15     Q.  Did you have occasion to review Exhibit 2970 in its

16     entirety during any one of those sessions that you had with the

17     government?

18     A.  Is that the one that's on the screen?

19     Q.  Yes.

20     A.  I know that it was reviewed.  I can't say for sure that I

21     actually went through it and read it fully and completely

22     before any form of preparation.  The nature of the discussions

23     was generally me, you know, answering questions.

24     Q.  Now, would you -- withdrawn.

25           Now, let's talk about lapse rates in general.  It's

1   true, is it not, Mr. Burns, that just because a policy is a

2   STOLI policy doesn't mean that it can't lapse?

3   A.  I suppose it's always a possibility.

4   Q.  If an investor on a STOLI policy decides not to buy the

5   policy because of economic conditions or any other reason, the

6   policy would lapse; is that correct?

7   A.  If the premiums, required premiums ultimately weren't paid

8   to the insurance company, yeah, then it would, then it would

9   lapse.

10  Q.  Like a non-STOLI policy; is that correct?

11  A.  Yeah.  I mean the lapses are...

12  Q.  When the policies are not lapsing, whether they be STOLI or

13  other life insurance policies, the company is still collecting

14  the premiums, is that correct, while it's in effect?

15  A.  Either is collecting or has collected sufficient premiums.

16  Q.  And those premiums are invested by the insurance company;

17  is that correct?

18  A.  Yes.

19  Q.  With respect to premiums being paid, you testified that

20  when you were concerned that there were more STOLI policies

21  than your company wanted that you adjusted the price for the

22  STOLI; is that correct?

23  A.  We adjusted the price because we wanted to minimize any

24  potential attractiveness of our policies for STOLI purposes on

25  certain products.

D9PLBIN3                          Burns - cross

1    Q.  But if, despite the spike in price, a STOLI policy made it

2    through Lincoln, those higher premiums went to the company; is

3    that correct?

4    A.  Yeah, I mean the charges on a policy would be the premiums

5    that go to the company.

6    Q.  And when you were testifying about adjusting the price, you

7    meant increasing the price for STOLI-type applications?

8    A.  Right.  For all, but it impacted all, but in theory it was

9    to minimize the attractiveness for STOLI transactions.

10   Q.  Now, I believe that you testified about life settlements.

11           As far as you're aware, Mr. Burns, life settlements

12   are perfectly legal; is that correct?

13   A.  As far as I'm aware, they are, yes.

14   Q.  And are you aware that every insured has the right to sell

15   his or her policy whether they're over 70, under 70, or over

16   80; is that correct?

17   A.  Yeah, presumably, as long as it complies with the

18   regulatory framework.

19   Q.  What about the contract, doesn't the contract itself

20   provide the right for the insured to sell the policy?

21   A.  I don't know that there's any provision in the policy that

22   addresses that per se, but I don't think it prevents or has any

23   language prohibiting that.

24   Q.  And when the insurance company enters into the contract

25   with the insured, it is aware, is it not, that that policy

D9PLBIN3                         Burns - cross

1   could be sold?

2   A.   Yes, it's always a possibility.

3   Q.   Into the secondary market?

4   A.   Yes.

5   Q.   And you would agree with me, would you not, that the

6   secondary market for life settlements is a multibillion-dollar

7   industry?

8            MS. McCALLUM:   Objection.

9            THE COURT:   The objection is sustained.

10  Q.   Are you aware that it is a significant industry in this

11  country?

12           MS. McCALLUM:   Objection.

13           THE COURT:   The objection is sustained.

14  Q.   Are you aware that there's nothing illegal about selling a

15  policy into a life settlement company?

16  A.   Yeah, as long as it complies with the state regulations,

17  presumably it's legal.

18  Q.   And that's despite the fact that your company didn't want

19  to do it; is that right?

20  A.   No.   What our company didn't want to do was issue policies

21  where the original and the intent at the time of purchasing the

22  policy was to simply, simply settle it and so buy it with the

23  intent of settling it.   We wanted to issue policies where there

24  was a need other than just automatically or intentionally at

25  the time of purchase putting it on the secondary market.

D9PLBIN3                         Burns - cross

1   Q.  But you couldn't prevent somebody from doing, selling it

2   within a half-hour of signing the document?

3   A.  I don't know if we could or couldn't and I'm not so sure --

4   there may be a regulatory framework that prevents it.  I just

5   don't know that.

6   Q.  You don't know that?

7   A.  Yeah, I don't.

8   Q.  Never learned whether that would be prevented?

9   A.  There's nothing in the contract that would prevent that.

10  What I don't know is whether or not there's regulations.  So

11  the NAIC Viatical Settlement Act, whether or not there's

12  provisions that prevent it from occurring within, say, for the

13  first two to five years.

14  Q.  Can we look at Exhibit 977, please, page 5 of the exhibit.

15  Page 5.  Page 5, Bates 38015.  Actually, if we stay on page 1,

16  just for identification, this is a Jefferson Pilot life

17  insurance company policy that's in evidence, and I'm asking

18  you -- it's for Silas Griffin Jr., and I ask you to look at

19  38015, highlight the language about change of owner or

20  beneficiary, please.

21          Do you see the last paragraph there where it says

22  change of owner or beneficiary?  Could you please read that out

23  loud to the jury, Mr. Burns.

24  A.  While the insured is alive, the owner or beneficiary may be

25  changed.  Any change will take effect as of the date the

1    request is signed.   The insured need not be living when the

2    requested change is recorded at our service office.   However,

3    the requested change must be delivered to us prior to the death

4    of the insured.

5    Q.   Has your recollection been refreshed that this type of

6    clause is in the insurance contract issued by your company?

7    A.   I mean I generally knew that that clause is there.

8    Q.   Now, now looking at -- can we look at Exhibit 2972 for a

9    minute, the first page of 2972.

10            Now, this is a memo that you testified about that you

11   helped to write; is that correct?

12   A.   Correct.

13   Q.   Can you look at the language in the first paragraph that

14   says this memo was created at the request of the audit

15   committee; do you see that?

16   A.   Yes.

17   Q.   And then in the executive summary section, it says life

18   insurance settlements can serve a legitimate financial planning

19   need, and participation in the life settlement business is a

20   potential opportunity discussed in a recent memo from Phil Elam

21   to the audit committee.

22            Do you see that?

23   A.   Yes.

24   Q.   When you wrote that, were you aware of any memo that

25   Mr. Elam had written to the audit committee?

1   A.  I knew he was working on one.

2   Q.  Had you seen it before October 24, 2008?

3   A.  I don't know.  I just don't recall.

4   Q.  I show you, Mr. Burns, what's been marked Defendant's

5   Exhibit No. 13 for identification and ask you to look at it.

6   Don't tell us anything about it, but look at it, and I ask you

7   whether it refreshes your recollection about any audit

8   committee memo?

9           THE COURT:  Have you ever seen this document before,

10  sir?

11          THE WITNESS:  I think I have.

12          THE COURT:  Okay.  And does that jog your memory that

13  there was an audit committee memo, a memo that was written to

14  the audit committee on that subject?

15          THE WITNESS:  Yeah, I mean.

16          THE COURT:  It does.  It jogs your memory.

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.  Thank you.

19  Q.  And does it jog your memory that you may have seen this

20  memo before your memo of October 24, 2008?

21  A.  Yeah.  I presumably would have been in discussions with

22  Phil.  I may have been asked to take a look at it and, you

23  know, offer any thoughts, proofread it, as an example.

24          MR. ABRAMOWITZ:  I offer it in evidence, your Honor.

25          MS. McCALLUM:  Your Honor, objection.

1                THE COURT:  Ground?

2                MS. McCALLUM:  First of all, the witness has not said

3       he actually recalls seeing this memo at the time.  He says he

4       would have potentially seen.

5                THE COURT:  That's not what I heard.

6                MR. ABRAMOWITZ:  It's not what he said.

7                THE COURT:  Next ground?

8                MS. McCALLUM:  Hearsay.

9                MR. ABRAMOWITZ:  Not offering it for the truth.  It's

10      a business record of the company.

11               MS. McCALLUM:  What other purpose would it be offered

12      for?

13               THE COURT:  I'm going to have to take a look at it.

14      Just a minute, please.

15               (Pause)

16               THE COURT:  Look, it hasn't been qualified as a

17      business record, but if it is, except for there's a little bit

18      of hearsay within the hearsay, I can't see why it wouldn't come

19      in.  There are magic questions that can be asked, you know.

20               MR. ABRAMOWITZ:  I thought we had a stipulation with

21      the government about business records, but if we don't.

22               THE COURT:  Hand me the stipulation.  I'll make sure.

23      I remember the stipulation.

24               MS. McCALLUM:  May I confer with counsel for one

25      moment?

D9PLBIN3                          Burns – cross

1              THE COURT:  Yes.  Hand me that first stipulation,

2      please, the one I read the first day.

3              (Pause)

4      Q.  Mr. Burns, what do you identify Defendant's Exhibit 13 for

5      identification, what kind of a document is it?

6      A.  It's a memorandum.

7      Q.  Is it a memorandum involving employees of Lincoln National

8      or Jefferson Pilot to an audit committee within that company?

9      A.  Yes.

10     Q.  Is it the kind of document that is kept and maintained in

11     the ordinary course of business of Lincoln Financial or

12     Jefferson Pilot?

13     A.  I would presume, yes.

14     Q.  And is it the regular course of business of Jefferson Pilot

15     and Lincoln National to keep and maintain documents such as

16     Defendant's Exhibit 13 for identification?

17     A.  I presume so.

18              MR. ABRAMOWITZ:  I offer it in evidence.

19              THE COURT:  It's admitted.

20              (Government's Exhibit 13 received in evidence)

21     Q.  Now --

22              MR. ABRAMOWITZ:  This is extremely dangerous for me.

23              THE COURT:  You doing that?  Yeah, I would agree.

24              MR. ABRAMOWITZ:  It really is.

25              MR. FISCHER:  I did this.

1          THE COURT:  I thought it's why they made you a

2    partner.

3          MR. ABRAMOWITZ:  There's no other reason, right.

4    Q.  Now, looking at the section up there that says executive

5    summary, do you see where it says -- can you read the first two

6    bullet points, please.

7    A.  We are exploring opportunities to leverage our mortality

8    and risk management expertise in new, nontraditional

9    businesses.

10         Life settlements meet needs of clients with unwanted

11   policies while providing institutional investors with

12   opportunity for attractive returns via low market correlated

13   assets.

14   Q.  No social problem with that?

15         MS. McCALLUM:  Objection.

16         THE COURT:  Overruled.

17   Q.  Is there a social problem with your exploring these

18   opportunities to leverage your mortality and risk management in

19   new nontraditional businesses; do you see that?

20         MS. McCALLUM:  Objection.

21         THE COURT:  The objection is sustained.  That's kind

22   of --

23   Q.  It's in there, right?

24         THE COURT:  Mr. Abramowitz, what's in there is in

25   there.

D9PLBIN3                    Burns – cross

1              MR. ABRAMOWITZ:  I understand.

2    Q.  Mr. Burns, you testified that your company didn't want to

3    do this kind of business because there were social implications

4    involved; is that correct?

5              MS. McCALLUM:  Objection.

6              THE COURT:  Well, look, can I see you guys for a

7    minute, just for a minute.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  I can't make your objections for you.  I

3    can't do it.

4              MS. McCALLUM:  I've been trying to object, your Honor,

5    but I don't want to spell out the objection.

6              THE COURT:  I would have salivated to have this

7    document in based on what's on the last page.  It should have

8    been Government Exhibit 1.

9              MS. McCALLUM:  We're going to of course highlight

10   that.  Of course.

11             THE COURT:  So, Mr. Abramowitz, you're asking a

12   misleading question.

13             MR. ABRAMOWITZ:  I don't intend to be misleading.  I

14   believe he's not telling the truth.

15             THE COURT:  The life settlement business and the STOLI

16   business are not necessarily the same thing.

17             MR. ABRAMOWITZ:  Yeah, but they are very similar.

18             THE COURT:  They may be -- here's what you do.  You

19   let Mr. Abramowitz ask his questions.  You set him up for the

20   kill.  Okay.

21             MR. ABRAMOWITZ:  Right.

22             THE COURT:  Because you're going to have more fun on

23   redirect than you have ever had in your life.  Okay.

24             MR. ABRAMOWITZ:  Are you getting ready?

25             MS. McCALLUM:  I know.

D9PLBIN3                          Burns – cross

1              MR. ABRAMOWITZ:  Getting ready.

2              (Continued on next page)

1            (In open court)

2            THE COURT:  Sir, I believe the question is:  Did you

3   not say earlier that Lincoln didn't want to be involved in the

4   life settlement business because of social issues?

5            THE WITNESS:  No.  We didn't want to partake in STOLI

6   business.  So we didn't want to issue life insurance policies

7   that right after issue or those insurance policies were being

8   purchased with the intent to sell.

9   BY MR. ABRAMOWITZ:

10  Q.  How do you distinguish STOLI from life settlement,

11  Mr. Burns?

12  A.  STOLI is when you enter into an insurance contract so it's

13  being originated by a stranger that really has no, no purpose

14  or no need and, in fact, is inducing somebody to purchase an

15  insurance policy where they have no need for the insurance and

16  they're entering into that contract to essentially flip that

17  policy.

18            I want to buy a life insurance policy, I have no

19  intent, no desire for the coverage at all.  I don't want the

20  life insurance.  All I want is to make money off of selling

21  that policy.  That's a STOLI.  That's how I view a STOLI

22  transaction.

23  Q.  And, again, 15 minutes or a half-hour after a person over

24  70 buys one of your policies, he can sell it, he or she can

25  sell it into a life settlement arrangement; is that not

D9PLBIN3                         Burns - cross

1   correct?

2   A.   There's nothing under the terms of our contract that

3   prevent that.  What I don't know is what the NAIC, the National

4   Association of Insurance Commissioners, viatical regulation,

5   which regulates life settlements, allows or doesn't allow.

6   Q.   You don't know as you sit here?

7   A.   I'm not an expert in the NAIC viatical regulation.

8   Q.   But as far as you know as you're sitting here, without

9   regard to any regulation that you may not know about, there is

10  nothing wrong, is there not, with somebody selling a policy 15

11  minutes after he or she signs it?

12  A.   There is nothing in our contract that prevents that.

13  Q.   Thank you.  Now, can you turn to Bates No. 757 of this

14  exhibit, please, and can you look at the second full paragraph

15  where it says Lincoln Financial Advisers?

16  A.   Yes.

17  Q.   Can you read the first sentence in that paragraph?

18  A.   Lincoln Financial Advisers, LFA, recently established a

19  relationship with Life Settlements Insights, LSI, a life

20  settlement broker to assist LFA planners in executing life

21  settlements transactions on behalf of their clients.

22           And then it says --

23  Q.   Sorry.

24  A.   Then there's something in parentheses.

25  Q.   Now, Lincoln Financial Advisers was what?

1   A.   That's one of our distribution arms.

2   Q.   And if you establish -- if Lincoln Financial Advisers

3   established a relationship with Life Settlement Insights broker

4   to assist planners in executing life settlements, would that

5   indicate that Lincoln Financial was encouraging the life

6   settlement business?

7   A.   No.  I don't know that I see it that way.

8   Q.   Was it discouraging the life settlement business?

9   A.   I don't know that it would -- it doesn't look like it would

10  be specifically preventing it and, you know, whether or not it

11  was discouraging it I can't answer.

12  Q.   With respect to the social implications of life settlement

13  sales, again, this is not a traditional insurance policy, a

14  life settlement arrangement; is that correct?

15  A.   No, a life settlement transaction involves a traditional

16  life insurance policy.

17  Q.   Originally, and then a sale; is that correct?

18  A.   Right.  And essentially what a life settlement is is

19  selling the interest in a life insurance policy.

20  Q.   And when you sell the interest what happens to all these

21  mortality assumptions and lapse assumptions and grace period

22  assumptions and minimum funding assumptions when it goes to a

23  third party?

24  A.   When it goes to a third party, however the third party

25  manages it is in terms of how they pay their premiums is going

1    to dictate how they're going to play out into the future.

2    Q.  And am I correct that the third party in a life settlement

3    situation is not likely to let the insurance lapse; is that

4    correct?

5    A.  Yeah, presumably.

6    Q.  And am I correct that the third party in a life settlement

7    arrangement is not likely to take advantage of the grace

8    periods that are provided for in the contract or, excuse me,

9    are likely to take advantage of the grace periods in the

10   contract?

11   A.  They -- I don't know.  I don't know if they would or would

12   not.

13   Q.  But it's a different assumption when you're dealing with a

14   third party; is that correct?

15   A.  How they fund it --

16   Q.  Yes.

17   A.  -- is going to be different.  And we could make an

18   assumption without, you know, much knowledge or experience on

19   it.

20   Q.  And what about premium financing, do the assumptions about

21   premium financing go out the window when a third party is

22   involved in buying an insurance contract?

23   A.  I'm not sure -- you know, in terms of an assumption of

24   premium financing, that's really just an assumption of the

25   ability and capabilities and paying the premiums.

D9PLBIN3                        Burns - cross

1   Q.   Generally am I correct that when a third party buys it in

2   the life settlement market, the assumption is the premiums are

3   going to be paid fully; is that correct?

4   A.   The assumption would be that the third party would keep it

5   in force.

6   Q.   And, again, when it's sold into the life -- when an

7   insurance policy is sold into the life settlement market, would

8   Lincoln National or any insurance company expect that the third

9   party would pay more than the minimum premium?

10  A.   The expectation would be that no, not saying it can't

11  happen, but the expectation would be no.

12          MR. ABRAMOWITZ:  May I have a minute, your Honor.  One

13  minute, your Honor.

14          Can we have Exhibit 2972 and can we go to Bates 753,

15  which is page 3, and can I ask the government to highlight the

16  paragraph under the table.

17  Q.   Now, again, Mr. Burns, this is a document that you wrote on

18  October 24, 2008; is that correct?

19  A.   I believe it is, yeah, if that's what it said.

20  Q.   Can you please read the paragraph that begins "as indicated

21  by the results in the table."

22  A.   As indicated by the results in the table, actual mortality

23  experience on policies with face amounts of a million or

24  greater and issued to insured ages 70 and older, the STOLI

25  demographic is currently 88 percent of expected or 12 percent

D9PLBIN3                          Burns - cross

1    better or lower than assumed in pricing.  This suggests that

2    STOLI activity has not had an adverse impact on our mortality

3    experience.

4    Q.  Now, was that true at the time you wrote that?

5    A.  Yeah, would have been.

6    Q.  And do you still believe that statement?

7    A.  I believe the statement, sure.

8              MR. ABRAMOWITZ:  I have no further questions.

9              THE COURT:  I don't think it's your turn yet,

10   Ms. McCallum.

11             Ms. Stavis, you have nothing, right?

12             MR. STAVIS:  No, your Honor.

13             THE COURT:  Ms. Murray.

14   CROSS-EXAMINATION

15   BY MS. MURRAY:

16   Q.  Good afternoon, Mr. Burns.

17   A.  Good afternoon.

18   Q.  Your job, among other responsibilities, involves analyzing

19   risk and pricing products for Lincoln; is that right?

20   A.  Yes.

21   Q.  You're not directly involved in marketing Lincoln's

22   products, correct?

23   A.  Not directly involved with marketing products.

24   Q.  I mean not directly involved in drafting the marketing

25   materials, correct?

D9PLBIN3                         Burns – cross

1    A.   That's correct.

2    Q.   There's a large sales staff employed by Lincoln Financial

3    which engages in the actual marketing and selling of the

4    insurance products; would that be correct?

5    A.   There's a marketing department that would put together the

6    marketing materials, and then there would be a network of

7    wholesalers that would wholesale or distribute the products to

8    producers and advisers.

9    Q.   And are you aware whether the marketing department staff

10   earned commissions based on volumes of business?

11   A.   The marketing department, I don't know their compensation

12   plans.

13   Q.   Are you aware if the wholesalers earned commissions based

14   on volume of sales?

15   A.   Yeah, presumably the wholesalers, their compensation was

16   tied to their level of production.

17   Q.   Are you aware if underwriters' compensation is tied to the

18   level of business signed each year by Lincoln?

19   A.   I don't know if their direct compensation is specifically

20   tied to their level of sales.

21   Q.   And you mentioned on direct that between 2006 and 2009, the

22   target market of the universal life product was primarily

23   estate planning and wealth preservation related; is that

24   correct?

25   A.   For, yeah, the main product, one of the products, Legend

1    300XG, or the Life Guarantee product.

2    Q.  And the population to whom this would be marketed to would

3    be the over 60 age group; is that right?

4    A.  For those products that would be the intent.

5    Q.  Do you have any knowledge as to the percentage of UL sales

6    of Lincoln in the 2006 to 2009 era that were marketed to the

7    over 60 population?

8    A.  Marketed, no.

9    Q.  Or sold?

10   A.  We would have distributions of our various products and

11   policies in terms of, you know, how -- percentages sold within

12   various categories such as age or gender, smoker status, those

13   risk classes, those sorts of things.

14   Q.  Are you aware approximately of the percentage of UL

15   products sold to the over 60 age group between 2006 and 2009?

16   A.  Not off the top of my head.

17   Q.  Would you agree that it would be a significant portion of

18   those UL products?

19   A.  Yeah.  It would have varied.  Some policies it would have

20   been virtually none.  Other products, expectedly, it would have

21   been a higher percentage.  And on an overall basis, that would

22   have depended upon which products we sold more of, and even

23   within some of those products, you know, did we see

24   distributions, how they varied.

25   Q.  And you personally and your staff in the actuarial

D9PLBIN3                         Burns - cross

1    department didn't deal directly with insurance agents or

2    producers; would that be fair to say?

3    A.   Generally we didn't.  Occasionally we might get a call from

4    a producer on something, but it was definitely not part of our

5    day to day.

6    Q.   The individuals at Lincoln who would deal directly with

7    agents and producers would be in the sales staff; would that be

8    right?

9    A.   Underwriters would too.  But sales, their job is obviously

10   to secure business.  And underwriters, their job is to

11   underwrite the business.  So, as a result, they could have more

12   contact.

13        MS. MURRAY:  Just one moment.

14   Q.   Now, you also mentioned on direct this morning, Mr. Burns,

15   that you've seen a correlation between higher net worth and

16   longer mortality; is that correct?

17   A.   As a general rule, yeah, net worth, higher net worth

18   individuals will generally have better mortality or increased

19   longevity.

20   Q.   Now, you're aware -- are you basing this on the experience

21   of the higher face value insurance policies that were issued by

22   Lincoln over the years?

23   A.   It's been based on a couple things.  One is some of it has

24   been based on experience.  So we have had experience where

25   larger face amount mortality experience tends to be more

1   favorable than lower face amount.

2          Another piece of it though is we have had at least one

3   distribution partner that we've worked with that has focused

4   exclusively on the higher net worth income segment and with

5   their experience, as we've worked with them on it, have seen a

6   validation that their overall experience is better than general

7   life insurance experience.

8   Q.  And this distributor is selling high face value insurance,

9   life insurance policies?

10  A.  Yeah, and normally the higher one's net worth, typically

11  the higher their face amounts and policy sizes would be.

12  Q.  And the individuals who obtain higher face value insurance

13  policies are subject to very rigorous medical underwriting; is

14  that right, Mr. Burns?

15  A.  I'm not a underwriting expert, wasn't trained as a

16  underwriter.  But I think, yeah, my knowledge is that the

17  larger the face amount, the more rigorous and, obviously, the

18  more attention is paid to underwriting all the various medical

19  risks.

20  Q.  And this would include analyzing the individual's medical

21  records and medical history and as well as the history of

22  family members, correct?

23  A.  Yeah, I don't know how much of analyzing the history of the

24  family members and stuff.  But, yeah, within the guidelines,

25  there's published underwriting guidelines that underwriters are

D9PLBIN3                          Burns – cross

1    to follow that set the parameters for what levels of tests they

2    should apply from the medical underwriting standpoint.

3    Q.  And in addition to analyzing medical records, they also

4    subject many of these individuals to additional medical tests,

5    correct?

6              MS. McCALLUM:  Objection.

7    Q.  If you're aware.

8              MS. McCALLUM:  This witness has already stated he has

9    no foundation.

10             THE COURT:  He can answer the question.

11   A.  Yeah, I'm not an expert in underwriting, so.

12   Q.  You're currently supervising underwriters, correct,

13   Mr. Burns?

14   A.  Yeah, underwriting reports up through me.

15   Q.  And it would be fair to say that in issuing high value

16   policies, Lincoln's goal is to issue to the healthiest of the

17   individuals, correct?

18   A.  No, not necessarily.  Really what we want to do is most

19   appropriately assign the pricing of the product with our

20   underwriting risk assessment.  So, you know, if somebody is

21   impaired from a health standpoint, the underwriting process is

22   really intended to get the best estimate, the best evaluation

23   of one's health so that the premium that is charged as the rate

24   that gets assigned is appropriate for what their underwriting

25   condition should be.

D9PLBIN3                     Burns - cross

1   Q.  Maybe I should rephrase the question.  Is the goal in

2   underwriting high value insurance policies, is the goal to

3   issue policies to individuals with longer longevity?

4   A.  No, again, it's not.  The goal of an underwriter is to make

5   the best underwriting decision they possibly can.

6   Q.  Are you aware of any insurance study, Mr. Burns, which

7   determines that the healthiest of the wealthy will live longer

8   than the healthiest of people with modest means?

9   A.  I don't know that there's any published studies that I can

10  recall recently.  I know that when I was studying my actuarial

11  training that there were -- that there were papers on high face

12  amount mortality demonstrating that high face amount mortality

13  was better than low face amount mortality.

14  Q.  And to reiterate, high face amount mortality involves much

15  more rigorous medical underwriting than other products issued

16  by Lincoln, correct?

17  A.  It depends.  Again, even if there's a low face amount, if

18  there's reason for an underwriter to really want to make sure

19  they're making a good underwriting decision that they can do

20  that, would have to do that.  But on average, that's probably a

21  fair statement.

22           MS. MURRAY:  No further questions.  Thank you.

23           THE COURT:  Ms. McCallum.

24           MS. McCALLUM:  Yes, your Honor.  Just a moment.

25           THE COURT:  No problem.

1   REDIRECT EXAMINATION

2   BY MS. McCALLUM:

3   Q.  Mr. Burns, you recall you were asked some questions about

4   the life settlement market; do you recall Mr. Abramowitz asking

5   you those questions?

6   A.  I do.

7   Q.  And do you recall you were asked about this memo, Defense

8   Exhibit 13?

9   A.  Yeah.

10  Q.  Have you got that in front of you?

11  A.  Yes, I do.

12  Q.  This is a memo from Phil Elam; is that correct?

13  A.  Elam.

14  Q.  Elam.  And as far as you're aware, did Lincoln ever enter

15  the life settlement business?

16  A.  No.

17  Q.  Let's turn to the last page.

18          THE COURT:  Hang on.  As far as you're aware, does

19  that mean you're not aware or does that mean they didn't.  Can

20  we get a clarity.

21          THE WITNESS:  Yes.  So they have not entered the life

22  settlement market.

23  Q.  Thank you.  Can we turn to the last page of this document,

24  which Mr. Abramowitz did not show you, Bates stamp 759, and

25  let's put it on the Elmo.

1           Can you just read from the top, Mr. Burns.

2  A.   Where it says regulatory issues, as a life settlement

3  provider, we would need to maintain appropriate state licenses

4  and adhere to compliant policies and procedures.  In addition,

5  we would establish best practices with respect to stranger

6  originated STOLI screening of policies offered for sale.

7           It is important to distinguish between STOLI and life

8  settlements.  Some STOLI schemes count on selling policies for

9  a gain shortly after the two-year contestable period expires.

10  Settlements occurring early in the third policy year are likely

11  to be part of a STOLI scheme.  For this reason, a growing

12  number of life settlement providers refuse to bid on policies

13  offered for sale shortly after their second policy anniversary.

14  Most settlements occur at later durations and meet legitimate

15  needs of individuals with policies that they no longer want or

16  need.

17           Life settlements investors typically look to the life

18  settlements provider for help in avoiding purchase of STOLI

19  policies.  Successful STOLI screening improves the collateral

20  for the life settlements investment and avoids potentially

21  embarrassing headlines, both of which are important

22  considerations for institutional investors.

23           A growing numbers of states either have adopted or are

24  considering adopting some form of regulation for life

25  settlements.  We believe this trend is good for life

1  settlements as well as life insurance.  We recommend that

2  Lincoln continue to support state legislation patterned after

3  the NAIC model, the NCOIL model, or a hybrid of the two.

4  Q.  Why did Lincoln permit its insureds to sell policies that

5  had been legitimately issued?

6  A.  We had to.

7  Q.  And could you control that, could you control the sales?

8  A.  We had to operate within the regulatory framework.  You

9  know, we had discussed the notion of putting provisions in our

10  policies that would prevent their sale, but based on the advice

11  of our state filing area, we're instructed that we would not

12  get our policies approved in states.  So that if we tried to

13  put a provision like that, we wouldn't be able to issue the

14  life insurance policy.

15  Q.  And could you control for STOLI, however, did you have --

16  were you allowed to prevent people from buying life insurance

17  policies with the purpose of selling those policies in the

18  secondary market?

19  A.  By controlling it up-front, by managing the intent of why

20  they were purchasing the policies, we felt as though we were

21  allowed to within our framework do that.

22  Q.  And did you in fact do that?

23  A.  Yes.  We put the procedures in place with the intent to do

24  that.

25  Q.  Were those procedures costless, those measures that you

1    took?

2    A.  No, no.  We put those in.  Again, I can't necessarily

3    quantify them, but there was a lot of work, a lot of discussion

4    and process and implementations that were human capital costs

5    in order to implement.

6    Q.  Are the circumstances under which a policyowner would sell

7    a policy legitimately issued on the secondary market different

8    from the circumstances of a STOLI sale?

9    A.  Yes.

10   Q.  How?

11   A.  A STOLI sale, again, is a transaction where the intent to

12   purchase occurs at the time the policy is actually being issued

13   and so the circumstance is not a change in health or a change

14   in need.

15          A legitimate settlement, by its definition, there was

16   the purchase of a sale for a specific need and a legitimate

17   settlement would then have the potential to sell the policy

18   either because the insured's need changed from when they

19   originally purchased the policy, or in some instances it's

20   because the insured's health, for example, has gotten worse and

21   they want to sell the life settlement policy or life settle the

22   policy so they can raise more cash and pay for things such as

23   medical bills.

24   Q.  Can you look at Government Exhibit 2971, the October 10,

25   2007 memo.

1           MS. McCALLUM:  And if we can have up on the screen

2    page 4 of that memo ending in Bates stamp 510, I believe.  And

3    can we blow up the portion at the top that says life

4    settlements overview.

5    Q.  And, Mr. Burns, I'll just ask that you read that out loud,

6    please.

7    A.  Okay.  I'm sorry.  I found it here.  What page is that?

8    Q.  Page 4.

9    A.  Okay.  So the life settlements overview.

10   Q.  Yes.

11   A.  Life settlements occur when an older insured whose health

12   has declined since issue is offered a chance to sell the

13   policy.  There can be a legitimate reason to execute such a

14   settlement if the policyholder has no estate needs, including

15   charitable, and the value offered by the life settlement

16   company is greater than the cash value of the policy.  However,

17   the very event (decline in life expectancy) that makes the

18   policy attractive to an investor makes it even more attractive

19   to the policyholder since unlike the investor, the policyholder

20   has no expenses, commissions, underwriting for life expectancy,

21   etc., and the proceeds are income tax free to the policy's

22   beneficiary, whereas the life settlement company will have to

23   pay the corporate income taxes on the profits on the policy.

24   Q.  Okay.  We can stop there.

25           Now, Mr. Abramowitz -- we can take that down -- was

1    asking you some questions about STOLI policies, undisclosed

2    STOLI policies lapsing when an investor couldn't be found.

3              Do you recall those questions?

4    A.  Yeah.

5    Q.  Now, when a policy lapses in the first couple of years

6    after it's issued, is that good for the company?

7    A.  In general, within the first couple years, no, that's not

8    good.

9    Q.  Why not?

10   A.  Because companies have a lot of up-front expenses.  And so

11   we typically incur significantly more expenses when we issue a

12   policy than the amount of the first year premium that comes in.

13   And so it's not until we receive several years' worth of

14   premiums that the accumulation of the premiums and the

15   investment coming out of those premiums accumulates to an

16   amount that exceeds the total cost.  So really we don't begin

17   to make a profit as an insurance company until several years

18   after a policy is issued.

19   Q.  Mr. Abramowitz was also asking you some questions about

20   expectations of lapse in the over 70 market.

21             Do you remember those questions?

22   A.  Yeah.

23   Q.  Do you still expect some lapse in the general population

24   over 70?

25   A.  Yes.

D9PLBIN3                          Burns - redirect

1   Q.  And the Advantage Solutions product that was the product --

2   the subject of many of the exhibits we had you look at earlier,

3   what demographic was that priced for?

4   A.  It was more of a general population type product.  So it

5   was priced more for what we would characterize as more of a

6   mass, mass affluent, as opposed to the higher net worth.

7   Q.  What was the target age market for those policies?

8   A.  It would be more we'll call it 40 to 55ish.

9   Q.  It was available in the over 70 market; is that right?

10  A.  Yeah, it was, which is common.  So it had a maximum issue

11  age that was higher than that.

12  Q.  You were asked some questions as well about repricing, the

13  repricing we discussed earlier.

14          Do you recall those questions from Mr. Abramowitz?

15  A.  I guess.

16  Q.  The repricing of the products to try to combat STOLI.

17  A.  Oh, right, okay.

18  Q.  Those policies that we looked at earlier, were those issued

19  based on the old pricing or the new pricing?

20  A.  The -- so the Advantage Solutions, for example, that was

21  based on the old, old pricing.

22  Q.  Now, even under the new pricing, would you expect higher,

23  the same, or lower profitability for a STOLI policy that had

24  gotten through than you would for a regular policy that you're

25  expecting?

1    A.   After the repricing, you know, the intent, the intent was

2    to make it so that on those policy forms that were issued after

3    the repricing and in general the expectation would be that the

4    profitability wouldn't be significantly different than the base

5    pricing.  It's not to say there could be instances where the

6    funding could are more efficient than we had assumed in our

7    modeling or that, you know, that there was some form of, you

8    know, for example, the table reduction program as part of the

9    transaction.

10   Q.   Mr. Abramowitz started off his examination by asking you

11   some questions about whether the defendants in this case were

12   aware of Lincoln's policy on STOLI.

13        Do you recall those questions?

14   A.   I do, yeah.

15        MS. McCALLUM:  Can we just have up on the screen,

16   please, Government Exhibit 776, which is in evidence.  And if

17   you could turn to the page Bates marked 39736 and just blow up

18   the top box there.

19   Q.   Could you just read out loud the paragraph at the top,

20   Mr. Burns, where it says "please complete."

21   A.   It says please complete this certification after reviewing

22   the accompanying February 21, 2007 policy statement regarding

23   investor-owned life insurance, IOLI.  This certification must

24   be submitted with all applications for single life, universal

25   life where the insured is age 70 or older and the face amount

D9PLBIN3                    Burns - redirect

1   of all currently pending life insurance applications is

2   $2 million or more, including applications with other insurers.

3   Q.  Let's go to the next page on that exhibit.

4           MS. McCALLUM:  Just blow up the signature line,

5   please, and the certification.  Sorry.

6   Q.  And could you read that out loud, Mr. Burns.

7   A.  By my signature below, I declare and certify that I have

8   read and understand the Lincoln policy regarding investor-owned

9   life insurance, and it is my understanding that this life

10  insurance policy being applied for does not violate the stated

11  intent and spirit of the Lincoln policy regarding investor

12  owned life insurance.  I declare and certify that the

13  information contained in the certification is true, correct,

14  and complete to the best of my knowledge, information, and

15  belief.

16          MS. McCALLUM:  You can take that down.  And can we now

17  have up Government Exhibit 1101, which is in evidence.  1363.

18          I apologize.  Let's pull up Government Exhibit 776

19  once more.  I forgot to show one page.  The last page, please.

20  Q.  And, Mr. Burns, can you just read what is highlighted on

21  the screen.

22  A.  Lincoln policy regarding investor-owned life insurance,

23  February 21, 2007.  The success of Lincoln Financial Group of

24  companies depends on the public's confidence in our honesty,

25  integrity and professionalism.  As one of our producers or

1    representatives, your business practices and professional

2    conduct reflect directly upon how the public perceives Lincoln

3    Financial Group.  Therefore, we expect that our producers and

4    representatives will understand and actively support our

5    efforts to not issue any new life insurance policies where any

6    of the parties are considering or actually intend the eventual

7    transfer of the life insurance policy to a settlement company

8    or other investors.  Our life insurance products are intended

9    to provide benefits to the insured and his or her

10   beneficiaries, all of who have a bona fide need for the

11   insurance protection.  Our life insurance products are not

12   intended to enrich investors who simply hope for a financial

13   profit from the death of the insured.

14           Investor owned life insurance programs, IOLI, come in

15   many different forms.  Some of the approaches simply offer

16   financial inducements to an individual to apply for a life

17   insurance policy that will solely benefit the investors that

18   will pay the premiums.  Other more sophisticated structures are

19   designed to appear like traditional premium finance.  IOLI

20   arrangements are constantly changing their structures and

21   practices in an effort to avoid detection and identification.

22   We expect our producers and representatives to assist us in

23   implementing our policy against IOLI and refrain from

24   submitting inappropriate cases to underwriting.  There are,

25   however, certain common red flags that we believe are present

D9PLBIN3                          Burns - redirect

1    in many of the more common IOLI arrangements.  Cases with any

2    of the following red flags are particularly suspect, and the

3    details of any cases with these characteristics must be fully

4    disclosed to underwriting.

5              THE COURT:  Okay.  I can't.  I have to stop you.  I

6    hate to do it.  I know it's a lousy place to stop you.  This is

7    the day of the monthly meeting of the board of judges at which

8    we're going to be told what's going to happen if the government

9    shuts down next week.  I have to go to this meeting.  So I have

10   to stop us for lunch now.

11             We will be back at ten after two.  Don't discuss the

12   case.  Keep an open mind.

13             (Luncheon recess)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

 1              AFTERNOON SESSION

 2              2:10 pm

 3              (Trial resumes)

 4              (In open court; jury not present)

 5              THE CLERK:  Ready to roll?

 6              THE COURT:  I'm ready to roll.

 7              (Jury present).

 8              THE COURT:  Okay.  Let's all have a seat.  Sir, you're

 9    still under oath.  Ms. McCallum.

10              MS. McCALLUM:  Thank your Honor.

11    REDIRECT EXAMINATION

12    BY MS. McCALLUM:

13    Q.  Mr. Burns, when we broke, we were looking at a document,

14    Government Exhibit 776.  We had read the certification and we

15    were on the last page of that document entitled Lincoln policy

16    regarding investor owned life insurance, and I had you read

17    down to the portion where the bullets begin.

18              Could I have you please read the bullets now with the

19    sentence that precedes it as well.

20    A.  Cases with any of the following "read flags" are

21    particularly suspect, and the details of any cases with these

22    characteristics must be fully disclosed to underwriting.

23              Bullet Point 1.  The insured or owner applicant are

24    offered some financial inducement for applying for the life

25    insurance policy.  It could be a direct cash payment to someone

(e.g., the insured, family member, business partner, charity)
or an indirect payment such as the right to designate a
beneficiary for a portion of the life insurance death benefit.

Bullet Point 2.  The insured or owner applicant is
borrowing all of the premiums and is not making any personal
investment in the life insurance program.  Arrangements where
all the interest on the premium financing is added to the loan
balance are particularly suspect, regardless of the time period
involved.  Capitalization of the loan interest is never
justified when the likely source of the loan pay off is the
policy death benefit.

Point 3.  The interest rate, loan terms and fees on
the premium financing must be reasonable and the loan terms,
taken as a whole, cannot create an incentive for the insured or
owner applicant to transfer ownership of the policy to the
lender or other third parties.  Generally, any loan interest
rate in excess of LIBOR plus 300 basis points is unreasonable.
Origination and prepayment fees should be reasonable.  There
must not be any understanding (whether written or oral) that
the lender will accept ownership of the policy in full
satisfaction of any outstanding premium financing.

The last bullet.  If there is a life insurance trust,
the trustee is usually selected by the insured or trust
guarantor.  The trustee's primary fiduciary responsibility must
be to the intended beneficiaries of the trust.  Any trustee

D9PJBIN4                          Burns - redirect

1   that is associated with the lender, or a life settlement

2   company, is particularly suspect.

3   Q.  Could you just read the last portion of the memo here right

4   below the bullets.

5   A.  Sure.  The above list of red flags is not intended to be

6   all inclusive.  If you have an arrangement that does not have

7   any of these red flags but otherwise violates the spirit of our

8   policy, you should not submit it to underwriting.

9   Q.  Can we now have Government Exhibit 1363 on the screen,

10  please.  Can we turn to -- all right.  We'll use the Elmo.

11          Mr. Burns, can you see that certification there?

12  A.  Yes, I can now.

13  Q.  Does it appear to be the same certification we saw in

14  Government Exhibit 776?

15  A.  Yeah, in sum.

16  Q.  Does this page, the Lincoln policy regarding investor owned

17  life insurance, appear to be the same as the document we just

18  read out?

19  A.  Yes.

20  Q.  Can we have Government Exhibit 1101 on the screen.  If you

21  could pull up page Bates stamped 47143 first, and now go to the

22  next page, please.  Can you highlight the certification with

23  the signature underneath.

24          Does this appear to be the same certification as

25  appeared in the prior two exhibits, Mr. Burns?

1   A.  Yes.

2   Q.  Can we go to the page afterwards, please.

3           Does this appear to be the same statement of Lincoln

4   policy regarding investor owned life insurance you saw in the

5   other two exhibits preceding this one?

6   A.  Yes, it does.

7           MS. McCALLUM:  No further questions.

8           MR. ABRAMOWITZ:  Your Honor, I just have a few.

9           THE COURT:  Sure.

10  RECROSS EXAMINATION

11  BY MR. ABRAMOWITZ:

12  Q.  Good afternoon, Mr. Burns.

13  A.  Good afternoon.

14  Q.  You were asked I believe on redirect examination about

15  whether Lincoln ever went into the life settlement business,

16  and you, I believe, said you didn't think they did?

17  A.  We did not.

18  Q.  You did not?

19          I would like you to look at Defendant's Exhibit 13.

20  I'll put it up on the Elmo.  I ask you to look at the

21  highlighted part.  It says, does it not, that Lincoln Financial

22  advisors established a relationship with life settlements

23  insights, a life settlement broker, to assist LFA planners in

24  executing life settlement transactions on behalf of their

25  clients.  Do you see that?

1    A.  Yes.

2    Q.  So does that not indicate to you that Lincoln Financial

3    advisors was in the life settlement business at least to the

4    extent as described in that exhibit?

5    A.  I don't see it that way.  I don't see us, I don't see

6    Lincoln Financial advisors in the life settlements business.

7    Q.  They just established a relationship with LSI.  Is that

8    right?

9    A.  Yes.

10   Q.  To assist your planners, LFA, is your planners in executing

11   life settlement transactions, right?

12   A.  Correct.

13   Q.  That means that Lincoln Financial wanted to be involved in

14   the executing of life settlement transactions, is that not

15   correct?

16   A.  It means that we wanted to provide a service of allowing

17   the clients to be in, providing that service for their clients.

18   Q.  For a fee, I assume, or for some money, right?

19   A.  I don't know, actually, the specifics of the economics.

20   Q.  Are you telling us that Lincoln Financial didn't make money

21   on life settlements?

22   A.  Yeah, the way I would think about it is --

23   Q.  Just yes or no?

24           Are you saying that Lincoln Financial did not make

25   money on life settlements, yes or no?

1    A.  Lincoln Financial, correct, Lincoln Financial did not make

2    money as an enterprise on life settlements.

3    Q.  As an enterprise?

4    A.  Yes.

5    Q.  What do you mean by an enterprise?

6    A.  What I mean, and that is what I was trying to explain, when

7    I think of Lincoln Financial Group, I think of the corporation,

8    and so entering into a life settlements transaction as it was

9    structured there, that was a relationship that was put together

10   by Lincoln Financial Group to assist the planners in terms of

11   working and executing on life settlement transactions for their

12   clients, but to my knowledge, any fees that were paid as a

13   result of those transactions would have been compensation that

14   would have gone directly to the advisors in the form of the

15   advisor compensation as opposed to Lincoln Financial Group's

16   bottom line.

17   Q.  What about the premiums?  What about the premiums for these

18   life settlements, who gets that?

19   A.  Again not knowing the transactions, the premiums would go

20   to the life settlement provider or the life settlement firm.

21   They wouldn't go to Lincoln.

22   Q.  On the insurance policy that was sold, am I correct in

23   asking you whether --

24   A.  Oh, to be clear, too, the life insurance policies that were

25   sold don't necessarily have to be Lincoln Financial life

1    insurance policies that the planners are managing.  A Lincoln

2    Financial advisor could have policies from various companies

3    for their clients.

4    Q.  What about the ones they had from Lincoln, would Lincoln

5    get the money, the premiums?

6    A.  You're saying that if some --

7    Q.  I am not saying; I am asking.

8           MS. McCALLUM:  Objection.  The question makes no

9    sense.

10          MR. ABRAMOWITZ:  That could be.  Let me withdraw the

11   question.

12   BY MR. ABRAMOWITZ:

13   Q.  Mr. Burns, on those policies that Lincoln Financial owned

14   that were sold into the life settlement market, did the

15   premiums from those, whether it was paid by a third party or by

16   the insured, did the premiums from those policies go to

17   Lincoln?

18   A.  Sure, any?  Yes, any?

19   Q.  Yes.

20   A.  Yes.

21   Q.  You were asked a series of questions, were you not, by Ms.

22   McCallum on redirect about the difference between a life

23   settlement and a STOLI policy, right?  Do you remember those

24   questions?

25   A.  Okay, yeah.

1    Q.  You were asked specifically about part of DX, Defendant's

2    Exhibit 13 that dealt with the difference, right, the

3    regulatory difference?

4            You say in the second paragraph, it is important to

5    distinguish between STOLI and life settlements.  And then you

6    go on to say some STOLI schemes count on settling policies for

7    gain shortly after the two-year contestable period expired.

8            Do you see that?

9            MS. McCALLUM:  Objection.  This is not from the

10   witness's mouth.

11           MR. ABRAMOWITZ:  It is in evidence.

12           THE COURT:  First of all, this is within the scope of

13   redirect.

14           MR. ABRAMOWITZ:  It certainly is.

15           THE COURT:  Go ahead.  Go ahead, ask your question.

16   Ask your question.  The witness may not be able to answer it,

17   but ask the question.

18           MR. ABRAMOWITZ:  He may not.

19   BY MR. ABRAMOWITZ:

20   Q.  It says there, the second paragraph, it is important to

21   distinguish between STOLI and life settlements, right?

22           And it goes on to say some STOLI schemes count on

23   settling policies for a gain shortly after the two year

24   contestable period expires.  Do you see that?

25   A.  Yes.

1   Q.  How would your underwriter know before the two years

2   expired that it was a STOLI policy separate from a life

3   settlement policy?

4   A.  How would our underwriter know?

5   Q.  Yes.

6   A.  By asking the questions on the applications.

7   Q.  Right.

8   A.  By following through on all the requirements and presuming

9   that if everything was certified to and answered truthfully,

10  that the intent of the policy purchase was legitimate.

11  Q.  How about confirming those answers?

12              MS. McCALLUM:  Objection.

13              THE COURT:  The objection is sustained.  Move on,

14  please.

15  BY MR. ABRAMOWITZ:

16  Q.  Mr. Burns, isn't it true that there is no way to tell the

17  difference between a STOLI policy and somebody who buys a

18  policy and 15 minutes later decides to sell it.  Is that

19  correct?

20              MS. McCALLUM:  Objection.

21              THE COURT:  The objection is sustained; asked and

22  answered.

23              MR. ABRAMOWITZ:  I am not sure it was.

24              THE COURT:  It certainly was.  Move on, please.

25              MR. ABRAMOWITZ:  If we have the answer, we have the

1    answer.

2    BY MR. ABRAMOWITZ:

3    Q.  You said on your redirect that you couldn't control the

4    sale of the policies, but you could control the procedures for

5    the applications, couldn't you?

6    A.  I'm sure -- not sure --

7    Q.  You were asked, all things being equal, you would prefer it

8    if the insured couldn't sell the contracts, the life insurance

9    contracts, but the state law insists that you allow it?

10           THE COURT:  The objection is sustained.  His

11   preference is irrelevant.  Move on, please.

12   BY MR. ABRAMOWITZ:

13   Q.  Am I correct in asking you whether procedures for the

14   underwriter could have been implemented to different

15   procedures, further procedures, could have been implemented to

16   check for STOLI at the inception of the policy?

17           MS. McCALLUM:  Objection.

18           THE COURT:  The objection is sustained.

19           MR. ABRAMOWITZ:  You were asked a question on recross

20   from Exhibit 2971.  Is that an Elmo exhibit or do you have it,

21   2971?  Page 4 of that exhibit, which is Lincoln 90510, can we

22   highlight the top part where it says life settlements overview.

23   BY MR. ABRAMOWITZ:

24   Q.  Now, you were asked questions about this paragraph where it

25   says life settlements occur when an older insured whose health

1   has declined since issue is offered a chance to sell the

2   policy.  Do you see that language?

3   A.  I do.

4   Q.  Is it true, Mr. Burns, that life settlements can occur with

5   an older insured whose health has not declined?

6   A.  Yes, it is possible.

7              MR. ABRAMOWITZ:  I have no further questions.

8              THE COURT:  Ms. Murray?

9              MS. MURRAY:  No further questions.

10             THE COURT:  Anything else?

11             MS. McCALLUM:  Nothing else.

12             THE COURT:  Sir, you're done.

13             (Witness excused)

14             THE COURT:  Call your next witness.

15             MS. McCALLUM:  The government calls Edward Lynch.

16             (Pause)

17             May we have a two-minute break?  We need to go and

18   sort something out.

19             THE COURT:  Sort something out.  We'll sit and wait.

20             (Recess)

21             MS. McCALLUM:  The government calls Mr. Lynch.

22    EDWARD J. LYNCH,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

1    BY MS. McCALLUM:

2    Q.  Good afternoon, Mr. Lynch.

3    A.  Good afternoon.

4    Q.  Where do you live?

5    A.  3254 Beaver Drive, Yorktown Heights, New York.

6    Q.  What do you do for a living?

7    A.  I am an insurance sales agent.

8    Q.  What kind of insurance do you sell?

9    A.  Currently I sell long-term care, disability and life.

10   Q.  What is long-term care?

11   A.  Long-term care is what I started in.  That is strictly the

12   type of policy that assists mainly senior citizens but really

13   anyone over 50 in the event they need care of a custodial or

14   cognitive nature, be it in their own home or facility.  This is

15   a policy that would pay for their care without them having to

16   deplete their assets.

17   Q.  What year did you first get started in the insurance

18   business?

19   A.  1993.

20   Q.  Do you have any professional licenses?

21   A.  New York State life and health license.

22   Q.  When did you get that?

23   A.  1993.

24   Q.  Where did you work when you first started out in the

25   insurance business?

1    A.  For new branch of Travelers long-term care, Net Plus

2    Division in Armonk, New York.

3    Q.  What kind of insurance were you selling there?

4    A.  Strictly long-term care.

5    Q.  Until what year approximately did you work at Travelers?

6    A.  Until approximately 1997 when they sold their long-term

7    care division to GE Capital.

8    Q.  From then until around 2006 did you continue selling

9    insurance?

10   A.  Yes.

11   Q.  What company do you work with now?

12   A.  Myself, technically I was a 1099 independent agent, but now

13   I am doing mainly Mutual of Omaha product line.

14   Q.  Do you know someone by the name of Kevin Kergil?

15   A.  Yes, I do.

16   Q.  What year approximately did you first meet Mr. Kergil?

17   A.  I would say approximately 1996, thereabouts.

18   Q.  When was the last time you saw Mr. Kergil?

19   A.  I actually bumped into Mr. Kergil about three or four

20   months ago at a restaurant, bar and grill in the area that I

21   live in.

22   Q.  Do you see Mr. Kergil here in the courtroom?

23   A.  Yes, I do.

24   Q.  Could you tell us where he is sitting and identify an

25   article of clothing he is wearing, please?

1   A.  He is sitting in the second row back, it looks like he has

2   a suit on.

3          THE COURT:  So does everybody.

4          THE WITNESS:  I can't see --

5          MR. STAVIS:  It is not me.  I will short-circuit it

6   and stipulate it is Mr. Kergil.

7          THE COURT:  Yes.  Let's at least look at the second

8   row before we ask for identification by an article of clothing,

9   which I know is time-honored, but they're all wearing exactly

10  the same.

11  BY MS. McCALLUM:

12  Q.  Do you know somebody by the name of Mark Resnick?

13  A.  Yes, I do.

14  Q.  What year did you first meet Mr. Resnick?

15  A.  I met Mark, it was probably 1994-95.

16  Q.  What year did you last see him?

17  A.  Probably two to three years ago.  We would get together

18  with some other old colleagues from Travelers whenever he came

19  up to New York for a week or two in the summertime.

20  Q.  Do you see Mr. Resnick here in the courtroom?

21  A.  Yes, I do.

22  Q.  Would you tell us where he is sitting.

23  A.  He is at the end of the row over there on the far right.

24         MS. MURRAY:  Identification stipulated.

25         THE COURT:  Mr. Resnick.

1    BY MS. McCALLUM:

2    Q.  Do you know someone named Michael Binday?

3    A.  Yes, I do.

4    Q.  What year did you first meet Mr. Binday?

5    A.  I was introduced to Michael Binday, I am trying to think,

6    right around 2000, 1999 -- oh, what am I saying?  I am getting

7    a little confused with my dates.  Was that before or after

8    Travelers?  After Travelers, so probably 2005, 2006.  2006, I

9    suppose it was.

10   Q.  How long ago did you last see him?

11   A.  Not for quite some time.  I think it was probably after I

12   saw him definitely at a trip we went on to at Atlantis in the

13   Bahamas, and I saw him at his office a couple of times after

14   that, so that would have been 2009, 2008, 2009, I would guess.

15   Q.  Do you see Mr. Binday anywhere in the courtroom?

16   A.  Yes, I do.

17   Q.  Where is he sitting?

18   A.  Third from the right with the glasses on.

19          MR. ABRAMOWITZ:  Identification conceded.

20          THE COURT:  Indicating Mr. Binday.

21   BY MS. McCALLUM:

22   Q.  From 2006 to around 2009, did you have any business

23   dealings with the three men you just identified?

24   A.  Yes, particularly with Michael, Michael's brokerage office.

25   Q.  What kind of business dealings were those?

1   A.  That was the first time I was introduced to life insurance.

2   Q.  Have you been subpoenaed to testify here today?

3   A.  Yes, I have.

4   Q.  In your response to that subpoena, did you intend to assert

5   your Fifth Amendment right not to incriminate yourself.

6   A.  Yes, I did.

7   Q.  Have you reviewed an order related to your testimony?

8   A.  Yes.

9          MS. McCALLUM:  May I approach, your Honor?

10          THE COURT:  You may.

11          (Pause)

12   BY MS. McCALLUM:

13   Q.  I just handed you Government Exhibit 4002, marked as such.

14   Do you recognize that document?

15   A.  Yes, I do.

16   Q.  What is it?

17   A.  It is an order, Southern District order pursuant to United

18   States --

19   Q.  Not to read it, sir.  Just tell me what that order is.

20          THE COURT:  Do you know what it is?

21          THE WITNESS:  Yeah, well, I forget the actual term for

22   it.  It is the -- I am sorry.  I am forgetting the name of that

23   particular order.

24   BY MS. McCALLUM:

25   Q.  Is it an immunity order?

D9PJBIN4                          Lynch - direct

1   A.  Yes, it is my immunity order, yes.

2   Q.  What do you understand this order to require of you?

3   A.  That I tell the truth here today.

4   Q.  What, if any, protections do you get if you tell the truth

5   here today?

6   A.  I don't know about protections.  I just know I have to tell

7   the truth.

8   Q.  Can the government prosecute --

9   A.  They can't criminally prosecute me, that is my

10  understanding from my lawyer, I cannot be criminally

11  prosecuted.

12  Q.  You can put that to the side.

13          Where did you first meet Mr. Resnick, Mark Resnick?

14  A.  In the Travelers Net Plus long-term care office.  He came

15  in maybe a year and a half to two years after I did as a

16  long-term care agent.

17  Q.  Until around what year did Mr. Resnick work with you at

18  Travelers?

19  A.  About three years after I started, maybe four, and then he

20  was given the opportunity to open a Travelers branch in

21  Florida.  That would have been about 1997, I am guessing, '97,

22  '98 possibly.

23  Q.  Where did you first meet Kevin Kergil?

24  A.  I met Kevin Kergil, it was actually at a restaurant bar and

25  grill in my neighborhood that I would stop at after running

D9PJBIN4                          Lynch - direct

1   late night appointments, and I got to know his girlfriend who

2   was a bartender and waitress at that restaurant.

3   Q.   What was his girlfriend's name?

4   A.   Linda.

5   Q.   Do you recall her last name?

6   A.   I think it starts with an F, but I really don't recall.

7   Q.   Did there come a time when you and Mr. Kergil worked

8   together at Travelers?

9   A.   Yes.

10  Q.   How did it come about that Mr. Kergil began working with

11  you at Travelers?

12  A.   His girlfriend had spoke -- well, over a bowl of --

13          MS. McCALLUM:   Actually.

14          (Off-the-record discussion)

15  BY MS. McCALLUM:

16  Q.   Did you recruit Mr. Kergil to come to Travelers?

17  A.   Yes, I did.

18  Q.   Until what year did Mr. Kergil work with you at Travelers?

19  A.   Approximately right up until we were bought by GE, which I

20  believe was about 1998, '99.

21  Q.   Now, Mr. Binday, could you describe the circumstances under

22  which you met Mr. Binday for the first time.

23  A.   Yes.  Mr. Kergil had told me about his agency and told me

24  he had worked with him on some long-term care cases that

25  couldn't be placed through the carriers that Travelers used and

1   that he was getting into a new product of life settlements and

2   that I should meet Michael.

3   Q.  Had you ever sold life insurance before?

4   A.  No, I had never done that.  I was always strictly long-term

5   care insurance up to that point.

6   Q.  Did there come a time you met Mr. Binday?

7   A.  Yes, there was.

8   Q.  Would you tell us about that first meeting, please.

9   A.  There was a recruiting meeting at Michael's office in

10  Scarsdale with myself and several other ex-Travelers agents,

11  where Michael presented the opportunity of life settlement

12  policies to all of us in the group.

13  Q.  You mentioned his office.  Let me just pull up Government

14  Exhibit 4100, please, on the screen.  Is what is depicted in

15  this photograph look familiar to you?

16  A.  Yes, that would be Michael's office.

17  Q.  Can we pull up Government Exhibit 4101.  Do you recognize

18  that?

19  A.  Yes, that is Michael Binday's office in Scarsdale.

20  Q.  Who was in attendance at this first meeting?

21  A.  Michael Binday, of course, Kevin Kergil and myself and some

22  other prior Travelers agents, Don Engle, Steven Chewkaskie and

23  I believe Sandy Einhorn.

24  Q.  How did the meeting begin?

25  A.  Well, the first thing off the bat after some chitchat,

1    Michael started the presentation, was words to the effect of

2    who wants to have a Ferrari in their driveway.

3    Q.  What, if anything, did Mr. Binday go on to say?

4    A.  He went on to tell us about the opportunity to make large

5    commissions with a new type of policy in the life settlement

6    life insurance field.

7    Q.  Did he give you any further information about this program?

8    A.  Yeah, just that it was well suited to our long-term care

9    backgrounds because the people that this policy, the prospects

10   for this type of insurance should be older in age, 70's and

11   80's, as well as having a good amount of assets, and that was

12   the profile for the people that you would want to seek out to

13   sell these policies to.

14   Q.  What was your understanding of what would happen with these

15   policies based on this recruiting session?

16   A.  That there were investors that would form a trust to buy

17   the policies on behalf of the clients and that upon the death

18   of the clients, the investors would receive the death benefit

19   value of the policy and that the client would get a large

20   up-front cash payment and that agents would get very large,

21   substantial commissions.

22   Q.  How long did this session, this first session, last?

23   A.  Oh, maybe 30, 40 minutes.

24   Q.  Was there any discussion during this session about the

25   application forms for these life insurance policies?

D9PJBIN4                          Lynch - direct

1    A.  No.  More conceptual.

2    Q.  Do you recall there being any handouts during this session?

3    A.  Yes, there was a handout about just going over the core

4    idea of life settlements and an emerging new product in the

5    life insurance market.

6    Q.  Had you ever known anything about life settlements before

7    this meeting with Mr. Binday?

8    A.  No.

9              MS. McCALLUM:  May I approach, your Honor?

10             (Pause)

11   BY MS. McCALLUM:

12   Q.  I just handed up Government Exhibits 100 and 101.

13             Mr. Lynch, do you recognize those two documents?

14   A.  Yes, I do.

15   Q.  Did they come from your files?

16   A.  Not these particular.

17   Q.  Are they copies of documents that came from your file?

18   A.  Yes, I received these, handout copies of these.

19             MS. McCALLUM:  Just a moment.

20             (Off-the-record discussion).

21   BY MS. McCALLUM:

22   Q.  Were those documents you received from Mr. Binday?

23   A.  Yes.

24             MS. McCALLUM:  The government offers 100 and 101.

25             MR. STAVIS:  No objection.

1          THE COURT:  Is that a universal "no objection"?

2          MS. MURRAY:  Yes, your Honor.

3          MR. ABRAMOWITZ:  Universal.

4          THE COURT:  Admitted.

5          (Government Exhibits 100 and 101 received in evidence)

6          MS. McCALLUM:  Would you put up Government Exhibit 100

7    on the screen, please.  Can we just highlight the first three

8    paragraphs, please.  Can you go zoom back out and go to the

9    very bottom, the, "we will." can we now put up Government

10   Exhibit 101.  Can you just zoom in on the top four bullets.

11   BY MS. McCALLUM:

12   Q.  Mr. Lynch, would you just read the last bullet there out

13   loud.

14   A.  "Once the coverage is issued, the premiums are paid by the

15   insurance trust.  The insured is not personally responsible for

16   the premiums."

17         MS. McCALLUM:  You can take that down.

18   BY MS. McCALLUM:

19   Q.  After this meeting, this recruiting meeting, did there come

20   a time you met with Mr. Binday again?

21   A.  Yes.

22         MR. ABRAMOWITZ:  May we focus a time, your Honor.

23   BY MS. McCALLUM:

24   Q.  Approximately what year was this?

25   A.  Oh, it was a matter of maybe a month or so after the

D9PJBIN4                        Lynch - direct

1   original meeting.

2              THE COURT:  When did the original meeting happen, what

3   year, if you can recall?

4              THE WITNESS:  I would say it was most probably early

5   2006, your Honor, possibly late 2005, but more likely early

6   2006.

7              THE COURT:  All right.  Great.  Thank you.

8   BY MS. McCALLUM:

9   Q.  This second meeting occurred about a month after the first

10  meeting.  Is that right?

11  A.  Approximately, yes.

12  Q.  What was the purpose of this second meeting?

13  A.  Well, everybody was very excited about the opportunity.  I

14  think I took a little longer than others, but decided I did

15  want to go on board with Michael Binday's company as a sales

16  rep for this, and we went over the actual, some of the actual

17  presentations to approach clients as well as some of the

18  paperwork.

19  Q.  Who is we?  Who participated in this?

20  A.  Just myself and Michael sitting in a conference room at his

21  office.

22  Q.  Is that the same office we saw a picture of before?

23  A.  Yes.

24  Q.  What was discussed in terms of the presentation to make to

25  clients?

A.  A cup couple things; the way to go about it, to sort

through my existing clients for long-term care and the ones I

felt fit the criteria, mainly being their age and assets, to

start, initiate with a phone call, to get an appointment to

meet with them and go over this opportunity in greater detail.

          That opportunity presentation to clients was also

discussed around was mainly just the points in this exhibit

letter about the opportunity that existed in the secondary

market.

Q.  Did you discuss during this meeting what, again how to fill

out applications for insurance?

A.  Yes, just very vaguely and briefly, the main thing being to

get health information, make sure their health hadn't changed

since they originally became clients of mine, and the main

thing was to get signatures on applications of clients that

wanted to pursue this.

Q.  Now, after this one-on-one training with Mr. Binday, what

happened next with the program?

A.  As far as my participation, I culled through some of my

long-term care clients, picked out two or three that I thought

would benefit from this type of product that fit the age

criteria and fit the asset criteria and made phone calls and

arranged appointments.

Q.  Who in particular were the people you recall pitching?

A.  The main two were Mr. Bob Katz, Robert Katz, and Flora, Flo

1   Adler.

2   Q.  How did those people respond to the initial pitch?

3   A.  It was the nice thing about the pitch, they responded

4   positively because they were going to get a big chunk payout.

5           So they made meetings with me to go over it in more

6   detail.

7   Q.  Did you end up submitting applications to insurance

8   companies in Florence Adler's name, Flora Adler's name?

9   A.  Yes, I did.

10  Q.  What about the names of the Katzes?

11  A.  Yes, I did.

12  Q.  Were any policies actually issued on Ms. Adler or the

13  Katzes?

14  A.  Yes, Mrs. Katz, Babette, I believe, I believe though she

15  applied, she didn't fit the criteria.  I can't really recall if

16  it was because she had health concerns or that the investors

17  that ran the trust didn't want to back her for a policy and

18  back paying the premiums, so she did not get one.

19          Mr. Katz we were able to get two different policies

20  on.

21  Q.  What about Ms. Adler as well?

22  A.  Ms. Adler as well, yes.  Although it never went all the way

23  through, I believe it technically did get issued by Prudential.

24  Q.  Now, going back to your general understanding of how this

25  process worked, based on your conversations with Mr. Binday,

D9PJBIN4                         Lynch - direct

1    how did you understand the application process and the investor

2    involvement would work?

3    A.  Well, the way it was explained to me was basically that at

4    that age premiums are getting very high for people in their

5    70's into their early '80s to get life insurance benefits,

6    plans of 2, 3, $4 million, and it was explained to me that the

7    investors in the trusts were willing to pay the premiums

8    because it was kind of a tricky thing.  They wanted people in

9    good enough health to get preferred health or standard health

10   rates, not to have bad health so the premiums were even higher.

11            So you wanted people in good health so they got good

12   rates, but they also, the second part was they were -- a couple

13   of companies that predicted based on their health records their

14   life expectancies, or LE's as we call them, and you wanted them

15   to have good life expectancy but not too long, to the point

16   where the investors of the trusts would be paying the premium

17   too long.

18            It was kind of a gamble that they would hope that if

19   they put in a million in premiums over years and then the

20   insured passed away and they got a $3 million policy, death

21   benefit to the trust, and they spent a million doing it, then

22   they were still up two million.

23   Q.  After you made the phone pitch -- just talking about Ms.

24   Adler -- after you made your phone pitch, did you meet her in

25   person?

D9PJBIN4                          Lynch - direct

1    A.  Yes, I did.

2    Q.  Where did you meet her?

3    A.  At her apartment in Scarsdale.

4    Q.  What kind of apartment was that?

5    A.  I am not sure if it was a co-op or a condo.

6    Q.  What was your pitch to Ms. Adler?

7    A.  Just that it was a new, emerging market and she fit the

8    criteria age-wise and healthwise, and I was there to

9    investigate if her health had changed and what her asset

10   picture looked like, and she was very excited about the

11   possibility of getting a cash payout.

12   Q.  What kind of cash payout do you recall telling her she

13   could get?

14   A.  I couldn't be totally specific because it would depend on

15   what the investors were willing to do and we didn't know that

16   until we got records, but it could be hundreds of thousands.

17   Q.  During that first in-person meeting with Ms. Adler about

18   this program, did you gather any information from her?

19              MR. ABRAMOWITZ:  I will object as hearsay.

20              THE COURT:  It is a yes or no question, did you get

21   any information from the lady?

22              THE WITNESS:  Yes, I did.

23   BY MS. McCALLUM:

24   Q.  What kind of information?

25   A.  About her health and a ballpark figure on her assets.

1   Q.  What was the ballpark figure that she gave you on her

2   assets?

3   A.  I think it was roughly about 500 to $700,000.

4   Q.  Did you gather any other information from Ms. Adler at this

5   time?

6   A.  Yes, additional health information, although I don't think

7   too much had changed.  There had been a couple of health

8   changes since her application was made years before that for

9   Travelers so, yes, I got health information as well.

10  Q.  What, if anything, did you do right after this meeting with

11  Ms. Adler?

12  A.  She was right in Scarsdale, so I stopped over to Michael's

13  office and spoke directly with Michael and let him know I

14  didn't think she fit the criteria based on her assets, that

15  they weren't as high as I thought they might be.

16  Q.  What was Mr. Binday's response to that?

17  A.  He said well, you never know.  He said there's a lot of

18  things to take into consideration, the value of her co-op or

19  condo, whichever it was.  She owns a Mercedes.  I told Michael

20  that she did have a lot of jewelry and a lot of artwork, but I

21  had no idea how to appraise that.

22         He kind of said well, let's wait and see.

23  Q.  In arriving at the net worth number, did you ask Ms. Adler

24  to calculate all of her assets?

25  A.  Yeah, pretty much.  There was a list that we would check

1    down.  I didn't actually fill in the list with her, but I made

2    notes, but I don't know if I was as detailed as I should have

3    been on asking her more about her artwork and her jewelry.

4    Q.  Did the net worth figure of 500,000 to $750,000 include the

5    apartment?

6    A.  Yes

7    Q.  What happened next with respect to Ms. Adler?

8    A.  We went ahead and did an application on her.  I was kind of

9    surprised.

10   Q.  Just backing up for a minute, did there come a time you had

11   her sign any forms?

12   A.  That would obviously be the very next step.  I went back to

13   her and said Let's see if we can get you coverage.  I wrote

14   down her health information and had her applications that were

15   preset for me with tabs on them that said applicant sign here,

16   applicant sign here, so I just went to her apartment and she

17   just signed where I showed her and -- it needed to be signed.

18           MS. McCALLUM:  May I approach, your Honor?

19           THE COURT:  You may.

20           (Pause)

21   BY MS. McCALLUM:

22   Q.  Do you recognize Government Exhibit 168 which I just handed

23   up?

24   A.  Yes.

25   Q.  What is that document?

1    A.  That would be the first step, it kind of goes hand-in-hand

2    with the application, is her okay, her signature giving us

3    permission to have underwriters get her health records.

4            MS. McCALLUM:  The government offers Government

5    Exhibit 168.

6            MR. ABRAMOWITZ:  No objection.

7            MS. MURRAY:  No objection.

8            THE COURT:  Admitted.

9            (Government Exhibit 168 received in evidence)

10           MS. McCALLUM:  May we just have the first page of

11   Government Exhibit 168 on the screen, please.

12   BY MS. McCALLUM:

13   Q.  Do you know what Life Asset Group is, Mr. Lynch?

14   A.  It is just a group that -- Life Asset, I am really not sure

15   about Life Asset.  It looks like it would be a group that goes

16   out and gets --

17           MR. STAVIS:  Objection.

18           THE COURT:  Hang on.  Hang on.  I can't listen to two

19   voices at once.  Are you objecting to the question?

20           MR. STAVIS:  I am objecting to the answer.

21           THE COURT:  You are moving to strike the answer?

22           MR. STAVIS:  I am moving to strike, yes.

23           THE COURT:  We don't want you to speculate or tell us

24   what it looks like it would be.  Do you know the answer to the

25   question?

1            THE WITNESS:  I do, upon looking at it, your Honor, it

2    is a group that you give permission to to go and get your

3    medical records from your primary physician.

4    BY MS. McCALLUM:

5    Q.  I am just drawing your attention to the fax stamp at the

6    top.  There are two fax stamps?

7    A.  Yes.

8    Q.  What is the first one at the very top, if we can highlight

9    that, please?

10   A.  The first one is from Kevin Kergil.

11   Q.  And then the one below that?

12   A.  That would be from me.

13   Q.  Do you recall why these fax stamps are on there?

14   A.  Well, it would have been sent, it was sent to me to get the

15   signature, and then I got the signatures and faxed them back.

16   Q.  Why was Kevin Kergil sending you these forms?

17   A.  I don't know.  He might have had the forms handy at his

18   house.  I really don't know if he was faxing from his home or

19   Michael's office.

20           MR. STAVIS:  Your Honor, objection.

21           THE COURT:  I am sorry.

22           MR. STAVIS:  It is the answer I am objecting and move

23   to strike.

24           THE COURT:  You move to strike the answer?  Sir, I

25   need you to move back from that microphone a little bit.  Where

1    I am sitting, I am getting a lot of reverberation.

2              THE WITNESS:  I am so sorry.

3              THE COURT:  It is not your fault.  Then when Mr.

4    Stavis talks, I can't hear two voices at once, okay?

5              I am not going to strike the answer.  He doesn't know

6    where he was faxing it from.  Let's go on.

7    BY MS. McCALLUM:

8    Q.  At the time you had Ms. Adler sign these forms, had any

9    insurance, formal insurance application been submitted yet on

10   her behalf?

11   A.  I don't believe so.  The process that I knew in the couple

12   of applications that I did was they got health records first so

13   they would establish if it was worth applying for based on

14   getting a life expectancy report, so the medical records would

15   come first and then followed right behind it based on a life

16   expectancy report and interest shown by investors to form a

17   trust.

18             (Continued on next page)

19

20

21

22

23

24

25

D9PLBIN5                        Lynch – direct

1    BY MS. McCALLUM:

2    Q.  I think you said there was a time, there did come a time

3    when you submitted applications on Ms. Adler's behalf, right?

4    A.  Yes.

5           MS. McCALLUM:  May I approach again, your Honor?

6           THE COURT:  You may.

7    Q.  I've just handed you what have been entered into evidence

8    as Government Exhibit 110 and 130.  If we could look at

9    Government Exhibit 110 first and have that on the screen as

10   well.

11          Do you recognize this document, Mr. Lynch?

12   A.  Yes.

13   Q.  What is this?

14   A.  It's an application for life insurance with insurance

15   company called AIG, American General.

16   Q.  Can we turn to page 2, please, of this document.

17   A.  Okay.

18          MS. McCALLUM:  And just blow up the primary proposed

19   insured box.

20   Q.  In whose name is this application being submitted?

21   A.  I'm sorry?

22   Q.  In whose name is this application being submitted?

23   A.  Florra Adler.

24   Q.  Do you recognize the handwriting in this portion?

25   A.  Yes, that's my handwriting.

1    Q.  And do you see where it says personal income, household

2    income, and net worth at the bottom?

3    A.  Yes.

4    Q.  Why are those left blank?

5    A.  Because I never filled out the money information on

6    applications.

7    Q.  Why not?

8    A.  I had notes on it and told Michael and Kevin Kergil of

9    them, but I was told leave them blank.

10   Q.  Who told you that?

11   A.  Both Michael and Kevin.

12   Q.  Can we turn to I think there's a flag there, Mr. Lynch, on

13   your copy at page 16 of the document, if we could pull that up.

14   It's Bates stamp ending 598.  I'm sorry, it might be 15.  And

15   could you just blow up the wording in the top right-hand

16   corner, please, and then you can zoom back out.

17           Are there any numbers filled in here, Mr. Lynch?

18   A.  No.

19   Q.  Again, why not?

20   A.  I didn't fill in numbers.

21   Q.  And then if we just turn to the last page of that exhibit,

22   whose signature is at the bottom here, Mr. Lynch?

23   A.  Florra Adler.

24   Q.  Is there any information filled out on this page?

25   A.  No, there isn't.

1  Q.  What did you do with that application after you got

2  Ms. Adler's signature and filled out the beginning?

3  A.  I handed it into Michael's office, most likely to his

4  secretary.

5  Q.  Can you look now at Government Exhibit 130, which is also

6  in evidence.

7         MS. McCALLUM:  And may we have that on the screen,

8  please.

9  Q.  What is this, Mr. Lynch?

10 A.  This is an application for Florra Adler for life insurance

11 coverage with Prudential Insurance Company.

12 Q.  Whose handwriting is on that first page?

13 A.  That would be mine.

14 Q.  And does any date appear on this application?  If you could

15 just take a moment to flip through it.

16 A.  No.

17 Q.  Why not?

18 A.  I very often when I -- well, only two or three applications

19 I ever did with this company, it would say get signature, do

20 not date.

21 Q.  Who would say that?

22 A.  There would be Post-its on the application with sign here

23 tabs and my job was basically to get signatures.

24 Q.  Where would you get those applications with the sign here

25 tabs on them?

1    A.   I would pick them up from Michael's secretary.

2    Q.   What was her name?

3    A.   Rose.

4    Q.   Do you know her last name?

5    A.   I knew it, but I'd know it if I heard it -- but no, I

6    don't.  Flanagan, I believe, that may be it.

7    Q.   And are there any financial figures filled out in this

8    application to Prudential?

9    A.   No.

10   Q.   Does your signature appear on this application?  Just

11   directing your attention to the fifth page of the document, if

12   we could pull up the fifth page.

13   A.   Yeah, my signature does appear on the fifth page.

14   Q.   And what did you do with that application, the Prudential

15   application, after you completed the portions you completed?

16   A.   I dropped it off to Michael's secretary.

17   Q.   And after you dropped off these applications for AIG and

18   Prudential or sent them to Mr. Binday's office, what did you

19   understand was happening with respect to them?

20   A.   That they were going to go out and get see if they could

21   get the life expectancy reports.  The fact that we filled out

22   an application showed they maybe had some interest based on the

23   life expectancy reports that there would be investors that

24   would form a trust and bank roll the premiums.

25   Q.   I handed you what's been marked as Government Exhibit 104

```
 1    for identification.  Could you just look at that and tell me
 2    whether you recognize it?
 3    A.  Yeah, this is an email from Michael sent April 6 of 2007
 4    updating me on the two cases I had in existence, which was the
 5    Katzes and this looks like it's the Katzes.
 6              MS. McCALLUM:  The government offers Government
 7    Exhibit 104.
 8              MR. ABRAMOWITZ:  No objection.
 9              THE COURT:  Admitted.
10              (Government's Exhibit 104 received in evidence)
11              MS. McCALLUM:  Can we pull that up on the screen,
12    please.  And if you just focus in first on the to, from, CC
13    block.
14    Q.  Do you have an understanding as to why Kevin Kergil is
15    copied on this email?
16    A.  Yeah, well, it was Kevin's position in the company, he was
17    pretty much handling the financial numbers.
18    Q.  And if we can go down to -- why don't we just read from "we
19    are attaching a status sheet," the very top.  Could you read
20    that out loud, please.
21    A.  We are attaching a status sheet -- Dear Ed, we are
22    attaching a status sheet.  This shows all cases where LE
23    reports are in house.  This includes a number that have
24    recently arrived.  These are all being actively shopped with
25    funders.
```

1        Submitted to AIG.  These cases need to be expedited.

2   Regardless of whether we have offers, you should order medical

3   exams and work on the data sheets.  We are doing everything

4   possible to wrap these up and to use the Medalist product.

5        In your case, this means Babette Katz.  Please arrange

6   a medical and get a data sheet to Kevin.

7        There are a few of the AIG cases where we only

8   received the LE report in the past week.  Some of these have

9   other company offers in red, meaning we still have to run them.

10  This will get done fairly soon, as we want to get other offers

11  at the same time.  This is only one AXA quote among your cases.

12       Offers:  These prospects all have two lines.

13  Underneath each policy, we list the offer or offers.  For

14  example, under the Florra Adler Prudential, it says AC.  This

15  is a new offer.  It translates to Applied Capital is making an

16  offer, but the amount is not yet provided.  Except at two to

17  3 percent.  We also have an HM offer which is a two year wait

18  and see.  She was declined with AIG, so the offers we had for

19  that policy are not shown.

20       Regards, Michael Binday.

21       MS. McCALLUM:  And if we could just turn to the second

22  page and blow up the chart, please.

23  Q.  And what are the names on the left of this chart,

24  Mr. Lynch?

25  A.  Babette Katz, Robert Katz, and Florra Adler.

D9PLBIN5                          Lynch - direct

1    Q.  Okay.  You can put that to the side.

2             Did there come a time when you learned what

3    information was being supplied to insurance companies about

4    Ms. Adler's finances?

5    A.  Yes.

6    Q.  When did you learn what was being submitted?

7    A.  Initially it was at the bottom of an email sent to me by I

8    think it was Michael that sent it.

9    Q.  About how long after the applications had been submitted

10   did you learn this information?

11   A.  I'm not certain, within a month maybe.

12   Q.  And what was the information that you learned was being

13   submitted about her finances?

14   A.  That her finances had been put down and stated as four and

15   a half million dollars.

16   Q.  What if anything did you do when you saw that those numbers

17   were appearing?

18   A.  I looked the other way.  I needed the commission and I

19   didn't say anything at that point.

20   Q.  Did you know that those numbers were false?

21   A.  Yes, I did.

22   Q.  And have you always told the truth to the government about

23   what you knew of misrepresentations concerning Ms. Adler's

24   financials?

25   A.  Not always, no.

1    Q.  What did you say when you began meeting with the

2    government?

3              MR. ABRAMOWITZ:  Can we have a time?

4    Q.  Let's say the first time you met with the government, what

5    did you tell the government about your knowledge of the

6    inflation of Ms. Adler's financials?

7    A.  That I didn't realize.

8              MR. ABRAMOWITZ:  Your Honor, may we have a time and

9    place, best as we can?

10             THE COURT:  No.

11             MR. ABRAMOWITZ:  No, okay.

12             THE WITNESS:  I'm sorry, what was the question again?

13   Q.  When you first met with the government, what did you say

14   about your knowledge of the inflation of Ms. Adler's

15   financials?

16   A.  That I didn't know about it until a later date.

17   Q.  And did you tell the truth about that before or after you

18   received your immunity order here?

19   A.  Before.

20   Q.  Let's talk now about the Katzes.

21             THE COURT:  Actually, let's take our afternoon break.

22   Don't discuss the case.  Keep an open mind.

23             (Continued on next page)

24

25

```
 1                (Jury not present)

 2                (Recess)

 3           THE COURT:  Everybody here?  I have a juror issue.

 4      Okay.  Alternate No. 5.

 5           THE DEPUTY CLERK:  Five, which is alternate four now.

 6           THE COURT:  Mr. Chong?

 7           THE DEPUTY CLERK:  No, Brenda Rodriguez.

 8           THE COURT:  Brenda Rodriguez, right.

 9           You can have a seat, sir.  Sit down.

10           Came to Jim yesterday and said that it didn't look

11      like she was going to get paid during jury service.  And she

12      obviously wanted to serve because she said can you do something

13      about that.  So Jim did what he has done sometimes

14      successfully, sometimes not successfully in the past:  He

15      called the employer and appealed to the employer's sense of

16      civic duty.  The employer has no sense of civic duty and is not

17      going to pay her starting tomorrow.

18           So she doesn't know that yet, by the way.  He knows

19      it, I know it, now you know it, she doesn't know it.

20           So it seems to me at the end of the day we need to

21      meet with Ms. Rodriguez and figure out what's going to happen

22      with her, okay.

23           MS. McCALLUM:  That's fine.

24           THE COURT:  All right.  Let's get the jury.

25           (Continued on next page)
```

1              (Jury present)

2              THE COURT:  You're still under oath, sir.

3              THE WITNESS:  Yes, your Honor.

4              THE COURT:  Let's continue.

5    BY MS. McCALLUM:

6    Q.  Mr. Lynch, just going back too Ms. Adler for one second,

7    did you ever tell Michael Binday that she -- her net worth was

8    anywhere in the neighborhood of 4.5 million?

9    A.  No, I did not.

10   Q.  And when you talked about her jewelry and her artwork, did

11   you convey that might reach the level of 4.5 million?

12   A.  No.

13             MR. ABRAMOWITZ:  Your Honor, I'm reluctant to object,

14   but this is leading.

15             THE COURT:  The objection is quite proper and it is

16   sustained.

17   Q.  What did you tell Mr. Binday about the value of Ms. Adler's

18   assets?

19             THE COURT:  He's already answered that question.

20   Q.  The Katzes, what were Mr. and Mrs. Katz's financials?

21   A.  When I first met with them, they said in the area --

22   including their home, everything -- probably about $3 million.

23   Q.  Did you convey that information to anyone?

24   A.  Yes.  Originally I said, I told Michael and I believe Kevin

25   that they were -- had good assets of 3 million.

1  Q.  And did you submit applications for the Katzes to insurance

2  companies?

3  A.  Yes.

4  Q.  Was -- how did you submit them?

5  A.  I'm not sure what you mean.  Getting signatures?

6  Q.  By what means did you submit the applications?

7  A.  I made an appointment, I went to their house.  As was the

8  case with the other couple of applications I did, there was a

9  pre-tabbed folder where signatures needed to be signed on

10  various pages.  I went and said they were good candidates for

11  getting this type of coverage, and they signed where the arrows

12  were pointing.  I said sign here, sign here, sign here.

13  Q.  What did you do once you had the signatures?

14  A.  I turned the application in to Michael's secretary.

15          MS. McCALLUM:  Can I approach, your Honor.

16  Q.  Could you look at Government Exhibit 300, please.  Do you

17  recognize that?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's an email from Michael's secretary, Rose Flanagan, to

21  me.

22  Q.  About what generally?

23  A.  About Babette Katz's info sheet, net worth, and income

24  worksheet for her was fully executed, PDF, paid for, looks like

25  I forget to send network sheet.

D9PLBIN5                              Lynch - direct

1   Q.  Don't read from it, sir, please.

2            MS. McCALLUM:  The government offers Government

3   Exhibit 300.

4            MR. STAVIS:  May I have a moment, your Honor?

5            THE COURT:  Yes.

6            MR. ABRAMOWITZ:  No objection.

7            THE COURT:  Admitted.

8            MR. STAVIS:  No objection, your Honor.

9            THE COURT:  Admitted.

10            (Government's Exhibit 300 received in evidence)

11            MS. McCALLUM:  Can we put the first page on the

12   screen, please.

13   Q.  This is the email from Rose Flanagan; is that correct?

14   A.  Yes.

15   Q.  Can we go to page 12 of that exhibit, please.

16            MS. McCALLUM:  It's Bates ending in 363.  And can you

17   just blow up the financial question section at the top, No. 4.

18   Q.  Mr. Lynch, that number, $5.2 million for household net

19   worth, was that accurate for the Katzes?

20   A.  Not based on the information I had gathered, no.

21            MS. McCALLUM:  Can we go just two pages before that,

22   so it will be Bates No. 361, and can you blow up on the

23   right-hand side where it says date of trust and then trustee

24   name.

25   Q.  Mr. Lynch, do you know who Michael Block is?

1    A.  No.  And that's not my handwriting.  Nor was the other page

2    we referenced.

3              MR. STAVIS:  Your Honor, I would move to strike.

4    There was no question before the witness.

5              THE COURT:  That's correct.

6    Q.  Was your handwriting on that document we just looked at?

7    A.  No.

8    Q.  You have in front of you, sir -- we can take that down --

9    Government Exhibit 281.  Would you look at that.

10             MS. McCALLUM:  This is in evidence, I believe, so can

11   we have it on the screen.

12   Q.  Do you recognize this document?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's a statement of policyowner and agent intent.

16   Q.  And is this for an application to Union Central?

17   A.  Yes.

18             MS. McCALLUM:  Can we just blow up the proposed

19   insured at the top.  And you can zoom back out.

20   Q.  Did you complete this page, Mr. Lynch?

21   A.  No.  The only thing I did was sign it.

22   Q.  And before you signed it, did you read the questions that

23   were on this?

24   A.  Before I signed it, nothing was filled in.  I just signed

25   it and was told not to date it.

1          MS. McCALLUM:  Can we zoom in on questions two and

2     three, please.

3     Q.  Mr. Lynch, question 2 reads:  Have you spoken with an

4     individual or company offering to pay you for your life

5     insurance?

6          Was this true or not true with respect to Mr. Katz?

7     A.  Not true.

8     Q.  And so was this question answered truthfully or falsely?

9     A.  Falsely.

10    Q.  And No. 3:  Have you spoken with an individual or company

11    offering you free or no cost insurance?  The answer is checked

12    no.

13         Was that true or not true?

14         MR. STAVIS:  Objection, your Honor.

15         THE COURT:  Overruled.

16    A.  Not true.

17    Q.  Did Union Central, as far as you knew, did Union Central

18    issue a policy on Mr. Katz?

19    A.  Yes.

20    Q.  Did you gain any benefit as a result?

21    A.  Yes, I did.

22    Q.  What benefit did you gain?

23    A.  I believe the commission I made on that was approximately

24    $30,000.

25    Q.  Did any other company as far as you knew agree to issue a

1   policy on Mr. Katz?

2   A.  Yes, there was a second policy done on him.

3   Q.  Did you get a commission payment on that as well?

4   A.  Yes, I did.

5   Q.  How much?

6   A.  I believe that commission was approximately $20,000.

7   Q.  And were you the actual agent of record on that other

8   application or for the other policy?

9   A.  No.  It was tabbed that I should not sign it.  I did not

10  sign on the second one.

11  Q.  Did you have any understanding of why you were told not to

12  sign it?

13          MR. ABRAMOWITZ:  Objection, your Honor, unless we find

14  out from whom and when.

15          THE COURT:  I'm sorry?

16          MR. ABRAMOWITZ:  Said did you have an understanding.

17  That calls for a hearsay from somebody and no statement --

18          THE COURT:  I know.  The asking of that question

19  drives me crazy.

20          You were told not to sign it?  Did someone tell you

21  not to sign it?

22          THE WITNESS:  Not to sign which, your Honor?  All I

23  would do is sign it.

24          THE COURT:  All you would do it sign it.

25          THE WITNESS:  My signature.  I didn't fill in the

D9PLBIN5                         Lynch - direct

1    other information.

2    Q.  We're talking now about the other application that was

3    submitted to a different company for a different policy on

4    Mr. Katz, not the document in front of the witness.

5    A.  Yes, okay.

6    Q.  And I believe the witness testified that --

7    A.  That second application I was told not to sign.

8              THE COURT:  Who told you?

9              THE WITNESS:  Michael.

10   Q.  Did he explain why not to sign?

11   A.  Just that it did not look good to have the same agent be

12   the agent of record on the same person.

13   Q.  Do you have Government Exhibit 132 in front of you, sir?

14   A.  Yes.

15   Q.  That's in evidence as well.  Can we pull it up, please.

16             Do you recognize that document?

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  It's the agent statement for the application for insurance

20   with Union Central.

21   Q.  I'm sorry, you've got a different exhibit.  I'll bring this

22   one up.

23             Do you recognize Government Exhibit 132?

24   A.  Yes.

25   Q.  What is that?

1   A.   That is a policyowner statement for Florra Adler for

2   Prudential life insurance policy.

3   Q.   And does your signature appear on that?

4   A.   Yes.

5   Q.   Did you fill this out?

6   A.   No.

7   Q.   Did you discuss with anyone the questions that were being

8   asked in this form?

9   A.   Well, originally I had asked Michael about these questions,

10  and the explanation I got was that they didn't apply about

11  someone else -- are you selling this, are you being solicited,

12  as these questions state -- that it didn't apply because the

13  trust would be owning the policy from the very onset.  So, and

14  that I was told that then they could be answered "no"

15  accordingly.

16       MS. McCALLUM:  Can we pull up, blow up question one,

17  please.

18  Q.   Mr. Lynch, could you just read that out loud that question.

19  A.   Have you or the proposed insured been offered free

20  insurance or any inducement such as a cash payment, gifts, loan

21  proceeds in excess of the amount necessary to fund the policy,

22  or anything else of value as an encouragement to apply for this

23  insurance company policy?

24  Q.   That question is checked no.  Was that true with respect to

25  Ms. Adler?

1   A.  No, it is not.

2   Q.  And let's go to question 2.  Could you read that out loud,

3   please.

4   A.  Have you or the proposed insured been solicited to sell or

5   transfer or had any discussions about selling any of the

6   following to a life settlement company or group of investors in

7   the next five years:  The proposed life insurance policy, and

8   any life insurance policy on the life of the proposed insured,

9   or, a trust, limited liability company or other entity that has

10  been or will be established to own the policy?

11  Q.  And that question is checked no as well.  Was that true

12  with respect to Ms. Adler?

13  A.  No, it was not.

14  Q.  Now, what happened with respect to Ms. Adler's applications

15  to AIG and to Prudential?

16  A.  At what juncture are you referring to?

17  Q.  After they were submitted.

18  A.  Well, Prudential began an internal investigation regarding

19  Ms. Adler's assets.

20  Q.  How did you learn about that?

21  A.  Initially Michael mentioned it to me very matter-of-factly,

22  really, that there was an investigator for Prudential that was

23  looking into her assets and not to worry about it.

24  Q.  And did you ever end up speaking to any Prudential

25  investigator?

1    A.   No, I did not.

2    Q.   Did there come a time when you learned that a different

3    body aside from Prudential was investigating the Adler

4    situation?

5    A.   Yes.

6    Q.   How did you learn that?

7    A.   Michael told me that the Prudential investigator was making

8    basically a mountain out of a mole hill and now Albany had

9    called him to initiate their own investigation of it.

10   Q.   And did you discuss anything further with Mr. Binday about

11   the Albany investigation?

12   A.   A couple of different things.  When Michael mentioned that,

13   I was in his office and he kind of seemed puzzled that his

14   signature was on the Flo Adler application, which I never saw

15   it, but it was puzzling to me because I had signed the Flo

16   Adler application in all the proper signature spots.

17        He also mentioned that there was a chance that I might

18   be approached by Albany and, if that happened, to let him know.

19   Q.   And what was your understanding of what was in Albany?

20   A.   Well, that it was an investigation into whether the

21   application and assets had been filled out honestly.

22   Q.   Did you understand who was conducting that investigation?

23   A.   Yes, the Albany New York State life insurance committee

24   department.

25   Q.   And when you said that Michael was puzzled about a

1   signature, did you actually see an application with his

2   signature at that time?

3   A.  Not at that time, no.

4   Q.  Did you have any further discussion with Michael about the

5   Albany investigation?

6   A.  Yes.  I -- he went to Albany for an interview with his

7   lawyer.  And at the time when he got back, I asked what's going

8   on, how did it go?

9              And he said, you know, couldn't really tell yet and

10  that if they contacted me, he would have his lawyer accompany

11  me and that I should stop by in the coming week and just have a

12  quick hello and meet and greet with Michael's lawyer at his

13  office in Scarsdale.

14  Q.  Did you do that?

15  A.  Yes, I did.

16  Q.  What happened during that meeting with the lawyer?

17  A.  It was really very brief, matter of a couple few minutes,

18  introduced ourselves and told me I probably won't get

19  contacted.  If I do, talk to him, gave me his number and said

20  if they call you or just keep everything very short and talk to

21  me.  If it gets to it, we'll go into things in more detail.

22  Q.  After these investigations opened into the Adler

23  application, did you speak with Ms. Adler?

24  A.  Yes, I did.

25  Q.  And what did you speak with her about?

D9PLBIN5                         Lynch - direct

1   A.  Well --

2            MR. ABRAMOWITZ:  Your Honor, just what he told her,

3   please.

4            THE COURT:  The objection is overruled.

5            THE WITNESS:  She --

6            THE COURT:  What did you talk to her about?  What was

7   the subject of your conversation?

8            THE WITNESS:  Yes.  I can answer that, right, your

9   Honor?

10           THE COURT:  Please do.

11  A.  Okay.  I received a phone call from Ms. Adler and she was

12  very upset.

13           MR. ABRAMOWITZ:  Your Honor, I object.

14           THE COURT:  The objection is overruled.

15  A.  As I said, I received a phone call and Ms. Adler was very

16  emotionally upset and distraught that she had gotten a call

17  from the Prudential investigator, words to the effect of --

18           THE COURT:  She was upset because she had gotten a

19  phone call.

20           Next question.

21           That's all you have to say.

22           Next question.

23  Q.  Did you do any other applications through Michael Binday's

24  office after that conversation with Ms. Adler?

25  A.  No, I did not.

1    Q.  During your conversations with Ms. Adler, did you ever

2    discuss with her the possibility that she would pay the

3    premiums for any life insurance policy?

4    A.  No.

5    Q.  Did you ever discuss her children paying the premiums?

6    A.  No.

7    Q.  Did you ever discuss any need to pass millions of dollars

8    on to Ms. Adler's children?

9    A.  No.

10          MS. McCALLUM:  Can we pull up Government Exhibit 164,

11   please.

12   Q.  Mr. Lynch, can you see that on the screen before you?

13   A.  Yes.

14          MS. McCALLUM:  And can we just blow up the top portion

15   down to the bottom of the first sentence.

16   Q.  Can you just read the "to whom it may concern" and below

17   that.

18   A.  To whom it may concern, based upon data submitted to me,

19   the estimated annual income for Mrs. Florra Adler is broken

20   down as follows.

21          MS. McCALLUM:  And then can we zoom out and blow up

22   the numbers, that whole section, yes.  The whole section.

23   Q.  As far as you knew, were these numbers accurate?

24   A.  Not at all.

25   Q.  Do you know what Kupper Tax and Financial Services is?

1   A.  Yes, I heard mention of it from Michael and Kevin.

2   Q.  Had you ever spoken with anyone from Kupper Tax and

3   Financial?

4   A.  No, I had not.

5   Q.  What had you heard from Kevin or Michael about Kupper tax?

6          MR. STAVIS:  Objection, compound question, your Honor.

7          THE COURT:  Objection sustained.  Rephrase the

8   question.

9   Q.  What had you heard from Mr. Binday about Kupper Tax and

10  Financial?

11  A.  That it was a assessor that they used in Florida that for a

12  fee he would do a financial statement on clients.

13  Q.  And what did you hear from Mr. Kergil about Kupper Tax and

14  Financial Services?

15         MR. STAVIS:  Objection as to form, your Honor.

16         THE COURT:  Overruled.  Answer the question, please.

17  A.  Basically the same exact thing.

18  Q.  Before preparing for this trial had you seen this document

19  before?

20  A.  No.

21  Q.  Did you ever discuss Kupper tax with Ms. Adler?

22  A.  No.

23  Q.  Are you a financial adviser?

24  A.  No.

25  Q.  What discussions did you have, if any, with Mr. Binday

1    about how the premiums on Florra Adler's Prudential policy

2    would be paid if it issued?

3    A.   My understanding was -- no in-depth discussion -- the same

4    concept applied that premiums would be paid by the investors

5    who formed the trust.

6              MS. McCALLUM:  Can we pull up Government Exhibit 112,

7    please, and can we do a split screen, actually, with Government

8    Exhibit 130.

9    Q.   Mr. Lynch, do you have Government Exhibit 130 in front of

10   you?

11   A.   Yes.

12   Q.   Could you just look through that exhibit and tell me if

13   that's the one with your signature on it?

14   A.   Yes, my signature is on it.

15   Q.   And I'll just ask you to look at the two pages in front of

16   you on the screen in the split screen.  The handwriting at the

17   top, does that appear to be the same on both documents?

18   A.   Yes, it does.

19   Q.   Let's go to the second page of both documents, please.  The

20   information that appears in Government Exhibit 112 on the left,

21   is that information that you filled in?

22   A.   No.

23   Q.   Is that your handwriting?

24   A.   Not at all.

25   Q.   And then let's go to the next page, please, for both

1    documents.  Whose handwriting do you observe on these two

2    pages?

3    A.  That's my handwriting about the doctor's name and address,

4    but not that very bottom part about the height and weight.

5    Q.  Let's go to the next page, please, for both documents.  The

6    information on the left that's filled in, is that your

7    handwriting?

8    A.  No.

9             MS. McCALLUM:  And on Government Exhibit 112 on the

10   left, can you jump forward two pages, and Government

11   Exhibit 130 on the right, just turn to the next page.

12   Q.  Mr. Lynch, what if anything do you observe about the

13   differences between these two pages?

14   A.  Well, the one on the right is the original one that I had

15   Mrs. Adler sign and then I signed in the appropriate spot as

16   the representative.

17            The one on the left has Mrs. Adler's signature but it

18   does not have my signature.  It appears to be Michael Binday's

19   signature.

20   Q.  Before preparing for this trial had you seen the document

21   on the left before?

22   A.  No.

23   Q.  Let's turn to the next page for both documents, please.

24   What do you observe in comparing these two pages?

25   A.  Same thing in the sense that the one on the right is the

1    one I had Mrs. Adler sign and then I countersigned as the

2    agent.  The one on the left has Mrs. Adler's signature, but I

3    did not sign or write anything else on that page.

4            MS. McCALLUM:  We can take those down.

5    Q.  You spoke earlier of a discussion you had with Michael

6    Binday where he seemed puzzled about the signature on an

7    application.

8            What if anything else did Mr. Binday say at that time

9    about that signature?

10   A.  Just that he didn't know why he signed it and he said I

11   must have been away on vacation or visiting my kids in college

12   or something to that effect.

13   Q.  Were you in fact visiting your kids in college or away?

14   A.  Not that I recall.

15           MS. McCALLUM:  May I have a moment, your Honor.

16           THE COURT:  Yes.

17           MS. McCALLUM:  Nothing further, your Honor.

18           THE COURT:  Mr. Abramowitz.

19           MR. ABRAMOWITZ:  I believe Mr. Stavis.

20           THE COURT:  Mr. Stavis, okay, great.

21   CROSS-EXAMINATION

22   BY MR. STAVIS:

23   Q.  Mr. Lynch, you had a relationship with Ms. Adler going back

24   how many years?

25   A.  She became my client for long-term care several years

D9PLBIN5                         Lynch - cross

1   before I approached her about the life insurance.

2   Q.  And you called her, I believe when you were testifying

3   about her you called her Flo?

4   A.  Yes.  I was on a first name basis, as I try to be with all

5   my clients.

6   Q.  And you were the one who approached Ms. Adler about

7   participating in the life settlement, correct?

8   A.  Yes.

9   Q.  And Ms. Adler didn't need life insurance at the time; is

10  that correct?

11  A.  No.

12  Q.  It's not correct?

13  A.  No, she didn't need life insurance that she approached me

14  first.  I just saw her as a candidate for this type of product

15  based on how it was explained to me.

16  Q.  Ms. Adler needed cash rather than life insurance; isn't

17  that correct?

18  A.  I couldn't say that either way.

19  Q.  Haven't you said that?

20  A.  I know that she wanted the cash, sure.

21  Q.  Yes?

22  A.  Yes.

23  Q.  And your pitch to her was about the payment; is that

24  correct?

25  A.  Yes.

D9PLBIN5                         Lynch – cross

1   Q.   Now, this meeting at Mr. Binday's office where you

2   discussed for the first time life settlements, there were other

3   agents present at the meeting, correct?

4   A.   Yes.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And agent named Don Engle was there, correct?

2    A.  Yes.

3    Q.  An agent named Steve Chewkaskie was there, correct?

4    A.  Yes.

5    Q.  An agent named Sandy Einhorn was there, correct?

6    A.  I am pretty sure Sandy was there, correct.

7    Q.  There may have been some other agents there, correct?

8    A.  It is possible.  It was quite a while ago.

9    Q.  Now, you were asked some questions about Government Exhibit

10   100 and 101.

11           MR. STAVIS:  If Mr.Platt or Ms. Hayakawa can get those

12   ready.  Can we have Exhibit 100 first.  Do we get zeroing in

13   privileges, also?

14           THE COURT:  Oh, yes.

15           MR. STAVIS:  Can I have the first paragraph zeroed in

16   on.

17   BY MR. STAVIS:

18   Q.  Mr. Lynch, you were asked questions about this Government

19   Exhibit 100, and there in the first sentence it says an unusual

20   opportunity presents itself for those over the age of 70 and in

21   good health.  Do you see that there?

22   A.  Yes.

23   Q.  And you had previously testified on direct examination that

24   your words were the main thing was health.  Is that correct?

25   You testified just early this --

1  A.  That is how it was explained, yes.

2  Q.  Please allow me to finish my question.

3          Is that what you testified to earlier this afternoon

4  on your direct examination?

5  A.  Yes.

6  Q.  You were the one who used the words "main thing" with

7  regard to health, correct?

8  A.  Yes.

9  Q.  Now, can I have Government Exhibit 101, please.

10         Now, Government Exhibit 101 which you were asked

11 questions about is the program that you had the meeting with

12 the other agents.  Was this, Government Exhibit 101, something

13 that was given to you at that meeting about life settlements or

14 after the meeting about life settlements?

15 A.  I believe it was at the meeting but I couldn't say 100

16 percent certain.

17 Q.  If we can zero in on the first of the bullet points of how

18 the program works, Government Exhibit 101, and this Government

19 Exhibit 101 says, and this is first in order of how things

20 worked, correct, on Government Exhibit 101?

21 A.  Yes.

22 Q.  The first thing that you do is you contact the physician

23 and receive their medical history, correct?

24 A.  That's correct.

25 Q.  And then once the medical history and the physicians are

1     contacted, you determine whether or we determine, meaning what,

2     the agency?  Advocate Brokerage?

3     A.   That would be my take on it.

4     Q.   Whether you qualified for insurance and at what rate,

5     correct, that is No. 1 on how the program works, Government

6     Exhibit 101, correct?

7     A.   Yes.

8     Q.   Now, may I have No. 2, please.

9              No. 2 under this program which is how the program

10    works, Government Exhibit 101, starts out if the client

11    qualifies, correct?

12    A.   Yes.

13    Q.   And the "if" refers to the medical history that was in the

14    previous bullet point, that first bullet point that I just

15    asked you about, correct?

16    A.   Yes.

17    Q.   So when you get the medical out of the way, then you start

18    the formal application process under this document Government

19    Exhibit 101, how the program works, correct?

20    A.   Yes.

21    Q.   And you testified on direct examination that --

22             MR. STAVIS:  Thank you, Mr.Platt.  I am finished with

23    those two exhibits.

24    BY MR. STAVIS:

25    Q.   -- and you testified on direct examination that the

1    premiums on these types of policies in this life settlement

2    program, you used the word "very high," correct?

3    A.   Yes.

4    Q.   "Very high" meaning a hundred thousand dollars plus, would

5    that be fair to say?

6    A.   It would depend on the face value of the policy but, yeah.

7    Q.   Now, you testified on direct examination --

8            MR. STAVIS:   May I have one moment, your Honor?

9            THE COURT:   Yes.

10           (Pause)

11   BY MR. STAVIS:

12   Q.   Ms. McCallum asked you a question when you said something

13   about I looked the other way, and you, in answer to her

14   question, you said that that was a lie.  Do you recall that

15   testimony this afternoon?

16   A.   I recall saying that when I knew incorrect information was

17   out of the e-mail stating her assets are 4.5 million, I looked

18   the other way.

19   Q.   What was the lie part that you were talking to --

20   A.   That her assets were highly inflated.

21   Q.   Please allow me to finish --

22   A.   I thought you were finished.

23   Q.   -- to finish my question.

24           What was the part where you lied to the U.S. Attorney?

25   What was that lie about?

D9PJBIN6                        Lynch - cross

1   A.  I initially told them I didn't know until a later date that

2   the assets had been highly boosted up to 4.5 million.  I told

3   them I hadn't heard that until my conversation with Flo Adler.

4   In fact, I had seen it on that e-mail earlier.

5   Q.  When you told that lie to the U.S. Attorney, were you

6   accompanied by your attorney?

7   A.  No, I wasn't.  I didn't have an attorney at the time and I

8   was not accompanied by anyone.

9   Q.  You have an attorney now, do you not?

10  A.  Yes.

11  Q.  You also have an immunity order now, is that correct, which

12  you testified about on direct examination?

13  A.  Yes.

14  Q.  Under that immunity order, you can't lie any more, correct?

15  A.  That's correct.

16  Q.  It is the U.S. Attorney that is going to determine whether

17  you lied or not under that immunity order.  Isn't that correct?

18  A.  I would suppose.  I am not a lawyer.

19  Q.  Well, without being a lawyer, what is your understanding of

20  your immunity agreement, Mr. Lynch?

21  A.  That I must tell the truth 100 percent.

22  Q.  What is your understanding of who determines whether you

23  tell the truth 100 percent?

24  A.  I would think it would be the prosecution's office, but I

25  can't answer for them.

1  Q.  Now, you were asked --

2          MR. STAVIS:  May I have please Government Exhibit 104.

3  BY MR. STAVIS:

4  Q.  -- you were asked questions on direct examination about

5  Government Exhibit 104, and there is a fax something or other

6  at the top of that.  Do I have the wrong exhibit number, 4-6-07

7  e-mail?

8          (Off-the-record discussion)

9          MR. STAVIS:  168, may I have 168, please.  Now, can we

10 please, if you be so kind, zero in on the top fax thingey on

11 the top there.

12 BY MR. STAVIS:

13 Q.  You were asked questions about Mr. Kergil -- no.  It is a

14 different exhibit.  It is not Exhibit 168.  You were asked

15 questions as to -- may I --

16         MR. STAVIS:  May I have one moment, your Honor.

17         (Off-the-record discussion)

18         MR. STAVIS:  Let's go back to 104, I was right the

19 first time.  May I have the from, sent to, CC, subject

20 highlighted.

21 BY MR. STAVIS:

22 Q.  Now, you were asked questions on direct examination about

23 the CC to Kevin Kergil.  Do you recall that this afternoon?

24 A.  Yes.

25 Q.  Ms. McCallum was questioning you?

D9PJBIN6                          Lynch - cross

1    A.  Yes.

2    Q.  And she asked you why Kevin Kergil's name was in the CC.

3    Do you recall that?

4    A.  Yes.

5    Q.  You said, "Because of Kevin's position in the company of

6    handling financial numbers."

7            Do you recall that testimony?

8    A.  Yes, I do.

9    Q.  What company were you referring to?

10   A.  Advocate Brokerage.

11   Q.  Now, are you sure that Kevin Kergil was an employee of --

12   A.  He may not have been an employee, but he did work at a desk

13   there.  Any time I went there, he was sitting in a conference

14   room working.

15   Q.  Really?

16   A.  I don't know if he was an employee.

17   Q.  You don't know?

18   A.  I am not certain.

19   Q.  Have you heard of JK Kergil Insurance Services, Inc?

20   A.  No.

21   Q.  Never heard of them?

22   A.  No.

23           MR. STAVIS:  May I have Government Exhibit 281, just

24   one page, Government Exhibit 281, please.  Can you highlight

25   the bottom where it says, "I hereby certify."

1    BY MR. STAVIS:

2    Q.  Now, you testified just a few minutes ago on direct

3    examination that when you signed this, there was nothing above

4    it, correct?

5    A.  That's correct.

6    Q.  So that when you signed there, "I hereby certify that the

7    information provided herein to the best of my knowledge and

8    belief is true and complete," that was false because there was

9    no information according to your testimony, correct?

10   A.  That's correct.

11              MR. STAVIS:  Nothing further, your Honor.

12              MR. ABRAMOWITZ:  I don't have any questions.

13              MS. MURRAY:  I have no questions.

14              MS. McCALLUM:  Nothing further, your Honor.

15              THE COURT:  You, sir, may step down.

16              (Witness excused)

17              THE COURT:  We have 15 minutes.  Do you have a 15

18   minute witness?

19              MS. McCALLUM:  We have a short witness, very short

20   witness.

21              THE COURT:  And cross?

22              MS. McCALLUM:  He needs to get home to Texas.

23              THE COURT:  You and cross, right?

24              MS. CHOI:  I hope so.

25              THE COURT:  I hope so, too.

1          MS. CHOI:  The government calls Frank Pelliconeto the

2     stand.

3      FRANK PELLICONE,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6     DIRECT EXAMINATION

7     BY MS. CHOI:

8          MR. STAVIS:  We just saved the court a lot of time and

9     the jury, too.

10         THE COURT:  Yes?

11         MS. CHOI:  Without objection I believe from the

12    defense, the government offers into evidence Government

13    Exhibits 1871, 1922, 5502, 5503, 5504, 5506 and 5507.

14         THE COURT:  No objection?

15         MS. MURRAY:  No objection.

16         MR. STAVIS:  No objection.

17         THE COURT:  Admitted.

18         (Government Exhibits 1871, 1922, 5502, 5503, 5504,

19    5506 and 5507 received in evidence)

20    BY MS. CHOI:

21    Q.  Good afternoon, Mr. Pellicone.

22    A.  Hello.

23    Q.  How old are you?

24    A.  83.

25    Q.  Where do you live?

1   A.  Plano, Texas.

2   Q.  Did you live somewhere else before you lived in Plano,

3   Texas?

4   A.  I lived in Plano 9 years.  Prior to that, I lived Suffolk

5   County, New York.

6   Q.  Are you retired?

7   A.  Yes, ma'am.

8   Q.  What did you do before you were retired?

9   A.  I was an insurance inspector.

10  Q.  How long did you work as an insurance inspector?

11  A.  About 40 years.

12  Q.  What does an insurance inspector do?

13  A.  He obtains applications from the agent and he verifies the

14  information with the applicant.

15  Q.  What kind of information is contained in an inspection

16  report?

17  A.  Well, it has the applicant's name, address, age, date of

18  birth, marital status, income, employer, sometimes health

19  questions.

20  Q.  Did you work for a company before you were retired?

21  A.  Yes, ma'am.

22  Q.  Were you employed by that company or were you an

23  independent contractor?

24  A.  While I was in Texas, I was an independent contractor.

25  Q.  Which company was that, sir.

1    A.  I believe it was Hooper Holmes.

2    Q.  Do you know of a company called EMSI?

3    A.  EMSI, yes.

4    Q.  What is your understanding of the relationship between the

5    companies?

6    A.  I seem to recall they're the same company.  I am really not

7    sure, but I worked for EMSI and Hooper Holmes.  Whether they're

8    the same or not I don't really know.

9    Q.  Do you know who Kevin Kergil is?

10   A.  I know his name.  I know him by telephone contacts.

11   Q.  Who was he?

12   A.  He was an insurance agent.

13   Q.  Have you ever met him in person, "him" being Kevin Kergil?

14   A.  Never.  I don't know what he looks like.

15   Q.  How did you come to know about Kevin Kergil?

16   A.  From what I recall, he called me one day and asked are you

17   an insurance inspector?  I got your name from someone.  Will

18   you do inspections for me?  And I said yes.

19   Q.  Did you, in fact, then do inspections for Kevin Kergil?

20   A.  Yes, I did.

21   Q.  Putting Kevin Kergil aside for the moment, could you

22   describe generally the process by which you prepared an

23   inspection report for any insurance agent.

24   A.  Well, the agent would send or fax a request to me with the

25   above information, name and address and whatnot, and I would

1   contact the applicant and verify the information given to me by

2   the agent.

3   Q.  Would you do other types of research on that applicant?

4   A.  Well, it would vary with the type of inspection.  Normal

5   inspections, no; but if they're major inspections, you would

6   contact banks, other than savings banks and occasional credit

7   checks.

8   Q.  Now, turning back to Mr. Kergil, did you follow that

9   process with inspection reports you prepared for Mr. Kergil?

10  A.  Yes.

11  Q.  Did there come a point where you changed the process with

12  Kevin Kergil?

13  A.  From what I recall, one day he said I have to have this

14  case out right away.  I don't know why, if he needed the money

15  or needed the case right away.  He said if I give you all the

16  information, I know the applicant, will you take the case on

17  for me?  And I said yes.

18  Q.  From that point forward, did you follow that procedure,

19  meaning that Kevin Kergil would provide to you the information

20  for you to prepare the inspection report?

21  A.  From what I recall, yes.

22  Q.  How did Mr. Kergil give you that information?

23  A.  It was either by telephone or fax to me.

24          MS. CHOI:  Could you pull up Government Exhibit 1871,

25  Mr.Platt.  I will give you a copy of that as well.  Sorry,

1   permission to approach, your Honor?

2           THE COURT:  Blanket permission.  You never need to ask

3   again.

4           MS. CHOI:  Thank you, ma'am.

5   BY MS. CHOI:

6   Q.  Mr. Pellicone, you can either look at the document in front

7   of you or you can look at the screen in front of you, whatever

8   you prefer, what is easier for you.

9   A.  Okay.

10  Q.  Could you read out loud that fax, starting with Frank?

11  A.  "Frank, worksheet for Mary G. Pernice for AXA and U.S.

12  Life.  Three pages includes this.  Thanks Kevin."

13  Q.  Who is Frank?

14  A.  I'm Frank.

15  Q.  Who is Kevin?

16  A.  Kevin is the agent who sent this request to me.

17          MS. CHOI:  Could you turn to Page 2, Mr.Platt.

18  BY MS. CHOI:

19  Q.  Mr. Pellicone, could you just read what is at the very top

20  of that page.

21  A.  "Net worth and income worksheet, name of spouse Mary G.

22  Pernice."

23  Q.  Was this a document attached to the fax that is referenced

24  in the first page of this document.

25  A.  Yes.

1   Q.  Did you receive this from Mr. Kergil?

2   A.  Yes.

3   Q.  Could you turn to Page 3 of the document, please.  Do you

4   see the title of this document, Mr. Pellicone?

5   A.  "Inspection report worksheet."

6   Q.  Do you see how there is various sections of the page, the

7   section that says "medications."  Do you see there is

8   handwriting there?

9   A.  Yes.

10  Q.  Whose handwriting is that?

11  A.  It is not mine.

12  Q.  Is this another page that you received from Kevin Kergil?

13  A.  Pardon?

14  Q.  Is this another page of the same fax you received from

15  Kevin Kergil?

16  A.  Yes, yes.

17          MS. CHOI:  Could you please pull up Government Exhibit

18  5506.  I am going to hand you two documents, Mr. Pellicone.

19  They're labeled Government Exhibit 5506 and 5507.  Could you do

20  us a split screen, Mr.Platt.

21  BY MS. CHOI:

22  Q.  Now, it might bet a little hard to see on the monitor, Mr.

23  Pellicone, so you may want to use the documents in front of

24  you.  On both of these documents, do you see the top line where

25  it says "April 24th, 2008"?

1    A.  Yes.

2    Q.  Could you read that line across.

3    A.  It looks like 11 P Frank Pellicone, 972-842-2268.

4    Q.  Whose number is that?

5    A.  That was my fax number.

6    Q.  Do you see that it says company name on both of these

7    documents?

8    A.  One is AXA, which is an insurance company.  The following

9    number is the insurance company number.

10   Q.  Does it say a name of the applicant for both of these

11   documents?

12   A.  Pardon?

13   Q.  Does it say a name of the applicant for both of these

14   documents?

15   A.  Yes, the name of the applicant was the same, it is Pernice,

16   Mary G.

17   Q.  I am sorry.  I might have misheard you.  On document 5507

18   what is the company name there on the right-hand side of the

19   screen?

20   A.  That one is U.S. Life.

21   Q.  These documents, are these copies of inspection reports?

22   A.  Yes.

23   Q.  Are these inspection reports that you filled out, sir?

24   A.  Yes.

25   Q.  Are they inspection reports that you filled out with

1    information from Mr. Kergil?

2    A.  I really don't know.

3    Q.  Well, sir, if you want to take a look at the previous

4    document that we had showed you, 1871, let me show you, Mr.

5    Pellicone.

6    A.  Oh, okay.

7    Q.  Now, 1871, does it mention --

8    A.  Yes, yes.  After looking at it with his writing on it, they

9    would be the information I got from him.

10   Q.  Now I am going to hand you another document, Mr. Pellicone.

11   Could you pull up what has been marked as Government Exhibit

12   5503.  Now, Mr. Pellicone, do you recognize the top line of

13   this document?

14   A.  August 16th, '07, Frank Pellicone, my fax number up on the

15   top.

16   Q.  Is this an inspection report you did, sir?

17   A.  Yes.

18   Q.  Could you read out loud the name of the applicant as you

19   see it?

20   A.  The name of the applicant, "Espinal, Martha."

21   Q.  Do you see the section that says business profile?

22   A.  Yes.

23        MS. CHOI:  Mr.Platt, could you zoom in on the text of

24   that section.

25        THE WITNESS:  You have a pleasant voice but I can't

1   quite hear what you say.

2              MS. CHOI:  Sorry.  Is this better?  Can you hear me

3   now?

4              THE COURT:  Everybody is ganging up on Ms. Choi.

5   BY MS. CHOI:

6   Q.  We are going to try this.  Do you see the circled

7   information in the middle of the page, sir?

8   A.  Yes.

9   Q.  What does that say?  Could you read it out loud?

10  A.  "Her worth furnished at $4 million."

11  Q.  Yes, sir.  Could you read that sentence out loud, Mr.

12  Pellicone.

13  A.  "Her worth furnished at $4 million" .

14  Q.  Sorry.  Now I am having difficulty hearing you.  I am going

15  to show you what has been marked as Government Exhibit 5504 and

16  I will leave here Government Exhibit 5502, okay?

17             Could you pull up the next document, please, 5504.  Do

18  you see that, Mr. Pellicone, on the screen in front of you?

19  A.  Yes, "Hello, Frank.  Could you correct Martha Espinal,

20  Union Central, her net worth of $4,900,000.  Two pages includes

21  this.  Thanks, Kevin."

22             MS. CHOI:  Could you put the third page of that

23  document, Mr.Platt.

24  BY MS. CHOI:

25  Q.  Mr. Pellicone, if you want to take a look on your monitor,

1   do you recognize -- could you read the title of this document?

2   A.  "Net worth and income worksheet."

3   Q.  Do you see where it says, "total assets"?

4   A.  Total assets, yes, 4,935,600.

5   Q.  Were these parts of a document you received from

6   Mr. Kergil?

7   A.  Yes.

8   Q.  Now we are going to go to that next document that I gave

9   you, sir, which is 5502.

10  A.  Yes.

11  Q.  Now, do you have 5502 in front of you?

12  A.  Yes, ma'am.

13  Q.  And 5503 as well, which is -- let me --

14  A.  03.

15  Q.  Can we do a split screen with 503 and one side?

16  A.  Yes.

17  Q.  We are just talking about Government Exhibit 5503.  Do you

18  see that?

19  A.  I didn't hear what you said.

20  Q.  We were just talking about Government Exhibit 5503.  Do you

21  recall, Mr. Pellicone?

22  A.  Yes.

23  Q.  The date on the top of that fax, do you mind reading that

24  out out loud?

25  A.  August 16th, '07.

1   Q.  If turn to 5502, could you compare those two documents for

2   a second and see if you see any differences?

3   A.  Yes, the differences in her worth furnished at 4 million 9

4   and one is her worth furnished at $4 million.

5   Q.  For the one that says her worth was furnished at 4 million

6   9, could you read the date on the top of that fax?

7   A.  That one was August 17.

8   Q.  Putting the documents aside, these are all examples of

9   inspection reports that you did at the request of Mr. Kergil,

10  correct?

11  A.  Yes.

12  Q.  Did you receive any money from Mr. Kergil in connection

13  with these inspection reports?

14  A.  Any what?

15  Q.  Any money?

16  A.  No, ma'am.

17  Q.  At the time you were doing these inspection reports for

18  Mr. Kergil, did you know that the process you were using was

19  not the same as the process you should have been using as an

20  inspector?

21          MR. STAVIS:  Objection as to form, your Honor.

22          THE COURT:  Okay.  Please!

23  BY MS. CHOI:

24  Q.  Were you relying on information that Mr. Kergil was giving

25  to you at the time?

1              MR. STAVIS:  Objection.

2              THE COURT:  The ruling was sustained, okay.  Were you

3     relying on, yes or no, is a leading question, okay?  On what

4     were you relying?  Ask a non-leading question.

5              MS. CHOI:  Yes, your Honor.

6     BY MS. CHOI:

7     Q.  On what information were you relying on in preparing these

8     inspection reports?

9     A.  On information that Mr. Kergil furnished to me.

10    Q.  Did you know whether or not what you were doing was right

11    or wrong?

12    A.  No, I didn't.  We had worked more or less a friendly basis,

13    on a friendly basis, he gave me information and I assumed it

14    was correct.

15    Q.  Mr. Pellicone, did there come a time when you resigned from

16    Hooper Holmes?

17    A.  Yes.

18    Q.  Why did you do that?

19    A.  Well, number one, I was about 80 years' old or 79 years'

20    old, it was time to leave, plus the fact that they had changed

21    their manner of doing inspections.  They wanted everything done

22    on a recorded basis, and I wasn't technically involved, able to

23    do it.

24             MS. CHOI:  One moment.

25             (Off-the-record discussion)

830

1           MS. CHOI:  No further questions.

2           MR. STAVIS:  No cross-examination.

3           THE COURT:  Anybody?

4           MR. ABRAMOWITZ:  No.

5           MS. MURRAY:  No questions.

6           THE COURT:  Thank you very much for coming up.

7           (Witness excused)

8           THE COURT:  While Mr. Pellicone is leaving us, let me

9   tell you where we are.  We are booking.  The government tells

10  me that it anticipates that it will rest either this Thursday

11  or next Monday, which is a couple of days earlier than I

12  thought the government was going to rest.

13          At that time I have some intimation that the defense

14  may be putting in a case, although that is not a decision that

15  they have to make until the government rests.  As you know,

16  they have nothing to prove because the defendants are presumed

17  innocent, so the defendants don't have to put in a case, but

18  some or all of them might wish to put on some witnesses for

19  some purposes, and that will probably consume a couple of days,

20  3, 4 days.

21          So we are right on schedule to have this case summed

22  up and charged in the week before Columbus Day which is I think

23  good news, and I wanted to let you all know that.  I thank all

24  of the lawyers because they have been, notwithstanding our

25  little fisticuffs here in the courtroom, incredibly, incredibly

D9PJBIN6

1    cooperative with me and with each other in finding ways to

2    streamline the case, and I could not be more grateful and I

3    know that you are as well.  All right.

4           So we're done for the day.  Take your notebooks back

5    to the jury room and do not communicate in any manner, shape or

6    form with anyone or thing about this case.  Keep an open mind.

7    We are still in the middle of the evidence, and Jim will go

8    back with you.

9           (Jury excused)

10           THE COURT:  We are going to chat with Alternate No. 5.

11   Hey, Ms. Rodriguez, come up a second.  Take your seat.  It is

12   yours.  It belongs to you.  Have a seat.

13           So I know that yesterday when you came in, you told

14   Jim that you had some concern about your employer who let you

15   know you weren't going to get paid, and you asked Jim for some

16   help.  We called, we reached out to the employer, but you're

17   right, your employer isn't going to pay for more than five days

18   of jury service.  So I need to know from you is that something

19   that will work such a financial hardship on you that it would

20   make it hard for you to concentrate on the evidence and to do

21   your job as a juror in this case over the next few weeks?

22           JUROR:  No, it doesn't make a difference.  It doesn't

23   impact me on the case in general.  My concern was just the

24   financial.

25           THE COURT:  That is the question.  My question really

D9PJBIN6

1   is are you going to be worried about your financial situation

2   enough that it will distract you from listening to the evidence

3   and, if called upon, evaluating it?

4          JUROR:  No.  Based on the information you just gave us

5   before that the case may be closed before Columbus, because I

6   can always use vacation time so I would have enough to cover me

7   until then.  So I would have enough vacation time I can use, so

8   that wouldn't be a problem.

9          THE COURT:  Ma'am, thank you very much.

10          JUROR:  You're welcome.  That is it.

11          THE COURT:  You are excused for the day.

12          (Alternate Juror No. 5 left the courtroom)

13          THE COURT:  Every now and again you see an example of

14   good citizenship.

15          MR. STAVIS:  Yes.

16          THE COURT:  I'll have to find something to do for her

17   if just to send her a letter of commendation.  See you guys in

18   the morning.

19          (Court adjourned until Thursday, September 26, 2013,

20   at 9:30 o'clock am)

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                       Page

 3   MICHAEL BURNS

 4   Direct By Ms. McCallum . . . . . . . . . . . 659

 5   Cross By Mr. Abramowitz  . . . . . . . . . . 695

 6   Cross By Ms. Murray  . . . . . . . . . . . . 732

 7   Redirect By Ms. McCallum . . . . . . . . . . 739

 8   Recross By Mr. Abramowitz  . . . . . . . . . 753

 9   EDWARD J. LYNCH

10   Direct By Ms. McCallum . . . . . . . . . . . 761

11   Cross By Mr. Stavis  . . . . . . . . . . . . 807

12   FRANK PELLICONE

13   Direct By Ms. Choi . . . . . . . . . . . . . 818

14                    GOVERNMENT EXHIBITS

15   Exhibit No.                         Received

16   2970   . . . . . . . . . . . . . . .661

17   2971   . . . . . . . . . . . . . . .662

18   2972   . . . . . . . . . . . . . . .662

19   13   . . . . . . . . . . . . . . . .722

20   100 and 101  . . . . . . . . . . . .771

21   168  . . . . . . . . . . . . . . . .779

22   104  . . . . . . . . . . . . . . . .786

23   300  . . . . . . . . . . . . . . . .793

24   1871, 1922, 5502, 5503, 5504, 5506 and  . . . 818

25          5507
```