DA1JBIN1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                             12 Cr. 152 CM

5    MICHAEL BINDAY,
     a/ka/ Sealed Defendant 1,
6    JAMES KEVIN KERGIL,
     a/k/a Sealed Defendant 2,
7    and MARK RESNICK,
     a/k/a Sealed Defendant 3,
8
                  Defendants.
9
     ------------------------------x
10

11

12                                           October 1, 2013
                                             10:12 a.m.
13

14

15   Before:

16                    HON. COLLEEN McMAHON,

17                                           District Judge
                                               and a jury
18

19

20

21

22

23

24

25

DA1JBIN1                    Trial

                              APPEARANCES

PREET BHARARA,
        United States Attorney for the
        Southern District of New York
SARAH McCALLUM,
ZACHARY FEINGOLD,
EUN YOUNG CHOI,
        Assistant United States Attorneys


MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.
        Attorneys for defendant Binday
BY:   ELKAN ABRAMOWITZ, Esq.
        BENJAMIN SEAN FISCHER, Esq.
        JASMINE MARIE JUTEAU, Esq.
                Of counsel


GALLET DREYER & BERKEY, LLP,
        Attorneys for defendant Kergil
BY:   ROGER LEE STAVIS, Esq.
        ADAM MICHAEL FELSENSTEIN, Esq.
                Of counsel


LAW OFFICES OF JANE ANNE MURRAY
        Attorneys for defendant Resnick
BY:   JANEANNE MURRAY, Esq.
                Of counsel

DA1JBIN1                           Trial

1           (Trial resumes)

2           (In open court; jury not present)

3           THE COURT:  I'm sorry.

4           THE CLERK:  Come to order.  Case on trial continued,

5    the government and the defendants are present.  The jurors are

6    not present.

7           MR. ABRAMOWITZ:  Good morning.

8           THE COURT:  I apologize.  The dental problem flared up

9    again.  The government has something that it wishes to do

10   before it rests, I believe?

11          MS. McCALLUM:  Yes, your Honor, there are some

12   additional exhibits that we plan to read and publish to the

13   jury.  There is a stipulation, final stipulation the parties

14   have been able to agree upon which I can hand up to the court

15   now.  We would ask that be read to the jury.

16          THE COURT:  This is not the scenario that we planned

17   out yesterday, which is that everything was going to get done

18   yesterday except you were going to dot the I's and cross the

19   T's.  You weren't going to read anything, weren't going to have

20   the jury in here.  Now I can't do motions now.  Now I can't do

21   that now.  I am really annoyed.

22          MS. McCALLUM:  I apologize if there was some

23   confusion.  The government did let the court know we had

24   additional exhibits.

25          THE COURT:  Additional exhibits mean you introduce

DA1JBIN1                         Trial

1     them and talk about them during summation.

2                MS. McCALLUM:  Your Honor, I believe we said --

3                THE COURT:  I would have had the jury come in.  Now we

4     would have done it and I would have sent them off for a long

5     lunch.

6                MS. McCALLUM:  The parties at least understood what

7     the state of --

8                THE COURT:  I didn't understand.

9                MS. McCALLUM:  I apologize for that, your Honor.

10               THE COURT:  I understood, I understood that we would

11    be in a position to argue motions.  We're not, not if the jury

12    is going to hear additional evidence.

13               MS. McCALLUM:  I think we had understood we would be

14    in a position to have the motions heard, with the understanding

15    that there was a little bit left of the government's case to

16    come in.  The defense counsel is aware of what that is.  It is

17    just e-mails and bank records to publish.  We do have that

18    stipulation which we referenced yesterday that had to be

19    completed by the parties, and the only other thing is some

20    additional exhibits the government will just offer.

21               MR. ABRAMOWITZ:  Your Honor, my defense lawyer

22    instincts wants to come to the defense of Ms. McCallum, but

23    certainly not in front of the jury.  I believe your Honor said

24    that they could rest before the jury comes in, we could do the

25    motions as long as they are not going to put on any more

1    evidence.

2            THE COURT:  I tell you what we'll do.  Offer your

3    evidence.  We'll admit it.  You can rest.  They won't be

4    allowed to introduce any more evidence, and when the jury comes

5    in, you can exhibit to the jury whatever you want to exhibit to

6    the jury, okay?  That is what we'll do.

7            MS. McCALLUM:  That is fine, your Honor.  Thank you.

8            MR. ABRAMOWITZ:  Sarah, I'll send you a bill.

9            THE COURT:  Okay.

10           MR. FISCHER:  Your Honor, just one clarifying point on

11   Government Exhibit 5001, I think the stipulation that was just

12   handed up to you.  The parties have agreed to put an oral

13   stipulation on the record as to that, and to a piece of that, I

14   don't think that oral stipulation needs to be read -- sorry.

15   Pardon me.  The government corrects me.  5006.

16           THE COURT:  Is that this list?  No?

17           MR. FISCHER:  I may be talking about --

18           THE COURT:  Wait!  5006?  There is something marked

19   5006.

20           MR. FISCHER:  Anyway, there is an oral stipulation

21   that we agreed to, and we are going to want to tell you about

22   it.

23           THE COURT:  Okay.  I mean I see why this is coming in.

24           I am perfectly happy, we can tell the jury that the

25   parties have stipulated in Government Exhibit 5006, that

DA1JBIN1                        Trial

1   certain commissions and certain amounts were paid by certain

2   insurance companies in respect of certain policies to the

3   following companies:  R. Binday, CPS Insurance services, Crump

4   Life Insurance Services, Denise Binday Koslowsky, Lynn Binday,

5   Madison Brokerage, and there is a stipulation that sets out all

6   the details of that.  That is enough for the jury, I think.

7            MR. FISCHER:  Correct.  I can give our oral

8   stipulation right now, your Honor, if it is acceptable to the

9   government.  I will read it to from my iPad.  It is

10  memorialized, and I want to make sure I get every word right.

11           THE COURT:  This is my first iPad stip.

12           MR. FISCHER:  I am proud to be part of this moment.

13  (Pause)  Whenever your Honor is ready?

14           THE COURT:  Yes.

15           MR. FISCHER:  The parties agree that the numbers set

16  forth in Government Exhibit 5006 will not bind any defendant in

17  any other proceeding, including sentencing in this case, and

18  that all defendants enter into this stipulation without

19  prejudice and with full reservation of their rights in

20  connection with any other proceeding, including sentencing in

21  this case.

22           MR. FEINGOLD:  The government agrees to that

23  stipulation, your Honor.

24           THE COURT:  Okay.  That is definitely not a

25  stipulation that the jury needs to hear.

DA1JBIN1                         Trial

1          MR. FISCHER:  Correct.  That is appreciated, your

2    Honor.

3          THE COURT:  Okay.  I hear it.  All right.  That is

4    what we'll do with 5006.  So why don't you, Ms. McCallum,

5    introduce the rest of your exhibits.

6          MS. McCALLUM:  Your Honor, I understand counsel just

7    needs a moment to double-check the exhibits and then we will

8    offer them.

9          THE COURT:  Cool!

10         MR. ABRAMOWITZ:  Your Honor, we handed to Mr. O'Neill

11   supplemental requests to charge which we have served on the

12   government as well.

13         THE COURT:  Okay.  I'll have an opportunity to -- I

14   assume you just love the charge I gave you yesterday.

15         MR. ABRAMOWITZ:  It looked like a repeat of the

16   government's request.

17         THE COURT:  No, no.  It is definitely a McMahon

18   charge.  The government just uses a lot more words, a whole lot

19   more words.

20         MR. ABRAMOWITZ:  There were things from your motion in

21   limine that weren't in there, so that we just ask you to put

22   that in and some other things.

23         (Recess)

24         MS. McCALLUM:  You have a list.  At this time the

25   government offers all exhibits on this list except Government

DA1JBIN1                        Trial

1  Exhibit 2005.

2              THE COURT:  I am going to cross it out, okay.  We will

3  give it to the court reporter.  The court reporter will know it

4  is not in evidence.

5              MS. McCALLUM:  Yes.

6              THE COURT:  Any others?

7              MS. McCALLUM:  The government offers the remainder.

8              THE COURT:  Any objection?

9              MR. FISCHER:  Just a moment to confer with Ms.

10  McCallum.

11              MR. FELSENSTEIN:  We have no objection.

12              MR. FISCHER:  No objection.

13              MS. McCALLUM:  I understand there is no objection.

14              THE COURT:  Fine.  All of these exhibits, and I will

15  give this to the court reporter on the document legend,

16  government exhibits to be offered 10-1-2013 are admitted.  I

17  have crossed out the one that is not offered.  The number of

18  the exhibit --

19              MS. McCALLUM:  What I might propose, your Honor, is

20  that we provide to the court reporter a clean version of this

21  that does not have the description of the documents beside it

22  and omits 2005.  We can get that to the court reporter

23  hopefully by the end of today.

24              THE COURT:  Fine.

25              THE CLERK:  It will be marked?

DA1JBIN1                    Trial

1              MS. McCALLUM:  Government Exhibit 6001.

2              THE COURT:  Okay.

3              (Government Exhibit 6001, except Government Exhibit

4       2005, received in evidence)

5              THE COURT:  Good.  Now, with the introduction of that

6       evidence, does the government have any more evidence that it

7       wishes to introduce?

8              MS. McCALLUM:  There is nothing further it wishes to

9       introduce, your Honor.

10             THE COURT:  Well, then there are three magic words

11      that should be the next words out of your mouth.

12             MS. McCALLUM:  The government rests.

13             THE COURT:  I love those words!

14             Okay.  And you'll get to say them again, all right?

15      Let's do old business first and then new business.

16             Old business is that I have a mistrial motion.  I have

17      to find the papers.  We are going to do it in the following

18      order.  We are going to do the mistrial motion, we are going to

19      do Rule 29 motions, and then we'll talk about the defense case.

20             I have read your submissions of this morning.  You've

21      listed all my favorite cases.  For substantially the reasons

22      articulated in the government's letter of October 1, 2013, the

23      motion for mistrial is denied.  There is no need for a hearing.

24             I think at the end of the defendants' letter, the end

25      of Mr. Stavis' letter, he cites my favorite, favorite case,

DA1JBIN1                     Trial

1   United States versus Cromitie, for the proposition that

2   Cromitie makes clear that when the government proffers a

3   witness who has knowingly committed perjury, even if such

4   perjury was committed outside of court, it can be grounds for

5   new trial.  Boy, if it was not grounds for a new trial in

6   Cromitie, it is not grounds for new trial or mistrial here.

7           Mr. Krupit was either very careless or badly advised,

8   and the government, I believe, was careless in not ascertaining

9   that which Mr. Stavis was able to ascertain, just as I believe

10  the government was careless virtually to the point of

11  misconduct in Cromitie in not uncovering the unbelievably

12  extensive evidence of Mr. Hussain's virtually daily career as a

13  serial perjurer.

14          Mr. Stavis, you can sit down.

15          MR. STAVIS:  Will I be able to stand up when --

16          THE COURT:  You can.  I am making a ruling.  I have

17  read and I am denying your motions.  You have made your record.

18  You have made it in writing.

19          MR. STAVIS:  I have it, your Honor.  When your Honor

20  finishes, I which to have one minute and 15 seconds.

21          THE COURT:  Say your one minute and 15 seconds worth

22  of stuff.

23          MR. STAVIS:  First of all, in terms of favorite case,

24  Cromitie and the Second Circuit cited two cases I argued in the

25  Second Circuit United States versus Al Kassar, A L, K A S S A

DA1JBIN1                      Trial

1    R, 660 F.3d 108, and United States versus Rahman, R A H M A N,

2    189 F.3d 88, both of which I argued.  The quote from Al Kassar

3    in the Cromitie decision, your Honor, is government

4    involvement, "Government involvement in a crime when the theory

5    becomes so excessive, it violates due process."

6              THE COURT:  The government wasn't involved in the

7    crime.  All the government -- assuming Mr. Krupit was

8    committing a crime, the government very carelessly did not find

9    out that he did it.  That is not what you were arguing in that

10   case, and you know it.

11             MR. STAVIS:  Your Honor, that was an entrapment case.

12             THE COURT:  So was Cromitie.  This is not an

13   entrapment case.

14             MR. STAVIS:  That's correct.  The government

15   misconduct, and if I might finish the quote, violates due

16   process, requires the dismissal of charges against the

17   defendant.  The government --

18             THE COURT:  If, if, if, if, right.

19             MR. STAVIS:  And that gets to the --

20             THE COURT:  When I was a law student, first year law

21   student, my father, probably the best lawyer I ever knew, would

22   sit at the dinner table with me when I was on break and he

23   would listen as I expounded on some great language from some

24   this case or that case, and eventually after I had made my

25   brilliant point, he'd look at me and he'd say, "And how did the

1   case come out?"

2          Generally speaking, the language on which I had

3   seized, much like the language you seized on in Cromitie,

4   sounds real good, but it didn't get you anywhere.

5          MR. STAVIS:  Your Honor, I just --

6          THE COURT:  In Cromitie, for example, where the lying,

7   the lying by Mr. Hussain, undiscovered by the government, was

8   infinitely greater than the lying in this case, the Second

9   Circuit did not reverse the convictions, did not grant a new

10  trial.  None of those things happened.  They're in jail for the

11  next 25 years.

12         MR. STAVIS:  Yes, your Honor.  What I want the record

13  to be clear about saying, I am saying I am not relying

14  exclusively on Cromitie.

15         THE COURT:  No.  You're relying on the cases cited in

16  Cromitie.

17         MR. STAVIS:  The point I wish to make is the

18  government's conduct gave the green light to its cooperator to

19  sell insurance, and the government should have known that that

20  in itself was a crime.  Without the government's conscious

21  avoidance, there would have been no crime.  Your Honor used the

22  word careless, quote, to describe what the government did.  I

23  submit to the court, without an evidentiary hearing, your Honor

24  cannot draw that conclusion they were careless.

25         THE COURT:  Guess what.  You take that to the circuit

DA1JBIN1                     Trial

1    if you're unlucky enough to go there because I am not granting

2    a mistrial or Kyles Hearing on this issue.  I am not.  I don't

3    think you're entitled to one.  The jury listened as you

4    skillfully surgically exposed this man for having lied

5    repeatedly, and the government, to its credit, did not attempt

6    to rehabilitate him.  He wanted to explain, he wanted to

7    explain that his lawyer told him it was all right.

8            I wouldn't let him on cross.  The government did not

9    try to elicit that on redirect.  The lies are there.  The

10   argument is there.  You've got the argument.  I see absolutely

11   no difference, no difference between this situation and

12   Cromitie, except that having sat through his testimony and

13   having sat through Hussain's testimony, he lied a lot less than

14   Mr. Hussain did on fewer occasions and about fewer things.  So

15   anyway, those motions denied.

16           Now, there are Rule 29 motions, I assume?

17           MR. ABRAMOWITZ:  Yes, your Honor.

18           THE COURT:  Mr. Abramowitz.

19           MR. ABRAMOWITZ:  I believe I am making this motion on

20   behalf of all three defense counsel.

21           MS. MURRAY:  Yes.

22           THE COURT:  They probably want to say something

23   anyway.

24           MR. ABRAMOWITZ:  If I miss something, I am sure

25   they'll be first to say so.

DA1JBIN1                              Trial

1            Your Honor, we make a motion under Rule 29 for the

2    entry of judgment of acquittal because the evidence that has

3    been adduced by the government is simply insufficient to

4    sustain a conviction.  I say that with particular reference to

5    United States against Guadagana, G U A D A G A N A, 183 F.3d

6    122 (2d Cir.) in which the court said, "The court may grant a

7    judgment of acquittal for insufficient evidence only if the

8    evidence that the defendant committed the crime alleged was

9    nonexistent or meager."

10           I want to focus on the meager.  Your Honor's ruling on

11   the motion in limine, which we are not rearguing now, did say

12   that the government would have to prove that the insurers would

13   have suffer some sort of tangible economic harm as a result of

14   the loss of the right to control their decision to issue STOLI

15   policies.

16           I would agree that taking all the favorable inferences

17   as you must to the government at this stage, that they have

18   proved that the -- or they offered proof that the insurance

19   companies did not want STOLI policies; and, therefore, to the

20   extent that our clients presented STOLI policies, they lost

21   their right to refuse that business or they arguably lost their

22   right to refuse that business.  However, the second arm of that

23   is that that's insufficient, according to your Honor's ruling,

24   and there additionally has to be a tangible economic harm.

25           Now, with respect to that issue, 16 witnesses were

1    called by the government.  Only two were in a position to speak

2    to the alleged impact, and that is Messrs. Avery and Burns.

3    They simply proved that there was no tangible economic harm,

4    and I make reference to the fact Mr. Avery's testimony,

5    Transcript Pages 514, he was asked how STOLI entering the

6    market impacted Prudential's bottom line, to which he

7    responds -- and it is not only the bottom line that I am

8    talking about --

9              THE COURT:  But the question -- I remember the

10   question vividly because the question was bottom line.  The

11   question wasn't directed to anything else.  We have already

12   established beyond peradventure that the bottom line is not the

13   only indicia of economic, tangible economic injury.

14             MR. ABRAMOWITZ:  I agree with you.  It could be an

15   indication.  It isn't in this case.  That is my point, and we

16   are going to move down to other aspects of economic harm.

17             He said in testimony, he testified we didn't see any

18   different experience because we tried as best not to sell any.

19   So as far as the bottom line is concerned, he acknowledged that

20   that wasn't what he was talking about.

21             He further stated that had the representations at

22   issue not been present in the relevant applications, the result

23   would have been that we would not issue the contract, period.

24   That is simply the right to control.  He testified on Page 701

25   of the transcript that he believed the most significant risks

1    of IOLI were social, legal, tax-related, not economic, and he

2    used the word, "not economic."

3            That means that as far as a tangible economic impact,

4    that he acknowledged there was no economic impact.

5            THE COURT:  Since we are all fixated on the in limine

6    motion, can I make the point that I think what I said was that

7    it wasn't enough to show, for the government to show that the

8    insurance company wouldn't have entered into the transaction.

9            MR. ABRAMOWITZ:  Correct.

10           THE COURT:  I think those were the words I used.  Am I

11   right about that?

12           MR. ABRAMOWITZ:  Yes.

13           THE COURT:  I didn't say it is not enough for the

14   government to show loss of the right to control property.  I

15   said it is not enough for the government to show that the

16   insurance company would not have entered into the transaction.

17           MR. ABRAMOWITZ:  You did say that.

18           THE COURT:  I want to be real sure.

19           MR. ABRAMOWITZ:  You used the word, "economic harm."

20           THE COURT:  But I think it is the law that the right

21   to control, the loss of the right to control one's property

22   constitutes tangible economic harm.

23           MR. ABRAMOWITZ:  No, that is the Shellef case and that

24   is what is missing here.  It is not enough.  The right to

25   control is simply not enough.  It is an intangible right. .

1    Let me quote to you what you said in the in limine motion.

2              THE COURT:  I have got it here.  I am looking at it.

3              MR. ABRAMOWITZ:  You said they must prove that the

4    insurers would have suffered some sort of tangible economic

5    harm as a result of a loss of --

6              THE COURT:  But I went further.  I was really

7    specific.  I said if the government can prove that the victims

8    did not get what they bargained for, if they thought they were

9    bargaining for universal life, and they ended up getting STOLI,

10   which they didn't want, that would be enough.  That would do

11   it.

12             MR. ABRAMOWITZ:  That is not what you said.

13             THE COURT:  That is what I said, if the government can

14   prove that the victims did not get what they bargained for

15   rather than exactly what they paid for.

16             MR. ABRAMOWITZ:  You also said --

17             THE COURT:  There was a discrepancy between the

18   benefits reasonably anticipated universal life and the benefits

19   actually received STOLI, then the mail and wire fraud statutes

20   are properly invoked and a conviction may be I obtained.

21             Indeed, I think I went on to say I think the

22   government made a mistake when it started talking about rights

23   to control because if you think you're not selling a STOLI

24   policy because you have a policy against not selling STOLI,

25   against selling STOLI policies, and you end up selling a STOLI

```
 1    policy because someone tells you a lie, there is a discrepancy
 2    between what you bargained for and what you got.
 3            MR. ABRAMOWITZ:  What they bargained for, your Honor,
 4    with respect, is an insurance policy that contained the right
 5    to sell, and that is where the analysis falls apart.  Your
 6    Honor said, in quote, and I am quoting, "The government cannot
 7    prevail if it does not introduce evidence that the insurers
 8    suffered; for example, the harms outlined at Paragraph 18 of
 9    the indictment which qualify as financial harm as pleaded in
10    Paragraph 4."
11            And there are several economic issues that are listed
12    in the indictment at Paragraph 4.  The government did not prove
13    them.  In fact, they proved the opposite, proved that these are
14    intangible property rights.
15            THE COURT:  So is goodwill.  Goodwill is an tangible
16    property right.
17            MR. ABRAMOWITZ:  Goodwill can be a balance sheet item,
18    is financial.  I am sorry, your Honor, it is.
19            THE COURT:  It --
20            MR. ABRAMOWITZ:  Loss of reputation and some worry
21    about tax status is an intangible right.  It is not, has no
22    economic impact whatsoever, and if it does, it wasn't proved.
23            There wasn't a witness that said we suffered any
24    tangible economic harm here.  They said the opposite.  They
25    didn't want the STOLI policies, there is no question about
```

1   that, but there was no economic harm offered, no dollars and

2   cents on a balance sheet and no tangible economic harm.

3            Now, I want to go back to basics here, your Honor.

4   The basic is that under McNally, a Supreme Court case that read

5   the mail and wire fraud statutes to exclude intangible property

6   rights and invited Congress to amend that statute, the only

7   amendment that Congress did was for honest services.  It did

8   not amend 1341 or 1343 in any other way.

9            So that the ruling under McNally, as amplified under

10  Skilling, which I agreed was an honest services case, but the

11  language in Skilling talks about this has to be a money or

12  property offense and not intangible rights.

13           Goodwill, your Honor, is an accounting function,

14  goodwill under the Schwartz case does have a dollar and cents

15  value.  We didn't hear a peep about goodwill, about any

16  economic impact other than they didn't want to do these

17  applications.  Right to control without what your Honor had

18  added in the in limine motions does not satisfy the tangible

19  economic harm.

20           If you need any cites -- in fact, they have an

21  economic benefit.  It was one exhibit, Exhibit 2972, where

22  Mr. Burns said that the actual mortality experience on policies

23  with with face amounts of a million or greater and issued to

24  insured ages 70 or older, the STOLI demographic, is 88 percent

25  of expected or 12 percent better or lower, and that suggests

1    that STOLI activity has not had an adverse impact on our

2    mortality experience.

3            So all we are getting from the government's case is

4    pure right to control.  We bring you back to Shellef.  Shellef

5    is a case that says that pure right to control is not a

6    tangible economic harm.

7            Your Honor, I urge you to consider these arguments.  I

8    think McNally is the case, even though it is a 1987 Supreme

9    Court case, that takes us there.  The cases cited for -- and

10   also if your Honor had told the government they should prove

11   the harms in the indictment, they didn't come near proving the

12   harms in the indictment.

13           THE COURT:  We don't know.  They don't have to prove

14   the ones alleged in the indictment.  What I said was if they

15   proved those, that would be sufficient.

16           MR. ABRAMOWITZ:  Well, they didn't.  Therefore, what

17   is left is testimony that really is clear that there was no

18   economic harm.  STOLI is a controversial type of life

19   insurance.  It can be dealt with in different contexts.  It

20   cannot be dealt with in the context of a crime of mail fraud

21   because there was no economic harm, or at least we didn't hear

22   any.  Thank you.

23           MR. STAVIS:  Your Honor, would your Honor like to hear

24   briefly from defense counsel?

25           THE COURT:  Yes, I would.  It is your motion, after

1      all.

2              MR. STAVIS:  Yes, yes, your Honor.

3              The Shellef case, S H E L L E F, in 507 F.3d 82,

4      refers to the essential elements of the bargain.  I don't think

5      that in the context of the conspiracy and the mail and wire

6      fraud counts, as Mr. Abramowitz has said, I don't believe that

7      that has been proven beyond a reasonable doubt.  Even taking

8      all the facts in the light most favorable to the government, as

9      your Honor must, the right to control is not enough.

10             I also point out the individual facts, the law to the

11     side, the individual facts with regard to my client, James

12     Kevin Kergil, are insufficient with regard to the conspiracy to

13     commit mail and wire fraud, the mail fraud and the wire fraud

14     counts.  With regard to Mr. Kergil, the government has not

15     produced sufficient evidence beyond a reasonable doubt on the

16     conspiracy to obstruct justice.

17             The elements necessary have not been proven

18     specifically with regard to Mr. Kergil, and for those

19     supplemental reasons, I move pursuant to Rule 29 for a judgment

20     of acquittal.

21             THE COURT:  Ms. Murray.

22             MS. MURRAY:  Your Honor, I would second my co-counsel

23     and especially Mr. Stavis' remarks about United States v.

24     Shellef, and as to the essential nature of the insurance

25     bargain, your Honor, fundamentally a life insurance bargain is

1    a contract based on the health, gender and age of the

2    individual and priced accordingly.

3            Lapse rates and the expectation of lapses are not an

4    essential element of the bargain, but that is the only thing

5    that the insurance company executives talked about on the stand

6    as creating potential for economic harm.  I simply say reliance

7    on lapse rates is outside the essential nature of life

8    insurance bargained, and for that reason the government hasn't

9    proved its case on the mail fraud conspiracy.

10           I would like to then address the doctrine construction

11   charge Mr. Resnick.  There was some miscommunication between

12   myself and Mr. Binday's lawyers early this morning.  I had

13   wanted the obstruction charge to simply be included again in

14   our supplemental request this morning since I believe our

15   charge is the better and more appropriate charge, and the

16   reason for this is there was a "to wit" clause in the

17   indictment which narrows very specifically what the obstruction

18   was here.

19           The alleged obstruction was Mr. Kergil and Mr. Resnick

20   agreed to destroy documents, and the word "destroy" was used,

21   it wasn't alteration, wasn't mutilation, but it was destroy

22   documents to make them unavailable for a grand jury proceeding.

23   It is very specific as to document destruction and a grand jury

24   proceeding.  So the way the charge is currently written, it

25   involves multiple different kinds of destruction, and it also

DA1JBIN1                        Trial

1    has another object, just general obstruction of justice.

2              THE COURT:  This is a charging conference issue.

3              MS. MURRAY:  It is relevant to the motion to dismiss,

4    your Honor.

5              THE COURT:  Okay.

6              MS. MURRAY:  Assuming, your Honor, I am correct the

7    charge should be specific to the "to wit" clause in the

8    indictment which the grand jury voted, I would submit that

9    there is insufficient evidence that Mr. Resnick joined in a

10   conspiracy to destroy documents.

11             First of all, the only witness who talked about any

12   conspiracy was Mr. Krupit, and he actually admitted that Mr.

13   Resnick was deemed to be taking the issue lightly.  While there

14   is a phone call where my client allegedly admits to doing it

15   and flying down to Florida to do it, that phone call has to be

16   viewed in the context both of what we know actually happened

17   and in the context of the representation by counsel by both

18   parties on that call and the fact my client is under no

19   obligation to tell somebody, a potential co-defendant, that he

20   is in possession of documents that that co-defendant or

21   co-defendant's lawyer might want to have access to.

22             What we know happened was Mr. Resnick went to the

23   Apple store.  He created a mirror image.  Whatever he did

24   afterwards is completely irrelevant because he created an exact

25   replica, a forensic copy of his hard drive.  There was no

1    destruction.

2              THE COURT:  Great jury argument, Ms. Murray,

3    absolutely fabulous!

4              All right.  Let's hear from the government.

5              Are you prepared to have me charge United States

6    versus Starr and try the case on that theory?

7              MS. McCALLUM:  Your Honor, we --

8              THE COURT:  You didn't get what you thought you were

9    getting?

10             MS. McCALLUM:  No, that is not our theory.

11             THE COURT:  Why not?

12             MS. McCALLUM:  This is a straightforward mail and wire

13   fraud case.  It is a straightforward case.

14             THE COURT:  United States versus Starr is a

15   straightforward mail fraud case.

16             MS. McCALLUM:  Right.  Your Honor, this is not a

17   theory of the case in which we're claiming anything close to

18   they just -- they wouldn't have issued the contract had they --

19             THE COURT:  That is what they all said.

20             MS. McCALLUM:  No, your Honor, they went much further.

21             I want to remind the court this is a straightforward

22   case because what we are alleging is that there was a scheme to

23   defraud insurance companies of money and property, deprive them

24   of commissions, they wouldn't have paid these commissions had

25   they known the truth, deprive them of the policies they

1   wouldn't have issued and the costs they wouldn't have incurred

2   had they known the truth.

3          Yes, it also deprived them of their right to control

4   their economic decision-making.  There is no need -- and the

5   court has already said this, it is black letter law -- there is

6   no need for the government to prove ultimate economic harm.

7   There is a good reason why that is difficult to prove here, and

8   it is not something we would ever have to prove.

9          Again this is a long game, and these insurance

10  companies, the executives who took the stand and testified

11  about the harms they foresaw with STOLI, they talked about

12  reduced profitability, they talked about tax consequences, they

13  talked about higher prices resulting from having to get

14  reinsurers' approval.  They talked about all these economic

15  harms, these economic harms they were facing as a result of

16  STOLI.

17         The Lincoln witness was particularly I think eloquent

18  on this about the economic harms that the company viewed STOLI

19  as posing.  So what did they do?  They incurred massive

20  economic costs, not quantifiable necessarily, they described as

21  soft costs, to try to limit STOLI, to try to stamp it out.

22  That is why both those witnesses said we don't think ultimately

23  so far we have seen a hit to the bottom line, but that is

24  because we took all these measures, we think we stamped it out.

25         The government has presented overwhelming proof that

1    these were economic harms that were posed by STOLI and that the

2    lies the defendants told these insurance companies had economic

3    impact or carried economic impact.

4         Now, in terms of what is alleged in the indictment,

5    the specific harms alleged in the indictment were proved at

6    trial.  Both these witnesses talked about the way that lapse

7    assumptions played into the pricing of STOLI policies, and that

8    is one of the reasons they didn't want STOLI.  That is why it

9    posed reduced profitability.

10         They both talked about reduced cash flow from

11   assumptions you make that human beings are going to be paying

12   the premiums on these policies and are going to overfund them

13   in some circumstances.  He made assumptions about the

14   population you're insuring.  When those assumptions are thrown

15   off because people are lying to you and sneaking investor-owned

16   policies into the mix, that is an economic harm, and that is

17   one of the harms alleged in the indictment.

18         Both witnesses also talked about the link between

19   financial misrepresentations and the assumptions that are made

20   in pricing policies.  The assumption again is based on

21   experience with these high face value policies and the people

22   who buy them.  There is a link between mortality and net worth,

23   and when you're not getting the pool of applicants that you

24   believe you're getting, that affects the economics of the

25   transaction.  So for all of those reasons, the Rule 29 motions

1    should be denied on the first three counts of the indictment.

2              On the obstruction of justice charge, the court heard

3    again overwhelming evidence there was a conspiracy.  This is a

4    conspiracy charge.  There was a conspiracy to obstruct justice.

5              THE COURT:  The government always charges conspiracy.

6    God forbid they charge a substantive crime!

7              MS. McCALLUM:  Here there was overwhelming evidence of

8    a conspiracy to destroy documents, do destroy records.  You

9    heard testimony from the Apple witness that Mark Resnick came

10   into that Apple store and asked for his hard drive to be wiped.

11   He didn't need to have to ask to have his hard drive wiped to

12   get a clone of that hard drive.  You heard the phone calls in

13   which Mr. --

14             THE COURT:  And the testimony about the making of the

15   clone, that was something that was done automatically?

16             MS. McCALLUM:  No.  It was something, the copy of the

17   hard drive was transferred to a much smaller device.

18             THE COURT:  I understand that.  Did Mr. Resnick ask

19   that a clone be made?

20             MS. MURRAY:  Yes, your Honor.  In the documents

21   submitted by Apple, he paid for the external hard drive.  He

22   had to buy an external hard drive.

23             MS. McCALLUM:  He did not have to ask have to ask to

24   have his hard drive wiped.

25             THE COURT:  He didn't have to ask for an iPhone 5,

DA1JBIN1                        Trial

1    either, but the point here is that he, as I remember the

2    testimony, he specifically asked that a copy be made.

3              MS. McCALLUM:  I don't think the government would

4    dispute that, but he also specifically asked that the hard

5    drive on his computer that is sitting in his house be wiped.

6              THE COURT:  Yes.

7              MS. McCALLUM:  And the information, the data, he could

8    keep it for himself perhaps, but the information could be kept

9    on a much smaller device.

10             THE COURT:  How does that frustrate a grand jury

11   subpoena?

12             MS. McCALLUM:  Your Honor, it makes it --

13             THE COURT:  How does that frustrate a grand jury

14   subpoena?  I am not aware that that renders you incapable of

15   responding to a grand jury subpoena just because you have it on

16   a thumb drive instead of on your hard drive.

17             MS. McCALLUM:  I think the evidence really here, and

18   again returning to the conspiracy, this is a conspiracy charge,

19   and you have the phone calls in which Mr. Resnick and

20   Mr. Kergil are acknowledging they were in an agreement to

21   delete e-mails.  The evidence from Apple is just corroboration

22   of the general conspiracy to obstruct justice through

23   destruction of documents, through destruction of particular

24   e-mails.

25             You have Mr. Krupit's testimony as well again

1    establishing all three of these men had agreed to destroy

2    documents, to delete everything with Advocate and R. Binday on

3    it.  The government is not going to contend all of those

4    documents were, in fact, destroyed.  Of course they weren't.

5          A bunch of them were presented at trial.  A bunch were

6    submitted at trial.  We think all of this is sufficient to

7    prove the conspiracy, and we think it is certainly sufficient

8    to go to the jury.  That addresses the fourth count, your

9    Honor.

10          THE COURT:  Okay.

11          MR. ABRAMOWITZ:  I just want to repeat briefly that

12   the benefit of the bargain language includes the right to sell

13   and that every one of the lapse assumptions, the cash flow and

14   the pricing and the premium financing, is bargained away with

15   the right to sell.  They have not --

16          THE COURT:  What?

17          MR. ABRAMOWITZ:  When you sell it, you sell it to a

18   third party, he acknowledged that the lapse rate would be not

19   expected.  He acknowledged that it could be premium-financed.

20   These are intangible harms that are subsumed in the right to

21   sell.

22          THE COURT:  I guess I didn't hear his testimony the

23   same way you heard testimony.  I thought he said that they

24   would have priced the policy differently.  Their pricing

25   assumptions, the actuary guide, the pricing assumptions are

DA1JBIN1                         Trial

 1   impacted by the -- of course, they factor in a certain lapse
 2   rate, they factor in the fact that a policy could be sold, but
 3   in this case the policy is 100 percent going to be sold, and my
 4   understanding of the testimony that I heard was that the
 5   policies were mispriced because more of the policies were
 6   absolutely positively going to be sold, not just that they were
 7   alienable, they were going to be alienated from day one, and
 8   that was not factored into the pricing on the policy.

 9            MR. ABRAMOWITZ:  And what they did was raise the
10   prices, okay?  So what they did in response to STOLI was to
11   raise the prices.  They say to discourage it, but they got the
12   money, so there is no harm.

13            Ms. McCallum's harm about we got commissions, they got
14   the premiums and they got exhorbitant premiums that they would
15   not have gotten if these STOLI policies were not approved,
16   again we are back to intangible economic harm.  They didn't
17   prove anything about the significance of the lapse rates.

18            THE COURT:  I cannot say that I agree with you, Mr.
19   Abramowitz.

20            MR. ABRAMOWITZ:  You can try.

21            THE COURT:  I cannot say that I agree with you.  I am
22   looking forward to hearing your argument.

23            MR. STAVIS:  Very briefly, your Honor.

24            Adding to what Mr. Abramowitz just said, I recall that
25   when Mr. Burns testified, he said the fight to STOLI was to

DA1JBIN1                          Trial

1  raise the premiums on the policies, that is what his company

2  did.

3          The point I want to make, a very discrete point, your

4  Honor, Ms. McCallum spoke about lapse rates affecting

5  profitability, assumptions.  "Assumptions," she says it affects

6  the, "economics of the transaction."

7          Those are all theoretical, your Honor.  Those are

8  theories that were proposed, and that is not sufficient

9  evidence of mail and wire fraud and conspiracy to commit mail

10 and wire fraud, those theories.

11         Turning to the obstruction, I would just point out

12 since Ms. McCallum referenced the telephone conversation that

13 was recorded by Mr. Krupit, when Mr. Krupit said Kevin, you

14 told me to destroy e-mails, he said, "That is not what I said,"

15 and, therefore, I would reiterate that the obstruction

16 conspiracy charges have not been proven beyond a reasonable

17 doubt.

18         THE COURT:  All motions are denied.

19         Okay.  Before we get to the defense proffer, give me

20 five minutes, okay?

21         (Recess)

22         THE CLERK:  The government and the parties are

23 present.  The jurors are not present, but they are present in

24 the jury room.

25         THE COURT:  Mr. Abramowitz is standing at the mike.

DA1JBIN1                     Trial

1          MR. ABRAMOWITZ:  Let me just, for your scheduling

2     purposes, indicate to you that this is likely to take a half

3     hour or more.

4          THE COURT:  I think so.

5          MR. ABRAMOWITZ:  The issue is what you want to do with

6     the jury?

7          THE COURT:  How much how much stuff does the

8     government have to introduce to the jury?  How much are we

9     going to show them?  How much are we going to read?

10          MS. McCALLUM:  It is only about 15 minutes at most, I

11     believe, your Honor.

12          THE COURT:  They're not going to show them everything.

13     They're only going to show them some stuff.

14          MR. STAVIS:  The record will reflect I held my hands

15     approximately 10 inches apart.

16          THE COURT:  You know what?  Let's bring the jury in.

17          I'll apologize because the delay is my fault, and

18     let's show them what we're going to show them, tell them what

19     we're going to tell them, let them rest, the government rest in

20     front of the jury, and then I guess they'll just get an early

21     lunch.

22          MR. ABRAMOWITZ:  The motions will have been deemed

23     made?

24          THE COURT:  The motions will have been deemed made,

25     right, and then we'll talk about what we are going to talk

```
 1    about.  Let's bring in the jurors.

 2              (Jury present)

 3              THE CLERK:  Be seated.

 4              THE COURT:  Good morning.

 5              THE JURY:  Good morning.

 6              THE COURT:  Entirely due to my fault, we are going to

 7    have the brief ending of the government's case and then I will

 8    have to waste your time and let you go for lunch.

 9              As some of you may recall, I was having a root canal.

10    I had some complications and I had to go see the dentist this

11    morning so I got here late.  As a result, we didn't get

12    everything done that we were supposed to get done.  My bad!

13    I'll take all the blame.  It means I have to waste a little bit

14    of your time, and I apologize for that, but we did get some

15    things done.

16              The government is ready to put in the last bits of its

17    case.  One of those things is a stipulation, which is

18    Government Exhibit 5006, and I am not going to read every word

19    of it.  We all agreed that I can summarize it for you.

20              It is stipulated and agreed by all the parties that in

21    connection with certain named life insurance policies, policy

22    numbers and named of the insureds are listed in the

23    stipulation, several insurance companies, American General

24    life, AXA Equitable, John Hancock, Lincoln National, Pruco

25    Life, Security Mutual, Sun Life Financial, and Union Central
```

DA1JBIN1                          Trial

1    Life, those eight companies paid out commissions, and the

2    amounts of the commissions that they paid in connection with

3    those policies are listed in this government exhibit, and the

4    payees, the people who got the money, are listed and the

5    commissions were paid to one of the following:

6              R. Binday Plans & Concepts, CPS Insurance Services,

7    Inc, Crump Life Insurance Services, Denise Binday Koslowsky,

8    Glenn Binday, Madison Brokerage Corporation.

9              As you will see, eight insurance companies paid a

10   number of commissions to one of those people or entities for

11   policies that are listed in this stipulation.  The parties will

12   argue from that.  I have accepted this stipulation, 5006 into

13   evidence.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

DA1LBIN2                    Trial

 1            THE COURT:  So we also were able to introduce a last

 2   batch of documents, the last batch of documents that the

 3   government wanted to introduce into evidence, and we got that

 4   done this morning.

 5            And, Ms. McCallum, are you going to make some

 6   presentations to the jury from those documents?

 7            MS. McCALLUM:  Yes, your Honor.  At this time we are

 8   going to just publish select documents to the jury.

 9            THE COURT:  Okay.  The government is going to show you

10   some of those documents that came into evidence.  It's about 40

11   or 50 of them came into evidence.

12            Could we have them by number, please.

13            MS. CHOI:  Government Exhibit 1670.

14            THE COURT:  And please give the jurors time to read

15   it.

16            MS. CHOI:  Government 1677.

17            Government Exhibit 1687.

18            Government Exhibit 1654.

19            Government Exhibit 1698.

20            Government Exhibit 1654.

21            Government Exhibit 2670.

22            Government Exhibit 1642.

23            Government Exhibit 2659.

24            Government Exhibit 2659A.

25            Government Exhibit 5004.

1          MS. McCALLUM:  The government rests, your Honor.

2          THE COURT:  Ladies and gentlemen, the government rests

3   are magic words.  The government is advising us that it has now

4   placed before you all of the evidence from which the government

5   will argue that it has proved the defendants' guilt of the

6   charged crime beyond a reasonable doubt.

7          Nothing has changed.  The presumption of innocence

8   continues to cloak the defendants.  We have not reached the end

9   of either the presentation of evidence or the arguments of

10  counsel.  You haven't been instructed on the law yet.  So

11  remember the defendants are and continue to be presumed

12  innocent, but the government has finished putting in its case.

13         So I'm actually doing this the way it's supposed to be

14  done which is to tell you that I am now required to do some

15  things outside of your presence with the lawyers.  And I'm

16  going to ask you to be back at 1:30 and we will get started

17  with the afternoon's proceedings.  I don't know how long

18  they're going to be.  I have no way of knowing.

19         And as you will recall, I told the government it had

20  to put on a case.  I will ask the defense if it wants to put on

21  a case.  The defense has nothing to prove because the

22  defendants are presumed innocent.

23         One of the things I'm going to find out while you're

24  at lunch is what's going to happen in terms of presentations,

25  if any, on behalf of the defense.  I remind you that if the

DA1LBIN2                          Trial

 1    defense decides or any of the defendants decide to put on any

 2    evidence, they are not thereby assuming the burden of proof.

 3    We presume that they are innocent.  The government has to

 4    overcome that presumption.

 5              So have some lunch.

 6              I just wanted to address one other thing because this

 7    is, as you all know, sort of a weird and momentous day.  The

 8    government has shut down for business except that in this

 9    building it has not for two reasons.  First of all, the courts

10    actually have a source of funding outside of revenues raised

11    through the taxes and appropriated by Congress.  We collect

12    fees from people who file things.  And so we're going to use up

13    that money to keep going for as long as we can.  Second, when

14    that stops, we -- and that, by the way, is enough business days

15    that we'll be done, okay.

16              And if and when that money should run out, we are by

17    law required to keep essential services going.  We're in the

18    middle of a criminal trial.  That is an essential service

19    provided for by the Constitution of the United States.  So we

20    will not be shutting down this operation until we're done, all

21    right.  So I just didn't want anybody to have any doubt about

22    that or any questions about that.  We're just on go.  We're

23    just on go.  All right.

24              I'm really sorry that I didn't manage to get this

25    arranged so as to minimize the wasting of your time, but enjoy

1    the beautiful sunshine.  I'll see you.  Don't discuss the case.

2    Keep an open mind.

3              (Jury not present)

4              THE COURT:  Okay.  Now.

5              MR. ABRAMOWITZ:  May I, your Honor?

6              THE COURT:  I'm waiting for you.

7              MR. ABRAMOWITZ:  I thought you were doing something

8    else.

9              THE COURT:  No, I'm setting up to take notes.

10             MR. ABRAMOWITZ:  Just for a little background, your

11   Honor, as to how we discovered these exhibits that we intend to

12   show you and hopefully the jury.

13             Your Honor will recall from the pretrial applications

14   concerning subpoenas first that as early as April 2010, the

15   government issued -- that's over three years ago -- the

16   government issued a grand jury subpoena calling for files

17   relating to all records concerning life insurance associated

18   with Michael Binday and all records concerning life insurance

19   policies for specifically identified insureds, and that was one

20   that was specifically sent to Lincoln and other insurance

21   companies.

22             Your Honor will recall that there was an issue as to

23   whether they actually enforced that contract -- that subpoena

24   because the documents we discovered were not furnished to us.

25   We came in the case in April of 2013, and we undertook an

1    effort to analyze the content of the production.  And after two

2    months of that, we discovered that there were defects in the

3    production for those insurance policies and that led to our

4    application for the subpoena that your Honor eventually

5    granted.

6          Now, your Honor's order in July and August had an

7    effect.  We did get for the first time a huge volume of

8    documents that could have been and in many respects have been

9    in the government's possession years ago and even before the

10   indictment, which is even more relevant.

11         We have undertaken -- and this is on behalf of all the

12   defendants -- we have undertaken to review 44 of those files.

13   There remain as of today 62 additional files that we have not

14   yet had an opportunity to review.  And these documents came

15   from six insurers:  American General, John Hancock, Lincoln

16   Financial, Security Mutual, Sun Life, Union Central, and

17   Prudential.

18         And in analyzing them -- we have been analyzing these

19   on a full-time basis since mid-August -- we have discovered

20   that 35 of the 44 files had substantial underwriting issues

21   akin to those which we will sample in this presentation.

22         Now, we have taken and propose to prove a sample of 11

23   files from four insurers:  American General, Lincoln, Union

24   Central, and Sun Life.  Within those 11, five files relate to

25   the witnesses in this case:  three of them from James Farrell,

DA1LBIN2                          Trial

1    one from Maria Ramos, and one from Silas Griffin.  And I

2    propose to present some of this to you so you get the drift and

3    you'll see what we intend to prove from these exhibits.

4           Can we put on -- we have a hard copy of the excerpts

5    we're going to show you, but we intend to put it on the screen.

6    So if you want a hard copy, we'll be glad to give it to you.

7           But let's look at Defendant's Exhibit 3352.  And let

8    us go to American General page 14367.  And can we blow up the

9    bottom portion of the letter.

10          These are again, your Honor, from the underwriter's

11   files.  We have a letter from an attorney stating that he was

12   helping her with some estate issues.  Also provided break down

13   of NW but also -- which I would interpret as net worth -- but

14   also stated he did not audit these figures and they are being

15   regurgitated by the proposed insured.  Underwriter to CC to GA,

16   please note, the letter from the lawyer does not fulfill the

17   third party financial requirement as he states in the body of

18   the letter that these figures were supplied by the client

19   herself.  We will need verification of finances from a third

20   party (CPA?  Tax preparer?  Accountant?).

21          We next go to 3271, which is an application from Myra

22   Davis also to American General.

23          And, by the way, every one of these policies, the

24   policy was granted, your Honor, and we would intend to show

25   that.

```
 1              DX3271, can we go to page 001 --
 2              THE COURT:  This the same policy we're going to
 3    talking about?
 4              MR. ABRAMOWITZ:  This is a different one.
 5              THE COURT:  So do we know what happened in response to
 6    the thing that says we need to hear from the accountant, we
 7    need to hear -- do we know what happened?
 8              MR. ABRAMOWITZ:  It was issued.  The policy was issued
 9    without it.
10              THE COURT:  Do we know --
11              MR. ABRAMOWITZ:  Nothing.
12              THE COURT:  Do we know that it was issued without that
13    directive we need to hear from the accountant?  Do we know it
14    was issued without any information from the accountant?
15              MR. ABRAMOWITZ:  Yes.
16              THE COURT:  How do we know that?
17              MR. ABRAMOWITZ:  It's not in the file.
18              Let me introduce Ms. Juteau, who would be the one
19    testifying about this.
20              MS. JUTEAU:  In addition, in this particular case,
21    several days later there's a subsequent underwriter note that
22    says we're fine with the attorney's letter and the policy is
23    issued.
24              MR. ABRAMOWITZ:  And we will show that to the jury.
25    Your Honor, I'm shortening this for you just to get the idea.
```

1           THE COURT:  But I'm going to ask questions.

2           MR. ABRAMOWITZ:  You should.

3           THE COURT:  Because underwriting -- do we know if it's

4  a STOLI policy?  Do we know if it's a STOLI policy, was that a

5  policy that was intended to be sold?  Was it sold?

6           MR. ABRAMOWITZ:  Indeed, it was a Binday STOLI policy.

7           THE COURT:  Okay.

8           MR. ABRAMOWITZ:  And we will show in all of the

9  examples I'm about to give you, we will show that they knew it

10 was a STOLI policy and they granted it anyway.

11          THE COURT:  And how did they know it was a STOLI

12 policy?

13          MR. ABRAMOWITZ:  Because the net worth didn't match.

14 You'll see because --

15          THE COURT:  I'm sorry.  I'm missing it.  I really need

16 to understand.  Okay.  The net worth didn't match.  What do you

17 mean?

18          MR. ABRAMOWITZ:  Do you want to show more.

19          THE COURT:  I need to understand why this is.  So they

20 said they wanted third party verification, and they issued the

21 policy without getting third party verification.  And how did

22 they know it was a STOLI policy that they were issuing?

23          MR. ABRAMOWITZ:  Age -- all of the factor -- came from

24 Binday, the age of the woman and the net worth was high and

25 all -- they had all of the hallmarks of a STOLI policy.

DA1LBIN2                      Trial

1            MS. McCALLUM:  Your Honor, I believe this exhibit does

2     not relate to the one about whom you're talking.

3            MR. ABRAMOWITZ:  Your Honor, we really could run

4     through the entire testimony if you want.  I'm trying -- let me

5     just try to explain in a proffer.

6            The proffer will show that the kinds of letters that

7     the government says defrauded the insurance companies they saw

8     and in other situations understood that they were not getting

9     audited statements.  These are older applicants, 70 or older,

10    these are high net worth individuals asking for high face value

11    policies.

12           THE COURT:  You can go as fast as you want.  I just

13    get to ask questions.

14           MR. ABRAMOWITZ:  I know, your Honor.

15           THE COURT:  I can't rule without understanding.

16           MR. ABRAMOWITZ:  I think that the way to rule is to

17    hear the whole body of it because it's the weight of it that's

18    significant.  It's the fact that there were 35 out of 44 STOLI

19    policies, what we would argue are STOLI policies, that they

20    could clearly have seen were STOLI policies and they let them

21    go and it's not negligence.  This is wide open.  They see that

22    letter and they say this letter is nonsense and it's not

23    sufficient to establish the net worth and then that policy gets

24    granted.

25           Then Myra Davis, which would be Exhibit 3271.  Please

DA1LBIN2                         Trial

1   go to 016577.  Right away they notice it's a premium financed

2   case.  We heard some very pious testimony that they didn't want

3   premium financed cases because that was a STOLI red flag.  And

4   we -- they noticed there was a premium financed case right away

5   and it said yes.

6            Now, go to, please, 0016557.  Please blow up the

7   highlighted portion.  Now, here is a underwriter who did some

8   of the things that I suggested that the insurance companies

9   didn't require.

10           Financially I did a zillow.com check on the two

11   residences mentioned in the inspection report.  The address in

12   Boynton Beach does not exist, but neighborhood houses only in

13   the upper 300,000 to low 400,000 range.  The second address is

14   in Melville, New York, is only worth 773,000.  This does not

15   come close to their admitted real estate holdings that they

16   mentioned on the inspection report.  She says she has other

17   real estate holdings.  Should we pursue or do you feel okay as

18   it is?  Jerry.

19           That is an example where they actually know that they

20   have gotten a false financial statement and they went ahead and

21   issued the policy.

22           Please go to 0016540.  Looking at the picture on

23   zillow, it appears to be a condo complex, which I doubt is in

24   the $3 million range.  Secondly, page 1 lists a different owner

25   of the Boynton Beach, Florida residence, but lists her as the

1   owner on page 2.

2           Again, another indication that they discovered that

3   there was false information on the financial -- on the

4   application.

5           Please go to 0016539.  "So adding it all up I get a

6   little over one to $1.5 million in real estate holdings and not

7   much else.  So I don't see the financial justification.  Her

8   CPA didn't verify the holdings so that doesn't help us.  So

9   whether they need to show stockbroker's statements showing the

10  7.3 million in holdings along with real estate holdings, or I

11  wouldn't issue since the evidence we have isn't holding up to

12  the amount she is telling us.  Hope this helps."

13          Please go to 0016522.  These are -- highlighted

14  portion -- these are certificates of ownership for three

15  cooperative apartments in New York, two in the Bronx, one in

16  Great Neck.  I zillowed all three.  The two in the Bronx

17  probably go for 250,000 apiece, and that is what comparable

18  apartments appear to be going for in that building.  The other

19  apartment in Great Neck is not found on zillow.

20          Thoughts.  Do these certificates distributed in 1985

21  and 1986 prove current ownership?  They are not listed on the

22  e-search.  This just appears to be another agency trying to

23  overinsure an elderly life.  If these properties are being used

24  to generate rental income, I would presume they would be listed

25  on her tax returns with addresses and income generated.  I had

DA1LBIN2                        Trial

 1  already increased this to $5 million.  Appreciate your input as
 2  to how to handle this.  And the next thing we know they granted
 3  the policy.
 4          MS. McCALLUM:  Your Honor, may I clarify, this is
 5  relating to Myra Davis still?
 6          MR. ABRAMOWITZ:  This is relating to Myra Davis, yes.
 7          Now going to Defendant's Exhibit 3038, which relates
 8  to James Farrell, Lincoln National.  Can we go to 33830.  These
 9  are again underwriting notes.
10          THE COURT:  Are we now off Myra?
11          MR. ABRAMOWITZ:  Yes.
12          THE COURT:  Policy issued.
13          MR. ABRAMOWITZ:  Policy has been issued in all of
14  these, your Honor.
15          THE COURT:  Okay.
16          MR. ABRAMOWITZ:  Just so you know.  And if we get to
17  the testimony, that will be part of it.
18          This is for James Farrell.
19          THE COURT:  And this is -- a document number, please.
20          MR. ABRAMOWITZ:  Document.
21          THE COURT:  Defense.
22          MR. ABRAMOWITZ:  Defendant's Exhibit 3038.
23          THE COURT:  3038.
24          MR. ABRAMOWITZ:  And we're on page 33830.  "Worried
25  about income replacement but the majority of income is

1    unearned.  The trust was set up at 5/07, same address as

2    applicant, no planning done?  The illustration has a first year

3    premium of 170,000 and 154,000.  What's the plan here?

4          "No in force insurance and now at 72 he is convinced

5    to purchase a $4 million policy with $4.5 million net worth at

6    154,000?"

7          Again, indicating that they were suspicious of the

8    application that was sent in.

9          Same page, problem is finances.  Case is indicated as

10   not being premium financed.  Has no formal estate plan, and

11   balking regarding getting an accountant's statement.  Should I

12   let this go with an IOLI amendment?  For $4 million of

13   insurance and paying 170,000, shouldn't he have some formal

14   estate plan?

15         The short answer here is, your Honor, they issued, as

16   Mr. Farrell testified, they issued the policy despite the red

17   flags that are highlighted in the underwriting notes.

18         Four.  Defendant's Exhibit 3101, which is Silas

19   Griffin, also a witness in this case.  Go to page 33957.

20         THE COURT:  Let me just ask a question.  Does the

21   government contend that information from the underwriting files

22   relating to the very policies that were testified about on its

23   case should not be admitted into evidence on the defense case?

24         MS. McCALLUM:  Yes, your Honor, for all the reasons we

25   spelled out in our motions in limine.  Negligence is not a

1    defense to the charges here.  And this is -- I will just

2    note --

3              THE COURT:  I hate to tell you, anything that is

4    coming from a file from a policy that was testified to on your

5    case is coming in.  It's coming in.

6              MS. McCALLUM:  Your Honor, that's not what the Court's

7    ruling was.

8              THE COURT:  My ruling today is that it's coming in.

9    You can argue that it's simply negligence but it's coming in.

10   You got information about those policies.  You got information

11   about those policies in front of the jury.

12             MS. McCALLUM:  These are internal underwriting notes

13   to the --

14             THE COURT:  Ms. McCallum, let me tell you something.

15   Let me tell you something.

16             MS. McCALLUM:  I understand the Court's ruling.

17             THE COURT:  You don't because I want to make something

18   very clear.  The government made its usual close to the vest,

19   cards to the chest, in a vacuum in limine motion to keep out

20   evidence.  The government did not give me the underwriting

21   files and all of the -- and perhaps I should have asked for

22   them; I didn't think to ask for them -- the government did not

23   give me all of the evidence relating to those particular

24   policies.  Nor did the government say to me -- I don't really

25   remember hearing it or reading it -- that it is the

1   government's position that Mr. Farrell's policy was issued as a

2   result of negligence by somebody in the insurance company

3   because then we could have talked about something that was

4   concrete.  We were talking in a vacuum about stuff that was

5   amorphous.

6           This is concrete.  The government chose, the

7   government chose to put some information about Mr. Farrell's

8   policy in front of the jury, some information, including how

9   it -- the fact that it got issued.  Well, as far as I'm

10  concerned, all information about Mr. Farrell's policy, some of

11  which the jury knows, is fair game.

12          MS. McCALLUM:  Your Honor, I will just note that the

13  first two policies you just heard about relating to Myra Davis

14  and Eva Hearttimer, those are not cases we proved at the trial.

15          THE COURT:  I haven't said anything about them.

16          MS. McCALLUM:  Okay.

17          THE COURT:  It was Mr. Farrell that I stopped and

18  asked about Mr. Farrell because I listened to Mr. Farrell.

19          MS. McCALLUM:  Your Honor, I understand.  I just want

20  to note for the record this Mr. Farrell, we will have a

21  rebuttal case on this.

22          THE COURT:  That's fine.

23          MS. McCALLUM:  All of this is very misleading.

24          THE COURT:  There will be an issue about whether you

25  can have a rebuttal case or should have put it on in the case

1    in chief.  You may well have a rebuttal case.  That's okay.

2    But I have to tell you right now the jury has only part of the

3    story about why -- was it Lincoln that issued the policy to

4    Mr. Farrell -- about why Lincoln issued the policy to

5    Mr. Farrell.  And it gets to hear the whole story.

6             MR. ABRAMOWITZ:  Your Honor, aside from Mr. Farrell

7    and Mr. Griffin and the others, this -- I dare say the

8    government may stand up now not having seen all this and say

9    they're going to say this is negligence.  This is not

10   negligence.  IOLI detection doesn't mean negligence.  It means

11   to me we see it, we know it, we're disregarding our policies

12   and we're going to issue it.  Negligence --

13            THE COURT:  I think you've got a great argument,

14   Mr. Abramowitz.  I couldn't possibly keep it out.

15            MR. ABRAMOWITZ:  And I'm not going to argue, I'm not

16   going to offer anything where they made addition errors or

17   things like that.  IOLI detection is not something that is

18   negligence in my view.  And then if we can blow up the rest of

19   that.  First above that.

20            Another red flag, multiple applications exist.

21            THE COURT:  Whose policy is this?

22            MR. ABRAMOWITZ:  This is Farrell.

23            THE COURT:  Same --

24            MR. ABRAMOWITZ:  Sorry.  Is this Griffin?  This is

25   Mr. Griffin.  This is 3101.

1           THE COURT:  That's Mr. Griffin?

2           MR. ABRAMOWITZ:  Yes.

3           THE COURT:  Lovely man.

4           MR. ABRAMOWITZ:  Lovely man.  I totally agree.

5           Multiple applications exist for the insured.  Review

6   case for possible nonrecourse premium financing.

7           Make it a little bigger.

8           No MIB hits, priors as noted, no coverage in force.

9   No financials on the application.  Await medicals.

10          Another notice that it exceeded financial guidelines,

11  retention amount was exceeded.

12          Can we go to Exhibit 3108.  I'm sorry, that's another.

13          THE COURT:  Are we still on Mr. Griffin's policy?

14          MR. ABRAMOWITZ:  No.  We're now --

15          THE COURT:  I can tell you 3038 is coming in and 3101

16  is coming in.

17          MR. ABRAMOWITZ:  Your Honor, all of these --

18          THE COURT:  Don't talk all of these.  I don't do all

19  of these.  I do individual documents, okay.  And I can -- but

20  as a group I will tell you that if these kinds of entries are

21  found in the underwriting files of policies that the jury heard

22  about on the government's case, they're going to see the whole

23  megillah, okay, they are.  They just are.

24          MR. ABRAMOWITZ:  And we'll next go to Exhibit 3108,

25  Eva Hearttimer at Lincoln National and we'll go to page 33624.

DA1LBIN2                        Trial

1           THE COURT:  This is 3108.  And this is someone we

2    haven't heard about?

3           MS. McCALLUM:  Have not heard about.

4           MR. ABRAMOWITZ:  33624.  IOLI -- this is also Lincoln,

5    your Honor, and the point is that these are Lincoln policies

6    where we had a witness, Mr. Burns, who said we have these

7    policies.  We don't want STOLI.  And they have all the

8    guidelines and now what do we see?  IOLI detection.

9           Owner state of residence is different from the insured

10   state of residence.  Review case for possible nonrecourse

11   premium financing.

12          Now we can go another Lincoln, Defendant's

13   Exhibit 3062.  This is Maria Ramos.  This is somebody --

14          THE COURT:  She was here.

15          MR. ABRAMOWITZ:  -- was here.  IOLI -- excuse me, page

16   091653 -- IOLI, multiple applications exist for the insured.

17   Review case for possible nonrecourse premium financing.

18          Next go to Defendant's Exhibit 3159, page 50824.

19   Another Lincoln policy, Tomasa Contreras.  Could we look at --

20   this is part of the application where they answered the

21   question:  Have you had any discussions about the eventual sale

22   of new life insurance, including any indirect sale, etc., and

23   the insured says yes.  And he says while -- the applicant,

24   excuse me.  While there are no plans to sell this policy at

25   this time or in the future, we have discussed the secondary

1    market.

2            And then let's compare that to Defendant's

3    Exhibit 3162.

4            MS. McCALLUM:  What was this exhibit?

5            MR. ABRAMOWITZ:  That's 3159.  And let's compare it to

6    3162 where the same question, the same applicant has answered

7    the answer to that same question is no and it's in the same

8    application.  Now let's compare -- that's for that exhibit.  So

9    on the face of it, they have two inconsistent red flag IOLI

10   answers.

11           Let's go to Defendant's Exhibit 3043 at page 36760.

12           THE COURT:  Who is the insured?

13           MR. ABRAMOWITZ:  Alma Lapp, another Lincoln National

14   applicant from Mr. Binday's office.  Thirty -- I want to

15   compare Exhibits 3043 and 3044 at pages 36924.  And let's look

16   at -- these are in the same underwriting file.  On the left

17   side it says cash in banks, one million four.

18           Let's do it this way.  Let's look at what do they list

19   for real estate on the left, 550,000.  What does 3044 list for

20   real estate, 400,000.  Defendant's Exhibit 3043 lists for

21   liabilities, zero.  Defendant's Exhibit 3044 lists for

22   liabilities, 259,111.  Defendant's Exhibit 3043 lists for

23   personal property, $1 million.  3044 lists for personal

24   property, $500,000.  3043 lists for cash, 1,400,000.  And

25   Defendant's Exhibit 3044 lists for cash 550,000.  So in the

1    same file they have obviously inconsistent financial statements

2    for people in STOLI red flag zone.

3         Let's look at Exhibit 3045, another Alma Lapp

4    application.  We'll go to page 33701, another Lincoln National

5    policy.  Also coming up as an IOLI.  We need to question for

6    premium financing.

7         Let's go to page 33705.  Agree okay for 2.5 million.

8    Would obtain the agent IOLI certification form.

9         Let's go to Exhibit 3301.

10         THE COURT:  Hang on, please.  What is that?

11         MR. ABRAMOWITZ:  That indicates that they knew it was

12    IOLI.  All they wanted to do was get a certification form to

13    keep in the files.  And we would argue that that indicates that

14    they knew they were getting STOLI and they let it go.  The

15    government can argue it's negligence, it's this and it's that.

16    We have a right to argue that, first of all, with every one of

17    these Lincoln policies, they knew what they were getting

18    despite the financial -- despite the guidelines that were

19    issued from the top.

20         Let's go to Defendant's Exhibit 3301, another James

21    Farrell at Sun Life.  At page 62, we go to the highlighted

22    language, although I do not find language that indicates a

23    relationship to the secondary market, the trust is a bit

24    sparse.  Is this case a premium financed case, they ask.  And

25    that again is one of the red flags of IOLI and should have put

1    the company on notice that they were -- they should not have

2    issued that policy if they didn't want it.

3             We go to page 63.  The amount of shopping still is of

4    concern to me.  The trust seems vague.  The trustee is a little

5    atypical.  I am still somewhat uncomfortable with this case and

6    would use a very specific amendment in relation to the total

7    line and dates last seen by the MDs.

8             Now, your Honor, these are only samples.  We have, we

9    have others from the insurance files of Mr. Binday which the

10   government has stipulated should be introduced into evidence

11   and they are --

12            THE COURT:  No.

13            MR. ABRAMOWITZ:  Files.

14            MR. FEINGOLD:  That's not the stipulation.

15            THE COURT:  The stipulation was that they're business

16   records.

17            MR. ABRAMOWITZ:  Yes, I'm sorry.  They're business

18   records from Mr. Binday and they come from Mr. Binday's files

19   and they deal with the companies that --

20            THE COURT:  Sit down, please.

21            MR. FEINGOLD:  We did not stipulate they're business

22   records, your Honor.

23            THE COURT:  Fine.

24            MR. ABRAMOWITZ:  They are insurance applications that

25   are on file with the insurance companies that you did stipulate

1    were part of the file.

2            THE COURT:  We'll pull the stipulation out.  I'm sure,

3    I'm relatively certain there is a witness who can be called who

4    is not Mr. Binday who could qualify them as business records.

5            MR. ABRAMOWITZ:  The insurance files were stipulated

6    as business records.

7            THE COURT:  We'll see.  Give me the stipulation.  But

8    not this minute.

9            MR. ABRAMOWITZ:  Not this minute.

10           THE COURT:  I want you to finish your thought.

11           MR. ABRAMOWITZ:  Your Honor, I have given you a sample

12   of what -- I don't -- it's a two-hour presentation, I think.

13   And the way I propose to do it is to have Ms. Juteau take the

14   stand and I will simply go through for these applicants and

15   others situations like this.

16           The government is certainly free to say this is

17   negligence.  I say that 35 out of 44 with indications that they

18   were not fooled at all, not deceived, goes right to the heart

19   of our defense.  And it goes right to the heart of our defense

20   that the procedures that when Mr. Burns and Mr. Avery were

21   here, they lied on the stand.  They lied when they said they

22   would -- the process enhancements.  The process enhancements

23   was to raise the price to stop STOLI.  So that encourages the

24   applications to be granted, especially when they know they're

25   IOLI.  If they know that they're STOLI and they know they are

1    IOLI, they are not being deceived.  And that is --

2                THE COURT:  I have to agree that if they know they are

3    STOLI, they are not being deceived.

4                MR. ABRAMOWITZ:  And we have 35 examples out of the

5    ones that we've looked at from insurance -- from Mr. Binday's

6    insurance files and the insurance companies that are alleged to

7    be the victims here that indicate that they knew.

8                THE COURT:  You understand that I'm particularly

9    interested in the ones that the government has introduced

10   evidence of on its case in chief because the government isn't

11   proving and isn't charged with proving something grand and

12   amorphous.  It's charged with proving particular incidents of

13   fraud.

14               MR. ABRAMOWITZ:  But no -- they've gone much broader.

15   There are a thousand exhibits here about insurance policies,

16   about people that you haven't heard from.  And there are

17   insurance companies that have gone on the stand and said how

18   they really don't want this.  They don't want it.

19               THE COURT:  I listened to them all.

20               MR. ABRAMOWITZ:  They don't want it.  And I want to

21   show that they may say they didn't want it, but they got it.

22   And these are employees --

23               THE COURT:  Not that they got it.  You want to show

24   that they knowingly took it.

25               MR. ABRAMOWITZ:  Correct.  And I think I'm entitled to

```
 1    do that.  The government can say it's negligence.  The
 2    government can say whatever they want to say.  But the fact of
 3    the matter is when a good portion of their case is that these
 4    accountant's letters and these lawyer's letters, they know that
 5    they said we didn't verify anything.  And when they say we want
 6    to have a certification from Mr. Binday that this is not IOLI,
 7    they knew it was IOLI and all they wanted to do was put paper
 8    in the file.  And that's exactly what this case is about.
 9              And we feel that this is our defense and we really
10    feel we need to be able to present this to the jury.  The jury
11    can reject it.  The government can say they lied, they lied,
12    they lied, they lied.  We can say they weren't deceived at all.
13              One minute, your Honor.
14              And Mr. Stavis informs me and reminds me that we have
15    a constitutional right to present our defense.  This is our
16    defense.
17              THE COURT:  I'm aware of that.
18              MR. ABRAMOWITZ:  I know you are.
19              THE COURT:  They taught me that in law school.
20              MR. ABRAMOWITZ:  I went to law school so long ago I
21    don't know if the Constitution --
22              THE COURT:  We both did.  It was still in force then.
23              Ms. McCallum, Mr. Feingold, somebody.
24              MS. McCALLUM:  Your Honor, you just saw presumably
25    what is the best of and --
```

1        MR. ABRAMOWITZ:  There's more.

2        MS. McCALLUM:  For the three -- there were only three

3   insureds there who were talked about during this trial.

4        THE COURT:  Is there any evidence about any of the

5   other insureds in the thousands of documents that have been

6   admitted but that were not discussed on the witness stand?  In

7   other words, is there a Government Exhibit in evidence about

8   Ms. Lapp, is there a Government Exhibit in evidence about

9   Mr. Contreras?

10       MS. McCALLUM:  No.  There is an email I believe that

11  references Alma Lapp.

12       THE COURT:  Myra Davis?

13       MS. McCALLUM:  The government in selecting its

14  exhibits for this trial -- and there are a lot of them, but

15  they relate to particular insureds.  They relate to a list of

16  about 12 insureds.  And the exhibit list is actually broken

17  down by insured.  And you heard from some of those insureds;

18  you did not hear from others.  But the government -- they are

19  part of the government's case.  Ms. Hearttimer --

20       THE COURT:  Those insureds are whom?  Read me the

21  list.

22       MS. McCALLUM:  They are Florra Adler, Robert Katz,

23  Helen Carufe.

24       THE COURT:  Ellen?

25       MS. McCALLUM:  Helen Carufe, C-A-R-U-F-E, James

DA1LBIN2                    Trial

1    Farrell, who has a lot of documents.

2              THE COURT:  Yes, he does.  Had a lot of policies, as I

3    recall.

4              MS. McCALLUM:  Yes.  Martha Espinal.  Also has a lot

5    of documents.  Silas Griffin, Opal Headrick.

6              THE COURT:  Opal Headrick.

7              MS. McCALLUM:  H-E-A-D-R-I-C-K.  Oswald Heaton, Hanni

8    Lennard, Mary Pernice, who had no policies issued, Maria Ramos,

9    Doris Riviere, Lillian Robinson.

10             MR. ABRAMOWITZ:  Your Honor, they are charged with

11   defrauding insurance companies.  I intend to show -- they may

12   have picked what they wanted to pick, and if I were a little

13   more suspicious, I would suggest they didn't pick the ones that

14   we have just been talking about, but these are Binday policies

15   going to the same insurance companies in which there's a broad

16   conspiracy charged for 13, 13 insured companies in the

17   indictment.  They started with ten or whatever, they're down to

18   two.

19             We want to produce, we want to show that the insurance

20   companies knew, not any particular insured.  They knew by the

21   guidelines that they set -- 70 years old, over $4 million,

22   $3 million policies -- that they wanted these policies.

23             And the government is certainly free to argue that we

24   pulled the wool over their eyes, that these guys were just

25   being negligent.  I dare say when they see it all, they'll have

DA1LBIN2                         Trial

1    to come up with a different argument.  This is not negligence.

2    And it's not so much the individual insured, it's the

3    companies, the ones that are receiving.

4              THE COURT:  Could you -- would you mind sitting down.

5              MR. ABRAMOWITZ:  No.

6              THE COURT:  Thank you.  Because Ms. McCallum actually

7    had the floor.

8              MR. ABRAMOWITZ:  She sat down, I thought.

9              THE COURT:  She sat down because you stood up.

10             MR. ABRAMOWITZ:  She didn't see me stand up.

11             MS. McCALLUM:  I did.

12             THE COURT:  She sensed you behind her.

13             MR. ABRAMOWITZ:  I see.  Okay.

14             MS. McCALLUM:  Your Honor, there's a reason the

15   defendants have selected insureds that were not actually

16   testified about during the trial.  They have tried to cherry

17   pick from the underwriting files of select insureds that they

18   know the jury hasn't heard about yet.

19             I understand the Court's ruling with respect to the

20   particular insureds who were testifying here.

21             THE COURT:  Or for whom the government has exhibits in

22   evidence.

23             MS. McCALLUM:  That's fine, your Honor.  I understand

24   the Court's ruling.

25             THE COURT:  It's fine.  It's not fine -- there's a

1    separate issue about how the stuff gets into evidence, but

2    that's a separate question.

3            MS. McCALLUM:  Your Honor, I mean the parties have,

4    you know, some agreement with respect to some of these records

5    that there's not going to be objections on hearsay or

6    foundation grounds, but not with respect to the hundreds of

7    exhibits that were produced over the weekend relating to all

8    sorts of insureds about whom the government was not presenting

9    evidence during its case in chief.  And, again, these are

10   extraordinarily misleading excerpts that you just saw.

11           THE COURT:  Well, excuse me.

12           MS. McCALLUM:  I just want to give the Court some

13   context.

14           THE COURT:  I am sure you think they are

15   extraordinarily misleading excerpts.  The problem is that

16   that's for the jury to decide whether they are extraordinarily

17   misleading.

18           When I tell the jury what the definition of negligence

19   is, as I will, it will probably be argued that if they said

20   this looks like an IOLI policy to me, we're not talking

21   negligence.

22           MS. McCALLUM:  Your Honor, that's why they're

23   misleading.

24           THE COURT:  Yes, of course.

25           MS. McCALLUM:  I just want to just have the Court

DA1LBIN2                          Trial

1    understand what is really happening here.

2              THE COURT:  I do understand what's really happening

3    here, Ms. McCallum.  There's a defense in this case.

4              MS. McCALLUM:  I understand, your Honor.  But to bring

5    in all of these files about people whom the jury has not heard

6    about and about whom the government has not presented any

7    evidence.

8              THE COURT:  I'm not sure we can do that.

9              MR. ABRAMOWITZ:  Your Honor, please.  They've heard

10   the insurance companies.  Forget the individual insured.  They

11   heard that Mr. Binday and the other defendants are charged with

12   a conspiracy of putting STOLI documents in.  We are not limited

13   to their exhibits on our defense case.  We have a defense case.

14             THE COURT:  I hear you.  I hear you.

15             MR. ABRAMOWITZ:  Excuse me, your Honor.

16             THE COURT:  My biggest problem with your presentation,

17   Mr. Abramowitz, is not that you have a defense case.  It's how

18   you propose to put it in.

19             MR. ABRAMOWITZ:  I propose to put it in by files from

20   the insurance companies who are involved in this case, who are

21   alleged to be the victims in this case.  And how can they say

22   that with one they pick it got through, but then the 20 that go

23   to the same company and it's the same alleged conduct that we

24   say is perfectly legitimate conduct and they say is perfectly

25   criminal conduct, we're allowed to show that they knew what

DA1LBIN2                          Trial

1     they were getting from Mr. Binday and Mr. Kergil and

2     Mr. Resnick.

3              And they can argue that, oh, it slipped through, it

4     slipped through.  I dare say when the whole presentation is

5     made they cannot make that argument, as your Honor just

6     indicated.  They will not be able to make that argument.

7              They can argue that they relied on what Mr. Binday

8     said, but we certainly are free to argue that could not have

9     relied on what he said and could not have relied on those

10    nonsense accountant letters, they were just paper.  Just paper.

11    They wanted the IOLI, STOLI business until they didn't want to

12    pay it.  That's the case.  They wanted it all those years the

13    hedge funds were paying all those premiums.  They wanted the

14    business.  They closed their eyes, they consciously avoided

15    finding out the truth about these IOLI policies.

16             And we are entitled to show that under the DeMatto

17    case.  And not that they didn't bring out these individual

18    applicants -- they're all Binday applicants, they're all STOLI

19    applicants.  It's the insurance companies that are supposedly

20    the victims here, and we want to show that they were not

21    victimized.

22             THE COURT:  Okay.  Let's start with the stipulation.

23    Where is the stipulation?  Because I'll bet that the

24    stipulation gets in records relating to Adler, Katz, Carufe,

25    Farrell, Espinal, Griffin, Headrick, Heaton, Lennard, Pernice,

 1    Ramos, Riviere, and Robinson.  Am I right?

 2              MS. McCALLUM:  No, it doesn't get in any documents,

 3    your Honor.  It's a stipulation that the government -- that

 4    both parties will not contest on hearsay or foundation grounds

 5    certain select exhibits that are appended to the stipulation.

 6              MR. FISCHER:  Your Honor, this is the nonhearsay.

 7              THE COURT:  Could I have the stipulation?  What's the

 8    number?

 9              MR. FISCHER:  Government Exhibit 5001.

10              THE COURT:  Government Exhibit 5001.

11              Jimmy, I need a copy of it.  It was admitted into

12    evidence.

13              THE DEPUTY CLERK:  They have their stips back.

14              MR. FISCHER:  And, your Honor, if you look at the top

15    portion of Defendant's Exhibit, this is a nonhearsay

16    foundation.  The parties will not object on nonhearsay grounds.

17    Defendant's Exhibit 3001 through 3076 are part of this

18    presentation.  They are documents, your Honor, that come

19    directly from the insured's policy file that were produced by

20    the insurance companies, as Mr. Abramowitz said, some cases

21    three years ago, two years ago, or a year ago and the

22    government has had access to.  They are policy file documents.

23    That's why they're on this stipulation because the government

24    is not going to object on hearsay grounds.  They may object on

25    relevance, they may object on 403.  That's reserved.

DA1JBIN3                         Trial

1            MR. FISCHER:  What we have done, your Honor, this

2     reflects the defense's Exhibit 3001 through 3076 as given to

3     the government I think over a week ago or over a week ago.

4            In the interim, we have been working around the clock

5     to make this presentation, identified additional exhibits we

6     have provided to the government.  Three other series of

7     exhibits we request they be put on this chart, on this file,

8     and they are of the same kind, they are from policy file

9     documents, insured policy filed documents.

10            THE COURT:  Can I stop with 3001 through 3076.

11            They're clearly on the stipulation, right?  So the

12     government has waived any hearsay or foundational objection to

13     the introduction of those documents.  So, Ms. McCallum, what is

14     the basis for the government's objection for the documents

15     coming in?

16            MS. McCALLUM:  Relevance and admissibility, your

17     Honor.

18            THE COURT:  Admissibility?  First of all, relevance,

19     you're wrong.  Now, relevance, you lose.

20            Now, admissibility, what is the federal rule of

21     evidence that has led you to admissibility.  They're

22     inadmissible because it is hearsay?  They're inadmissible?

23            MS. McCALLUM:  Rule 403.  It relates to --

24            THE COURT:  Oh, no, no, no, no.  So sorry, not 403.

25     They're admitted.

1              (Defense Exhibits 3001 through 3076 received in

2     evidence)

3              MR. ABRAMOWITZ:  Just so you'll know, when we make the

4     presentation, there will be other similar documents in the

5     series.

6              THE COURT:  Will you listen to me?  Will you listen to

7     me?  I am just sorry I didn't send the jurors home altogether,

8     right?

9              I need a list.  I need copies of documents.  3001

10    through 3076, if the government's objection is relevance and

11    403, it is the first time I have ever had the government say

12    that a document that has probative value is too prejudicial.

13    Usually that is the argument that the defense makes, and the

14    government says yeah, right, it is prejudicial because it shows

15    he's guilty.

16             MR. ABRAMOWITZ:  We're saying it in reverse.

17             THE COURT:  Correct, you're saying it in reverse.

18    What is good for the goose is good for the gander.

19             MR. ABRAMOWITZ:  May I suggest the following?

20             THE COURT:  If there are other documents?

21             MR. ABRAMOWITZ:  They're of a similar nature.  I will

22    be glad to give you our --

23             THE COURT:  I am perfectly willing -- if the

24    government is not prepared to enter into the kind of

25    stipulation, which is their right, they can try their case the

1   way they want -- I am perfectly willing to adjourn this trial

2   until you can subpoena people in here to authenticate them as

3   business records.

4          MR. ABRAMOWITZ:  They have been authenticated.  All I

5   am suggesting is I have given you samples, there will be other

6   similar things in that series that they stipulated to.  They're

7   policy files.  They're coming from --

8          THE COURT:  I am telling you if the government isn't

9   willing to agree that the documents that you wish to introduce

10  are subject to this stipulation, we will adjourn the trial, you

11  can subpoena people from the insurance companies, and they can

12  come in and authenticate the documents and indicate that they

13  were prepared in the ordinary course of business of the

14  insurance companies, that it was the business of the insurance

15  companies to prepare such documents and that the person who was

16  preparing the documents was under a duty, okay?

17         If they really want the insurers to come in and say

18  that, then the insurers can come in and say that.  To the

19  extent there is a relevance objection to any document that does

20  not violate the company's policy to do that, so it shouldn't

21  have been introduced, the government is free to assert on a

22  document-by-document basis.

23         For that, I need documents.

24         MS. McCALLUM:  I do want to be clear that the exhibits

25  that are covered by that stipulation, first of all, are not

DA1JBIN3                          Trial

1   limited to the ones we have heard about during this trial,

2   okay?  The scope is much larger than that.

3           MR. ABRAMOWITZ:  That's right.

4           THE COURT:  Here is the deal.  The jurors are going to

5   go home.  I want a copy of every document that is part of the

6   defense presentation.  I want it after lunch.  I want other --

7   we are going to go through them one-by-one, one-by-one we are

8   going to find out what the objections are to those exhibits.

9   We are going to see what comes in and what does not.  We are

10  going to see what witnesses we need to have available in order

11  to authenticate documents, to lay foundations, to do whatever

12  has to be done.

13          MR. FISCHER:  Your Honor, on the stipulations, just to

14  clarify, the 3000 series up to 3076 is on this non-hearsay

15  stip, and we can all agree on that.  The issue is there were

16  other documents identified because we are doing this on a

17  realtime basis and providing it to the government on a realtime

18  basis.

19          THE COURT:  I hear you.

20          MR. FISCHER:  The government's objection, your Honor,

21  was not that -- it is a timing issue.  We are not going to

22  include it on the stip.  It is a timing issue.  We need to

23  review the documents.  If it comes from the policy file similar

24  to why these documents were included here, we are not going to

25  object on a hearsay basis.

DA1JBIN3                              Trial

1          THE COURT:  I hear you.  I hear you, okay?  I hear

2     you.  I am not privy to or party to your conversations.  I am

3     telling you how we are going to do this.  We are going to do

4     this the old fashioned way, the formal way, piece of paper by

5     piece of paper.  That is how we are going to spend our

6     afternoon, and then there won't be any doubt or any question.

7     I have had people get up here and say it is our company policy

8     that we don't do these kinds of things.

9          Now, I can see policies slipping through, but if the

10    files are replete with underwriters saying it looks like IOLI

11    to me, looks like STOLI to me, and the policies are issued

12    nonetheless, I am letting it in.

13         MR. ABRAMOWITZ:  Your Honor, may I simply just suggest

14    the following rather than send the jury home.  If we could

15    spend, if we could spend some time with the government, I will

16    show them the rest of the outline, and I will show them the

17    exhibits --

18         THE COURT:  You guys need to have lunch.  I need to

19    have lunch.

20         MR. ABRAMOWITZ:  I am reluctant to lose the time, your

21    Honor.

22         THE COURT:  I understand you don't want to lose the

23    time.

24         MR. ABRAMOWITZ:  We don't need to, either.

25         THE COURT:  I don't know that we don't need to.  The

DA1JBIN3                         Trial

 1    jurors are coming back at 1:30.  If we are not ready to go by a

 2    quarter of 2:00 or 10 of 2:00, then I will send them home and

 3    we'll get ourselves ready to go so tomorrow we can go.

 4                MR. ABRAMOWITZ:  I think we can, if I have a few

 5    minutes with the government, I really can show them the rest.

 6                THE COURT:  Good.

 7                MR. ABRAMOWITZ:  All of the --

 8                THE COURT:  Probably it is helpful for the government

 9    to know that I really don't buy their relevance or 403

10    objections in the circumstances after seeing what I have seen.

11                MR. ABRAMOWITZ:  Therefore, I hope that they will just

12    put their objection on the record, but that we can proceed this

13    afternoon, and I think we will not be wasting anybody's time by

14    doing that.

15                THE COURT:  Okay.

16                (Luncheon recess)

17                (Continued on next page)

18

19

20

21

22

23

24

25

1        AFTERNOON SESSION

2        1:50 pm

3        (Trial resumes)

4        (In open court; jury not present)

5        THE CLERK:  Come to order, please be seated.  Case on

6    trial continued.  The government and defendants are present.

7    The jurors are not present.

8        MS. McCALLUM:  The government requests a little bit

9    more time to go through these files.  I have confidence we will

10   be able to resolve any issues over these documents with defense

11   counsel if we are just granted the afternoon to review them.

12       THE COURT:  I think that sounds like a very sensible

13   suggestion.  I would apologize profusely to the jury and take

14   all the blame.

15       MR. ABRAMOWITZ:  Before you ask the jury to come in,

16   do you want to try to anticipate the schedule for the rest of

17   the week?

18       THE COURT:  Well, sure, that is a great idea actually,

19   Mr. Abramowitz.  We actually had a trial where we had a juror

20   who would come out of the jury room and peek during -- yes, we

21   did have a juror.  We don't want to do that again.  I don't

22   think this jury has a similar individual.  We did let him go.

23       So, yes, you tell me.  You tell me what the schedule

24   is.  We're on tap for Wednesday and Thursday.  They'll

25   deliberate Friday if they're deliberating.  I don't know if

 1    they'll be deliberating.

 2              MR. ABRAMOWITZ:  This presentation in its full form

 3    probably takes two hours at the most.

 4              THE COURT:  Right.

 5              MR. ABRAMOWITZ:  And there were other documents.

 6              THE COURT:  This is a week.  Every now and again I

 7    like to remind you -- your client is Michael Binday -- you are

 8    going to put on this presentation which is applicable to all

 9    three defendants.  Is Mr. Binday going to add any anything

10    more?

11              MR. ABRAMOWITZ:  Just documents, your Honor.

12              THE COURT:  How about Mr. Kergil?

13              MR. ABRAMOWITZ:  One second.  Perhaps a custodian

14    witness, but I am trying to work that out with the government

15    as well.

16              THE COURT:  If we have to, we have to.

17              MR. STAVIS:  As I informed the government this

18    morning, Mr. Kergil will not be testifying on his own defense.

19    We have just two or three documents, possibly a custodian.  If

20    not, then we can just go with our few documents and that would

21    be our case.

22              THE COURT:  Ms. Murray?

23              MS. MURRAY:  As I advised the government, Mr. Resnick

24    will not be exercising his right to testify.  Also I am working

25    on a stipulation with the government or I may call Agent

1    McDonald for a brief direct.

2            THE COURT:  I figured somebody was going to call Agent

3    McDonald.  Then I will take the hint and I assume you will have

4    some sort of rebuttal case?

5            MS. McCALLUM:  Yes, I think that is a fair assumption,

6    not very long, your Honor.

7            THE COURT:  Okay.  So if you're going to take, the

8    defense will take between two and three hours tomorrow, and the

9    government will put on a short rebuttal case and we are going

10   to have a charge conference, that will consume tomorrow.  That

11   would mean that we will have summations on Thursday and a

12   charge on Monday morning.  That sounds like to me -- or

13   summations may go over into Monday.  We will not have

14   summations starting on Monday.

15           MR. ABRAMOWITZ:  No, no, no, I wasn't going to suggest

16   that, but we would like to try to avoid having all the defense

17   summations on Thursday and then the rebuttal summation on

18   Monday.

19           THE COURT:  Well, that depends on how long they take,

20   Mr. Abramowitz.  That just depends on how long they take.

21   We'll work for a full day.  My guess, knowing you guys, is that

22   we'll end up getting through two of the three defense

23   summations on Thursday, but I don't know.  If we get through

24   them all, if we get through everything and everything is short,

25   I will make the government do its rebuttal summation on

DA1JBIN3                      Trial

1    Thursday.  All the summations, everybody should be ready to sum

2    up on Thursday.

3              MR. ABRAMOWITZ:  Can we start a little earlier and end

4    later so all the summations get done if we can?

5              THE COURT:  We'll do our damnest, okay?

6              MR. ABRAMOWITZ:  Say it again.

7              THE COURT:  I'll do my best.  I'll do my west best.

8              Could we have the jury.

9              THE CLERK:  Yes, your Honor.

10             THE COURT:  I am going to spend the afternoon

11   reworking the charge.

12             (Jury present)

13             THE COURT:  Okay.  Don't get too comfy.

14             In every trial there is a day like today.  It is the

15   day when we are trying to tie everything up and we try to do it

16   quickly because we don't want to be a burden to you, and we end

17   up realizing somewhere about halfway down the pike that if we

18   don't slow down, we're just going to confuse you.

19             So we reached that point about a quarter of 1:00, at

20   which time it was too late to telephone you all and tell you to

21   go home.  So we're going to send you home.  We are going to

22   finish our work this afternoon, which is going to streamline

23   things I think by a whole day, so you will have lost a day, and

24   I apologize for that, but we will gain a day at the other end.

25             After talking to the lawyers, I believe that tomorrow

1    there will be some kind of a case that will go on with the

2    defense and, of course, the government has the burden of proof.

3    So the government has an opportunity to present something

4    called a rebuttal case if it wants to do so, and the government

5    has indicated that it may have some rebuttal case.

6         I think that is what you all will be listening to

7    tomorrow.  Then I'll probably be excused a little bit early

8    because we have to have a conference about the charge once all

9    the evidence is in and before you hear the summations.

10        Thursday it looks like you will be hearing summations.

11   Whether we get through all of them on Thursday or not I don't

12   know.  We have a total of five summations.  The government goes

13   first.  Each of the defendants gets to sum up and the

14   government, the party with the burden of proof, gets to go

15   last, but we will definitely be charging you on Monday.  You

16   may hear a couple of summations before that.  We'll definitely

17   be charging you, you will definitely start deliberating on this

18   case next Monday, okay?

19        So that's the schedule.  We're still ahead.  I

20   apologize for today, I really do in every way.  I know it is

21   frustrating to come in and not do anything or work for 15

22   minutes.  Don't communicate about the case tonight.  Keep an

23   open mind, and I will see you tomorrow morning.  We will get

24   started at exactly 10:00 o'clock.

25        (Jury excused)

DA1JBIN3                          Trial

 1               THE COURT:  Okay.  Go to work.  It will take me a

 2     minute to log out and get out of here.

 3               (Court adjourned until Wednesday, October 2, 2013, at

 4     10:00 o'clock am)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DA1JBIN3                        Trial

1                        GOVERNMENT EXHIBITS

2     Exhibit No.                                    Received

3      6001, except Government Exhibit 2005, 1211

4                         DEFENDANT EXHIBITS

5     Exhibit No.                                    Received

6      3001 through 3076   . . . . . . . . . . . .1269

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25