DA3JBIN1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          12 Cr. 152 CM

5    MICHAEL BINDAY,
     a/ka/ Sealed Defendant 1,
6    JAMES KEVIN KERGIL,
     a/k/a Sealed Defendant 2,
7    and MARK RESNICK,
     a/k/a Sealed Defendant 3,
8
                    Defendants.
9
     ------------------------------x

10

11

12                                        October 3, 2013
                                          10:10 a.m.
13

14

15   Before:

16                   HON. COLLEEN McMAHON,

17                                        District Judge
                                            and a jury
18

19

20

21

22

23

24

25

DA3JBIN1                         Trial

                                APPEARANCES

PREET BHARARA,
        United States Attorney for the
        Southern District of New York
SARAH McCALLUM,
ZACHARY FEINGOLD,
EUN YOUNG CHOI,
        Assistant United States Attorneys


MORVILLO ABRAMOWITZ GRAND IASON & ANELLO, P.C.
        Attorneys for defendant Binday
BY:  ELKAN ABRAMOWITZ, Esq.
        BENJAMIN SEAN FISCHER, Esq.
        JASMINE MARIE JUTEAU, Esq.
                     Of counsel


GALLET DREYER & BERKEY, LLP,
        Attorneys for defendant Kergil
BY:  ROGER LEE STAVIS, Esq.
        ADAM MICHAEL FELSENSTEIN, Esq.
                     Of counsel


LAW OFFICES OF JANE ANNE MURRAY
        Attorneys for defendant Resnick
BY:  JANEANNE MURRAY, Esq.
                     Of counsel

DA3JBIN1                              Trial

```
 1              (Trial resumes)

 2              (In open court; jury not present)

 3              THE CLERK:  Come to order, please.  You may remain

 4     seated.

 5              THE COURT:  Let's talk about the charge first.  Bring

 6     me up to date.  When I last heard, there was a rumor that you

 7     had come up language for Page 30, which Mr. O'Neill has

 8     inserted, and I was told this morning that the agreement is

 9     subject to some kind of a caveat about a word or a phrase.

10              MR. STAVIS:  4 words.

11              THE COURT:  4 words?  4 words?  It sounds like a bad

12     song.  Point me in the right direction and then let's talk

13     about the words.

14              MR. STAVIS:  Right after "proof" on the third

15     paragraph, at the end of the page.

16              THE COURT:  Wait a minute.  Okay.  Then the government

17     will not have met its burden of proof.

18              MR. STAVIS:  And you must find the defendants not

19     guilty.  So it is 9.

20              THE COURT:  Oh, come on!

21              I don't insert those words into my charges.  That is

22     the dispute?

23              MR. STAVIS:  It is a correct statement of the law.

24              THE COURT:  It is a correct statement of the law.

25              MR. STAVIS:  Your Honor was very emphatic --
```

DA3JBIN1                      Trial

1           THE COURT:  I don't throw it everywhere in the charge.

2      I just tell them this is the rule.

3           MR. FISCHER:  Your Honor, so with that ruling, I think

4      we are in agreement with the government on -- I don't want to

5      get you too excited.  I have one more minor issue to be worked

6      out or to address.  We are in agreement on that submission that

7      the government made last night.  We agreed to that.

8           We received your Honor's e-mail of last night and

9      obviously, subject to the objections we made on the record

10     yesterday, we will deal with that charge.

11          THE COURT:  That is what I am prepared to say because

12     that is the law, and what you asked me to charge is not the

13     law, and you have your objection to my not charging what is

14     plainly not the law.

15          I was happy to be rereading D'Amato because it was

16     sitting on my chair.  What does it say?  It says the scheme to

17     defraud need not have been successful or complete.  Therefore,

18     the victims of the scheme need not have been injured.

19          You know, it is very weird.  State law is so nice and

20     straightforward.  Fraud is fraud.  They don't worry about

21     schemes, conspiracies and things like that.  Just fraud!

22          MR. FISCHER:  It is too late to have the case removed

23     to state court, your Honor.

24          THE COURT:  It is too late to have the case moved to

25     state court, that is true.

1           Do I have the right Page 30 here?  This is the

2    proposed new Page 30?

3           THE CLERK:  Correct.

4           MS. McCALLUM:  That is just the proposed first three

5    paragraphs of Page 30.

6           THE COURT:  The replacement paragraphs and then there

7    is the last paragraph.

8           MS. McCALLUM:  Correct.

9           THE COURT:  A juror has arrived.  I am going to excuse

10   her.  We're going to put her in the custody of Mr. O'Neill for

11   a few minutes.

12          THE CLERK:  A Marshal is on the way up.

13          THE COURT:  Excellent.  We'll do the hand-off, and I

14   think that is what we are going to do.  Could we bring her out.

15          THE CLERK:  Yes, Judge.

16          THE COURT:  Are you ready, Ms. McCallum?

17          MS. McCALLUM:  Yes, I am ready to go.

18          THE COURT:  When we're done, then if you will on the

19   way back out just knock on the door and tell them to come on

20   out.

21          MR. FISCHER:  We'll address that one more piece of the

22   charge, a minor issue.

23          THE COURT:  Let's address it now.

24          MR. FISCHER:  Let's do it now.

25          THE COURT:  What page is it on?

1           MR. FISCHER:  Page 30 of the charge you circulated

2      yesterday, and it is the paragraph that starts, "There is one

3      more thing that I must tell you."

4           THE COURT:  Yes, about the no negligence.

5           MR. FISCHER:  About the no negligence, we think there

6      is no basis for that charge in this case.  We are not arguing

7      negligence.  We are not going to raise that issue.  The taking

8      out of our suggested language, we think, should also result in

9      the taking out of that language.

10           THE COURT:  That language is put in there to protect

11      your guys.  If you want it out, I'll take it out.

12           MS. McCALLUM:  No, your Honor.  That language is

13      absolutely essential in a case like this where the defense is

14      putting on evidence that really is evidence of negligence.  I

15      know they want to --

16           THE COURT:  I hate to tell you, Ms. McCallum.  You

17      don't understand.  Obviously, you haven't practiced enough

18      civil law to understand what negligence is.

19           MS. McCALLUM:  This is black letter law.  We need this

20      instruction at least just not to have the jury confused about

21      this and to make clear that negligence is not a defense to this

22      charge, to these charges.

23           THE COURT:  Then I will say negligence is not a

24      defense and the defendants in this case are not asserting it.

25      I'll add those words.  I will keep the language in and I will

1    add the defendants in this case are not asserting negligence as

2    a defense.  That way you'll have your language, they'll have

3    the point they made, and everybody will live happily ever

4    after.

5              MR. STAVIS:  If something is the law and doesn't apply

6    to the case being tried, and we made it quite clear with

7    everything we have done it is not negligence, I object to any

8    mention of negligence.

9              THE COURT:  Fine.  Your objection is noted.

10             MR. STAVIS:  It is confusing to the jury.

11             THE COURT:  Your objection is noted.

12             THE CLERK:  The juror?

13             THE COURT:  Yes, please.

14             (Alternate Juror No. 5, Ms. Yemi Collins, entered the

15   courtroom)

16             THE COURT:  Hi, ma'am.  I got your phone message.  It

17   is pretty clear that you're not going to be called on to

18   deliberate, and it seems like there is some stuff you need to

19   deal with, so we're going to excuse you at this point.

20             Jim wants to talk to you about some next step stuff,

21   so you and he will go off and talk for a bit.

22             JUROR:  Okay.

23             THE COURT:  Thank you so much for your service.  Thank

24   you for being here every single day.  It has been rough, I

25   know, and you have been a trooper and a really really good

DA3JBIN1                    Trial

1   citizen.  It has been a pleasure and a privilege for us to work

2   with you.

3               JUROR:  Thanks.

4               THE COURT:  Okay.

5               (Alternate Juror No. 5, Ms. Yemi Collins, left the

6   courtroom)

7               THE COURT:  Okay, let's do it.

8               (Jury present)

9               THE COURT:  Good morning, everybody.

10              THE JURY:  Good morning.

11              THE COURT:  So Alternate No. 5, who is now Alternate

12  No. 4, we have excused, and we are going to proceed on to the

13  closings.  Counsel, you can sit down.

14              Let me tell you a little bit about what is going to

15  happen.  The lawyers are going to make arguments to you.  If

16  they're right about how much time they're going to take, they

17  may all get done with those today.  They're never right about

18  how much time they're going to take.  They always underestimate

19  how long it is going to take them to say what they want to say.

20  I have 18 years of experience in this regard.

21              We may get through some of the summations today and

22  then go back to some of them on Monday.  It just depends.  Also

23  there is only so much you can absorb.  It is hard for you to

24  listen to speech and after speech after speech.  I appreciate

25  that.  However, this is in some ways the most interesting part

DA3JBIN1                          Trial

 1    of the case because we have listened for several weeks to a

 2    very disjointed presentation, a little bit read from this

 3    document, this witness says something to us.  Now the lawyers

 4    are going to take all of that evidence and they're going to use

 5    it like paint, to paint a picture for you.

 6          They're going to argue to you what conclusions you

 7    ought to draw about the only question you have to decide, which

 8    is whether the government, the party with the burden of proof,

 9    has managed to overcome the presumption of innocence beyond a

10    reasonable doubt.  That's the question you have to answer.

11          It is not going to come as a surprise to you that the

12    lawyers will paint somewhat different pictures with the paint

13    available to them, with the evidence, right, and they'll ask

14    you to draw different conclusions.  If lawyer asks you to draw

15    a conclusion that seems to you to be logical and something that

16    flows naturally from the evidence that you've seen and heard,

17    you're free to say yeah, that sounds right and adopt that

18    conclusion.

19          If, on the other hand, a lawyer asks you to adopt a

20    conclusion that doesn't strike you as logical or rational or

21    that doesn't flow from the evidence or appears to contradict

22    the evidence that you find to be believable, then simply say

23    no, that doesn't appeal to me, put that to one side and draw

24    your own conclusion based on the evidence that you find to be

25    credible and persuasive in the case.

DA3JBIN1                          Trial

1           The reason that I sent you home yesterday afternoon is

2    because the lawyers and I spent some hours and into the night

3    and back this morning again talking about the charge.  The

4    lawyers know what I'm going to tell you about the law.

5    Remember what I say about the law is the law in this case.  The

6    lawyers obviously need to know what that is so that they can

7    taylor their arguments to what the legal charge is going to be,

8    and so we dickered over the wording and everything like that,

9    but we are all on the same page about what the law is.

10          Should a lawyer -- they're all going to say Judge

11   McMahon will tell you.  They'll all say that because they

12   always do say that, and they'll tell you what I'm going to tell

13   you.  If on Monday when I give you the charge you say but

14   that's not what this lawyer or that lawyer said Judge McMahon

15   is going to tell me, remember what they say about the law is of

16   no account.  They're the lawyers.  I'm the law.  If there is

17   any discrepancy between what I say the law is and what they

18   tell you I'm going to say the law is, what I say controls.

19          We have had objections during the course of the trial

20   and we have had sidebars to talk about procedural things.

21   There are rules that have to be followed by the lawyers during

22   summations, so it is not at all unlikely that we will hear some

23   objections during the course of the summations.  I will rule on

24   those objections.

25          I remind you, lawyers have a duty to call it to my

1    attention when they think that the rule is being violated, so

2    don't take offense if a lawyer utters an objection.  By the

3    same token, any ruling I make is not intended to be a signal to

4    you that I think that lawyer is right or that I think that

5    lawyer is wrong, or that I think the government has met its

6    burden of proof or hasn't met its burden of proof.  I'm just

7    calling both balls and strikes.  I am not anything other than

8    the umpire here, so don't draw any conclusions from my rulings

9    for or against either side.  It is very, very important that

10   you understand that basic rule.  The order of summations, as I

11   told you yesterday, is as follows:

12          The government will deliver its principal summation.

13   Then each of the defendants, in the order that they're listed

14   in the indictment, which happens to be alphabetical, will have

15   his lawyer sum up.  So we'll hear first from Mr. Abramowitz and

16   then we'll hear from Mr. Stavis and then we'll hear from Ms.

17   Murray.  Then the government has an opportunity to have the

18   last word because it has the burden of proof.  Anybody who was

19   a debater in high school, you know that the team that had the

20   affirmative went first and went last.  It goes the same in a

21   trial.  The government goes first and the government last last,

22   all right?  So we have a total of five summations, a total of

23   five summations.

24          Ms. McCallum, are you ready?

25          MS. McCALLUM:  I am, your Honor.

1          THE COURT:  In that case, the floor is yours.

2          MS. McCALLUM:  Who wants to have a Ferrari in their

3   driveway?  That was the line that Michael Binday used to

4   recruit a roomful of salesmen for his scheme to defraud life

5   insurance companies, and it worked.

6          Lured by massive commissions, Kevin Kergil, Mark

7   Resnick and others joined Michael Binday in telling reams and

8   reams of lies on life insurance applications, to get insurance

9   companies to issue policies they never would have issued had

10  they known the truth, lies about who was going to own the

11  policies, lies about who was going to pay for them, lies about

12  the applicant's wealth, all of these lies designed to trick

13  insurance companies into doing deals that were bad for their

14  business but good for the defendants.

15         What were the lengths to which the defendants went to

16  perpetuate their fraud, to keep the commissions flowing?  They

17  instructed seniors stay quiet if insurance companies call.

18  They made sure the seniors would be ready to lie if interviews

19  couldn't be avoided.  They hired supposedly independent

20  inspectors and actuaries and accountants to verify the bogus

21  financials they were feeding the insurance companies.

22         They wired money into seniors' accounts, instructed

23  them to write checks on those accounts with the same money to

24  the insurance companies, all to make it look like the seniors

25  were the ones who owned these policies and were the ones who

DA3JBIN1                    Summation - Ms. McCallum

1   were really paying for them, could really afford them.

2           Then when investigators and the government caught wind

3   of their fraud, the defendants took that fraud to a whole new

4   level.  Michael Binday lied under oath to the New York State

5   Insurance Department not just about individual STOLI policies

6   that he had helped get, but about his entire business.  Kevin

7   Kergil and Mark Resnick set out to destroy evidence, wipe hard

8   drives, delete e-mails, get rid of anything with Binday's name

9   on it.

10          These actions, ladies and gentlemen, are the actions

11  of guilty men, men who know they've committed fraud and men who

12  are trying to cover their tracks, but it didn't work because

13  here you are having to see and listen to over two weeks worth

14  of overwhelming evidence that these defendants committed the

15  crimes with which they're charged.

16          Now, I want to start out this summation by talking a

17  little bit about what is in dispute and what isn't in dispute

18  because there can't be really any disagreement about some

19  pretty important basic facts.  What are those?

20          The first is that Michael Binday and Kevin Kergil and

21  Mark Resnick lied over and over again on applications for life

22  insurance.  They were recruiting seniors to get multi-million

23  dollar policies for hedge funds and for other investors, yet

24  they were swearing up and down to the life insurance companies

25  that that's not what they were doing.

1          These three men knew the seniors that they were

2     recruiting, that many of them had very little money, yet they

3     were swearing up and down to the insurance companies that these

4     people were multimillionaires.  So the defendants lied

5     repeatedly.  That is not really in dispute.

6          What else isn't really in dispute?

7          That each of these men knew the applications they were

8     submitting to the insurance companies were filled with lies.

9     They all knew the whole point of this scheme was to get STOLI

10    policies, and they sent applications with their own signatures

11    filled with those lies.

12         The same with the lies about finances.  Each of these

13    men knew the seniors that they were recruiting for their STOLI

14    scheme had modest means, and they knew that the insurance

15    applications they were submitting were painting these people as

16    multimillionaires.

17         Take Silas Griffin, the first witness you heard from

18    in this trial.  He had a $50,000 house.  Mark Resnick claims

19    the man has $4.8 million.

20         James Farrell, another witness you heard from, his

21    true net worth gets whited out and quadrupled by Binday.

22         Then you have Kevin Kergil, the man behind the numbers

23    getting real asset figures and net worth figures from agents in

24    the field like Ed Lynch and Paul Krupit and spitting out fake,

25    grossly inflated numbers for the life insurance applications.

DA3JBIN1                    Summation - Ms. McCallum

1    So there can be no dispute about knowledge here, ladies and

2    gentlemen.  These men knew they were lying.

3           A third thing that can't seriously be disputed is the

4    motive for these crimes, the motive for lying.  Why did they do

5    it?  Because they wanted the money.  They wanted those Ferraris

6    in their driveways.  They wanted the staggering commissions

7    they got every time a policy issued.  This is that stipulation

8    that was admitted into evidence about all the commissions

9    earned on some of the policies you heard about during this

10   trial, massive commissions.

11          They also wanted to cash in for themselves on the

12   enormous death benefits they could reap in some cases.  You saw

13   and heard about what happened with Doris Riviere, Mark

14   Resnick's STOLI client.  Resnick and Kergil learned that she

15   was dying, and they pounced on the opportunity to make a

16   killing off of this.

17          The benefit -- that is the commissions -- the benefit

18   on Doris Riviere's policy was $4 million.  That gets paid out.

19   Kergil invests a little over 300,000 and he gets back over $1.3

20   million from the insurance company.

21          Resnick gets over $770,000 in this payout.  You heard

22   a similar thing happened with Hanni Lennard.  That was one of

23   Kergil's clients, also a STOLI client.  Kergil and Binday

24   learned Lennard had died, and they maneuvered to take control

25   over the policy, the death benefit that Union Central paid, $2

1    million.  Kergil gets a $1.3 million payout on that and Binday

2    gets over $300,000 from that payout.  So the motive is not

3    disputed.  The motive is money, massive amounts of money.

4             So we've talked about what is not really in dispute.

5             Let's talk about what is in dispute.  What seems to be

6    disputed here is whether the targets of the defendants' scheme,

7    the life insurance companies, cared about the lies the

8    defendants were telling.  Did they care?  Did the lies matter

9    and did the defendants know those lies mattered?

10            Of course they did.  Of course the lies mattered and

11   of course these defendants knew that they mattered.  The

12   evidence on these points is overwhelming, and I want to spend

13   most of my time walking you through it.

14            So what is the first thing you can look to to satisfy

15   yourselves that the insurance companies cared about these lies?

16   It's the testimony of the insurance company witnesses you

17   actually heard from.  You had representatives from two

18   different companies come and talk to you, and they made two

19   basic points:

20            Number one, they didn't want STOLI because it was bad

21   for business;

22            Number two, they wanted to make sure that people

23   applying for these multi-million dollar life insurance policies

24   could actually afford those policies.

25            So regarding STOLI and the reason these companies

1    didn't want it, let's start with Jim Avery.  He is the man who

2    ran Prudential's life insurance business during the period

3    where these defendants were scheming to defraud the life

4    insurance companies.  Now, Avery told you that when he first

5    learned about STOLI back in 2004, 2005, he quickly understood

6    this was not the type of transaction that he would allow at

7    Prudential.  Prudential decided it simply would not issue STOLI

8    policies, period.

9          Why was that?  Because Prudential is a business, and

10   STOLI makes bad economic sense for insurance companies.

11   Prudential priced its policies for people, not hedge funds.

12   People sometimes stopped paying their premiums.  They lapsed

13   their policies.  You heard that term a lot, "lapse."  They let

14   their policies lapse when circumstances change, and that lets

15   Prudential offer lower prices to people it is insuring in that

16   pool.  It makes its products more competitive as well.

17         But investors who benefited from death and didn't

18   benefit from anything else, as Jim Avery told you, planned to

19   hold their policies all the way to death.  They pick insureds

20   who are healthy enough to qualify for good rates, but aren't

21   going to live so long that they're going to have to pay a lot

22   of premiums on those policies.

23         These investors, as Jim Avery told you, are betting

24   against the house, betting against the insurance companies, and

25   the insurance companies are on the losing end of that bet.

DA3JBIN1                    Summation - Ms. McCallum

1    Again Prudential is a business.  It makes business decisions

2    based on the economics of the deal.  STOLI was a bad deal for

3    Prudential.  As Avery told you, weeding out STOLI was important

4    for a lot of reasons and important to Prudential's financial

5    health.  It was important for pricing and it put at risk the

6    company's other economic interests, its goodwill and its

7    reputation.

8            Now, what about the other insurance executive you

9    heard from, Mike Burns from Lincoln Financial who had

10   previously been at Jefferson Pilot.  He told you basically the

11   same thing about Lincoln and Jefferson Pilot that Jim Avery

12   told you about Prudential.  Lincoln didn't and doesn't want

13   STOLI.  Jefferson Pilot didn't and doesn't want STOLI.

14           Burns explained in some detail how Lincoln -- and I'll

15   just use that term to refer to both Lincoln and Jefferson Pilot

16   because they merged -- priced its life insurance policies on

17   certain assumptions.  They assume that some percentage of

18   people are going to lapse their policies, assume certain

19   patterns of premium payments are going to happen, again all

20   based on human beings being the people buying these policies.

21           When Mr. Burns told you when he and Lincoln looked at

22   STOLI, they took a close look at it, at how it would affect

23   their business, what did they determine?  They decided it would

24   hurt profitability, that it would threaten higher reinsurance

25   costs and that it would threaten the tax-free status of death

1    benefits generally.  Not good for Lincoln.  All bad economic

2    outcomes for insurance companies.

3            So Lincoln took a strong early stance against STOLI.

4    They decided they wouldn't take it.  They incurred all those

5    costs in pricing, underwriting, hiking prices on policies to

6    try to deter the STOLI investors, making those policies less

7    competitive.  Ladies and gentlemen, how do you know the

8    insurance companies cared whether the defendants were telling

9    the truth about investor ownership and payment for these life

10   insurance policies?

11           You know it because the insurance company witnesses

12   you heard from told you so.  You know they were worried about

13   the economic impact that STOLI would have on their business,

14   and those witnesses are corroborated by countless documents you

15   saw throughout this trial.  You saw the applications for these

16   policies.  They all have specific questions designed to detect

17   and weed out STOLI.

18           Will the insured or owner applicant receive any

19   compensation as a result of the issuance of this policy?  A

20   classic sign of STOLI.  Is premium financing contemplated?

21   That is not a disqualifier but another indicator of STOLI.

22   This is the Prudential questions.

23           At the top of this form, Prudential will not knowingly

24   participate in a life insurance sale where the sale of the

25   policy is a secondary market or the participation of investors

DA3JBIN1                    Summation - Ms. McCallum

1    in a policy death benefits is being considered.  Then there is

2    this series of questions specifically added and specifically

3    designed to weed out stranger-owned life insurance.  Now, the

4    companies even required separate agent certifications, and you

5    saw some of that during the trial.

6          You saw the ones that Lincoln, Lincoln had all three

7    defendants sign.  This is the Silas Griffin application that

8    Mark Resnick signed.  With respect to the application for life

9    insurance identified above, I carefully reviewed the IOLI

10   policy.  All of the following answers are true and correct to

11   the best of my knowledge and belief.

12         Here are the questions.  No to the compensation

13   question.  No to premium financing.  There is the

14   certification.  I declare and certify that I have read and

15   understand the IOLI policy, and it is my understanding that

16   this life insurance policy being applied for does not violate

17   the stated intent and spirit of the Lincoln policy regarding

18   investor-owned life insurance.  There is Mr. Resnick's

19   signature to those lies.  Here is the attached policy.  This is

20   the IOLI policy attached to these certifications.

21         There it is, we don't want STOLI.  It isn't just the

22   applications, ladies and gentlemen.  You have company policy

23   documents, policy statements going back all the way to 2005.

24   Just a couple of examples here.

25         Jefferson Pilot not interested in selling life

1    insurance, STOLI or IOLI life insurance.

2            American General, again not interested.  We are not

3    accepting this business.

4            John Hancock.  We're not accepting this business.  It

5    is bad for business.

6            That is what these witnesses told you and that's what

7    the documents show.  Then as if you needed more on this, you

8    have the internal company memos, and you saw the three memos

9    that Mike Burns wrote to the Lincoln board of directors audit

10   committee starting back in early 2007.  This is what he says,

11   giving an update on screening out IOLI business.

12           Our primary concerns with IOLI business are the

13   following:  The reduced profitability of this business; the

14   potential impact on reinsurance pricing; the long term risk

15   that tax-favored benefits of life insurance could be

16   jeopardized.

17           These companies didn't just care about STOLI, ladies

18   and gentlemen, they cared so much that they adopted specific

19   questions for their applications.  They intensified their

20   underwriting.  They repriced their policies to try to combat

21   STOLI, and they sent repeated notices to their agents reminding

22   them this was the company position.  They demanded

23   certifications from their agents saying this isn't STOLI.

24   Promise this isn't STOLI.

25           So you know the insurance companies cared about STOLI.

DA3JBIN1                    Summation - Ms. McCallum

1     You know they worried about the economic impact it would have.

2     The evidence on that is overwhelming.

3                  You know the companies cared about finances, too.

4     Again Jim Avery from Prudential and Mike Burns from Lincoln

5     both told you finances mattered.

6                  Now, I want to be clear here.  Health is really

7     important to life insurance companies.  There is no doubt about

8     it.  If you're really unhealthy, you're probably not going to

9     live very long and you're probably not going to pay a lot of

10    premiums, and the insurance company is going to price for that.

11                 So insurance companies, of course, care about health,

12    but they also care about finances.  They need to know that

13    applicants can afford their policies.  They need to know the

14    applicants aren't going to be worth more dead than alive.

15                 Insurance companies also want to make sure that the

16    people they're issuing policies to are people with the same

17    general mortality risk, the same likelihood of death as those

18    they price for.

19                 They price based on experience.  They price based on

20    their own experience, industry experience with mortality, and

21    that experience really, for better or for worse, shows that

22    wealthier people, they do better with mortality.  The insurance

23    companies price that way.

24                 So how else do you know the insurance companies cared

25    about finances besides the testimony of the witnesses?  Because

DA3JBIN1                    Summation - Ms. McCallum

1    they asked specific questions about finances on these

2    applications.  Of course they cared!

3           Why else would they ask those questions?

4           And why else, for example, would those Prudential

5    underwriters you saw who were examining the case of Flora

6    Adler, Ed Lynch's client -- Ed Lynch told you all about her.

7    Why would they ask follow-up questions about how Flora Adler

8    can afford her premiums?  Why do they ask those questions if

9    they don't care?

10          Why else do these insurers demand to see estate plans,

11   demand to see CPA letters, inspection reports, verification of

12   assets?  Why would you ask for those things if you don't care?

13          All of this evidence makes it undeniable that the

14   insurance companies cared about STOLI and about finances, the

15   very things that the defendants in this case lied about

16   repeatedly.

17          And now how do you know the defendants knew the

18   insurance companies cared?  How do you know they knew they were

19   committing a fraud by telling the lies that they told?  You

20   know it from two things:  You know it from the defendants'

21   words and you know it from the defendants' actions.

22          Look at the lies the defendants told on these

23   applications and look especially at the context of those lies.

24   How could they possibly have believed the lies didn't matter

25   when the companies are saying on the applications themselves

just how much they care about this information, when they're

demanding that the agents certify those facts.

Another one of these Lincoln certifications, this

would be from Michael Binday, Martha Espinal.  These lies,

there is the certification again, there is Michael Binday's

signature.  Knowing all of this and seeing how much the

companies care on these applications, these defendants press

forward with their lies.  They knew the lies mattered, and then

Let's look at the things the defendants said, what they wrote

during the course of their scheme to defraud.

When Mark Resnick recruited Silas Griffin for this

STOLI scheme, what did he tell Mr. Griffin?  You saw that

handwritten note.  "Mr. Griffin, please do not answer any

questions if contacted by insurance company.  Advise them to

contact me."

Now, why did Resnick say that?  Because he knew he

lied about things the insurance companies cared about and he

didn't want to get caught in that fraud.  When Kevin Kergil

sent a checklist to Paul Krupit of things agents should tell

seniors they recruited for STOLI policies, what did Kergil say?

"Sometimes the insurance company will call you without

your authorization and begin asking you personal and financial

questions.  This usually ends in the application being denied

since they feel the client might not be able to afford the

policy."

1    Kevin Kergil knew that his and his co-conspirators'

2    lies mattered to the insurance companies.  He knew they had to

3    be covered up, and so what did he suggest?  It is underlined

4    there, "Seniors should tell life insurance companies thank you,

5    but due to identity theft, kindly mail to me your request in

6    writing and I will respond."

7        Later Kevin Kergil learned that a senior who Mark

8    Resnick had recruited for the STOLI scheme, Mr. Oswald Keaton,

9    might be interviewed by an insurance company.  Kergil fed a

10   whole list of false answers for the senior to give to the

11   questions.  If asked did someone call him to verify finances,

12   health or personal information, he should say yes in reference

13   to the inspection report that was completed because phone calls

14   to client for inspection reports are always supposed to be

15   made.

16       He could be asked questions why he is taking out the

17   policy.  Answer:  Estate planning.

18       He could be asked who suggested taking out the policy.

19   Answer:  Financial advisor.

20       He could be asked if he has any intent of selling or

21   transferring policy to someone else or has anyone offered free

22   insurance.  Answer:  No.  This could be the reason they are

23   calling.

24       He could be asked how he will pay for premiums.

25   Answer:  Through investment income.

1          Underwriter could ask where he met agent.  Through

2     financial advisor might be okay.

3          These are all lies, ladies and gentlemen, all lies

4     being fed to these seniors in the event an insurance company

5     calls.  The lies are being fed because there were lies on the

6     application.  The defendants knew those lies mattered, and now

7     they have to back them up because they have to make sure the

8     insurance companies don't find out, don't uncover the fraud.

9          Now we get to 2009.  Michael Binday learns that

10    insurance company investigators might come calling on the

11    seniors who have been recruited for his STOLI scheme, and what

12    does he do?  He sends word out to his agents they should tell

13    seniors nothing good can come from speaking about policies.

14    Why did he do that?  Because he knew he had committed a fraud

15    and that the things he had lied about to the insurance

16    companies were things those companies cared about, STOLI and

17    finances.

18         Later, in 2010, around the time the FBI comes knocking

19    on people's doors in this case, Michael Binday sent a message

20    to his agents, coaching them on lies seniors should tell.  If

21    your clients are so bold as to make any statements, we hope

22    that they would indicate that policies were purchased as part

23    of their estate financial plan.  This is what Michael Binday

24    had to say about estate planning back in 2007.

25         Talking to one of his principal funders, your program

1    is not designed for estate planning, so don't kid us about it.

2    We expect every policy that goes through HM to get sold in two

3    years.  In 2010 Michael Binday is coaching people to lie about

4    this.

5         What else does he say?  They should say their

6    financials were accurately represented at least for two years

7    ago before things went town the tubes.  You know that is not

8    true.  You heard from James Farrell, you heard from Steven

9    Espinal, clients that Michael Binday had direct dealings with.

10   He knew there were lies about finances on these applications.

11        What else does he say?  And they had no intent to sell

12   when they bought the policy.  They all had intent to sell.

13   These policies were not being purchased for these seniors.

14   They were being purchased for sale to investors.

15        Now, these are just a few examples of the e-mails and

16   other documents in which the defendants' own words make plain

17   they knew insurance companies cared about STOLI and cared about

18   financial misrepresentations.  If the words weren't enough,

19   ladies and gentlemen, just look to the actions the defendants

20   took as well, the actions they took to cover up their fraud.

21        To back up all the lies, for example, they got

22   supposedly independent inspectors and accountants to verify

23   those lies.  They got Frank Pellicone, the man you heard from

24   last week, the contractor for Info-Link, who you heard he

25   agreed, he took false numbers from Kevin Kergil and then

1    pretended to insurance companies that he'd actually verified

2    them when he hadn't.

3           You heard how Michael Binday made sure the insurance

4    companies didn't see all these reports, these Info-Link reports

5    they were getting to generate their numbers were from Frank

6    Pellicone.  You heard from Michael Binday's secretary, Tracey

7    Robinson, about how Binday instructed her to white out the fax

8    headers with Pellicone's name.

9           Binday knew he needed Mr. Pellicone because the

10   defendants could trust Mr. Pellicone to prop up their fraud

11   but, he wanted to try to insure the insurance companies didn't

12   know the same guy was doing all these reports.

13          Why was it important to get these Info-Link reports?

14          Why was that important to get these third-party

15   inspections?  Because the insurance companies relied on them.

16   You heard from Susan Macauley, the woman who used to be a

17   supervisor with Info-Link during the course of the defendants'

18   fraud, and she explained to you what inspectors were supposed

19   to do for these reports.

20          Call the applicants, verify the information, conduct

21   public record searches in every case.  That's what they were

22   supposed to do and that is what the insurance companies

23   expected them to do, but that is not what Frank Pellicone did

24   at the request of Kevin Kergil and with the knowledge of the

25   other defendants in this case.

1          The defendants knew Frank Pellicone wasn't checking

2     the numbers.  That's why they used him.  That is also why they

3     used accountants like Al Desai we heard from earlier this week,

4     the man that Mark Resnick roped into this.  Desai told you

5     about how Resnick sent him samples of personal financial

6     statements and then fed him the numbers he would use in those

7     statements.

8          You saw the faxes that Resnick sent.  You saw how some

9     of those numbers were coming to Desai, straight from Kevin

10    Kergil with these bogus numbers.  You have fake accountant

11    letters.  That is another way to prop up the fraud, another way

12    you know these defendants knew their lies mattered and had to

13    support their lies.

14         You saw the reports from Steven Kupper, too, another

15    supposedly independent accountant.  He purported to verify that

16    Flora Adler, Ed Lynch's client, had millions of dollars.  This

17    is the CPA who, when Prudential called him, he couldn't

18    actually verify any of the numbers.  Remember what Michael

19    Binday had to say about that in an e-mail where he learned that

20    Kupper had not played ball on this, had not pretended to have

21    verified these assets?

22         Michael Binday writes to Kevin Kergil, "Again please

23    kill Kupper."  Why does he say that?  Because he is concerned

24    his lies are going to get discovered.  He is concerned the

25    insurance companies are going to know that he answered falsely

DA3JBIN1                    Summation - Ms. McCallum

 1    the questions they care about.

 2              What else did the defendants do to cover up and

 3    perpetuate their fraud?  Well, to make sure that insurance

 4    companies didn't discover the STOLI nature of these policies

 5    that were being issued, the defendants worked to make it look

 6    like the seniors whose names were on these policies were

 7    actually paying for them.

 8              They wired money into the seniors' accounts and got

 9    the seniors, or their supposedly trustees, people who had never

10    spoken to these seniors, to write checks to the insurance

11    companies with that same money, all to make it look like the

12    money was coming directly from the senior when, in fact, it was

13    coming from hedge funds, other funders, Michael Binday in some

14    cases, all to make it look legit when it wasn't.

15              Keeping the insurance companies in the dark was key to

16    the success of the defendants' scheme because if the insurers

17    discovered the connection between the agents, these defendants

18    and the funders who were actually behind the policies the

19    agents were getting issued, that would spell disaster.

20              As Michael Binday put it in an e-mail to one of the

21    main funders behind the policies, "He needed to be super

22    careful on this front.  Clearly we do not want our name

23    reaching insurance companies as an associate of your program."

24              Ladies and gentlemen, the actions these defendants

25    took, getting bogus inspection reports and account letters to

1    back up the lies they already told, playing shell games with

2    bank accounts, hiding connections to funders, these actions

3    show once again that these defendants knew their lies mattered,

4    knew the insurance companies cared about those lies, and then

5    if this were not already overwhelming evidence of materiality

6    and intent to defraud, you have the actions the defendants took

7    when they learned they were being investigated by government

8    authorities.

9              I want to take a moment and really take stock of these

10   particular actions.  Consider first Michael Binday.  You heard

11   from Ed Lynch.  He recruits Ed Lynch to pedal STOLI deals to

12   seniors.  Ed Lynch told you about that session in Binday's

13   office where Binday announced these salespeople could have

14   Ferraris in their driveways.  All they needed to do was find

15   seniors who are healthy, but not too healthy, people who would

16   be willing to hand over their medical records in exchange for a

17   quick payout.

18             So Ed Lynch goes out and he pitches an old long-term

19   care client of his, Flora Adler.  She agrees to participate.

20   Lynch gets her to sign an application for a Prudential life

21   insurance policy, and Lynch signs the application, too.

22             He turns it into Binday for submission to the

23   insurance company.  Now, Lynch knows, as he told you, that

24   Adler's net worth is at most $750,000, and he tells Binday

25   that.  Binday's response:  Don't worry about it.  You'd be

DA3JBIN1                    Summation - Ms. McCallum

1    surprised.  Later Lynch learns that Binday and Kergil have

2    monkeyed with the numbers and made it look like Flora Adler is

3    worth 4.5 million, but Lynch looks the other way because, as he

4    told you, he really wanted those commissions.

5           Then what happens?  Binday submits the application to

6    Prudential, but instructs his staff to put his name on it

7    instead of Lynch's.  He wants to be the agent on the case

8    presumably to get the higher commission and whatever other

9    bonuses or awards that come with being the agent on these big

10   policies.  So the doctored application gets submitted this time

11   with Binday's name on it.

12          Then Prudential starts asking some questions.  How

13   exactly will this lady be paying for premiums even with his

14   massively overstated income and assets?  How was this policy

15   pitched to her?  How was the sale made?

16          In response to these questions, Binday just lies.

17   Knowing full well that Adler has a bad relationship with her

18   kids and that neither she nor the kids will be paying a dime

19   toward the premiums for this Prudential policy, Binday tells

20   Prudential that the children, the children might be involved in

21   paying these premiums.  Then he badgered Prudential to get this

22   policy issued.  We are very upset with all this follow-up.

23   Suddenly we're receiving a multitude of inquiries on her

24   financial situation.

25          I am completely offended by this situation and the way

1    it is being handled.  They're asking for an appraisal of her

2    home.  My reaction is not suitable for a lady's ears.  He is

3    trying to get his policy issued, trying to get his commission,

4    perpetuating his lies.

5          Then he even works behind the scenes to have Steve

6    Kupper, that accountant, Florida accountant, pretend to verify

7    the assets for Flora Adler, tries to get him to tell lies to

8    the Prudential investigators.  Look at what Binday tells Kevin

9    Kergil what Kupper should say.

10          Prudential underwriting wants to call Steve Kupper.

11   We assume he was referred by her financial advisor.  Ladies and

12   gentlemen, you know that is not true.  This is somebody these

13   defendants used for a number of their policies.  They may ask

14   how long they worked together or the work he does for her.

15   This is probably confidential and he does not need to provide.

16          Premium questions.  It would help if he stated she

17   would only pay for insurance until age 90 and take the chance

18   on living beyond this.  It would help if he conveyed that the

19   children may pay for a substantial portion of the insurance

20   premiums.  A lie.

21          It would also be helpful if he states they currently

22   feel that $2 million would be an appropriate amount of

23   coverage.  She wants to make sure that her children are taken

24   care of and that her children offering to pay for some of the

25   life insurance greatly eased her anxiety.  These are the things

1  Michael Binday is telling Kevin Kergil to feed to Kupper so

2  when Prudential calls, Kupper can have these lies at the ready

3  to cover up the fraud.

4          Only when that backfires, only when Kupper doesn't

5  play ball and admits to the Prudential people that he has no

6  idea about flow Adler's finances does Binday finally give up.

7  By then it has gone to the next level.  The New York State

8  Insurance Department has gotten involved and begun to

9  investigate.

10         They've called Binday to an examination under oath.

11  What does Binday then do?  He lies through his teeth.  He

12  begins by telling the examiners that he only signed the

13  application for Adler because Ed Lynch was taking his daughter

14  to school.  You know that is a lie, ladies and gentlemen.  You

15  saw the application that Ed Lynch signed.  Binday just pasted

16  his own signature over it.

17         Then comes the mother of all lies.  If a client

18  intends to sell the policy, then I'm going to tell them that we

19  cannot take the application.  I certainly haven't had any

20  conversations with a client saying they're not responsible for

21  premiums after that point.

22                 (Continued on next page)

23

24

25

1          MS. McCALLUM:  As you know and as the evidence in this

2     case has overwhelmingly established, Binday's entire business

3     was encouraging seniors to apply for life insurance policies to

4     be sold to investors.  His whole business was STOLI.  That's

5     what the large case files, that euphemistic term that Tracey

6     Robinson referred to, that's what they were, STOLI.  Binday is

7     lying about that under oath.

8          And why is he doing that?  Because he knew his earlier

9     lies about intent to sell, about premium financing, about

10    senior's net worth were material misrepresentations.  The

11    insurance companies cared about these lies.  Binday knew he

12    committed fraud and he didn't want to be caught in that fraud.

13    That's Binday.

14         Now, what about Kevin Kergil and Mark Resnick?  What

15    did they do when government authorities come calling?  They

16    schemed to destroy evidence.  You know this from the testimony

17    of Paul Krupit, another one of the agents who worked with these

18    guys, from the recorded telephone calls Krupit made with these

19    defendants, Mr. Resnick, Mr. Kergil; and from the records

20    showing that Resnick walked into an Apple store in Florida and

21    asked to have the hard drive on his desktop erased, wiped.

22         Now, Krupit told you about how this played out.

23    Before he began cooperating with the government, he got a call

24    from Kevin Kergil:  Get rid of everything with Michael Binday's

25    name on it.  Krupit also told you he understood this came from

1   Michael Binday.  Get rid of your hard drive.  What did Krupit

2   do?  Started shredding documents, brought his computer into the

3   shop, asked to get the hard drive wiped.

4         And what did Resnick do?  Same thing.  He flew all the

5   way from New York to Orlando to retrieve his desktop computer

6   and bring it into the Apple store where he got the hard drive

7   wiped and the data transferred to a portable device, something

8   that could be hidden.  You saw the records of Resnick's visit

9   to the Apple store wiping the hard drive.  And you heard

10  Resnick on that tape.

11        Can we have Government Exhibit 3074, please.

12        (Audio recording played)

13        MS. McCALLUM:  That's the call with Mark Resnick.  And

14  how do you know that Kevin Kergil is the one who actually gave

15  the instruction to destroy this evidence?  Because you heard

16  him on his own tape with Paul Krupit.  Let's play that one too.

17        (Audio recording played)

18        MS. McCALLUM:  These actions that Kevin Kergil and

19  Mark Resnick took when they found out that the FBI was

20  investigating their scheme to defraud is overwhelming proof

21  that they knew they committed fraud and that they needed to

22  cover their tracks.

23        I want to spend just a minute here to address the

24  evidence that the defense presented to you yesterday to try to

25  show that the insurance companies didn't care, that they were

1   just papering the files.  You saw their evidence yesterday,

2   those excerpts from a handful of policy files, many of them

3   relating to people you didn't even hear about really in the

4   government's case:  Myra Davis, Eva Hartheimer, Tomasa

5   Contreras, Alma Lapp.  I'll remind you, of course, the defense

6   has no burden here.  The government bears the entire burden of

7   proof and we embrace that burden.  But when the defense

8   presents evidence to you and makes arguments to you, you should

9   evaluate that evidence and those arguments the same way you

10  would any other evidence and arguments.  You should use your

11  common sense as well.  And when you do that, you'll see these

12  policy file excerpts the defense showed you are pure

13  distraction presented you to totally out of context.

14          First of all, as I expect Judge McMahon will instruct

15  you, negligence on the part of a victim of a fraud is not a

16  defense to the charges in this case.  It's irrelevant.  In any

17  event, what the full underwriting notes show -- and they are in

18  evidence -- is that these companies had specific processes in

19  place to try to detect STOLI and financial misrepresentations.

20  They used those processes, the IOLI detection.  That was a

21  catch phrase the defense kept pulling out for you yesterday.

22  That's a system user, a specific process Lincoln Financial has

23  put in place to try to catch STOLI and try to make sure it

24  didn't slip through.

25          Yes, these companies noticed when the income didn't

DA3LBIN2                        Summation - Ms. McCallum

1    seem to support the premium.  That was part of the protocol.

2    This is the underwriting they had in place.  Yes, they noticed

3    when the trust didn't seem right.  They noticed all these

4    things because they didn't want STOLI and they had systems in

5    place to try to prevent it, detect it, not let it through.

6              And then what did they do when they noticed these

7    things, ladies and gentlemen?  They followed up with the

8    agents, their own agents.  They followed up with Michael

9    Binday, asked:  Does this guy have an estate plan?  How exactly

10   is this person affording these premiums?  What is the property

11   value here?  That follow-up, ladies and gentlemen, is what the

12   defense did not show you from those policy underwriting notes.

13             Because you know what happened when those follow-up

14   questions were asked, and you saw this in the Florra Adler

15   Prudential files as well.  Binday answered the questions with

16   more lies.  Again and again and again, and I'm just going to

17   take one example here.  The defense showed you that policy file

18   in which the underwriter questions whether James Farrell has an

19   estate plan that would justify the insurance.

20             Now, you know what they didn't show you, what we had

21   to introduce in our rebuttal case, the totally bogus estate

22   plan for James Farrell that Binday made up and sent in to the

23   insurance company in response to this inquiry.  There's the

24   estate plan for James Farrell.

25             This blame the victim defense, ladies and gentlemen,

1   is no defense at all.  And the tiny excerpts of policy files

2   that the defense showed you from a handful of the over a

3   hundred large cases that R. Binday was handling and trying to

4   push through these companies doesn't prove negligence.  It

5   shows underwriters asking questions, worrying about STOLI,

6   worrying about financials, and getting massive elaborate lies

7   back from Binday in response to those questions.

8          Michael Binday you saw badgering and pressuring these

9   underwriters into issuing these policies because he wants that

10   Ferrari in his driveway.

11          Now, for their criminal conduct, the defendants are

12   charged here with three counts of fraud.  The first count

13   charges a conspiracy, really just an agreement to commit mail

14   and wire fraud.  And the second count charges mail fraud.  The

15   third count charges wire fraud.  We've already walked through

16   the ways in which the evidence in this case overwhelmingly

17   establishes most of the essential elements of these crimes.

18   The defendants agreed to make and did make material

19   misrepresentations to defraud insurance companies into issuing

20   policies they wouldn't otherwise have issued because they were

21   bad for their business.  They didn't make economic sense.

22          The defendants did this to get the insurance companies

23   to pay huge commissions the defendants wouldn't have gotten had

24   the insurance companies known the truth.  And sometimes they

25   did it because they had a shot at the big pay out, the death

DA3LBIN2                    Summation - Ms. McCallum

1    benefits on Doris Riviere, on Hanni Lennard.  The defendants

2    defrauded the insurance companies out of money and property.

3          Now, because the charges here are mail and wire fraud

4    and conspiracy to commit mail and wire fraud, the government

5    has to prove that the defendant's scheme involved the use of

6    the mails and of the wires.  And I'm not going to spend a lot

7    on this because you have seen tons of evidence that the mails

8    and the wires were used.  You heard from Binday's secretary,

9    Tracey Robinson, that the false applications she was helping to

10   prepare on behalf of Binday and Kergil and Resnick would be

11   mailed and couriered by UPS to the insurance companies.  You

12   saw those UPS envelopes that Steven Espinal had in his

13   possession, got in New Jersey from Binday's Westchester office.

14         For the wires, you saw countless faxes and emails

15   furthering the defendants' scheme.  There's just one email sent

16   out to all agents from Binday.  And you know that Resnick and

17   Krupit were both in Florida.  Binday is up in New York, so you

18   know these are interstate wires.

19         That's the first three counts of the indictment.  And

20   that leaves Count Four, which charges Resnick and Kergil with

21   conspiring to destroy evidence, records.  We've already talked

22   through the evidence underlying this count, Resnick and Kergil

23   agreed together and with Paul Krupit to get rid of documents

24   and emails with Binday's name on them and to erase their hard

25   drives, all after having learned of the FBI's investigation.

DA3LBIN2                    Summation - Ms. McCallum

1              Now, you heard in opening statements some suggestion

2      this crime can't be proved because the government actually

3      ended up with incriminating evidence against Resnick and

4      Kergil.  They can't have committed the charged crime because

5      not all the evidence was destroyed.  That's wrong, ladies and

6      gentlemen.  Even if these men hadn't destroyed a single

7      document, they'd still be guilty of conspiracy, conspiracy or

8      agreement to destroy records.  You don't need a completed act

9      to be guilty of that crime.

10             And Kevin Kergil and Mark Resnick plainly are guilty.

11     They agreed together and with others to get rid of documents

12     related to the FBI's investigation of the fraud in this case.

13     So that's Count Four of the indictment proved through Resnick

14     and Kergil's own words, through documents from Apple, and

15     through the testimony of Paul Krupit.

16             Now, at the start of this case, we told you that

17     Michael Binday and Kevin Kergil and Mark Resnick concocted and

18     then carried out a massive scheme to defraud life insurance

19     companies.  They did it for the money and that's what the

20     evidence has shown.  These men made it their business to

21     defraud other businesses.  They put together a well-oiled

22     machine with staff coached to lie, insureds, applicants coached

23     to lie, bogus financial documents put together by CPAs and an

24     inspector who only pretended to verify financials.  They did

25     this all for their own economic gain, to make the massive

1  commissions they got every time a policy issued, to trick the

2  insurance companies into issuing these policies and paying

3  those commissions.  And they did it sometimes, again, as you

4  saw with Doris Riviere and Hanni Lennard, to cash in on the

5  same bet against the insurance companies that the other

6  investors were making.

7        These men made millions off their fraud.  They're

8  guilty beyond a reasonable doubt of the crimes charged against

9  them, and we ask you to return that verdict of guilty on all

10 counts.  Thank you.

11       THE COURT:  Okay.  Let's break and be back at 25 of

12 12, all right.  And we'll hear Mr. Abramowitz's summation

13 before we break for lunch.

14       Don't discuss the case.  Keep an open mind.

15       (Jury not present)

16       THE COURT:  Ms. McCallum, I congratulate you on having

17 come closer to your time estimate than any other assistant

18 United States attorney.

19       Okay.  Let's take a little break.  Just apropos juror

20 issues.  You will recall that we had to excuse a juror.  One of

21 our really good citizen jurors got as far as Grand Central.

22 She was very sick.  She felt very sick.  She went home.  We let

23 her go home.  Her appendix had burst.  So we were correct.

24       MR. ABRAMOWITZ:  We caught something we thought we

25 caught from juror No. 5, but apparently not that.

DA3LBIN2

```
 1              THE COURT:  I don't think you caught anything from
 2    juror No. 5.
 3              MR. ABRAMOWITZ:  Thank you, your Honor.
 4              THE COURT:  We found out yesterday.
 5              (Recess)
 6              MR. ABRAMOWITZ:  Your Honor, before the jury comes in.
 7              THE COURT:  Case on trial continued.  The parties are
 8    present.  The jurors are not present.
 9              MR. FISCHER:  Your Honor, we noticed during the
10    government's summation there was an exhibit shown to the jury,
11    stipulation Government Exhibit 5006, that was a prior draft of
12    the stipulation that we had actually signed.  It was not the
13    signed stipulation and contains some at least one inaccurate
14    number that was off by about $300,000.
15              THE COURT:  And what would you like me to do?
16              MR. ABRAMOWITZ:  I think the government --
17              MR. FISCHER:  The government has a proposal, your
18    Honor.
19              MS. CHOI:  Your Honor, we've discussed this with
20    defense counsel.  If at some point you could just instruct the
21    jurors that generally they're to refer to the evidence as it
22    will be brought back to them, but specifically with regard to
23    5006, which is the commission stipulation.  We think that will
24    be sufficient.
25              THE COURT:  I'll tell them we accidentally showed them
```

DA3LBIN2

1    a draft that had a wrong number on it.  So forget what they saw

2    on the screen and look at the stip.

3              MR. ABRAMOWITZ:  That's fine.

4              MR. FEINGOLD:  Your Honor, we just add for the record

5    it was appeared on the screen for about a second.

6              MR. FISCHER:  Enough to notice it, your Honor.

7              MR. FEINGOLD:  Fair enough.

8              (Jury present)

9              THE COURT:  Okay.  Mr. Abramowitz, are you ready to

10   close?

11             MR. ABRAMOWITZ:  I am, your Honor.  Was your Honor

12   going to say something to the jury?

13             THE COURT:  I was.  Folks, a little snafu during the

14   government's summation.  A draft of the stipulation that's

15   Government Exhibit 5006 was shown to you instead of the final

16   and it had a wrong number on it, okay.  Disregard what you saw

17   up there on the screen.  The real stipulation, the final one

18   with the signatures will be back with you in the jury room.

19   That's the evidence in the case and that's what you should look

20   at.  Okay.

21             MR. ABRAMOWITZ:  May I, your Honor.

22             May it please the Court, counsel for the government,

23   counsel for the defense, ladies and gentlemen of the jury,

24   first of all, I know that I'm speaking on behalf of all the

25   counsel in this case in thanking you for your attention during

DA3LBIN2                    Summation - Mr. Abramowitz

1    the course of this trial.  There were moments during the trial

2    that seemed very tedious and not clear and pieces of exhibits

3    coming in, some highlighted, some not.  All the lawyers, both

4    tables, noticed that you were paying full and complete

5    attention and you deserve our thanks for that and I'm giving it

6    on behalf of everybody.

7            Now, I told you when I stood here before you the last

8    time at the opening right up front that there was absolutely no

9    scheme to defraud anyone, let alone insurance companies.  And

10   despite hundreds of exhibits, snippets from emails, testimony

11   from many people and rhetoric coming from the government, there

12   is simply no evidence from which you should conclude that these

13   defendants committed the crimes that are charged.

14           And let me tell you why.  What these defendants

15   participated in with the insurers and the insureds, both the

16   insurance company and the insureds was really an investment

17   scheme designed in the high-flying period before the economic

18   crisis in 2005, 2006, intended to have everyone involved in the

19   investment make money, everyone, and not lose money, including

20   the insurance companies.

21           And as the judge ultimately will instruct you on

22   Monday, if Mr. Binday, Mr. Kergil and Mr. Resnick intended no

23   economic harm, then they have not committed the crimes for

24   which they are charged.  And now that you've heard the

25   evidence, let me see if I kept my word to you because I did.

DA3LBIN2                    Summation - Mr. Abramowitz

1              The indictment charged that the defendants committed a
2       crime because the insurers suffered an economic harm because
3       there was a discrepancy between the benefits reasonably
4       anticipated by the insurers and what they actually received.
5       We believe that we have shown that the insurance companies
6       actually received the benefits that they anticipated because
7       they got exactly what they bargained for.  Every one of these
8       insurance contracts were enforceable, transferable life
9       insurance contracts based on the age and the actual medical
10      condition of the applicant.  That's what they bargained for,
11      that's what they anticipated, and that's what they actually
12      received.
13             Now, let's examine the basic four lies that the
14      government claims were criminal and that we claim, claimed in
15      our opening and are claiming now, were totally immaterial to
16      the insurance companies.  First, net worth.  Second, the intent
17      to sell the policy.  Third, the misstatements involving premium
18      financing.  That simply means that other people were funding
19      the premiums.  Fourth, whether there were multiple applications
20      for the same people.  It's essentially the four lies on the
21      forms that the government showed you and that appear on the
22      applications.
23             Now, let's deal with net worth first.  You heard ample
24      testimony and we did not and do not contest that the net worth
25      of these applicants were greatly inflated.  There is no issue

DA3LBIN2                    Summation - Mr. Abramowitz

1    about that.  It is true that people with lower net worths may

2    not be able to have gotten these policies with larger death

3    benefits, but insurance companies also would not have gotten

4    the larger premiums associated with the larger death benefit

5    cases, policies.  When they get a $4 million policy, there's

6    huge premiums.  And you saw how much those premiums amounted

7    to, hundreds of thousands of dollars.

8            Now, it is true that they may not have wanted these

9    policies, but they got them and they got the premiums that are

10   associated with it.  They were all paid.  We'll see, first of

11   all, the government says that they really didn't want these

12   policies and they had all sorts of statements in effect -- we

13   don't want this, it's bad for business, bad for business.

14   Well, in a few minutes we'll see whether how true that

15   statement is, but for the purposes now, let's me just tell you

16   they got them and they got the money and they kept the money.

17   So that the fact that the net worth statements were inflated

18   only meant that the STOLI policies were issued in those large

19   amounts, but the premiums were issued in large amounts as well

20   and they were paid and they were paid by people who could

21   afford to pay them and those would be the third party

22   investors.

23           Now, you heard directly from Mr. Avery, very high

24   executive at Prudential, when we asked what went into the

25   pricing of the life insurance policies, he said -- let's show

 1   the transcript.

 2           He said, well, again, it would be based on age,

 3   gender, health, and then our experience with these -- those

 4   classifications of age, gender and health.  And again he said

 5   the risk, the prime risk in a life insurance contract is death.

 6   The risks we are measuring primarily is the risk of death.

 7           Ladies and gentlemen, that's the testimony from

 8   Mr. Avery.  There were no lies in this case relating to age,

 9   there were no lies in this case with respect to gender, there

10   were no lies in this case with respect to health.  Those are

11   the material pieces of information that the insurance companies

12   wanted:  age, gender, health.

13           Now, moving past net worth, the government first

14   claims that when the policies were sold, the insurance

15   companies didn't receive the extra money over and above the

16   premiums.  Universal life policies permitted people to pay

17   extra money, more money than the premiums.  They only received

18   the premiums but not the extra money.  And, second, when the

19   policies were sold, the third party pays all the premiums.  If

20   they don't pay extra, they pay -- and they pay it on time, they

21   don't stop paying them.

22           And then the government says, well, this is Mr. Avery

23   said, Mr. Burns said this is shocking.  We count on people

24   stopping paying.  We count on lapsing.  Remember the testimony

25   about lapsing.  We want to take their money for the first

1   couple years and then hopefully they'll get tired of paying

2   these premiums and then they lapse.  We kept the money but we

3   don't have to pay the death penalty.  They were counting on

4   that, Mr. Avery and Mr. Burns said, counting on that.

5           But the problem is lapses are a windfall.  They're not

6   part of the contract.  It's not the right bargained for in the

7   contract.  It was, therefore, not a benefit that they

8   anticipated or reasonably anticipated.

9           One of the other ones is the grace period.  We count

10  on people taking full advantage or not taking full advantage of

11  the grace period and that somehow affects the pricing and our

12  economic well-being.  That's absolute nonsense because, simply

13  put, all of these three things -- lapsing, paying extra money,

14  grace periods -- are in the contract that can be sold.  And

15  when it is sold, they do not expect it to lapse.  They cannot

16  reasonably expect it to lapse.  They can't reasonably expect

17  extra money.  They bargained away all of these illusory and not

18  real harms that the government says really is bad for their

19  business, bad for their business.

20          They are dependent, all of these three anticipations

21  that Mr. Avery and Mr. Burns said, oh, we really wanted the

22  lapsing, we really wanted the extra money -- are simply hopes,

23  hopes that the individual will not pay the premiums and not

24  sell the policy.

25          But the problem is and has been and what this case is

1  all about is a provision that's in every insurance policy.

2  Every insurance policy in this case and in the world, every

3  life insurance policy has this language.  You may change the

4  owner or the beneficiary at any time during the lifetime of the

5  insured.  That means you can sell the insurance policy.  That

6  means that it is an asset and that it can be sold.  You can get

7  paid for selling it.

8          So then the companies may not want you to.  They

9  certainly made it clear that they don't want you to sell these

10  policies.  But they had to reluctantly concede that the law and

11  the contract require them to permit exactly that.

12          And when I asked Mr. Burns from Lincoln, question:

13  When you sell the interest, what happens to all these mortality

14  assumptions, lapse assumptions, grace period assumptions,

15  minimum funding assumptions, when it goes to a third party,

16  what happens?

17          And he answers:  When it goes to a third party, the

18  third party manages it in terms of how they pay the premiums is

19  going to dictate how they're going to play out into the future.

20          And then I asked:  And am I correct that the third

21  party in a life settlement situation is not likely to let the

22  insurance lapse; is that correct?

23          And he answers:  Yeah, presumably.

24          And then next I asked:  Again, when it's sold into

25  life -- when an insurance policy is sold into the life

1    settlement market, would Lincoln National or any insurance

2    company expect that the third party would pay more than the

3    minimum premium?

4            Answer:  The expectation would be no.  Not saying it

5    can't happen, but the expectation would be no.

6            Therefore, when you're talking about benefits

7    anticipated and benefits received, they could not have

8    reasonably anticipated that the contract would not be sold and

9    they could not have reasonably anticipated that all of these

10   so-called expectations about lapses and extra funding would not

11   have gone with the sale.  And the insurance companies certainly

12   were aware of this possibility, and they are very much aware of

13   the life settlement market.

14           In fact, you saw a Lincoln Financial memorandum making

15   it clear that Lincoln itself, the life insurance company that

16   doesn't want insurance policies to be sold, it's a terrible

17   thing, that life insurance policies should be sold.  It was a

18   memorandum that Lincoln very much wanted to participate in this

19   lucrative market.

20           Let's look at Defendant's Exhibit 13.  It says Lincoln

21   Financial recently established a relationship with Life

22   Settlements Insights, a life settlement broker, to assist LFA

23   planners in executing life settlements transactions on behalf

24   of their clients.  Going forward, we expect more broker dealers

25   and managing general agencies to establish relationships with

DA3LBIN2                   Summation - Mr. Abramowitz

1    life settlement brokers, if not assume the life settlement

2    broker themselves.

3           They loved life settlements.  And there's a very good

4    reason why they liked life settlements.  They were worth it to

5    them and to everybody who participated in it.

6           And there was testimony.  I asked Mr. Burns:  In all

7    your committees and all your work with trying to get

8    legislation passed, have you learned that STOLI, the life

9    settlement industry, is a multibillion dollar industry?

10          Answer from Mr. Burns:  Yes.  We have seen that report

11   by the life settlement industry itself.

12          Now, the government has argued or tried to suggest

13   during the course of the trial that the life settlements and

14   STOLI are different somehow.  But any distinction between STOLI

15   or IOLI as you heard it and life settlements is meaningless and

16   immaterial in this case.  The only difference between STOLI and

17   a life settlement policy is that a STOLI policy is bought with

18   the intention to sell right away, and a life settlement is

19   presumably in the to third parties in a market after you sign

20   the insurance policy when you do have the right to sell.

21          So, the difference is in STOLI, when you sign it, I

22   intend to sell it, that the life insurance companies say, oh,

23   that's terrible.  Bad for business, bad social policies, bad

24   everything.  But, a minute later I can decide to sell it into

25   the life settlement market and I can make money.  So that's

1    okay.  There's no social problem with that.  There's absolutely

2    nothing wrong from an insurance company point of view to wait

3    that one second, change your intent and sell the policy.

4         Now we come to the fourth alleged economic harm the

5    insurance companies say they suffered because there was an

6    earlier greater pay out of the death benefits when it's sold to

7    a third party.  Again, this alleged harm is totally illusory

8    and not real.  It's based upon the debatable assumption, and

9    you heard Ms. McCallum argue it today, wealthy people are

10   healthier than poorer people.

11        The short answer to that debate is that whatever

12   assumptions the insurance companies have as a general matter

13   about any connection between health and wealth, the specific

14   policies involved in this case had totally accurate information

15   about health.  Period.  And even the general theory about

16   wealth and health was debunked, and let's show you by the

17   testimony of Mr. Burns.

18        Can we put up Exhibit 2972.  This is from Lincoln.  I

19   asked him:  Can you please read the paragraph that begins as

20   indicated by the results in this table.

21        Answer:  As indicated by the results in the table,

22   actual mortality experience on these policies with face amounts

23   of a million or greater and issued to insureds ages 70 or

24   older, the STOLI demographic, is currently 88 percent of

25   expected, or 12 percent better or lower than assumed in the

1    pricing.  This suggests -- look at that last sentence -- this

2    suggests that STOLI activity has not had an adverse impact on

3    our mortality experience.

4           That means health is not wealth.  That means that if

5    the person is healthy as an individual, that's what counts, not

6    general notions of mortality.  And as a matter of fact, their

7    experience indicated that they did better than they expected.

8    There was less potential economic harm than they expected.

9           And I asked him, question:  Was that true at the time

10   you wrote that?

11          Answer:  Yeah, it would have been.

12          And I asked him:  And do you still believe that

13   statement?

14          And he answered:  I believe the statement.

15          So let's move on to a new topic.  The government spent

16   much of its argument about all the lies that the defendants

17   perpetrated.  Again, we were very up-front with you in the

18   openings and during the course of the trial that the

19   applications for the insurance policies contained lies.  But as

20   the judge will tell you, in order for lies to be considered a

21   crime in this case, they must be material lies, part of a

22   scheme to defraud someone or some entity and to cause some

23   economic harm.  In order for a lie to be material, it must

24   matter.  In order for a lie to matter, it must be intended to

25   deceive someone, in this case, the insurance companies.

1          Let me tell you directly, as I think I have on two

2     other occasions, Mr. Binday did not deceive the insurance

3     companies and none of the other defendants did either, period.

4     No one involved in this investment plan suffered any economic

5     harm.  In reality, there are no victims.  We're not blaming

6     victims.  There were no victims.  Insureds made money and we'll

7     come to that.  The defendants made money, no question.  And the

8     insurance companies, who say they didn't want to issue these

9     policies, nevertheless, got extremely high premiums from them.

10         Now, there's no question, the large case file

11    discussion, these defendants focused on bringing STOLI policies

12    to the insurance companies.  That's what they were doing for

13    several years.  And to be clear, there is absolutely no charge

14    in this case that the defendants committed any crime by

15    participating in STOLI or IOLI transactions.  The insurance

16    companies say they don't like them, they tried to get them

17    outlawed.

18         But the fact of the matter is that Mr. Binday is not

19    charged with crimes because he was involved with STOLI

20    policies.  Despite the fact that Mr. Avery from Prudential

21    offhandedly said it's illegal and Mr. Burns suggested in his

22    testimony that they're illegitimate, it is clear that there is

23    no material legal difference when an insured intends to sell

24    the policy when he or she signs it or changes his or her mind a

25    minute later.

DA3LBIN2                    Summation - Mr. Abramowitz

1              I asked that question of Mr. Avery.  Question:  But

2      people can change their minds; is that correct?

3              Answer:  We would find very strange that someone would

4      buy a $5 million policy and change their mind the next day.

5              My question:  You might find strange, but is it legal,

6      Mr. Avery?

7              Answer:  It is legal, yes, sir.

8              Now, you don't have to take my word for the fact that

9      the insurance companies didn't suffer any economic harm from

10     these defendants.  They acknowledge as much themselves.

11             Let's look at Exhibit 2971, page 3.  Just look at this

12     line.  Further, we believe the most significant risks of IOLI

13     are social, legal, and tax related, not economic.  Not

14     economic.  So general statements that this was bad for business

15     and we don't like this, we don't want it, ultimately, it's for

16     other significant risks other than economic.

17             They may have other concerns and they may be

18     legitimate concerns.  Maybe they really don't like these

19     policies and maybe these policies should be outlawed.  But the

20     bottom line, those risks are not economic.  And to have a

21     scheme to defraud, you need to intend economic harm.

22             When I asked Mr. Burns about this memo, he more or

23     less agreed.

24             I asked him, question:  In all the years since your

25     memo was written, has there been any change in the tax status

DA3LBIN2                        Summation - Mr. Abramowitz

1    of insurance companies with respect to life insurance policies?

2              Answer:  No.

3              So this fear that STOLI was going to raise some tax

4    consequence risk is not born out.

5              And I also asked him:  You sent this memo, did you

6    not, that it's difficult to estimate but we regard the overall

7    economic impact of IOLI and life settlements as minor; is that

8    right?

9              Answer:  That's what it says.

10             Question:  And minor meaning not terribly significant?

11             Answer:  Correct.

12             And question:  When you say assuming that IOLI makes

13   up ten to 15 percent of sales, the overall REO -- which I think

14   is return on equity -- on new business would be affected by

15   less than 1 percent?

16             (Continued on next page)

1            Less than 1 percent.

2            Was that actuary a accurate when you wrote that, I

3    ask?  Answer:  Yeah, I believe it to be.

4            But again focusing on whether any economic harm was

5    intended, I asked Mr. Avery specific questions about economic

6    harms, and this is what he said:

7            Do you know, Mr. Avery, whether Prudential varies its

8    cost of insurance based upon an insured's assets?

9            That is the component of the net worth statement, the

10   assets.

11           Not directly, no.

12           So it doesn't vary its cost of insurance based upon

13   the assets, a direct answer that the net worth statements are

14   immaterial.  It didn't affect the cost of insurance.

15           Do you know whether Prudential varies its cost of

16   insurance depending upon whether an insured had an intent to

17   cell sell the policy?

18           So-called really bad thing that the defendants tried

19   to pull over the wool of the eyes of the insurance company.

20           No, because we wouldn't issue it so it would not be in

21   our experience.

22           I said if it slipped through, suppose a STOLI policy

23   slipped through, did Prudential vary the cost of insurance

24   depending on whether the insured had an intent to sell the

25   policy?

1          Answer:  No.

2          Then I asked:

3          Did Prudential vary its cost of insurance depending

4     upon whether the premium would be paid with the purchaser's own

5     funds or with borrowed funds, that is the premium financing

6     question?

7          No, it didn't vary its cost of insurance based upon

8     whether it was going to be premium-financed.

9          I asked:

10         Did Prudential vary its cost of insurance depending on

11    insured's purpose for purchasing the insurance?

12         No.  It doesn't have to be for estate planning, it

13    doesn't have to be for all the things that the government is

14    trying to suggest were material to the insurance company's

15    economic harm.

16         Answer:  No, it didn't matter.

17         Finally:

18         Did Prudential vary its cost of insurance depending

19    upon whether the purchaser had any other pending applications

20    for effective policies for life insurance at the time of the

21    purchase?

22         No.

23         So that none of the supposed material lies are

24    material.  It didn't have an economic harm as its intent and

25    did not have an economic harm to the insurance companies.

1          Now, not only did the insurance companies suffer no

2     harm, they were not deceived in the slightest, in the slightest

3     by the lies on the application forms and, thus, these lies did

4     not matter to the insurance companies; and, therefore, were not

5     material.

6          They may have had internal policies which prohibited

7     STOLI and IOLI insurance policies.  They certainly had those,

8     and we saw whatever they said about the discouragement of STOLI

9     and IOLI business was really only for show.  It was this.  We

10    don't want, we don't want the STOLI policies, really we don't

11    want them, but everything they did encouraged the STOLI

12    business.  On one hand we don't want them, but just keep

13    rolling them in because we're all making money.

14         The representatives of the insurance companies who

15    dealt with the defendants grasped for all the STOLI and IOLI

16    business they could get.  You saw that far from discouraging

17    this business that our clients brought to them, they wanted it

18    and they turned a blind eye to the lies involved in this case.

19         I told you in the opening and I'm telling you again

20    look at what they did, not what they said from the witness

21    stand.  It's their conduct and not the self-serving

22    rationalization from the Averys and Burnses of the insurance

23    companies that matter.

24         In its opening the government said what the insurance

25    companies didn't know was that these seniors did not plan to

DA3JBIN3                    Summation - Mr. Abramowitz

1    keep these policies for themselves.  They said that the

2    defendants tricked the life insurance companies into issuing

3    these policies by lying to them.  Today we heard we're blaming

4    the victim.  We are not blaming the victim.  Nothing could be

5    further from the truth.  They were not tricked by these

6    applications and any statement on these applications.

7            You saw from the evidence -- let me show you why this

8    is so important and so true -- you saw from the evidence that

9    they knew exactly what to look for to detect STOLI and IOLI.

10   You saw that policy after policy had every indication that

11   these were STOLI policies.  They saw it, we saw it in yesterday

12   running through these exhibits, IOLI detection, IOLI detection,

13   IOLI detection for all of those Michael Binday applications.

14           So they knew that there were problems with this

15   policy.  They knew, it is detected, it is IOLI, and yet they

16   went through.

17           Now, let me take you through just one example of what

18   we went through yesterday to show you that the insurance

19   companies knew exactly what these policies were and wanted them

20   and took them despite the problems.

21           I told you about Myra Davis and showed you an AIG

22   internal communication reflecting its awareness that the

23   financial information submitted by Mr. Binday on behalf of Ms.

24   Davis was false.  Let's take a look at 3271.  These are

25   underwriter notes.  This is an underwriter that was doing his

DA3JBIN3                    Summation - Mr. Abramowitz

1    job at the insurance companies.

2            He sees this application.  He says financially, I did

3    a Zillow dot com check on the two residences mentioned on the

4    IR.  That is the inspection report.

5            Then he gives the addresses.  He says that address

6    does not exist.  The neighborhood houses are only in the upper

7    300,000 to low 400,000.  And the range on the other address is

8    773,000.  This does not come close to their admitted real

9    estate holdings that they mention in the IR.  She says --

10   referring to the applicant -- she says she has other real

11   estate holdings.  Should we pursue or do you feel it okay as

12   is?

13           That was on August 20th, 2008.  So let's go to Page

14   16539.  On October 13th they write, so adding it all up, I get

15   a little over 1 to $1.5 million in real estate holdings and not

16   much else.  So I don't see the financial justification.  Her

17   CPA didn't verify the holdings, so that doesn't help us.  So

18   whether they need to show stockbrokers statements showing the

19   7.3 million in holdings along with real estate holdings, or I

20   wouldn't issue since the evidence we have isn't holding up to

21   the amount she is telling us.

22           What does that mean?  That means they saw the

23   application, they see it's false, the financial information is

24   false.

25           So we go to Page 16522 and this is on December 16th.

1    These are certificates of ownership for three cooperative

2    apartments in New York.  This just appears -- listen to this --

3    this just appears to be another agency trying to over-insure an

4    elderly life.  If these properties are being used to generate

5    rental income, I would presume they would be listed on tax

6    returns with addresses.  I had already increased this to $5

7    million.

8           So here IOLI detected.  We have a problem with the

9    financials.  They don't seem to add up, so what happens?  I

10   increased this to a $5 million policy.

11          On rebuttal, the government introduced the following

12   exhibit which they didn't discuss with you.  Despite the

13   significant questions during the underwriting process

14   concerning Ms. Davis, on December 22nd, William Gutterdeign,

15   the chief underwriter at AIG American General, writes to

16   Michael Binday and says -- let's read this.  Sorry.  Michael, I

17   was out Friday.  Needed the day off after my birthday

18   celebration the previous night.  This case has gone up the food

19   chain and based on what I have, I can't disagree with it.

20   Stocks and bonds were listed as $7.3 million, but the info we

21   have shows closer to 2 million.

22          That is about $5 million off, not an accounting error.

23   Also do not see any info in the file which shows that she is

24   the owner of the properties.  She said she was the owner of the

25   properties, but there is nothing in the file that shows she's

1    the owner of the properties.  As always, willing to review any

2    additional data you may have to increase the offer.  Thanks and

3    have a good time in Florida.  Happy holidays!

4            Senior vice president, chief underwriter, chief

5    underwriter.

6            On December 28th a Happy New Year present, six days

7    later the policy was issued.

8            What this e-mail says is keep sending me this stuff.

9    My bosses say we don't want it but just keep sending it.  Maybe

10   be a little bit more careful on the financial statements, but

11   just keep sending the business.

12           They detected the problem and they issued the policy

13   anyway.  There is a reason why they did:  Net worth, assets,

14   any financial information is totally irrelevant and immaterial

15   to the decision to issue the policy.  Age, gender and health

16   were the material questions that needed to be answered.

17           There is even more evidence that the financial

18   misrepresentations on the STOLI applications were totally

19   immaterial.  We showed you yesterday that Mr. Binday was

20   identified at Lincoln National as someone who was submitting

21   STOLI and IOLI policies as early as June 2007, and I showed you

22   nine STOLI policies.  We whizzed by them quickly, but they have

23   the dates.  Nine STOLI life insurance policies submitted by

24   Mr. Binday and issued by Lincoln National after Mr. Binday's

25   name appeared on the list.

1          Now, if you were on a list as IOLI-suspected in June

2     of 2007, you would think that a directive should go out to the

3     entire company, "don't deal with Mr. Binday.  He's selling us

4     STOLI policies.  We don't want STOLI policies.  We told you we

5     don't want STOLI policies."

6          Well, nothing like that happened because the top brass

7     didn't want it to happen.  They wanted to tell the world that

8     they were opposed to STOLI, but they still wanted the agents

9     like Mr. Binday and the other defendants to keep bringing them,

10    we're making money.

11         Now, not only did they keep issuing policy after

12    policy after policy which were obvious STOLI policies, they

13    gave him awards.  He received stock options.  He was named the

14    premier partner, which meant that Lincoln Financial said he was

15    the best of the best, and he received also sorts of awards,

16    benefits and incentives.

17         Now, what is the inescapable, inescapable conclusion

18    that you must reach with respect to this evidence?  These

19    companies simply were not defrauded by these applications.  In

20    the context of fraud charges, a lie is not criminally material

21    if the person or the company to whom the lie is directed is not

22    deceived.

23         You saw that every insurance company involved in this

24    case knew what were the telltale signs of a STOLI policy; an

25    insured over the age of 70 seeking a face amount of insurance

1    more than $1 million and that the owner of the beneficial

2    interest is a trust.  They knew what to look for.  If they

3    really wanted to detect it and prevent it, they really could

4    have done it.

5         But they never put into place any additional

6    meaningful review process to confirm the financial information

7    of policies brought to them for people over 70, for an amount

8    of 2 to $5 million and which named a trust as the beneficiary,

9    characteristics that applied to almost every policy in this

10   case.  They could have rooted the STOLI policies out if they

11   wanted to.  They certainly knew what to look for.

12        Now, the evidence showed that with respect to the

13   examination of financial information, unlike the independent

14   examination of the medical records which you saw evidence off,

15   you have to get this test or that test and we have a doctor

16   coming to your home, have to confirm this and be retested, we

17   need more medical information.  The insurance companies did not

18   perform any real independent testing of an applicant's

19   financial condition to confirm their true financial condition.

20        If they really wanted to confirm the net worth of an

21   applicant, they could have easily done this.  How could they

22   have done it?  You ask for a copy of your tax return to be

23   attached to the application.  If they had asked these insureds

24   to submit a copy of their tax return along with the

25   application, we wouldn't be here, there would be no STOLI, they

DA3JBIN3                    Summation - Mr. Abramowitz

1    could root it out simply.

2              Now, let's look at Defendant's Exhibit 7 because AIG

3    actually thought that this might root out STOLI, and on May

4    18th, 2006 they issue a directive about investor-owned life

5    insurance, and it says in order to verify that applications and

6    quotes received are consistent with this new policy, all of the

7    following documents -- the policy against IOLI -- must be

8    received for any single permanent life insurance application

9    for a proposed insured that is a 70 or greater with a requested

10   death benefit of a million dollars or greater.

11             Look at the third bullet point, a copy of the proposed

12   insured's most recently filed tax return (Form 1040).

13             They also say the policy's annual premium cannot

14   exceed 20 percent of the proposed insured's adjusted gross

15   income as stated on their tax return regardless of who is

16   paying the premium or if it is financed.

17             If the policy had stayed in effect, as I said, they

18   would have rooted out STOLI, but the obvious answer is look

19   what happened.  Let's look.  Three months later, three months

20   later, August in 2006, it says formal applications approved,

21   issued, or with effective dates on or after September 1st will

22   be handled under our new underwriting requirements and

23   approach.  Tax returns will not be required and the 20 percent

24   of AGI test, adjusted gross income test, will not be applied.

25   New plans and rates will be available.

1              For three months they required the tax returns, and

2    three months later they said we really don't need to see them.

3    The real reason that they didn't want the tax returns was they

4    turned a blind eye to the exaggerated and false net worth

5    statements and didn't want to know the truth because if they

6    knew the truth, the IOLI and STOLI business would end.

7              Now, exaggerated financial information led to the

8    higher premiums.  I asked Mr. Avery something about this.  I

9    want you to see how credible was he when I asked him this tax

10   return issue:

11   "Q   And did you, for example, ask that a copy of the tax

12   return be attached to the application?

13   "A   In some instances we may have, but tax returns are quite

14   private, quite private information for wealthy people, so

15   that's not always the best way to do it.

16   "Q   Quite private?

17   "A   Quite private.

18   Q.   But their net worth statement is not so private?

19   "A   They have to provide that information or we wouldn't issue

20   them.

21   "Q   Right.

22   "A   If they decide to keep it private, they could, but we

23   would probably not issue without the information.

24   "Q   Right.  So that the net worth statement is submitted but

25   you think that if you ask people to attach the tax return, that

1    they may resist doing that?

2    "A   It wasn't what I thought.  It was push-back that we might

3    get from the producer or the broker dealing with that client

4    and sometimes.

5    "Q   Push-back?  Push-back?

6    "A   Push-back.

7    "Q   Did it ever occur to you that the push-back would be

8    because if you submitted the tax return, you would know

9    precisely how much that person was worth or how much money that

10   person had in income?

11   "A   If they pushed back, we would try to use other means to

12   discover whether they truly were of the financial means they

13   indicated."

14          Now, just step back.  Does that make any sense to you,

15   when you now know that they did require or keep the requirement

16   for tax returns for wealthier people, $10 million policies or

17   over you had to have a tax return, but this 2 to 5 -- 2 to $4

18   million, the one Mr. Krupit said under the radar, not over $10

19   million, not under 10 million, 2 to $4 million under the radar,

20   that you don't need a tax return for because obviously the

21   wealthy people in that group might be offended by being asked

22   for the tax return, but the very wealthy people would not be.

23          It is nonsense, absolute nonsense.  They didn't want

24   the tax returns.  They didn't care about the financial

25   information.  They did not care that they were selling STOLI

DA3JBIN3                          Summation - Mr. Abramowitz

1    despite their pronouncements.

2              Now, what about this thought that this is such private

3    information?  You saw some of the medical records.  Did you see

4    what you had to put down there?  You had to talk about very

5    private things on your medical information, some stuff which

6    you would not want to have third parties see about your medical

7    condition, but your tax return, that would be a little too

8    private for Mr. Burns or Mr. Avery.

9              Now, let's look at Defendant's Exhibit 51 because then

10   you will really see what the push-back meant.  This is the

11   push-back.  After they issued the policy about requiring the

12   tax returns, it says since that date, or this date, incoming

13   volume on cases age 70 plus have decreased and pending volume

14   has dropped with many cases being withdrawn.

15             That says, to me, that the policy's working.  If we

16   ask for a tax return, we are not going to get these inflated

17   net worth applications.

18             Then they say total pending/Cond. issued cases have

19   dropped from 659 on May 19th to 372 on July 6th.  That is

20   dramatic.

21             Field reaction has been mixed, with some producers

22   withdrawing cases and others submitting full financial

23   underwriting requirements.  The drop from 650 to 372 indicates

24   tax return policy will weed out STOLI.  If that is what we want

25   to do, it is working.  The push-back is ooh, wait a minute, no,

1    we don't really want it to work.  We want to say we really are

2    trying to root out STOLI, but whenever we've come up with

3    something that actually would work, forget about it!

4           The salesmen said we're not making enough money, we

5    need STOLI, we need the IOLI business.

6           It is true, you saw all sorts of arguments that the

7    defendants made a lot of money in commissions, no question

8    about it, but so did the insurance companies.  They did not

9    suffer at all economically from this alleged scheme to defraud.

10   Instead, this its what Mr. Burns said.  We came up with a great

11   idea to root out STOLI.  Instead of requiring a tax return,

12   we'll raise the price, we'll raise the price.  That will stop

13   it.

14          Does that make any sense to you?  They raise the

15   price, they keep getting STOLI, STOLI, STOLI, they make more

16   money.  How is that stopping STOLI?

17          When I asked Mr. Burns about how this particular

18   method of deterring STOLI affected the insurance companies, he

19   testified:

20   "Q   But if despite the spike in price, a STOLI policy made it

21   through Lincoln, those higher premiums went to the company,

22   right?

23   "A   Yes.

24   "Q   I mean the charges on a policy would be the premiums that

25   go to the company?"

1     And they put all of these process enhancements, you

2     talk about euphemisms, process enhancements, we will really

3     root out STOLI with all our process enhancements, did it occur

4     to either one of them that requiring a tax return would have

5     put an end to the business?  No.  They decide the best idea for

6     process enhancement to ward off STOLI is to raise the premiums.

7     That will stop it.

8          Does that make any sense to you?

9          You didn't leave your common sense at home before you

10    swore to be jurors in this case.?  It is absolute nonsense.

11    None of them requested independent information that would have

12    confirmed the applicant's assets.  Did they request copies of

13    investment account statements?  No.  Did they request copies of

14    bank account statements?  No.

15         Did they request copies of 401 (k) pension statements?

16    No.

17         Did they ask that the properties they they put on the

18    application be appraised?  No.

19         But the government says they did ask for verification.

20    The government says oh, they asked for verification.  The

21    inspection reports and accountant statements, that is the

22    verification that these very sophisticated insurance companies

23    really wanted and needed to have.  Let's look at what these

24    say.

25         This is the accounting letter which is Exhibit 335 A.

1    It says please -- the accountant's letter.  He says in the

2    letter, "Please be advised that I have not audited these

3    financial statements and they are based solely on information

4    provided by my client."

5         What does that mean other than I'm just writing down

6    what the person told me.  I'm not verifying it.  I didn't ask

7    for bank statements.  I didn't ask for tax returns.  I didn't

8    ask for anything.  The applicant tells me she is worth $5

9    million, I say she says she is worth $5 million, that is the

10   accounting letter.  That is what is in the file.

11        Let's look at the inspection report.  It says sources:

12   Resident neighbors.  What is the source of the information?

13   Applicant.  No verification of the type that would prove what

14   she was worth if they really wanted to find out what she was

15   worth.

16        This sole independent, this is the sole independent

17   verification that in most of these cases the insurance

18   companies received before papering the file.  We have an

19   accountant's report.  It doesn't matter what the report says.

20   The accountant's report says we didn't look at this at all.  We

21   have an inspection report.  It doesn't matter what the

22   inspection report says.  We didn't look at it at all.  That is

23   the third-party verification.  That is nothing, and it is

24   another indication that they didn't care at all what the

25   financial information was about.

1          Can you imagine, by the way, if there was a letter in

2     the file from Doctor X, saying applicant Eva Hartheimer, not my

3     patient, but she came in and she told me I'm healthy, and I am

4     writing that down and giving you, the insurance company, I

5     haven't taken a test, I didn't examine her, I didn't send her

6     for any kind of medical verification at all, she told me she's

7     healthy.  Here's my letter to you, insurance company, that

8     should do it.

9          Now, you know that that wouldn't work because you know

10    that health is the primary concern of the insurance company,

11    not wealth.  Health was the primary concern.  They would have

12    never accepted a letter like that, but that is what they accept

13    in connection with financial.  The applicant tells me she is

14    rich.  Fine with me.  The applicant tells me she has all of

15    this.  These are the numbers that have been furnished.  I

16    didn't check them.  I wasn't asked to check them.  I am not

17    checking them.  I didn't check them.

18         This so-called third-party verification turns out to

19    offer no independent corroboration of the information provided

20    by the applicant.

21         Now, it is important for you to know -- and this is an

22    important part of this case -- that there was no economic harm

23    to the person whose life and whose lives were insured.  In

24    fact, for every one of those people there was a benefit.  They

25    did not invest any of their own money in these transactions,

1    and once the policy was sold, the premium loans were fully

2    repaid from the sale proceeds and the person whose life was

3    insured was often paid a lump sum of money.

4            If they were not, like Silas Griffin, they would have

5    at least had had the benefit of free insurance for two years.

6    These are real benefits in the hands of the insureds while

7    they're alive which would not have been available to them if

8    they hadn't applied for the STOLI policy.

9            Again if the insured should die before the policy was

10   sold, his or her estates would keep the several million dollar

11   benefit and pay back the loans from the proceeds.  It was

12   intended, intended as a win-win situation for the insured

13   person, and the government does not, cannot allege that the

14   person getting the insurance was a victim.

15           The rest of the insureds that you learned about

16   received substantial money from these STOLI policies.  Let's

17   show what the record shows.  James Farrell received $150,000.

18   Maria Ramos, $118,000.  Doris Riviere, 118,000.  Cornelia

19   Chestnut, 118,000.  Elouise Hails, 118,000.  Robert Katz,

20   115,000.  Paul Card, 118,000.  And Martha Espinal received

21   $10,000.00.  This is real money that they would not have gotten

22   if they weren't participating in the STOLI transactions.

23           Let's examine what the defendants knew at the time.

24           It is here that they did not think while they were

25   processing these STOLI applications that they were committing

1    any crime whatsoever.  The business was openly discussed in the

2    office.  Everybody in the office was involved.  There are

3    e-mails back-and-forth, there is letters wide open, letters and

4    documents that you saw from Tracey Robinson.  Everybody in the

5    office knew this was going on.

6         They sent advertisements out, advertisements and

7    fliers to she insurance clients and others describing the life

8    settlement and secondary market opportunities.  All the

9    employees knew exactly what was going on.  They were placing

10   hundreds of these life insurance policies with 13 of the

11   biggest and most sophisticated insurance companies in the

12   world.

13        Now, consistent with their belief that they had

14   committed no crimes, Michael Binday openly said that everything

15   with respect to these insurance transactions was a hundred

16   percent Kosher.  Similarly, Paul Krupit first told the FBI when

17   they came at him that he didn't do anything wrong.  They had

18   every reason at that time to believe that they had done nothing

19   wrong.

20        Ask yourselves, this is where human beings, it is an

21   important part of this process.  This case is not only about

22   e-mails and documents, highlighted applications.  This is real

23   human events that happened here.  Ask yourself how would you

24   feel when for years you feel the effects of seeming

25   encouragement of this business coming from the salesmen of the

1    insurance companies and the defendants themselves.  Of course,

2    Michael Binday knew that they were submitting STOLI policies

3    and he knew that the insurance companies could have rejected

4    them if they wanted to because they could spot the hallmarks of

5    these policies from a mile away.

6         Instead of refusing to do business with him, and he

7    knew that they knew and suspected IOLI in early '07, instead of

8    refusing to do business with him, they lavished  him with gifts

9    including all expense paid trips to some of the nicest vacation

10   spots in the world.

11        You heard testimony Binday's firm was named insurance

12   agency of the year by Security Mutual in 2008.  If insurance

13   companies really didn't want this business, as the government

14   suggests, it had all the information it needed at its

15   fingertips to put a stop to it.

16        But then all of a sudden the FBI gets involved and

17   everyone panics.  These are human beings.  They panic.  Ask

18   yourself when you get back into the jury room, ask yourself

19   what would you do if all of a sudden the long arm of the law

20   points a finger at you and says you are a fraudster, you have

21   committed crimes for the last three years.  What would go

22   through your mind?

23        Now, they haven't.  It is panic.  It is as simple as

24   that.  These are human beings.  They react in a human way.  The

25   government, recognizing perhaps that they can't objectively

DA3JBIN3                    Summation - Mr. Abramowitz

1   prove a fraud through the evidence, tries to say that they're

2   proving it through the mouth of my client, Michael Binday.

3   They did so by relying on testimony that he gave to the State

4   Insurance Department.  It was false.  The testimony was false.

5          He is not charged with any crime of lying to the State

6   Insurance Department.  He panicked.  He thought for years that

7   he had been dealing in an honest way with the insurance

8   companies, and now because the financial crisis, because of the

9   financial crisis, nobody wants to buy these policies any more,

10  the insurance companies are pointing their finger at him, too.

11         It is as simple as that, he panicked.

12         Now, it was foolish, no question that it was foolish,

13  but it does not prove a thing towards whether he committed a

14  crime that's charged in this indictment for years for which he

15  thought was perfectly legitimate.

16         Now, ladies and gentlemen, what do we make of all

17  this?  As I think you can tell, I urge you that the government

18  has not proved this case beyond a reasonable doubt.  I am

19  asking you, every one of you, to return a verdict of not

20  guilty.

21         Now, I just want to tell you, by returning a verdict

22  of not guilty, it doesn't mean that you approve of the conduct

23  of these defendants or that you approved of lying or that you

24  like STOLI policies or you don't like STOLI policies, or you do

25  or you don't like insurance companies or anyone associated with

1    them, but when you first started your service, you took an oath

2    to decide this case solely on the evidence and the law as

3    presented by Judge McMahon, not your attitudes about any of

4    this, not your attitudes about STOLI, not your attitudes about

5    insurance companies.  You were asked to decide it on the

6    evidence.  Ladies and gentlemen, the evidence isn't there to

7    prove that Mr. Binday and the other defendants committed the

8    fraud that is charged in the indictment.

9              Now, the government is going to have another chance to

10   speak to you in rebuttal, and I won't.  I am asking you to say

11   to yourselves when they raise arguments, what would Binday's

12   lawyer say about that?  What would Kergil's lawyer say about

13   that?  What would Resnick's lawyers say about that?

14             Because they do, because they have the burden of

15   proof, they have the last word, but I am asking you pursuant to

16   your oath, to just say does that make sense?  Didn't the

17   lawyers say this?  Didn't the lawyers say that?  I am confident

18   if you follow your oath and you do as I'm asking, you will

19   return a verdict of not guilty.  Thank you.

20             THE COURT:  Okay.  So we're going to take a break for

21   lunch and we will return at 2:00 o'clock.  Don't discuss the

22   case and keep an open mind.

23             (Jury excused)

24             (Luncheon recess)

25             (Continued on next page)

AFTERNOON SESSION

2:09 p.m.

1          THE DEPUTY CLERK:  Case on trial continued.  The

2     government and the defendants are present.

3          THE COURT:  Are the jurors present?

4          THE DEPUTY CLERK:  The jurors are present in the jury

5     room.

6          THE COURT:  Bring them in.

7          Mr. Stavis, are you ready?

8          MR. STAVIS:  Yes, your Honor.

9          THE DEPUTY CLERK:  One moment.

10         (Jury present)

11         THE COURT:  Okay.  Hope you had a good lunch.

12         Mr. Stavis, I believe the floor is now yours.

13         MR. STAVIS:  I want to cut to the chase and tell you

14    what the case is about without all the materialities and the

15    lapse rates and all the stuff.  The case is about ripping off

16    insurance companies.  And, ladies and gentlemen, you can't rip

17    off an insurance company if the insurance company knows exactly

18    what you are doing and wants your business.  The insurance

19    companies were partners of these three gentlemen at the table,

20    not victims.  That's what the evidence shows.

21         How did the insurance companies get ripped off?  I sat

22    here for two and a half weeks and I can't tell you.  I can't

23    tell you how these insurance companies got ripped off because

1    there's no evidence.  Oh, I know that their actuarial

2    assumptions were compromised; I know that.  I heard that.  I

3    know that their lapse rates were impacted; there was testimony

4    about that.  But not how they were ripped off, and there is no

5    evidence of that.

6         And you know what, ladies and gentlemen?  There was a

7    point earlier this morning, Ms. McCallum was talking about the

8    insurance company witnesses and they're so harmed because of

9    their assumptions.  I wrote it down -- assumptions.  That might

10   be okay in the insurance world that they came from to have

11   assumptions of how we're supposed to make money or what we're

12   supposed to do.  That passes in the insurance world.

13        Ladies and gentlemen, this is a criminal case with

14   very serious consequences for three human beings who are

15   sitting at this table.  The government is asking you to find

16   these human beings guilty of very serious crimes based on the

17   assumptions and the theories of the insurance companies.

18        Criminal cases, ladies and gentlemen, do not rest on

19   theories, they do not rest on assumptions.  They rest on

20   evidence, in this case evidence that someone, some insurance

21   company was ripped off, evidence that you don't have.  It's not

22   a game, ladies and gentlemen.  It's not a game of

23   misrepresentation plus lapse rate equals guilt.

24        Where is this great rip off of these insurance

25   companies?  Where is it?  So they had Silas Griffin.  Now, you

want to go, when you're analyzing evidence beyond a reasonable

doubt, you want to look at the evidence, not the theories, not

the way that the insurance company would like to conduct its

business, but you want to look at the evidence.

So you take we had Silas Griffin.  He was one of the

insured.  What happened to his policy?  Did it lapse, did it

not lapse, did they make money off of it, did they not make

money off of it?  Is it still in effect, are they still getting

premiums for Silas Griffin?

James Farrell.  Did his policy lapse?  Policies?

There were several.  What happened to the insurance company?

That's the specifics.  How did these policies rip off the

insurance companies?  And after sitting here for two and a half

weeks, there is no evidence of that.

The lapse rates, okay.  They changed because now hedge

funds are buying the policies.  That's what the insurance

company people told you.  Now hedge funds are going to change

the lapse rates.  Was there a witness that came from the hedge

funds?  Was there a witness that came from the hedge funds to

tell you, well, we never let a policy lapse in our hedge fund?

No.  It's an assumption.  It's a theory that the insurance

company is proposing to you in this criminal trial where you're

going to have to determine the guilt or innocence of three men.

There was Mike Burns, who was Lincoln Financial super

executive.  Page 664, he was explaining to you this rip off.

1    "Lincoln's life products are priced assuming a certain level of

2    policy persistency.  IOLI business is not expected to lapse,

3    resulting in a death claim on every policy."

4             Assuming?  Expected?  That's not substitute for proof

5    as to what happened.  That's not substitute for proof beyond a

6    reasonable doubt as to how the insurance companies were harmed.

7    The assistant U.S. attorney this morning was talking about

8    these assumptions.  Assumptions are not evidence.

9             Ladies and gentlemen, I asked Paul Krupit, you might

10   remember him.  He testified earlier in the week.  I asked him

11   about his statement to Special Agent McDonald when he was first

12   approached by Special Agent McDonald, and it was kind of

13   interesting because I asked him what he told Special Agent

14   McDonald.

15            And he said at page 996, I told him I did not want to

16   talk to him without the presence of an attorney.  That's what I

17   said.

18            But then if you'll remember, when I showed him his own

19   handwritten notes, which he testified were made within an hour

20   or so, he admitted that he told Agent McDonald "I did nothing

21   wrong."

22            When Paul Krupit told Agent McDonald I did nothing

23   wrong, Paul Krupit was telling Agent McDonald the plain

24   unvarnished truth.  Paul Krupit did nothing wrong, Michael

25   Binday did nothing wrong, Kevin Kergil did nothing wrong, and

1    Mark Resnick did nothing wrong.

2              But, of course, Paul Krupit said that was a lie.

3    Well, when Ms. McCallum was giving her summation this morning,

4    she kept saying lies and lies and lies.  I wrote it down --

5    reams and reams of lies.  Well, look at Paul Krupit.  You want

6    to talk about lies.  And look who the U.S. attorney and the

7    U.S. government got into bed with in terms of a liar.  That's

8    Paul Krupit.  He lied.  He said there were -- he lied to keep

9    selling insurance.  Remember, I went one by one.  Yes, there

10   was a lie, that was a lie, that was a lie.

11             He lied about $200,000 in commissions, and I'll

12   explain to you what that is.  When we went through his

13   cooperation agreement, he has to pay, at the time of his

14   sentence, he has to pay money in forfeiture and he has to pay

15   money in restitution to these insurance company victims, which

16   aren't victims.  I'll get to that.

17             And he said at various times there were more than 20

18   policies and he said there were 15 to 25,000 apiece that he

19   would make.  I don't know if you remember I used the Elmo.  I

20   mean it was simple math.  It didn't add up.  But now you know

21   why he had that math problem, because he's lying to save

22   himself money.  If he really made $600,000 and he says

23   $200,000, then he saves $400,000.

24             He lied to please the government, ladies and

25   gentlemen, when he said I did nothing wrong because that was

1  true.  He actually pled guilty to a crime that he did not

2  commit because he wanted to please the government.  He lied to

3  save himself, just like he lied about everything else to save

4  his license or to save money.  But when he said I did nothing

5  wrong, that was the plain, unvarnished truth.

6         Now, Ms. McCallum said this morning, she said that the

7  defendants knew they didn't -- that the insurance companies

8  didn't want STOLI, that the defendants knew that they didn't

9  want STOLI.  Where is the evidence of that, ladies and

10 gentlemen?

11        I want to, if we could to 1037, line 15.  Okay.  You

12 testified on page 922 that you had a conversation with Kevin

13 Kergil about false information on applications and that when

14 you told him you were very concerned about it, he told you not

15 to worry about it.  Is that correct?

16        Answer:  That's what he said.

17        Question:  He also told you that insurance companies

18 wanted to issue these policies, correct?

19        Answer:  Yes, that's what he said.

20        There's evidence that Kevin Kergil knew that the

21 insurance companies wanted to issue the policies.  He knew it.

22 All of them knew it.  And there's plenty of evidence to back it

23 up that the finances didn't matter one whit.  They knew that

24 the insurance companies wanted this STOLI business, and they

25 had no intent to deceive the insurance companies.  All the

DA3LBIN4                    Summation - Mr. Stavis

1   stuff and the misrepresentations is jumping through the hoops

2   that you have to do to do the STOLI business that the insurance

3   company wanted, jumping through the hoops, dotting the Is,

4   crossing the Ts.  Kevin Kergil knew the information was not

5   correct and so did the insurance companies.

6          Ladies and gentlemen, when the insurance companies say

7   that this was material and it changed their whole outlook,

8   actions speak louder than words.  They knew that the STOLI

9   policies were going to be issued anyway and it didn't influence

10  anything.

11         And I just can I have 3271.  Mr. Abramowitz spoke to

12  you about this, but I just want this part of it again for

13  emphasis.  This is Myra Davis's underwriting notes.

14  Underwriting notes are the internal things that the insurance

15  company does when it's deciding whether to issue a policy.

16  That's where all this stuff comes from.

17         This just appears to be another agency trying to

18  overinsure an elderly life.  Okay.  This is STOLI but it's only

19  5 million and the premiums are pretty good.  Let's do it.  And

20  they did it.  They issued the policy.

21         Tracey Robinson testified page 312, testified to

22  something that was very interesting.  This is line 5.  Okay,

23  she was talking about the process at R. Binday Plans.

24         Medical records were sent, you had testified to this

25  last week, to see if the insurance company would accept the

1    application on a preliminary basis, correct?

2              Correct.

3    "Q.  This wasn't the actual application that was going into the

4    insurance companies, correct?

5    "A.  Correct.

6    "Q.  It was just the medical records, correct?

7    "A.  Correct.

8    "Q.  On the basis of just the medical records, the insurance

9    company would give a preliminary yes or no, correct?

10   "A.  Yes, pretty much.

11   "Q.  You would get, as you testified last week, you might get a

12   favorable offer from the insurance company?

13   "A.  Right, correct."

14             MR. STAVIS:  That's the way that this operates with

15   the STOLI policies.  They get the medical records, as Tracey

16   Robinson told you.  They get them to the insurance company and

17   they get a preliminary offer and then they start that whole

18   thing with the hedge funds, okay.  Where is the financials?

19   Where is it?  It's not there.  They get the preliminary nod

20   just from the medical records.

21             And you know as opposed to actuarial assumptions and

22   lapse rates, we can all figure out how important medical is in

23   a determination by insurance company.  And you know medical is

24   the primary thing.  In this case and in these STOLI cases,

25   ladies and gentlemen, medical was the only thing that mattered.

1    And you don't need some insurance company big shot to tell you

2    that medical was important.  You don't need some insurance

3    company big shot to tell you that medical really had a big

4    to-do with our bottom line.

5        Now, you did have two high-up insurance company

6    executives.  You had Jim Avery and Mike Burns.  And

7    Mr. Abramowitz was alluding to this earlier before lunch that

8    these guys were at the very top of these insurance companies.

9    They were above it all.  They lived in a world of actuarial

10   assumptions, materiality, lapse rates; but it's down the food

11   chain where the salespeople and the other people want to make

12   the commissions and the bonuses and go on the trips that the

13   STOLI policies are being written with the acquiescence and the

14   active encouragement, ladies and gentlemen, of the insurance

15   companies.

16       And you can bring in all the big shots from insurance

17   companies in the world to convince you that they didn't want

18   STOLI, but their actions speak louder than words.  Ms. McCallum

19   said this morning, you know, this affected the insurance

20   companies because the insurance companies came here and said

21   so.  Well, ladies and gentlemen, you determine that.  You are

22   the triers of fact, not an insurance executive, okay.  Not just

23   because they said so.  Then talking about lapse rates and

24   actuarial assumptions is not proof beyond a reasonable doubt

25   that you need to decide a criminal case.

1            Can you put up Defendant's Exhibit 51, please.

2            Now, we saw this this morning.  I'm not going to

3    reinvent the wheel, believe me.  What happened was AIG said,

4    some big shot in AIG said we don't want STOLI, and the way

5    we're going to get rid of it is we're going to require a tax

6    return.  Everybody has a tax return.  It's not like going to

7    Frank Pellicone.  Okay, everybody has a tax return.  That was

8    the update.  And that was on May 19 of 2006.

9            And so then there was a meeting.  That's what this

10   document is, Defendant's Exhibit 7.  Then there was a meeting

11   to discuss how is this anti-STOLI program going.  How is it

12   working out for you, okay.  And they said IOLI guidelines

13   restricted cases on older age insureds for single life were

14   implemented on 5/19.  Since this date, incoming volume on cases

15   70 plus have decreased and pending volume has dropped with many

16   cases being withdrawn.

17           In other words, it was working.  Requiring a tax

18   return was ending STOLI.  And the last one, the field reaction,

19   the people that are selling the policies in the insurance

20   companies and the -- what do they call them -- producers,

21   brokers that Mr. Avery said he had 30 to 50,000 of them working

22   for him, field reaction has been mixed, with some producers

23   withdrawing cases and others submitting the full financial UW

24   requirements.

25           And what happened from May 19, then there's the drop

1    in STOLI because you found the magic key to ending STOLI which

2    was tax returns.  And then as Mr. Abramowitz showed you the

3    documents, they ended this anti-STOLI program that was working

4    so well.  They ended it September 1.  That's how serious they

5    were about combating STOLI.  They wanted the money.

6          Every time the U.S. attorney gets up here they say,

7    oh, their motive was to make money, these insurance agents who

8    are on trial.  Well, isn't that everybody's motive that goes to

9    work?  Motive.  This isn't like a murder case where you have to

10   figure out who done it because of a motive.  The motive was to

11   make money and they made money and so did the insurance

12   companies.  I said it in my opening.  You want to talk about

13   commissions?  Fine.  They made a lot of money.  Talk about the

14   premiums -- $200,000 a year, $250,000 a year for these elderly

15   people.  The insurance company made it too.

16         And you want to talk about motive?  That's the

17   insurance company's motive for wanting STOLI business even

18   though the big shots on top say, oh, we don't want it.  They

19   did want it.  The bottom line showed it and the way they

20   treated, it came out.

21         They said like the character from Jerry McGuire, show

22   me the money.  And these three gentlemen showed it to them.

23   They wanted it.  They were not deceived.  They were not ripped

24   off in any way, shape, or form.

25         So where does Kevin Kergil fit into this?  Well,

1   Ms. McCallum was correct, he's essentially the man behind the

2   numbers.  He put the numbers into the applications, the numbers

3   were false.  No question about that.

4          But can we have 905, line 1.  Something very important

5   about the numbers in this case and the materiality and it's the

6   under the radar, okay.  So this was testimony from Paul Krupit.

7          Did Kevin Kergil explain to you how large the death

8   benefit on these types of insurance policies would be?

9          Yes.  He explained they would be typically between

10  three and $4 million.

11         Did he explain to you why it would be between three

12  and 4 million?

13         Yes.  Because he explained that the policies had to

14  stay under the radar.

15         Now, I submit to you that if somebody told me that

16  something had to be under the radar, I would kind of know what

17  they meant.  But this is Paul Krupit.

18         Did he explain to you what staying under the radar

19  meant?

20         Yes, he did.

21         What did he explain to you?

22         He explained that being under the radar, simply it

23  means that anything over three to 4 million would require

24  excessive documentation such as tax returns, stock reports,

25  bank statements, and that type of thing.

1      Now, when the insurance company executives come to you

2  to testify, they speak in glowing general terms, okay, about

3  what they would like to see.  We have here a criminal case.

4  Something might be material in the abstract, but it's not

5  material under $5 million because under $5 million they don't

6  care.  They can make so much money from the premiums that under

7  $5 million is not material to them because it's under the radar

8  screen.  They don't require anything and they don't require

9  because they don't care.  They want the business.  They were

10  not ripped off and they were not deceived in the least.

11      Financial misrepresentations do not equal criminal

12  conduct, no matter how many times we might be told that.  Where

13  is the rip off here, ladies and gentlemen?  Where were the

14  insurance companies ripped off?

15      Can I have 1034.  I want to show you something.  It's

16  interesting, as I'm discussing this, Mr. Feingold was asking

17  Paul Krupit about something he did and they called it bad

18  conduct.  They didn't call it criminal conduct, they called it

19  bad conduct.  There you see on line 7 and line 9.

20      And I asked Paul Krupit:  And bad conduct is different

21  from criminal conduct; is that correct?

22      Mr. Krupit:  I don't consider that the same thing.

23  Bad conduct was anything that could be improper.

24  "Q.  So it was improper for you to lie on that certification to

25  united health, correct?

1   "A.   That is correct.

2   "Q.   So that is what you referred to in your testimony as bad

3   conduct, correct?

4   "A.   Yes.

5   "Q.   Not criminal conduct, bad conduct, correct?

6   "A.   Yes."

7         MR. STAVIS:  Well, when Paul Krupit lies on an

8   insurance certification for united health, it's not a crime.

9   It's bad conduct.  Not every lie that's told to an insurance

10  company is a crime, ladies and gentlemen.  That's some proof.

11        Kevin Kergil, the man behind the numbers.  I told you

12  in my opening statement he was an insurance agent.  He went to

13  work, this is what he did.  He's the guy with the inspection

14  reports with Mr. Pellicone, but the insurance company didn't

15  care.  Ladies and gentlemen, you could have drawn a picture of

16  Mickey Mouse on one of those reports and it would have gotten

17  through these insurance companies so long as the picture of

18  Mickey Mouse was accompanied by a check for the first year's

19  premiums in the amount of $250,000.  That's what was happening

20  here.  That's the evidence you have from this case -- not

21  insurance company executives, not lapse rates -- that's the

22  evidence.

23        Now, there is a charge of conspiracy to obstruct

24  justice to destroy documents.  There is a tape I'm going to

25  play it for you in one moment.  But what there isn't, there

DA3LBIN4                    Summation - Mr. Stavis

1    isn't testimony you can believe in addition to the tape because

2    the testimony is from Paul Krupit.

3         Now, the government did something very interesting

4    with Paul Krupit.  On page 981, Mr. Krupit was asked by

5    Mr. Feingold:

6    "Q.  What did you do in response to Kevin Kergil's

7    instructions?"

8         That was the word -- instructions.  I think I made a

9    note of that one too -- instructions.

10        Then this morning we heard Ms. McCallum talk about

11   Kergil giving instructions to Paul Krupit.  And who is he, the

12   Godfather?  The crime boss?  Giving instructions?  Directing

13   that you do this?  Paul Krupit didn't work for him.  Kevin

14   Kergil didn't pay Paul Krupit's salary.  He didn't hire him.

15   You heard Paul Krupit had crossed paths with Mark Resnick and

16   he called -- he had a call to Kevin Kergil and then he had a

17   call to Michael Binday and went to a meeting.  He's not the

18   boss.  Instructed me.

19        Now if we could play that tape.  Listen very carefully

20   and then I'm going to show you something.

21        (Audio recording played)

22        MR. STAVIS:  Now, ladies and gentlemen, did it sound

23   to you like Kevin Kergil was instructing Paul Krupit, ordering

24   him, instructing him?  Did you hear what Kevin Kergil said?

25   Well, get it from AOL.  Then give it to him.  Then it's not

1   exactly what I said.

2            Can you 1042.

3            I asked Paul Krupit:  Didn't you try very hard to get

4   him to say certain things, Mr. Krupit?

5            I had no notes.  I had nothing.

6            That is a yes or no?

7            No, I did not.

8            Okay.  Paul Krupit is saying I didn't try to get

9   information out of him or anything.  He also said that the only

10  thing that Agent McDonald told him was don't discuss lawyers

11  but gave him no direction.

12           You just heard him on the tape.  You heard him baiting

13  Kevin Kergil, trying to get him to say something.

14           Do you have the transcript that goes with that?

15           Now, this tape that you just heard lasted two minutes,

16  21 seconds.  And in that two minutes, 21 seconds, on the first

17  paragraph you see:  You told me to go in there and delete

18  emails, you know.

19           And then the next one is five down.  Paul Krupit:  But

20  you told me to get rid of the stuff with your name on it.

21           See the baiting?

22           Paul Krupit on the top of the next page:  But they're

23  going to find out that I went in there and deleted emails, you

24  know.

25           Seven down, Paul Krupit:  But you called and said get

DA3LBIN4                      Summation - Mr. Stavis

1    rid of that stuff, you know?

2              Then four up from the bottom, Kevin, it's Kevin called

3    and told me to delete the emails.

4              Then Kevin says that's not exactly what I said.

5              That's the point.  In a two minute call, Krupit told

6    Kevin Kergil four times, or once every 30 seconds, you told me

7    to delete emails.  He was baiting him.  But there was no bait

8    to take, ladies and gentlemen.  Kevin Kergil, that's what you

9    heard.  What you heard was the reality, not the spin from Paul

10   Krupit about what happened.

11             And Mr. Abramowitz was telling you before the lunch

12   break about how people react sometimes and when everything that

13   you were doing every day for your work is now being

14   investigated because the U.S. government thinks it's some sort

15   of a crime, that's how things like that can happen.  It's not

16   obstruction.  The government hasn't proven obstruction.  Lord

17   knows it's a lot of documents in this case that you saw, and

18   they haven't proven obstruction of justice.

19             Ladies and gentlemen, the government proved the

20   business that Kevin Kergil was in, the insurance business, the

21   life settlement business, which Mr. Abramowitz showed you the

22   insurance companies, I think it was Lincoln, they wanted in on

23   it so they could make money.  And when the insurance companies

24   are doing it, it's okay.  Insurable interest out the window,

25   lapse rates out the window.  Show me the money.  It's okay when

1    they do it.  But when Kevin Kergil does it, when these

2    gentlemen do it, then it's a crime.

3            The business that Kevin Kergil and these other

4    gentlemen did is not a crime.  They made money from it.  You

5    don't need this whole motive thing.  Everyone goes to work to

6    make money.  The James Farrells of the world made money.  The

7    insurance companies made a ton of money in premiums despite

8    what they say about actuarial assumptions being compromised and

9    the theoretical assumptions that they had.  Where were they

10   ripped off?  Where?  They knew what they were getting -- they

11   were getting STOLI.  They wanted it, they got it, they were

12   paid for it.

13           There was no intent to deceive them when the insurance

14   companies were their partners.  Not victims, not blame the

15   victims, but their business partners.  What was the harm?  Can

16   you say what the harm was?  And, ladies and gentlemen, the

17   judge is going to instruct you about the burden of proof and

18   proof beyond a reasonable doubt.  And if you go into that jury

19   room and you can't figure out what the harm was, you have to

20   vote not guilty in this case.

21           This is a criminal case, ladies and gentlemen, not a

22   case for assumptions, actuarial or otherwise.  If you're going

23   to seek criminal charges and a conviction against people in

24   this country, it takes evidence, evidence beyond a reasonable

25   doubt, not actuarial assumptions and lapse rates, not theories,

1    not general theories, what happened in this case and evidence.

2             There was no crime here, ladies and gentlemen.  And if

3    you when you're deliberating can't figure out what the crime

4    is, then you must find Kevin Kergil and the other defendants

5    not guilty.  And when I say "you," I'm addressing you as a

6    group, but "you" means each and every one of you.  You have a

7    vote in that jury room, each of you.  And I beg you, ladies and

8    gentlemen, don't make a mistake with that vote.  Don't make a

9    mistake.

10            Mr. Kergil's job was not a crime.  His work was not a

11   crime.  The insurance companies were not ripped off in this

12   case.  And for that reason, you should find him not guilty.

13            Thank you.

14            THE COURT:  Ms. Murray.

15            MS. MURRAY:  May it please the Court, ladies and

16   gentlemen of the jury, the government has told a story here

17   designed to shock you:  People who are motivated by Ferraris,

18   people who sign documents saying one thing but the reality is

19   something totally different, people who bet on death, even on

20   someone's death bed.

21            Well, I'm going to tell you a very similar story but

22   in that story my client, Mark Resnick, a solo insurance agent,

23   is not the culprit.  My story is about the so-called victims of

24   this case -- the insurance companies, who the insurance

25   companies who knew full well that they were getting STOLI in

DA3LBIN4                    Summation – Ms. Murray

1    these policy applications and who welcomed in and embraced it

2    because it was bringing so many profits into their companies.

3            And the government is going to tell you in rebuttal

4    that the defense is just turning the tables here in an effort

5    to manipulate you, undermine your common sense and divert you

6    from reality, shifting the focus away from our client's

7    behavior.  But there's a difference here because the government

8    is invoking the criminal law, and that means their story must

9    be proved beyond a reasonable doubt.  It's not enough to smear

10   my client or inspire sympathy of their witnesses.  They have to

11   prove every element beyond a reasonable doubt and they have

12   not.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        Let's make no bones about it here, Mr. Resnick lied.

2    I told you in the opening statement I would agree with much of

3    what the government is going to present in their opening

4    statement.  I have sounded surprised by how much I ended up

5    agreeing with what they presented because they gave so little

6    attention to the things that are really in dispute in this

7    case, the contested matters, the parts that you need to decide.

8        That is what I am going to focus on in this summation,

9    whether these misrepresentations were material, whether the

10   insurance companies were defrauded, whether they were deceived.

11   Then did Mr. Resnick act with any intent to defraud, something

12   that really collapses into that first argument.

13       Third, was there any conspiracy to destroy documents,

14   and the answer to all these questions is going to be a

15   resounding no.

16       Could you show the first slide, please.

17       If the insurance companies want to approve these

18   policies, it is okay.  That is what Paul Krupit said Mark

19   Resnick said to him when he first got involved in this life

20   settlement business.  The insurance companies wanted these

21   policies and turned a blind eye to all the red flags popping up

22   in the policies.

23       They turned a blind eye because they knew the truth.

24   They knew that this was STOLI and they knew that it was funded

25   by hedge fund investors not that far away from this Court

1      house.

2                The people at the insurance companies are very

3      sophisticated individuals who make it their business to know as

4      much as they can possibly know about what is going on.  They

5      collect all sorts of data.  What they know about you and me is

6      mindboggling.

7                I put it to you they knew all about the life

8      settlement industry.  They knew all about its ability to fuel a

9      STOLI business, and their response to this was bring it on.  If

10     the hedge fund investors want to beat us at our own business,

11     we are quite ready to respond to that because we trust our

12     mortality tables and our mortality projections far more than

13     theirs.

14               As Mr. Avery put it in his testimony, and Ms. Macauley

15     actually mentioned this in her summation, they were betting

16     against the house, and their behavior would be so different

17     than a normal insured who is hoping to live, not hoping to die.

18     They were betting against the house.

19               Here are these hedge fund investors, and the house is

20     the insurance companies, and we know the house always wins.  In

21     this case, they won, too.  Mr. Binday, Mr. Kergil and Mr.

22     Resnick, they are just tiny bit players in this high stakes,

23     high finance world of life settlements, a multi-billion dollar

24     industry.

25               So how do we know that the insurance companies were

1    not defrauded?  How do we know that they knew they were getting

2    STOLI?  I am going to go through six points here and I will try

3    to do it as briefly as I can, as a lot of this is covered by my

4    co-counsel.

5         First of all, they approved policies with red flags.

6    We can go back to the policy of Silas Griffin.  His policy was

7    full of red flags.  The amount of the insurance, the fact that

8    the owner was a trust, the beneficiary was a trust, the amount

9    of the premium, $250,000, he has no other insurance in effect,

10   those are all the red flags that the documents say tell us this

11   is very likely STOLI.

12        What's really interesting about Silas Griffin's case?

13        He was one of Mr. Resnick's clients.  Mr. Resnick

14   wanted to get him upwards of $200,000.  Mr. Griffin would never

15   have been able to turn his own health, his own longevity into

16   an asset.  And so, unfortunately, it didn't work out, his

17   policy didn't get sold for him, but I guess we can also say

18   that that is fortunate because it is the hedge funds

19   determining that he is a very healthy man, and certainly he

20   came across as a robust man on the stand.

21        The interesting thing about Mr. Griffin's application

22   is how quickly one can do financial underwriting on his

23   application.  It is just a simple property records search and

24   one can determine that his house is underwater and that he had

25   refinanced three times in the previous 18 months, it just takes

1    a few minutes.  Several other of the insureds that the

2    government presented throughout the case could be financially

3    underwritten in a few minutes.

4            The insurance companies ignored the red flags, and

5    then the next thing they did was they adopted a whole host of

6    so-called due diligence measures to investigate these STOLI

7    applications, but due diligence measures that were leading to a

8    whole lot of nothing.

9            The insurance company's efforts to detect STOLI had

10   the appearance of being serious and detailed, but they were

11   just smoke and mirrors.  They would ask for certifications.

12   They suspect that this is STOLI, and then they're asking the

13   policyholder and the agent to certify that it is not STOLI, a

14   meaningless due diligence requirement.

15           I would say to you a signal, a signal to the insurance

16   agents that this is simply a pro forma thing, it was a signal

17   that what they wanted was pro forma compliance that can be

18   honored on paper and ignored in practice.

19           Or they'll ask for inspection reports like this one.

20   As we learned through the testimony of Ms. Macauley, these

21   inspection reports are also a ridiculous, elaborate measure by

22   the insurance company leading to nothing.  They're just mills

23   that hire contractors that aren't even met by their employers,

24   people who obviously are not doing any of these so-called

25   sources here, but what is really interesting, look at No. 4,

1    credit records.

2              The first three couldn't be verified, but No. 4 could

3    be verified, but these inspection reports don't come with

4    credit checks attached because the credit checks aren't

5    actually done.

6              They don't do property appraisals, we learned on the

7    cross-examination of Ms. Macauley, or the insurance companies

8    will ask for a compilation report, here an accountant's report

9    which as Mr. Desai pointed out to us on the stand, all it is is

10   a statement that this is what the policyholder is now

11   representing is their property.  You can be sure that the

12   insurance companies would never accept a statement from a

13   doctor saying this is what the patient is telling me his or her

14   health is like.

15             The next slide.  Thanks.  Now, the next companies not

16   only adopted controls that were elaborate but meaningless, they

17   rejected obvious controls like doing a credit check, getting

18   the tax return, like doing a property appraisal, like asking

19   for a bank and brokerage statements.

20             As my co-counsel pointed out, and again I don't want

21   to belabor the point, the very reasonable measure of asking for

22   a tax return, what does it do?  It resulted in the business

23   drying up completely.  They had to rescind that policy in

24   months.  The next slide is the AIG memo where they're

25   withdrawing that policy.  They're changing their minds about

DA3JBIN5                    Summation - Ms. Murray

1    having the tax return.  They're going to eliminate it going

2    forward as of September because, of course, the business

3    dropped and it dropped significantly.

4         It dropped from 659 new cases to about 300 new cases.

5    In fact, it was like a 50 percent drop in business in the

6    period during which they were looking for the tax returns.

7         What is also interesting about this memo is that it

8    opens up saying effective September 5, 2006, we will provide

9    our producers with greater flexibility, completing the

10   necessary underwriting documentation to complete the issuing

11   process for new policies.  They made it sound like it is just

12   all part of some routine quest for greater efficiency when in

13   reality it is oh, my God, we made a huge mistake asking for

14   those tax returns, our business has dried up and we better

15   reverse course really quickly.

16        Now you know the backdrop to the AIG story.  You can

17   assess all those other corporate memos and bulletins the

18   government shows you as proof of what the insurance companies

19   supposedly really wanted.

20        The fourth area that teaches us that this, the

21   insurance companies knew they were getting STOLI and that the

22   representations on these policies were not material to the

23   insurance companies goes to the issue of the nature of the

24   bargain, the insurance bargain between the policyholder and the

25   insurance company.

1          You may remember people talking on the stand,

2    Mr. Burns and Mr. Avery, about the difference between temporary

3    and permanent insurance.  Temporary insurance is insurance we

4    are all familiar with, it is the insurance that we will buy for

5    20 or 30 years so that it is there in the horrible eventuality

6    of our not being able to finish paying our mortgage or pay for

7    our kids' college.

8          If we survive that term, it is a win-win situation.

9    We have had bought peace of mind during that period, the

10   insurance company got premiums, but it is deemed a temporary

11   insurance policy that we're hoping to outlive.

12         Permanent, on the other hand, is the insurance like

13   whole life, like universal life that is expected to stay with

14   us till the very end.  In fact, Mr. Avery, in his testimony, he

15   agreed that the way they market the permanent insurance is that

16   it will be with you as long as you're alive.  Then he said to

17   me -- and reading from the middle of the slide:

18   "Q  And as Prudential markets it, it's designed to last as long

19   as you live, correct?

20   "A  As long as you live and as long as you desire it to last.

21   "Q   But you don't market it as a benefit designed to last

22   until you lapse, you don't mark it that way, do you?

23   "A   No."

24         Now they're telling us of all this marketing is one

25   big fat lie.  They don't want it it to be with you always.

DA3JBIN5                    Summation - Ms. Murray

1    They want you to lapse.  They depend on you lapsing.  We were

2    talking about universal life policies where somebody has

3    purchased it at age 75 or 78, we're talking about lapses

4    happening when obviously the person purchasing that wasn't

5    intending to let it lapse.

6            So when the insurance companies talk about the lapse

7    rates with universal life policies, they're really telling you

8    that their marketing on these policies are not to be trusted.

9    They are anticipating lapses, depending on lapses, relying on

10   lapses, all in direct contradiction of what the insurance

11   companies say an individual says they are all about in an

12   insurance insurance policy.  It is contrary to the essence of

13   the whole life transaction.

14           What is also notable about the universal life policies

15   is they're all assignable.  You can see in every single one of

16   those policies, just as Mr. Abramowitz pointed out in his

17   closing statement, they're freely transferable.  Lapses aren't

18   part of the essence of that contract and, in fact, they are

19   freely transferable.

20           So for life insurance companies to be saying it is

21   material to them that these not be assigned and sold even

22   minutes after they are obtained does not hold any water in

23   terms of the materiality of the misrepresentations about who

24   was going to ultimately own that insurance contract.

25           Now, we also know that insurance companies employ the

1   smartest and savviest people around.  Mr. Avery took the stand

2   and told us that actuaries are tiny professionals, there are

3   only 50,000 of them in the world, and they have to sit some

4   very rigorous certification classes in order to pass and become

5   a sitting actuary.

6          I say to you these insurance companies absolutely knew

7   that there was a big life settlement industry in 2005, bringing

8   with it a huge STOLI industry.  For Mr. Avery to tell you that

9   they priced their products based on not just age, health and

10  gender, which is the usual factors that go into pricing of life

11  insurance policies, but also previous lapse rates when they

12  knew there was a huge life settlement industry on the horizon

13  is just simply false.

14         They knew full well that there was a big life

15  settlement industry that would be purchasing these policies and

16  potentially funding these policies, and they knew, therefore,

17  that their lapse rates could not be relied on, and I submit to

18  you they didn't rely on their lapse rates.

19         Now, we see that the insurance companies repriced its

20  policies in 2006.

21         THE COURT:  Do you need a moment?

22         MS. MURRAY:  Sure.

23         THE COURT:  Fine.

24         (Pause)

25         THE COURT:  Okay, Ms. Murray.  Go ahead.

1          MS. MURRAY:  In fact, they repriced their policies

2     here in this memo in 2007, January of 2007, so that if you get

3     zero lapses and minimum funding policies, classic IOLI, we

4     would achieve profitability consistent with the products

5     overall pricing returns.  They repriced their policies so they

6     could reap more profits.

7          Indeed, extensive profits were made.  Here is the

8     defense exhibit I put in at the end of my case.  Could we go to

9     the Lincoln 10-K.  Here we see that the total sales in millions

10    of universal life in 2005 amounted to $226 million worth.  In

11    2006, this had almost doubled.  In 2007, we had $637 million in

12    profits, so practically a tripling not of profits, but in

13    sales, a tripling of sales in two years.

14         Mr. Burns testified that predominantly universal life

15    product was sold to senior citizens, and we learned from the

16    AIG memo that once the tax return requirement came in, sales

17    went down by 50 percent.  So that gives us a sense of how much

18    STOLI business was out there, at least 50 percent.  If we think

19    of those profits, those sales revenues in terms of the

20    attraction of STOLI to insurance companies, we can realize

21    quite how much money was involved.

22         I submit to you that the reason the repricing happened

23    in 2007 was not because the insurance companies just woke up

24    and realized oh, my goodness, we're getting STOLI, we better

25    price higher to make sure that our lapse rates remain in

1    accordance with profits, that is not why they repriced.  They

2    repriced because they realized that the hedge funds were now

3    getting a little better with their mortality assumptions.

4           They wanted this business all along.  The insurance

5    companies said bring it on.  You want to play mortality rates

6    against our mortality rates, our actuaries are much better and

7    we trust our actuaries.

8           But as we see in this memo from October 2008, our next

9    slide -- go back.  Sorry -- yes.  Government Exhibit 2972, this

10   is another Lincoln Financial memo to the audit committee, and

11   these two paragraphs, to paraphrase for you, simply say for a

12   long time the hedge funds were using one particular life

13   expectancy provider, 21st Service, whose mortality tables were

14   wrong, and they have just modified their mortality rates, so

15   now the hedge funds will have a better -- they're closer to us

16   in terms of analyzing life expectancy rates, so we need to

17   price higher now so that we will continue to make money from

18   them.

19          But what this memo is telling us is that the insurance

20   companies knew all along that the hedge funds were the ones

21   behind STOLI, that there was a lot of profit in it, that they

22   wanted it, and that they were saying we can beat you on the

23   mortality assessments.

24          The money was coming in at both ends.  It wasn't just

25   coming in at the front end in premiums, it was also there at

1    the back end.  You heard Mr. Burns talk about reinsurers.

2    Reinsurers are the companies that will reinsure a portion of

3    the risk.  Mr. Burns testified why they needed to put all of

4    these controls in place, but these controls, as I pointed out

5    and my colleagues pointed out, were really meaningless

6    controls.

7         Why did they put those controls in place?  Because if

8    they weren't in place, we would expect the reinsurers would

9    potentially challenge claims and claim coverage and we wouldn't

10   get reimbursed.  So now you know why those elaborate but

11   utterly meaningless due diligence measures had to be put in

12   place.  These were controls to satisfy reinsurers, but they

13   weren't there because the insurance companies wanted to keep

14   STOLI out.  The insurance companies wanted it to keep coming

15   in, but they also wanted to shore up their reinsurance at the

16   back end.

17        I submit to you that the economic reasons they're

18   coming up with now to say that it mattered to them, the social

19   reason that they don't want to look back, they don't want to be

20   suing their policyholders, their tax reasons that their tax

21   deferred status could be jeopardized, the theoretical fear of

22   reinsurers bailing on them, these are after-the-fact

23   justification for a fateful and greedy decision they made to

24   welcome in STOLI rather than stamp it out with very simple

25   controls like credit checks and property checks and tax

1    returns.

2            The very reason why the lies at the issue of this case

3    are not material to the insurance company dovetailed with the

4    reasons why Mr. Resnick did not act with intent to defraud.  As

5    Mr. Stavis said in his summation, essentially Mr. Resnick,

6    Mr. Kergil, Mr. Binday were the partners of the insurance

7    companies in having this business come in, and this is why they

8    were feted with those fancy trips in California and Portugal.

9            Where the government sees fraud, we say there was

10   consent.  Where the government sees obstruction, I say there

11   was preservation.

12           Mr. Resnick faces another count here, the count of

13   conspiracy to obstruct justice arising out of his supposed

14   destruction of documents representing to a grand jury

15   proceeding.

16           First of all, a conspiracy is just a fancy word for an

17   agreement.  If we look closely at this evidence, we have to

18   question where is the evidence of an agreement?

19           It comes from Mr. Krupit saying there was an

20   agreement, and we've already learned what a liar Mr. Krupit is

21   and perjurer, but even if we were to believe Mr. Krupit on this

22   issue, you know that he says that both he and Mr. Kergil

23   thought that Mr. Resnick was taking this whole issue lightly.

24   Here is the transcript:

25   "Q  In these conversations about getting rid of records, what,

1    if anything, did Kergil say about speaking with Mark Resnick

2    about destroying these types of things?

3    "A   He said he tried to talk to Mark about it, but Mark took

4    it lightly.

5    "Q   What did Resnick tell you on those calls about Kergil's

6    instructions?

7    "A   He took it slightly, as Kevin indicated, and I told him it

8    was very important."

9         And then he goes on to say that Mr. Resnick told him

10   he got on a plane and went down to Orlando to get his hard

11   drive replaced, but that information came from just a phone

12   call, recorded phone call you heard.

13        What we know happened is very different.  What we know

14   is that Mr. Resnick took his computer into Apple and got a

15   mirrored image created of it.  He made an exact replica of his

16   hard drive.  In fact, he did the one thing you can do if you're

17   actually going to preserve electronic data.  Take a look at the

18   Apple evidence that is in the record.

19        I am sorry we don't have it enhanced here.  It

20   indicates, here confirmed, that what occurred was -- they

21   confirmed the data transfer method with Mr. Resnick's lawyer,

22   verified at the genius bar that data transfer performed as a

23   disk image cloned.

24        Then if we can see the testimony from the Apple

25   executive, the Apple employee:

1    "Q   Would it also be fair to say, Mr. Massoni, if somebody

2    wanted the hard drive of their computer removed, that is not

3    something Apple does?

4    "A   Generally.

5    "Q   If you wanted an exact replica of your hard drive in your

6    computer, the only way to do it is to clone it or make a mirror

7    image.  Is that right?

8    "A   Correct.

9    "Q   If your goal is to preserve a hard drive in its original,

10   its material in its original form" -- remember this also

11   included meta-data which Mr. Massoni told us -- "the only way

12   to do it is either take that hard drive out or clone it,

13   correct?

14   "A   Yes.

15   "Q   If you continued using a computer and didn't make a clone

16   or a mirror image at a moment in time, potentially you will be

17   destroying data as you continue to use your computer.  Is that

18   right?

19   "A   Yes."

20        Mr. Resnick went into the Apple store using his own

21   name, his only credit card, gave his own address.  This is not

22   the act of someone committed to document destruction.  In fact,

23   he did the opposite.  He preserved it.

24        The government makes much of his wiping his hard drive

25   afterwards.  So what?  He didn't need two copies of this.  He

DA3JBIN5                    Summation - Ms. Murray

1    preserved all of the data in a moment in time to capture

2    everything that was on it at that point, and then he is free to

3    go ahead and use his computer again back at home.  It is far

4    safer to do what his lawyer clearly confirms that he did, make

5    a replica.

6          Ms. McCallum suggested in her summation this was done

7    in order to put it on something smaller.  This is a

8    preposterous suggestion.  One can always hide a computer.

9    There is lots of other things one can do with a computer if you

10   want to destroy it, like pouring a glass of Coke on it or

11   running over it with a car.  This really is ridiculous.  If he

12   wanted to destroy the data, there are plenty of other ways of

13   doing it, and he could also not go to the Apple store using his

14   own name and his own credit card.

15         There is even another reason beyond the Apple records

16   to find Mr. Resnick did not destroy documents.  Here look at GX

17   2177.  Produced MR.  That is an e-mail in the record relating

18   to Doris Riviere, an e-mail to Michael Binday.  We can take it

19   down.

20         These are supposedly these incriminating e-mails the

21   government has used as government exhibits in this case.  Where

22   do they come from?  From MAR Group, Inc, the name under which

23   Mark Resnick did business.

24         Where is the evidence of a conspiracy to destroy

25   documents so they're not available for a federal grand jury

1    proceeding when you're being asked to convict Mr. Resnick on

2    documents he himself supplied, over 2,000 of them?  If he is a

3    document-destroyer, I will say to you he is a very incompetent

4    one.

5            The government makes much of the phone call with Paul

6    Krupit in which he said I did.  We already know he is saying he

7    did.  Keep in mind the context of that phone call.  Mr. Krupit

8    testified that at the time he and Mr. Resnick had lawyers, the

9    federal agents had visited them, and it is entirely

10   understandable for Mr. Resnick to be evasive and not want to

11   admit that he had kept all of his documents intact in case he

12   didn't want to hand them over to Mr. Krupit's lawyer.

13           No conspiracy, members of the jury, no document

14   destruction.

15           When I came to you in my opening statement, I said

16   this case really is about the rule of law.  The government

17   wants you to see this as a despicable example of people betting

18   on death.  What do you think insurance companies are doing

19   every day?  They're betting on death, as are the other high

20   stakes players that are the invisible parties throughout this

21   trial, the investors in Wall Street, but this case is not a

22   game where the price on the table is somebody's gambling chips.

23           This case is about real people and real lives, my

24   client, Mark Resnick, a solo insurance salesman, and the lives

25   close to him, his wife and his children.  This case may look a

 1    lot like a civil case with all the documents and all the

 2    discussion with complex terms, lapse rate, but while the facts

 3    and the issues and appearance of this case might be civil, it

 4    really is a criminal case with all of the burdens and

 5    obligations of a criminal case.

 6            Mr. Resnick is shrouded in the presumption of

 7    innocence, and it is the government's obligation to prove their

 8    case beyond a reasonable doubt, and the failure to do that

 9    leaves Mr. Resnick continually shrouded in that presumption of

10    innocence, and these are not just technical, lawyerly words.

11    These are the things that protect all of us and our loved ones

12    and require that the criminal sanction is invoked in cases

13    where the proof really is proof beyond a reasonable doubt.

14            At issue here is not money, but liberty and lifelong

15    reputation.  I submit to you the government has not proved this

16    case beyond a reasonable doubt, and I ask you to bring back a

17    verdict of not guilty as to Mr. Resnick.

18            Thank you.

19            THE COURT:  We are going to take a break for 15

20    minutes.  Clear your heads, and the government will deliver its

21    rebuttal summation.  Don't discuss the case.  Keep an open

22    mind.

23            (Jury excused)

24            (Recess)

25            THE CLERK:  Come to order please.

1           (Jury present)

2           THE COURT:  Okay, Mr. Feingold.

3           MR. FEINGOLD:  Thank you, your Honor.

4           Over these last two-plus weeks, ladies and gentlemen,

5   you have heard overwhelming evidence of the defendants' fraud.

6   You heard testimony, you saw e-mails, you've listened to phone

7   calls.  All this evidence showed beyond a reasonable doubt that

8   the defendants lied again and again and again in order to get

9   life insurance policies, in order to get the millions and

10  millions of dollars that came along with those life insurance

11  policies, and you heard about how they tried to cover up their

12  lies and their fraud.

13          They lied to insurance companies.  They had fake

14  reports made to support those lies.  They tried to silence each

15  other and they tried to silence their elderly clients.  In

16  Michael Binday's case, he lied to the regulator in order to

17  keep his scheme going.  You heard about how these lies mattered

18  to the insurance companies and how STOLI business was not the

19  type of business they wanted to get into.  They did not want

20  it.  You heard about how the defendants did this so that they

21  could reap the millions in commissions and death benefits when

22  their clients died.

23          Now, you just heard from lawyers from each of the

24  three defendants.  As Judge McMahon told you, the burden of

25  proof remains with the government at all times.  The defendants

DA3JBIN5                         Rebuttal - Mr. Feingold

1   could have done nothing at all in this case in putting the

2   government to this burden, but when they do make arguments, as

3   Ms. McCallum told you, you can and you should evaluate whether

4   these arguments make any sense, whether they're supported by

5   the evidence, the evidence, ladies and gentlemen, in this case,

6   and not just by their arguments.

7         In this case, ladies and gentlemen, their arguments

8   are, in fact, contradicted by the evidence that you have seen

9   here over these last few weeks, and the arguments, ladies and

10  gentlemen, are ridiculous.

11        Ms. Murray is right, I am going to get up here and

12  tell you that what the defendants' lawyers are trying to do is

13  distract you from their conduct, to put the attention on the

14  insurance companies because the less they make you think about

15  what their defendants actually did, the less they can make you

16  think about their lies and their fraud and their crimes, the

17  better for them.  Ladies and gentlemen, that is not the

18  evidence.  The evidence is about their lies and their fraud and

19  their coverup and their crimes.

20        Now, I'm not going to keep you here into the evening

21  to go through each one of their arguments.  You have been

22  paying attention to know that some of them don't even merit a

23  response, but I will address some of the recurring themes in

24  their arguments and I want to address some of the misleading

25  parts of their arguments as well.

1          The defendants are arguing that the insurance

2     companies did not care one bit about STOLI.  They're arguing

3     that they knew, that the insurance companies knew that they

4     were issuing STOLI policies to Michael Binday's clients, to

5     Kevin Kergil's clients and to Mark Resnick's clients, and I use

6     that term loosely.

7          They're arguing that despite what you heard from the

8     insurance company witnesses and despite what you saw in black

9     and white from all the different insurance companies, the

10    companies actually wanted these policies, that there was some

11    sort of secret agreement, not to be spoken, that the insurance

12    companies, despite their official policies, despite what they

13    told all their producers and agents, they actually secretly

14    wanted the business.

15         The problem with these arguments is that they're not

16    supported by the evidence and at the end of the day they

17    completely defy common sense.

18         Let's talk about one of the first arguments that

19    you've heard I think from each of the lawyers, that no one was

20    hurt from STOLI policies, there is no harm here.  It was a

21    win-win for everyone, it is a win for the defendants, a win for

22    the clients and insurance companies.

23         Ladies and gentlemen, you know there is no such thing

24    as everyone winning.  There has to be a loser.  Not everyone

25    makes millions.  They're trying to oversimplify the deal

DA3JBIN5                    Rebuttal - Mr. Feingold

1    between the insurance companies on the one hand and the

2    insureds on the other.  Yes, premiums in exchange for death

3    benefits for death, yes, that is part of the deal, that is

4    right.

5              The insurance companies did not get what they signed

6    up for when they issued life insurance policies based on lies

7    from Michael Binday, Kevin Kergil and Mark Resnick.  That is

8    not what they signed up for, ladies and gentlemen.  They

9    thought they were issuing universal life policies to legitimate

10   insureds, but instead they were tricked into issuing STOLI

11   policies.

12             STOLI policies to these pretend clients of Binday,

13   Kergil and Resnick, that is not what the companies bargained

14   for, and they were exposed economically when they issued these

15   policies.  You heard from the insurance company witnesses their

16   companies did not want to issue STOLI, but if they were going

17   to issue STOLI, they sure would have priced these policies a

18   whole lot differently.  They would have priced them a lot

19   higher.

20             They do their pricing, as you heard, based on

21   experience.  Now, Mr. Stavis is making a whole line of argument

22   these are assumptions.  No.  This is how the insurance company

23   operates a business.  They take their experience, how this

24   group of insureds has done in the past, and then they price

25   their policies.  That is what an assumption is called.  That is

DA3JBIN5                        Rebuttal - Mr. Feingold

1    the business of insurance companies.

2              They look at how these types of policies have

3    performed in the past.  They look at the history, how much

4    money have people paid in premiums in the past, how often have

5    these people stopped paying or lapsed is the word you heard a

6    lot, and how often have the insurance companies had to pay out

7    the death benefit on the policies when the insurance policies

8    were valid and the insured dies.

9              STOLI, ladies and gentlemen, throws out the window

10   that entire wealth of experience on which the insurance

11   companies base their pricing.  That is because STOLI policies,

12   as you've heard, are always sold to investors, they're always

13   kept valid and in force.

14             Insurance companies are almost always going to have to

15   pay out that death claim on a STOLI policy because an investor

16   who is holding that policy is not just going to let that policy

17   lapse.  He is not going to give his money to the insurance

18   company and not collect when that insured dies.

19             Now, you've seen this in all the memos, and we'll talk

20   about some of the memos that defendants' lawyers have referred

21   you to, but the insurance companies do not want this and

22   they're harmed when investors are the ones holding all the

23   policies.

24             Insurance companies assume that a certain percentage

25   of people holding these policies are at a certain point going

1   to stop paying premiums.  What does that mean?  That means if

2   the premiums aren't paid, the policy lapses and the insurance

3   company doesn't have to pay out if the insured dies.  It is

4   just a fact of the industry, a certain percentage of people,

5   based on the insurance company's history, are going to stop

6   paying the premiums.

7         It is based on the experience of these insurance

8   companies have from thousands and thousands of policies.  They

9   know that this is how these insurance policies are going to

10  behave and they price them accordingly.

11        You can look at Mr. Avery's answers to questions posed

12  by Ms. Murray at Page 572 and 573 of the transcript and look at

13  this testimony at the bottom of Page 580.  He said given we

14  take into account lapsation, every policy we issued never

15  lapsed, never surrendered, the insurance company would lose

16  millions of dollars.  You heard from Mr. Burns, pages 642 to

17  643, the death benefit would always be paid in a STOLI policy

18  because a STOLI policy would never be expected to lapse.

19        Ladies and gentlemen, it makes sense because think

20  about it for a minute.  If the insurance companies had to pay

21  out on every policy it issued, no one could afford insurance.

22  Think about auto insurance, the same concept.  An insurance

23  company insures a hundred cars.  Imagine if all 100 of those

24  cars were totaled, completely totaled?  The insurance companies

25  would have to pay out 15, 20, 25, $30,000 to replace those

1    cars.  What would happen, ladies and gentlemen?  The insurance

2    companies would go out of business.  The same goes for life

3    insurance.

4         Some of these policies, by the insurance company's

5    history and calculations, will lapse and will not need to be

6    paid out upon death.  If that were not the case, the life

7    insurance policies get will be a lot more expensive than it

8    already is.  Ladies and gentlemen, don't take the insurance

9    company's word for it.  Just look at Michael Binday's own

10   calculation.  We saw this in Government Exhibit 1408.  If we

11   can pull that up, please.

12        Now, this is for Oswald Heaton, age 80.  If you look

13   on the left there is -- 73.  If you look at this exhibit in

14   1408, you see Oswalt Heaton is clearly 80 years' old.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1             MR. FEINGOLD:  And let's just look at this one

2      example.  You see this is a $4 million policy if you look at

3      the death benefit.  And if you look at the net, if you look at

4      the premiums, 2.3 million, 2.2 million, 2 million.  And then

5      you look at the bottom, you look at what the investor net,

6      that's what the investor has to pay net.  1.2 million.  1.2 to

7      million.  1.7 million.

8             $1.2 million, ladies and gentlemen, for $4 million in

9      return.  $4 million when that insured dies.  Yes, the insurance

10     company gets premiums, they get about $2 million in premiums.

11     But for what, ladies and gentlemen?  For the opportunity to pay

12     $4 million when that insured dies.  That's not good business.

13     It's not good business.  If every policy behaved like this, if

14     every policy behaved like this, $2 million for $4 million in

15     return, insurance companies would not and could not exist.

16            You can take that down.  Thank you.

17            But according to the defendants, the insurance

18     companies wanted this business.  They wanted this business

19     where they take in about half of the death benefits they're

20     actually going to pay out.  Ladies and gentlemen, no one can

21     say that that is good for business.  And this argument is

22     indeed, as Ms. Murray said, a distraction from the defendant's

23     own criminal conduct.

24            You heard a lot of argument about the insurance

25     companies made out like bandits.  They collected all these

DA3LBIN6                          Rebuttal - Mr. Feingold

1    premiums and, yes, they did collect premiums.  That's how the

2    investors keep the insurance policies alive.

3           But you know what, ladies and gentlemen?  The premiums

4    were big because the bets the investors were making against the

5    insurance company were big.  And with big premiums came big

6    commissions.  You've heard about the commissions.  Over

7    $3 million on just a handful of policies we've looked at in

8    this case from the witnesses you've heard about and from the

9    emails you've seen on insureds.  Over $3 million just in

10   commissions.

11          Now let's just look at Government Exhibit 2938, if we

12   could, and if we could zoom in on that top policy for one of

13   Michael Binday's clients.  Look at the commissions.  If we

14   could look at the premium amount, ladies and gentlemen,

15   160,000.  Look at how much, look at how much R. Binday Plans &

16   Concepts gets for that commission, for that premium:  $130,000.

17   And look at how much the insurance company has to pay to BISYS,

18   you heard from Tracey Robinson is kind of like a broker above

19   R. Binday, broker between R. Binday and the insurance company.

20   The insurance company pays out $87,000 to BISYS.

21          That's a whole lot more than they're taking in in

22   those first couple years, ladies and gentlemen, that's a whole

23   lot more.  You see the money going out, that's bigger than the

24   premiums coming in.  So this whole argument that the insurance

25   companies are rolling around in the money because of these

1    premiums is absurd.

2          And you know what else comes with big premiums, ladies

3    and gentlemen?  Huge multimillion dollar death benefits.  You

4    heard about the millions that Kergil made from his and

5    Resnick's clients, Hanni Lennard and Doris Riviere.  Now, you

6    saw Resnick's response on the email, Government Exhibit 4206,

7    when he hears about his beloved client Doris Riviere, hears

8    about her death from her son-in-law?  Tony, I'm sorry.  Pay the

9    money to HM as planned.  Get it done right way.  That's his

10   response to hearing about Doris Riviere's death.  They wanted

11   the money.  They wanted the commissions.  They wanted the death

12   benefits.  That's why they were in this business.  That's why

13   they lied over and over and over again and tried to cover up

14   their lies.  You know Resnick made over $700,000 when Riviere

15   died.  Kergil made 1.3 million.  And Resnick's in-laws made

16   another 1.3 million.

17         You also heard that Kergil made another 1.3 million on

18   his client Hanni Lennard's death.  And you heard a lot about

19   how this was so great for the family.  This was so great for

20   the defendant's client's family or for the defendant's clients

21   they had this insurance.  Well, ladies and gentlemen, look at

22   how much Hanni Lennard's family got of this $2 million death

23   benefit.  Hardly anything.  Thousands at best.  Kergil,

24   1.3 million, about 350,000 of which later went to Michael

25   Binday as we saw in Government Exhibit 5004.  Same account that

DA3LBIN6                    Rebuttal - Mr. Feingold

1   Hanni Lennard 1.3 million goes into, Kergil later sends out

2   almost $350,000 for Michael Binday's benefit.

3           And Michael Binday, ladies and gentlemen, you heard

4   and saw documents that showed that Michael Binday was in this

5   game to reap the death benefits too.  You saw documents about

6   how Binday and his company, B.D. Estate Planning, bought Opal

7   Headrick's policy.  Now, Michael Binday's name was of course

8   nowhere on the paperwork, but you know that it's Michael Binday

9   behind B.D. Estate Planning.  Just look at Government

10  Exhibit 2659-A, page 318, ladies and gentlemen.  Look at the

11  signature on the check to B.D. Estate Planning.  Kevin Kergil

12  to B.D. Estate Planning.  Who's signing that?  Michael Binday.

13  Michael Binday is B.D. Estate Planning.  And just like Kevin

14  Kergil and just like Mark Resnick, he wasn't in it just for the

15  commissions.  He was in it for the grandest of all pay outs,

16  that multimillion dollar pay out when their clients died.

17          So the insurance companies were benefiting from all

18  this, is that the argument from the defendants?  They were

19  benefiting from having to pay out multimillion dollars on these

20  policies that were procured by fraud?  That doesn't sound like

21  much of a benefit, ladies and gentlemen.

22          Now, much was made about this Lincoln Financial memo,

23  Government Exhibit 2971, about how there's a statement about

24  how there was no economic impact in 2008, October 2008, from

25  STOLI business.  Now, Mike Burns testified extensively about

DA3LBIN6                    Rebuttal - Mr. Feingold

1    Lincoln's desire to keep out STOLI.  You've seen a lot of

2    documents about Lincoln's desire to not issue STOLI.  The

3    defendants didn't want to talk about that, ladies and

4    gentlemen.  They didn't want you to see how in October 2008,

5    Lincoln was still fervently anti-STOLI.

6              Let's look at the memo, 2971.  Page 1.  Executive

7    summary.  Look at those first three bullet points, ladies and

8    gentlemen.  If we can blow that up.

9              What does STOLI do?  Reduces profit.  It has an impact

10   on pricing, it impacts the reinsurance, and they're afraid that

11   the tax benefits of life insurance could be impacted.  They do

12   not want STOLI.  October 2008.

13             And you heard Mr. Burns talk about the approach that

14   Lincoln has taken to combat STOLI, and he concludes that there

15   was at the time very little economic impact on STOLI.  Now, why

16   is that?  Why is there very little economic impact in

17   October 2008 from STOLI?  Well, you heard from Mike Burns, look

18   at the transcript page 691.  There's no way of knowing how over

19   the long term STOLI is going to impact the business.  There may

20   have been policies that snuck in during these early years.  The

21   memo only talks about the first couple years of their

22   experience.  How are they supposed to know what's going to

23   happen down the road when they have to pay out those STOLI

24   policies that are on their books and kept alive by investors?

25   There's no way of knowing two years into this what the economic

1    impact is going to be.  There's no way of knowing three or four

2    or five years into it.

3           They know it's bad because eventually they're going to

4    have to pay out on these life insurance policies.  Insurance,

5    especially life insurance, it's not a short term game.  It's a

6    long term business.  And eventually when those policyholders

7    who have STOLI policies die, insurance companies are going to

8    have to pay out the millions that they're obligated to pay on

9    them.  And there's going to be no way out of it, ladies and

10   gentlemen.

11          Now, you also heard a lot about from Ms. Murray about

12   how Lincoln was not harmed because they repriced their

13   policies.  They adjusted for this so they're going to raise

14   their prices so they can take in more in premiums.  And they're

15   going to be fine, so STOLI is not going to impact them.  And

16   you heard from Mike Burns about how Lincoln had to reprice

17   their policies because they thought STOLI might be sneaking

18   through the cracks.

19          Ladies and gentlemen, do you remember Mike Burns'

20   testimony about when Lincoln repriced on the policies that they

21   thought were being impacted by STOLI?  It was after May 30,

22   2007, ladies and gentlemen, right after May 30.  On May 31,

23   2007 or June 1, 2007 is the repricing.

24          But let's look at Government Exhibit 606.  And let's

25   go to page 37401.  Let's look at who swoops in right before the

DA3LBIN6                    Rebuttal - Mr. Feingold

1   repricing deadline to take advantage of these pre-adjusted

2   prices.  It's Michael Binday, May 30, 2007.  He knows that

3   they're repricing to adjust for STOLI sneaking in.  They're

4   going to make it harder for investors to make money on these

5   policies.  They're going to raise prices.  So what does he do?

6   He sneaks a bunch of policies right before the deadline.

7          Let's go to Government Exhibit 210, page 38782,

8   please.  May 30, Michael Binday.

9          Government Exhibit 782, page 39686.  Michael Binday,

10  ladies and gentlemen.

11         And there are others.  Let's look at 1940, page 605.

12  Mark Resnick, ladies and gentlemen.

13         Let's look at 977, page 38053.  Mark Resnick, Silas

14  Griffin's policy in just before the repricing deadline.

15         So the insurance companies weren't harmed by this

16  because they repriced to account for STOLI?  Sure, they tried

17  to.  They tried to.  But look who foiled their plans:  Michael

18  Binday, Mark Resnick with their policies.

19         Now, you also heard a lot about the life settlement

20  business.  The defendants are trying to argue that because the

21  policyholders are permitted to sell their policies, the

22  insurance companies knew exactly what they were getting into.

23  They knew exactly what they were bargaining for.  But, again

24  ladies and gentlemen, they're trying to confuse the issue.

25  They're trying to distract you.

1           MR. STAVIS:  Objection, your Honor.

2           THE COURT:  Overruled.

3           MR. FEINGOLD:  They're trying to distract you from

4    their own criminal conduct.

5           Let's be clear, yes, insurance policies can be

6    transferred or sold after they are issued.  And why is that?

7    You heard from Mike Avery and from Jim Burns, you heard them

8    explain that companies have to, they have to allow these

9    policies to be transferred or sold.  It is a matter of law and

10   regulation.  If a policy holder decides they're going to do

11   that, there's nothing they can do to stop them.  Once the

12   policy is out of the insurance company's hands, there's nothing

13   they can do to stop it.  That's the law.  Out of their hands.

14   You heard Mike Burns talk about this at page 741.

15          But, ladies and gentlemen, that doesn't mean that the

16   insurance companies expected every life insurance policy they

17   issued to be sold.  In fact, you know from Avery and Burns that

18   it's quite the opposite.  The insurance companies expected

19   relatively few policies to wind up in the hands of investors.

20   Look at Mike Burns's testimony at pages 604 and 685.  Look at

21   Jim Avery's testimony at page 533.  They do not anticipate a

22   large number of policies being sold in the traditional life

23   settlement market.  That is not what their calculations, that's

24   not their assumptions, that's not what the history of these

25   policies show.  This shows that most of these people are

1    getting these policies for their own protection and for

2    themselves and their families, not for investors.

3            But when STOLI policies are issued, issued through the

4    lies by people like the defendants, when they're issued, they

5    always end up in the hands of investors and that is not what

6    the insurance companies are planning for.  That's not how they

7    expect an insurance company to perform -- I'm sorry -- an

8    insurance policy to perform for the insurance company.

9            And Mr. Abramowitz made a big deal about this memo,

10   Government Exhibit 2971, about how Lincoln was looking into

11   getting into the life settlement business.  Let's go to page 5

12   of that memo and look at the second paragraph.  Is this 2971?

13   We'll come back to that memo.  But in the second paragraph,

14   you'll see Lincoln is distinguishing, they distinguish life

15   settlements from STOLI.

16           And you'll hear Mike Burns testify on pages 742 how

17   STOLI is going to be sold from the get-go.  STOLI is going to

18   be sold from the beginning.  Life settlements, however, are

19   something that happen much later after the policy is issued and

20   due to a change in circumstance of the policyholder.  It's not

21   automatically going to be sold and, in fact, the insurance

22   companies don't expect a typical universal life policy to be

23   sold in the life settlement market.  STOLI is a different

24   animal, and it is always going to end up in the hands of

25   investors who are going to maximize that policy to their own

DA3LBIN6                          Rebuttal - Mr. Feingold

1    benefit.

2              So, ladies and gentlemen, the fact that policyholders

3    can, by law, sell their policies in the life settlement market

4    does not mean that they will.  STOLI though always, always goes

5    to the investor who is making a bet against the insurance

6    company, a bet that the insurance company didn't know it was

7    entering into and a bet that they did not want to enter into.

8    Again, ladies and gentlemen, another attempt to distract you.

9              Now, Mr. Abramowitz both yesterday and today went

10   through a lot of documents about underwriting, about what the

11   insurance companies did when they reviewed applications for

12   policies.  And their argument from all of this is that the

13   insurance companies knew that they were issuing STOLI, that

14   they turned a blind eye.  Now, to accept Mr. Abramowitz and

15   Mr. Stavis and Ms. Murray's argument on this, you have to start

16   with the assumption that, one, Jim Avery and Mike Burns lied

17   through their teeth on the witness stand, lied through their

18   teeth when they told you those companies didn't want STOLI,

19   they were completely lying.

20             And, ladies and gentlemen, you know they had no motive

21   to get up there and lie.  Mike Burns, a senior executive at

22   Lincoln.  Jim Avery doesn't even work in the insurance industry

23   anymore.  He's retired.

24             And you also have to start with the assumption that

25   the defendants knew -- I'm sorry -- the insurance companies

1  knew that everything that defendants were submitting to them

2  was a lie and that everything that the defendants were having

3  everyone send on their behalf -- the CPAs, the inspection

4  reports -- you have to start with the assumption the insurance

5  companies knew that those were lies too because the defendants

6  are trying to make you think that the insurance companies were

7  simply papering their files and getting the assurances that the

8  policies they were issuing were not STOLI.

9          They're trying to argue that they knew they were

10 issuing STOLI policies.  They're arguing that the insurance

11 companies knew that every word out of Michael Binday's mouth

12 was a lie.  They're trying to get you to believe that the

13 insurance companies assumed that the CPAs and attorneys who are

14 submitting letters and false reports for the defendants were on

15 the take.  They're arguing that the insurance companies had to

16 have known that the inspection reports that they were getting

17 from Info Link were entirely made up.  They want you to believe

18 the insurance companies knew that Michael Binday was faxing in

19 whited out life insurance applications.

20         And they want you to believe that the insurance

21 companies ignored all the other lies the defendants made and

22 others made for them.  They're arguing the insurance companies

23 just had to paper the files with the backup documentation and

24 the certifications by the defendants that they're not issuing

25 STOLI policies.  It's an absurd argument, ladies and gentlemen.

1    It is absurd.

2              What the defendants are arguing really at its core is

3    that all of their lies and all of their egregious behavior over

4    several years should be excused.  They're trying to shift your

5    attention away from the criminal acts, away from their lies,

6    away from their deceit and shift the focus to the insurance

7    companies.  Ladies and gentlemen, the insurance companies are

8    not on trial.

9              Now, the defendants showed you 11 policy files, 11

10   policy files from the insurance companies for eight people,

11   eight insureds.  Three were elderly insureds who you heard

12   about in the government's case.  The others we know next to

13   nothing about.

14             But even looking at those policy files, what is in

15   there?  Well, there's evidence of underwriters looking at what

16   is submitted to them by Michael Binday and others.  They're

17   often asking for more information, and they're often being met

18   with more lies by Michael Binday.

19             Now, you saw Ms. McCallum show you this morning an

20   example of what was left out of the defendant's presentation of

21   those underwriting files.  Now, again, ladies and gentlemen, I

22   remind you defendants have no burden here, but you've got to

23   think about their argument.  You've got to think about if it

24   makes any sense.  Their argument that the insurance companies

25   knew they were issuing STOLI is based on 11 policy files, and

DA3LBIN6                     Rebuttal - Mr. Feingold

1    only three of which are for insureds you heard about here.  And

2    there are a handful of other Binday clients included in there

3    out of the hundred plus clients that Binday had for STOLI, as

4    you heard from Tracey Robinson, page 30 of the transcript.

5           And their argument is that those 11 policy files

6    erases, they erase and they excuse the years of lies and the

7    lengths that the defendants went to conceal them.  That cannot

8    be the case, ladies and gentlemen.  Why would the insurance

9    companies even go through this charade of having an

10   underwriting department if they didn't care?  Why would they

11   waste time on even following up on anything if they didn't

12   care?

13          Let's look at what the defendants left out of their

14   presentation to you.  You heard about Myra Davis.  That's one

15   of the insureds who we saw an underwriting file on.  Here's

16   what the defendants didn't tell you when they were giving this

17   presentation.

18          First, let's look at Defendant's Exhibit 3273.  Myra

19   Davis.  You saw some correspondence about we're only going to

20   offer $5 million.  What did Myra Davis apply for?

21   $9.5 million.  $9.5 million, ladies and gentlemen.  That's what

22   Michael Binday applied for for Myra Davis.

23          And then if you look Defendant's Exhibit 3271, page

24   52, and this is something that I believe Mr. Abramowitz showed

25   you.  They're questioning, the underwriters are questioning the

1   real estate values that are listed in the application.  Well,

2   let's see what happens in response to that.

3          Let's go to page 31.  Who comes to save the day,

4   ladies and gentlemen?  Michael Binday.  You seem to be missing

5   some information that we almost certainly sent before.  She

6   owns six properties.  This creates substantial value.  And he

7   goes on to provide what he believes are the true values of

8   those properties.  The total value of these properties above is

9   up to $4.8 million.  You could argue a little lower but,

10  regardless, this is a substantial amount.  He wants to get the

11  policy issued so he keeps going forward with the lies.

12         Now, Mr. Abramowitz showed you the top part of an

13  email from this policy file, Government Exhibit 9400.

14  Mr. Abramowitz showed you the email from the chief underwriter.

15  He didn't show you what he was responding to -- he was

16  responding to Michael Binday's email.  He was responding to

17  Michael Binday pushing to get more insurance, more than the

18  5 million, six, seven and a half million dollars.  Asking AIG

19  to accept his valuation of her real estate holdings.  That's

20  what they were responding to.

21         And, ladies and gentlemen, Mr. Abramowitz didn't show

22  you Government Exhibit 9401.  This is the brokerage statement

23  that was submitted at the underwriter's request about

24  Ms. Davis's finances.  Now, that's a value of $2.7 million in

25  her IRA.  The insurance companies didn't care about finances?

1    They didn't care what was written on the application?  Why did

2    they ask for backup in instances like this?  Why waste their

3    time?  Why even create a file?  Just issue the policies if they

4    don't care.

5         You know the answer, ladies and gentlemen.  It's

6    because they did care.  They cared about what was written in

7    the application.  They cared about what Michael Binday, Mark

8    Resnick, and Kevin Kergil submitted to the insurance companies

9    when they lied about why they're taking out these policies,

10   when they lied about their client's finances.  They cared.

11        And, ladies and gentlemen, if the life insurance

12   companies didn't really care, if they knew they were issuing

13   these STOLI policies, the defendants must have been so foolish

14   to spend all their time and all their effort on these lies.  I

15   bet Michael Binday sure is sorry that he spent all that time,

16   those two or three years when his only business was STOLI, his

17   only business was STOLI, his only business was lying to get

18   STOLI policies, those two or three years.

19        I bet he's really sorry he wasted all that time and

20   effort lying, having his office white out documents, sending

21   emails to tell clients not to talk to the insurance companies,

22   Kevin Kergil having these third parties fill out these bogus

23   reports.  Because if the insurance companies didn't care, then

24   ladies and gentlemen, why did Binday, Kergil, and Resnick spend

25   all that time and effort lying and covering up those lies?  It

1    makes no sense.

2            Now, could the insurance companies have done more,

3    could they have been a little more vigilant in their

4    underwriting?  Perhaps, perhaps, just like a bank that got

5    robbed could have hired more security guards.  Perhaps the

6    insurance companies could have been more careful and more

7    suspicious of the defendants and their fellow liars.  You heard

8    Mr. Stavis and Ms. Murray say these were their business

9    partners.  The insurance companies and the brokers are business

10   partners.

11           And the insurance companies are not supposed to assume

12   from the get-go that their business partners are lying to them

13   over and over and over again.  This whole argument about the

14   insurance companies not caring, all because the defendant

15   showed you a handful of policy files is a distraction and it

16   does not excuse the defendants' years and years of lies and

17   cover-up.

18           Now, just quickly, ladies and gentlemen, I'm not going

19   to spend too much time on this.  You heard a lot about AIG

20   amending their policies so they don't require tax returns

21   anymore.  Now, you'll see if you go through the AIG documents

22   that there are evolving guidelines with STOLI.  At one point

23   they refuse to issue policies to anyone in their seventies.

24   Then he had realized they're throwing out a lot of good

25   business with the bad.  They reprice, just like Lincoln, did

1   hoping to keep out STOLI.  When they think that's effective,

2   they take back some of the restrictions because you can't throw

3   out all the good with the bad.  They still have to maintain a

4   business, ladies and gentlemen, and you heard Mike Burns

5   testify about that.

6           You heard Mike Burns testify about balancing

7   competitive concerns with STOLI concerns.  You can't not write

8   any business, ladies and gentlemen.  You have to write

9   legitimate business or the insurance companies don't exist.  So

10  they did their best to balance that.

11          And even requiring tax returns would not have stopped

12  these defendants.  Let's look at Government Exhibit 2807.  From

13  Michael Binday to Julie Whitehead:  Hi Julie, we just saw that

14  JP is requesting two years tax returns from Shirley

15  Freedberger.  They may ask for this on other cases.  On

16  Mr. Farrell, they asked for estate planning documents, but did

17  not yet ask for tax returns.

18          Now, if you look down at the bottom line or if you

19  look at the third paragraph:  Can you verify this and find out

20  whether it will be added to all cases or only when requested.

21          You go to the last line:  If client does not want to

22  provide tax returns, find out if they can reduce the face to

23  $2 million and bypass this requirement.

24          Ladies and gentlemen, Michael Binday could get around

25  the tax return requirement.  He finds out that a company might

1    start asking for them.  What does he do?  He asks if he can get

2    a smaller policy to avoid the requirement to prevent the

3    companies from knowing the truth about his operation.

4           Now, you heard a lot from Mr. Stavis about Paul

5    Krupit, the government's cooperating witness who testified

6    here.  And you heard Mr. Stavis spent a lot of time talking

7    about what a liar Mr. Krupit is.  Mr. Stavis had no problem

8    referring to the good parts for him of Mr. Krupit's testimony,

9    what he thought were the good parts for him.  But when it

10   didn't suit him, Mr. Krupit is a liar and you can't believe

11   him.

12          Now, why did Mr. Stavis take so much time talking

13   about Mr. Krupit?  To distract you from the core of the case,

14   distract you from what these defendants --

15          MR. STAVIS:  I object, your Honor.

16          THE COURT:  Objection is overruled.

17          MR. FEINGOLD:  Now, let's be clear, ladies and

18   gentlemen.  Paul Krupit is an admitted felon.  He is an

19   admitted liar.  He admitted to you that he was part of this

20   scheme to lie and deceive the insurance companies.  And he

21   admitted to you about his other lies and he pled guilty for

22   lying and for committing fraud on the insurance companies with

23   these defendants.  And Paul Krupit was one of many people who

24   gave you an insider's view of this scheme -- recruit elderly

25   clients and join these defendants in lying to insurance

1   companies.  That's the scheme.  No one is disputing that.  No

2   one is disputing that these defendants recruited clients,

3   filled in false information on numerous applications to the

4   insurance companies, and got paid when a policy issued and got

5   paid when a policy sold.

6           Now, Krupit's testimony on this is no different from

7   what you heard from other witnesses and what you saw in other

8   evidence.  There's no real dispute that this is how the scheme

9   worked.  And, ladies and gentlemen, you don't need Paul

10  Krupit's testimony to convict any of the defendants of any of

11  the charges.  There's nothing he told you about the process of

12  getting life insurance policies and lying to insurance

13  companies that has been challenged here.  Nothing at all.

14          You also heard the recordings that the FBI made with

15  Krupit and Kergil and Krupit and Resnick.  The tapes speak for

16  themselves.  Don't take Paul Krupit's word for it, ladies and

17  gentlemen.  Take Kevin Kergil's own words from that July 15

18  call, take Mark Resnick's own words from that July 23 call.

19  I'm not going to make you listen to these calls again.  I know

20  you've heard them.  I know you've listened to them and you've

21  paid attention to them.

22          Let's just talk about the Kergil call for one minute.

23  Kergil -- Krupit three times says to Kergil you told me to

24  destroy documents, you told me to get rid of these things.  And

25  how does Kergil respond those first three times?  Silence.

DA3LBIN6                    Rebuttal - Mr. Feingold

Maybe some mumbling here and there, but pretty much silence.

Then when he finally does respond the fourth time that Krupit confronts him on it, what does he do?  He pauses and with some explaining then says that is not exactly what he told Krupit to do.  How do you not exactly tell someone to destroy records?  How do you not exactly tell someone to get rid of anything with Advocate, Kergil, or Binday's name on it?  How do you not exactly tell someone to delete a computer hard drive?

You don't, ladies and gentlemen.  Kergil's silence on that call and finally his "not exactly" is an admission that he conspired with Krupit to get rid of files.

And you heard the Resnick call.  Now, first with respect to Kergil, you heard Resnick rebut Mr. Stavis's argument about Mr. Kergil not giving any instructions.  You heard Resnick's own words:  Pretty much everything Kevin told us to do was wrong.  And you heard Mark Resnick admit to flying back to Florida to destroy, delete his hard drive.

Now, Ms. Murray told a great story about Mr. Resnick really just wanting to preserve evidence.  Now, it just so happened that Mark Resnick wanted a new clean hard drive on his Apple computer in June 2010.  It's a great, great story.  There are just a few details she left out, important details though.

Ms. Murray forgot to mention that Resnick was visited by the FBI on June 21, 2010.  You know this from emails, for example, Government Exhibit 3022, sent early the morning of

DA3LBIN6                     Rebuttal - Mr. Feingold

1   June 22, Mark Resnick is telling Michael Binday the names of

2   the FBI agents who came to his house.

3           And then when did Resnick bring in his computer to the

4   Apple store, ladies and gentlemen?  That same week.  Days

5   later -- June 26.  So Resnick was really just backing up the

6   data, preserving this evidence.  Back up data.  Back up the

7   data, Mark Resnick.  Don't erase the entire hard drive.

8           How do you know that Resnick was not just backing up

9   his data?  Because he told you so on that July 23 phone call

10  when he admitted to flying back from New York to Orlando to

11  have his hard drive erased.  Just think about it, ladies and

12  gentlemen.  Resnick is approached by the FBI, the same week he

13  decides that he needs to take all the data off of his 25-inch

14  desktop computer and put it on to a handheld external device.

15  The hard drive that can fit in his hand.  Sound like a

16  coincidence, ladies and gentlemen?  I think not.

17          And this whole line of argument from Ms. Murray about

18  how the fact that Resnick's company produced emails in response

19  to a subpoena somehow erases his conduct, somehow makes it

20  okay, well, first, as you heard, Mark Resnick and Kevin Kergil

21  are charged with conspiracy, with an agreement to destroy

22  records and obstruct justice.  As I expect Judge McMahon will

23  tell you and as Ms. Murray told you, the government only has to

24  prove beyond a reasonable doubt that they formed an agreement

25  to do so.  We don't have to prove that there is actual

DA3LBIN6                        Rebuttal - Mr. Feingold

1    destruction of records or documents.

2              And Ms. Murray told you Mark Resnick wasn't hiding

3    anything.  He produced these thousands of pages in response to

4    a grand jury subpoena to his company.  But, ladies and

5    gentlemen, Ms. Murray didn't mention the emails that he didn't

6    produce that the government obtained through other means.

7              MS. MURRAY:  Objection.

8              THE COURT:  The objection is overruled.

9              MR. FEINGOLD:  Let's look at Government Exhibit 1304.

10   Ms. Murray -- blow up the text of this, please.  You probably

11   remember this email, the instructions from Kevin Kergil to Mark

12   Resnick at that same MAR Group email address on what to tell

13   Ozzie Heaton to say if the insurance companies keep calling,

14   the lies they were feeding Ozzie Heaton to say if he got

15   called.

16             MS. MURRAY:  Objection.

17             THE COURT:  Ground?

18             MS. MURRAY:  Testifying, your Honor.  Objection.

19   There's no evidence in the record.

20             THE COURT:  Is this document in evidence?

21             MS. MURRAY:  Yes, your Honor.

22             THE COURT:  The objection is overruled.

23             Ladies and gentlemen, sometimes lawyers get up during

24   summations, lawyers for both sides, and they object and they

25   say that's not what the evidence is, there is no such evidence.

1           It is your recollection of what is in evidence, it is

2     your recollection that controls.  I can't say I guess they're

3     right, that's not in evidence, because then I'd be making a

4     finding of fact.  I can't do that.

5           This document is in evidence.  It's fair comment on

6     this document.  Please continue.

7           MR. FEINGOLD:  Let's, ladies and gentlemen, you're

8     familiar with this document.  You've seen it.  Let's take the

9     larger view of the document.  Look on the bottom right.

10    There's no MR stamp.

11          Ms. Murray made a show showing you the MR stamps in

12    the thousands of pages of emails that Mark Resnick produced in

13    response to a grand jury subpoena to MAR Group.  Where is the

14    MR stamp on this document, on this incriminating document?

15    It's not there.  It's not there because he didn't produce it.

16          Let's look at Government Exhibit 4200, email from Mark

17    Resnick to Tony Mohr about the Doris Riviere policy.  Again,

18    not there.

19          Government Exhibit 4204, Doris Riviere, collecting

20    these millions of dollars on when Doris Riviere's dies, not

21    there.

22          Government Exhibit 4205, not there.

23          Government Exhibit 4206, again, Doris Riviere, Tony

24    Mohr saying Mary Kay just called to say Doris passed.  Mark

25    Resnick.  Tony, I'm sorry.  Pay the money to HM as planned.

1   Get it done right away.  That wasn't there, ladies and

2   gentlemen.  There's no MR stamp on that email.

3           Now, ladies and gentlemen, Ms. Murray told a

4   compelling story, but one is completely contradicted by the

5   evidence.  It is just that -- it is a story and nothing more.

6           Now, how do you know that the defendants knew that

7   their lies mattered?  How do you know that they knew that they

8   were important to the insurance companies?  How do you know

9   that they knew what they were doing was wrong?  Again, just

10  look at their actions and their words.  Ms. McCallum showed you

11  the lies in the applications.  I'm not going to make you go

12  through those documents again.

13          You've seen the lies in their conversations with the

14  insurance companies.  Look at the Florra Adler situation with

15  Prudential and the lies that Binday came up with.  And you saw

16  some of the coaching of the others to lie.  We just saw 1304.

17  You saw 3019 where Binday is telling off his agents, hey, watch

18  out.  AIG is conducting an investigation on older people.

19  Watch out.

20          You saw the handwritten note in Government Exhibit 950

21  from Mark Resnick to Silas Griffin.  Please do not answer any

22  questions if contacted by insurance company.  Advise them to

23  contact me.

24          You saw on Government Exhibit 874 Kevin Kergil tell

25  Michael Binday, this is in reference to Espinal with Union

DA3LBIN6                        Rebuttal - Mr. Feingold

1   Central application.  I wanted to remind you that she could be

2   getting an interview, I don't know.  So I wanted to let you

3   know before any worksheet is generated.

4          You remember the financial worksheets, ladies and

5   gentlemen, those worksheets that Kevin Kergil manufactured and

6   filled with lies about the millions of dollars that their

7   clients didn't have.

8          You saw the email in Government Exhibit 903, Martha

9   Espinal again, Indy Life.  They're going on and making extra

10  phone calls to clients to verify income.  We do not expect them

11  to call Martha, but are concerned that everything remain

12  consistent.  On the chance that they should call, you can make

13  sure that, one, she should not speak to anyone unless she knows

14  in advance from you to expect a call.  There is lots of

15  identity theft.

16         You've seen that before, ladies and gentlemen.  You've

17  seen the reference to identity theft in order to get the

18  seniors not to talk.  You saw that in that memo from Kevin

19  Kergil to Paul Krupit.  There's lots of identity theft and she

20  should not release this level of information.

21         Two, if she does speak to anyone, she should be

22  consistent with the financials attached.  But, ladies and

23  gentlemen, the defendants are telling you that the financials

24  don't matter.  They don't matter.  If they don't matter, why is

25  Michael Binday coaching people to lie?

DA3LBIN6                    Rebuttal - Mr. Feingold

 1              And you saw in Government Exhibit 1687 in the second

 2    email from the top, again, Indy Life, different client, Hanni

 3    Lennard, the one on whom Kevin Kergil made $1.3 million.

 4    Kevin, as you know, Indy Life on a few of her cases made an

 5    extra phone call to verify income.  It's the same email.  He

 6    had to sent it so many times he just cut and paste it.  Cut and

 7    pasted it to warn people that the insurance companies were out

 8    asking for truthful information and coaching people to lie.

 9              But they didn't care, ladies and gentlemen.  The

10    insurance companies didn't care.  That's the argument and it

11    doesn't make any sense.

12              But, ladies and gentlemen, really, what's left for the

13    defendants to argue other than the insurance companies didn't

14    care?  They tried to give you the impression that their lies

15    can be excused if you lie enough times and in enough different

16    ways.  They've tried to make this case not about themselves but

17    about the insurance companies.  Again, burden is on the

18    government, but you have to evaluate their arguments.  They've

19    tried to turn the focus onto the insurance companies and you

20    can't blame them.  What are other choice do they have when

21    their lies are so voluminous, so severe, and so calculated?

22    Blame the insurance company is the only defense that they can

23    possibly try to make, and it is a desperate attempt to take

24    your attention away from their egregious fraud.

25              Now, ladies and gentlemen, right from wrong is

 1    something that most people learn in kindergarten.  It doesn't

 2    take much to see through the defendants' arguments and figure

 3    out that the defendants knew that what they were doing was

 4    wrong.  There's no gray area that allows them to lie about

 5    almost everything that insurance companies wanted to know

 6    about.  There's no gray area that gave them permission to get

 7    other professionals, CPAs and attorneys, to give false and

 8    fraudulent information for them.  There's no gray area that

 9    allowed them to silence their clients to keep the insurance

10    companies from figuring out their scam.  And there is no gray

11    area that allowed the defendants to use these lies to collect

12    millions and millions of dollars from the insurance companies.

13    It is that simple, ladies and gentlemen.  You learned that what

14    the defendants did was wrong; you learned that in kindergarten.

15         Now, please go back and evaluate this case for what it

16    is, a mountain of lies told to make a lot of money.  And when

17    you take this case for what it is, ladies and gentlemen, you're

18    going to come back to this jury box with a verdict that is

19    consistent with all the evidence that you have seen and heard

20    in this case, a verdict of guilty on all counts.

21         THE COURT:  Okay, ladies and gentlemen.  We have now

22    heard the summations of counsel.  Counsel have made the

23    arguments to you based on their view as expressed to you of how

24    you should look at the evidence.  It is, as it always is, a

25    fascinating experience to listen to summations, as I expected

1    them to be outstanding.

2              You're now going to take a break and have a very

3    restful weekend because as hard as you worked listening today,

4    you're going to work even harder next week.  Next week you're

5    going to have to listen to my charge on the law.  I told you

6    that the lawyers were going to paint pictures with the

7    evidence.  Think of my charge as the frame that gets put around

8    the pictures painted by the lawyers, right.  The charge will

9    help you to understand why evidence is important or not

10   important and arguments work or don't work and generally to

11   understand what it is that the government, only the government,

12   has the burden to prove beyond a reasonable doubt in order to

13   overcome the presumption of innocence that I think one of the

14   lawyers said in this afternoon still cloaks those three

15   defendants today.  They are still presumed innocent.

16             So, because you're going to work very hard next week,

17   please have a lovely weekend.  I understand the weather is

18   going to be good and enjoy yourselves.  Don't think about the

19   case.  Certainly don't communicate in any way about the case

20   with any man, machine or beast.  Keep an open mind.  You've

21   heard all the evidence.  You've heard everything the lawyers

22   have to say to you, but until you hear the law, you don't have

23   everything you need to make your decision in this case.

24             All right.  And you will hear that at 10 o'clock on

25   Monday morning.  See you then.

DA3LBIN6

 1              (Jury not present)

 2              THE COURT:  They were indeed outstanding summations.

 3              MS. MURRAY:  Your Honor.

 4              MR. ABRAMOWITZ:  Thank you, your Honor.

 5              THE COURT:  Yes, Ms. Murray.

 6              MS. MURRAY:  Your Honor, I have an application.  I

 7    move for a mistrial on the obstruction count as to Mr. Resnick

 8    and frankly as to --

 9              THE COURT:  You move as to Mr. Resnick.

10              MS. MURRAY:  Your Honor, the issue is --

11              THE COURT:  Sit down everybody.

12              MS. MURRAY:  -- the government has just testified to

13    the jury that I did not produce certain emails in Mr. Resnick's

14    production.  There is no evidence at all in this case as to

15    what Mr. Resnick did or did not produce.  And I was about to

16    put the agent on the stand on my case and I was told by the

17    government that if I did, they were going to show the agent

18    emails to say were these emails in the production from MAR

19    Group.

20              So I sat down and I thought about it because I have a

21    lot of emails in MAR Group's production that were Government

22    Exhibits but were not taken from his files.  They were taken

23    from Binday's files or they're taken from Kergil's files.  I

24    have the email to Mr. Desai with the numbers from Kergil

25    forwarded by my client, and I have the attachment back from

DA3LBIN6

1    Mr. Desai saying here's your compilation report for Oswald

2    Heaton.  I have that in the MAR Group production.

3            And it's not in evidence that we produced that just as

4    it's not in evidence what we didn't produce.  And I made a

5    strategic choice about not calling the agent because the

6    government elected on their case not to establish what was in

7    or not in Mr. Resnick's production.

8            And now on summation they've had the audacity to tell

9    the jury that there were certain emails used as Government

10   Exhibits that were not produced in my production.  And there is

11   no evidence at all.  They basically told them convict him of

12   obstruction.

13           I think it's an outrage, your Honor.  This is no

14   different as if they are executed a search warrant on

15   somebody's kitchen, discovered that steak knives were missing,

16   and then didn't bring in at the murder trial that there were

17   missing steak knives in the person's knife collection and then

18   announce to the jury oh, by the way, jury, in summation, you

19   know, we didn't find his steak knives in his kitchen.  That's

20   exactly what happened here.  It's outrageous.

21           THE COURT:  It's a very serious allegation,

22   Mr. Feingold.

23           MR. FEINGOLD:  Yes, your Honor.  Here are the facts.

24   There's a stipulation in evidence that says that documents with

25   the MR stamp came from MAR Group pursuant to grand jury

DA3LBIN6

1    subpoena.

2              THE COURT:  That's true.

3              MR. FEINGOLD:  Ms. Murray in her summation pointed to

4    that MR stamp on an email and said, look, Mark Resnick gave

5    these documents.

6              THE COURT:  Also true.

7              MR. FEINGOLD:  And I think it's a perfectly fair

8    response to show the documents that did not come from the --

9    with the MR stamp.

10             MS. MURRAY:  No, no, no.  Not the same.  They have

11   testified to the jury.  I never testified that I produced loads

12   of -- that I produced counterparts to all of the emails in

13   evidence with Mark Resnick's email.  I simply said you know we

14   produced and you know we produced at least one incriminating

15   email and in fact there's a few others in evidence too from the

16   MAR Group label.  I did not --

17             THE COURT:  Wait a minute.  Let me see if I understand

18   because I understood things unfolding as Mr. Feingold said.

19   Hang on.

20             There is a stipulation.  It was introduced like the

21   first day of the trial that said if it has MR on it, it was

22   produced by Mr. Resnick.  There is such a stipulation in

23   evidence.

24             Now, it is absolutely true that there is no

25   stipulation that says if it doesn't have an MR stamp on it

DA3LBIN6

1    anything, all it says, all there is is a stipulation that says

2    if it has an MR stamp on it, then Mr. Resnick produced it.

3            Ms. Murray did indeed in summation to follow through

4    on the line of questioning that she used during the course of

5    the trial with the fellow from the Apple store to suggest that

6    there was in fact no destruction of documents.  Look here, look

7    at this document, here it is, his stamp is on it.

8            Mr. Feingold, as I understood it, was arguing don't be

9    silly, there was a destruction of documents because documents

10   that should have been on his hard drive on his computer, we

11   don't have a copy with an MR stamp on it.

12           MS. MURRAY:  Correct.

13           THE COURT:  That's the essence of your argument?

14           MR. FEINGOLD:  Yes, your Honor.  And it was put at

15   issue in Ms. Murray on summation showed the MR stamp with the

16   2,000 whatever it was on it to show that he did in fact produce

17   documents.

18           THE COURT:  And your point is that he didn't produce

19   all the documents that would necessarily have had to be on his

20   hard drive.

21           MR. FEINGOLD:  That's correct, your Honor.

22           THE COURT:  Okay.

23           MS. MURRAY:  But that's testimony to the jury.

24           MR. FEINGOLD:  There's a stipulation.

25           THE COURT:  It's not testimony to the jury.  It's

DA3LBIN6

1   argument.

2           MS. MURRAY:  Your Honor, it's one thing to say we have

3   this incriminating email and it doesn't have an MR stamp.  But

4   it's another thing to tell the jury we do not have the

5   counterpart from Mr. Resnick's production with an MR stamp.

6   They get to choose where they take their emails.  And they

7   really -- they have testified to the jury now that there is no

8   counterpart with an MR stamp.  There's no evidence as to that,

9   and they chose not to put on evidence about that.  They could

10  have put on the agent.

11          THE COURT:  Now I understand.  Now I understand what

12  you're saying.

13          MR. FEINGOLD:  Can I respond, your Honor?

14          THE COURT:  Please do.

15          MR. FEINGOLD:  Ms. Murray could have put in the entire

16  MR production if she wanted to make her argument.

17          THE COURT:  Hang on.  Wait a minute.  Ms. Murray could

18  have done a lot of things.  Ms. Murray has no obligation to do

19  anything.

20          MR. FEINGOLD:  Correct.

21          THE COURT:  Except represent her client zealously

22  within the bounds of the law.  That she has an obligation to

23  do.

24          So your rejoinder to what she just said is that if she

25  wanted to make the argument, it was her obligation to make the

DA3LBIN6

1    record.

2           MR. FEINGOLD:  Well, to support the argument that she

3    did in fact make.

4           THE COURT:  One thing I'm going to need is

5    Ms. Murray's summation.

6           Okay.  Well, as with so many things in this trial,

7    this is a first.  I expect I'll hear from both of you in

8    writing.

9           Mr. Stavis.

10          MR. STAVIS:  Yes, your Honor.  I had objected two

11   times during Mr. Feingold's rebuttal summation and your Honor

12   overruled those objections without me stating in front of the

13   jury what the basis was.

14          On those two occasions, Mr. Feingold was stating that

15   I as an attorney were distracting the jury.  Not evidence, but

16   Stavis as an attorney was distracting the jury and that is

17   improper argument and has no place in the government's rebuttal

18   summation and that was my application, my objection.

19          Your Honor overruled it.  I would have appreciated a

20   curative instruction at that time.  I don't believe that it

21   rises to the level of a mistrial motion, but I did want to make

22   my record clear, your Honor.

23          THE COURT:  Thank you, Mr. Stavis.

24          Anybody else have anything?

25          MS. MURRAY:  Your Honor, I do want to just add one

DA3LBIN6

1    point to my argument.  Right here on my computer I have an

2    exhibit that a piece of MR's production which is forwarded from

3    Mr. Kergil with the assets for Oswald Heaton to Mark Resnick,

4    which Mark Resnick forwarded to Al Desai who testified.

5           Now, my one is MR0077.  And I have the attachment that

6    is Government Exhibit, you know, I forget which one it is,

7    giving an actual compilation report.  And the government

8    elected to put in Al Desai's version of that, not my version,

9    and I never argued to the jury that I have an MR version of

10   this, or indeed all the other Mark Resnick emails that came in

11   at trial.  I didn't do that because it wouldn't be proper.  It

12   wasn't in evidence.  I'm not going to testify to the jury.  And

13   I --

14          THE COURT:  I actually think that you need, not that I

15   want to put a burden on you, I actually think, now that I

16   understand the import of your argument, that you need to

17   demonstrate to me with as many concrete examples as you can.

18          MS. MURRAY:  I have many.  I was going to

19   cross-examine the agent, and I decided not to because they

20   chose not to --

21          THE COURT:  Attach them to a letter.

22          MS. MURRAY:  I will.

23          MR. FEINGOLD:  Your Honor, just for the record, the

24   emails that I did show were not produced by --

25          MS. MURRAY:  Big deal.  They basically testified

DA3LBIN6

1    they --

2              MR. FEINGOLD:  Ms. Murray is trying to make it seem

3    like we took emails her client produced but had them from

4    another source so didn't use the ones her client produced.

5    That is just false.  She made an argument.  We have a right to

6    respond to it and we did.

7              MS. MURRAY:  Not with evidence outside the record.

8              THE COURT:  Okay.  Thank you.  I have to do Ms. Ely's

9    case now.

10             (Adjourned to October 7, 2013, at 10 o'clock a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25