UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA,            :

        - v. -                       :

MICHAEL BINDAY,                      :
JAMES KEVIN KERGIL, and                          12 Cr. 152 (CM)
MARK RESNICK,                        :

            Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**GOVERNMENT'S SENTENCING SUBMISSION**


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York  10007

Sarah E. McCallum
Eun Young Choi
Assistant United States Attorneys
   -- Of Counsel --

**TABLE OF CONTENTS**

TABLE OF CASES ............................................................................................................. iii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

   I.    THE COUNTS OF CONVICTION .................................................................... 2

   II.   OVERVIEW OF DEFENDANTS' SCHEME .................................................... 2

   III.  DETAILS OF THE OFFENSE CONDUCT ...................................................... 6

        A.     Origination of the Scheme ........................................................... 7

        B.     Exploiting the Insurers' Pricing and Underwriting .................. 12

        C.     The Insurers' Anti-STOLI Policies ............................................ 15

        E.     Recruitment of Straw Insureds .................................................. 21

        F.     Finding Investors ........................................................................ 24

        G.     The Fraudulent Applications...................................................... 27

        H.     Policy Issuance and Commissions ............................................. 38

        I.      Reaping the Death Benefits ........................................................ 40

            1.    Hanni Lennard Union Central death benefit .................... 40

            2.    Doris Riviere Hancock death benefit ................................ 42

            3.    Ellis LimQuee AIG death benefit...................................... 43

        J.      Preventing Exposure of the Fraud.............................................. 44

            1.    Disguised premium payments ........................................... 45

            2.    Coaching seniors to lie ....................................................... 46

        K.     Conspiracy to Obstruct Justice by Destroying Records........... 50

   IV.  THE DEFENSE AND REBUTTAL CASES ................................................... 51

   V.   THE VERDICT ................................................................................................. 53

DISCUSSION ................................................................................................................. 53

   I.    SENTENCING GUIDELINES CALCULATIONS ......................................... 53

        A.     Loss Calculations ........................................................................ 54

            1.    Identification of Scheme Applications............................... 54

            2.    Calculation of intended loss ............................................... 55

3.   Calculation of actual losses ........................................................... 57

4.   The relevant loss figure for Guidelines purposes ................................. 58

B.   Obstruction of Justice Enhancements ..................................................... 58

C.   Role Adjustments ................................................................................ 59

II.   APPROPRIATE TERMS OF IMPRISONMENT ........................................... 60

A.   Consideration of Section 3553(a) Factors ................................................ 61

1.   Binday .............................................................................................. 61

2.   Kergil ............................................................................................... 63

3.   Resnick ............................................................................................ 64

B.   Variance from the Guidelines—Intended Loss Considerations............................ 65

C.   Defendants' Other Sentencing Arguments .............................................. 68

1.   The above intended and actual loss calculations are correct.............................. 69

2.   Resnick is responsible for the full loss amount ...................................... 71

III.   RESTITUTION AND FORFEITURE........................................................... 72

CONCLUSION ................................................................................................ 75

## TABLE OF CASES

*PHL Variable Ins. Co.* v. *P. Bowie 2008 Irrevocable Trust ex rel. Baldi*,
    889 F. Supp. 2d 275 (D.R.I. 2012) ............................................... 54

*United States* v *Lamonda*, No. 05 Cr. 131,
    2008 WL 68744 (M.D. Fla. Jan. 2, 2008) ................................... 66

*United States* v. *Bahel*, 662 F.3d 610 (2d Cir. 2011) ..................... 71

*United States* v. *Barbera*, No. 02 Cr. 1268 (RWS),
    2005 WL 2709112 (S.D.N.Y. Oct. 21, 2005) ........................... 54

*United States* v. *Carrozzella*, 105 F.3d 796 (2d Cir.1997) ............ 55

*United States* v. *Contorinis*, 692 F.3d 136 (2d Cir. 2012) ............ 72

*United States* v. *Coppola*, 671 F.3d 220 (2d Cir. 2012) ............... 57

*United States* v. *Jenkins*, 578 F.3d 745 (8th Cir. 2009) ........... 54, 66

*United States* v. *Jimenez*, 513 F.3d 62 (3d Cir. 2008) ................. 65

*United States* v. *Lorefice*, 192 F.3d 647 (7th Cir. 1999) ......... 54, 66

*United States* v. *Martin*, 455 F.3d 1227 (11th Cir. 2006) ............ 60

*United States* v. *Mueffelman*, 470 F.3d 33 (1st Cir. 2006) ......... 60

*United States* v. *Qurashi*, 634 F.3d 699 (2d Cir. 2011) ............... 71

*United States* v. *Turk*, 626 F.3d 743 (2d Cir. 2010) .................... 70

*United States* v. *Uddin*, 551 F.3d 176 (2d Cir. 2009) ................. 72

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencings of Michael Binday, James Kevin Kergil, and Mark Resnick ("defendants"), which are scheduled for July 30, 2014 at 2:30 p.m.  Proper application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") yields terms of imprisonment of 262 to 327 months for Binday, 235 to 293 months for Kergil, and 168 to 210 months for Resnick.  While under the particular circumstances of this case, the Government does not believe that terms of imprisonment of these lengths are necessary to serve the purposes of sentencing, it urges the Court to impose very substantial incarceratory sentences on all three defendants.  As the evidence at trial established, all three defendants engaged in a calculated and protracted insurance fraud scheme—a scheme so intricate that lies permeated every aspect of the transactions at issue.  Then, when the authorities began to catch on to their scheme, defendants conspired to cover their tracks by destroying records and prompting others to lie.

Even now, in their recent objections to the draft Presentence Investigation Reports ("PSRs") prepared by the United States Probation Office, defendants evince no remorse for or recognition of the unlawfulness of their conduct.  They persist in arguing—contrary to what the Government proved and the jury found beyond a reasonable doubt at trial—that the lies they fed insurance companies were immaterial, and that the insurance companies "wanted" the bad business they were smuggling through with their fraud.  There is a compelling need here for long terms of incarceration to promote respect for the rule of law, to punish the conduct forming the basis of the convictions, and deter these defendants and others from engaging in similar criminal conduct.

**STATEMENT OF FACTS**

## I.   THE COUNTS OF CONVICTION

On October 7, 2013, following a twelve-day jury trial before this Court, all three defendants were found guilty of conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349 (Count One); substantive mail fraud, in violation of Title 18, United States Code, Section 1341 (Count Two); and substantive wire fraud, in violation of Title 18, United States Code, Section 1343 (Count Three), in connection with a scheme to defraud insurance companies whom defendants purported to serve as agents.  Kergil and Resnick were also found guilty of conspiring to obstruct justice through destruction of records, in violation of Title 18, United States Code, Section 1512(k) (Count Four).[1]

## II.   OVERVIEW OF DEFENDANTS' SCHEME

The insurance fraud scheme charged and proved at trial was spearheaded by Binday, who ran a business called R. Binday Plans and Concepts, Ltd. ("R. Binday") from the first floor of a building in Scarsdale, New York.  The other floors of the building housed other insurance operations run by Binday's family members under the name Advocate Brokerage, Inc. ("Advocate").  To state regulators and the insurance companies on whose behalf it claimed to act as agent (the "Insurers"[2]), R. Binday was a general agency securing high face-value life

---

[1] Binday was not charged in this count.

[2] The Insurers are American General Life Insurance Co. and its affiliates ("AIG"), AXA Equitable Life Insurance Company ("AXA"), John Hancock Life Insurance Company (U.S.A.) ("Hancock"), The Lincoln National Life Insurance Company and its predecessors and affiliates ("Lincoln"), MetLife Investors U.S.A. Insurance ("MetLife"), The Prudential Insurance Company of America ("Prudential"), Security Mutual Insurance Company ("Security Mutual"), Sun Life Assurance Company of Canada ("Sun Life"), and Union Central Life Insurance Company (now Ameritas) ("Union Central").  Although defendants submitted fraudulent applications to other insurers as well, the Government informed defendants before trial that it would limit its proof to this subset.

insurance policies for wealthy "clients."   In truth, from in or about 2006 through around early 2009, Binday and his company were engaged almost exclusively in procuring so-called "stranger-originated life insurance" (or "STOLI") policies—policies on the lives of seniors for the benefit of investors who were strangers to them—by means of fraudulent applications.

Fraud was necessary to Binday's business model, because the Insurers expressly barred their agents from soliciting and submitting STOLI business.  This was hardly surprising. STOLI investors sought to profit at the expense of the Insurers by exploiting "inefficiencies" in the pricing and underwriting of universal life insurance, all of which stemmed from the Insurers' basic premise that the people applying for the policies—rather than professional investor—were the ones seeking and planning to pay for these high-face-value policies.  These assumptions permitted the Insurers to offer lower prices than they could have without the assumptions.  But they created an arbitrage opportunity for investors.  The Insurers did not want their actuarial and underwriting processes exploited through this arbitrage.

So the Insurers asked questions on their universal life applications targeted to smoke out STOLI.  And they required their agents to certify that all information in the life insurance applications—including the answers to these questions and the applicants' financial information—was accurate.

Binday, with the help of R. Binday office workers and independent insurance agents in the field, including defendants Kergil and Resnick, circumvented the Insurers' anti-STOLI policies through rampant fraud.  The agents—and Binday himself—recruited senior citizens in New York, Florida, and elsewhere willing to have investors take out life insurance policies on them in exchange for cash payouts.  They generally identified people of modest means who would be lured by the prospect of six-figure payouts, and would not be able to pay

3

premiums on multi-million-dollar policies themselves.  The agents, with the help of the R. Binday office workers, completed life insurance applications in the names of these seniors.  The R. Binday office workers, at the direction of Binday, then submitted the applications to the Insurers.

As Binday, his workers, and the agents, including Kergil and Resnick, all knew, these applications were riddled with lies calculated to make it appear to the Insurers that the seniors whom defendants had identified as life insurance candidates were wealthy individuals who wanted insurance for their "estate planning" needs.  In fact, unbeknownst to the Insurers, most of the seniors could only dream of affording these policies.  They had been recruited so that investors could insure the seniors' lives, pay the premiums until death, and then reap what Binday and his associates had projected would be massive profits—at the expense of the Insurers.  Yet Binday, Kergil, Resnick, and others certified to the Insurers, over and over, that these were not applications for STOLI policies, and that the information on the applications was accurate to the best of their knowledge.  It never was.

The initial set of lies—the lies in the applications for life insurance that defendants prepared and submitted to the Insurers—was just the first layer of deceit.  Defendants supported their fraud with bogus back-up documentation and supposedly "independent" verification papers, all predicated on false financial figures and other lies.  Once a policy had been issued based on these falsehoods, defendants arranged elaborate bank transactions to make it look like seniors—rather than investors—were paying the premiums on policies.  They also instructed straw insureds they had recruited to refuse to speak to Insurer representatives and, worse, lie if conversation could not be avoided.

And then, finally, defendants went yet further.  To cover up and perpetuate their fraud, they lied to governmental authorities and conspired to destroy evidence.  First, in 2009, when the New York State Insurance Department became suspicious that Binday had tried to push STOLI policies through at Prudential, they called him to give testimony under oath.  He lied, saying he was not involved in STOLI, and would never submit a life insurance application knowing it to be STOLI.  Later, in 2010, after agents from the Federal Bureau of Investigation ("FBI") approached Resnick with questions about stealth STOLI policies he had submitted, all three defendants and another insurance agent conspired to destroy documents and electronic records related to their fraud.

What the investors behind defendants' stealth STOLI applications stood to gain from multi-million-dollar policies on straw insureds were the policy payouts upon the insureds' deaths.  To be sure, the investors had to pay large premiums to keep these policies in force.  With defendants' help, however, they selected the insureds and engineered the deals to try to reap the highest returns for the least investment—low premiums over a relatively short remainder of a person's life, with a multi-million-dollar death benefit at the end.  Defendants themselves reaped gains in this manner.  Kergil and Resnick made six- and seven-figure profits on a death benefit paid for one of the straw insureds Resnick had recruited.  Kergil and Binday made other large sums by investing in a STOLI policy on an insured Kergil had recruited.  Binday diverted to himself a $4 million death benefit on one of Resnick's recruits.

But what defendants stood to gain more regularly—and the reason they participated in this fraudulent scheme to begin with—was commissions.  For every stealth STOLI policy issued, the Insurers paid out a massive commission, usually in the six figures.  Defendants split these commissions with the funders on whose behalf they were secretly

operating, generally pocketing about half for themselves.  Collectively, defendants made millions on commissions over just a few years, all on the backs of their fraudulent stealth STOLI applications.

## III.    DETAILS OF THE OFFENSE CONDUCT

To prove its case at trial, the Government called sixteen witnesses: two R. Binday employees who helped effectuate the fraudulent stealth STOLI scheme and who testified pursuant to non-prosecution agreements with the Government; two field agents (one cooperating witness, and one testifying pursuant to an immunity order) who, like Kergil and Resnick, recruited straw insureds in hopes of receiving big commissions; five straw insureds and relatives of straw insureds; two Insurer executives (from Prudential and Lincoln); a third-party "verifier" and an accountant who, at defendants' request, prepared documents for submission to Insurers without ever speaking with the straw insureds whose finances they purported to certify; an executive from the third-party verification company for which the corrupt verifier had worked; Resnick's brother-in-law, whom Resnick had recruited to act as a "trustee" for one STOLI policy and to invest in a second STOLI policy that resulted in windfall profits to Resnick, Kergil, and the witness; and an employee from a computer store in Florida who had received Resnick's request, following his visit from the FBI, that the store "wipe" the hard drive of Resnick's desktop computer.

The Government also introduced a total of 619 exhibits.  These included, among other items, the following:

- applications, signed and certified by defendants and other members of the charged conspiracy, that were riddled with lies about intent of the insureds, premium financing, and insureds' financials, and submitted through R. Binday to the Insurers;

- bogus, supposedly independent inspection reports, net worth statements, and estate plans generated to support the false applications;

- email messages from and between defendants and their co-conspirators and others discussing their fraudulent business and the profits they hoped to reap, and communicating directives to be passed to straw insureds about lies they should tell investigators who came calling;

- documents showing that stealth STOLI policies defendants sought were actually issued, and that they were funded and sold to investors;

- bank records showing large payments of commissions and death benefits into defendants' accounts;

- documents both internal to and disseminated by the Insurers making plain that they wanted to prevent issuance of STOLI policies, and explaining why issuing those policies would be bad for the Insurers' business; and

- recordings of telephone calls a cooperating witness and fellow field agent made with both Resnick and Kergil in which they discussed their conspiracy to destroy records associated with their fraud.

Finally, in support of the sentencing arguments contained herein, the Government offers supplemental records related to the losses defendants caused and intended to cause by their fraud.  These materials are attached to the Declaration of FBI Special Agent Thomas McDonald ("McDonald Decl.") filed with this memorandum.

Together, all of this evidence establishes the following:

### A.    Origination of the Scheme

The stealth STOLI scheme helmed by Binday began in or about 2006, when Binday was working at Advocate, his family's insurance business in Scarsdale.  At the time, Binday's brother, Glenn Binday, headed up Advocate's commercial lines insurance business, and his sister, Denise Koslowsky, worked in the personal lines (home and auto insurance, for

example) business.  (Tr. 124-27).[3]  Binday was responsible for "financial services," including health insurance, life insurance, and long-term care insurance, and he operated that business through R. Binday, a corporate entity separate from Advocate.  (Tr. 126, 259-60).  Commercial lines, personal lines, and financial services (R. Binday) each occupied a different floor in Advocate's Scarsdale building.  (Tr. 260).

      R. Binday had some legitimate insurance business; it helped genuine clients in need of insurance secure health plans, long-term care plans, and legitimate life insurance.  By no later than the summer of 2006, however, Binday's fraudulent stealth STOLI scheme had overtaken the company, accounting for a major portion of its operations and its staff's resources.  (*See* Tr. 130-31).

      Broadly speaking, and as described in more detail below, this scheme involved the procurement of multi-million-dollar "universal" life insurance policies on people in the over-70 age bracket, with the plan that the premiums would be financed, and the policies owned, by investor-controlled "trusts."  (Tr. 129-30; *see* Tr. 640-41 (Lincoln executive's definition of STOLI)).  Universal life insurance is a kind of permanent life insurance designed to allow for premium flexibility (including the ability to pay extra premiums if desired and build up value on a tax-deferred basis), and is often secured as a means to pay estate taxes upon death.  (*See* Tr. 500-01, 634-35).  Here, however, the policies were being secured not for the benefit of the insured's estate and family, but instead, secretly, for the benefit of investors.  To circumvent the Insurers' clear policy against issuing policies under these circumstances, Binday and his co-conspirators resorted to fraud in the applications.  They wanted the hefty commissions that came with placing multi-million-dollar policies—commissions that could be as high as 90 or even 100

---

[3] "Tr." refers to the trial transcript.  "GX" refers to a Government exhibit admitted into evidence at trial.  "DX" refers to a defense exhibit admitted into evidence at trial.

percent of the first year's premium, which was typically in the six figures.  (*See* Tr. 509-10; GX 1019 (Binday explaining to Resnick that "[w]e usually make at least 90% compensation" on the first year premium and that "[w]henever possible we attempt to maximize commission")).

At first, Binday attempted to get the stealth STOLI scheme off the ground himself.  He tried recruiting seniors to act as straw insureds by tapping into Advocate's existing client database and cold-calling potential candidates over 70 years old.  (Tr. 132).  He explained to these people that although insurance policies would be secured on their lives, they would not be responsible for the premiums, and would profit by selling the policies to third parties.  (Tr. 132-33).  Binday also sent out "News Flash" flyers describing an "unusual opportunity . . . for those over the age of 70" according to which a "Trust is created by investors (banks and hedge funds) which purchase a life insurance policy on an individual."  (GX 500-A).  The flyers, while assuring candidates that "[t]he insured is not responsible for the premiums," also promised cash payouts for allowing policies to be taken out in their names.  (*Id.*).   The flyers said nothing about deceiving Insurers.

Binday's efforts to lure straw insureds in this fashion met with some success. James Farrell, for example, agreed to participate in the scheme after receiving the "News Flash" flyer and speaking with Binday over the telephone.  (Tr. 347-49 (Farrell testimony); GX 500-A). Binday told Farrell that investors could take out as many as four separate policies on his life, resulting in quadruple cash payouts to Farrell, and that investors would pay the premiums on all of the policies.  (Tr. 349-50).  Binday was, in fact, able to get four policies on Farrell's life, for a total of $15 million worth of insurance.  (GX 535 (Farrell Sun Life policy for $3 million; GX 556 (Farrell AIG policy for $4 million); GX 567 (Farrell Security Mutual policy for $4 million); GX 606 (Farrell Lincoln policy for $4 million)).

But the scheme truly took flight when Binday began to leverage agents in the field to do the recruiting for him.  Several of these agents—Kergil, Resnick, trial witness Ed Lynch, and others[4]—were long-term care insurance salesmen who had worked together at Travelers Insurance in earlier years and were now out on their own.  (Tr. 761-63, 766-68).  Their client base tended to include substantial over-70 contingents, and these men were attracted by Binday's promise of outsized commissions generated on high-face-value life insurance policies.  At a pep session in 2006 in Advocate's Scarsdale building, Binday, to underscore the enormity of the commissions that could be generated from participating in his scheme, asked a roomful of former Travelers salesmen, "Who wants to have a Ferrari in their driveway?"  (Tr. 769).

Another field agent who became integral to Binday's stealth STOLI scheme was Paul Krupit, a Florida insurance salesman who had been making a living selling $5,000 to $15,000 burial plan insurance policies, for commissions of $300 to $500 a policy.  (Tr. 902).  He and Resnick met because they used the same telemarketer for their Florida insurance operations. (*Id.*).  Resnick introduced Krupit to the stealth STOLI scheme—and to Kergil, who acted as an intermediate supervisor between Binday and many of the field agents involved in the scheme and regularly took cuts of the commissions they generated.  (Tr. 903-04, 923).  On a conference call that Resnick arranged, Kergil gave Krupit a partial explanation of the stealth STOLI scheme, saying the idea was to "take out a large case life insurance policy and immediately it would be sold to an investor."  (Tr. 902-04).  He said the policies would typically not exceed $3 or $4 million each, because they "had to stay under the radar"—meaning that "anything over three to

---

[4] The others included Don Engle, Sandy Einhorn, and Steven Chewkaski.  (Tr. 768).  Other field agents who participated in the stealth STOLI scheme included Janice Greenbaum and Allison Haas-Bromberg.  (*See, e.g.*, GX 892; GX 3019 at 2).

four million would require excessive documentation such as tax returns, stock reports, bank

statements, that type of thing" to support the applications.  (Tr. 905).

   After this call, Kergil arranged to have Krupit speak directly with Binday.  (Tr.

906-07).  Binday explained to Krupit that the "clients" for this program should be "between 69

and 85 years old," and "healthy . . . but not too healthy," because the process would involve

generation of life expectancy reports for investors, who would not want to invest in insurance on

the life of someone who was going to live too long to generate a sizeable return on the

investment.  (Tr. 907).  Binday reiterated Kergil's point that these policy applications had to fly

"under the radar," meaning that they should request several millions of dollars of insurance but

not so many millions that the need for additional documentation would be triggered.  (Tr. 907;

*see also* Tr. 530-31 (Prudential executive explaining that $5 million was threshold for requiring

additional documentation of finances)).  Finally, Binday confirmed that the purpose of securing

these policies "was to sell them to investors on the secondary market."  (Tr. 907-08).

   The explanation Binday gave Krupit was similar to the one he gave Ed Lynch in a

one-on-one training session following the group pep talk Binday hosted for the former Travelers

salesmen:

> [T]he way it was explained to me was basically that at that age
> premiums are getting very high for people in their 70's into their
> early 80's to get life insurance benefits, plans of 2, 3, $4 million,
> and it was explained to me that the investors in the trusts were
> willing to pay the premiums because it was kind of a tricky thing.
> They wanted people in good enough health to get preferred health
> or standard health rates, not to have bad health so the premiums
> were even higher.
>
> So you wanted people in good health so they got good rates, but
> they also, the second part was there were—a couple of companies
> that predicted based on their health records their life expectancies,
> or LE's as we call them, and you wanted them to have good life

expectancy but not too long, to the point where the investors of the
trusts would be paying the premium too long.

It was kind of a gamble that they would hope that if they put in a
million in premiums over years and then the insured passed away
and they got a $3 million policy, death benefit to the trust, and they
spent a million doing it, then they were still up two million.

(Tr. 775; *see also* GX 101 (flyer Lynch received from Binday entitled "How the Program

Works")).

### B.   Exploiting the Insurers' Pricing and Underwriting

As Binday's explanation to Lynch made plain, the point of all this was to bet big

against the Insurers and generate massive commissions along the way.  What made certain types

of universal life insurance policies such attractive targets for these bets were the economic

inefficiencies, from an investor's perspective, in their associated premium pricing and

underwriting classifications—inefficiencies that flowed from Insurers' expectations that their

customers were the people applying for the policies and their families, rather than professional

investors.

On the pricing side, there were essentially three expectations or actuarial

assumptions to be exploited by investors.  First, the Insurers assumed that a certain proportion of

insureds would lapse their policies—meaning that they would stop paying premiums, for a

variety of reasons, and thus forfeit entitlement to the ultimate death benefit.  (Tr. 512, 573, 640;

GX 2970 (internal Lincoln memo dated Jan. 3, 2007) at 1).  As Michael Burns, who headed up

Lincoln's life insurance business during the period of defendants' fraud and is an actuary by

training, testified at trial:  "[I]n instances where there is a lapse, we'll have collected premiums

and not have to pay out a death benefit.  To the extent that that occurs, that is an opportunity to

provide a lower cost to all the other insureds that will not lapse their policy."  (Tr. 640).  Binday

12

himself understood this lapse assumption well; in one case, discussed in greater detail below, he tried to push a stealth STOLI application through at Prudential by representing that the straw insured, whose ability to pay for premiums the insurer was questioning, planned to pay for coverage only until the age of 90 and then lapse her policy if she lived beyond that age. (GX 119 at 1).[5]

The second actuarial assumption that allowed Insurers to offer lower prices than they could have absent the assumption was that some proportion of the insured pool would "pay premiums at a higher level" than the minimum required to keep a policy in force, which would "provid[e] a source of investment income that then makes its way into the underlying pricing . . . ." (Tr. 639-40; *see also* Tr. 634).

Finally, in pricing premiums for multi-million-dollar universal life policies, the Insurers assumed that the pool of insureds they would attract would have roughly the same characteristics—including the same economic means—as the insureds who had previously been attracted to similar kinds of policies. (Tr. 660). This was an important assumption for high-face-value policies traditionally secured by the wealthy, because "it's perhaps an unfortunate aspect but a reality in terms of what we see which is that higher net worth individuals historically experience better overall mortality experience than the general population due to factors such as better access to healthcare." (Tr. 660; *see also* Tr. 735 ("As a general rule . . . higher net worth individuals will generally have better mortality or increased longevity."); Tr. 576, 578 (noting relationship between high face amount and longevity)). In other words, wealthier individuals—

---

[5] Lapse only results in a net positive cash flow to the Insurer if it occurs after the origination costs of the subject policy—including the massive commission paid to the agent(s)—have been recouped. (Tr. 744 (Lincoln executive's testimony that "it's not until we receive several years' worth of premiums that the accumulation of the premiums and the investment coming out of those premiums accumulates to an amount that exceeds the total cost")).

those who can afford and would want multi-million-dollar policies on their lives—tend to live longer, and pay premiums longer.  The expectation of greater premium build-up over time was yet another factor permitting the Insurers to offer competitive prices on their high-face-value universal life policies.

On the underwriting side, the inefficiency to be exploited was the Insurers' flexibility in offering competitive premiums to people whose health arguably—or even plainly— should have warranted a higher premium.  (*See* GX 2827 (Binday describing this to a funder as "underwriting arbitrage")).  With universal life insurance, the minimum premiums charged for a particular policy depended on the size of the policy and on the health of the insured at the time of application.  But although individualized health assessments would be undertaken by the Insurers' underwriting departments, premium pricing would not itself be individually tailored; instead, the purpose of the assessments was to place a given insured within a "broad categorization" or "risk class" for premium pricing purposes.  (Tr. 503, 637).  That meant that insureds of varying healthiness would all get the same rate.  And, in some cases, insureds just below the acceptable level of health for a good premium pricing category—"standard" or "preferred," for example—would get the good pricing anyway under so-called "table shave" programs.  (Tr. 681-83).  These programs were a stealth STOLI procurer's dream; they "would create an opportunity to get favorable life insurance pricing that would make it more saleable on a secondary market to the life settlement companies, and that could facilitate and make more attractive the economics of the IOLI-STOLI transaction."  (Tr. 683).  Put differently, the programs permitted investors to get lower-than-usual premium charges on people who likely would not live very long.  The result would be an earlier multi-million-dollar payout at a cheaper price.  The same result could be achieved by aggressive agents, like Binday, who pushed for

14

standard rates in individual cases where the insured's health technically placed him or her just below the threshold for qualification.  (*See* GX 154 (Binday announcing that he had succeeded in getting a "non-smoker plus" rate for someone whose health really warranted a worse classification, in contemplation of a stealth STOLI transaction)).

### C.    The Insurers' Anti-STOLI Policies

Not surprisingly, the Insurers wanted none of this exploitation of their pricing and underwriting processes.  When they began to understand, in or about 2004 or 2005, that investors were acting behind the scenes to generate multi-million-dollar policies on the lives of seniors who had no need or ability to pay for those policies, they likewise understood that this would be bad for business and, if permitted, would drive up the prices the Insurers had to charge for universal life.  As Jim Avery, who was the chief executive officer of Prudential's individual life insurance business during the period of defendants' fraud, explained:

> These policies, this class of policies would be owned by investors who benefited from death and didn't benefit from anything else, and so we believe[d] that they would continue to pay premiums and that they would try to select insureds where they believe[d] based on their evaluation that the premiums were inadequate for the death benefit eventually to be received.  They were betting against the house and their behavior would be so different than a normal insured who is hoping to live, not hoping to die.

(Tr. 514-15; *cf.* GX 2497 (Binday email to hedge fund reporting that a straw insured had had a stroke, and stating: "Our agent met with Ms. Robinson and got her new doctors.  We will order records tomorrow.  This is good and bad.  Good is that we got doctors.  Also that she had a massive stroke.  Bad is that she got out of the nursing home and appears to be doing well.")).

Michael Burns of Lincoln offered a similar description of the unfavorable economics, from an Insurer's perspective, of a STOLI transaction: "the policy would never lapse, so always the death benefit would be paid because the policy would never be expected to lapse, and it would be

funded on a minimum basis, so there would be no investment income to offset some of that or reduce investment." (Tr. 642).

Of course, the Insurers priced to assume that death benefit payouts in some cases would exceed premiums paid in—that is, that the Insurer would pay out more on a particular policy than it took in. They also priced with the assumption, baked in through experience, that some insureds would decide after issuance of their policies to sell those policies on the secondary market—a practice that occurred in only a small proportion of cases, and that the Insurers, by regulation and state law, were prohibited from banning. (*See* Tr. 533-34, 636).[6] But STOLI, if kept unchecked, threatened to drastically increase that proportion of policies that were, on an individual basis, losers for the company. If too many STOLI policies got on the books, with investors minimally funding policies that would never lapse on people at the shorter end of the longevity spectrum within a given risk class, and with inevitable multi-million-dollar payouts, entire life insurance product lines could be jeopardized. (Tr. 581 ("[I]f every policy we issued never lapsed, never surrendered, the insurance company would lose millions and millions of dollars and it would have to, as soon as it started to experience that, since we base pricing on experience, we would have to significantly raise prices going forward."); Tr. 641 ("STOLI business would impair profitability of our business, and our products weren't priced for STOLI.")).

STOLI was bad for business in other ways as well. It put the tax treatment of universal life insurance—and thus the market for that kind of insurance—at risk. (*See* GX 2970

---

[6] Prudential's Jim Avery explained the modest impact of traditional life settlement business on pricing assumptions: "The life settlement business was a small business. . . . And typically the life settlement business was dealing with very old policies which tended to be very small face amounts from years ago, so it would have a modest impact as long as it was those very old policies of low face amounts." (Tr. 533-34).

at 1 (internal Lincoln memo listing as one of three "primary concerns" with STOLI "[t]he long-term risk that tax-favored benefits of life insurance could be jeopardized")).  Universal life insurance, like other forms of life insurance, carries certain tax benefits.  The death benefit is tax-free to the beneficiary.  (Tr. 507).  And the value that builds up inside the policy accumulates on a tax-deferred basis.  (*Id.*).  But if universal life insurance were "perceived as a commodity that becomes a tradeable investment by third party investors," taking it "away from the more fundamental purpose of insurance being a protection type vehicle for families," the Insurers worried that these tax benefits would be revoked.  (Tr. 665; GX 2970 at 1).  The result would be that the insurance would be "less attractive as an alternative for the general population to serve their needs," and life insurance companies "would more than likely sell a lot less life insurance as a result."  (Tr. 665-66).

Relatedly, the Insurers were concerned about the public policy implications and accompanying reputational damage entailed in failing to vigilantly prevent STOLI.  As Prudential's Jim Avery explained, "[w]e thought that we would have insureds or beneficiaries feeling that they somehow were duped, and it would be bad for our reputation to be involved in these transactions f[rom] any perspective."  (Tr. 515).

To counter the various threats that STOLI posed to the Insurers' business, the Insurers adopted and promulgated policies prohibiting their agents from soliciting or submitting STOLI applications, and incorporated questions on their universal life application forms designed specifically to smoke out STOLI.  (*See, e.g.*, GX 2922 (Lincoln anti-STOLI policy); GX 2904 (AIG anti-STOLI policy); GX 2915 (Hancock anti-STOLI policy); GX 2943 (Prudential anti-STOLI policy); GX 2951 (Union Central anti-STOLI policy)).  Lincoln, for

example, adopted the following anti-STOLI policy, which it required its agents to familiarize themselves with and follow:

> The success of Lincoln Financial Group of companies depends on the public's confidence in our honesty, integrity and professionalism.  As one of our producers or representatives, your business practices and professional conduct reflect directly upon how the public perceives Lincoln Financial Group.  Therefore, we expect that our producers and representatives will understand and actively support our efforts to not issue any new life insurance policies where any of the parties are considering or actually intend the eventual transfer of the life insurance policy to a settlement company or other investors.  Our life insurance products are intended to provide benefits to the insured and his or her beneficiaries, all of who have a bona fide need for the insurance protection.  Our life insurance products are not intended to enrich investors who simply have hope for a financial profit from the death of the insured.

(GX 776 at 6).  This policy statement was attached to applications for Lincoln universal life policies, and agents were required to certify every time they submitted an application for universal life that (1) they had read and understood the anti-STOLI policy, (2) the subject "life insurance policy d[id] not violate the stated intent and spirit" of the anti-STOLI policy, and (3) everything in the application was "true, correct and complete to the best of [the agent's] knowledge."  (*Id.*).  Defendants in this case signed these certifications when they submitted applications to Lincoln.  (*See, e.g.*, GX 776 at 5 (Binday certification for straw insured Martha Espinal); GX 1101 at 16 (Kergil certification for straw insured Opal Headrick); GX 1363 at 14 (Resnick certification for straw insured Oswald Heaton)).

　　　　The questions that the Insurers incorporated into their applications—the answers to which they required their agents to certify as correct to the best of their knowledge—were designed to detect STOLI.  They asked, for example, the purpose for which the insurance was being sought, whether the applicants intended or had discussed selling their policies with anyone,

18

how they intended to pay premiums, whether premium financing was being contemplated, whether the applicants had any other active life insurance policies, and whether they had received incentives to apply for life insurance.  (*See, e.g.*, GX 413 at 13 (Security Mutual questions); GX 531 at 5-6, 12-13 (Sun Life questions); GX 541 at 13 (AIG questions); GX 605 at 1-2 (Lincoln questions); GX 650 at 13 (Union Central questions); GX 1324 at 2-4, GX 1325 at 6-7 (AXA questions); GX 2000 at 2, 9, 16 (Hancock questions); GX 2350 at 25 (Prudential questions)).  The answers to these questions were important to the Insurers.  If it became evident from the answers that a policy was being sought for the purpose of third-party investment—that is, that it was an application for a STOLI policy—the application would be denied.  (Tr. 526-27).

### D.      Insurers' Financial Underwriting

There was another set of questions asked on the Insurers' universal life application forms relevant to this case: questions about the proposed insured's finances.  These questions generally constituted the first stage of the financial underwriting process.  The *medical* underwriting process, which involved gathering historical medical records of the proposed insured and reviewing updated test results, was aimed at placing an applicant within the appropriate risk class, and thus ascertaining the appropriate minimum premium to charge.[7]  The financial underwriting process, on the other hand, was aimed at ensuring that the proposed insured actually needed and could afford the insurance being applied for.  This mattered both because the Insurers did not want to have an insured "worth more dead than alive" (Tr. 529; *see also* Tr. 505-06), but also because it tied in with efforts to weed out STOLI; if an insured could not afford a policy, then someone else must be paying the premiums.  (*See* Tr. 529).

---

[7] The Government has never alleged that defendants in this case misrepresented any straw insured's medical information.

19

The finance-related questions the Insurers asked on their universal life applications related to the net worth and income of the applicant, and the applicant's plan for paying the premiums.  (*See, e.g.*, GX 112 at 8-9 (Prudential questions); GX 532 at 6 (Sun Life questions); GX 561 at 6 (Security Mutual questions); GX 541 at 15 (AIG questions); GX 970 at 12 (Lincoln questions); GX 1125 at 5 (Union Central questions); GX 1325 at 6 (AXA questions); GX 2000 at 16 (Hancock questions)).[8]  Generally, the Insurers required that the answers given be supported by independent verification of some kind.  (*See* GX 2807 (email from Binday describing financial verification requirements)).  For policies below a certain threshold face value (for example, $5 million, *see* Tr. 530 (Prudential)), the financial support requirements would not be particularly onerous.  But they would include an "inspection report" by an approved vendor entailing at least a telephone interview by the vendor's employee with the applicant and a search of public records.  (Tr. 846-50 (testimony of executive from third-party inspection service used most often by defendants explaining verification process); GX 201, 212, 280, 401, 530, 544 at 3-5, 564, 603, 646, 772, 941, 1060, 1104, 1122, 1360, 1381, 1616, 1623, 1653, 1853, 1870, 1922, 1980, 2001, 2051, 2307 & 2385 (inspection reports)).  In many cases, the Insurers would go further, requesting copies of estate plans and accountant-certified net worth statements.  (*See, e.g.*, GX 213 at 1-2 (email from Binday to managing general agency attaching estate plan for Robert Katz); GX 679, 774, 1044, & 1907 (estate plans); GX 164, 410, 604, 680, 1361, 1415, 2074, 2308 & 2406 (accountant statements)).

---

[8] Relatedly, Insurers also typically asked whether applicants had (or had applied for) other life insurance policies.  (*See id.*; *cf.* Tr. 529 (Prudential executive testimony about making sure applicant is "not overinsuring")).

### E.   Recruitment of Straw Insureds

For defendants' stealth STOLI scheme to succeed, they had to lie to the Insurers about the STOLI character of the policies they were seeking.  They also had to lie about the financial health of their "clients"—the straw insureds—who were in truth generally people of modest means tempted (or misled, in some cases) into the scheme by the promise of quick cash.

Binday, as noted, kicked off his bid to recruit straw insureds by sending out flyers and making cold calls over the phone.  The field agents with experience selling insurance to the elderly—the long-term-care salesmen like Kergil, Resnick, and Lynch, and Krupit, the man who sold burial plans—were more aggressive.  They visited the homes of candidate seniors to try to pitch them on allowing investors to buy insurance on their lives.  Resnick, for example, visited Silas Griffin, an elderly former federal employee with a home worth $50,000 and savings of about $3,000, at his home in Orlando, Florida, to pitch him on the stealth STOLI program.  (Tr. 72-76).  Griffin had expressed an interest in buying life insurance of about $15,000 to $20,000. (Tr. 75).  But Resnick said he doubted whether Griffin would "qualify" for genuine life insurance, and proposed "a good life insurance policy that he thought would interest [Griffin] more."  (Tr. 76).  This was the STOLI scheme.  As Griffin explained at trial, Resnick told him that

> [t]he insurance that I might be more interested in would be insurance where the trust would hold the policy for me, the policy would be a $4 million policy, the trust would hold it.  My wife would be the beneficiary of the trust.  And I wouldn't pay no premium and it kept me insured for two years.  At the end of the two-year period, then they would pay us $200,000 and we would sign over the $4 million policy to the trust.

(Tr. 76-77).[9]

Griffin agreed to apply for this "insurance," and Resnick arranged for medical tests. (Tr. 76-78). He also had Griffin sign a number of waivers, including waivers for release of information to companies that would broker sales of life insurance policies. (Tr. 78-79; GX 1045 (Griffin waiver forms); Tr. 138-39 (testimony of R. Binday employee describing forms)). Griffin signed these forms. (Tr. 77). As discussed below, the waivers were the first step in the road toward issuance of a STOLI policy on a straw insured's life.[10]

Resnick employed a similar approach with another straw insured, Maria Ramos, who was a retired teacher's helper married to a retired maintenance worker. (Tr. 422). Ramos and her husband owned a condominium near Orlando worth about $182,000, and had savings totaling about $30,000. (Tr. 423-24). Ramos, like Griffin, met Resnick when she was looking to buy life insurance. (Tr. 424). Resnick told her she could not afford the insurance she wanted (it would have cost $200 a month), and pitched her a different kind of "life insurance" that would

---

[9] Resnick and Binday did secure a policy from Lincoln on Griffin's life. (GX 977 (Lincoln policy)). When it came time to sell, Binday and the funder with which he was working offered Griffin $2,500 to release his interest and sign the paperwork necessary to sell off the policy to an investor. (GX 1023 at 1). Griffin refused to sign for such a paltry amount, having been promised much more, and Binday caused letters to be sent to Griffin threatening legal action and claiming that Griffin owed over $800,000 in "loans" for the policy. (GX 1028 (Binday email requesting that funder send Griffin a "legally threatening letter"); GX 1029 (Binday email to Resnick and Kergil noting that unless Griffin signed the papers, funder would "hold him personally responsible" for the premiums paid to date)). Griffin did not bow to the threats, and received no money. The policy on his life lapsed in 2011. (*See* McDonald Decl., Ex. 4 (chart of policy information from Lincoln)).

[10] Binday, like the field agents, had the straw insureds he solicited directly sign these waiver forms. (Tr. 133-34).

net her a cash payout of $200,000.  (Tr. 424-26).  Ramos, like Griffin, signed some paperwork and underwent medical tests.  (Tr. 426-27).[11]

Ed Lynch, the former colleague of Rensick and Kergil at Travelers, began with calls to clients he thought might be interested in the STOLI program, and then followed up with house calls during which he discussed the "emerging market" of selling life insurance policies to investors and explained the prospect of a "cash payout."  (Tr. 773-76).  Lynch—unlike Resnick, who did not even bother—asked these prospective straw insureds about their assets.  (Tr. 776-77).  Like Resnick, Lynch had the "clients" sign waiver forms permitting Binday's office to get their health records, and giving policy-selling operations access to those records.  (Tr. 778-79; GX 168 (waiver forms for Lynch recruit Florra Adler)).  Lynch got the waiver forms from Kergil.  (Tr. 780).[12]

Paul Krupit, the Florida agent who Resnick introduced to Binday's stealth STOLI program, met with 60 or 70 prospective "clients" during the course of the scheme.  (Tr. 909).  He would have these prospective straw insureds sign the waiver forms and would also gather their financial information on "worksheets."  (Tr. 909-10).  Krupit would then fax the waivers to Binday's office, and fax the financial worksheets, containing true, handwritten numbers, to

---

[11] Relying on defendants' lies, Lincoln issued a $4 million policy on Ramos's life.  (GX 1940). The policy was transferred to an investor immediately after issuance, and Ramos received approximately $118,000 for the transfer.  (*See* GX 1941 at 40).  The subject policy lapsed about a year after defendants were indicted in this case.  (McDonald Decl., Ex. 4).

[12] Lynch, whose involvement in the fraudulent scheme was relatively limited, managed to help secure two separate policies on straw insured Robert Katz—one for $4 million from Lincoln and one for $2 million from Union Central.  (*See* GX 210 (Lincoln policy); GX 303 (Union Central policy)).  He earned approximately $50,000 in commissions for his role in fraudulently procuring these policies.  (Tr. 795-96).  The Lincoln policy lapsed in early 2013 (McDonald Decl., Ex. 4), and the Union Central policy is still in force (*id.*, Ex. 9).

Kergil, who (as discussed further below) "was responsible for the financial information and for arranging third-party inspections." (Tr. 910).

Kergil was not just responsible for the numbers and for supplying other agents with waiver forms when they needed them, but sometimes acted as a field agent himself. For example, Kergil, with Binday in tow, approached Mary Pernice and her son Tom at the son's home in Peekskill, New York, to try to convince them to participate in the stealth STOLI scheme. (Tr. 621-22; GX 1838 (email exchange between Binday and Kergil discussing the planned meeting)). Before making the approach, Kergil told Binday by email that the son "could definitely use the money" from the scheme, and "[m]y feeling is the lure of another offer or two with mention of the two-year plan that offers two free years of multi-million dollar life insurance and a cash settlement might be the trick." (GX 1842; *see also* GX 433 (similar exchange between Binday and Kergil regarding another Kergil recruit, Helen Carufe)). As Tom Pernice testified at trial, Kergil and Binday, when they visited his home, described the scheme as "some kind of syndicate was to pay the premiums on the life insurance policy for my mother in return for me signing I guess my rights to the policy over to that syndicate and would get a hundred thousand dollars." (Tr. 622).[13]

### F.   Finding Investors

Once an agent had successfully piqued a straw insured's interest in having his or her life insured by investors in return for cash, Binday's office, using the waiver forms sent in by the field agent and signed by the insured, would obtain the insured's medical records. (Tr. 134, 139-40 (testimony of R. Binday employee); Tr. 449-50 (testimony of former R. Binday employee)). Binday's employees would then do two things with those records: First, they

---

[13] Although efforts were made to secure policies on Mary Pernice's life (*see* GX 1845), none was successful.

would send them out to companies that specialized in predicting life expectancies. (Tr. 140; Tr. 448-49). This was an important part of the scheme because the resulting life expectancy reports would "show [prospective investors] how long they would have to pay premiums until the client would die, they could collect the death benefit." (Tr. 449-50). Second, Binday's employees would submit the medical records to insurance companies to get a preliminary read on what risk class or "table" the "client" would qualify for. (Tr. 140). A recent college graduate whom Binday had hired as a "financial analyst" was responsible for using the insurance companies' preliminary table ratings to generate "illustrations" of what premiums would be required to fund policies from different insurance companies over specified periods. (Tr. 442-43, 450 (describing an illustration as "theoretically showing what premium would be needed to be paid to keep the life insurance policy running")).

With these illustrations and the life expectancy reports in hand, Binday would then "shop" the insureds' information to potential investors. (Tr. 149-50; Tr. 443-50). Typically, Binday would send prospective investors two life expectancy reports from two different predictor companies, and a set of illustrations for different insurance companies from which the investor could choose. (Tr. 445-49; *e.g.*, GX 469 (email to investor with two life expectancy reports for straw insured Helen Carufe and illustrations attached); GX 1407 & 1408 (emails to investors with two life expectancy reports for straw insured Oswald Heaton and illustrations attached)). Binday also prepared for prospective investors projections of the "net outlay" they would have to pay over the expected life of a given policy to yield the multi-million-dollar death benefit. (Tr. 461-67; *e.g.*, GX 1407 at 8-22, 1408 at 8-22). These reflected

substantial expected profits—sometimes millions of dollars on a single policy—upon death of the insured.[14]

        The investors whom Binday solicited generally fell into two different categories.[15]  First, there were "upfront" investors who were willing to purchase policies immediately upon issuance—with correspondingly quick payouts to straw insureds.  (Tr. 143-44).  These were risky transactions for investors, because newly-issued policies are more vulnerable to rescission and claim denial by Insurers than older policies for which the two-year "contestability period"—the period during which, by law, Insurers may deny claims and readily seek rescission—has passed.  (*See* Tr. 520; Tr. 740; DX 13 (discussing contestability period)).  The second kind of investor with whom Binday worked extensively, a hedge fund called Himelsein Mandel ("HM"), tried to mitigate this contestability risk by deferring the date of formal sale.  HM offered non-recourse "premium financing" for two years through an intermediary "trust" that it helped set up, and then arranged for sale of the policy through a life settlement company (with payment of principal with interest to HM) at the end of the two years.  (*See* Tr. 141-42).  This was the "two-year deal" that Binday and his field agents peddled to prospective straw insureds.  (Tr. 142).  A straw insured who agreed to participate in the two-year program, and thus defer cash payment, was promised more money than a straw insured whose policy sold upfront.  (Tr. 349 (straw insured James Farrell's testimony that Binday told him if he

---

[14] GX 1407 and GX 1408 each include an example of these charts, for straw insured Oswald Heaton.  Other such charts, which were not introduced as exhibits at trial but were collected from R. Binday's database and produced to the defense in 2012, are attached as Exhibit 10 to McDonald Declaration accompanying this submission.

[15] The Government neither alleged nor proved in this case that the investors who funded and purchased the stealth STOLI policies that defendants secured knew about defendants' fraudulent representations to the Insurers or were co-conspirators in defendants' conspiracy.

held a policy "for two years, you get much more money as a fee than some of the other ones, maybe almost as much as double some of the other ones")).

If an upfront investor decided, following receipt of the life expectancy reports and illustrations from Binday, that it wanted to pursue a policy on a particular insured, it would make an offer. (*See, e.g.*, GX 432 (Binday email conveying to Kergil an upfront offer by investor on proposed Helen Carufe Security Mutual policy); GX 1846 (email conveying investor offer to pay 3% face amount of policy on proposed Mary Pernice Prudential policy)). Similarly, if HM decided it was interested in funding a policy for two years on a particular insured with a view to selling it thereafter, HM would send Binday a "sample term sheet" containing the substance of its offer. (*See, e.g.*, GX 658 at 2 (HM sample term sheet for James Farrell Lincoln policy), GX 1161 at 3 (sample term sheet for Opal Headrick Lincoln policy)). All of these negotiations generally occurred before any application to any Insurer had been submitted; Binday wanted assurances, before proceeding further, that an investor or funder would take responsibility for the policy once issued and generate a hefty commission for his troubles. (*See* Tr. 143-44; Tr. 468-69).

Binday, sometimes with input from his field agents, decided whether to accept an HM or upfront offer regarding a prospective policy on a straw insured. (Tr. 469). A good offer was one that permitted Binday to keep at least 50 percent of any accompanying agent commission for himself and his co-conspirators. (*See* Tr. 455).

G.     **The Fraudulent Applications**

If Binday decided to accept an investor offer on a particular kind of policy for a particular insured, or (as often happened) to accept offers for multiple policies on a given insured, the next step was to submit formal applications to the Insurers. (Tr. 153). If the straw

27

insured had been recruited by Binday himself or by an agent from the Scarsdale area (for

example, Ed Lynch or Janice Greenbaum), Binday would have an employee send blank

applications to the insured or local agent for signatures, with flags indicating where to sign and

directives not to complete certain information or to date any of the signatures.  (Tr. 154; Tr. 351

(testimony of James Farrell); Tr. 590-98 (testimony of son of straw insured Martha Espinal); GX

703).  Financial information in particular had to be left blank.  (Tr. 783).  For straw insureds who

had been recruited by field agents in Florida, Binday would direct his staff to send applications

to the agents with instructions to secure signatures and, again, typically leave the financial

information blank.  (Tr. 153-54; Tr. 912-13; GX 1015 (Binday employee instructing Resnick to

tell insured that "the Assets and Liabilities Sections don't have to be filled out, just sign at the

bottom of the page")).  Resnick, at least, sometimes did not even bother to get clients' actual

signatures on these applications, but either forged them or cut-and-pasted them from the

signatures on the initial waiver forms he had had them sign.  (*See* Tr. 77-78 (straw insured Silas

Griffin confirming his signature was the one on the waiver forms, but that the signature on

applications for Lincoln and Union Central policies were not his); GX 1045 (Griffin waiver

forms); GX 970 (Lincoln application with forged signature and Resnick signing as agent, and

with cut-and-pasted signature at page 7); GX 1006 (Union Central application with forged

signature and Kergil signing as agent); Tr. 431-32 (straw insured Maria Ramos's testimony that

signature appearing on application or Lincoln policy was not hers); GX 1900 (Lincoln

application with forged signature)).

    If multiple applications were to be submitted for a single insured, Binday would

make sure a different agent's name appeared on each application so as to avoid raising red flags

with the Insurers, who might be comparing notes.  (Tr. 169; Tr. 797).  For example, although

28

James Farrell was Binday's own recruit, and Binday signed as the agent on Farrell's application

to Lincoln, Binday's brother Glenn—who was not in the life insurance business, but instead in

commercial insurance—signed as agent for Farrell's Security Mutual application; Kergil signed

as agent for Farrell's Sun Life application; and Resnick signed as agent for Farrell's Union

Central application.  (Tr. 156, 163-65, 171; GX 610 at 8 (Lincoln application); GX 561 at 10

(Farrell Security Mutual application); GX 531 at 9 (Farrell Sun Life application); GX 650 at 8

(Farrell Union Central application)).  Similarly, for straw insured Martha Espinal, who had been

recruited by agent Janice Greenbaum, Binday directed his staff to have Greenbaum sign as agent

for the Union Central application, Binday himself as agent for the Lincoln application, Glenn

Binday as agent for the Prudential application, and Binday's sister, Denise Koslowsky—who

was not a life insurance agent but headed up Advocate's personal lines business—as agent for an

application to yet another insurance company.  (GX 859 (email from Binday directing agent

assignments)).[16]

As noted, insureds—and some agents who were less experienced with the stealth

STOLI scheme—were directed to keep financial sections of the applications blank.  This was so

that Binday's staff or, in some cases, agents in the field could fill in fraudulent figures designed

to trick the Insurers into issuing much bigger policies than the straw insureds otherwise would

have qualified for.  (Tr. 361-66 (Farrell testimony); Tr. 604 (Espinal testimony); Tr. 788, 791

(Lynch testimony)).  The schemers even went so far as to white out accurate financial numbers

that one straw insured mistakenly filled in, and replace them with phony ones.  (Tr. 360-65

---

[16] Illustrating how arbitrary these agent assignments were, Espinal's various applications ended
up with slightly different assignments than the ones Binday had directed initially.  Binday
remained the agent for Lincoln.  (GX 770 at 11).  For an AIG application, Stephen Chewkaski
signed as agent.  (GX 745 at 6).  For Indianapolis Life, Kergil was the agent.  (GX 751 at 2).  And
Denise Koslowsky signed for Prudential.  (GX 805 at 8).

(Farrell testimony); GX 503-A, 504-A, 541).  The fake numbers on all these applications came

from "worksheets" typed up by Kergil and faxed or emailed into Binday's office or to the

relevant agent.  (Tr. 914-15; GX 468 (worksheet for Helen Carufe faxed from Kergil to Binday's

office); GX 1182 (worksheet for Opal Headrick faxed from Kergil to Binday's office); GX 1703

(worksheet for straw insured Hanni Lennard faxed from Kergil to Binday's office)); *see* Tr. 173-

74, 176).  The numbers on these worksheets generally were entirely fabricated by Kergil, and

bore no relation to the straw insureds' actual finances.  (Tr. 786, 788, 791; Tr. 915-17).  The

worksheets—and hence the applications—made it seem as though the applicants for these

policies had substantial net worth, typically in the range of $4 to $5 million.

      And these fantasy worksheets were backed up by other financial documents that

Kergil caused to be generated: the supposedly independent third-party inspection reports that

Insurers typically required to be submitted.  (*See* Tr. 178, 184; Tr. 921-22; GX 2806 at 1 (email

explaining that Kergil had these reports sent directly to Insurers); *e.g.*, GX 5502 (Espinal

inspection report); GX 5506 (Pernice inspection report)).  The "inspector" whom Kergil used for

virtually all of the reports submitted as part of defendants' stealth STOLI scheme was a man

named Frank Pellicone.[17]  Pellicone, who testified at trial, acknowledged that at Kergil's request

he did not bother to call any of the insureds whose finances and other information he was

purporting to verify but instead simply took the numbers Kergil gave him and pretended they had

been verified.  (Tr. 821, 829; *see also* Tr. 922 (Krupit testimony that Kergil told him the

inspection reports were "just signed off on and no one actually verified it"); GX 5504 (Kergil fax

---

[17] These reports typically did not include the inspector's name on them, so Insurers would not
ordinarily have cause to observe that all of the inspection reports coming through Binday's
offices were from a single inspector.  But Binday took the precaution of instructing his staff to
"white out" Pellicone's fax header where it appeared on reports faxed to Binday's offices by
Kergil.  (Tr. 179-80; GX 2307 at 5 (example of fax with whited-out header)).

of false Espinal figures with note requesting Pellicone to "correct" net worth figure upward)). This was in blatant violation of Pellicone's company's policies. (*See* Tr. 849).

To further perpetuate the lies about the financial information supplied on the subject applications, defendants retained various accountants to prepare false statements purporting to set forth straw insureds' income, net worth, and other financial figures. Binday had his relative, Michael Block, prepare such statements for people—straw insureds—who were in truth total strangers to Block. (*See, e.g.*, GX 680 (financial statement for James Farrell); Tr. 370-76 (Farrell testimony)). Binday knew that the Insurers would not issue multi-million-dollar policies on individuals with modest net worth, and crafted fraudulent documents to clear that hurdle.

Resnick did the same thing; he paid his own tax accountant, Atul Desai, to prepare statements of financial net worth purportedly for the straw insureds who had "retained" Desai, when in fact Desai had never met the insureds in question, had never sent the statements to them, had cribbed the statements from samples Resnick supplied, and had copied the financial numbers from a print-out of an email Kergil sent to Resnick. (*See* Tr. 1128-34 (Desai testimony); GX 6100 (sample statements faxed from Resnick to Desai); GX 6101 (statement for Oswald Heaton); GX 1321 (same, from AXA files); GX 1361 (same, from Lincoln files); GX 6102 (list of false financial figures for Heaton supplied to Desai by Resnick); GX 6103 (statement for straw insured John Pletto); GX 6104 (email from Resnick forwarding Pletto financial figures supplied in email from Kergil)). And Binday, Kergil, and Krupit all were familiar with yet another accountant whom Krupit had lured into the scheme: Steven Kupper. (Tr. 949-50 (Krupit testimony that "[w]e used Steven Kupper to certify financials of a client, of several clients," and that the financials supplied to Kupper were false)). Like Block and Desai,

Kupper prepared net worth statements for "clients" whom he had never met.  (Tr. 949-50; *see, e.g.*, GX 164 (Florra Adler net worth statement), GX 410 (Helen Carufe net worth statement), GX 2074 (Doris Riviere net worth statement), GX 2308 (Lillian Robinson net worth statement)).  When investigators with one Insurer, Prudential, evinced a desire to follow up with Kupper on a report he had prepared for a particular straw insured, Binday urged Kergil to speak with Kupper and coach him to lie in response to the investigator's questions.  (*See* GX 136 (email chain between Binday and Kergil)).  Kergil did speak with Kupper, and gave Binday the go-ahead for Prudential to call Kupper.  (GX 136 at 1).  But Kupper did not play ball; he admitted to Prudential that he had never spoken with the insured or done any independent verification of the numbers with which he had been supplied.  (GX 158 at 1-2).  Binday's response, when he heard about this, was to email Kergil the following message:  "please KILL Kupper."  (*Id.* at 1).

　　　　The financial information was not, of course, the only false information that Binday, Kergil, Resnick, and their co-conspirators and agents caused to be included in these applications.  The applications were absolutely riddled with lies.  To questions about whether the applied-for policy was intended to be sold, or whether the insured or agent had even had any discussions about selling, the answer was always a resounding, agent-certified, "no."  (*See, e.g.*, GX 1611 at 8 & Tr. 267).  The same went for questions asking whether the policy was to be premium-financed: "no."  (*See, e.g.*, GX 1611 at 8 & Tr. 267).  When an Insurer asked the purpose of the insurance sought, the answer was usually—at Binday's express direction—"estate planning" or a variant of that phrase.  (Tr. 176-77; *see, e.g.*, GX 541 at 15).  In answer to the question whether the insured had other life insurance in force at the time of the application, defendants said again "no"—even though, in many instances, the applicant had millions of dollars' worth of STOLI policies on his or her life already.  Binday expressly directed his staff to

lie about this—not just on applications, but in follow-up email correspondence with Insurer representatives.  (Tr. 188-89; GX 566 (R. Binday employee's false statements to Security Mutual representative)).

Other documents that sometimes accompanied the applications—or were submitted during the application process, in response to questions from Insurers—were likewise false.  For example, in a cover letter accompanying an application to Sun Life for James Farrell, Kergil (who had never met or spoken with Farrell) signed his name to a slew of false statements about Farrell's net worth, income, and projected plan for paying premiums from his "investment income."  (GX 531 at 1).  As another example, when an Insurer asked to see a proposed insured's estate plan, Binday would oblige—crafting one out of thin air and submitting it as if it were real.  (*See* GX 213 at 1-2 (Binday email sending Katz estate plan); GX 679 (Farrell estate plan); GX 774 (Espinal estate plan); GX 1044 (Griffin estate plan); GX 1907 (Ramos estate plan)).

Indeed, Binday, who had much more direct contact with the Insurers and their underwriting departments than did field agents like Kergil and Resnick, went to great lengths to support and reinforce the lies contained in the initial applications—lies both about the straw insureds' finances and about the STOLI characteristics of the transactions being pitched.  The point is illustrated by an email exchange that Binday conducted with Prudential investigators in connection with the application for a $4 million policy on Florra Adler.  Adler was Ed Lynch's recruit, and she—as Binday well knew—had nowhere near the $4.5 million net worth listed in her application.  (Tr. 777, 791 (Lynch testimony); GX 112 (Adler Prudential application)).  Binday was familiar with Adler's Prudential application, and was working to locate an investor for it.  (GX 144 (Binday report to Lynch about developments with investors in potential Adler

policies)).  In fact, Binday, unbeknownst to Lynch, had even signed as agent on Adler's

application—causing Lynch's signature to be whited out and copied over.  (*Compare* GX 130

(original application signed by Lynch, with financial information blank) *with* GX 112

(application submitted to Prudential with Binday signature and false financial information

completed); *see* GX 151 (email from Binday instructing staff to change agent on Adler

Prudential policy from Lynch to Binday)).  Binday successfully convinced Prudential to offer a

"nonsmoker plus" rating for Adler, even though—as Prudential had discovered during the

underwriting process—she had serious health issues and thus should have qualified for a much

less favorable rating.  (GX 154 (Binday email to Lynch, copying Kergil, stating: "Very good

news.  Flora Adler was just medically approved.  This required an exception worth four tables. . .

that was huge!")).  Binday also worked with Kergil and Lynch to secure false financials for

Adler, and to iron out problems associated with listing Adler's children—with whom she had a

poor relationship—as nominal beneficiaries on the planned policy.  (GX 154 at 1 (Kergil email

to Binday saying "[i]t has come to light recently in conversations with Ed and Flo that her

relationship with the son/daughter is not good")).

       But then Prudential's underwriting representatives began asking questions about

how Adler would afford the premiums on the proposed policy, and about the economics of the

transaction from her perspective:

> How did the sale come about?  How did you get the insured to
> agree to spend 65% of her income on insurance?  Do you feel that
> you can project her estate growth at 7% going forward considering
> that $157,000 annually will be going towards insurance premiums?
> Where will the funds to pay the premium come from?

(GX 119 at 1-2).  Binday's response was high-handed and shot through with lies:

> Please get this policy issued.

In answer to your questions:

Sale came through a referral from a financial confidant.

Premiums are not actually anticipated at 65% of her income.  A number of scenarios were run.  Most likely is paying to keep policy to age 90. . . .  Client may change her premium at any time.  Possibly she should have sent an illustration going to 90 instead of to 100.

There is an open question whether she will pay the premiums.  For example her children have the option to pay premiums.  I am not privy to this entire conversation.  I have been told verbally that she will likely pay premiums herself; children or other trust assets could be used to pay premiums in whole or in part.

By paying a lower premium initially, they anticipate that estate will continue to grow.

This should sufficiently answer all questions.  Please confirm and please get this case issued.

(GX 119 at 1).

In response to this, Prudential asked to speak with Kupper, the accountant who had purported to certify Adler's financials.  (GX 134 at 1-2).  The Prudential underwriter also indicated that she might need to request tax returns and a real estate appraisal.  (*Id.*).  Binday's reaction was to forward the underwriter's requests to another Prudential employee and try to bully Prudential into backing off and just issuing the policy:

We are VERY upset.  In fact we are ready to pull this case from Prudential and move it elsewhere.  If we go back to this client with empty hands, she will fire us.  And we will lose a valuable referral source. . . .

I am completely offended by this situation and the way it is being handled.  [Adler] lives in Scarsdale where the average home price is $2MM.  She has a residence that she says is worth $1MM, modest for the area.  And they are asking for an appraisal of her home?  My reaction is not suitable for a lady's ears! . . . .

35

> Prudential had four months to ask these questions.  The fishing
> expedition referred to below would take another month.  This is
> completely unacceptable.
>
> We cannot present the underwriter's request to the client.  If we
> did so at this time, she would fire us.

(GX 134 at 1; *see also* GX 158 at 2 ("We will not ask her to get her home appraised.  That is a

very aggressive request and it is outside both my style and my comfort level.  She is a private

lady and making such requests will lose the business.")).  As discussed above, when Binday's

bullying failed, and Prudential insisted on speaking with Kupper, Binday tried through Kergil to

get Kupper to lie.  (GX 136).  Only when that failed ("please KILL Kupper," GX 158) and

Prudential initiated an investigation into the Adler case did Binday finally drop his campaign and

withdraw the application.  (*See* GX 121).  In the process, he emailed missives to Prudential

warning them not to contact Adler directly because "[m]any older people are very concerned

about personal security," and Adler "may not sleep at night now that she fears a guy waiting

outside her door to investigate her."  (GX 121 at 3).

Undeterred, Prudential pursued its investigation into the Adler case further,

ultimately referring it to the New York State Insurance Department ("NYSID").  Still Binday

persisted in his lies and efforts to get others to lie for him.  When forced to admit to Prudential

that Lynch, not Binday, was the agent who had approached Adler about this life insurance

policy, Binday became concerned that Prudential might reach out to Lynch directly.  (GX 161).

So he emailed Kergil and fed him lies for Lynch to tell any investigators who came calling—to

make his answers "consistent" with the story Binday had told.  (*Id.*).  Specifically, Binday

suggested Lynch describe himself as Adler's "financial adviser" and say that the reason his

signature did not appear on Adler's application was that he was "away when the application

came in, such as taking his children to school."  (*Id.*; *see* Tr. 804, 807 (Lynch testimony that he

was not a "financial advisor" and that Binday had suggested to him the false dropping-children-off-at-school explanation)).

Prudential investigators never reached out to Lynch directly, and neither did the NYSID. (Tr. 799-800). But NYSID investigators did reach out to Binday—first by letter, and then by demand for testimony under oath. Binday's letter response—through his attorney—to the NYSID's questions about the Adler application was, again, littered with lies. It said that Adler's "$4 million policy [application] was based on financials provided by the client," and "[i]t was the understanding that for both Ms. Adler and" another STOLI insured, recruited through Krupit, "the premiums would be paid by the insureds." (GX 362 at 2-3). As Binday well knew, the financials supporting Adler's applications were fabrications of Kergil's, and Adler had no intention of paying premiums on this policy.

Binday's subsequent testimony under oath, in November 2009, was equally deceitful and obstructive. He repeated his lie about Lynch having been away "taking his daughter to school" as the reason why Binday's own signature appeared on the application. (Tr. 896; GX 363 at 5). In response to questions about whether he knowingly submitted stealth STOLI applications to Insurers, Binday flat-out denied that he did: "If a client intends to sell the policy, then I'm going to tell him that we cannot take the application." (Tr. 897; GX 363 at 6). He said that he "certainly" had not "had any conversation with a client saying they're not responsible for premiums" after New York State made plain its policy against STOLI in 2005. (Tr. 897-98; GX 363 at 7). Regarding financials, Binday was likewise unequivocal in his lie: "So far as I know, every policy that we've processed has been a good policy in terms of financials . . . any number that I get presented to me damn well better be a good number or I'm going to be very upset." (Tr. 898-99; GX 363 at 8).

NYSID closed its investigation of the matter without action.

## H.    Policy Issuance and Commissions

Binday's relentlessness in pushing through fraudulent applications, combined with Kergil's financial alchemy and Resnick's (and other agents') pursuit of elderly straws with modest means, proved immensely lucrative for these men.  The total number of straw insureds in whose names Binday's company submitted fraudulent STOLI applications to insurance companies exceeded 100—with multiple applications for each insured in the typical case.  (Tr. 130 (testimony of Binday employee that so-called "large cases," all of which were STOLI, numbered "[m]ore than a hundred")).[18]  Focusing just on those applications submitted to the subset of insurance companies upon which the Government agreed in advance of trial to train its proof (the Insurers), and limiting the analysis to those cases in which Insurers have still-extant records of applications having been submitted,[19] a conservative count of the number of applications submitted pursuant to the charged scheme is 92.  (McDonald Decl. ¶ 14 & Ex. 11).  Of those, 74 resulted in issued policies.  (*Id.*).  Usually, an issued policy generated a six-figure agent commission.

In fact, the total commissions paid out by Insurers on these 74 policies was approximately $12 million.  (McDonald Decl. ¶ 22 & Ex. 11 at tab 1).  The bulk of these payments—about $10.5 million—were made either to Binday's company (R. Binday) or to individual agents involved in the scheme, including Kergil, Resnick, Krupit, Lynch, and the

---

[18] This number does not include a universe of about 125 STOLI files associated with another scheme in which Binday—but not, to the Government's knowledge, Kergil or Resnick—appears to have been involved.  Binday was never charged with that separate scheme, and the Government did not present proof of it at trial.

[19] This limitation reduces the universe of "counted" applications because Insurers did not necessarily maintain copies in their files of applications that were submitted but not successful.

other co-conspirator agents identified at trial.  (McDonald Decl. ¶¶ 18, 22 & Ex. 11 at tab 1).

The balance was paid principally to managing general agencies that Binday sometimes used,

with certain carriers, to shepherd through his applications.

Generally speaking, commissions that came in on these stealth STOLI policies

would be split 50-50 with the investor whose interest had prompted the application in the first

place, and the remainder would be divided between Binday, Kergil (as intermediary between

Binday and several agents, and as the person responsible for generating false financials), and the

agent who had recruited the insured.  (GX 892 (email from Binday to agent Janice Greenbaum

explaining "[a]fter splits (50% to funder, 1/3 of remainder to you), I'm guessing this works out to

$15 – $20k to you" on Espinal STOLI policy); Tr. 455 (testimony from Binday employee that

"[t]he first year premium would usually be a commissionable premium where the agent would

get paid his commission, and they would split it with the funder"); Tr. 923 (testimony from

Krupit that "[m]y understanding is there was a three-way split between me, Kevin and Michael,

and the investor got everything over that."); GX 3028 (email from Binday setting forth

commission splits for Robert Katz Union Central policy, Raymond Caffiero AIG policy, Maria

Ramos Lincoln policy, Doris Riviere Union Central policy, Hanni Lennard Union Central policy,

and Eloise Hails Security Mutual policy)).  Applying that metric, defendants and their co-

conspirators netted approximately $5.2 million in commissions during the life of the scheme.

(McDonald Decl. ¶ 22 & Ex. 11 at tab 1).[20]

---

[20] Defendants also managed to win trips from Insurers as rewards for the volume of business they
brought in—business the Insurers believed was legitimate.  (*See* GX 1166 at 1-2).  When they
gathered together on these trips, Binday would shush any of his agents who began talking about
how they really conducted their business. (Tr. 926 ("Every time that we started talking about our
clients and bringing out the fact of how we were conducting business, we were shushed by
Michael.")).

**I.      Reaping the Death Benefits**

Commissions, though the chief motivator for defendants in conducting their scheme, were not the only proceeds of the fraud.  In a handful of cases, defendants used their familiarity with straw insureds' rapidly declining health to reap windfalls on policies they had good reason to believe would pay out millions in short order.  Two of these cases were the subject of evidence admitted at trial: the case of Hanni Lennard, who was Kergil's recruit; and the case of Doris Riviere, who was Resnick's recruit.  A third case—that of Ellis LimQuee, another Resnick recruit—was the subject of civil litigation in which Binday was deposed.

1.      *Hanni Lennard Union Central death benefit*

Kergil recruited Lennard as a straw insured in 2007, persuading Lennard's daughter that the stealth STOLI scheme was worth pursuing.  (GX 1677 (Kergil email to Binday relating state of play with Lennard family)).  Kergil and Binday were able, through fraudulent applications, to secure policies on Lennard from Union Central and Security Mutual, each for $2 million.  (GX 1621 (Security Mutual policy); GX 1667 (Union Central policy)).  As in other cases, here Binday and Kergil worked with the insured to make sure she would lie about her financials if approached by an Insurer.  (*See* GX 1687 (Kergil email to Binday confirming that he had spoken with Lennard's daughter about making sure she did not speak to any insurer; Binday admonition that "[i]f she does speak to anyone, she should be consistent with the financials" Kergil had prepared); GX 1703 (false net worth and income worksheet)).

The Security Mutual policy was sold to an investor upfront immediately after issuance.[21] But the Union Central policy was funded pursuant to HM's two-year deal. (GX 1720 at 2). When Binday and Kergil learned in October 2010—before HM had sold the policy to a permanent investor—that Lennard had died, they arranged to have the bulk of the $2 million death benefit paid out to themselves, with HM getting back the premiums loaned plus interest. (*See* GX 1720; GX 1654 (death certificate); GX 1698 (Binday arranging with Michael Block, "trustee" of Lennard's Union Central policy trust, to give Binday signatory powers over the trust's bank account); GX 2670 at 41 ($2 million check from Union Central to Hanni Lennard trust account); *id.* at 7 (trust bank account statement showing $2 million credit and wire of premium amounts back to HM after Lennard's death); *id.* at 11 (debit of $5,000 to a law firm for "Kevin Kergil" and "M. Binday")). Kergil netted over $1 million from the transaction, and Binday got about $343,000. (*See id.* at 45, 84 (withdrawal of $1 million and purchase of cashier's check in amount of $1,000,472.18); *id.* at 30 (statement showing check of $306,245.02 paid out); GX 2659-A at 302-03 (cashier's checks in amounts of $1,000,472.18 and $306,245.02 deposited into personal account Kergil held jointly with his mother); GX 2659 at 268 (deposit of $1.3 million into Kergil's personal account); GX 5004 (stipulation that on or about March 13, 2012, Kergil paid $343,143.59 for the benefit of Binday from the personal account he held with his mother)).[22]

---

[21] The sale was notarized by Dorothy France, the mother of Kergil's girlfriend. Resnick's sister, Marcy Trachtenberg, signed as trustee of the trust that held the policy. Lennard's daughter, who had been listed as the nominal beneficiary, signed off on the sale. (GX 1621). Upon Lennard's death, Security Mutual paid the $2 million benefit on this policy. (*See* McDonald Decl., Ex. 7).

[22] Lennard's daughter, with whom Kergil had arranged the stealth STOLI policies, predeceased her. Two hundred thousand dollars of the death benefit were paid to the presumed beneficiary of Lennard's estate. (GX 2670 at 44 (check to Bernard Schneiderman as "Distribution/beneficiary")).

2.      *Doris Riviere Hancock death benefit*

Kergil made another $900,000 upon the death of Doris Riviere, one of Resnick's recruits.  (*See* GX 2659 at 226 (Kergil bank account showing credit of over $900,000)).  Riviere, like Lennard, was a straw insured whose information Binday shopped to funders with a view to obtaining STOLI policies on her life.  (*See* GX 4200).  These efforts bore fruit.  HM agreed to fund a $4 million Hancock policy on Riviere's life (GX 2122), and an upfront investor agreed to take a $4 million Union Central policy on her (GX 2119; GX 2096).[23]  Both policies issued after Binday submitted fraudulent applications.  (GX 2002 (Hancock policy); GX 2094 (Union Central policy)).

In the spring of 2010, it became clear that Riviere's health was declining rapidly, and Riviere's family began pressing Resnick to try to sell her Hancock policy to investors with this news of her ill health.  (GX 2175; GX 2136 (email from Riviere's son-in-law to Resnick offering medical update and stating: "At this stage, every effort should be made to keep the policy in force.  And with her life expectancy going from a rough estimate of 9yrs to an Oncologist's assessment of weeks, there should be increase an interest and sales value of the policy.")).  When Resnick presented these developments to Binday, and suggested that Resnick would like to "think about buying" the policy (GX 2176), Binday approached someone else with a plan to purchase the policy through a limited liability company jointly controlled by Binday. (GX 2134, 2135 (Binday email suggesting that he and investing partner give Riviere's family 10 percent of the death benefit to make the sale palatable)).  At the same time, Binday was trying, through emails to Resnick, to discourage Riviere's family from trying to purchase the policy themselves—an outcome that obviously would have stripped Binday of the opportunity that

_____

[23] Upon Riviere's death, Union Central paid out the $4 million benefit on this policy.  (*See* McDonald Decl., Ex. 9).

Binday, unbeknownst to the family, was trying to reap for himself behind the scenes.  (GX 2137).

Binday's efforts proved unsuccessful, because Resnick put together a package that allowed him, Kergil, Resnick's brother-in-law (trial witness Gregg Trachtenberg), and Riviere's daughter's family to pay HM back the premiums it had laid out, plus interest, and reap the remainder of the death benefit.  (*See* GX 2138 (Binday email to investing partner that "[f]amily is considering keeping the policy for themselves. . . . Probably best for them.  Very disappointing from our perspective."); GX 4204 (email chain with Resnick and Riviere family member laying out plans for purchase); Tr. 1156-59 (Trachtenberg testimony)).  The investments, to pay off the premiums and interest fronted by HM, included $321,113 from Kergil and $350,000 from Trachtenberg.  (GX 2693 at 5, 6 (bank statements reflecting deposits and HM payoff)).  The net returns, when Riviere died in October 2010 and Hancock paid out $4 million in death benefit, were $900,000 to Kergil (GX 2671 at 1), $779,700 to Resnick (*id.* at 2-3), $1,328,300 to Trachtenberg (*id.* at 7), and approximately $600,000 to Riviere's family.

### 3.    *Ellis LimQuee AIG death benefit*

A third instance in which a defendant reaped death benefit proceeds on a policy fraudulently procured as part of the charged scheme involved the $4 million AIG policy on the life of Ellis LimQuee, a Resnick recruit.  This was one of three STOLI policies on LimQuee for which Binday had found investors, and for which he had helped submit false applications to Insurers.  (*See, e.g.*, McDonald Decl. ¶ 23 & Ex. 12 (LimQuee AIG application from R. Binday documents and "sample term sheet" communications between Binday and HM regarding

LimQuee)).[24]   When the investor in the AIG policy could no longer pay premiums, Binday,

through a company called B.D. Estate Planning, stepped in to take over control of the policy and

the corresponding entitlement to any death benefit paid, at a total cost of approximately $11,000.

(McDonald Decl. ¶ 24 & Ex. 13 (excerpts from deposition of Binday in civil litigation) at 90-98).

Shortly thereafter, LimQuee died, and AIG paid out the $4 million in death benefit proceeds to a

trust that Binday controlled.  (*Id.* at 26, 39-40).  Binday had invested a mere $50,000 to $60,000

in premiums into the policy when he received this windfall.  (*Id.* at 93-94).

> To fortify his claim to the LimQuee AIG death benefit proceeds, Binday, through

his company, filed a lawsuit in New York State Supreme Court against Marcy Trachtenberg,

Resnick's sister and the "trustee" of the "trust" Binday had helped create to hold the LimQuee

AIG proceeds.  When LimQuee's widow intervened in the lawsuit, Binday feigned ignorance of

the fraudulent representations that had been made to procure the policy, and prosecuted the suit

by—under oath—accusing the *family* of fraud.  (*Id.* at 55-56, 110-11 ("I believed [the

LimQuees] were a very wealthy couple and I had documents from them that led me to believe it.

Now, I believe that they lied very severely and they probably had very little money. . . . I would

never have had any involvement in this if I had realized that . . . .")).[25]

### J.    Preventing Exposure of the Fraud

> It was critical to defendants' scheme, and to their retention of ill-gotten gains, that

the Insurers not discover their fraud within at least the first two years after issuance of the policy.

(After that, as explained above, the contestability clause would make it much more difficult for

---

[24] In addition to the AIG policy, Binday secured two $4 million policies on LimQuee's life from
Security Mutual and Union Central, respectively.  Union Central paid out the death benefit on its
policy.  (*See* McDonald Decl., Ex. 9).  The claim for the death benefit proceeds against Security
Mutual remains pending.  (*Id.*., Ex. 7).
[25] As far as the Government is aware, the civil litigation related to the LimQuee AIG policy is
still pending.

Insurers to challenge the validity or legality of the policy, or to rescind it on grounds of fraudulent inducement.)  To avoid discovery, defendants did two principal things: they disguised premium sources, and they tried to prevent straw insureds from talking to Insurer representatives.

           *1.*     *Disguised premium payments*

        As discussed above, the pitch to the straw insureds involved in this stealth STOLI scheme was that they would not have to pay a penny in premiums; the investors would put up that money.  But the Insurers had to be made to believe that the money was coming from the insureds or their families.  (*See, e.g.*, GX 2122 at 1 (Binday email to Resnick urging him to get family of straw insured Doris Riviere to agree to write a premium check from a personal account, to be reimbursed later, because "[i]f the initial premium check comes from the client and is documented, this makes it much more difficult for Hancock to challenge")).  In cases where HM had agreed to fund the policy, this illusion was maintained by means of "trusts" that bore the straw insureds' names but were funded entirely with HM's cash.  (Tr. 199).  The "trustees" of these trusts were family members and friends of the defendants—Binday's uncle and one of his family friends, Resnick's sister and his brother-in-law, and so on.  (Tr. 195, 199-200; GX 2803).  They had no contact with the insureds or nominal beneficiaries of the trusts, and were paid a set fee to open a bank account and make sure premium checks were paid to Insurers on time and in the right amounts.  (*See* Tr. 1154-56 (testimony of Resnick's brother-in-law, who acted as trustee on one STOLI policy)).

        In cases where the funder or investor for a policy had not been arranged sufficiently in advance of an application to allow for a "trust" to be created and named as the "owner" in the resulting policy, the premiums would be fronted to the straw insured and made to appear as if they were coming from the straw insured's personal bank account.  (Tr. 145; *see,*

*e.g.*, GX 451 (Binday email to co-conspirator who, for a fee, would wire "bridge loans" of premium money into insureds' accounts, requesting "bridge loan" to straw insured Helen Carufe's personal account); GX 453 (Binday email telling Kergil to instruct Carufe to send a premium check using the wired funds); GX 2665, 2667 (Carufe bank statements showing wiring of funds from co-conspirator's account); GX 2666, 2668 (copies of premium checks paid to Security Mutual from Carufe account); GX 2669 (copies of co-conspirator's bank statements showing fronting of funds to pay premiums on policies for the following straw insureds, among others: Oswald Heaton, Robert Haug, Helen Carufe, Marilyn Nurik, Alan Wachs, Richard Ratner, Ronald Pincous, Sol Krevlin, James Farrell, Harold Besser, George Haas, Tomasa Contreras, Opal Headrick, and Ellis LimQuee)).  This was what happened, for example, with James Farrell's Sun Life policy.  Binday caused premium funds to be wired into Farrell's account and had his staff instruct Farrell to write a check to the insurance company in the same amount.  (Tr. 391-92; GX 512-A, 513-A at 2).  Maria Ramos, one of Resnick's recruits, likewise received a wire of a premium amount into the joint checking account she held with her husband, from which a check to the insurance company was then written.  (Tr. 428-29; GX 1931).  When Paul Krupit asked Binday why this process had to be used for one of his own clients, Opal Headrick, Binday explained that "it was very important that the insurance company had to believe that for us to get the policy in place, in force, that the check had to come from her account."  (Tr. 936; *see* GX 1168).

       2.    *Coaching seniors to lie*

       Getting seniors to funnel premium payments through their personal bank accounts was just one of the ways in which defendants used straw insureds to cover up and perpetuate their fraud.  Defendants also coached these insureds to refuse to speak with insurance companies

or, if conversation could not be avoided, to lie to the Insurers' representatives.

   For example, after Resnick had recruited Silas Griffin as a straw insured, and

successfully secured a policy on his life, he mailed a partial policy to Griffin with a handwritten

note that included the following warning:  "Please do not answer any questions if contacted by

insurance company.  Advise them to contact me."  (GX 950; *see* Tr. 120).  This was consistent

with the general guidance that Binday and Kergil gave field agents.  In a June 2008 email, for

example, Kergil forwarded to Krupit an "Insurance Checklist" with which to coach straw

insureds.  (GX 2841).  The list included the following detailed admonition:

> Besides the initial phone call from the medical examiner
> (Doctor/Nurse) and upon completion of the medical exam the only
> other contact you should have is with your Insurance agent.
> However, sometimes the Insurance Company will call you without
> your authorization and begin asking you personal and financial
> questions.  This usually ends in the application being denied since
> they feel the client might not be able to afford the policy and
> therefore was being taken advantage of by the Insurance agent.
> While the intent of the Insurance Company may have been
> justified, intruding into your affairs without knowing the facts we
> do not agree with.  This can unjustly create problems with the
> Insurance agent who besides making a living is trying to do the
> best he can for you.  If the Insurance Company has questions our
> General Agency [that is, Binday] can assist them.  The proper
> response for anyone, Insurance Company or otherwise who is
> calling you asking personal or financial questions is **'Thank you
> but due to identity theft kindly mail to me your request in
> writing and I will respond.'**  You will be amazed at how little
> mail you receive!  In an era of identity theft this should be the
> response but many times it is not.  Many an elderly person's
> identity and fortune have been stolen over the telephone.

(GX 2841 at 2 (emphasis in original)).  Similarly, in a September 2009 email, after Lincoln sent

a letter inquiring about a change of the trustee's address related to Silas Griffin's Lincoln policy,

Binday instructed Resnick to "make sure that Mr. Griffin does not speak to any investigator or

otherwise discuss his life policy."  (GX 1020 at 1).  Binday gave like instructions regarding other

straw insureds.  (*See, e.g.*, GX 1508 (Binday email to Resnick in June 2010, after learning that Lincoln investigators might be trying to contact straw insured Oswald Heaton, telling Resnick to instruct Heaton not to "answer any phone calls or questions related to this policy")).

Kergil, in consultation with Binday (*see* GX 1304), also relayed to the agents he supervised particularized guidance for coaching individual insureds to lie.  In the fall of 2008, concerned that straw insured Oswald Heaton would have to answer questions from a Lincoln representative, Kergil sent Resnick an email feeding answers to the anticipated questions.  (*Id.*). To questions about "financials," Heaton was instructed to respond based on the bogus "worksheet" Kergil had developed and an "accountant letter" that had been secured.  (*Id.*).  Then "[i]f asked did someone call him to verify finances, health, or personal information, He should say yes (in reference to Inspection report that was completed) because phone calls for inspection reports are always supposed to be made."  (*Id.*).  As Kergil well knew, of course, such calls were never made during the course of the stealth STOLI scheme, because Kergil had directed his inspector, Pellicone, not to make them.

Next, in answer to any questions about the purpose for which the policy had been sought, Kergil instructed Heaton to answer "Estate Planning."  (*Id.*).  When asked who had "suggested taking out the policy," Heaton was to say "Financial Advisor."  (*Id.*).  If asked how he expected to pay premiums on the policy, Heaton was to say "through investment income." (*Id.*).  And then appeared this instruction:  "He could be asked if he has any intent of selling or transferring policy to someone else.  Or has anyone offered free insurance.  Answer-NO.  This could be reason they are calling."  (*Id.*).  Resnick printed out this list of instructions and gave it to Heaton.

The general instruction that insureds not speak to insurance companies was one that Binday gave all agents involved in his stealth STOLI scheme.  For example, in early 2009, upon learning that AIG might be conducting interviews of insureds, Binday explained to all his agents that "There is no obligation to answer any question or to speak to anyone.  Those calling are professionals and will mislead and misrepresent to get information.  Nothing good can come from speaking about policies."  (GX 3019).  He went on: "Should any client or trustee receive a phone call, we recommend that they request that any questions be in writing.  That no answers be provided on the spot.  And that your client discuss questions with your [*sic*] (as their advisor), or their attorney prior to answering."  (*Id.*).

This message got more pointed—and more obstructive—when Binday learned in June 2010 that the FBI had become involved in interviewing straw insureds.  (*See* GX 3022 (email from Resnick to Binday following up on conversation about visit by FBI agents to Resnick on June 21)).  Binday's initial instruction to agents was that they tell their insureds not to speak with any investigators.  (GX 3021; Tr. 971-73).  Evidently having recognized that such an instruction as it related to federal agents might constitute obstruction of justice, however, Binday backpedaled; in an email dated June 22, 2010, he wrote:

> If the investigators in question show up, I've been told that we can get in trouble for telling people not to speak to them.  It is still good advice to tell them not to speak to any investigator without counsel present.  Nor are they under any obligation to discuss their financial situation and planning.  We cannot advise not to speak, yet nothing good can come from any conversation.  That could only lead to policy rescission or worse, and worse just became a possibility.

(GX 3023).  Binday then, in veiled fashion, fed the lies that insureds should tell any agents who came calling:

> We assume that the fishing expedition is for STOLI and/or
> financial misrepresentation.  If your clients are so bold as to make
> any statements, we hope that they would indicate that policies were
> purchased as part of their estate/financial plan.  And that their
> financials were accurately represented, at least for two years ago
> before things went down the tubes.  And that they had no intent to
> sell when they bought the policy, though anyone can say that they
> hear the daily advertisements in FL and are aware of the option.

(*Id.*).  As Binday well knew, these policies were hardly the product of any "estate/financial

plan"; Binday himself had observed in an email to HM three years earlier that this scheme was

"not designed for estate planning, so don't kid us about it."  (GX 2842).  Binday was equally

aware that the financials supporting these policies were fictitious, and that all of the insureds had

had "an intent to sell" from the moment they were contacted by agents.

### K.    Conspiracy to Obstruct Justice by Destroying Records

While Binday was disseminating silence directives and proposed lies for insureds

to tell agents in June 2010, Kergil was giving like guidance to agents he supervised—Krupit and

Resnick.  Specifically, Kergil reinforced Binday's message to "get ahold of the clients [and] tell

them not to talk to anyone, especially without the presence of a counsel, and to get their business

card."  (Tr. 980).  Kergil then went further, instructing Krupit and Resnick to destroy records

related to the stealth STOLI scheme—to "get rid of everything with the name Advocate

Brokerage, Michael Binday's name on it and his name on it and get rid of it."  (Tr. 980-81).

Kergil also instructed Krupit and Resnick to "get rid" of their "hard drive[s]."  (*Id.*; Tr. 986-87;

*see also* GX 3072 (recorded call between Krupit and Kergil in which Kergil does not deny he

instructed Krupit to delete emails)); GX 3073 (transcript of GX 3072); GX 3074 (recorded call

between Krupit and Resnick in which Resnick acknowledges, in discussion of email and hard

drive deletion, that "pretty much everything Kevin told us was wrong"); GX 3074 (transcript of

GX 3074)).  These instructions were coming, ultimately, from Binday.  (Tr. 1071-72; *see also*

GX 3073 at 2 (in response to Krupit's worries about Kergil's instruction to delete emails, Kergil

stating: "No, Michael, you know Michael is talking about things . . . .")).

Krupit began to implement these instructions, "deleting emails and shredding

documents." (Tr. 981). He also took his computer to a technician, but was able to retrieve it

shortly thereafter, upon advice of his counsel. (*Id.*). Resnick took similar action. He flew all the

way from his second home in New York back to Orlando, Florida, so that he could bring his

desktop into a computer store down there and request that the technicians "wipe" his "hard

drive," backing up the data to a portable device. (GX 3074 (recorded call in which Resnick

admits he "got back on a plane" to Orlando to deal with his hard drive); GX 3075 (transcript of

GX 3074); Tr. 981-82; GX 3077 (record from Apple store in Orlando reflecting request by

Resnick for "wiping hard drive" after transfer of data to a portable device); Tr. 1087-89

(testimony of Apple employee)). Resnick, like Krupit, ultimately sought (through counsel) to

retrieve his computer before any data could be wiped. (*See* GX 3077 at 4 (record showing

Resnick's counsel's requests to Apple)).

Approximately 18 months later, Binday, Kergil, and Resnick were all indicted on

the charges that were the subject of the September 2013 trial.

## IV.     THE DEFENSE AND REBUTTAL CASES

The only witness called by any defendant at trial was Jasmine Juteau, an attorney

from the law firm that was then representing Binday. (*See* Tr. 1302). Juteau was called to read

documents from underwriting files for several straw insureds—to try to establish that the

misrepresentations defendants made in their stealth STOLI applications were immaterial to the

Insurers. The exhibits published to the jury by these means were from the following

underwriting files:

- Eva Hartheimer: AIG and Lincoln (Tr. 1303-15)

- Myra Davis: AIG (Tr. 1316-21)

- James Farrell: Lincoln, AIG, and Sun Life (Tr. 1321-23, 1336-40, and 1343-45)

- Silas Griffin: Lincoln (Tr. 1323-25)

- Maria Ramos: Lincoln (Tr. 1325-27)

- Alma Lapp: Lincoln (Tr. 1327-30)

- Tomasa Contreras: Lincoln (Tr. 1330-36)

- Marilyn Nurik: Lincoln (Tr. 1340-43)

Defendants used the excerpts from these files to argue that the Insurers were seeing STOLI "red flags" in the referenced applications, but issuing policies notwithstanding, without conducting any further inquiry.

The only other evidence offered in the defense case were medical records for certain straw insureds and additional Insurer documents, one of which Resnick's counsel published to the jury to show the total revenue that Lincoln received from universal life insurance business from 2005 through 2007. (Tr. 1347-49).

The Government's rebuttal case consisted exclusively of documents from the same underwriting files that the defense had selected for introduction during its case but had determined not to show the jury—documents that, as the Government would argue in its summations, negated the defense's misleading suggestion that the Insurers had not followed up with further inquiry when they detected potential STOLI applications. (*See* Tr. 1352).

**V.      THE VERDICT**

Summations occurred in Thursday, October 3, 2013.  Four days later, on October 7, the jury was charged.  Within a few hours from commencement of deliberations, the jury had returned its verdict of guilty on all counts, against all defendants named in each count.

## DISCUSSION

Defendants' scheme to defraud insurance companies was sustained, corrupt at every level, and driven by greed.  The obstruction of justice in which they engaged to cover their tracks once alerted to the FBI's investigation was of a piece with the way in which they had conducted themselves in the several years preceding discovery of their fraud.  For their conduct, defendants should receive very substantial sentences of incarceration.

Proper application of the Guidelines, which tether the offense level to intended loss, yields terms of imprisonment ranging from roughly 14 to 17.5 years for Resnick to 22 to 27 years for Binday.  Although the Government does not believe, under the particular circumstances of this case, that terms quite this lengthy are necessary to serve the goals of sentencing, it does strongly believe that very substantial sentences are warranted for all three defendants.

**I.      SENTENCING GUIDELINES CALCULATIONS**

The Guidelines, as properly applied to this case, yield terms of imprisonment in the ranges of 262 to 327 months for Binday, 235 to 293 months for Kergil, and 168 to 210 months for Resnick.  The calculations are summarized as follows:

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

- Because defendants intended loss to the Insurers of over $100 million but less than $200 million, 26 levels are added to the offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(N) & cmt. 3 ("[L]oss is the greater of actual loss or intended loss.").

- All three defendants, for involvement in the charged conspiracy to destroy records, have earned a two-point enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1; *see also id.*, cmt. 8.

- Because Binday "was an organizer or leader of a criminal activity that involved five or more participants," a four-point enhancement is appropriate for him pursuant to U.S.S.G. § 3B1.1(a). Binday's total offense level is therefore 39, which, at Criminal History Category I, yields a range of 262 to 327 months' imprisonment.

- Because Kergil "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," a three-point enhancement is appropriate for him pursuant to U.S.S.G. § 3B1.1(b). Kergil's total offense level is therefore 38, which, at Criminal History Category I, yields a range of 235 to 293 months' imprisonment.

- Resnick's conduct does not warrant any role enhancement. His total offense level is therefore 35, which, at Criminal History Category I, yields a range of 168 to 210 months' imprisonment.

## A.    Loss Calculations

The principal driver of the sentencing ranges yielded by the Guidelines in this case is the loss amount associated with the universe of policy applications which defendants submitted to the Insurers as part of their scheme (the "Scheme Applications").

### 1.    *Identification of Scheme Applications*

As discussed above, the total number of straw insureds in whose names Binday's company submitted fraudulent STOLI applications to insurance companies during the timeframe of the scheme charged well exceeded 100—with multiple applications for each insured in the typical case. (Tr. 130). The Government has culled that universe of applications significantly, including for loss calculation purposes only on those applications (1) squarely connected to the scheme charged and proved at trial (as opposed to any other, related schemes), (2) submitted to the companies upon which the Government agreed in advance of trial to focus its proof (the Insurers), and (3) for which Insurers have still-extant records of applications having been

54

submitted.  The Government's calculations do not include applications that defendants withdrew before decision, unless the reason for the withdrawal was that the Insurer identified misrepresentations in the applications (as in the case of Florra Adler's application to Prudential, for example).  Applying these parameters, the universe of Scheme Applications totals 92. (McDonald Decl. ¶ 14 & Ex. 11).  Of those, 74 resulted in issued policies.  (*Id.*).

     2. *Calculation of intended loss*

    Intended loss associated with each of the Scheme Applications has two components: (1) the projected death benefit; and (2) the hoped-for commission.

      i. <u>Intended death benefit losses</u>

    The intended death benefit loss associated with a given Scheme Application is the difference between the death benefit sought and the expected total premium outlay on the applied-for policy.  *See United States* v. *Jenkins*, 578 F.3d 745, 749-51 (8th Cir. 2009) (affirming approach to intended loss calculation in life insurance fraud case that subtracted projected total premiums from expected death benefit); *see also United States* v. *Lorefice*, 192 F.3d 647, 654-55 (7th Cir. 1999) (holding that intended loss in life insurance fraud scheme was total face value applied for).[26]  In this case, calculating intended death benefit loss is relatively straightforward, because Binday did the calculations himself for many of the Scheme Applications.

---

[26] There is some authority for the proposition that premiums should not be subtracted from face value in calculating total loss.  *See, e.g.*, *United States* v. *Barbera*, No. 02 Cr. 1268 (RWS), 2005 WL 2709112, at *5 (S.D.N.Y. Oct. 21, 2005) ("Where, as here, the payment of certain funds is necessary in order for the scheme to continue, the amount paid to sustain the scheme may not be used to offset the gross loss amount"); *PHL Variable Ins. Co.* v. *P. Bowie 2008 Irrevocable Trust ex rel. Baldi*, 889 F. Supp. 2d 275, 283 (D.R.I. 2012), *aff'd*, 718 F.3d 1 (1st Cir. 2013).  In this case, the Government is adopting the more conservative approach to calculating loss reflected in the *Jenkins* case.

For 41 of the 92 Scheme Applications, Binday created or caused to be created charts for prospective investors projecting the total premiums that would have to be paid on a policy issuing as a result of the subject application.  (Copies of those charts are attached as Exhibit 10 to the McDonald Declaration.  These are the same kinds of charts that were entered into evidence at trial as parts of GX 1407 and GX 1408, for straw insured Oswald Heaton.)  These projections take the insured's life expectancy and pair it with information from the Insurer, based on the insured's medical records, about the premiums that would have to be paid to keep the contemplated policy in force pending death, to yield a total premium outlay.  Subtracting that total from the face value of the policy (the death benefit) yields the net death benefit loss on the subject Scheme Application.

Although projection charts are not available for every Scheme Application, the Government used the 41 charts that do exist to estimate the average losses expected to be inflicted upon Insurers in cases for which no charts could be located.  (*See* McDonald Decl. ¶ 20 & Ex. 11 at tab 11).  Then, because the projection charts do not account for interest the Insurers could earn on premiums paid into the policies until death, the Government applied an across-the-board 20% discount or offset on losses—intended to correspond roughly to an annually compounded rate of 4% (which assumes a very high actual rate of return on the premium funds, because the *owner* of the policy actually benefits from and can apply toward the premium payments some portion of the cash accumulated on premiums already paid).[27]

---

[27] This, again, represents a conservative approach to calculating intended loss.  There is authority for the proposition that interest payments reaped by victims are not to be offset.  *See United States* v. *Carrozzella*, 105 F.3d 796, 805 (2d Cir.1997) (refusing to offset periodic interest payments to victims, since "the return of money as interest or other income is often necessary for the scheme to continue"), *rejected on other grounds by United States* v. *Kennedy*, 233 F.3d 157, 160 (2d Cir. 2000).

The total intended death benefit loss on Scheme Applications, according to these calculations, is $130,252,357.  (McDonald Decl. ¶ 22 & Ex. 11 at tab 1).

ii.   Intended commission loss

Wholly apart from the losses defendants intended the Insurers to suffer in death benefit payouts were the commissions they intended the Insurers to pay *them* in every case—six-figure sums usually amounting to 90 or even 100 percent of the first year's premium.  Taking an extremely conservative approach, and in light of (a) the variety of factors that dictate what commission is paid in a given case and (b) the relatively small impact (as compared to death benefit loss) the commission loss calculation has on the overall intended loss figure, the Government simply used commissions actually paid as a proxy for commissions intended to be paid.  This yields a figure of $11,695,523.  (McDonald Decl. ¶ 22 & Ex. 11 at tab 1).

\* \* \*

Adding intended death benefit losses and intended commission losses, the total intended loss amount is $141,947,880.  (McDonald Decl. ¶ 22).

3.   *Calculation of actual losses*

Applying roughly the same analytical approach as with intended loss, actual losses incurred by the Insurers on policies issued pursuant to defendants' scheme are calculated principally by looking to the 74 Scheme Applications that resulted in issued policies (the "Scheme Policies"), tallying the commissions paid by the Insurers on those policies, and, in cases where the outcome of the transaction is known—that is, cases where a policy has already terminated with or without payment of a death benefit—adding any death benefits paid out and subtracting all premiums paid in.  Put differently, the total actual losses are commissions and death benefits paid out on all Scheme Policies, offset by any premiums Insurers received either

57

before death or before termination by lapse or otherwise on a policy the outcome of which is

known.  For those policies that are still in force, and that may either lapse (in which case the

Insurer will retain the premiums paid to date and not have to pay the death benefit) or result in

payment of a death benefit, premiums are not offset, nor has the Government made any attempt

to quantify expected losses.[28]

Applying these calculations, the total actual loss realized by the Insurers on

Scheme Policies, before accounting for attorneys' fees and costs, is $36,098,992.  (*See*

McDonald Decl. ¶ 22 & Ex. 11 at tab 1).

### 4.     The relevant loss figure for Guidelines purposes

A district court is not required to calculate loss under the Guidelines with

"absolute precision," but need only "make 'a reasonable estimate of the loss' given the available

information."  *United States* v. *Coppola*, 671 F.3d 220, 250 (2d Cir. 2012) (quoting U.S.S.G.

§ 2B1.1 cmt. n. 3(C)).  The "loss" to be considered is the greater of intended and actual loss.  *See*

U.S.S.G. § 2B1.1 cmt. 3(A).

In this case, the greater number is intended loss, and that should govern.  For an

intended loss between $100 million and $200 million, as here, 26 points are added to the base

offense level.  *See* U.S.S.G. § 2B1.1(b)(1)(N).

### B.     Obstruction of Justice Enhancements

All three defendants have earned the two-point enhancement for obstruction of

justice pursuant to Section 3C1.1 of the Guidelines.  Kergil and Resnick were both convicted of

conspiracy to obstruct justice, and the Guidelines commentary specifies that grouping of that

---

[28] Some of the Insurers have submitted to the Government that they are entitled to estimated losses on in-force policies as a part of restitution.  The Government is unaware of precedent for awarding projected losses in these circumstances or any closely analogous circumstances.

count of conviction with the fraud counts generates application of the two-point enhancement.
*See* U.S.S.G. § 3C1.1, cmt. 8.[29]  As for Binday, the evidence at trial proved at least by a
preponderance of the evidence that he was involved in the same obstruction conspiracy of which
Kergil and Resnick were convicted.  Krupit testified that Kergil told him the instructions to
destroy evidence in anticipation of the FBI's investigation and potential criminal prosecution
were coming from Binday.  (Tr. 1071-72; *see also* GX 3073 (Kergil referencing what "Michael
is talking about" in connection with deletion of emails)).  That instruction was consistent with
the instructions Binday had given his agents at other points during the fraud—telling them to
coach insureds to lie to Insurers, for example.  (*See* GX 3023 (Binday email, after FBI agents had
visited Resnick's home, feeding insurance agents lies they should have insureds tell)).  And
Binday's directive to destroy evidence falls squarely within the heartland of conduct meriting
application of the two-point enhancement.  *See* U.S.S.G. § 3C1.1, cmt. 4(D) (giving as example
of "covered conduct" "directing or procuring another person to destroy or conceal evidence that
is material to an official investigation or judicial proceedings").

### C.    Role Adjustments

Binday's criminal conduct has also earned him the four-point leadership role
enhancement for being "an organizer or leader of a criminal activity that involved five or more
participants."  U.S.S.G. § 3B1.1(a).  Plainly, the stealth STOLI scheme of which Binday was the
architect involved at least five participants; the three defendants and the two co-conspirator
agents who testified at trial (Krupit and Lynch) alone meet that threshold.  And there can be no

---

[29] This commentary note provides: "If the defendant is convicted both of an obstruction offense .
. . and an underlying offense (the offense with respect to which the obstructive conduct
occurred), the count for the obstruction offense will be grouped with the count for the underlying
offenses [and] [t]he offense level for that group of closely related counts will be the offense level
for the underlying offense increased by the 2-level adjustment specific by this section[.]"

question that Binday was "an organizer or leader" of the scheme.  As discussed at length above, Binday conceived of the scheme.  He then recruited field agents to procure straw insureds and generate the massive commissions that accompanied issuance of the Scheme Policies.  He decided what applications agents should fill out, and directed and trained agents on how to approach prospective straw insureds and complete the applications.  He made sure agents were coordinating with Kergil to secure the appropriate bogus financial documents and information.  He gave guidance to his agents (to be disseminated to straw insureds) on how to deceive Insurers who came asking questions about STOLI applications or policies.  He instructed agents to destroy evidence relating to the FBI's investigation.  And Binday took for himself a cut of every commission generated by every Scheme Policy's issuance.

Kergil, too, held a supervisory role in the scheme—though below the level of Binday.  He "was a manager or supervisor" of the criminal activity involving five or more participants, pursuant to U.S.S.G. § 3B1.1(b), and thus merits the three-point enhancement corresponding to that role.  Kergil managed a subset of the field agents, making sure they had the right forms for insureds to complete, and that they properly coached insureds to divulge nothing or else lie about the fraud to Insurers.  He also worked with agents to ensure that they had the necessary (false) financials incorporated into their applications, and the bogus supporting documents to make those financials appear real.  Kergil was the one who conveyed to Resnick and Krupit Binday's instruction to destroy records.  And Kergil, like Binday, regularly took a cut of field agents' commissions.

## II.     APPROPRIATE TERMS OF IMPRISONMENT

Applying the factors set forth in Title 18, United States Code, Section 3553(a), very substantial—albeit below-Guidelines—terms of incarceration are necessary here to serve

the ends of justice and the goals of sentencing.

### A.    Consideration of Section 3553(a) Factors

All three defendants' conduct was egregious.  All three—unlike many of the defendants who appear before this Court—are well-educated individuals who enjoyed significant educational and other advantages, yet committed serious crimes in spite of those advantages. And in the cases of all three, the goals of general and specific deterrence, just punishment, and promotion of respect for the law call for imposition of heavy sentences.  *See* 18 U.S.C. § 3553(a)(2); *see also, e.g.*, *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (noting that legislative history of Section 3553(a) supports conclusion that "Congress viewed deterrence as 'particularly important in the area of white collar crime,'" and that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence"); *United States* v. *Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

Key considerations that must inform the Court's sentencing decisions here are, of course, the "nature and circumstances" of the offense conduct in which each defendant engaged and the "nature and characteristics" of each individual defendant, 18 U.S.C. § 3553(a)(1).  These factors likewise weigh heavily in favor of very substantial terms of incarceration for all three defendants.

### 1.    Binday

Binday, who initiated the scheme and personally recruited field agents and straw insureds alike to feed his greed for ill-gotten commissions, is the most culpable of the three.  He is the one who decided what lies to tell Insurers, in what ways, and what documentation had to

be secured to prop up the initial lies.  He trained his staff to lie on insurance applications and to perpetuate those lies in correspondence with Insurer representatives.  He trained field agents to lie about the purposes for which these policies were being sought and their straw insureds' finances, and urged agents to coach straw insureds to tell the same lies.  When Insurers began to suspect his scheme, Binday did not just deny wrongdoing—he bullied Insurer representatives, made up elaborate stories to support his initial lies, and pressed forward in pursuit of his hefty commission.  When a straw insured refused to comply with directives by signing papers needed to formally transfer title to a STOLI policy procured through defendants' fraud, Binday caused others to threaten him with crippling debt.  When state authorities began investigating Binday's practices, and whether he was engaged in procurement of STOLI policies, Binday lied through his teeth, under oath.  And then when he learned of the FBI's investigation in this case, Binday urged his agents to get their straw insureds to lie both about the purposes for which their policies had been sought ("estate planning") and their finances as of the time of application.  He also directed his agents to destroy evidence.

           In short, Binday orchestrated, fueled, and personally engaged in an elaborate fraud the commission of which spanned several years.  He approached every stage of the fraud with calculation and contempt for the Insurers whom he purported to serve but in fact defrauded.  He made millions in commissions and death benefits generated by the fraud.  The history and circumstances of the offense, as well as the history and characteristics of the defendant illuminated by the evidence at trial (including in many, many emails and other documents entered as Government exhibits), warrant a very substantial prison sentence.  Moreover, the lack of remorse that Binday displayed both during the fraud and in its wake underscore the need in his

case for a very substantial sentence to adequately deter further conduct by him and by others who contemplate white-collar crimes of this kind.

        2.    *Kergil*

        Kergil's culpability comes close to that of Binday.  Kergil, who was involved in the fraudulent scheme from the outset, wore several different hats in service of that scheme.  He acted as a field agent, recruiting straw insureds like Mary Pernice and Helen Carufe, and also helped Binday recruit other field agents—former colleagues of his in the long-term care business—to assist in finding straws.  Binday often copied Kergil on his correspondence with field agents Ed Lynch, Resnick, and Krupit, and used Kergil as an intermediate supervisor to instruct field agents on how to deal with straw insureds and make sure that they did not reveal the fraud to Insurer representatives who might come calling.  When Binday needed to stop Ed Lynch from revealing the truth to Prudential investigators who might come asking questions about Florra Adler's STOLI application, he knew he could rely on Kergil to convey the message—and Kergil rose to the task.  Kergil was also the one who disseminated Binday's message to destroy evidence in the face of the FBI's investigation.

        Apart from his general supervision of field agents, Kergil had direct involvement in virtually every Scheme Application submitted to Insurers.  He was "the man behind the numbers" (Tr. 1484)—the conspirator responsible not only for creating the false financial "worksheets" used by Binday's staff and field agents to fill out applications, but also for making sure that the supposedly independent third-party inspection reports submitted to the Insurers aligned with those false worksheets.  Kergil located the corrupt inspector and fed him the numbers for his reports.  Kergil also had direct contact with accountants who certified the false financials.  When it became clear that one of those accountants, Steven Kupper, might be

contacted by an Insurer, Kergil was the one who, at Binday's request, reached out to try to get him to lie to the Insurer.

For his part in the conspiracy, Kergil got a cut of the commissions generated as a result of the scheme—both those resulting from his own straw recruitment efforts and those resulting from the efforts of other agents.  And he made millions more in ill-gotten gains by "investing" in the fraud-procured policies on the lives of his own "client," Hanni Lennard, and Resnick's "client," Doris Riviere.

As with Binday, the history and circumstances of the offense and the history and characteristics of the defendant overwhelming favor a very substantial prison sentence for Kergil.

3.   *Resnick*

Resnick, in his submissions to the Probation Office, has sought to minimize and excuse his role in the fraudulent scheme—going so far as to claim entitlement to a "minor role" adjustment under the Guidelines.  In truth, Resnick's participation in the fraud was extensive, calculatedly self-interested, and very far from "minor."  In his case, too, a very substantial prison sentence is warranted.

Resnick was a field agent, like Krupit.  Two of the straw insureds he recruited (Silas Griffin and Maria Ramos) testified at trial, and their testimony, combined with the documentary evidence introduced, revealed that Resnick's tactics in recruiting and using straw insureds were cynical and deceptive.  Both Griffin and Ramos approached Resnick with a desire to secure modest, affordable life insurance policies commensurate with their actual (modest) means.  Resnick dissuaded them, offering instead "free" multi-million-dollar insurance with the promise of a quick cash payout.  To prevent the straw insureds learning what was actually

involved in securing this "insurance," Resnick forged their signatures on the applications and resisted providing the insureds with copies of paperwork.  Working with Kergil, he urged the straw insureds to lie to Insurers who came calling—about the purposes for which they had sought the insurance, who was funding the premiums, and the insureds' financials.  Resnick, like Kergil and Krupit, procured false accountant certifications to back up the fraudulent applications he was submitting.  And Resnick, like Krupit, tried to wipe his hard drive when he learned of the FBI's investigation.

Resnick netted over two hundred thousand dollars in commissions on the stealth STOLI policies he helped procure.  And he made nearly $800,000 more by "investing" in Doris Riviere's policy on the eve of her death, with full knowledge that this profit was derived from a fraudulently-procured policy.

Although not quite as culpable in the scheme as Binday and Kergil, Resnick's conduct warrants a heavy prison sentence.   The excuses and explanations he has offered to the Probation Office only underscore the need for such a sentence, because they evince a total lack of remorse or recognition of the criminality of his conduct.

### B.  Variance from the Guidelines—Intended Loss Considerations

For the above reasons, imposition of a very substantial prison sentence is necessary in the case of each of the three defendants to serve the goals set forth in 18 U.S.C. § 3553(a).  The Government does not believe, however, that terms of imprisonment as lengthy as those called for by the Guidelines are necessary to serve those goals here.  That is because, in the circumstances of this particular case, the intended loss calculation, which is the principal driver of the offense level, overstates the seriousness of defendants' conduct.

To be clear, the fact that the intended loss has not fully *materialized* neither brings this case outside the Guidelines' heartland nor independently warrants a variance from the Guidelines, for at least three reasons.  First, a number of the Scheme Policies are still in force, and may still result in payments of death benefits in excess of the premiums paid in.  Thus, loss that was intended but not yet materialized may still materialize.[30]  Second, even with respect to those losses not expected to materialize (a circumstance the Guidelines specifically contemplate), the Guidelines are clear that intended loss includes loss "that would have been impossible or unlikely to occur."  U.S.S.G. § 2B1.1, cmt. 3(A)(ii).  Third, and relatedly, disparities between intended loss and actual loss have been, and no doubt will continue to be, at least in part attributable to circumstances that defendants and the investors on whose behalf they operated would not have predicted.  *See United States* v. *Jimenez*, 513 F.3d 62, 87–88 (3d Cir. 2008) ("It is not appropriate to reduce the amount of the loss, as computed under the Guidelines, in order to reflect other causes of the loss which were beyond the defendant's control." (internal quotation marks omitted)).  For example, defendants could not have predicted the 2008 financial crisis, which impaired credit flow generally, and certainly had an impact both on the market for STOLI policies and on the ability of investors to keep current with premium payments.  These factors no doubt led to lapses—and accompanying forfeiture of entitlement to death benefits—in many more cases than defendants and investors had predicted.  Moreover, defendants' mortality

---

[30] Defendants have asserted in the past that if Insurers really wanted these policies off their books, they could just seek to rescind them.  This assertion is disingenuous.  Rescission entails institution of legal proceedings (itself a costly undertaking) against current policy owners who in many cases would be expected to assert ignorance of the fraud that caused the policies to be issued in the first place.  Moreover, depending on the jurisdiction, there are legal impediments to undoing a life insurance contract once the two-year contestability period has passed—as it has with respect to all of the in-force Scheme Policies.  (Indeed, as explained above, defendants crafted their scheme to take into account this fact and ensure the contestability period would not interfere with their plans to resell.)

predictions, based on the life expectancy reports they procured on straw insureds, may well have been too aggressive; one of the principal life expectancy report companies upon which Binday relied adjusted its mortality tables in 2008 to predict longer lives generally.  (*See* GX 2972 at 3-4 (noting this development as a reason why STOLI transactions might have become less attractive to investors in around 2008)).  In other words, straw insureds may end up living longer than predicted, resulting in less-than-predicted (or no) profit to investors.

Nor is there any merit to defendants' argument, made in their submissions to the Probation Office, that intended loss should be calculated differently in the life insurance fraud context than in other contexts.  The argument appears to be that because life insurers (just like other kinds of insurers) price their policies to assume that claims in excess of premiums will have to be paid out in some cases—that is, that even on legitimately-issued policies, they will suffer net "losses"—defendants should not be held responsible for all (or even, they appear to be arguing, *any*) of the losses incurred on the policies defendants procured through fraud.  This argument runs contrary to all case law of which the Government is aware.  *See, e.g.*, *United States* v. *Jenkins*, 578 F.3d at 749-51; *United States* v. *Lorefice*, 192 F.3d at 654-55; *United States* v *Lamonda*, No. 05 Cr. 131, 2008 WL 68744, at *10 (M.D. Fla. Jan. 2, 2008) (holding that intended loss in life insurance fraud case was total face value of fraudulently-obtained life insurance policies).  As these cases make plain, if a defendant fraudulently procures a contract—whether for life insurance or anything else—he is held responsible for the potential losses that he reasonably expects may flow to his counterparty on that contract.  It is no defense that some losses are expected in the ordinary course.  The *defendant*, not the victim, bears the risk of loss on a contract fraudulently procured.

All of that said, the intended loss calculation here is predicated on charts that Binday and his staff developed to try to make the STOLI transactions at issue appear as lucrative to investors—and as consequently detrimental to Insurers—as possible.  The Government's calculations of intended loss already correct for that reality to some degree, by applying a 20% offset against the projected profits for interest earned on the premiums paid into the subject policies.  They do not, however, fully correct for the "marketing" aspect of the charts, which reflect the most aggressive possible analysis of potential profit (and attendant loss to Insurers). The Government believes the Court can and should take that feature into account—not in calculating intended loss in the first instance, but in assessing whether the intended loss calculation should (as the Guidelines contemplate) properly be treated as the principal driver of offense level.  Accounting for this, the Government believes that although very substantial terms of incarceration are called for in the case of each defendant, sentences within the Guidelines would be "greater than necessary" to serve the goals of sentencing.  18 U.S.C. § 3553(a).

### C.    Defendants' Other Sentencing Arguments

In objections to the draft PSRs, defendants have made other sentencing arguments, principally regarding the loss calculations in this case.  Chief among these is that defendants neither intended nor caused any loss at all to the Insurers.  Relatedly, Resnick has argued that no loss is attributable to him because he believed the Insurers wanted the STOLI policies that he and others admittedly secured through deceit.  These arguments lack merit.[31]

---

[31] To the extent defendants in their submissions to the Court raise other objections to the PSRs or other sentencing arguments, the Government intends to file a responsive submission no later than one week before sentencing, in accordance with the Court's individual rules of practice.

1.      *The above intended and actual loss calculations are correct*

The principal argument that defendants have made to the Probation Office is that this is a "no loss" case because the misrepresentations at issue did not matter—either at the time of the false representations or ultimately—to the Insurers.  (*See* Letter from Andrew Frisch, Esq., to U.S. Probation Officer Jemmard Thomas, dated June 23, 2014, at 2-3 (arguing that "the actual and intended loss in this case is zero" because this is not a case where "the person's life or health are the subjects of the fraud," and because the Insurers allegedly "priced" for STOLI); Letter from Roger L. Stavis, Esq., to U.S. Probation Officer Robert Flemen, dated May 29, 2014, at 1-2 (arguing that evidence at trial showing Insurers had not yet seen a significant impact on their overall bottom line from the few STOLI policies they believed had slipped through shows that "there has been no financial loss to the insurance companies, nor was any loss intended"); Letter from JaneAnne Murray, Esq., to U.S. Probation Officer Jemmard Thomas, dated June 20, 2014 ("Resnick PSR Ltr.") at 1-2 (arguing that "[t]he insurance companies suffered no losses here" because, *inter alia*, their universal life business generally was profitable and Insurers purportedly "specifically priced" for STOLI)).  The Court should reject these arguments, which retread old ground.

Most of the points defendants present as reasons to find no loss are the same arguments they presented—unsuccessfully—to the jury about materiality and risk of economic loss.  All three defendants argued at trial that the misrepresentations at issue (about finances and the STOLI character of the policies, among other things) did not matter to the Insurers in any economic sense, because, *inter alia*, the only thing Insurers purportedly cared about was the health of the insureds.  As part of their materiality/no economic loss thesis, the defense (Resnick most forcefully) tried to argue that a "repricing" of certain classes of policies that one Insurer—

Lincoln—undertook in 2007 to account for the possibility that STOLI might be slipping through the cracks was proof that STOLI had no economic impact on any Insurer.  (*See* Tr.1500 (Resnick summation); *see also* Tr. 1521-22 (Government rebuttal pointing out the defects of this argument)).

The Government presented conclusive evidence negating these points.  As to whether the misrepresentations at issue mattered to the Insurers because they exposed them to economic loss, the evidence—which is described in detail in the Statement of Facts above—was substantial and essentially unrebutted.  The Government established that the Insurers asked questions about STOLI and finances because they wanted to prevent economic exploitation of their actuarial assumptions and underwriting flexibility by those who would seek to profit at the Insurers' expense.  The evidence of this reached the most granular level.  Presented with specific examples of STOLI policies that these defendants had procured through fraud from Lincoln, an executive from Lincoln testified that *those* policies, because they were STOLI, would be expected to "be less profitable than the standard."  (Tr. 678).  Relatedly, addressing the defense's suggestion that Lincoln's "repricing" of certain policy types in 2007 to counter STOLI erased any prospect of economic loss, the Government demonstrated why the repricing was a red herring.  Even for those policy types that actually were repriced (and only a few Lincoln types were), defendants made sure they applied *before* the repricing kicked in.  (Tr. 669-678 (testimony of Lincoln executive about pricing "refresh" and how the policies defendants here procured were issued based on *pre-refresh* pricing); GX 210, 606, 782, 977, and 1940 (Lincoln policies, all with application dates of May 30, 2007); Tr. 1521-22)).  Accordingly, the repricing had no impact on the policies at issue in this case.

The jury rejected defendants' arguments about materiality and risk of economic loss. The jurors concluded that defendants' reams of misrepresentations *did* matter to the Insurers and posed a risk of economic loss to them.

Those elements having been established, the questions at sentencing are (1) what losses did the defendants reasonably expect the Insurers would suffer as a result of entering into the applied-for fraudulently-induced life insurance contracts? and (2) what losses did the Insurers actually suffer as a result of having entered into fraudulently-induced life insurance contracts? *See United States* v. *Turk*, 626 F.3d 743, 749-50 (2d Cir. 2010) (making plain, in the context of mortgage fraud, that "loss" under the Guidelines is all reasonably foreseeable loss suffered—or intended to be suffered—as a result of having entered into the fraudulently-induced contract). These questions are answered above. To summarize, the losses defendants intended the Insurers to suffer as a result of the fraud were commissions paid plus net death benefits. The actual losses are those the Insurers suffered on the Scheme Policies they were fraudulently induced to issue.[32]

## 2. *Resnick is responsible for the full loss amount*

Finally, and relatedly, Resnick, like Binday and Kergil, should be held responsible for the full reasonably foreseeable loss flowing from defendants' scheme. Resnick's argument to the Probation Office that he did not reasonably foresee *any* loss to the Insurers, because he purportedly believed the Insurers "*wanted*" STOLI policies (Resnick PSR Ltr. at 2),

---

[32] To the extent defendants seek to meet the Government's evidence of intended and actual loss by pointing to success the Insurers have had in the universal life business generally, and the concomitantly low impact STOLI policies have had to date on the Insurers' bottom line, their arguments must be rejected as distraction. When an offender defrauds a bank into issuing a mortgage loan, it is no defense, and irrelevant to loss, that the bank profited from the mortgage business generally in the year of the defendant's fraud. That must particularly be so where, as here, the victim has invested substantial costs and resources in preventing and minimizing the impact of the very kind of fraud at issue. (*See* Tr. 741-42 (Lincoln executive's testimony concerning implementation of anti-STOLI measures)).

is baseless.[33]   The mountain of evidence at trial established that Resnick told repeated lies that

he knew were calculated to circumvent Insurers' policies against accepting STOLI business,

instructed the seniors he recruited for the scheme not to talk to Insurers and (in some cases) to *lie*

to an Insurer representatives who called, and then conspired to destroy records when it became

clear his fraud might be discovered.

## III.      RESTITUTION AND FORFEITURE

Pursuant to the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A,

defendants owe restitution to eight Insurers in the total amount of $37,253,667.41.  (*See*

McDonald Decl. ¶¶ 25-27 (listing attorneys' fees and costs and interest claimed by three

Insurers); *id.*, Ex. 11 (showing, for each Insurer, "Total Actual Loss (Offsetting Premiums on

Closed Policies)").  The bulk of the restitution is owed for actual losses on the Scheme

Policies—commissions paid upon issuance of the Scheme Policies, plus any losses (offsetting

premiums paid) on those of the Scheme Policies that have terminated through lapse, payment of

death benefit, or otherwise.  (*See* McDonald Decl. ¶¶ 21-22 & Ex. 11 at tab 1; *see also id.*, Exs.

1-9 (spreadsheets from Insurers).)  The remainder of the restitution amount—$1,154,674.63—is

owed for attorneys' fees, costs, and allowable interest claimed by certain of the Insurers.  *See* 18

U.S.C. § 3663A(b)(4) (providing for mandatory restitution to reimburse victims for "expenses

incurred during participation in the investigation or prosecution of the offense or attendance at

proceedings related to the offense"); *see also, e.g.*, *United States* v. *Bahel*, 662 F.3d 610, 647 (2d

---

[33] The support Resnick offered for this argument to the Probation Office was the testimony of
Krupit, who, as discussed above, Resnick introduced to the fraudulent scheme.  Krupit testified
that he confronted Resnick with the lies that he and Resnick and others were telling about
insureds' finances, and that Resnick responded by saying:  "Paul, there is nothing we can do
about it.  If the insurance companies want to approve these policies, that is okay."  (Tr. 923).
Even if this could be interpreted as Resnick assuring Krupit the Insurers "wanted" STOLI, it was
obviously a false assurance, belied by the extreme lengths to which Resnick went to hide his and
others' lies from the Insurers.

Cir. 2011) ("Attorneys' fees are 'other expenses' that are properly included within a restitution award."); *United States* v. *Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011) (holding that prejudgment interest is an appropriate component of restitution).  (*See* McDonald Decl. ¶¶ 25-27 & Exs. 14-16).

         As for forfeiture, defendants should be held jointly and severally liable for the gross commission payments fraudulently procured and paid to all co-conspirators in connection with issuance of the Scheme Policies—$10,159,916.  These funds are "property . . . which constitutes or is derived from proceeds traceable to" the crimes charged.  18 U.S.C. § 981(a)(1)(C); *see* 28 U.S.C. § 2461(c).  Because all three defendants were convicted of conspiracy, they are each liable for the reasonably foreseeable proceeds paid to all co-conspirators.  *See, e.g.*, *United States* v. *Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012).  Forfeiture of gross proceeds (without offsetting the commission portions Binday paid to funders and investors, for example) is appropriate here, because this is a case involving "illegal services" and "unlawful activities"—namely, fraudulent procurement of STOLI policies.  18 U.S.C. § 981(a)(2)(A) (explaining that in such cases, "the term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense"); *see, e.g.*, *United States* v. *Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (illegal sale of food stamps was an "unlawful activity" subject to gross proceeds analysis).

         In addition to the joint and several liability that defendants necessarily share for the reasonably foreseeable proceeds of their joint enterprise, defendants' forfeiture judgments should also include the following:

- For Resnick and Kergil, joint and several liability for their aggregate gross proceeds on the fraudulently-procured Doris Riviere Hancock life insurance

policy—$1,321,613 for Kergil and $779,700 for Resnick, for a total of $2,101,313.

- For Kergil and Binday, joint and several liability for their aggregate gross proceeds on the fraudulently-procured Hanni Lennard Union Central life insurance policy—$1,307,869.64.

- For Binday, individual liability for the $4 million death benefit paid to a trust under his control on the Ellis LimQuee AIG life insurance policy.

Proposed orders of restitution and forfeiture consistent with the foregoing, as well as a submission related to forfeiture of proceeds from the sale of property owned by Binday, will be submitted to the Court no later than one week prior to sentencing.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court sentence each defendant to a very substantial term of imprisonment, and direct restitution and forfeiture in accordance with the foregoing.

DATED:          July 8, 2014
                New York, New York


                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney


                                By: ___/s/_____
                                        Sarah E. McCallum
                                        Eun Young Choi
                                        Assistant U.S. Attorneys
                                        Southern District of New York
                                        Tel. (212) 637-1033/2187

75