UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA,      :

    - v. -                   :

MICHAEL BINDAY,         :
JAMES KEVIN KERGIL, and                12 Cr. 152 (CM)
MARK RESNICK,        :

                Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


# GOVERNMENT'S REPLY IN SUPPORT OF ITS SENTENCING ARGUMENTS AND SUPPLEMENTAL SUBMISSION REGARDING FORFEITURE

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York  10007

Sarah E. McCallum
Eun Young Choi
Paul M. Monteleoni
Assistant United States Attorneys
  -- Of Counsel --

## TABLE OF CONTENTS

TABLE OF CASES ........................................................................................................ ii

I.    THE GOVERNMENT'S APPROACH TO CALCULATING LOSS IS CORRECT ....... 1

      A.    The Relevant Inquiry at Trial.................................................................. 2

      B.    The Relevant Inquiry at Sentencing........................................................ 3

      C.    The Government's Quantification of Loss at Sentencing is Consistent with its
            Position at Trial and with Governing Law................................................ 4

II.   The Government's Intended Loss Calculations Are Correct ............................... 7

III.  The Government's Actual Loss Calculations Are Correct ............................... 12

IV.   IF THE COURT WERE TO CONCLUDE THAT NEITHER INTENDED NOR
      ACTUAL LOSS CAN REASONABLY BE DETERMINED, GAINS ARE AN
      APPROPRIATE PROXY FOR LOSS HERE ................................................. 15

V.    THE APPLICABLE GUIDELINE IS NOT OF "DUBIOUS GENESIS" ................... 17

VI.   THE OBSTRUCTION ENHANCEMENT PROPERLY APPLIES TO BINDAY ......... 19

VII.  RESNICK IS NOT ENTITLED TO A MINOR ROLE ADJUSTMENT ...................... 19

VIII. KERGIL'S CONDUCT WARRANTS AN AGGRAVATED ROLE
      ADJUSTMENT ..................................................................................... 20

IX.   THE COURT SHOULD IMPOSE VERY SUBSTANTIAL SENTENCES ON
      ALL THREE DEFENDANTS.................................................................... 20

X.    RESTITUTION AND FORFEITURE GENERALLY.................................................. 21

XI.   THE GOVERNMENT IS ENTITLED TO FORFEIT $2,970,396.11 FROM THE
      PROCEEDS OF THE SALE OF BINDAY'S CO-OP SHARES................................... 23

      A.    Basis for Forfeiture ................................................................................. 23

      B.    Tracing of Crime Proceed to the Co-Op Shares ................................... 25

      C.    Substitute Assets ................................................................................... 31

CONCLUSION............................................................................................................. 33

# TABLE OF CASES

**Federal Cases**

*Caplin & Drysdale, Chartered* v. *United States*, 491 U.S. 617 (1989) ....................................... 31

*Kimbrough* v. *United States*, 552 U.S. 85 (2007) ........................................................................ 17

*United States* v. *Bazemore*, No. 12 Cr. 319 (RCO),
    Docket Entry No. 130 (Judgment) (N.D. Tex. 2014)..................................................................... 9

*United States* v. *Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir. 1986).................................. 26

*United States* v. *Confredo*, 528 F.3d 143 (2d Cir. 2008) ....................................................... passim

*United States* v. *Daugerdas*, No. S3 09 Cr. 581 (WHP),
    2012 WL 5835203 (S.D.N.Y. Nov. 7, 2012) ..................................................................... 23

*United States* v. *Ebbers*, 458 F.3d 110 (2d Cir. 2006)............................................................ 6, 17

*United States* v. *Ferguson*, 676 F.3d 260 (2d Cir. 2011)........................................................... 2

*United States* v. *Goffer*, 721 F.3d 113 (2d Cir. 2013)............................................................... 17

*United States* v. *Grant*, No. S4 05 Cr. 1192 (NRB),
    2008 WL 4376365 (S.D.N.Y. Sept. 25, 2008) ..................................................................... 23

*United States* v. *Hatfield*, No. 06 Cr. 550 (JS),
    2010 WL 4340632 (E.D.N.Y. Oct. 22, 2010) ..................................................................... 25

*United States* v. *Jenkins*, 578 F.3d 745 (7th Cir. 2009) ........................................................... 9

*United States* v. *Kalish*, No. 06 Cr. 656 (RPP),
    2009 WL 130215 (S.D.N.Y. Jan. 13, 2009) ..................................................................... 25

*United States* v. *Kramer*, 06 Cr. 200 (ENV) (CLP),
    2006 WL 3545026 (E.D.N.Y. Dec. 8, 2006) ..................................................................... 31

*United States* v. *Lacey*, 699 F.3d 710 (2d Cir. 2012)................................................................ 10

*United States* v. *Levis*, 488 Fed. App'x 481 (2d Cir. 2012)........................................................ 3

*United States* v. *Mallory*, 709 F. Supp. 2d 455 (E.D. Va. 2010) ............................................... 4

*United States* v. *Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994) ..................................................... 2

*United States* v. *Paul*, 634 F.3d 668 (2d Cir. 2011)............................................................... 4, 5

*United States* v. *Rutoske*, 506 F.3d 170 (2d Cir. 2007) ........................................................... 6

*United States* v. *Shellef*, 507 F.3d 82 (2d Cir. 2007) ............................................................... 2

*United States* v. *Torres*, 703 F.3d 194 (2d Cir. 2012) ............................................................. 23

*United States* v. *Turk*, 626 F.3d 743 (2d Cir. 2010)...................................................................... 4, 6

*United States v. Uddin*, 551 F.3d 176 (2d Cir. 2009) ...................................................................... 2

*United States* v. *Walsh*, 712 F.3d 119 (2d Cir. 2013) .................................................................. 26

**Federal Statutes**

18 U.S.C. § 981(a)(1)(C) .................................................................................................................... 31

21 U.S.C. § 853.................................................................................................................................... 31

21 U.S.C. § 853(c) .............................................................................................................................. 31

28 U.S.C. § 2461(c) ............................................................................................................................ 31

The Government respectfully submits this memorandum in further support of its sentencing submission dated July 8, 2014 (the "Government's July 8 Submission"), in response to certain arguments defendants have raised in their sentencing submissions, and in support of its proposed forfeiture orders.

## I.     THE GOVERNMENT'S APPROACH TO CALCULATING LOSS IS CORRECT

Defendants insist that *no* intended or actual loss can be proved here because the Government (1) argued at trial that economic loss was not an element of the offenses charged and (2) has in any event presented no evidence isolating or quantifying "the difference in profitability between STOLI and non-STOLI on a per-policy basis." (Sentencing Mem. on Behalf of Michael Binday, filed July 16, 2014 ("Binday Mem."), at 9). These related arguments, which form the core of defendants' attack on the Government's approach to loss calculation under the Guidelines, are red herrings and should be rejected.

Both arguments confuse contemplation of economic harm (an essential, albeit sometimes unquantifiable, element of mail and wire fraud charges) with the quantifiable economic losses proximately caused by a proven fraud (*not* an element of mail or wire fraud, but a concept central to sentencing). The distinction is crucial. The Government properly sought to focus the trial on contemplated economic harm—the economic import of the staggering array of misrepresentations defendants made. The fraud having now been established beyond a reasonable doubt, the Government, equally properly, focuses at sentencing on the financial losses the Insurers suffered—and that defendants intended them to suffer—as a result of having issued the fraudulently-procured Scheme Policies. Defendants are right that the Government has not sought to isolate and "quantif[y]" (Binday Mem. at 4) the economic risk inherent in defendants' lies. But that is not what must be quantified. What must be quantified, based on reasonable

estimates, are all foreseeable losses flowing and intended to have flowed from the Subject

Insurers' entry into the fraudulently-induced insurance contracts.  The Government has offered

ample, competent evidence supporting such quantifications.  *See United States v. Uddin*, 551

F.3d 176, 180 (2d Cir. 2009) (noting that "the court need not establish the loss with precision but

rather need only make a reasonable estimate of the loss, given the available information")

(quotation marks and citations omitted).

> ### A.       The Relevant Inquiry at Trial

At the guilt phase of the proceedings, "it is not necessary for the government to

prove that [the target of the fraud] actually lost money or property as a result of the scheme."

(Tr. 1579[1]; *see* Transcript of Proceedings before the Hon. Colleen McMahon, September 10,

2013 ("9/10/2013 Tr."), at 6 ("Ultimate profits or ultimate loss is just not a relevant

consideration in a case like this or in any case, any fraud case.")).  Instead, the Government need

only prove that the defendant contemplated that his deceit would cause some economic harm—

not necessarily a hit to the victim's bottom line, but at least a deprivation of the victim's "ability

to make an informed economic decision about what to do with [its] money or property," resulting

in "a discrepancy between what the [victim] reasonably anticipated and what [it] actually

received."  (Tr. 1579-80); *see United States* v. *Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (holding

that a mail or wire fraud indictment must allege a scheme that depends for its completion on a

misrepresentation of an "essential element of the bargain"); *United States* v. *Mittelstaedt*, 31 F.3d

1208, 1217 (2d Cir. 1994) (explaining that a mail fraud theory cannot be sustained by allegations

that a target was deprived of control over merely ethical decisions); *see also United States* v.

*Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) (distinguishing between economic harm in the

---

[1] The abbreviations appearing herein are the same as those in the Government's July 8
Submission.

immediate sense and ultimate economic loss); *United States* v. *Levis*, 488 Fed. App'x 481, 486 (2d Cir. 2012) ("[E]ven if Levis meant to cause no ultimate harm to investors because he honestly believed Doral to be properly valued, he intended to cause them immediate harm by denying them the right to control [their] assets by depriving [them] of the information necessary to make discretionary economic decisions." (alterations in original; quotation marks and citation omitted)).  The focus of the inquiry at this stage is on the character of the misrepresentation at issue—whether the information hidden, distorted, or falsified was important in some economic sense.[2]

### B.    The Relevant Inquiry at Sentencing

Come sentencing, however, the question of whether defendants' misrepresentations carried a risk of economic harm—if only through deprivation of control over economic decision-making—no longer governs the inquiry.  That question has been answered "yes."   Now the inquiry—more pedestrian, and less theoretical—focuses on quantification of the losses that flowed and were intended to flow from defendants' fraudulent scheme.  Having been induced to issue stealth STOLI policies based on misrepresentations that carry a risk of economic

---

[2] Defendants assert that that the Government's "theory of conviction" at trial was "limited to 'right to control.'"  (Binday Mem. at 1).  This distorts the record.  The Government, while maintaining (in line with governing precedent and the Court's instructions to the jury) that deprivation of right to control economic decision-making was sufficient to convict, and that evidence of Insurers' profits and revenues during the period of the fraud was therefore irrelevant, pointed to tangible deprivations of property on individual Scheme Policies to support its charges.  Among these were the millions of dollars in commissions the Insurers paid defendants under false pretenses, and the millions in death benefits defendants reaped in two cases (those of Doris Riviere and Hanni Lennard), at the expense of the Insurers, as a result of their fraud.

Defendants' related assertion that they were precluded from offering evidence showing no tangible economic losses (*see id.* at 2) is equally distortive.  What the Court precluded, on the Government's motion, was "evidence that the Insurers made a lot of money during the period while they were issuing STOLI policies"—evidence the Court properly determined "does not appear to be germane to anything relevant to this case."  (Order dated September 16, 2013 at 11).  And even that evidence ultimately came in.  (*See, e.g.*, GX 2970, 2971, 2972; DX 2023).

harm, what losses did the Subject Insurers actually suffer as a result of that inducement?  What losses did the defendants intend them to suffer?   These are the relevant questions at this stage. *See, e.g.*, *United States* v. *Paul*, 634 F.3d 668, 676 (2d Cir. 2011) (where defendant fraudulently induced banks to make loans, actual losses were all losses flowing from the fact that loans were made; rejecting argument that district court should have offset losses whose most immediate cause was external market forces); *United States* v. *Confredo*, 528 F.3d 143, 145-46, 152-53 (2d Cir. 2008) (in context of fraudulently-induced loans, treating both intended and actual loss as total face value applied for, minus offsets as appropriate, without trying to quantify the added economic risk attributable to the particular misrepresentations made); *see also United States* v. *Turk*, 626 F.3d 743, 750 (2d Cir. 2010) (emphasizing, in mortgage fraud case, the need to hold defendants accountable for all foreseeable losses caused by their conduct, "to ensure that defendants who fraudulently induce financial institutions to assume the risk of lending to an unqualified borrower are responsible for the natural consequences of their fraudulent conduct'") (quoting *United States* v. *Mallory*, 709 F. Supp. 2d 455, 459 (E.D. Va. 2010)).

### C.    The Government's Quantification of Loss at Sentencing is Consistent with its Position at Trial and with Governing Law

Defendants' objections to the Government's approach to loss calculation stem, at bottom, from a failure to acknowledge the differences in the inquiries at the trial and sentencing phases.  Binday in particular demands an isolation and quantification of the *ex ante* economic risk posed by the particular misrepresentations defendants made—"the difference in profitability between STOLI and non-STOLI on a per-policy basis."  (Binday Mem. at 9).  Relatedly, he cries "bait-and-switch" (*id*. at 2) at the Government's change of focus from contemplated economic harm (at trial) to losses proximately flowing from the fraudulent inducement (at sentencing). These objections are baseless, because they rest on the false premise that the Government is

required to somehow quantify the risk to which defendants exposed the Insurers through their fraud.  At least in cases of fraudulent inducement, where the victim of the fraud would not have accepted the economic risks of the contract absent the misrepresentations, the relevant losses are *all* of those foreseeable losses that either did or were intended to flow from entry into the contract.  *See, e.g.*, *United States* v. *Paul*, 634 F.3d at 676.

The point is illustrated well by a case upon which Binday relies: *United States* v. *Confredo*.  There, the defendant loan broker submitted hundreds of false loan applications to banks on behalf of client small businesses that had poor credit but that the defendant, through lies, made appear creditworthy.  528 F.3d at 145.  In the majority of the cases, the loan applications were co-signed by people and entities with good credit.  *Id.*  The total amount of loans applied for was $24.2 million, and the victim banks claimed losses on the loans of about $10 million.  *Id.* at 146.  The principal issue at sentencing was how to calculate the intended losses.  The Second Circuit ruled that intended losses consisted of the total face amount of the loans ($24.2 million), but that "the defendant should have an opportunity to persuade the sentencing judge that the loss he intended was less than the face amount of the loans."  *Id.* at 152.  As the Court explained, "[a] defendant who applied for, or caused someone else to apply for, a $1 million loan, fully expecting at least $250,000 to be repaid, intended a loss of no more than $750,000."  *Id.*  And "[s]imilarly, a defendant who applied for, or caused others to apply for, ten $1 million loans, expecting at least three to be rejected, intended a loss of no more than $7 million."  *Id.*  Finally, the Court observed that in calculating *actual* losses, these offsets would not apply.  In the case of the defendant who applied for a $1 million loan expecting $250,000 to be repaid, "if no repayment is made, he would be subject to punishment for an actual loss of $1 million."  *Id.*  And in the case of the defendant who applied for ten $1 million loans expecting

three to be rejected, "if all were accepted and none was repaid, he would be subject to punishment for an actual loss of $10 million." *Id.*

*Confredo* is instructive for several reasons, not least of which is that it does not even hint at a need to isolate and quantify the economic risk to which the defendant exposed the victim banks by lying to them about applicants' creditworthiness (while nonetheless ensuring creditworthy co-signers). The *Confredo* Court did not ask, or require the Government or the district court to ask, what losses or intended losses might have occurred even in the absence of the defendant's deceit. The question, instead, was simply what losses the victims suffered or were expected to suffer as a result of having entered into transactions fraudulently induced by the defendant. That is the same question asked in all of the relevant cases of which the Government is aware—cases in which the fraud induced victims to enter into transactions they would not have entered into absent the fraud. There is no requirement in these cases that the Court try to identify which losses are attributable to the added economic risk presented by the particular misrepresentations at issue, and which may be attributable to other causes.

And this distinguishes fraudulent inducement cases from the stock fraud cases that Binday relies upon—*United States* v. *Ebbers*, 458 F.3d 110 (2d Cir. 2006), and *United States* v. *Rutoske*, 506 F.3d 170 (2d Cir. 2007). *Ebbers* and *Rutoske* stand for the proposition that losses suffered by those who purchase stock at inflated prices are measured by identifying the impact on the stock price caused by the fraud, and eliminating impacts "from market or other forces." *Id.* at 179. As the Second Circuit has made plain, this approach is *not* appropriate where the defendant fraudulently induces a transaction that would not have occurred absent the fraud. *See Paul*, 634 F.3d at 676; *see also United States* v. *Turk*, 626 F.3d at 751 (in mortgage fraud case, explaining that "arguments about the extrinsic forces that caused the value of the

collateral to decline are simply irrelevant—they may or may not be true, and [defendant] might

have earned a credit against loss if they had not occurred, but she may not invoke them to

insulate her from responsibility for the loss she *caused*, namely the loss of the unpaid loan

principal").

## II.     THE GOVERNMENT'S INTENDED LOSS CALCULATIONS ARE CORRECT

In this case, defendants plainly intended that they and the investors they served

would profit at the expense of the Insurers.  First, they intended to—and did—reap millions of

dollars' worth of ill-gotten commissions for their fraud.[3]  Second, they intended that investors

would profit by exploiting actuarial expectations and underwriting flexibility that were

predicated on the Insurers' belief—fed by defendants' fraudulent misrepresentations—that the

Scheme applicants genuinely wanted and intended to pay for their policies.  The losses

defendants intended would flow from this stealth arbitrage are well documented in the projection

charts that Binday created for nearly half of the Scheme Policies.  These charts lay out what total

premiums investors could be expected to have to pay to yield a given multi-million-dollar death

benefit, and they furnish a reasonable basis upon which to estimate similar intended losses on

those Scheme Policies for which there are not available projection charts.  *See United States* v.

*Uddin*, 551 F.3d at 180 ("A district court may make a reasonable estimate [of loss] by

extrapolating the average amount of loss from known data and applying that average to

transactions where the exact amount of loss is unknown." (citation and quotation marks

omitted)).[4]

---

[3] As noted in the Government's July 8 Submission, calculations of intended commissions here
are based simply on the ill-gotten commissions actually paid out.

[4] Kergil points to discrepancies in the loss figures contained in the draft PSRs and in the
Government's July 8 Submission as purported proof that neither intended nor actual loss is

Aside from their complaints about the Government's approach to loss calculation generally (which, for the reasons explained above, should be rejected), defendants' particular objections to the intended loss calculations appear to be that (1) the calculations fail to adequately account for premiums and other benefits the Insurers would be expected to receive (*see* Binday Mem. at 12 (protesting that Binday did not intend "that all of the insureds would die immediately or shortly after purchasing the policies"), 14-15 (misleadingly discussing loss calculated by reference to *gross* face value), 18 (referencing the "entire amount of the death benefits" as the purportedly asserted intended loss)); (2) defendants subjectively intended gains rather than losses to Insurers; (3) Resnick had no conception of the arbitrage involved in the stealth STOLI scheme; and (4) the universe of Scheme Applications and Scheme Policies identified by the Government and used as the basis for the intended loss calculations has insufficient record support.  These arguments all lack merit.

*First*, the Government's calculations of intended loss, based on Binday's own charts, fully account for the premiums the Insurers would be expected to receive, for many years, under the Scheme Policies.  The total intended loss figure consists of the commission payments actually made, plus the expected *net* death benefits.  Premiums are subtracted.  And the premiums here are, not surprisingly, greater than in life insurance fraud cases where the misrepresentations at issue relate to the applicant's health.  Thus, where a defendant has misrepresented a terminally ill person as a healthy person to fraudulently procure a particular policy, the expected premiums to life expectancy will presumably be very low, and the resulting

---

amenable to quantification in this case.  (Kergil Mem. at 3-4).  That is unfair.  The calculations in the draft PSRs are based on the Government's own calculations, which the Government has adjusted in the course of preparing for sentencing to correct errors and to define the universe of Scheme Applications and Scheme Policies ever more conservatively.  The Government has kept all defense counsel apprised of these changes at every turn.

net death benefit will be very high.  Here, where the misrepresentations are of less dramatic character, the net benefit is commensurately less dramatic.[5]  But the same question is asked: What were the net death benefits defendants expected the life insurance companies to have to pay out on the fraudulently-induced contract?  *See United States* v. *Jenkins*, 578 F.3d 745 (7th Cir. 2009).[6]

> *Second*, defendants' self-serving assertions that they believed the Insurers might *win* as a result of defendants' fraud (*see* Binday Mem. at 8, 10; Sentencing Mem. on Behalf of Mark Resnick, filed July 16, 2014 ("Resnick Mem."), at 4) is flatly contradicted by the overwhelming record evidence of the lengths to which they went to deceive the Insurers.  It is also contradicted by Binday's own premiums-to-life-expectancy projection charts predicting huge returns through stealth exploitation—charts relied on by the Government to calculate intended loss but all but ignored by Binday.  Binday quibbles about the amount of interest the Insurers were earning on the premiums they collected (Binday Mem. at 22-24), and claims he would have needed "the carriers' proprietary pricing models" to truly determine whether the

---

[5] Binday asserts that the sum of commissions plus net death benefits yields an "absurdly high loss figure" (Binday Mem. at 17) and represents a "caricature of Binday's culpability" (*id.* at 18). To support these assertions, he points to a plea agreement reached in the Eastern District of New York in which the parties in a case involving STOLI evidently stipulated that the intended loss was $120,000.  (*See id.* at 17).  Resnick also points to sentences imposed in that same Eastern District case.  (Resnick Mem. at 2, 11-13).  Both neglect to mention that an insurance agent in Texas who was convicted after trial of charges similar to the ones at issue here, on facts similar to the ones presented here, was sentenced in April of this year to 292 months' imprisonment based on an intended loss figure driven largely by the face values of the policies.  *See United States* v. *Bazemore*, No. 12 Cr. 319 (RCO), Docket Entry No. 130 (Judgment) (N.D. Tex. 2014). While the Government, as previously discussed, does not believe sentences of comparable length are needed here to serve the goals of sentencing, the *Bazemore* result offers a strong counterpoint to the Eastern District case defendants cite.

[6] Because the net death benefit calculation already accounts for differences in life expectancy between terminally ill and marginally healthy insureds, Binday's efforts to distinguish *Jenkins* based on that difference (*see* Binday Mem. at 13-15) fail.

Insurers would lose in the end (*id.* at 8).  This is nonsense.[7]   Of course the insurers invested the premiums they collected on these policies—just as Binday's behind-the-scenes investors could have invested the money they instead decided to pay in premiums.  No "proprietary pricing model" is needed to glean that much.  But Binday predicted that his investors' use of the money—payment of the premiums toward multi-million-dollar death benefits—would be more lucrative than alternative investments, precisely because it involved stealth exploitation of actuarial and underwriting assumptions.  This was not a zero sum game, and defendants knew it.[8]

> *Third*, and relatedly, Resnick's purported obliviousness to the fact that he and the other defendants' fraudulent scheme was calculated to generate ill-gotten commissions and millions of dollars in net death benefits at the expense of the Insurers is directly contradicted by the record.  (*Cf.* Resnick Mem. at 8-9).[9]   Resnick seeks to paint himself as a naïf, entering into this criminal scheme with benign hopes of providing a "nest egg" for his family and pay-outs to his elderly clients that were "beyond their wildest dreams."  (*Id.* at 4).  But if he knew that he and the straw insureds would win big, he necessarily also knew that someone was supposed to lose—namely, the Insurers.  This follows not just from common sense, but also from the record at trial.  Ed Lynch, an insurance agent who had minimal involvement in the stealth STOLI scheme

---

[7] Binday's objections to the Government's interest calculations make little sense.  Among other things, he confuses interest rates with the rate of return on capital invested in an insurance product—a figure generated not by investment of premiums alone, but by lapses and other factors as well.  (*See* Binday Mem. at 23-24).

[8] To the extent Binday is complaining that the Government's intended loss calculations take insufficient account of his subjective intent (*see* Binday Mem. at 11-12), it is his burden to establish that subjective intent by competent evidence.  *See Confredo*, 528 F.3d at 152; *United States* v. *Lacey*, 699 F.3d 710, 719 (2d Cir. 2012) (affirming intended loss calculation over objections about defendants' subjective intent because defendants failed to carry their burden on this score).  He has offered no proof to try to meet that burden.

[9] Under *Confredo*, Resnick bears the burden of showing that he did not subjectively intend what the objective evidence establishes was the intended loss flowing from the scheme.

compared to Resnick, was fully versed on the arbitrage involved.  (Tr. 775 (explaining the arbitrage opportunity and noting that the investors "would hope that if they put in a million in premiums over years and then the insured passed away and they got a $3 million policy, death benefit to the trust, and they spent a million doing it, then they were still up two million")). Moreover, cooperating witness Paul Krupit testified about a conference call that Resnick arranged and participated in during which Kergil explained to Krupit the economics of the scheme, and another call that Krupit alone had with Binday during which Binday went into yet more detail about the arbitrage involved.  (*See* Tr. 904-07).  This evidence shows that Resnick, like the other agents involved in the scheme, knew both the scope of the scheme and the hoped-for profits to be earned at the expense of the Insurers.

> *Finally*, Binday's complaint that the Government has presented insufficient evidence to establish that the 92 Scheme Applications were indeed stealth STOLI applications containing false responses to questions about the applicants' intent in procuring the policies, their net worth, the manner in which premiums would be financed, and so on, inexplicably ignores the trial record—including voluminous records defendants themselves offered as exhibits—and the record at sentencing.  The testimony at trial established beyond any doubt that the R. Binday Large Case Folder was devoted entirely to stealth STOLI applications.  This was a point Binday's counsel expressly conceded in summation:  "[T]here's no question, the large case file discussion, these defendants focused on bringing STOLI policies to the insurance companies." (Tr. 1446). All of the insureds in whose names the 92 Scheme Applications were submitted to the Insurers had files, in their names, within the Large Case Folder (the contents of which were produced to defendants in discovery in 2012).  (*See* McDonald Decl. ¶ 14).  All of the Insurers to whom the applications were submitted had clear anti-STOLI policies that they implemented in

part through questions about applicants' intent, premium financing, and finances.  For 41 of the

Scheme Applications, Binday created charts *before the applications were submitted* projecting

what the profits to investors would be on these policies.  (McDonald Decl., Ex. 10).  Nearly

every one of the applicants whose names appear on the 92 Scheme Applications either was the

subject of trial evidence establishing that the applicant was a straw insured involved in

defendants' scheme, or is the subject of one of Binday's profit projection charts.  (*See*

Addendum A hereto).[10]  In light of all this, Binday's protest of too little evidence borders on the

ridiculous.[11]

## III.    THE GOVERNMENT'S ACTUAL LOSS CALCULATIONS ARE CORRECT

As *Confredo*, *Turk*, and other like cases make plain, actual loss in cases of

fraudulent inducement is calculated by looking to the total, proximately-caused losses suffered

by the victim as a result of entering into the transaction, without regard the subjective intent or

expectations of the defendant.  A defendant who applies for a $1 million loan expecting to repay

some or all of it is "subject to punishment for an actual loss of $1 million" if no repayment is in

fact made.  *Confredo*, 528 F.3d at 145.  Applying that analysis here, defendants are responsible

for actual losses consisting of the millions of dollars in commissions they fraudulently induced

the Insurers to pay them, plus the millions of dollars in net death benefits the Insurers paid out on

the fraudulently-procured policies, minus any premiums paid on those policies and on other

---

[10] The addenda hereto are being submitted for filing under seal.

[11] Nonetheless, for complete avoidance of doubt, and to further support the fact, uncontested at trial, that applications within the Large Case Folder—the Scheme Applications—were stealth STOLI applications packed with lies, the Government will be prepared at the sentencing hearing to submit to the Court additional documents from the discovery productions in this case establishing that the eight straw insureds whose files were within the Large Case Folder but as to whom evidence was not presented at trial and as to whom no projection charts could be located (*see* Addendum A) were in fact part of the STOLI scheme.

Scheme Policies that were terminated without payment of death benefits.  It does not matter that defendants predicted greater premium payments on the paid-out policies than were actually made; they knew the *potential* loss was the entirety of the death benefit without substantial premium offset, and they are responsible for those potential losses that were in fact actualized. Moreover, under the Government's actual loss calculations, defendants are *credited* for offsets they did not intend but that came to pass—namely, premiums paid on policies that lapsed, and for which no death benefits had to be paid out.

The only clear challenge defendants raise to the Government's actual loss calculations—independent of their challenges to loss calculation generally or to intended loss— is that actual losses cannot be calculated at all because many of the Scheme Policies are still in force.  (Binday Mem. at 13; Resnick Mem. at 9-10).  This argument lacks merit.

*First*, it is simply not true, as Binday contends, that exclusion from the analysis of Scheme Policies that have not yet terminated, and as to which the endgame is not yet known, skews the numbers *upward*.  The in-force Scheme Policies have only been in force for six or seven years—many years short of the life expectancy marks at which Binday's charts still project massive returns on premiums.  Deaths of insureds over the next several years will still generate huge returns for the STOLI investors, at the expense of the Insurers.  Meanwhile, because the premiums are being generated by investors who already weathered the financial crisis, the expectation of lapse—which relieves the insurers of having to pay death benefits—with respect to these policies is low.[12]  Indeed, as Binday is well aware, several of the Insurers *have* analyzed

---

[12] Binday spends several pages of his submission pointing out that the Insurers' concerns about the economic impact of STOLI ultimately proved unfounded, at least in part because of the economic downturn in 2008.  (Binday Mem. at 19-21).  The relevance of these observations to loss calculation under the Guidelines is unclear.  That expected losses were not actually realized has no bearing on the intended loss analysis, and, as Binday does not dispute, the actual loss

projected losses on in-force policies, and have used that analysis to argue to the Government entitlement to millions upon millions *more* restitution than is owed for already-terminated policies.  The Government determined not to include projected losses on in-force policies in its actual loss or restitution calculations because it could find no apt precedent for inclusion of such figures.  Had it included the Insurers' projected losses on in-force policies, the Government's actual loss figures would be much larger.

   *Second*, and relatedly, accepting (as the Government does) that the actual loss calculations should exclude projections about still-in-force policies hardly compels abandonment of the effort to quantify losses to date.   Employing a familiar tactic, Resnick contends that the Government has reversed course by arguing at trial that evidence purporting to establish ultimate economic losses on STOLI policies was irrelevant to any element of the charges and in any event inherently incomplete because this is a "long game" (Tr. 1227), and arguing now that those losses that *have* materialized should be considered for sentencing purposes.  (Resnick Mem. at 9-10).  There has been no reversal; just because not all losses have materialized does not mean that the ones that have should be disregarded.

   The only other issues Binday raises with respect to actual loss are his unsupported assertion that "on balance, [the Insurers] came out *ahead*" (Binday Mem. at 10; *see also id.* at 22 ("the carriers realized profits and had no loss")), and his bald contention that the millions of dollars in commissions the Insurers paid defendants "are not loss" because (a) they are "gain," (b) they are "built into the pricing models as acquisition costs," and (c) they "are in any event

---

analysis the Government has undertaken fully accounts for the manner in which events actually unfolded (the high number of lapses, for example).

paid from monies the carriers earned in the form of first-year premium payments" (Binday Mem. at 24). These arguments, too, must be rejected.

Assuming that the assertion about Insurers coming out ahead refers to general profitability during the period of the fraud, the observation is of no moment. A generally profitable company or industry can still be a victim of a crime, and, in any event, the risks to which defendants' fraud exposed the Insurers will not be fully realized until all of the Scheme Policies have terminated through payment of death benefits or otherwise.

Concerning commissions, these most certainly constitute "gain" to defendants, but plainly *also* constitute losses to the Insurers. They are payments the Insurers never would have made had they known the truth—that their agents were engaged in gross deception and violations of clear company policy. Binday's suggestion that these losses were somehow "offset" by *premiums* (*see* Binday Mem. at 24) is absurd. Although the commissions often were calculated as a percentage of the first year's premium, they were not "paid out" of the premiums or in any sense offset by premiums. The premiums paid into the Scheme Policies were for the death benefits (which Binday inexplicably fails to integrate into his analysis), not the commissions. The commissions were supposed to be for services legitimately rendered by the Insurers' agents. Because the paid-for services were not rendered—because defendants instead violated their duties to the Insurers and defrauded them—the commissions manifestly qualify as losses.

## IV.    IF THE COURT WERE TO CONCLUDE THAT NEITHER INTENDED NOR ACTUAL LOSS CAN REASONABLY BE DETERMINED, GAINS ARE AN APPROPRIATE PROXY FOR LOSS HERE

Defendants not only attack the Government's calculations of intended and actual losses, but go so far as to insist that there was *no* intended or actual loss here—whether

quantifiable or not.  Defendants take their arguments to this extreme to try to escape what necessarily follows, under the Guidelines, from a determination that there was a loss but one that "reasonably cannot be determined": use of gain as a proxy for loss.  U.S.S.G. § 2B1.1, cmt. 3(B). After all, if the Court were to look solely to the commissions defendants were paid on policies they procured through fraud, the resulting Guidelines ranges would still be substantial.  The commissions defendants and their co-conspirators pocketed as a result of their fraudulent scheme totaled approximately $6,107,276.  (*See* Supplemental Declaration of Thomas W. McDonald ("McDonald Supp. Dec.") ¶ 30 & Att. AA).[13]  At this level of loss, Binday's offense level is 31 (instead of 39, under an intended loss analysis), with a corresponding Guidelines range of 108 to 135 months' imprisonment; Kergil's offense level is 30 (instead of 38), with a corresponding range of 97 to 121 months; and Resnick's offense level is 27 (instead of 35), with a range of 70 to 87 months.  Adding the net death benefit profits each defendant reaped from as a result of the fraud (approximately $4.3 million for Binday from the LimQuee and Lennard policies; approximately $2.3 million for Kergil on the Lennard and Riviere policies; and approximately $780,000 for Resnick on the Riviere policy) brings Binday and Kergil two levels higher, to offense levels 33 and 31, respectively, with corresponding ranges of 135 to 168 months and 108 to 135 months, respectively.

But defendants cannot colorably assert that this is a *no loss* case.  As discussed above, the commissions the Insurers paid out are losses that were both intended and realized. They are not, in the Government's view, the only losses suffered, but they are some of them, and they are obviously quantifiable.

---

[13] The exhibits to this supplemental declaration are being submitted for filing under seal.

The only conceivable circumstance in which the commissions would not qualify as losses, thus triggering the gain-as-proxy-for-loss rule, is if the Court were to conclude that there are no net losses because the commission losses are offset by gains Insurers enjoyed in some other respect on the Scheme Policies.  Such a conclusion simply cannot be reached here. The Government has detailed, among other things, the actual losses the Insurers suffered as a result of having issued the Scheme Policies.  Even if the Court were to agree with the defense that the proper measure of loss is only that (unquantifiable) portion of the net death benefit which can be traced to the particular misrepresentations defendants made, it could not infer from the absence of quantification of that portion of the loss that there was a net *profit* on the Scheme Policies.  Nor, in any event, could the Court conclude that defendants *intended* a net gain to the Insurers; again, even if the Court were to conclude that intended loss is too difficult to quantify in this case, not a shred of evidence supports a suggestion of intent to benefit the Insurers.

## V.    THE APPLICABLE GUIDELINE IS NOT OF "DUBIOUS GENESIS"

Binday argues that the Court should disregard the applicable Guideline, Section 2B1.1, because of its "dubious genesis."  (Binday Mem. at 34).  Because the Government agrees with the defense that, under the particular circumstances of this case, sentences below Guidelines (but still very substantial) are warranted, it addresses this argument only briefly:

The Court should reject Binday's wholesale attack on the fraud Guideline—an attack "based solely on policy considerations."  *Kimbrough* v. *United States*, 552 U.S. 85, 101 (2007).  Although the Second Circuit has endorsed policy-level challenges to the Guidelines in cases involving crack cocaine and child pornography, it has declined the opportunity to do so with respect to Section 2B1.1.  *See United States* v. *Goffer*, 721 F.3d 113, 131 (2d Cir. 2013) ("Defendants in this case assert that several district court judges have chosen to exercise this

17

ability to issue below-Guidelines sentences to white collar criminals.  [The defendants] raise

broad questions as to how harsh federal courts are, and how harsh they should be, in sentencing

white collar defendants.  We need not answer either question."); *cf. United States* v. *Ebbers*, 458

F.3d at 129 ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy

for [white collar] crimes.").  Moreover, the history of Section 2B1.1 does not lend itself to the

same criticisms defendants and courts have leveled against the crack cocaine and child

pornography guidelines.  Over a five-year period between 1996 and 2001, the Commission

engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses,

with the involvement of relevant stakeholders including the defense bar, the Department of

Justice, probation officers, and the U.S. Judicial Conference.  *See* Federal Register Notice

BAC2210-40, 62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment

regarding economic crime sentencing reform).  The resulting amendments were referred to as the

"Economic Crime Package," and they became effective on November 1, 2001. *See* Sentencing

Guidelines for the United States Courts, 66 Fed. Reg. 30,512, 30,540 (June 6, 2001).  The

Commission explained the amendments to Section 2B1.1 as follows:

> [M]ost fraud statutes cover a broad range of conduct with extreme variation in
> severity. The specific offense characteristics and cross references contained in this
> guideline are designed with these considerations in mind.
>
> The Commission has determined that, ordinarily, the sentences of defendants
> convicted of federal offenses should reflect the nature and magnitude of the loss
> caused or intended by their crimes. Accordingly, along with other relevant factors
> under the guidelines, loss serves as a measure of the seriousness of the offense
> and the defendant's relative culpability and is a principal factor in determining the
> offense level under this guideline.

*Id.* at 30,533.  Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the

Commission, following a collaborative process with relevant stakeholders, that loss amount

should be a central consideration in determining the seriousness of an offense to which that Guideline applies.

In light of the careful consideration devoted to Section 2B1.1 over the years, Binday's sweeping criticism thereof should be rejected.

## VI.     THE OBSTRUCTION ENHANCEMENT PROPERLY APPLIES TO BINDAY

For the reasons set forth in the Government's July 8 Submission, Binday's conduct, as proved at trial, warrants the two-point obstruction enhancement under Section 3C1.1 of the Guidelines.  The evidence at trial—the testimony of Paul Krupit, as corroborated by the recorded call between Kergil and Resnick referencing "Michael" as the engine behind the obstruction and by the other evidence that Binday generally dictated how agents like Kergil, Resnick, and Krupit should respond to investigations into the fraud—amply supports the enhancement.  On this score, Binday misapprehends the relevance of the emails he wrote to his agents directing them to coach insureds to lie to Insurers.  (*See* Binday Mem. at 37-38).  The Government's argument is not that those independently support an obstruction enhancement, but that they constitute strong circumstantial evidence that Binday was the one directing Kergil, Resnick, and Krupit to destroy documents.

## VII.    RESNICK IS NOT ENTITLED TO A MINOR ROLE ADJUSTMENT

Resnick's claim that he is entitled to a minor role adjustment must be rejected.  To be sure, there were arguably minor participants in this scheme.  Those of the straw insureds who knew they were telling lies to insurance companies in order to procure policies that would not otherwise have issued might qualify as minor participants.  Even some of the agents who submitted only one or two false applications might so qualify.  But Mark Resnick, who was a central player in this scheme, had numerous "clients" on whose behalf he submitted patently

false applications, forged signatures, swapped out notary stamps with his co-conspirator, and urged straw insureds to lie to Insurer representatives who came calling, manifestly does not earn the "minor role" designation.

## VIII.   KERGIL'S CONDUCT WARRANTS AN AGGRAVATED ROLE ADJUSTMENT

As explained in the Government's July 8 Submission, Kergil acted as a manager and supervisor of other agents involved in the charged scheme, and his conduct therefore warrants a three-point enhancement pursuant to Section 3B1.1(b) of the Guidelines.  The evidence supporting this enhancement is not, as Kergil insists, a matter of "semantics" (Pre-Sentence Memorandum of James Kevin Kergil, filed July 14, 2014 ("Kergil Mem"), at 16), but rather a matter of unrefuted record evidence establishing that Kergil helped recruit field agents into the scheme, guided them on what forms to fill out, supplied them with those forms, instructed them on how to coach seniors to lie, supplied them with the false financials necessary to support the fraudulent applications, relayed to them Binday's instructions to destroy evidence, and took regular cuts of the commissions on the policies they generated.

## IX.   THE COURT SHOULD IMPOSE VERY SUBSTANTIAL SENTENCES ON ALL THREE DEFENDANTS

Most of the foregoing arguments relate to the proper calculation of loss under the Guidelines—an important factor for the Court to consider in assessing what sentences defendants ought to serve in light of Title 18, United States Code, Section 3553(a).  Even if the Court agrees with the Government's position (supported, of course, by the defense) that application of Section 2B1.1's loss adjustment in the particular circumstances of this case generates an offense level that overstates the seriousness of the criminal conduct at issue, the Court's sentence should still take account of the enormity of the losses defendants intended and actually caused.  Indeed, even if the Court were to conclude that the only quantifiable losses were the commissions defendants

generated through their fraud, the loss would still be huge, and still, necessarily, form an important factor in sentencing.

But loss is not the only consideration here.  And the other considerations—in particular, the nature and circumstances of the offense conduct—independently weigh heavily in favor of very substantial sentences.  Doubtless, as with nearly all criminal defendants, each of these three defendants has done many laudable things in his life—has supported family members and friends, helped the unfortunate, and generally earned respect and loyalty in various ways.  The Court should of course take these things into account in assessing the "history and characteristics of the defendant" under Title 18, United States Code, Section 3553(a).  But a mountain of good-character letters cannot overwhelm the force of the evidence presented at trial concerning each defendant's offense conduct—evidence detailed at length in the Government's July 8 Submission.  Each of these men engaged in a protracted, calculated, and extensive scheme to defraud others for his own benefit.  Each told rampant lies, buttressed by bogus documents; coached elderly straw insureds to stay silent or else lie; schemed to destroy evidence; and reaped millions of dollars in ill-gotten gains by capitalizing on "clients'" deaths and betraying duties owed to Insurers—all out of greed.  These deeds warrant very heavy sentences.

## X.       RESTITUTION AND FORFEITURE GENERALLY

Attached as Addendum B to this submission are proposed orders of restitution and forfeiture.  The figures reflected in these orders, and in the Supplemental Declaration of Thomas W. McDonald being filed herewith in support of the Government's forfeiture claim, are substantially as anticipated in the Government's July 8 Submission, except that they reflect correction of an error in calculating commissions paid by two Insurers, Union Central and AIG. (*See* McDonald Supp. Dec. ¶ 30.)

The only significant challenge any defendant has raised to the Government's restitution and forfeiture calculations (aside from the challenges already discussed herein) are Binday's arguments that (1) the $4 million death benefit paid by AIG on the Ellis LimQuee STOLI policy was not received by Binday or by any trust within his control and (2) the Government improperly relies upon a theory of gross proceeds rather than proceeds net of direct costs. At least absent further showing by Binday, these arguments must be rejected.

In support of its forfeiture claim, the Government presented the Court with excerpts from Binday's own deposition in a civil case in which he acknowledged that $4 million had been paid by AIG to a trust of which Marcy Trachtenberg—whose husband Gregg testified at trial, and who is Resnick's sister—was the trustee. Binday had brought the lawsuit from which the deposition sprang in order to assert entitlement to that death benefit. Now, at sentencing, he claims he has "not received any money on the death benefit" and that "[t]he LimQuee family has received $2 million." (Binday Mem. at 50). These bare allegations are unsupported by any evidence. Absent some proof to rebut the evidence from Binday's own deposition, the full $4 million should be included in the forfeiture judgment.

Turning to Binday's attack on the Government's forfeiture theory, Binday argues that his money judgment should be limited to the net, not the gross, proceeds of the offense, analogizing his case to those involving insider trading. (*See* Binday Mem. at 49-50). This is unpersuasive, as the conduct of all defendants, in making fictitious representations to induce insurance companies to write policies that were different in nature from what they believed they were providing, is at best an "illegal service[]," 18 U.S.C. § 981(a)(2)(A), and entirely dissimilar to insider trading. But it is a moot point; even assuming that Section 981(a)(2)(B) applied, the forfeiture amounts would still be as stated in the Government's proposed forfeiture orders,

because defendants have not established any "direct costs incurred in providing the goods or services," 18 U.S.C. § 981(a)(2)(B), as it is their burden to do, *see id.* ("the claimant shall have the burden of proof with respect to the issue of direct costs").  Indeed, given that section 981(a)(2)(B)'s restrictive definition of direct costs explicitly excludes overhead and taxes, defendants do not appear to have incurred any eligible "direct costs."  *See* § 981(a)(2)(B) ("The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.").  Finally, Binday's complaint that not every policy for which forfeiture is sought was proven at trial (Binday Mem. at 50) misses the mark, as the rules expressly provide that the court can order forfeiture based on the trial record and "any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable."  Fed. R. Crim. P. 32.2(b)(1)(B).

## XI.   THE GOVERNMENT IS ENTITLED TO FORFEIT $2,970,396.11 FROM THE PROCEEDS OF THE SALE OF BINDAY'S CO-OP SHARES

Finally, as a component of the judgment against Binday, the Government is entitled to forfeit $2,970,396.11 from the proceeds of the April 10, 2014 interlocutory sale of Binday's co-op shares.  Of this total amount, $1,958,317.83 constitutes fraud proceeds and the other $1,012,078.28 is Binday's interest in the remainder as a substitute asset.

### A.   Basis for Forfeiture

As described in the Government's July 8 Submission, defendants must forfeit the reasonably foreseeable proceeds of their offense.  Proceeds are "'property that a person would not have but for the criminal offense,'" *United States* v. *Daugerdas*, No. S3 09 Cr. 581 (WHP), 2012 WL 5835203, at *2 (S.D.N.Y. Nov. 7, 2012) (quoting *United States* v. *Grant*, No. S4 05 Cr. 1192 (NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008)), including property that a defendant obtained lawfully but retained only because of the offense, *United States* v.

*Torres*, 703 F.3d 194, 200 (2d Cir. 2012).   Additionally, the forfeiture of substitute assets is authorized by Title 21, United States Code, Section 853(p), which provides that, if any forfeited property "(A) cannot be located upon the exercise of due diligence; (B) has been transferred, sold to or deposited with a third party; (C) has been placed beyond jurisdiction of the Court; (D) has been substantially diminished in value; or (E) has been commingled with other property which cannot be divided without difficulty," as a result of the defendant's actions or omissions, 21 U.S.C. § 853(p)(1), the "court shall order the forfeiture of any other property of the defendant, up to the value of property" so transferred or moved by the defendant, § 853(p)(2).

Here, the Government seeks the forfeiture of a portion of the proceeds of the sale of Michael and Karen Binday's shares in the 11 Riverside Drive cooperative corresponding to his penthouse apartment there.  Pursuant to a March 27, 2014 stipulation and order, those shares were sold, a portion of those proceeds ($884,462.70) were released to Karen Binday, and the majority ($3,098,011.70) was placed into escrow as a substitute *res* for the co-op shares. Because Binday used fraud proceeds to purchase at least a portion of the co-op shares, the Government is entitled to forfeit that amount as traceable fraud proceeds, and—because most of the proceeds of the fraud have been dissipated—to forfeit Binday's interest in the remainder of the property as substitute assets.

As set forth below, at least $1,958,317.83 of fraud proceeds were used to purchase the co-op shares.  The Government is entitled to this amount, plus Binday's interest in the remainder of the sale proceeds of the co-op shares as substitute assets.  The sale generated a total of $3,982,474.40 in proceeds, leaving $2,024,156.57 remaining.  Binday's marital interest in that is 50%, or $1,012,078.28.  Thus, the Government is entitled to forfeiture of a total of

$2,970,396.11.[14]  Under the stipulation and order of interlocutory sale, $3,098,011.70 is

currently restrained, and Binday's wife (who is the owner of the other half of the remaining sale

proceeds) has already received $884,462.70.  Upon entry of the requested forfeiture order, the

difference between the restrained funds and the sale proceeds to be forfeited, or $127,615.59,

would be released from escrow to Ms. Binday.[15]

      **B.**    **Tracing of Crime Proceed to the Co-Op Shares**

          As set forth in detail in the Supplemental McDonald Declaration, Binday

purchased the co-op shares for $2,650,000, consisting of a $265,000 deposit (the "Deposit")

placed in escrow on October 15, 2007, and the balance, plus closing costs, in a $2,385,094

cashier's check (the "Cashier's Check") on February 28, 2008.  (McDonald Supp. Dec. ¶¶ 9, 25

& Atts. I, Z).  The funds used to make the Deposit, and at least $1,693,317.83 of the funds used

to purchase the Cashier's Check, came from commission payments made by victim insurance

companies on Scheme Policies.  These payments first were deposited into an HSBC account held

in the name of R Binday Plans and Concepts (the "9105 account"), and then moved through two

---

[14] This figure is actually a very conservative calculation, as it discounts entirely the appreciation—which the Government is entitled to—on the co-op shares between when Binday initially purchased them for $2,650,000 and their sale for $3,982,474.40.  *See, e.g.*, *United States* v. *Hatfield*, No. 06 Cr. 550 (JS), 2010 WL 4340632, at *1 (E.D.N.Y. Oct. 22, 2010) ("[I]f tainted funds were used to purchase some of Mr. Brooks' Point Blank stock, the United States' forfeitable interest equals the dollar amount of such proceeds traced into the actual shares, with the United States enjoying the benefit of appreciation but Mr. Brooks bearing the risk of depreciation." (internal quotation marks omitted)); *United States* v. *Kalish*, No. 06 Cr. 656 (RPP), 2009 WL 130215, at *6 (S.D.N.Y. Jan. 13, 2009) (finding Government entitled to appreciation on stocks bought with traceable proceeds), *aff'd*, 626 F.3d 165 (2d Cir. 2010). However, in order to obviate litigation over the nature and source of the appreciation, the Government will, in this case, forgo its claim to the appreciation of the fraud proceeds and treat only the dollar figure Binday put in as traceable proceeds.

[15] Binday's wife has already received $884,462.70 from the sale proceeds, and thus the return of the additional $127,615.59 will account for her entire $1,012,078.29 interest in the untainted sale proceeds.

other HSBC accounts, one in the name of Michael Binday Enterprises Inc. (the "5653 account") and the other in the name of Michael L Binday and Karen Binday (the "6246 account").  The funds ultimately were transferred to a fourth HSBC account, in the name of Michael and Karen Binday (the "3684 account"), which was used to make the Deposit and purchase the Cashier's Check.

In the case of each of these accounts, crime proceeds were commingled with other funds, implicating the tracing rules applicable under forfeiture law.  When, as here, crime proceeds are commingled with other property, the Government has the option of treating the crime proceeds as remaining in the account (a lowest intermediate balance rule), as leaving the account (a first-in first-out rule), or to allocate the proceeds pro rata (an averaging rule).  *United States* v. *Banco Cafetero Panama*, 797 F.2d 1154, 1159-60 & n.6 (2d Cir. 1986) (recognizing government's option of lowest intermediate balance or first-in first-out rule, accounting choices, noting government did not seek to use averaging); *United States* v. *Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) (noting availability of *Banco Cafetero*'s three "accounting choices").

Using these rules, the Supplemental McDonald Declaration establishes that $265,000 of crime proceeds were used to make the deposit and at least $1,693,317.83 of the funds used to buy the Cashier's Check.  On or about September 19, 2007, the 9105 account received a check for $419,888.66 from victim AIG (*see* McDonald Supp Dec. ¶ 6 & Att. E), of which at least $378,005.99 of this amount was attributable to Scheme Policies (those of Karg, Card, and Skidmore) (*see id.* & Att. F at 16, 24, 25).  This money in turn flowed to the 5653 account and then the 3684 account.  On or about September 25, 2007, the 5653 account received a check from the 9105 account in the amount of $485,650.  (*See id.* ¶ 7 & Att. G).  Between September 19 and September 25, 2007, the balance of the 9105 account never dropped below

$378,005.99.  (*See id.*, Att. D at 0011896-97).  After receiving the $485,650 amount from the

9105 account, the 5653 account's next transaction was on October 1, 2007, when it issued a

check for $520,000, which was deposited into the 3684 account.  (*See id.* ¶ 8 & Att. H).

Accordingly, at least $378,005.99 of the amount transferred to the 3684 account was traceable to

the amounts that AIG paid on Scheme Policies.

   These fraud proceeds were used to make the Deposit.  On October 15, 2007, the

3684 account transferred $265,000 into escrow for the Deposit.  (*See id.* ¶ 9 & Att. I).  Between

October 1 and October 15, 2007, the 3684 account balance never dropped below $378,005.99.

(*See id.*, Att. A at 0025197).  Accordingly, the $265,000 Deposit was traceable to fraud proceeds,

and at least $113,005.99 ($378,005.99 minus $265,000) traceable to fraud proceeds remained in

the 3684 account as of October 15, 2007.

   Meanwhile, more fraud proceeds were accumulating in the 9105 account.  On

October 3, 2007, the 9105 account received a $358,433.83 check (*see id.* ¶ 10 & Att. J, of which

at least $356,238.74 was attributable to Scheme Policies (those of Karg and Farrell) (*see id.* &

Att. K at 5, 7, 13).  On October 31, 2007, the 9105 account received a $189,055.06 check from

AIG (*see id.* ¶ 11 & Att. L), of which at least $187,264 was attributable to Scheme Policies (that

of Merber) (*see id.* & Att. M at 17, 19).  Between October 3 and October 31, 2007, the lowest

balance in the 9105 account was $309,662.68.  (*See id.*, Att. D at 0011903-04).  Accordingly,

due to the lowest intermediate balance rule, there was at least $309,662.68 of fraud proceeds in

the 9105 account before $187,264 of fraud proceeds was added to it on October 31, for a total of

at least $496,926.68 in fraud proceeds.

   Binday transferred these fraud proceeds through the 5653 account to the 3684

account.  On November 21, 2007, the 9105 account issued a $491,390 check to the 5653

account.  (*See id.* ¶ 12 & Att. N).  Between October 31 and November 21, 2007, lowest

intermediate balance of the 9105 account was $441,343.75.  (*See id.*, Att. D at 0011904,

0011911-12).  Accordingly, pursuant to the lowest intermediate balance rule, of the November

21, 2007 $491,390 check to the 5653 account, at least $441,343.75 was traceable to fraud

proceeds.  On December 3, 2007, the 3684 account received a check for $425,000 from the 5653

account.  (*See id.* ¶ 13 & Att. O).  Between November 21, 2007 and December 3, 2007, the 5653

account balance never dropped below $425,000.  (*See id.*, Att. B at 0024320-21).  Accordingly,

the $425,000 the 3684 account received on December 3, 2007 (*id.*, Att. O), was entirely traceable

to the amounts that AIG paid on Scheme Policies.

      In turn, since between paying the Deposit on October 15, 2007 and receiving

these funds on December 3, 2007, the 3684 account balance never dropped below $113,005.99

(*id.*, Att. A at 0025197, 0025200, and 0025202), the 3684 account contained at least $113,005.99

of fraud proceeds when it received the additional $425,000, for a total of $538,005.99 of fraud

proceeds as of December 3, 2007.

      Even while accumulating money in the 3684 account, Binday continued to collect

new fraud proceeds in the 9105 account.  On or about November 26, 2007, the 9105 account

received a check in the amount of $263,115.79, from victim Union Central (*see id.* ¶ 15 & Att.

P), all of which was attributable to Scheme Policies (those of Melnick and Skidmore) (*id.* & Att.

Q).  Between November 26, 2007 and December 12, 2007, the balance of the 9105 account never

dropped below $263,115.79.  (*See id.*, Att. D at 0011912, 0011918).  On or about December 12,

2007, the 9105 account received a check from the Union Central Life Insurance Company, in the

amount of $242,975.70 (*see id.* ¶ 17 & Att. R), all of which was attributable to Scheme Policies

(that of DiFrisco) (*see id.* & Att. S).  Between December 12 and December 13, 2007, the balance

of the 9105 account never dropped below $506,091.49.  (*See id.*, Att. D at 0011918-19).

Binday then transferred funds to the 6246 account, and then the 3684 account,

through non-check transfers.  On or about December 13, 2007, the 9105 account was debited

$927,691.99 in a transaction marked "Cash disbursement R Binday Plans &-Net=Pay."  (*See id.*,

Att. D at 0011919).  On or about December 14, 2007, the 6246 account was credited

$900,517.11, in a transaction marked "Deposit from R Binday Plans &-Net=Pay."  (*See id.*, Att.

C at 0025325).  On or about December 17, 2007, the 6246 account, in turn, made an online

transfer of $965,000 to the 3684 account.  (*See id.*, Att. C at 0025325; *see also id.*, Att. A at

0025202).  Accordingly, at least $506,091.49 of the funds transferred to the 3684 account on

December 17, 2007 was traceable to amounts that Union Central paid on Scheme Policies.

These transfers caused the 3684 account to accumulate a large amount of fraud proceeds.

Between December 3, 2007 (when as set forth above, it contained at least $538,005.99 in fraud

proceeds) and December 17, 2007, the balance in the 3684 account never dropped below

538,005.99.  (*See id.*, Att. D at 0025202).  Accordingly, the 3684 account contained at least

538,005.99 of fraud proceeds as of December 17, 2007 before receiving at least $506,091.49 of

fraud proceeds from the 6246 account, for a total of $1,044,097.48 in fraud proceeds as of

December 17, 2007.

Binday collected more fraud proceeds in early 2008.  On January 8, 2008, the

9105 account received a check from victim AIG in the amount of $102,625.50 (*see id.* ¶ 21 &

Att. T, of which at least $101,651.35 of this amount is attributable to Scheme Policies (that of

Caffiero) (*see id.*, Att. U at 17, 19).  On January 8, 2008, the 9105 account also received a check

from victim Union Central, in the amount of $547,569 (*id.* ¶ 22 & Att. V), all of which was

attributable to Scheme Policies (those of Riviere, Lennard, and Katz) (*id.* & Att. W).  Between

January 8, 2008 and January 15, 2008, the balance of the 9105 account never dropped below

$649,220.35.  (*See id.*, Att. D at 0011926).

These additional funds flowed, as before, through the 5653 account to the 3684

account, causing it to contain at least $1,693,317.83 in fraud proceeds.  On February 15, 2008,

the 5653 account received $900,000 from the 9105 account. (*See id.* ¶ 23 & Att. X).  On

February 19, 2008, the 3684 account received $820,000 from the 5653 account.  (*See id.* ¶ 23 &

Att. Y).  Between February 15, 2008 and February 19, 2008, the balance in the 5653 account

never dropped below $649,220.35.  (*See id.*, Att. B at 0024330).  Accordingly, at least

$649,220.35 of the $820,000 transferred from the 5653 account to the 3684 account on February

19, 2008 is traceable to the amounts paid on Scheme Policies made by AIG and Union Central.

Between December 17, 2007 and February 19, 2008, the balance of the 3684 account never

dropped below $1,044,097.48.  (*See id.*, Att. A at 0025202, 0025205, 0025207).  Accordingly,

the 3684 account contained at least $1,044,097.48 in fraud proceeds as of February 19, 2008

before receiving at least $649,220.35 in fraud proceeds from the 5653 account (*id.*, Att. X), for a

total of $1,693,317.83 in fraud proceeds as of February 19, 2008.

Shortly after receiving this installment of fraud proceeds, the 3684 account used

them to complete the purchase of the co-op shares.  On February 25, 2008, the 3684 account

purchased the Cashier's Check, made out to the order of Eleven Riverside Drive Corp.  (*See id.*.

¶ 25 & Att. Z).  On or about February 28, 2008, the Cashier's Check was negotiated, completing

the purchase of the Riverside Drive Initial Shares.  Between February 19, 2008 and February 25,

2008, the balance of the 3684 account never dropped below $1,693,317.83. (*Id.*, Att. A at

30

0025207).  Accordingly, at least $1,693,317.83 of the value of the Cashier's Check was traceable to fraud proceeds.

    In total, then, the full $265,000 of the Deposit and at least $1,693,317.83 of the Cashier's Check were traceable to fraud proceeds, for a total of at least $1,958,317.83.

    **C.    Substitute Assets**

    In addition to the directly traceable proceeds, the Government is entitled to forfeit Binday's interest in the remainder of the sale proceeds as substitute assets.  Because the title to directly traceable crime proceeds vests in the United States as of the commission of the crime, Binday's interest extends to half of the remaining sale proceeds.

    Under the relation-back doctrine, the United States has superior title to the directly traceable crime proceeds.  This doctrine is codified in 21 U.S.C. § 853(c), under which "[a]ll right, title, and interest in property described in subsection (a) of this section [i.e., directly forfeitable property] vests in the United States upon the commission of the act giving rise to forfeiture under this section."[16]  Under this longstanding principle, title to crime proceeds vests in the United States at the time of the commission of the offense, giving the United States superior title to any other holder.  *See, e.g.*, *Caplin & Drysdale, Chartered* v. *United States*, 491 U.S. 617, 627 (1989) (noting the "long-recognized and lawful practice of vesting title to any forfeitable assets, in the United States, at the time of the criminal act giving rise to the forfeiture," such that the defendant "cannot give good title to such property to petitioner because he did not hold good title"); *United States* v. *Kramer*, 06 Cr. 200 (ENV) (CLP), 2006 WL

---

[16] The procedures of Section 853 are incorporated to the criminal forfeiture of the proceeds of mail and wire fraud offenses by 18 U.S.C. § 981(a)(1)(C) (authorizing civil forfeiture for such violations) and 28 U.S.C. § 2461(c) (authorizing criminal forfeiture and incorporating Section 853).

3545026, *7 (E.D.N.Y. Dec. 8, 2006) (noting that relation back provision "is the means by which the Government has an immediately vested right in potentially forfeitable property").

It is plain that the requisites for a substitute asset order are met. As the complexity of the above tracing exercise, which involved multiple transactions through four different bank accounts, suggests, the full amount of crime proceeds have not yet been located. The bank statements attached to the supplemental Roberts Declaration—or even the sections of them summarized above—show that crime proceeds were removed from the Binday accounts; these funds went to various third parties or to wholly unknown locations. Indeed, even Binday concedes that his co-op shares were his "sole remaining asset of any substantial value." (*See* Binday Mem. Supp. Mot. Lift Restraints at 1). There is no question that, as a result of Binday's actions or omissions, forfeitable property well in excess of Binday's $1,012,078.28 interest in the remaining sale proceeds "(A) cannot be located upon the exercise of due diligence; (B) has been transferred, sold to or deposited with a third party; . . . or (E) has been commingled with other property which cannot be divided without difficulty," 21 U.S.C. § 853(p)(1). In such circumstances, forfeiture of substitute assets is required. *See* § 853(p)(2) (providing that "court shall order the forfeiture of any other property of the defendant, up to the value of property").

Accordingly, in addition to a money judgment in the amount of the Scheme Commissions, Binday should forfeit $1,958,317.83 of the sale proceeds as traceable to crime and $1,012,078.28 as a substitute asset.

## <u>CONCLUSION</u>

For the foregoing reasons, and those contained in the Government's July 8

Submission, the Government respectfully requests that the Court sentence each defendant to a

very substantial term of imprisonment, and so order the proposed forfeiture and restitution orders

attached as Addendum B hereto.

DATED:  July 23, 2014
     New York, New York

          Respectfully submitted,

          PREET BHARARA
          United States Attorney


       By: ___/s/_____
        Sarah E. McCallum
        Eun Young Choi
        Paul M. Monteleoni
        Assistant U.S. Attorneys
        Southern District of New York
        Tel. (212) 637-1033/2187/2219