E7ugbins

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4            v.                          12 CR 152(CM)

5   MICHAEL BINDAY,
    JAMES KEVIN KERGIL, and
6   MARK RESNICK,

7            Defendants.

8   ------------------------------x
                                    New York, N.Y.
9                                   July 30, 2014
                                    2:35 p.m.
10
    Before:
11
                    HON. COLLEEN MCMAHON,
12
                                        District Judge
13
                        APPEARANCES
14
    PREET BHARARA
15       United States Attorney for the
         Southern District of New York
16   SARAH MCCALLUM
    EUN YOUNG CHOI
17   PAUL MONTELEONI
    ARIEL PLATT
18       Assistant United States Attorneys

19   LAW OFFICE OF JEREMY SPORN
         Attorneys for Defendant Michael Binday
20   ANDREW FRISCH
    JEREMY SPORN
21
    GALLET, DREYER & BERKEY, LLP
22       Attorneys for Defendant James Kevin Kergil
    ROGER STAVIS
23   ADAM FELSENSTEIN

24   MURRAY LAW, LLC
         Attorney for Defendant Mark Resnick
25   JANEANNE MURRAY

E7ugbins

1          (Case called)

2          THE COURT:  Good afternoon.  Have a seat everyone.

3          This matter is on for sentencing under docket 12 Cr.

4   152, United States of America v. Mark Resnick, United States of

5   America v. James Kevin Kergil, United States of America v.

6   Michael Binday.

7          The defendants having been found guilty following a

8   trial of a number of crimes.  For Mr. Binday, one count of

9   conspiracy to commit mail and wire fraud, one count of mail

10   fraud, and one count of wire fraud.

11          Mr. Kergil of one count of conspiracy to commit mail

12   and wire fraud, one count of mail fraud, one count of wire

13   fraud, and one count of conspiracy to destroy records and

14   obstruct of justice.

15          Mr. Resnick, one count of conspiracy to commit mail

16   and wire fraud, one count of mail fraud, one count of wire

17   fraud, and one count of conspiracy to destroy records and

18   obstruct justice.

19          The conspiracy to commit mail and wire fraud count is

20   a class C felony in violation of Title 18, United States Code,

21   Section 1349.  This crime carries a statutory maximum penalty

22   of 20 years' imprisonment, three years' supervised release, a

23   fine the greater of $250,000 or twice the gross gain to the

24   defendant or loss to identifiable victims other than the

25   defendant, and a $100 special assessment.

E7ugbins

1          Mail fraud is a class C felony in violation of Title

2     18, United States Code, Section 1341.  It carries the same

3     statutory maximum penalty as conspiracy to commit mail fraud.

4          Count Three, wire fraud, is a class C felony in

5     violation of Title 18, United States Code, Section 1343.  It

6     carries the same statutory maximum penalty as conspiracy to

7     commit wire fraud.

8          Count Four, conspiracy to destroy records and obstruct

9     justice is a class C felony in violation of Title 18, United

10    States Code, Section 1512(c) and (k).  It carries the same

11    statutory maximum penalty as the other three counts.

12         In connection with today's proceedings, I have

13    received and reviewed a great deal of material.  I have the

14    presentence reports for Mr. Binday, Mr. Kergil and Mr. Resnick.

15    Mr. Binday's and Mr. Resnick's were prepared by United States

16    Probation Officer Jemmard Thomas and Mr. Kergil's was prepared

17    by United States Probation Officer Rodger Flemen.

18         I have the government's initial sentencing submission,

19    which came in a fat, black binder, along with 14

20    separately-tabbed exhibits, some of which have subtabs, and

21    they include an affirmation or a declaration from Thomas W.

22    McDonald, Special Agent with the F.B.I.

23         I have sentencing submissions from counsel on behalf

24    of each of the three defendants, extensive written sentencing

25    submissions in most cases with letters and testimonials

E7ugbins

1    attached thereto.

2            I have the government's reply in support of its

3    sentencing arguments and its supplemental submission regarding

4    forfeiture, which has with it Addendum A and Addendum B.

5    Addendum A are some charts concerning trial evidence that

6    relates to the, quote, "scheme applications."  Addendum B are

7    proposed preliminary orders of forfeiture as to specific

8    property and money judgments as against each individual

9    defendant, and a proposed order of restitution that the

10   government would like me to enter in the course of today's

11   proceedings.

12           Is there anything else I should have seen in writing

13   prior to today's proceedings from the government?

14           MS. MCCALLUM:  Nothing from the government, your

15   Honor.

16           THE COURT:  From defendant Binday.

17           MR. FRISCH:  No, your Honor.

18           THE COURT:  From defendant Kergil.

19           MR. STAVIS:  From the day following our presentence

20   memorandum, I sent a letter to the Court attaching an email.

21   That was July 15, 2014.

22           THE COURT:  Mr. Ramil tells me I have it.  Do I have

23   it?

24           THE DEPUTY CLERK:  You do, indeed.

25           THE COURT:  Can you pull it out so I can read it

E7ugbins

1    because I don't recall I read it.

2            Ms. Murray, anything else on behalf of your client?

3            MS. MURRAY:  Nothing further.

4            MS. MCCALLUM:  I did omit one thing.  Mr. Monteleoni

5    pointed it out to me.

6            In addition to the reply with the supplemental

7    forfeiture submission, we also submitted a supplemental

8    declaration from Thomas McDonald.

9            THE COURT:  I should have said that.  This is

10   Mr. McDonald's supplemental declaration.  It's fat.  And here

11   is the letter from Mr. Stavis with the attached email, which I

12   am sorry I overlooked.  Thank you very much.

13           Has the government reviewed the presentence reports?

14           MS. MCCALLUM:  Yes.

15           THE COURT:  Any additions, deletions or corrections?

16           MS. MCCALLUM:  Aside from those reflected in the reply

17   submitted by the government, no.

18           THE COURT:  Let's go through them paragraph by

19   paragraph, report by report.  I'm afraid I have to do that.

20   Let's start with Mr. Binday because I'm not going to figure

21   them out on my own.

22           MS. MCCALLUM:  They relate only to the loss amounts,

23   your Honor and specifically the commission's calculations.

24           THE COURT:  And paragraph?  Since I'm forced to

25   calculate loss amounts, do commissions calculations actually

E7ugbins

1    matter?

2              MS. MCCALLUM:  Paragraph 35, your Honor --

3              THE COURT:  Paragraph 35 of Mr. Binday's presentence

4    report, it doesn't list any commission.  Indeed, that was a

5    question that I had for you.  It's a little confusing.

6              Are the actual loss figures payouts on policies that

7    have actually been paid out net of premiums paid and net of

8    commissions, or are they just net of premiums paid and the

9    commissions are in addition?

10             MS. MCCALLUM:  The actual losses consist of, first,

11   commissions paid out to the defendants and to others in

12   connection with the scheme policies; so that's one portion of

13   the actual losses.  The other portion relates to the death

14   benefit losses.

15             THE COURT:  Correct.

16             MS. MCCALLUM:  So it's death benefits paid out net of

17   the premiums paid on those policies, as well as all premiums

18   paid on lapsed scheme policies for which no death benefits were

19   actually paid out.

20             THE COURT:  You have just subtracted them willy-nilly

21   from policies as to whichever death benefits were paid out?

22             Is that correct?

23             MS. MCCALLUM:  Essentially, your Honor, we took the

24   collection, the universe of scheme policies, and any policy

25   within the scheme policies that has terminated, so it has

E7ugbins

1  either resulted in a death benefit or a lapse.

2            THE COURT:  Death benefit or a lapse.

3            MS. MCCALLUM:  We have netted out all premiums paid on

4  any lapsed or paid out policies.

5            THE COURT:  There's no death benefit to net out the

6  premiums against an unlapsed policy.

7            MS. MCCALLUM:  Correct.

8            THE COURT:  You have taken that number off the bottom.

9  Is that correct?

10            MS. MCCALLUM:  That's right.

11            THE COURT:  Thank you.

12            The same correction was made with respect to

13  Mr. Kergil's and Mr. Resnick's, correct, on the actual loss?

14            MS. MCCALLUM:  That's correct; yes.

15            THE COURT:  Does the government wish to be heard on

16  sentencing?

17            MS. MCCALLUM:  Yes, your Honor.  May I just stand at

18  the podium.

19            THE COURT:  Wherever you would like, Ms. McCallum.

20            MS. MCCALLUM:  The Court has informed the parties that

21  it does not intend to --

22            THE COURT:  In fact, I'll tell you what I'm going to

23  do because since the time that I informed you I have to and the

24  law requires me to calculate the guidelines, I'm going to use

25  the actual loss numbers that the government has provided me

E7ugbins

1   with in the updated submission from Mr. McDonald, so the actual

2   loss number is something like $36 million.

3        What I said I was going to do is calculate the

4   guidelines, consider the guidelines, and then sentence in the

5   old-fashioned way, and I still intend to do that.

6        MS. MCCALLUM:  Understood.  I will focus my brief

7   presentation on the 3553(a) factors.

8        I want to start with the nature and characteristics of

9   the offense.  You have volumes of paper in front of you

10   relating to the nature and characteristics of the offense.

11   Your Honor presided over the trial, so I will be brief.  I just

12   want to emphasize how calculated and multilayered and brazen

13   the fraud was in which the defendants engaged.

14        They didn't just submit 92 fraudulent scheme

15   applications to insurance companies.  They backed up their lies

16   with false accountant reports, bogus inspection reports, fake

17   estate plans, and then in the case of Mr. Binday, lengthy

18   emails, for example, to Prudential, purporting to specify

19   details of conversations with an insurer that had never

20   occurred.

21        Even worse than backing up their fraud with false

22   documents, the defendants in this case, all three of them,

23   coached senior citizens who were the straw insureds on these

24   policies to lie to insurance companies and they told them what

25   false answers to give to insurance companies.

E7ugbins

1          Then, on top of all of that, all three defendants

2     schemed in one way or another to obstruct justice, to conceal

3     their fraud.  In the case of Mr. Binday, he lied under oath

4     before the New York State Insurance Department, he instructed

5     seniors to lie after investigators came calling and he directed

6     Mr. Kergil, Mr. Krupit, Mr. Resnick to destroy documents after

7     learning that the F.B.I.'s investigation had begun.

8          Mr. Kergil and Mr. Resnick, for their part, also

9     schemed to destroy records at Mr. Binday's direction.  In the

10    government's view, the nature and the circumstances of the

11    offense here weigh heavily in favor of various substantial

12    terms of imprisonment.

13          Turning to the history and characteristics of the

14    defendants, your Honor has before you a number of good

15    character letters which, of course, must be weighed in the

16    balance.  On that front, the government would urge that the

17    Court also consider the character of the defendants as

18    reflected in their actions, and keep in mind that this is not

19    just an isolated event.  These are a series of events that took

20    place over many years beginning with fraudulent applications in

21    around 2006 and stretching through to obstruction of justice in

22    2010.

23          Turning to the number of goals of sentencing that are

24    listed, I think it's 3553(a)(2), I want to focus on two of

25    them.  The first is promotion of respect for the law.  The

E7ugbins

1   defendants in this case exhibited such contempt for the law in

2   their actions through their fraud and then through their

3   actions to cover up the fraud that the government believes this

4   particular goal weighs heavily in favor of substantial

5   sentences.

6          Similarly, the goal of deterrence:  These defendants

7   were not deterred by the threat of civil penalties or by the

8   threat that insurance companies might discover their fraud.

9   They were willing to run the risks of those kinds of penalties,

10  lying through their teeth the whole time.

11         They weren't deterred from destroying evidence or

12  seeking to destroy evidence after the FBI began investigating

13  their fraud.  And in a case like this where the law has been so

14  brazenly and repeatedly broken, substantial sentences are

15  warranted.

16         Does the Court have further questions?

17         THE COURT:  No.  You went on at great length in your

18  submissions, for which I thank the government.

19         MS. MCCALLUM:  Thank you, your Honor.

20         THE COURT:  Let's start with Mr. Binday.  Counsel,

21  good afternoon.  Have you reviewed the presentence report and

22  gone over it with your client?

23         MR. FRISCH:  Yes, we have, your Honor.

24         THE COURT:  Aside from your objection to the

25  guidelines calculation, is there any other error in the

E7ugbins

1    presence report that you need to call to my attention?

2              MR. FRISCH:  With the exception of those issues that

3    go to the guideline calculation and loss and economic harm, and

4    also with regard to the two enhancements, obstruction of

5    justice and what I have written about aggravating role, that's

6    it.  My understanding of how your Honor is going to proceed is

7    that with regard to the two enhancements, at least, your Honor

8    is certainly going to consider the underlying conduct as you

9    will the entire record --

10             THE COURT:  I'll tell you what I'm going to do.  I

11   read your arguments.  I think the enhancements are warranted.

12   I'll include them in the guideline calculation.

13             This is a perfect example of why the thing should be

14   abolished.  They should be gotten rid of:  The amount of time,

15   the amount of money, the amount of effort that has been

16   expended arguing the guidelines and how they should be

17   calculated instead of arguing about Mr. Binday is really

18   extraordinary, and, in this case, totally completely

19   unnecessary.

20             The conduct will obviously be taken into account, but

21   I am required by law, as you know, to calculate the guidelines.

22             MR. FRISCH:  I understand.  But for those things,

23   there are no outstanding objections to the PSR.

24             We brought some minor things, or relatively minor

25   things, to the attention of Officer Thomas.  He corrected them

E7ugbins

1    and those things have been taken care of.

2             THE COURT:  I will hear you on sentencing, sir.

3             MR. FRISCH:  Thank you, Judge.

4             One of the reasons why I think this case is unusual,

5    and I think we probably can all agree that the case is unusual

6    in some respects, is that I think we're unlikely to see this

7    type of particular conduct repeated with any significant

8    frequency in the future, both specifically and certainly

9    generally.

10            The conduct in this case began before and at a time

11   when the various entities involved were responding to STOLI.

12   At least some of the insurance companies at the time or shortly

13   after the conduct began were nominally or otherwise taking

14   steps to protect themselves from STOLI.

15            As your Honor knows, there were laws passed.  And, of

16   course, ultimately here, and in a few other cases around the

17   country, the United States Department of Justice planted a flag

18   in the STOLI non-STOLI landscape, which essentially said we

19   don't like this, stop it.

20            Plainly, the government in this case attempted to

21   craft an indictment that would fit this case into a cognizable

22   theory of criminal liability.  Your Honor sustained it.  The

23   jury found it.  Ultimately, the circuit will pass on it.  But

24   in no event can the Department of Justice be faulted for trying

25   and possibly succeeding.  And that's what the Department of

1    Justice does in the best scenario in many different kinds of

2    subject matters:  They see something they deem worthy of their

3    attention as they did here, something new, and they go after it

4    and they go at it.

5         But where I think the government misses the mark,

6    notwithstanding the government's presentation just now and what

7    they put in writing, how they missed the mark in this case is

8    their conclusion that it's necessary, the only way to respond,

9    you got to do it, you got to impose lots of prison time or else

10   somehow the point isn't made.

11        In my view, not only are the guidelines something that

12   were folly, but I think our current preoccupation with lots of

13   prison time when I say "our," I mean our national preoccupation

14   is also a folly, is counterproductive and doesn't serve

15   anyone's interest, especially in a case like this; though

16   having said that, I'm not saying this a probation case.  It is

17   not.  There were misrepresentations.  There's reason for

18   incarceration to be imposed.  The jury and your Honor rejected

19   the defense, but notwithstanding that, I think an overemphasis

20   on lots of prison time in situations like this is part of our

21   national problem in the system in which we all proudly work.

22        I think the government misses the mark for two

23   categories of reasons, one of which is general and one of which

24   is Mr. Binday specific.

25        The general reasons:  As I pointed out, the landscape

E7ugbins

1   has changed.  We're not going to see this kind of conduct,

2   certainly with any significant degree of frequency, going

3   forward.  The landscape is different now than when the conduct

4   in this case began, which is a way of saying general deterrence

5   is not something really that which I believe in this case the

6   Court has to be overly concerned.

7          In addition, and maybe more important, the fraud loss,

8   notwithstanding what your Honor has found as you have to make a

9   finding, that is, the fraud loss happens to be limited as a

10  matter of fact by the theory that the government crafted so

11  precisely and with such care to bring this as a criminal and

12  not a civil case.

13         In its papers, the government talks about things

14  flowing from stealth and proximate result of conduct, and

15  phrases of that sort.  They say, for example, in year one, he

16  had these representations; in year five or year ten, you have a

17  $2 million death benefit, but that's not a

18  criminal-lots-of-prison-theory.

19         This is not a case where a terminally ill senior was

20  presented as robust or that the fact that an insured or a death

21  was fabricated.  There are case like that.  Those are cases

22  where the calculation the government proposes and the kind of

23  sentence they recommend is properly applied.

24         The criminality here is the economic harm, the right

25  to control, the economic harm difference between STOLI and

E7ugbins

1    non-STOLI; and if that were any significant number, your Honor,

2    I respectfully submit two years into the case, we would have

3    heard about it.

4            That doesn't mean that Mr. Binday today gets an

5    attaboy or a pat on the back or a hug instead of a prison

6    sentence, but it is prospective as to what we're here to

7    sentence him for, what the crime was and what the government's

8    theory is.

9            General deterrence does not require more than a short,

10   definite period of incarceration.  It's the certainty, not the

11   length.  That's what the authorities that we cite to the Court

12   say.  I don't think it's in dispute.  It's the certainty in

13   white collar first offender cases that matters, not the

14   severity, which I submit is not productive.

15           There's no empirical evidence that the kind of

16   sentence sought by the government deters prospective white

17   collar defendants.  If a prospective white collar defendant is

18   not deterred by what has happened in this court to date and

19   what will happen in a prison sentence that is not so severe is

20   imposed, it is unlikely that any such person is going to be

21   deterred.

22           Let me turn to Mr. Binday.  If we can agree that a

23   trial is about charged conduct, sentencing is about the conduct

24   in context, the context of who the person is.  The letters

25   submitted on Mr. Binday's behalf are impressive.  They're

E7ugbins

enthusiastic.  They're genuine.  There's a goodly number of
them.  They put the conduct in perspective.  It doesn't say no
prison, but it cuts against the notion that we have to put him
in jail for a long time.

          A short sentence is going to help him get it to the
extent he hasn't already gotten it by having sit in this
courtroom today and having sat through the trial.

          Of the letters, there were more than 20 people, family
and friends who are here today, including his wife Karen of 15
years, and so many others.  These letters speak, your Honor, to
long-standing devotion to charitable and civic activities that
predate this case.

          I know what the government's view of Mr. Binday is and
his conduct, but the person you're about to sentence gives
gloves to homeless people, volunteers as a poll watcher, makes
sure that the commission is paid when the person that owes the
commission has completely forgotten about it, works for free to
help clients, always goes the extra mile, is the person to whom
people turn in a crisis, not once or twice, but time and again.

          So many people in these letters give witness to who
Mr. Binday is over so many years, generosity and selflessness
in so many contexts, so many times and so many people.  The
conduct in this case is important.  It's why he's being
sentenced today.  It's why he's going to jail.  It does not
define him, and it does not require the kind of sentence that

E7ugbins

1    the government proposes.

2            Mr. Binday is devoted to his two children, who are ten

3    and 12.  They're in grade school.  There will be collateral

4    damage in this case.  That's the way it is.  Those of us who

5    work in the system understand that and learn to accept it and

6    understand that our clients and their families have to figure

7    it out.  But the fact is, he is an involved father,

8    instrumental to their care as his wife works full-time.

9    They'll figure something out while Mr. Binday is not there to

10   perform his role, but a measured sentence reflecting who he is

11   in context is what's called for in addition to mitigate his

12   collateral damage.

13           It's in this context that you look at the trial.

14   There's a distinction between capitalizing on industry

15   protocols, which he did, how ever you can say it, whatever

16   adjectives you can use, which is why we're here on the one

17   hand; and on the other hand, intended harm that the carriers

18   would be hurt by this, he didn't believe that.  There's no

19   evidence from any of the cooperators whom the government has so

20   thoroughly debriefed or from the government in two years that

21   he intended anything more than the STOLI/non-STOLI

22   differential, even if he intended that and even if that can be

23   quantified.

24           By saying this, I'm not seeking to validate his state

25   of mind.  I'm saying there's a difference between imposing lots

E7ugbins

of prison, which should be reserved for the right people and

the right case at a time when we're putting too many people in

jail for too long and it's not helping anyone, and it's not

commanding respect for what we do here; on the other hand, a

case like this where I believe a more measured sentence is

necessary.

   For today's purposes, the government has established

that there is a crime deserving of punishment, but it's not the

same as those crimes not limited to theoretical economic harm

based on a right to control where the insurance companies did

not lose money and perhaps profited.

   Those sentences are reserved for the more serious

crimes, for which first offenders routinely get the kinds of

sentences not approaching what the probation department

recommends and what the government seeks, less than half of

what the probation department recommends, less than a quarter

in many cases.  I know every case is different.

   The Court has to fashion the sentence based on the

specific facts and offender before it, so it's not instructive

to say this person got that and this person got that.  Your

Honor knows what the sentence options are.  My point is, under

these circumstances, a severe sentence is more than is

necessary to make the point.

   As infuriating as the underlying conduct may be and

the misrepresentations, if anyone has the capacity to benefit

E7ugbins

 1    from a certain and measured and relatively short term of

 2    imprisonment, it's someone like Mr. Binday with his impressive

 3    history of doing so much good in so many different contexts and

 4    is so valued by his wife and kids and so many other, as

 5    evidenced by the showing here today on his behalf.

 6          Your Honor, I don't know if you want me to do this now

 7    or later, but in terms of restitution and forfeiture, I want to

 8    be heard on those two things.  I can do that now if you'd like.

 9          THE COURT:  Why don't you do it now.

10          MR. FRISCH:  With regard to restitution, it seems to

11    me that restitution needs to follow victim loss, which follows

12    the theory of conviction; that is, there's not $30 million of

13    loss in this case.  The loss is the STOLI/non-STOLI

14    differential which hasn't been established, which hasn't been

15    quantified.

16          It may be shocking in a case like this to say that the

17    loss is zero and the restitution is zero, but this is a novel

18    theory, at least it's an unusual theory if novel is not the

19    right word to use.

20          The insurance companies made lots of money.  Our view

21    and our calculation is they profited, but it's certainly not

22    $39 million of loss.  It so happens there's no loss and there's

23    no restitution based on the theory that the government so

24    carefully crafted in this case.

25          With regard to forfeiture, I want to make two general

E7ugbins

points, but before your Honor took the bench, I had occasion to

talk to the government about some last-minute knits we found

with the forfeiture calculation.  I don't want to burden your

Honor with those today.

THE COURT:  I got to write a forfeiture order.  I got

to enter a preliminary order of forfeiture while he's sitting

in this courtroom.

MR. FRISCH:  That's what we discussed.  I think what

we discussed doing is entering the order as-is.  For example,

there's a $4 million number in the proposed forfeiture order,

which I believe the government now acknowledges can be taken

out.  Perhaps, it's already been taken out in the copy you

have.  I don't know.

There are some other knits that I don't want to burden

you with today, but what I propose, and I believe the

government goes along with this, Mr. Monteleoni knows this

section number off the top of his head, I don't, but if you

enter the preliminary order and we can come back and amend it

after we have the opportunity to discuss it, that will satisfy

my concerns about the forfeiture order.

THE COURT:  Okay.

MR. FRISCH:  I do want to make, however, at least one

or two overarching comments about the forfeiture so we can be

guided in having those conversations.

One is the same as the restitution; that is, I believe

E7ugbins

1    the ill-gotten criminal gain is limited to the theory of

2    criminal liability; that is the difference between STOLI and

3    non-STOLI.  All the commissions are not ill-gotten criminal

4    gain because the criminal gain is not the full value of the

5    policies.

6          Put another way, the lion's share of the commissions

7    are not traceable to the fraud, which is the fraud that was

8    charged in the indictment, which is the economic harm right to

9    control theory.  I think as we go forward and the parties work

10    together as we may seek to amend the order, that's one issue

11    on which it may be helpful to have the Court's guidance today.

12          The second is the argument we made in our papers that

13    we believe it should be net and not gross, because the

14    underlying activity is legal.  It's not a pervasively illegal

15    activity, so we believe that Section 981 that provides for net

16    should be applied.  And if that's the ruling, we'll be in

17    contact with the government to discuss adjustment of those

18    numbers accordingly.

19          Let me have one second to make sure I have covered all

20    of the general forfeiture issues that I wanted to cover.  I

21    think that's it.

22          To protect the record, the government late last week

23    or last week Wednesday or Thursday gave us a tracing analysis

24    regarding the money in escrow from the sale of Mr. Binday's

25    coop as your Honor will recall.  We found some errors in that.

E7ugbins

1     We'll discuss those with the government.

2              If it's net as opposed to gross, there are some things

3     we want to talk to the government about.  There are a few other

4     errors or things that are included that shouldn't be included.

5     I state that so it's on the record and I have protected

6     Mr. Binday's interest.  But as I say, after your Honor has

7     enters the preliminary order or after everyone has spoken, we

8     can discuss the schedule so if there is to be a proposed

9     amendment, we can do it in a proper fashion.  Thank you, Judge.

10             THE COURT:  Mr. Stavis, have you reviewed the

11    presentence report and gone over it with your client.

12             MR. STAVIS:  I have, your Honor.  I do have the

13    additional issue with regard to the managerial role.  I

14    addressed it in my papers.  That's a finding that your Honor

15    has to make.

16             I have been with this case for four years and I really

17    didn't see any distinction between Mr. Kergil's role and the

18    roles of the others.  I didn't see him being able to give

19    orders and others being required to follow orders.  I didn't

20    see any kind of structure that your Honor's seen in many other

21    criminal-enterprise type cases, so as I indicated in my papers,

22    I was somewhat shocked, being familiar with the case as I am,

23    to see a managerial role for Mr. Kergil.  And that's an issue

24    that's before the Court with regard to the sentencing

25    guidelines, and I know that your Honor wished me to address the

E7ugbins

1     3553(a) factors.

2          Before I did so, I do want the record to be clear that

3     I do join the arguments made by counsel for Mr. Binday with

4     regard to losses and those general issues that apply to all of

5     the defendants across the board.

6          With that, I will get to the old-fashioned sentence,

7     what your Honor refers to as the old-fashioned sentence.  And

8     the old-fashioned sentence is based on the statute 3553(a), and

9     your Honor has to set a sentence that is sufficient but not

10    greater than necessary, as your Honor is aware.

11         I was listening to the government just before your

12    Honor talk about this fraud, quote, "calculated, multilayered,

13    brazen, rampant lies," which they indicated in their written

14    submissions.  They said on page 21 "protracted, calculated,

15    extensive scheme to defraud others for their own benefit."

16         Your Honor, all those are nothing more than saying

17    that this is a fraud.  The jury has found that this is a fraud.

18    And for this fraud, the government argued to the Court just a

19    few minutes ago that, quote, "very substantial terms of

20    imprisonment are required," very substantial.  In their written

21    submission, they refer to, quote, "very heavy sentences."

22         Your Honor, this is a fraud.  There are frauds and

23    there are frauds.  Bernard Madoff was a fraud.  He was

24    sentenced before this Court.  About two years ago, I tried a

25    case in front of Judge Sand that was an advanced scheme fraud.

E7ugbins

That was nationwide.  Victims lost their life savings, many of

them.  This is not that, your Honor.

        Some years ago, I was an assistant district attorney,

which is unlike an assistant U.S. Attorney, you can get that

job right out of law school.  And right out of law school,

sitting in a complaint room, you learn what a case is worth,

your Honor.  You learn how to separate the wheat from the

chaff.

        The victims in this case, your Honor, are insurance

companies and my client took away their right to control the

policies and representatives of those insurance companies,

testified concerning lapse rates, concerning actuarial

assumptions.  There was no human misery in this case.  There

was a fraud.  There were losses.  Your Honor has made findings.

It's different.  Most of these cases were brought as civil

cases as I indicated in my submission.

        Now this is a criminal case.  Your Honor has presided

over it.  The jury has decided it.  In terms of deterrence,

that sends the criminal case, the criminal prosecution and the

fact that people are sitting here to receive their sentences

from the Court, that's a clarion call to anybody who would even

think of STOLI fraud on an insurance company ever again.  That

says don't think about it, don't even think about it.  That's

the portion under 3553(a) where there has to be some context.

Not every fraud requires the heaviest sentence, and that's the

E7ugbins

1    context, your Honor, of the offense.

2           I'll turn to the history and characteristics of the

3    defendant.  Kevin Kergil — and your Honor has letters and your

4    Honor has received a written submission — he's a dutiful son.

5    I just want to point out while I'm here that standing, in the

6    second row is Mr. Kergil's mother Florence Kergil.  Next to

7    Mrs. Kergil is Mrs. Kergil's caretaker Selina Curtain, who has

8    also written a letter to the Court.

9           Ms. Curtain started out as a neighbor of Mr. Kergil's

10   and when she was a neighbor in need, Mr. Kergil was there when

11   her electricity was cut off.  There's a letter about that.

12   He's a good neighbor, your Honor, and he does various other

13   things in his community.

14          He is very active in government.  Leslie Lawler

15   submitted a letter concerning meetings which is where she met

16   Kevin at the Peekskill Common Council, the work sessions that

17   they would have there and at Our Lady of Assumption Church.

18          Now, it might seem trivial but it just rounds out who

19   he is, but rescuing animals and things of that nature, just so

20   that your Honor should know, it's not I can't possibly sentence

21   him because he helps animals.  It's nothing like that, your

22   Honor.  It's my job and my role here to fill out who this

23   person is apart from his criminal acts, so I do mention that.

24          Your Honor, the supplementary letter and email which

25   your Honor reviewed on the bench shows the civic-minded

E7ugbins

1    citizen, how he worked with the police to try to clean up

2    Peekskill.  If I could just add somewhat, when arrests were

3    made on March 21, 2013, Preet Bharara, the U.S. Attorney in

4    this district, said, and I quote, "Even small towns like

5    Peekskill are not immune from the narcotics trade and the

6    violence with which it is inextricably linked."Mr. Kergil was

7    active in fighting that and assisting in that investigation as

8    the detective has informed the Court.

9           Your Honor, when you want to know who this man is that

10   appears for sentence – he committed crimes, he must be

11   sentenced – you have to take the full measure of the man, your

12   Honor.  I think with all of the things, the fact that he would

13   be so dedicated to his elderly mother that he would bring her

14   home to take care of her himself, along with Ms. Curtain, I

15   think speaks volumes about the character of Kevin Kergil.  He

16   is much more than the sum of his criminal conduct.

17          If your Honor can consider some sort of a mixed

18   sentence which would allow him to serve a period of home

19   confinement where he could continue to take care of his mother,

20   I submit that that would serve the ends of justice.

21          I do have some specific issues with regard to the

22   judgment and commitment.  I don't know if your Honor wishes to

23   hear those at this time.

24          THE COURT:  No.

25          MR. STAVIS:  Thank you, your Honor.

E7ugbins

1          THE COURT:  Thank you, Mr. Stavis.

2          Ms. Murray, have you reviewed the presentence report

3     and gone over it with your client?

4          MS. MURRAY:  Yes, I have, your Honor.

5          THE COURT:  Aside from the calculations, any

6     additions, deletions or corrections in the report?

7          MS. MURRAY:  Aside from anything that I put in my

8     papers, I will go to the 3553 factors.

9          THE COURT:  Thank you.

10          MS. MURRAY:  Obviously throughout this trial, you

11     didn't get an opportunity to see the side of Mark Resnick that

12     his friends and family knows and I believe the side that is set

13     forth in the letters that I submitted to the Court:  A hard

14     worker, a devoted father, a devoted husband, somebody who has

15     had to actually bear the burdens of life more than others

16     because of his wife's illnesses.

17          I actually have one short additional letter from her

18     doctor, which I'll pass up.  He previously filled out a

19     questionnaire for us, and I asked if they could write a letter.

20     He's been treating her since 1997.  He just confirms the

21     diagnoses that I had put in my papers.

22          THE COURT:  It will be filed under seal.

23          MS. MURRAY:  I think that Mark comes to light, your

24     Honor, in the letters, particularly from his children.  His

25     son, Andrew, who is here in the courtroom, who talks about his

E7ugbins

father as Mr. Mom and has fond memories of his father making
his lunch in the morning, bundling him out to the bus stop,
helping him with his homework.

His daughter Michelle, who is unable to be here today,
her letter talked about the strongest, most enduring image of
her father is of catching her mother.  So I do think that there
is a very deep and profound family story here that I think
speaks so highly of Mr. Resnick and his goodness.

The role he played at home I think is matched with the
role he played with friends and relatives.  There are other
letters in there.  His brother Kenneth wrote of the role Mark
played when Kenneth himself was undergoing extensive, lengthy
legal battles in Florida and was suspended from his job without
pay, only later to have it reinstated many years later and
back-pay provided to him.  His sister-in-law Marcy also wrote
about the role that Mark has played in helping her in mediating
family disputes.

This is really, deep down, a decent, kind and
thoughtful person.  I know this is not the image that was
presented at the trial.  It may not be the image your Honor has
of him, but I want your Honor to see this other side of
Mr. Resnick.

In the same way that he cared about his friends and
relatives, I submit to you he cared about his clients.  And
they aren't "clients" in quotation marks as the government

E7ugbins

1    writes.  These were people he felt strongly about.  He has

2    always spoken to me about his love for his clients.  I

3    understand there was some foolish and misguided love.  I

4    understand that he himself didn't fully appreciate the

5    ramifications of what he was bringing them into, but I truly

6    believe that he operated in this case with a desire to help the

7    insureds that were his clients.

8          You can see it in the emails back and forth where when

9    they wrote to say what's going on with my policy, has it been

10   sold yet, the way that he immediately followed up with them and

11   went to Mr. Binday to find out what was going on.

12         You can see it in the way that he helped the family of

13   Doris Riviere to sell her second policy before her death.  And

14   you can see it, and I think most profoundly, at the time when

15   he is being asked to serve threatening letters on Mr. Griffin

16   and he puts a line in the sand and he said no way, I'm not

17   going to be part of that.  And I think that speaks wonders of

18   Mr. Resnick.

19         As to the other 3553 factors that I would ask the

20   Court to consider, obviously, the government concedes that

21   Mr. Resnick has the lowest level of culpability here in this

22   case.  He's at the very bottom of the pyramid.  He didn't

23   devise or organize this.  He recruited straw purchasers.  He

24   recruited a couple of trustees and he arranged forward some

25   bogus financials, but there was no role in lobbying the

E7ugbins

insurance companies to accept these policies; no role in

deciding what financial information goes into the policies; no

role in selling the policies; no role in preparing life

expectancy reports, he never even saw them; no role in lying to

regulators.

         I know that there is an obstruction charge here, your

Honor, and I do think it's important to note that even the

government concedes with his obstruction, he made a mirror

image of his computer, a mirror image that was provided to me

and from which I produced thousands of documents, several of

which were entered into evidence against him.

         Finally, your Honor, looking at the issues of

deterrence, I think it's worth thinking about what Frank

Zimring talks about, which is contingent opportunism when it

comes to crime.  It's not like there's lots of crime that's

bubbling up everywhere that we can stamp it out here and it

will come up over here.  In fact, there is a lot of crime that

is simply contingent on opportunity; it is people who are not

stone criminals, but rather people who are presented with the

opportunity and fall into it; I submit to you people who

deserve a more lenient treatment from the criminal

justice system than those who actually devise and invent the

crimes rather than falling in on the opportunity.

         Mr. Resnick is one of those who fell in on an

opportunity.  He's not a bad person with a penchant for crime.

E7ugbins

He's a good man; accordingly, your Honor, he's a person for
whom that research has said short, sharp, swift periods of
incarceration are far more a deterrent than anything longer.

I've also been severely punished enough.  He lost his
livelihood, his reputation, his finances are in disarray and
his health has deteriorated.  And I've provided your Honor with
recent health reports.

I submit nothing will be served by incarcerating
Mr. Resnick for a lengthy period of time, and his family and
his wife will be especially hurt by any lengthy incarceration.
So I would ask that you use the benchmark of *U.S. v. Lebovits*
in determining the appropriate sentence here.  Thank you.

THE COURT:  Thank you, Ms. Murray.

Anything else from the government?

MS. MCCALLUM:  Your Honor, I'm not going to reiterate
the arguments that we have laid out in our papers regarding
loss and everything.  I will rest on our papers for those
purposes.  And also with respect to the other guidelines point
which was raised, which was Mr. Kergil's objection to the
managerial role enhancement, we have laid out all of the
evidence that supports that enhancement.  We believe it
applies.

Just a couple of notes on the number for actual loss:
Your Honor was asking what the particular adjustment to
paragraph 35 would be.  I believe the number that's in there

E7ugbins

1    right now is 36 million.  The adjusted number is 38,153,631.

2              THE COURT:  I didn't see that in the supplemental

3    sentencing submission.

4              MS. MCCALLUM:  It's in the chart, your Honor, that is

5    attached.

6              THE COURT:  I went to the chart.  Which chart are we

7    talking about now?

8              MS. MCCALLUM:  This is attachment AA to Special Agent

9    McDonald's report.

10             THE COURT:  Yes, but there are so many different AAs.

11   There's an AA Hancock, an AA Lincoln, an AA MetLife, and an AA

12   Prudential.

13             Is there an AA AA?

14             MS. MCCALLUM:  Sorry.  It's the first chart, the

15   summary chart, so the first tab, you'll see the summary there.

16   It says "total actual loss."  Offsetting premiums on closed

17   policies.  And that includes the commissions.

18             As Mr. Binday's counsel noted, on the forfeiture

19   issue, we do have revised orders of forfeiture because

20   Mr. Binday submitted to us today an affidavit from his counsel

21   in the LimQuee litigation saying Mr. Binday has not, in fact,

22   received the $4 million on that policy.

23             THE COURT:  I figured that was going to happen when I

24   read your objection to his objection.

25             MS. MCCALLUM:  Right.  We have that affidavit.  The

E7ugbins

```
 1    government credits that affidavit.  We are omitting the

 2    $4 million from that forfeiture order.

 3              THE COURT:  Do you have orders that you want to hand

 4    up that I can sign and read into the record today with the

 5    understanding that it's subject to, perhaps, some further

 6    discussion between the people at the front table and the people

 7    at the back table?

 8              MS. MCCALLUM:  That's correct.  That's what we

 9    propose.

10              THE COURT:  Okay.

11              MS. MCCALLUM:  Shall I hand those up right now?

12              THE COURT:  Yes.

13              Mr. Binday, is there anything that you want to say to

14    me before I sentence you?

15              DEFENDANT BINDAY:  Yes, there is.  Can you hear me?

16              THE COURT:  I can, sir.

17              DEFENDANT BINDAY:  Your Honor, I stand before you with

18    tremendous remorse and shame.  With hindsight, I would have

19    walked away from each and every policy you heard about, but I

20    do not have that luxury.  Instead, I am left to dwell on how

21    and to what extent my actions caused harm to colleagues in

22    business and, most of all, to my family.

23              I would like to share with you one small story.  One

24    of my clients once came to me and told me he did not want to do

25    estate planning because he had enough money to leave his
```

E7ugbins

children a very substantial inheritance.  I told him he could

set up a policy that could leave money to charity, which he

did.

    I wish that my sentencing today focused just on those

kinds of stories, which I believe are as much a part of my life

as the conduct at issue here, but I do not have that luxury

either.  And I regret what your Honor knows most about me are

these STOLI policies.  STOLI policies were not all my business

and certainly not all my life.

    All that said, I am truly blessed to have so many

friends and family supporting me today.  I apologize to them

and I apologize to the Court.  Thank you, your Honor.

    THE COURT:  Mr. Kergil, is there anything you want to

say to me before I sentence you?

    MR. KERGIL:  Yes, your Honor.  First, I would like to

thank the Court for the opportunity to speak.  And I want to

tell you about myself, a little bit.

    Your Honor, I have always helped people in my

community and I have spent countless hours of volunteer work in

the rescue and fostering homeless and abused animals.  I always

have assisted the Peekskill Police Department on many

occasions.  One instance resulted in the federal arrest of

major drug dealers in the city.  This is still an ongoing

federal investigation in Ms. McCallum's office.  There is a

copy of the press release here.  My attorney has it.

E7ugbins

1          This investigation began when I met in my living room

2     with a detective referenced in letter by Mr. Stavis.  There was

3     a lot of risk associated with that.  There's no need to go into

4     that nor can I expound on it much more than I have.

5          Lastly, I am devoted to my elderly, disabled mother

6     who requires around the clock care and while I'm assisted by

7     see lien a curtain, a devoted and caring home health aid who is

8     here in court with my mother today I am the primary care giver

9     for the other 16 hours.  As a result, my mother enjoys the

10    freedom and independence of a home setting as opposed to a

11    nursing institution.  I wouldn't have it any other way.  These

12    are my life choices, your Honor.

13         In conclusion, your Honor, I ask you to consider that

14    I've been a good person, and done a lot of good things in my

15    life.  I would like to ask the Court for leniency in my

16    sentencing, and I thank you for your consideration.

17         THE COURT:  Thank you, sir.

18         Mr. Resnick, is there anything you would like to say

19    to me before I sentence you.

20         MR. RESNICK:  Yes, your Honor.  I just wanted to thank

21    the Court for the courtesy to me during this whole process.

22    Obviously a very tough process for us to go through.  I hope

23    you'll take into consideration my wife's health in my sentence.

24    We have been married 34 years and she goes through a battle

25    daily with her illnesses.

E7ugbins

1          I also want to apologize to my family, to my friends

2     and to you, the Court for being part of this.  I accept full

3     blame and responsibility for everything that I did.  Thank you.

4          THE COURT:  As I'm sure your lawyers have explained to

5     you, there are a great many formalities that we have to go

6     through in connection with the imposition of a sentence, so let

7     me begin.

8          I accept and adopt as my findings for purposes of this

9     sentencing the fulsome, and as per my memory, entirely correct

10    description of the scheme perpetrated by the defendants as set

11    forth in the government's principal sentencing memorandum at

12    pages six through 51.

13         Those pages of the government's briefs should be

14    deemed incorporated into these sentencing minutes, and they

15    replace the descriptions of the offense conduct in the three

16    sentence reports, which are necessarily abbreviated.

17         At the trial, the government needed only to prove that

18    these defendants contemplated that their deceit, their lies

19    would cause a victim some economic harm, at least in the sense

20    of depriving the victim of its ability to make an informed

21    economic decision about what to do with its money or its

22    property.

23         Here, the victim insurance companies were indeed

24    deprived of the ability to make a rational, informed decision

25    about whether to insure particular lives based on the patently

E7ugbins

false information about named insureds provided by these

defendants.

They were deprived of the ability to make an informed

decision about whether they wanted to deal with shysters,

fraudsters, thieves, liars, men of no repute whatsoever, and to

pay those individuals massive commissions in the millions of

dollars.

The government satisfied its burden beyond a

reasonable doubt ten times over.  I cannot imagine any basis on

which these verdicts could or will be overturned.  Indeed, I do

not think that there is a serious argument to be made on that

proposition.

These are fraudulent inducement cases.  These are

policies that would not have issued absent the fraud.  These

are not cases about the spread between STOLI and non-STOLI.

This is business that would not have been written.

In terms of calculating the loss amount for guideline

purposes, because I have to calculate the sentencing

guidelines, the defendants plainly intended that they and the

investors they served would profit at the expense of the

insurance companies.  They caused actual losses of $38,153,631,

consisting of total commissions paid to them on 74 scheme

applications, policies that the evidence showed would not have

been issued but for the fraud, total death benefits paid on

those policies that have settled less the premiums actually

E7ugbins

1    paid on those policies and the premiums on lapsed policies,

2    which, of course, are found money for any insurance company.

3         At that level, the Section 2B1.1 add-on to the base

4    guideline level for fraud, which is seven, is 22 additional

5    points rather than 26 used by probation when calculating

6    guidelines using the government's theory of intended loss.

7         The 22-point enhancement is more than sufficient,

8    especially as I believe it is easy to calculate known not lost

9    to date but difficult to estimate future losses, which shows

10   the time and represents something of a failure of the

11   fraudulent scheme.  For that reason, even though I understand

12   that the guidelines embody a preference for intended loss, I

13   favor calculating actual loss, which betters any reasonable

14   estimate by virtue of being tethered in fact.

15        The resulting 22-point enhancement is severe.

16   Calculating the guideline base figure using gain as a proxy for

17   loss would be slightly more favorable to the defendants, but

18   this Court views it as more appropriate to measure the crimes

19   for guideline purposes using losses to victims rather than

20   gains to the defendant.

21        I am unmoved by the argument made by one of the

22   defendants that the government has presented insufficient

23   evidence to establish that all of the applications it refers to

24   as scheme applications were indeed STOLI applications.

25        The trial testimony established beyond a shadow of a

E7ugbins

1   doubt – a standard that the government did not need to meet but

2   that it did meet – that the R. Binday large case folder was

3   devoted entirely to stealth STOLI applications, and all of the

4   insureds in whose names the scheme applications were submitted

5   to the insurers had files in their name within the large case

6   folder.  All or practically all were strawman purchasers as

7   proved at trial or were the subject of one of Mr. Binday's

8   profit projection charts.

9       Mr. Binday's assertion that the government's evidence

10  proved too little is, to use the government's own word,

11  ridiculous.  As far as I am concerned, probation correctly

12  calculated all of the other enhancements in each of the three

13  defendants' presentence reports.

14      I reject all arguments propounded by the defendants

15  for why such enhancements, particularly those relating to role

16  in the offense and to obstruction, are inappropriate, and I

17  reject them for substantially the reasons articulated by the

18  government in its briefs.

19      Mr. Binday's total offense level is 35, his Criminal

20  History Category is I, his guidelines range is 168 to 210

21  months.

22      Mr. Kergil's total offense level is 34.  His Criminal

23  History Category is I, his guidelines range is 155 to 188

24  months.

25      Mr. Resnick's total offense level is 29.  His Criminal

E7ugbins

History Category is I.  His guidelines range is 87 to 108 months.

Although I did not elect to calculate the guidelines using intended but actual loss, I feel constrained to address the defendants' assertion that they believed that the insurers would win by issuing these policies.  This assertion which underlay the defense that the jury rejected is indeed contradicted by the overwhelming evidence of the lengths to which the defendants went to deceive the insurers.

Had they really believed that the insurers would win from issuing these particular policies in these particular amounts on these particular lives, they would have given the insurers true information and let the insurers write the business, pricing it with full knowledge of exactly what they were insuring.

In the end, the defendants' argument that they did not intend for the insurers to lose money is no different, and if this be possible, less convincing, than the argument that every Ponzi schemer makes:  I never really thought anyone would lose money; I always intended that everyone would be made whole.

I am unconvinced.

Now, we have just spent a long time discussing the calculation of the sentencing guidelines.  This, of course, is the case that proves the idiotcy of retaining the federal structure guidelines structure now that the Supreme Court has

E7ugbins

1    belatedly recognized that it is unconstitutional, especially at

2    a time of economic hardships where courts and other government

3    institutions are denying the public basic services in order to

4    save money.

5         It could have saved a lot of time and money – money

6    spent on prosecutors, money spent on agents, money spent by

7    defense lawyers, money spent on me – had we not had to deal

8    with calculating guidelines and arguing about the calculations

9    of the guidelines *ad nauseam* when everyone agrees that the

10   guidelines are unnecessary to the sentencing decision in this

11   case.

12        Any sensible judge with a modicum of experience under

13   his belt would understand immediately that these are serious

14   economic crimes and that the people who perpetrated them should

15   go to jail for a significant period of time without regard to

16   any guideline at all.

17        Having considered the guidelines, it is my belief that

18   the goals of sentencing are best served by sentencing the

19   defendants in the old-fashioned way:  Emphasizing who they are,

20   what they did, and how to punish them, and send a message to

21   the industry that this sort of conduct will not be tolerated.

22   I intend to sentence them for the lying, cheating, scheming,

23   thieving, obstructive fraudsters that the evidence showed them

24   to be.

25        The nature and circumstances of the crimes committed

E7ugbins

by these three men are and should be the drivers of their

sentences.  The government's presentation, written and oral,

aptly summarized why this crime is as serious as any seen by

this Court.

       Forget about the amount of the fraud loss, whatever it

was or will turn out to be; in the end, this was a scheme

perpetrated over a span of years, brazen, as the government has

correctly characterized it, and characterized by a number of

truly horrible behaviors on the defendants' part.

       Starting with callous disregard for the little people

who were the straw purchasers of these policies:  Venality,

rampant mendacity, the creation of false documents, obstruction

of efforts by the victims to ascertain the truth, obstruction

of regulators and the government's efforts to learn the truth.

It is precisely the sort of criminality that has left large

segments of our society convinced that all businessmen are

crooks.  And many and honest businessman or woman finds himself

or herself unable to overcome the entirely undeserved belief

that they are disreputable people and that they ought to be

subject to disrepute.

       I heard Mr. Stavis talk about his experience in the

New York State Supreme Court as an assistant district attorney

in evaluating crimes.  I, as he knows, was a judge in the New

York State Supreme Court where I quickly learned that I had a

somewhat different perception of how to value crimes than did

E7ugbins

        my colleagues who seemed to think that if there was no physical

        violence, it was of no harm-no foul.  I did not feel that way.

                These were not victimless crimes.  The significant

        losses that the insurance companies incurred from hanging out

        on policies they never would have issued but for the

        defendants' fraud and the hefty amounts that lined the

        defendants' own pockets make that abundantly clear.

                The fact that the nominal victims here are major

        insurance companies does not and ought not lessen the disgust

        with which we view the defendants' behavior.  We, the public,

        those are us who purchase insurance are in the end the ultimate

        victims of this type of crime because in the end, we pay to

        cover the losses of the direct victims, the insurers.

                At least one of the defendants has argued that he

        should be excused because he had no legal intent, but instead

        simply saw a way for those close to him and his customers whom

        he cared about to profit at the expense of no one.  This

        argument does not resonate with me.  Life is more often than

        not a zero-sum game.  As the government rightly points out

        where there are winners, there also tends to be losers.

                I have now handled enough STOLI cases, civil and

        criminal, to believe that society would be much better off if

        we reverted to the model that served us well for centuries.

        One could not take a policy on someone's life unless he had

        what we used to call an insurable interest in that particular

E7ugbins

life.  Stranger-owned life insurance is a really bad idea.  The

traditional model would have made stranger-originated life

insurance an illegal product, and the stealth arbitrage

opportunity that was identified by those whose business it is

to exploit money-making opportunities, which is not a crime,

would never have arisen.

Stealth arbitrage is decried by the government.  The

governments used to have a way of preventing such opportunism

were that the old and tested rules still on the books.  But the

fact that stealth arbitrage is not a crime, that arbitraging

this opportunity that is created by stranger-originated life

insurance is not a crime does not mean that you can commit some

other crime in order to bring the arbitrage to fruition, and

that is what happened here.

Nothing in the personal lives of any of these three

men undermines my conclusion in this regard.  The fact that

they are good family men, devoted to the people whose lives

intersect with theirs does not move me, neither does any good

or charitable work that they may have done using the money they

effectively stole from these insurers.  For that sort of

argument, I fear you have the wrong judge.

Using other people's money to do what qualifies as

good works by your likes and then suggesting to me that I give

you credit for the fact that you didn't use the money to buy a

Lamborghini is something that I find and have always found to

E7ugbins

be contemptible, especially since all too frequently charity is

a means to bolster the esteem in which one is held by others.

I'm afraid I don't see any reason why anyone should esteem any

of you.

Using money honestly earned for charities is to be

extolled; using money stolen for any purpose is an affront to

the victim who has an absolute right to decide how it ought to

be spent.

I want to address the argument there is an

overemphasis on prison time in cases like this.  There are

crimes for which a critically important component of sentencing

should be to send a message to the community, for the industry

that this kind of behavior is intolerable, and to send a

message to the community and to the industry that this sort of

behavior is every bit as reprehensible as the types of crimes

for which I and others like me routinely send poor,

disadvantaged persons to prison for dozens of years.

It is precisely in cases like this that for too many

years there was an underemphasis on prison time.  And it is

entirely appropriate in my view to redress that underemphasis

so that society understands that the guy who steals money while

committing fraud and wearing a suit is no better than the guy

who steals it, and a whole lot less of it, while wearing a

hoodie.

Insurance fraud may not qualify as a crime of violence

within the meaning of our sentencing system and that,

unfortunately, is why it is all too often punished not with the

severity that it deserves.

There are other types of violence, and business fraud

do violence to the thin tissue of trust that holds us together

as a society.  We cannot afford this sort of antisocial

behavior and the cynicism that people will get away with it

that is engendered in our citizenry.  Only if white collar

crime is punished commensurate with the damage it inflicts on

society will citizens actually believe that the law meet metes

out equal right to the poor and to the rich, which words are

the cornerstone of the judicial oath.

The fact that the defendants are forfeiting

substantial assets and that they will be subject to significant

restitutionary judgments does not militate against a severe

incarcerative sentence for each of them.  Sadly, I do not

believe that the insurers will ever be made whole, so I am

unimpressed by the fact that the defendants will have a

financial millstone around their necks for the rest of their

lives.  I believe that they should.

Mr. Binday, will you please stand.  Under docket

number 12 Cr. 152, at a total offense level 35, the Criminal

History Category I, I'm imposing upon you a varying sentence.

I am remanding you to the custody of the Attorney General of

the United States and the Bureau of Prisons for a term of 144

E7ugbins

months, and that's per count.  All counts to be served

concurrently to be followed by a term of three years'

supervised release on each count to be run concurrently.

I am not imposing a fine.  The other financial

penalties will be more than sufficient.

Are we still operating on the same restitutionary

order that I was given with the government's supplemental

submission?

MS. MCCALLUM:  Yes, your Honor.

THE COURT:  The amount of the restitution that I am

imposing upon you jointly and severally with your codefendants

is $39,308,305.63 to the victims of the offenses charged in

Counts One through Three, which names addresses and specific

amounts are set forth in the schedule of victims that will be

attached to the restitution order that I will sign this

afternoon.  Your liability is joint and several with Mr. Kergil

and Mr. Resnick and Mr. Paul Krupit under 11 Cr. 1092.

While you are incarcerated, the criminal penalty of

restitution will be deducted from your prison wages in an

amount equal to $25 per calendar quarter or 50 percent of your

gross monthly earnings if you are in a UNICOR grade one through

four program.

I also impose upon you a special assessment of $300.

The special assessment is due and payable immediately.

Could I have the forfeiture order with respect to

E7ugbins

Mr. Binday.  It is hereby ordered that in light of the various

whereas clauses contained in pages one through three of this

order, and that as a result of the offenses charged in Counts

One through Three of the indictment in which you have been

found guilty following a trial by jury, a money judgment in the

amount of $13,522,424.64 in United States currency shall be

entered against you for which you shall be jointly and

severally liable with codefendant James Kevin Kergil to the

extent of $13,522,424.64 and with your codefendant Mark Resnick

to the extent of $12,214,565.

As a result of the offenses charged in Counts One

through Three of the indictment, all of your right, title and

interest in $1,958,317.83 of what are known in this order as

the deposited funds or the traceable sales proceeds are hereby

forfeited to the United States for disposition in accordance

with the law, subject to the provisions of Title 21, United

States Code, Section 853.

All of your right, title and interest in an additional

$1,012,078.28 of the deposited funds, the substitute sale

proceeds, which taken together with the traceable sale proceeds

is known as the specific property, is hereby forfeited to the

United States as a substitute asset for disposition in

accordance with the law, subject to the provisions of Title 21,

United States Code, Section 853.

Pursuant to Rule 32.2(b)(4) of the Federal Rules of

E7ugbins

1    Criminal Procedure, this preliminary order of forfeiture as to

2    specific property and money judgment entered at sentencing is

3    final as to you, Michael Binday, and shall be deemed part of

4    your sentence and included in the judgment and conviction

5    therewith.  Saying that, I understand that it may be subject to

6    amendment.

7            The specific property shall remain in escrow under the

8    terms of the stipulation and order, and the remaining deposited

9    funds amounting to $127,615.59 may be released from escrow to

10   Karen Binday upon entry of this preliminary order of forfeiture

11   as to specific property and money judgment.

12           Upon the conclusion of all appeals and related

13   proceedings, the United States Marshals Service is authorized

14   to seize the specific property and hold it in its secure

15   custody and control.

16           Pursuant to Title 21, United States Code, Section

17   853(n)(1), Rule 32.2(b)(6) of the Federal Rules of Criminal

18   Procedure and Rules G(4)(a)(iv)(C) and G(5)(a)(ii) of the

19   Supplemental Rules for Admiralty or Maritime Claims and Asset

20   Forfeiture Actions, the United States shall publish for at

21   least 30 consecutive days on the government's internet

22   forfeiture site notice of this preliminary order of forfeiture

23   as to specific property and money judgment.

24           Any person, other than the defendant in this case,

25   claiming an interest in the specific property must file a

E7ugbins

1     petition within 60 days from the first day of publication of

2     the notice on this official government internet site, or no

3     later than 35 days from the mailing of actual notice, whichever

4     is earlier.

5             This notice shall state the petition shall be for

6     hearing to adjudicate the validity of the petitioner's interest

7     alleged in the specific property, shall be signed by the

8     petitioner under penalty of perjury, and shall set forth the

9     nature and extent of the petitioner's right, title and

10    interest.

11            The government shall send notice to any person who

12    reasonably appears to be a potential claimant with standing to

13    contest forfeiture in an ancillary proceeding.

14            Upon adjudication of all third-party interests, this

15    Court will enter a final order of forfeiture with respect to

16    the specific property pursuant to Title 21, United States Code,

17    Section 853(n) and Rule 32.2(c)(2) of the Federal Rules of

18    Criminal Procedure, in which all third-party interests will be

19    addressed.  If finally forfeited to the United States, the

20    specific property shall be applied in partial satisfaction of

21    the money judgment.

22            All payments on the outstanding money judgment shall

23    be made by postal money order, bank or certified check, made

24    payable to the United States Marshals Service, and delivered by

25    mail to the United States Attorney's Office, Southern District

E7ugbins

1  of New York, Attention:  Money Laundering and Asset Forfeiture

2  Unit, One St. Andrew's Plaza, New York, New York, 10007,

3  indicating the defendant's name and case number.

4          The United States Marshals shall be authorized to

5  deposit the payments on the money judgment in the Asset

6  Forfeiture Fund, and the United States shall have clear title

7  to such forfeited properties.

8          The Court retains jurisdiction to enforce this order

9  and to amend it as necessary.  Upon the entry of this order,

10  the United State Attorney's Office is authorized to conduct any

11  discovery needed to identify, locate or dispose of forfeitable

12  property.  I'm signing the order at 4:06 p.m. on this 30th day

13  of July, 2014.

14          Place of incarceration, recommendation.

15          MR. FRISCH:  I would ask that you ask or recommend to

16  the Bureau of Prisons that the conditions to qualify for a camp

17  be waived in Mr. Binday's situation and that they make a

18  recommendation that he be designated to the camp in Schuykill,

19  Pennsylvania.

20          THE COURT:  I'm not prepared to make a recommendation

21  that they waive camp conditions.  I will recommend Schuykill if

22  it's possible or something that's in relatively close proximity

23  to Westchester County, New York.

24          MR. FRISCH:  I would say, if you're not going to waive

25  the conditions for a camp and not make that recommendation,

E7ugbins

1    that it simply be a facility close to his home.

2             THE COURT:  Westchester County, New York.

3             MR. FRISCH:  I'd also ask that, as the presentence

4    report notes on page 27, Mr. Binday is a proper candidate for

5    voluntary surrender as he's been completely compliant.  He

6    poses no risk of flight or danger.

7             I'd ask that you permit him to voluntarily surrender

8    to the place of designation.  If your Honor does that, I would

9    also ask that you set the date of such surrender for a Tuesday

10   when I understand that the facilities are best able and most

11   efficiently to welcome new inmates.

12            THE COURT:  Fine.

13            Surrender date, Mr. O'Neill.

14            THE DEPUTY CLERK:  November 4.

15            THE COURT:  Tuesday.  I'm going to take care of the

16   supervised release conditions with all three of them at the

17   same time.

18            MR. FRISCH:  One thing we talked about amending or

19   discussing with the government is amending the preliminary

20   order of forfeiture.  It seems to me we don't want to let that

21   go on too long in setting a date and some kind of schedule that

22   we submit whatever we're going to submit to you might make the

23   most sense.

24            THE COURT:  The usual rule for restitution is 90 days.

25   In fact, that's statutory.  I can't see any reason why it

E7ugbins

1     should take more than 90 days to get this done.

2              MR. FRISCH:  No.

3              THE COURT:  Ms. McCallum.

4              MS. MCCALLUM:  The government does not disagree with

5     that.

6              THE COURT:  Fine.  Let's say it will all be done

7     within the next 90 days.

8              MR. FRISCH:  Lastly, perhaps we should do this

9     together or I can do it first, which is to make an application

10    for bond pending appeal and an ultimate stay of execution of

11    the forfeiture order.

12             Would you like me to proceed now with that.

13             THE COURT:  No.  Let me get everybody sentenced,

14    please.

15             MR. FRISCH:  Okay.

16             THE COURT:  I'm going to talk to all three of you

17    about the conditions of supervision.  Once I get everybody

18    individually sentenced on the other matters, the conditions of

19    supervision are all going to be identical.

20             Mr. Kergil, will you please stand.  Docket Number 12

21    Cr. 152, at a total offense of level 34 and Criminal History

22    Category of I, I hereby sentence you James Kevin Kergil to be

23    remanded to the custody of the Attorney General of the United

24    States and the Bureau of Prisons for a term of 108 months on

25    each count to be served concurrently, to be followed by a term

of three years' supervised release on each count to be served
concurrently.

I'm not imposing a fine.  You're required to make
restitution jointly and severally with your codefendants in the
amount of $39,308,305.63 and the codefendants include not only
Mr. Binday and Mr. Resnick, but Mr. Paul Krupit.

You are required to pay a special assessment to the
United States of $400.  The special assessment is due and
payable immediately.  Restitution payments, to the extent not
made immediately, will be deducted from your prison wages at
the rate of $25 per calendar quarter or 50 percent of your
gross monthly earnings if you are assigned to a UNICOR grade
one through four program.

In terms of forfeiture, it is hereby ordered that in
light of the whereas clauses contained in the order I am about
to sign and as a result of the offenses charged in Counts One
through Three of the indictment of which you were found guilty
following the trial by a jury, a money judgment in the amount
of $15,623,737.64 in United States currency shall be entered
against you for which you shall be jointly and severally liable
with codefendant Michael Binday to the extent of $13,522,424.64
and with codefendant Mark Resnick to the extent of $14,315,868.

Pursuant to Rule 32.2(b)(4) of the Federal Rules of
Procedure, this preliminary order of forfeiture and money
judgment is final as to you, Kevin James Kergil.  It shall be

E7ugbins

deemed part of your sentencing and included in your judgment of

conviction.  It is, of course, subject to amendment.

        All payments on the outstanding money judgment shall

be made by postal money order, bank or certified check, made

payable to the United States Marshals Service and delivered by

mail to the United States Attorney's Office for the Southern

District of New York, Attention:  Money Laundering and Asset

Forfeiture Unit, One St. Andrew's Plaza, New York, New York,

10007, indicating your name and case number.

        Upon execution of this order, the United States

Marshals Service shall be authorized to deposit the payment on

the money judgment in the Asset Forfeiture Fund, and the United

States shall have clear title to such forfeited property.

        The Court shall retain jurisdiction to enforce the

order and to amend it as necessary.  And pursuant to Rule

32.2(b)(3) of the Federal Rules of Criminal Procedure, the

United States Attorney's Office is authorized to conduct any

discovery needed to identify, locate or dispose of forfeitable

property.  I'm signing the order at 4:14 p.m. this 30th day of

July, 2014.

        Mr. Stavis, recommendation on the place of

incarceration.

        MR. STAVIS:  Yes.  Actually, I have two

recommendations.  With regard to place of incarceration, I

would ask that your Honor indicate or reflect on the judgment

E7ugbins

```
 1    of commitment a recommendation to the Bureau of Prisons for a

 2    facility nearest to New York, nearest to Westchester County,

 3    New York, where Mr. Kergil resides.

 4              THE COURT:  I will so do.

 5              MR. STAVIS:  The other, as your Honor may recall from

 6    the presentence report, a history of substance abuse for

 7    Mr. Kergil.  I believe it was in the addendum on page 25 where

 8    the probation department was talking about conditions.  The

 9    probation officer said, and I quote, "We believe the defendant

10    may be at risk for future substance abuse."

11              THE COURT:  There's an inconsistency between the

12    probation report and the recommendation where it says "suspend

13    based on low risk of future substance abuse."

14              That is, in fact, not consistent with what appears in

15    the main body of the text of the report.

16              MR. STAVIS:  That's correct, your Honor, but what I

17    want to emphasize is, a person can be sober for a period of

18    time, but when you have this disease, you have it.

19              So based on the drug risk analysis on page 25 and

20    Mr. Kergil's history, I would ask your Honor to indicate on the

21    judgment and commitment a recommendation for any drug programs

22    that the BOP offers that he should be permitted to participate

23    in a drug program.

24              THE COURT:  I have no basis to recommend the 500-hour

25    program, but I'll recommend any other programs.
```

E7ugbins

1          MR. STAVIS:  Finally, your Honor, the probation report

2     referred to Mr. Kergil as a, quote, "good candidate" for

3     voluntary surrender.

4          I would note that when this adjournment occurred, one

5     of the things that Ms. McCallum wrote to the Court is that she

6     was seeking a longer adjournment for Mr. Kergil to wind up his

7     affairs with regard to his mother's care.  The government

8     agreed also to voluntary surrender.

9          I would ask the Court for Mr. Kergil to have an

10    opportunity to surrender at the facility that he is designated

11    to.  I would request that November 4 date as well.

12         THE COURT:  The same surrender date, November 4.

13         MR. STAVIS:  Thank you.

14         THE COURT:  Be seated.

15         Mr. Resnick, under Docket Number 152-03, total offense

16    level of 31, Criminal History Category I, which is also a

17    varying sentence as, by the way, Mr. Kergil's was as well, I

18    hereby sentence you Mark Resnick to be remanded to the custody

19    of the Attorney General of the United States and the Bureau of

20    Prisons for the term of 72 months, to be followed by a term of

21    three years' supervise release.  That's on each count.  All

22    counts to run concurrently.

23         No fine is being imposed.  Restitution joint and

24    severally with Mr. Binday and Mr. Kergil and Mr. Krupit in the

25    amount of $39,308,305.63, and a special assessment of $400,

E7ugbins

1  which is due and payable immediately.

2       The restitution amounts will be deducted from your

3  prison wages at the rate of $25 per calendar quarter or 50

4  percent of your gross monthly earnings if you are assigned to

5  participate in a UNICOR program grade one through four.

6       Ms. Murray.

7       MS. MURRAY:  Yes.  I would ask that you recommend that

8  he be incarcerated at Otisville.

9       THE COURT:  I'll certainly make a recommendation for

10  that, and it is the closest facility for all three of the

11  defendants.  It's also very crowded.

12       MS. MURRAY:  I would also ask for voluntary surrender

13  on the same date.

14       THE COURT:  Voluntary surrender, same surrender date,

15  November 4.

16       Be seated.  Let me talk to all three defendants about

17  the conditions of supervision when you are released.  I forgot

18  the forfeiture.  I apologize.

19       It is hereby ordered in light of the whereas clauses

20  contained in this order and as a result of the offenses charged

21  in Counts One, Two and Three of the indictment in which you

22  were found guilty following a trial, a money judgment in the

23  amount of $14,315,868 in United States currency shall be

24  entered against you for which you shall be jointly liable and

25  severally liable with codefendant Michael Binday to the extent

E7ugbins

of $12,214,565 and with codefendant James Kevin Kergil to the
extent of $14,315,868.

Upon the entry of this preliminary order of forfeiture
and money judgment, the order is final and the judgment is
final as to you Mark Resnick and shall be made part of your
sentence and included in your judgment of conviction.  It is
subject to amendment.

All payments on the outstanding money judgment shall
be made by postal money order, bank or certified check, made
payable to the United States Marshals Service and delivered by
mail to the United States Attorney's Office for the Southern
District of New York, Attention:  Money Laundering Unit and
Asset Forfeiture Unit, One St. Andrew's Plaza, New York, New
York, 10007, include your name and case number.

Upon the execution of this preliminary order of
forfeiture and money judgment, the United States Marshals
Service shall be authorized to deposit payment of the money
judgement in the Asset Forfeiture Fund, and the United States
shall have clear title to the forfeited property.

I retain jurisdiction to enforce this order and amend
it as necessary.  Pursuant to Rule 32.2(b)(3) of the Federal
Rules of Criminal Procedure, upon entry of this order and money
judgment, the United States Attorney's Office is authorized to
conduct any discovery even to identify locate or dispose of
forfeitable property.  I'm signing this order at 4:21 p.m. on

E7ugbins

1    the 30th of July, 2014.

2              The record should reflect that the order of

3    restitution that was included as part of addendum B to the

4    government's supplemental sentencing has been signed.

5              Let's talk about supervised release.  Gentlemen, when

6    you are released, you have 72 hours to report to a United

7    States Probation Officer in this district.  There are at

8    present probation offices down here moving back into this

9    courthouse and in White Plains at the White Plains courthouse.

10   You have 72 hours to report, and you will thereafter report on

11   a regular basis to a probation officer for a period of three

12   years.

13             During that period of time, you will do everything the

14   probation officer tells you to do, and you will refrain from

15   doing anything that the probation officer tells you not to do.

16             The following conditions of supervision are mandatory

17   for all of you:  You shall not commit another federal, state or

18   local crime.  You shall not illegally possess a controlled

19   substance.  You shall not possess any firearm or destructive

20   device for any purpose whatsoever.  You shall cooperate in the

21   collection of DNA, genetic identifying material as directed by

22   your probation officer.

23             You shall obtain and retain legitimate and verifiable

24   employment.  You shall not associate with persons who have been

25   convicted of felonies.  You shall not be found in places where

E7ugbins

1    criminal activity is being planned or carried out.  You shall

2    apprise your probation officer at all times of your address,

3    both your residence and your work address, and you may not

4    change either address without giving advance notice to your

5    probation officer.  If there is an emergency, if there's a

6    fire, if there's a gas leak and you're required to vacate

7    premises, you have 48 hours to notify your probation officer.

8         It is my recommendation that you are supervised in

9    your district of residence.

10        Now, I don't imagine that all of the restitution will

11   have been paid by the time you are released from prison and as

12   a result, you will abide by the following special condition of

13   supervision:

14        You shall provide your probation officer during that

15   three-year period with access to any financial information that

16   the probation officer requests.  You shall not incur any new

17   credit charges or open additional lines of credit without the

18   approval of your probation officer unless you are in compliance

19   with the installment payment schedule, which requires you to

20   make payment on the restitution at the rate of 15 percent of

21   your gross pretax monthly income commencing 30 days after the

22   date of your release from prison.

23        Assuming that the restitution is not fully paid off by

24   the three of you, by the time your periods of supervision are

25   over, you will find that the United States Attorney's Office

E7ugbins

will reduce that to a money judgment, which will subject you to

wage garnishment and the like.

Mr. Binday and Mr. Resnick pose a low risk of future

substance abuse and the mandatory drug testing condition is

suspended.

Mr. Kergil, the recommendation was made by probation

that you be subject to the mandatory drug testing condition,

which means that you will be tested for illicit substances once

upon your release and then twice thereafter at random occasions

at the direction of your probation officer.

It is my recommendation that the defendants be

supervised in their district of residence.  I am not imposing

the warrantless search condition.

Anything else in relation to the sentences that I have

overlooked?

MS. MCCALLUM:  Nothing from the government, your

Honor.

MR. STAVIS:  No, your Honor.

THE COURT:  Michael Binday, James Kevin Kergil, Mark

Resnick, you have a right to take an appeal from the jury's

verdict, the judgment of conviction and the sentence that has

been imposed upon you.

You have a right to counsel in connection with any

appeal that you might choose to file and if you cannot afford

an attorney, one will be appointed to represent you without

E7ugbins

1     charge.

2              Do you understand?

3              DEFENDANT BINDAY:  Yes.

4              DEFENDANT KERGIL:  Yes.

5              DEFENDANT RESNICK:

6              THE COURT:  Thank you.

7              The government technically has a right to take an

8     appeal from the sentences that have been imposed upon you if

9     the government believes them to be unreasonable.  If the

10    government were to elect to file an appeal and you did not do

11    so, you would again have a right to have counsel represent you

12    on appeal and to have a lawyer appointed to represent you if

13    you could not afford to hire one.

14             Do you understand?

15             MS. MURRAY:  Yes.

16             MR. STAVIS:  Yes.

17             MR. FRISCH:  Yes.

18             DEFENDANT KERGIL:  YES.

19             DEFENDANT BINDAY:  Yes.

20             DEFENDANT RESNICK:  Yes.

21             THE COURT:  Thank you.  We have taken care of that.

22             You have an application, counsel.

23             MR. FRISCH:  Yes, it's an application for bond pending

24    appeal.

25             Your Honor certainly knows the standard:  It's clear

E7ugbins

1      and convincing evidence that the defendant is not likely to

2      flee or pose danger, and the appeal raises a substantial

3      question likely to result in reversal.

4              THE COURT:  The problem is, you know that I don't

5      believe number two.

6              MR. FRISCH:  Except that the circuit has interpreted

7      that language as meaning a nonfrivolous claim.  And I think

8      there are nonfrivolous claims here.

9              Understanding that I'm standing before the judge from

10     whose decision we're going to be taking appeal, the respective

11     appellate issues include what we see as nonfrivolous in terms

12     of the theory of the case, the economic harm theory, the

13     insufficiency of evidence of contemplated harm, the fact that,

14     in our view – and this was all litigated before your Honor,

15     obviously unsuccessfully – that the Court's instructions

16     permitted a conviction on a no-sale theory in the way that your

17     Honor discussed what the jury could find with regard to

18     economic harm not limited to loss on the company's bottom line.

19             I know we made these arguments to your Honor.  That's

20     why it's an appeal.  But nonetheless, we believe these are

21     nonfrivolous.  We also believe all of that was exacerbated by

22     comments made by the government in summation which talked about

23     how you do business and what makes sense in doing business

24     which further, in our view, made it worse and authorized the

25     jury to find guilt on something other than the specific, narrow

E7ugbins

1      theory of criminal liability that was advanced.

2              We also believe that the Court constructively amended

3      the indictment by permitting the jury to find economic harm on

4      bases other than those four specific types of economic harm

5      that were identified in the indictment without any language

6      like "including the following but not limited to the

7      following."

8              Again, I understand that these are arguments that your

9      Honor rejected.  That's why it's an appeal, but nonetheless, I

10     believe these are nonfrivolous issues for appeal.  In light of

11     the defendant's complete compliance with the terms of his

12     restriction, we seek bond pending appeal from your Honor and

13     also a stay of the ultimate order of execution pending appeal.

14             THE COURT:  Mr. Stavis, Ms. Murray, I assume you're

15     joining in the application.

16             MR. STAVIS:  I join in the application.

17             MS. MURRAY:  Your Honor, I join in the application.

18             In addition, I believe that Mr. Resnick has additional

19     grounds for reversal here based on the insufficiency of

20     evidence of obstruction with respect to that charge; and also

21     what I consider, which I've argued to your Honor, the improper

22     government testifying to the jury about documents that were

23     obtained by the government in other areas of discovery that

24     were not in the documents that I provided in my production.  So

25     they essentially testified to the jury that there was indeed

E7ugbins

1    destruction of evidence, which was never presented at trial.  I

2    actually think that will be a fairly strong reversal argument

3    for Mr. Resnick.  I also believe that will affect the verdicts

4    on the other convictions that he faced in that case.

5           THE COURT:  Ms. McCallum.

6           MS. MCCALLUM:  The government strenuously opposes bond

7    pending appeal.

8           Regarding, first, Mr. Frisch's principal argument, the

9    Court's instructions to the jury perfectly echoed Second

10   Circuit precedent, even echoing the language from the very case

11   upon which defendants relied so heavily for their economic harm

12   arguments, that's the *United States v. Shellef* case.  There is

13   nothing novel here.  There's no nonfrivolous basis for appeal

14   on that ground.

15          With respect to Mr. Resnick, the Court, as you will

16   recall, issued a curative instruction.  To the extent there was

17   any prejudice posed by or error in the government's summation,

18   it was cured by that instruction.  In any event, that would not

19   impose a standalone basis for bond pending appeal.

20          THE COURT:  I'm not going to issue a bond pending

21   appeal.  I think I telegraphed that in my earlier remarks.  I

22   really do not think that there is a single nonfrivolous issue

23   to be raised on an appeal from these convictions.

24          If you can convince the Court of Appeals that there is

25   something nonfrivolous for the Court to listen to, you are

E7ugbins

1    welcome to make your application there.

2              But as Mr. Frisch noted, these issues have been

3    litigated before me repeatedly.  The evidence of guilt in this

4    case simply is overwhelming, simply overwhelming.  I see no

5    realistic possibility that there is any issue on which the

6    convictions could be reversed *in toto* or even in significant

7    part.

8              That application is denied.  I assume that there will

9    be an application made to the Court of Appeals in due course.

10   There's plenty of time to do that because surrender is not

11   until November.

12             Is there anything else?

13             MS. MURRAY:  As the presentence report notes,

14   Mr. Resnick is at this point indigent.  It does say that he has

15   no money to pay a fine.  He's making no money.  He owes huge

16   debts.

17             At this point, he does not have any money to pay for

18   counsel for appeal, so I'm asking if you would appoint me under

19   the CJA Act so I could do his bail pending appeal motion and.

20             THE COURT:  So appointed.

21             MS. MURRAY:  Thank you.

22             THE COURT:  Anything else from the government?

23             MS. MCCALLUM:  No, your Honor.

24             THE COURT:  From the defendant Binday.

25             MR. FRISCH:  No, your Honor.

E7ugbins

1          THE COURT:  From the defendant Kergil.

2          MR. STAVIS:  No, your Honor.

3          THE COURT:  From the defendant Resnick.

4          MS. MURRAY:  Nothing further.

5          THE COURT:  These proceedings are closed.

6          (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25