USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/2/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA

V.

14 CR 810 (CM)

MARK RESNICK,

       Defendant.

---------------------------------------------------------------x

DECISION AND ORDER GRANTING MOTION FOR COMPASSIONATE RELEASE

McMahon, C.J.:

On October 7, 2013, following a twelve-day jury trial, Mark Resnick and his two co-defendants, Michael Binday and James Kergil, were found guilty of conspiracy to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349; mail fraud, in violation of Title 18, United States Code, Section 1341; and wire fraud, in violation of Title 18, United States Code, Section 1343, in connection with a scheme to defraud insurance companies which the defendants purported to serve as agents. Resnick and Kergil were also found guilty of conspiring to obstruct justice through destruction of records, in violation of Title 18, United States Code, Section 1512(k).

On July 30, 2014, this Court sentenced Binday to 144 months' imprisonment; Kergil to 108 months; and Resnick to 72 months, along with three-year terms of supervised release for each defendant, and substantial forfeiture and restitution. On October 26, 2015, the Second Circuit affirmed the convictions and sentences of Resnick and his co-defendants, directing only a limited remand, at the Government's request, for entry of an amended

1

restitution order in a reduced amount of $37,433,914.17.

Resnick surrendered on July 6, 2016 to begin his term of imprisonment; he has to date served approximately three years and nine months of his six-year sentence. According to BOP's sentence monitoring computation data, as of March 19, 2020, Resnick's projected release date is October 7, 2021, reflecting good-time credit. Computation data from FMC Devens, where he is being held, establishes that as of March 19, 2020, he has served 61.7% of his term of imprisonment.

Before the Court is Resnick's Emergency Motion asking the Court to grant him Compassionate Release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), or to release him to home confinement, allowing him to serve the remainder of his sentence at home. ("Mot."). Resnick requests such relief because he suffers from chronic medical conditions (including diabetes and related end-stage liver disease) that render him particularly vulnerable to COVID-19. Resnick further asserts that, because he is close to meeting the criteria for the BOP's Elderly Reentry Pilot Program, the Court should release him on that basis as well. (Mot. at 2-3).

Resnick asks that he be immediately release to his wife's home in Connecticut, notwithstanding the mandatory 14-day quarantine period Attorney General Barr has put in place for prisoners being released during the COVID-19 crisis (Attorney General William Barr Memo, dated March 26, 2020). Resnick suggests that such quarantine is not indicated for his situation, and that it would subject him to additional unnecessary risk of contracting COVID-19.

Resnick's proposed release plan provides that:

- Mr. Resnick's wife Amy, who lives a little over an hour from the facility, would pick Resnick up in her car.

- She would provide him with an N-95 mask (and will wear the same herself), as well as other personal protective equipment (PPE) to cover him completely during the journey to her apartment.

- Resnick would reside with his wife in their two bedrooms and two bathroom apartment; allowing Resnick to fulfill a decontamination protocol upon arrival, and complete a period of self-quarantine.

(Mot. at 3).

### Compassionate Release Under 18 U.S.C. § 3582(c)

Section 3582(c) begins with the principle that "a court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see also United States v. Goode*, No. 14 Cr. 810 (CM), 2020 WL 58272, *1 (S.D.N.Y. Jan. 6, 2020); *United States v. Israel*, No. 05 Cr. 1039 (CM), 2019 WL 6702522, *1 (S.D.N.Y. Dec. 9, 2019). Prior to the enactment of the First Step Act, a court could not modify a defendant's duly-imposed sentence on compassionate release grounds unless it received a motion from the BOP asking that the court consider such modification. *See, e.g., United States v. Goode*, 2020 WL 58272 at *1 (citing U.S.S.G. § 1B1.13 Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement) (Effective Nov 1, 2006; amended effective Nov. 1, 2007; Nov 1, 2010; Nov. 1, 2016; Nov. 1. 2018)); *Stewart v. United States*, 13 Civ. 5279 (JGK), No. 02 Cr. 395 (JGK), 2013 WL 4044756, *3-6 (S.D.N.Y. Aug. 9, 2013); *United States v. Iosifidis*, No. 13 Cr. 170 (JFK), 2016 WL 3267329, *2 (S.D.N.Y. June 9, 2016).

On December 21, 2018, Congress passed the First Step Act, Pub. L. No. 115-391, which amended 18 U.S.C. § 3582(c)(1) to permit a court to consider a defendant's motion for compassionate release following the exhaustion of his or her administrative remedies with the BOP or 30 days after submitting a request to the appropriate Warden, whichever is sooner:

> The court may not modify a term of imprisonment once it has been imposed except that, . . . the court, upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment...

18 U.S.C. § 3582(c)(1)(A) (emphasis added). The First Step Act did not amend the eligibility requirements for compassionate release, which are set forth in 18 U.S.C. § 3582(c)(1)(A) and Section 1B1.13 of the United States Sentencing Guidelines. The court can only modify a sentence if, "after considering the factors set forth in section 3553(a) to the extent they are applicable," it finds that "extraordinary and compelling reasons warrant such a reduction," 18 U.S.C. § 3582(c)(1)(A)(i); or that the defendant is at least 70 years old and has served at least 30 years in prison, among other things. 18 U.S.C. § 3582(c)(1)(A)(ii). In either case, the proposed reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons exist." U.S.S.G. § 1B1.13 Application Note 1. These include an assessment of the defendant's medical condition and his or her age:

(A) Medical Condition of the Defendant—

> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end- stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>> (I) suffering from a serious physical or medical condition,
>>
>> (II) suffering from a serious functional or cognitive impairment, or
>>
>> (III) experiencing deteriorating physical or mental health because of the aging process,

4

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant – The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

U.S.S.G. § 1B1.13 Application Note 1.

Resnick's motion is predicated on his medical condition, in combination with the present COVID-19 pandemic.

BOP Program Statement No. 5050.50, "Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582, 4205(g)," sets forth the administrative procedures that the BOP follows when considering inmate requests, as well as the substantive criteria used by the BOP to evaluate whether a motion for a sentence modification is appropriate. As is relevant here, an elderly defendant may be considered for a reduced sentenced if the following criteria are met:

(i) Age 65 and older;

(ii) Suffer from chronic or serious medical conditions related to the aging process;

(iii) Experiencing deteriorating mental or physical health that substantially diminishes their ability to function in a correctional facility;

(iv) Conventional treatment promises no substantial improvement to their mental or physical condition;

(v) Have served at least 50% of their sentence.

U.S. Department of Justice, Federal Bureau of Prisons, Program Statement, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582, 4205(g), OPI OGC/LCI, No. 5050.50 (Jan. 17, 2019).

The defendant bears the burden of proving that he is entitled to relief under 18 U.S.C.

5

§ 3582. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010) (same).

**Pilot Program for Eligible Elderly Offenders**

Prior to the enactment of the First Step Act in December 2018, Section 60541(g) of Title 34, United States Code, part of the Second Chance Act of 2007, required the establishment of a pilot program at one or more BOP facilities to evaluate early community re-entry for eligible elderly offenders. The Pilot Program was authorized and funded for 2009 and 2010. 34 U.S.C. § 60541(g)(1)(A), (g)(3) (2014). Section 60541 established minimum requirements for "eligible elderly offenders," *id.* § 60541(g)(5)(A) (2014),[1] but left the decision about which eligible elderly offenders to release to the discretion of the Attorney General in two ways. First, the pilot program was not required to be established at all BOP facilities but only at "a Bureau of Prisons facility." *id.* § 60541(g)(1)(A) (2014). Second, the statute provided that the Attorney General "may release some or all eligible elderly offenders from the Bureau of Prisons facility to home detention," *id.* § 60541(g)(1)(B) (2014), and thus expressly did not require that every eligible elderly offender be placed in home confinement.

As is relevant here, the First Step Act reauthorized and expanded the Pilot Program. Under the First Step Act, the Pilot Program is re-established and funded for the years 2019 through 2023. Pub. L. No. 115-391, § 504(b)(1)(A). In addition, 34 U.S.C. § 60541(g) is modified to provide in relevant part:

> (A) The Attorney General shall conduct a pilot program to determine the effectiveness of removing eligible elderly offenders and

---

[1] An eligible elderly offender was an inmate who was at least 65 years old and had served the greater of 10 years' imprisonment or 75% of his or her release.

eligible terminally ill offenders from a Bureau of Prisons facilities and placing such offenders on home detention until the expiration of the prison term to which the offender was sentenced.

(B) In carrying out a pilot program as described in subparagraph A, the Attorney General may release some or all eligible elderly offenders and eligible terminally ill offenders from the Bureau of Prisons facilities to home detention upon written request from either the Bureau of Prisons or an eligible elderly offender or terminally ill offender.

Pub. L. No. 115-391, § 603; *see also* 34 U.S.C. § 60541(g)(1)(A), (B). The First Step Act further modifies 34 U.S.C. § 60541 to state: "the term 'eligible elderly offender' means an offender in the custody of the Bureau of Prisons – (i) who is not less than 60 years of age; (ii) who is serving a term of imprisonment that is not life imprisonment … and has served 2/3 of the term of imprisonment to which the offender was sentenced…" Pub. L. No. 115-391, § 603; *see also* 34 U.S.C. § 60541(g)(5)(A). The First Step Act did not remove the Attorney General's discretion in determining which eligible elderly offenders or eligible terminally ill offenders to release to home confinement under the pilot program.

BOP Operations Memorandum No. 001-2019, "Home Confinement under the First Step Act," sets forth the administrative procedures that the BOP will follow when considering inmate eligibility for the "Pilot Program for Eligible Elderly Offenders and Terminally Ill Offenders," and the substantive criteria used by the BOP to evaluate eligible elderly offenders. As is relevant here, an eligible elderly offender is defined as an offender in the custody of the BOP:

1) who is not less than 60 years of age;

2) who is serving a term of imprisonment that is not life imprisonment based on a conviction for an offense or offenses that do not include any crime of violence, sex offense, offense under 18 U.S.C. § 2332b(g)(5)(B), or offense under chapter 37 of Title 18, and has served 2/3 of the term of imprisonment to which the offender was sentenced;

3) who has not been convicted in the past of any Federal or State crime of

violence, sex offense, or other offense described in paragraph (2), above;

4) who has not been determined by the Bureau, on the basis of information the Bureau uses to make custody classifications, and in the sole discretion of the Bureau, to have a history of violence, or of engaging in conduct constituting a sex offense or other offense described in paragraph (2), above;

5) who has not escaped, or attempted to escape, from a Bureau of Prisons institution;

6) with respect to whom the Bureau of Prisons has determined that release to home detention under this section will result in a substantial net reduction of costs to the Federal Government; and

7) who has been determined by the Bureau to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention.

U.S. Department of Justice, Federal Bureau of Prisons, Operations Memorandum, Home Confinement under the First Step Act, OPI RSD/RRM, No. 001-2019 (Apr. 4, 2019).

**Covid-19 and the Attorney General's Guidance to BOP**

The world is presently in the grip of a pandemic due to the new coronavirus that causes the viral disease known as COVID-19.

In light of this unprecedented crisis, and while recognizing the ability of the Bureau of Prisons to deal with COVID-19 outbreaks within its facilities, the Attorney General has directed the Bureau of Prisons, when assessing compassionate release applications, to prioritize the transfer of incarcerated inmates to home confinement "where appropriate" to decrease the risks to their health. In assessing which inmates BOP should consider seriously for compassionate release, the Bureau is expected to consider:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers of Disease Control and Prevention (CDC) guidelines;

- The security level of the facility where the inmate resides, with priority given to those residing in low and medium security facilities;

8

- The inmate's conduct in prison;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment;

- Whether the inmates have a verifiable re-entry plan that would prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face at his or her BoP facility; and

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community.

BOP is specifically directed not to grant home confinement when doing so would increase, rather than decrease an inmates risk of contracting COVID-19; it is directed to grant home confinement only when BOP has determined—based on the totality of the circumstances—that transfer to home confinement is not likely to increase the inmate's risk of contracting COVID-19.

The Attorney General's directive is to an institution within the Executive Branch that is under his direct supervision. It has no binding force on the Judiciary. However, it is prudent to consider the factors that the Attorney General finds to be important when a judge is assessing a compassionate release motion directed to his or her discretion.

**Resnick Exhausted His Administrative Remedies in the BOP**

Resnick submitted a request for compassionate release under 18 U.S.C. 3582(c) on or about February 26, 2020. It was not stamped received by the warden's office until March 16, 2020.

The form permits an inmate to check only one box on the form, and Resnick checked the box most promising/applicable to his situation (release of those over 60 who have served 2/3 of their sentence). Resnick's counsel advises in her reply memorandum, filed today, that, "Mr. Resnick was advised by a social worker at the prison this morning that his 'Inmate Request for Compassionate Release Consideration,' handed in person to his counselor on February 26, 2020,

9

has been **denied**, because he does not meet the requirements of the box he checked on the form (for release based on age and service of sentence)."[2]

The Government argues that Resnick motion should be denied for his failure to exhaust his remedies with the BOP. The Government argues that "less than 30 days have elapsed since Resnick's requests for a reduced term of imprisonment were received by the Warden at his Bureau of Prison ("BOP") facility," and as such, "this Court lacks statutory authority to grant Resnick's request to modify his sentence and have him transferred immediately to home confinement pursuant to 18 U.S.C. § 3582(c)." (Gov. Br. at 1).

The Government is wrong.

Resnick filed his request with the warden on February 26, well over 30 days ago. He personally handed it to his counselor, a representation the Government has not disputed. This is typically the only mechanism by which an inmate can communicate with the warden's office. Inmates are not typically handed the keys of the warden's office so they can place their applications for compassionate release on the warden's desk. While the form now contains a stamp indicating that it was "received" on March 16, 2020, the stamped date is not the operative trigger for the 30-day time period under 18 U.S.C. § 3582(c). The statute does not say, "30 days, plus an additional 2.5 weeks until the form is formally accepted by the warden's office." Resnick submitted this to his counselor, the warden's representative.

The situation is analogous to the "prisoner mailbox rule," which provides that an inmate's papers are deemed filed the day that they are signed and given to prison officials for mailing. *See Houston v. Lack*, 487 U.S. 266, 276, 282 (1988) (defining the prison mailbox rule); *see also Hardy v. Conway*, 162 Fed. Appx. 61 (2d Cir. 2006) ("in the absence of contrary evidence,

---

[2] Resnick appears to be three months shy of serving 2/3 of his sentence.

10

district courts in this circuit have tended to assume that prisoners' papers were given to prison officials on the date of their signing"). Applying the prisoner mailbox rule, the counselor's receipt of the document constituted the warden's receipt of the documents.

In the alternative, the Government insists that Resnick has not exhausted because the operative administrative request for Resnick is one submitted on his behalf by his attorney on March 28, which (unlike his February 26 request) relies specifically on his particular susceptibility to COVID-19.

The Government's argument is sheer sophistry. Resnick has exhausted. He submitted a request to the Warden; more than thirty days passed since he did so; the Warden failed to act within those thirty days; so he filed an appeal to this, his sentencing court, as is his right under the First Step Act. That alone was enough. Now we have the new news that his first administrative request was denied on the merits. No more is required.

If the Government is suggesting that this court—which has undoubted jurisdiction because Resnick's original application for compassionated release has been exhausted—cannot take into account things that have occurred since February 26—things that render Resnick's situation even more parlous than it was a month ago, because he has not "exhausted" those grounds, I am again constrained to disagree. I am considering Resnick's situation today. I would be a fool not to consider what has happened in this country in the 35 days since Resnick originally applied for compassionate release.

Moreover, I give the Bureau of Prisons credit for having some modicum of common sense; I do not believe for one minute that BOP was unaware of the rapid deterioration of conditions due to the coronavirus, or that BOP did not have those circumstances in mind as it evaluated Resnick's original request for compassionate release. If it did not, then BOP actually

failed to follow the direct order of Attorney General Barr– who did not make his directive applicable only to compassionate release applications filed after it issued on March 26. Since as far as the court is aware the original application was denied today—April 2—the application was subject to the Attorney General's order. I will assume that the BOP did what it was ordered to do in Resnick's case.

I happen to think that BOP got it wrong.

**Compassionate Release is Warranted**

Mr. Resnick is 65 years old. He has diabetes and end-stage liver disease, making him particularly vulnerable to COVID-19. The BOP has acknowledged as much by placing him on the list of high-risk inmates and moving him from a communal environment to a cell. Given (1) the highly infectious nature of COVID-19, (2) the limitations in a prison environment (even a prison medical center) on practicing the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and (3) the fact that Mr. Resnick suffers from ailments that have already been identified as "high risk," this Court finds that Mr. Resnick's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release. *See* Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), *see* Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Resnick's high susceptibility to COVID-19 falls within the purview of this catchall.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody]

particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . .that the most vulnerable inmates are released or transferred to home confinement, if possible."[3]

Today's ruling is consistent with Attorney General Barr's March 26 directive and with ongoing efforts at the state and federal level to reduce prison population in light of COVID-19, wherever possible and prudent. Releasing a prisoner who is for all practical purposes deserving of compassionate release during normal times is all but mandated in the age of COVID-19.

And any reservations this court may have had about Resnick's being a possible spreader of COVID-19 if released into the community has been assuaged by the release plan he has proffered. Resnick will live with his wife in her apartment in Glastonbury Connecticut. At the request of SDNY Probation, the Probation Department for the District of Connecticut has already inspected and approved the apartment and agreed to take supervision over Resnick's case.[4] As a cancer survivor herself, Amy Resnick takes care to keep her home clean and virus-free. She has taken exceptional measures since the onset of the global COVID-19 pandemic. She lives a little over an hour from Devens FMC. She will drive to the facility to pick up Resnick. She has a two-bedroom apartment with two bathrooms, and so she and Resnick can observe a quarantine protocol on site. She also has access to personal protective equipment

---

[3] https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf
[4] According to Supervisory Probation Officers Ed Johnson from the SDNY and Brian Topor of the District of Connecticut: "Connecticut Probation Officer Enid Largaespada completed a video interview and virtual tour of the home with Mrs. Resnick today and they approve of Mr. Resnick releasing to their district. Due to Mr. Resnick's age, 65, health concerns, which include Type II Diabetes, high blood pressure and cholesterol, his status as a liver transplant patient, along with his low risk as a first time non-violent offender, we do not feel that a condition for home confinement is necessary." SUSPO Topor, concurred. Email to Court dated 4/2/20.

(PPE) that can be supplied to Resnick until he is beyond any quarantine period. In addition, the Resnick's will have the benefit of the guidance and advice from their son, Andrew, an anesthesiologist in Detroit, including PPE equipment that he is sending overnight to his mother.

This environment will be significantly better than Devens FMC, where despite the BOP's best efforts, Mr. Resnick is constantly at risk from contamination both from within and without the prison walls, and where access to PPE for inmates is essentially non-existent.

Accordingly, Resnick is granted compassionate release. He is to be released forthwith. He will be picked up by his wife and driven back to their Connecticut apartment, where he will remain in self-quarantine for 14 days, consistent with the release plan. He must notify the Probation Department for the District of Connecticut upon his arrival at his apartment, and is directed to follow the instructions of the assigned probation officer, as well as the conditions of supervised release imposed at the time of his sentence.

This constitutes the decision and order of the Court

Dated: April 2, 2020

Colleen McMahon
Chief Judge

BY ECF TO ALL PARTIES